UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN LEE ROW<br><br>     Petitioner,<br><br>  v.<br><br>THOMAS J. BEAUCLAIR, Director of the Department of Correction, and BRIAN T. UNDERWOOD, Warden of the Idaho Pocatello Women's Correctional Center, State of Idaho,<br><br>     Respondents. | Case No. 1:98-cv-000240-BLW<br><br>**MEMORANDUM DECISION AND ORDER**<br><br><br>**<u>CAPITAL CASE</u>** |

   The merits of the non-dismissed claims in Idaho state prisoner Robin Lee Row's Second Amended Petition for Writ of Habeas Corpus are currently before the Court. After considering the parties' written and oral arguments, and the record herein, the Court concludes that Row is not entitled to habeas relief, and this case will be dismissed.

**BACKGROUND**

1.   **The Fire**

   On February 10, 1992, Robin Row's husband, Randy, and her two children, Joshua and Tabitha, died from carbon monoxide poisoning while they slept in their upstairs bedrooms during an early morning fire at their duplex on Seneca Street in Boise. Investigators would later conclude that the fire had been intentionally set downstairs with

a flammable substance that likely burned slowly before igniting a much hotter burning

petroleum product. (State's Lodging A-4, pp. 2285-87.) The circuit breaker for the smoke

detector was shut off and the furnace fan was set to run continuously, feeding the flames

and circulating smoke quickly through the home. (*Id*. at 2274-75.)

At the time, Row was staying at the home of her close friend, Joan McHugh, and

she was not harmed. (State's Lodging A-4, pp. 1297-98, 1317-18.) For the previous

several weeks, Row had been telling McHugh and others that Randy was physically

abusing her, which she claimed involved serious beatings, kidnapping, and rape. (*Id*. at

1267-1307.) Row also told her friends that she intended to divorce Randy, and she had

recently moved her possessions out of the family home and into a storage unit. (*Id*. at

1568-69.)

On the night of the fire, Row awakened McHugh around 3:00 a.m. to tell her that

she had "a terrible feeling that there was something wrong at her house." (State's Lodging

A-4, p. 1318.) McHugh agreed to check on the house with Row. As they approached

Seneca Street in Row's car and saw the flashing lights of emergency vehicles, Row told

McHugh that there must have been a fire, even though they could not yet see smoke. (*Id*.

at 1322.) Once they arrived and saw that the house was burning, paramedics informed

Row that her children and husband had been found dead. (*Id*. at 1331-32.)

### 2. The Investigation and Trial

Within days, law enforcement officers learned that Row had lost two other

children under suspicious circumstances, and the arson investigation began to focus on her. (State's Lodging C-17, p. 2.) Officers obtained a search warrant for the burned Seneca Street residence, Row's car, her storage unit, and McHugh's home. Inside the storage unit, they uncovered evidence that Row had been embezzling money from the YWCA, where she had recently worked as the manager of a bingo game. (*Id*. at 2-3.) Officers also found insurance policies on the lives of Randy, Joshua, and Tabitha that totaled over $275,000; Robin Row was the beneficiary of these policies, the last of which had been purchased by her only a few weeks before the fire. (*Id*.)

It soon became apparent that Row's claims of abuse were either largely or entirely fabricated. For instance, there were no official reports of arrests or charges against Randy, and state welfare agents had never been to the home to give Randy tranquilizing shots after domestic disturbances, as Row had claimed. Investigators later discovered that Row had started a new sexual relationship with Joan McHugh's adult son, John Blackwell, in the weeks before the fire. (State's Lodging A-5, p. 2592.)

On February 13, 1992, Row was arrested and charged with grand theft for stealing from the YWCA. (State's Lodging C-17, p. 3.) She was not yet charged with any crimes associated with the suspected arson, but she remained incarcerated because she could not post a bond on the theft charge. (*Id*.) An attorney represented her on that charge.

Row soon began to call Joan McHugh from the county jail. During this time, McHugh was in contact with Ada County Sheriff's Detective Gary Raney, and Raney

suggested that she should secretly tape her telephone conversations with Row. (State's Lodging C-17, p. 3.) She agreed, and the Sheriff's Office provided the equipment for her to do so. (*Id.*)

On March 18, Detective Raney suggested to McHugh that she should lie and tell Row that she woke up early on the morning of the fire and came downstairs to where Row was supposedly sleeping, but that she did not see Row. (State's Lodging C-17, p. 2.) When confronted with this scenario, Row said that she could not remember what she was doing at that time. *Row v. State*, 177 P.3d 382, 386 (Idaho 2008) ("*Row III*").

By March 20, law enforcement officers believed that they had sufficient evidence to charge Row with murder. At about 11:00 a.m. on that date, a deputy prosecuting attorney signed a criminal complaint charging Row with three counts of murder and presented the complaint to a magistrate judge, who issued a warrant for her arrest. (State's Lodging C-17, p. 12.) At 1:00 p.m., the Sheriff and prosecutors held a joint press conference to announce the filing of these charges. (*Id.*)

Row had learned that she was being charged with murder, and she called McHugh at about the same time as the press conference. (State's Lodging C-17, p. 12.) McHugh repeated the story about not finding Row in the home on the night of the fire. This time, Row responded that she had been outside speaking with her psychiatrist. (*Id.*) In a call later that day, McHugh pressed Row about this supposed late night/early morning meeting, but Row refused to say who the psychiatrist was. *Row III*, 177 P.3d at 386.

McHugh finally told Row that she was working with Detective Raney, and their conversations ceased.

Row was arrested on the murder charges the following Monday, March 23, and she made her initial appearance before a magistrate judge that day. (State's Lodging A-1, pp. 3-5.) The attorney who had been representing Row on the grand theft charge continued to represent her on the new charges at the magistrate court level. (*Id*. at 22.) After a preliminary hearing, Row was bound over for trial on three counts of first degree murder and one count of aggravated arson. (*Id*. at 36.) The trial court then appointed the Ada County Public Defender as counsel for Row, and August Cahill and Amil Myshin of that office were assigned to the case. (*Id*. at 36, 48.)

A jury trial was held from late January to early March of 1993, and the jury returned guilty verdicts on all charges. (State's Lodging A-5, pp. 3562-63.)

### 3.   Sentencing

The sentencing hearing began on October 19, 1993. (State's Lodging A-6, p. 3672.) The State chose not to offer any additional evidence in aggravation. (State's Lodging A-6, pp. 3685-86.) Defense counsel Cahill and Myshin presented the testimony of three witnesses, in addition to letters written in support of Row, and Row gave an unsworn statement in court.  (*Id*.)

At the conclusion of the hearing, the trial court found that four statutory aggravating circumstances had been proven by the evidence beyond a reasonable doubt:

(1) Row committed multiple murders at the same time, Idaho Code § 19-2515(g)(2); (2) the murders were committed during an arson, making them first degree felony murders, and were accompanied by a specific intent to kill, Idaho Code § 19-2515(g)(7); (3) the murders were committed for remuneration or the promise of remuneration, Idaho Code § 19-2515(g)(4); and (4) Row exhibited an "utter disregard for human life," Idaho Code § 19-2515(g)(6).

The trial court also found several facts in mitigation, including that Row had endured a difficult and abusive childhood, had shown responsibility in the past, did not have an extensive record of violent crimes, was involved in a mutually abusive relationship with Randy, and suffered from various mental, psychological, and personality problems. (State's Lodging A-2, pp. 423-37.) The court weighed all of the mitigating circumstances against the multiple murder aggravating factor and concluded that mitigation did not outweigh that single aggravating circumstance. (*Id.* at 428-32.) The court declined to engage in a formal weighing assessment for each of the other aggravating factors, concluding that it would be an exercise in futility. (*Id.* at 432.)

On December 16, 1993, the trial court sentenced Row to death for the murder convictions and to twenty years fixed for aggravated arson. (State's Lodging A-2, pp. 413-433.)

### 4.     Post-Conviction and Direct Appeal

Two months after Row was sentenced, Rolf Kehne and John Adams substituted as

conflict counsel for the Ada County Public Defender in the capital post-conviction and appellate proceeding. (State's Lodging A-6, p. 4065.) The trial court ordered the immediate filing of a "tentative or generic" post-conviction petition, as required by Idaho Code § 19-2719, but gave counsel a deadline of 42 days after the trial transcripts were completed to submit a finalized petition. (State's Lodging A-6, p. 4067; State's Lodging B-10, pp. 51, 56.) Kehne and Adams lodged an initial Petition for Post-Conviction Relief on March 17, 1994. (State's Lodging B-10, p. 56.)

Six months passed before the transcripts were finished, but counsel did not file an amended petition by the previously imposed deadline. (State's Lodging B-10, p. 66.) Instead, three months later, they requested another extension of time, which the court granted until June 15, 1995. (*Id*. at 68, 87.) Kehne and Adams also asked that the court appoint an independent "money judge" to review all motions for the appointment of experts. (State's Lodging B-10, p. 73.) The court denied the request for a money judge but left open the possibility that certain motions that contained privileged matters could be reviewed in camera. (State's Lodging B-12, pp. 15-19.)

In March 1995, counsel filed a motion for an order authorizing $5,000 for a "mitigation specialist," which was denied. (State's Lodging B-12, pp. 33-34.) The denial was without prejudice, however, and the court indicated that it was "willing at a future date to take another look at this if a special showing can be made to the Court with specificity, again within the framework and against the backdrop of a UPCPA hearing."

(*Id.* at 34.)

On June 16, 1995, over one year after they had been appointed, Kehne and Adams filed an Amended Petition on Row's behalf, which included claims that Row had been deprived of her right to the effective assistance of trial counsel. (State's Lodging B-10, p. 121-34.) Two weeks later, the court granted, in part, Row's request for limited discovery and set an evidentiary hearing on the Amended Petition for January 8, 1996, some six months hence. (*Id.* at 178-79.)

On the day that the hearing was set to begin, Kehne and Adams requested another continuance to follow-up on an earlier CT scan showing that Row's brain may have atrophied. (State's Lodging B-10, p. 85.) The court denied the continuance, and the hearing proceeded as scheduled. (*Id.*)

August Cahill and Amil Myshin testified about wide-ranging matters related to their representation, with a particular emphasis on the extent of their investigation into mitigating evidence. In an unusual twist, Kehne testified as an "expert" witness, questioned by Adams, and gave his opinion about the reasonableness of trial counsel's investigation. (State's Lodging B-12, pp. 133-177.)

In a Memorandum Decision, the trial court denied all relief. (State's Lodging B-12, pp. 282-297.) On March 18, 1998, the Idaho Supreme Court affirmed Row's convictions, sentences, and the trial court's order denying post-conviction relief. *State v. Row*, 955 P.2d 1082 (Idaho 1989) ("*Row I*").

### 5.       The Federal Habeas Proceeding

Row filed a Petition for Writ of Habeas Corpus in this Court in 1999. The Court

stayed the federal case, at her request, pending the outcome of a second post-conviction

proceeding. That matter was eventually dismissed. *Row v. State,* 21 P.3d 895 (Idaho

2001) (*Row II*).[1]

Row returned to federal court and filed a Second Amended Petition. (Dkt. 293.)

The Court has since dismissed the following claims as either procedurally defaulted or

*Teague*-barred: Claim 7 (in part), 13-20, 23-31, 33, 34, 38-41.  (Docket No. 417, p. 41.)

The Court later denied, in part, Row's Motion for an Evidentiary Hearing, but reserved its

final ruling on whether Row would be entitled to a hearing on her claim of ineffective

assistance of counsel at her capital sentencing hearing. (Dkt. 472.)

The parties submitted final briefing on the merits of the non-dismissed claims and

presented oral argument. (Dkts. 480, 494, 503.) The Court took the matter under

advisement, but determined that an evidentiary hearing was necessary on the limited issue

of post-conviction counsel's diligence in developing the record on the ineffective

assistance of sentencing counsel claim. (Dkt. 509.) The Court then intended to take up

whether Row was entitled to a broader evidentiary hearing on the merits of the ineffective

assistance of counsel claim. (*Id.*) In the interim, however, the United States Supreme

---

[1] Row has since pursued at least two additional successive petitions for post-conviction relief in state court, which have also been dismissed on procedural grounds. *Row v. Idaho*, 177 P.3d 382 (Idaho 2008) (*Row III*).

Court decided *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), casting doubt on whether a hearing would be warranted under these circumstances. The Court ordered the parties to submit supplemental briefing on the *Pinholster* issue, and they have now done so. (Dkts. 538, 539, 542, 543.) For reasons set forth more fully below, the Court concludes that an evidentiary hearing is not necessary, and it will move directly to the merits of all claims.

## LEGAL FRAMEWORK FOR HABEAS REVIEW

The provisions of the Anti-terrorism and Effective Death Penalty Act (AEDPA) are applicable to this case. Under AEDPA, the Court cannot grant relief on any federal claim that the state court adjudicated on the merits, unless the state court's adjudication of the claim:

  1.    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

  2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) has two clauses, each with independent meaning. For a decision to be "contrary to" clearly established federal law, the petitioner must establish that the state court applied "a rule of law different from the governing law set forth in United States Supreme Court precedent, or that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and

nevertheless arrived at a result different from the Court's precedent." *Williams v. Taylor*, 529 U.S. 362, 404-06 (2000).

To satisfy the "unreasonable application" clause, the petitioner must show that the state court was "unreasonable in applying the governing legal principle to the facts of the case." *Williams*, 529 U.S. at 413. A federal court cannot grant relief simply because it concludes in its independent judgment that the decision is incorrect or wrong; the state court's application of federal law must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell v. Cone*, 535 U.S. 685, 694 (2002). Moreover, a federal habeas court's review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

To be eligible for relief under § 2254(d)(2), the petitioner must show that the state court's decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." *Id.*

When the state court has not adjudicated a federal claim on the merits despite the petitioner's fair presentation of the claim, AEDPA deference is unwarranted and the Court's review is *de novo*. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). Under all circumstances, however, state court findings of fact are presumed to be correct, and the petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

# GUILT PHASE/POST-CONVICTION CLAIMS

## The *Massiah* Claim (Claim 1)

In her first ground for relief, Row contends her recorded statements to Joan McHugh should have been suppressed because they were obtained "despite the commencement of formal criminal proceedings, the knowledge that [she] was represented by counsel and [her] request that counsel be present at any further interviews by the State." (Docket No. 293, p. 12.) The Court previously determined that this claim was properly exhausted only to the extent that Row alleged that her right to counsel had been violated under the Sixth Amendment and Fourteenth Amendments. (Dkt. 417, p. 9.) The Court now concludes that she is not entitled to relief on this claim.[2]

### 1.     The Telephone Calls

Row started making calls to McHugh after she had been arrested on the unrelated theft charge, and McHugh taped the calls with the encouragement and assistance of law enforcement officers. *See Row I*, 955 P.2d at 1085. On March 18, she told Row the lie suggested by Detective Raney about not seeing Row on the morning of the fire, and Row initially said that she could not remember what she was doing at that time. *Row I*, 955

---

[2] In her briefing, Row also relies on her Fifth Amendment privilege against self-incrimination. The Court has already determined that Row did not properly exhaust a Fifth Amendment claim. (Dkt. 417, pp. 9-10.) In any event, such a claim would be meritless in light of *Illinois v. Perkins*, 496 U.S. 292, 299 (1990), where the Supreme Court found no Fifth Amendment error when an undercover agent questioned an incarcerated suspect, who spoke voluntarily with the agent, without first giving him *Miranda* warnings. That rule applies squarely to the facts in this case.

Similarly, Petitioner did not properly exhaust an Eighth Amendment claim, and she has offered no argument or authority to support that theory.

P.2d at 1085; *Row III*, 177 P.3d at 386.

Two days later, on March 20, the criminal complaint charging Row with three counts of murder was presented to a magistrate judge, who signed a warrant for Row's arrest. At 1:00 p.m., the prosecuting attorney held a press conference with the Sheriff to announce the filing of the charges. About that same time, Row called McHugh, and McHugh repeated the lie. Row responded that she had been outside speaking with a psychiatrist, whom she refused to name. *Row III*, 177 P.3d at 386. Row was arrested at the jail the following Monday morning, March 23, and she appeared before a magistrate judge.

Row challenged the admissibility of her statements to McHugh in a pretrial motion to suppress. The trial court denied the motion as it pertained to the "psychiatrist statements," and Row's implausible story that she was outside of McHugh's home speaking with a psychiatrist, whom she could not name, early on the morning of the fire was introduced into evidence against her at trial.

During the post-conviction action, Row claimed that her trial counsel were constitutionally ineffective, in part, because they failed to argue that the delay between the issuance of the arrest warrant on March 20 and Row's initial appearance on March 23 was unreasonable. The trial court denied the claim, and the Idaho Supreme Court affirmed on appeal. *Row I*, 955 P.2d at 1091.

Respondents have since conceded that Row also fairly presented and properly

exhausted a claim that McHugh, acting as a state agent, elicited incriminating statements from Row after formal charging in the absence of Row's counsel (a "*Massiah* claim"). (Dkt. 409, p. 12; *see also* Motion Hearing, January 10, 2007.) Although the Idaho Supreme Court's opinion focuses mainly on Row's argument of unreasonable delay, Row must still demonstrate that its denial of relief under any theory is contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable interpretation of the facts in light of the evidence presented in state court. *See Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011) (holding that AEDPA deference applies even to a state court's unexplained and summary denial).

### 2. Clearly Established Federal Law

A criminal defendant has a right under the Sixth Amendment to the assistance of counsel at all critical stages of a criminal prosecution. *Gideon v. Wainwright*, 372 U.S. 335 (1963). The right to counsel does not attach, however, until the initiation of "adversary judicial proceedings," whether by way of formal charge, indictment, information, arraignment, or preliminary hearing. *United States v. Gouveia*, 467 U.S. 180, 187-89 (1984). Adversary criminal judicial proceedings begin only once "the government has committed itself to prosecute, and ... the adverse positions of government and defendant have solidified." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). This occurs, at the latest, when the defendant is brought before a judicial officer at an initial appearance and learns of charges against her. *Rothgery v. Gillispie County, Tex.*, 554 U.S. 191, 213

(2008). The right is also "offense specific," meaning that it cannot be invoked for charges that have not yet been filed, even if the defendant is in custody and has invoked her right on a different charge. *Texas v. Cobb*, 532 U.S. 162, 173 (2001); *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

Once the right to counsel has attached, it then applies to all post-charging interviews with law enforcement officers. *Moran v. Burbine*, 475 U.S. 412, 428 (1986) (citations omitted). The police cannot circumvent the defendant's right after formal charging by using an undercover agent to deliberately elicit incriminating information from the defendant in counsel's absence. *Massiah v. United States*, 377 U.S. 201, 206 (1964).

**3.      Discussion**

It is clear that Row's pre-existing relationship with an attorney on the unrelated theft charge did not confer a Sixth Amendment right to counsel as to the murder investigation and is therefore immaterial to any statements that she made to McHugh before adversary judicial proceedings officially began in this case. *See Cobb*, 532 U.S. at 173. Row made her incriminating "psychiatrist statements" to McHugh, however, a few hours *after* the prosecutor had presented a complaint to a magistrate judge charging her with three counts of murder, but *before* she had been arrested and brought before a magistrate judge for her initial appearance. McHugh was acting as an agent of the police at that time and she elicited the information from Row at Detective Raney's prompting.

The critical issue, then, is whether the Idaho Supreme Court's implicit determination that Row had failed to establish that her Sixth Amendment right to counsel attached before the conversation occurred was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable finding of fact in light of the evidence presented. This Court concludes that it was not.

As an initial matter, the parties appear to disagree about when a complaint was actually filed against Row. Respondents contend that although a complaint was presented to a magistrate judge on March 20, it was not filed with the Clerk of Court until March 23. In support, they point to a copy of a complaint that is included in the lodging of the state court record, which bears a district court file stamp of March 23, 1992 at 10:50 a.m. (State's Lodging A-1, p. 3.) Respondents claim that Row's right to counsel did not ripen under any theory until March 23 at the earliest, after she had made her statements to McHugh. (Dkt. 494, pp. 9-12.)

Row counters that the complaint charging her with murder was filed three days earlier, "at approximately 11:30 a.m. on March 20." (Dkt. 480, p. 59.) The Court finds this interpretation to be consistent with all other parts of the record. As one example, at the post-conviction evidentiary hearing the trial prosecutor admitted into evidence a "probable cause sheet," which he claimed showed on its face that it "was filed on March the 20th, *which is the date the complaint was filed*, 1992, at 11:29 a.m." (State's Lodging B-11, p. 339)(Emphasis added.)

The state courts also assumed that a complaint was active and pending by March 20. In denying post-conviction relief, the trial court noted that Row made her statements to McHugh "shortly after the time the formal Criminal Complaint charging her with Murder I had been authorized by a magistrate judge at the 'probable cause' hearing." (State's Lodging B-11, p. 289.) The court further indicated that prosecutorial officials held a press conference at "1:00 p.m. that afternoon announcing the filing of the criminal complaint," and that Row made her calls "in response to the knowledge that a complaint had just been filed." (*Id.*) The Idaho Supreme Court mirrored the lower court's assessment that the press conference "announc[ed] the filing of a criminal complaint" and wrote that Row had earlier learned that "charges were going to be filed against her." *Row I*, 955 P.2d 1082. This view is further corroborated by the online register of actions from Ada County case of *State v. Robin Row*, Case No. CR-MD-1992-00002056, or M9202056, which reflects the filing of a criminal complaint and an arrest warrant on March 20, 1992. *See* www.idcourts.us/repository. It is therefore apparent that a complaint was "filed" in some recognizable form under state law before noon on March 20.

The greater problem for Row is the absence of clearly established federal law setting out a rule that the filing of a complaint in a criminal matter starts formal adversary judicial proceedings under the Sixth Amendment such that the right to counsel attaches at that time. Although the Supreme Court has drawn a bright line at the defendant's initial appearance before a judicial officer, *see, e.g., Rothgery*, 554 U.S. at 213, it has never

squarely addressed whether the right to counsel can attach before then, and the law in the lower courts is not uniform.

On the one hand, the consensus in the federal courts is that the filing of a criminal complaint in the federal system does not initiate adversary judicial proceedings. *See*, *e.g.*, *United States v. Pace,* 833 F.2d 1307, 1312 ("[w]e hold that Pace's sixth amendment right to counsel did not attach upon the filing of the complaint by the FBI, the issuance of the warrant of arrest, or Pace's arrest"); *see also United States v. Bostic*, 545 F.3d 69, 83 (1st Cir. 2008) (collecting and citing cases). This is so because a complaint in the federal system serves almost exclusively as the means of setting out probable cause to a magistrate judge to secure an arrest warrant. *Bostic*, 545 F.3d at 83. All felony prosecutions then proceed by way of indictment, or, if an indictment is waived, by information. Fed. R. Crim. P. 7.

On the other hand, criminal complaints often carry heavier weight in state prosecutions, and some state courts have concluded that a complaint is a formal charge that triggers the right to counsel under the Sixth Amendment. *See People v. Viray*, 36 Ca.Rptr.3d 693, 708 (Cal. Ct. App. 2005) (holding that "in this state [a complaint] commits the prosecutor to pursue a criminal conviction" and that the right to counsel attaches at that point); *see also State v. Forbush*, 796 N.W.2d 741, 747 (Wisc. 2011) (same). Yet other states take a different view. *See, e.g., Commonwealth v. Holliday*, 882 N.E.2d 309, 325 (Mass. 2008) (reaffirming that "the mere ex parte issuance of a

complaint and arrest warrant by a magistrate does not trigger a defendant's Sixth

Amendment right to counsel").

Given the lack of settled law, the Idaho Supreme Court was free to chart its own

course within the broad parameters outlined by the United States Supreme Court without

running the risk that its judgment would be overturned on habeas review. *See Anderson v.

Alameida*, 397 F.3d 1175, 1180 (9th Cir. 2005) (finding the state court's determination

that "a police inspector filing a complaint seeking an arrest warrant is not a critical stage

that commits the prosecutor to trial" to be a reasonable one). As a result, Row cannot

establish that the state court's rejection of her constitutional claim was contrary to or

involved an unreasonable application of clearly established federal law.

But even if Row were able to overcome the formidable barrier placed in her way

by AEDPA, and she could further show that a Sixth Amendment violation had occurred

in this case, the Court would nonetheless conclude that habeas relief would be

unwarranted because any error did not have a "substantial and injurious effect or

influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637

(1993).

The evidence against Row was circumstantial but very powerful. She was the

named beneficiary on life insurance policies on her husband and children, none of whom

were income producers, with a total payout of over $275,000. The most recent policy had

been purchased a few weeks before Randy, Tabitha, and Joshua died. Row told her

friends and acquaintances elaborate tales of Randy's physical abuse and deteriorating

mental state in the weeks before the fire, none of which turned out to be true, generating

sympathy for herself while providing an explanation for her to leave the family home.

This cover story had the added benefit of offering a reason for Randy to engage in

suicidal or irrational conduct. She had conveniently removed most of her own personal

possessions and moved them into a storage unit, and she had begun a sexual relationship

with another man.

Row's actions on the night of the fire were also incriminating. An early morning

driver saw a car that he later identified as matching Row's car near the Seneca Street

home. Joan McHugh heard someone taking a shower and using the washing machine in

the early morning hours, and Row admitted to McHugh that she had showered and

washed her clothes. Row also awakened McHugh to tell her that she had a strange

premonition or a "terrible feeling" that something was wrong at the Seneca Street house,

and as they were driving there, she exclaimed that the house must be on fire before they

could see smoke.

Row's statement to McHugh that she was outside speaking to a psychiatrist on the

night of the fire was not a confession to the crimes and was incriminating only insofar as

it was an admission that Row was not in McHugh's house at an important time. This

statement, while unfavorable, did not add much weight to the impressive evidence that the

State had already arrayed against her. She has not established that its admission, if

erroneous, had a substantial and injurious effect or influence on the jury's verdict.

## Unreasonable Delay Before Initial Appearance (Claim 2)

In a related claim, Row alleges that the State intentionally delayed bringing her

before a magistrate judge for her initial appearance after the arrest warrant was issued on

March 20. The Idaho Supreme Court concluded that the timing of Row's appearance

before the magistrate judge complied with state and federal law. *Row I*, 955 P.2d at 1082.

In reaching that conclusion, it found that "there was no conscious effort by the State to

delay charging her as a ruse to entice Row to make potentially incriminating statements."

*Id.*

Row relies, in part, on *McNabb v. United States*, 318 U.S. 332 (1943), and *Mallory*

*v. United States*, 354 U.S. 449 (1957), to support her argument that the State failed to take

her before a magistrate judge without unnecessary delay and that her statements taken

during that delay should have been excluded. The so-called *McNabb-Mallory* rule was

adopted by the Supreme Court "in the exercise of its supervisory authority over the

administration of justice in the federal courts." *McNabb*, 354 U.S. at 453. It is not of

constitutional dimension and will not serve as the basis of a claim for relief in a habeas

corpus petition. *Ahlswede v. Wolff*, 720 F.2d 1108, 1110 (9th Cir. 1983).

Row's reliance on *Gerstein v. Pugh*, 420 U.S. 103 (1975), and *County of Riverside*

*v. McLaughlin*, 500 U.S. 44 (1991), is equally misplaced. In each of those cases, the

Supreme Court held that a defendant has a right under the Fourth Amendment to a prompt

determination of probable cause by a judicial officer after a warrantless arrest. *Gerstein*, 420 U.S. at 125; *McLaughlin*, 500 U.S. at 58-59. Here, in contrast, a magistrate judge had found probable cause to support the charges against Row before she was arrested pursuant to a warrant.

This Court recognizes that an unreasonable delay between a suspect's arrest and an initial appearance may still implicate general due process principles, but the record is clear that Row was taken before a magistrate judge within a few hours of her arrest on March 23. The delay between the *issuance* of an arrest warrant and an initial appearance before a judicial officer is immaterial; the time is not marked until a defendant has been arrested and is in custody. At any rate, Row's first appearance occurred regularly on the next business day following the presentment of the complaint to a magistrate (Friday to Monday). And while the decision to charge Row on a Friday without arresting her while law enforcement officers were aware that McHugh and Row were still conversing by phone may raise suspicions about the officers' motives, Row has failed to show that the state court's factual finding that the State did not intentionally delay bringing her before a magistrate judge was unreasonable in light of the evidence presented in state court. 28 U.S.C. § 2254(d)(2).

Finally, for the same reasons expressed related to Claim 1, any constitutional error related to the admission of the statements that Row made to McHugh between the signing of an arrest warrant and her first appearance would not entitle her to habeas relief because

she cannot establish that the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## Ineffective Assistance of Counsel Related to the Motion to Suppress

## (Claim 7, ¶ 80(a)(b))

Row also claims that her trial counsel were ineffective in failing to argue the *Massiah* or unreasonable delay issues properly in a motion to suppress filed with the trial court. The Idaho Supreme Court did not act unreasonably in rejecting these arguments as lacking in merit for the same reasons noted with respect to Claims 1 and 2. *See, e.g.*, *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (holding that the failure to file a meritless motion, or a motion that would not have reasonably changed the outcome, is not ineffective assistance of counsel). Row is not entitled to relief under 28 U.S.C. § 2254(d).

## The Reasonable Doubt Instruction (Claim 3)

Row next challenges the trial court's definition of reasonable doubt in its jury instructions. The Fourteenth Amendment's Due Process Clause requires the State to prove every essential element of the crimes charged beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1971). A jury's instructions will be deemed unconstitutional under the Fourteenth Amendment only when there is a reasonable likelihood that the jury actually understood its instructions, reviewed as a whole, to allow a conviction without proof beyond a reasonable doubt. *Cage v. Louisiana*, 498 U.S. 33, 41 (1990); *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

Row takes issue with a portion of Instruction No. 34:

> The effect of the presumption of innocence, however, is only to place upon the prosecution the burden of proving the defendant guilty beyond a reasonable doubt. It is not required that the prosecution prove guilt beyond all possible doubt. A reasonable doubt is a doubt based upon evidence or lack of evidence and upon reason and common sense – the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt must, therefore, be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it in the most important of his own affairs.
>
> If you have a reasonable doubt as to the guilt of the defendant, you must acquit him. But if, after going over in your minds the entire case, you have an abiding conviction, to a moral certainty, of the truth of the charge, then you are convinced beyond a reasonable doubt, and you should render your verdict accordingly.

(State's Lodging A-2, p. 317.)

According to Row, this instruction "diminished the degree of certainty necessary to convict by equating reasonable doubt with hesitation to act, decision-making in a juror's 'most important ... affairs,' and 'moral' rather than 'evidentiary' certainty." (*Id*. at 81-82.) The Idaho Supreme Court turned aside this claim after concluding that "[t]aken as a whole, the reasonable doubt instruction provided in this case, fairly and accurately conveyed the concept of reasonable doubt ..." (State's Lodging C-17, p. 9.)

In addressing a similar instruction in *Victor v. Nebraska*, 511 U.S. 1 (1994), the United States Supreme Court noted some concern with the phrase "moral certainty," which it indicated may not bring the same archaic meaning to a modern jury (essentially, subjective certitude based on proof beyond a reasonable doubt). Yet the Court still did not

find constitutional error, as it determined that the rest of the instructions provided content to that potentially ambiguous phrase. *Id*. at 14, 21.The jurors were told that they must have an "abiding conviction" of the truth of the charge, which, without reference to moral certainty, correctly states the prosecution's burden of proof and "does much to alleviate the concerns that the phrase 'moral certainty' might be misunderstood in the abstract." *Id*. The Court further approved of language that equated a reasonable doubt with a doubt that would cause "a reasonable person to hesitate to act." *Id*. at 21.

These same qualifying remarks were included in the instructions in the present case, and, as in *Victor*, the requirement that the State had the burden to prove Row's guilt beyond a reasonable doubt based on evidentiary proof was a recurring theme throughout the trial court's instructions. There is no reasonable likelihood that the jury understood that it could find Row guilty in the absence of proof beyond a reasonable doubt.

## Denial of Expert Assistance in the Post-Conviction Matter (Claim 4) and Denial of a Continuance (Claim 6)

In these two related claims, Row contends that the state district court's denial of expert assistance during the post-conviction matter (Claim 4), and the court's denial of her request for a final continuance of the evidentiary hearing (Claim 6), deprived her of her rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.[3]

---

[3] It is unclear what relief Row is seeking on these claims, but the Court assumes that, at most, success would result in a new post-conviction hearing. Generally, errors in a post-conviction proceeding are not of constitutional dimension and are not cognizable on habeas review. *Franzen v. Brinkman*, 877 F.2d 76 (1989). In an abundance of caution, however, the Court will address the merits of these issues.

A state must provide an indigent criminal defendant with the "basic tools of an adequate defense or appeal, when those tools are available at a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971). Applying *Britt*, the Supreme Court later held that, as a matter of due process, an indigent defendant facing a possible death sentence is entitled to the assistance of a psychiatric expert at state expense when his mental state or future dangerousness will be a significant issue in the case. *Ake v. Oklahoma*, 470 U.S. 68, 83 (1985).

Claim 4 fails both because the Supreme Court has never extended the *Britt/Ake* principle to state collateral proceedings and, even if it had, Row has not established that the state court in fact deprived her of adequate funds to pay for expert assistance. It is true that the district court denied Row's request to hire a mitigation expert, but it did so without prejudice to renewal, and Row actually received funding from an unknown source and retained a mitigation specialist, who had been working on the case for several months before the evidentiary hearing. Row never filed a motion for funds to hire a mental health expert, and her counsel did not complain about a lack of funding when he made an offer of proof to the district court in support of the motion for a continuance of the evidentiary hearing. He instead focused on the lack of time to complete the investigation.

Which leads to what appears to be Row's true complaint, that she was deprived of due process of law because the district court denied her a final continuance of the

evidentiary hearing to investigate and develop the mental health evidence. Requests for extensions of time are entrusted to the sound discretion of the presiding judge and are governed by state rules and procedures. To rise to a due process violation, the denial of a continuance must amount to an unreasonable and arbitrary "insistence upon expeditiousness in the face of a justifiable request for delay." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

The Idaho Supreme Court concluded that the district court's denial Row's eleventh-hour request for another continuance was not an abuse of discretion. (State's Lodging C-17, p. 11.) In reaching that conclusion, the Idaho Supreme Court emphasized that "from the date Row filed her application for post-conviction relief on March 17, 1994, to the date of the district court's decision to deny Row's petition for post-conviction relief, March 11, 1996, nearly two full years had passed, and Row had received several extensions of time." (*Id.*)

This was not an unreasonable application of *Unger* or any other clearly established federal law. The district court ordered the filing of a skeletal petition in March 1994, but set a deadline of 42 days after the completion of the jury trial transcripts for Row's counsel to submit a finalized petition. The transcripts were completed six months later, but counsel ignored the court's deadline and, after three months had passed, asked for another extension of an additional five months. (State's Lodging B-10, p. 72.) The court granted that request and set a new date for a finalized petition for June 15, 1995, and

advised the parties that it intended to set a court trial within six months from that date. (State's Lodging B-10, pp. 86-87.)

Counsel filed the petition on June 16, 1995. Attached to the petition was an affidavit from the mitigation specialist that counsel had hired, in which she indicated that she had contacted a neurological expert, and he advised that Row should undergo a full neurological examination. (State's Lodging B-10, p. 154.) Kehne attached his own affidavit, in which he asserted that "we are making arrangements for further testing of [Row]; we are continuing to investigate the issues surrounding the petition and [Row's] background; and we need more time for development of facts." (*Id*. at 148.) At a subsequent hearing, the court granted counsel's request for limited discovery, in part, and set an evidentiary date for January 8, 1996. (State's Lodging B-13, p. 81.) Kehne did not object and instead told that court that "we'll be here, Judge." (*Id*.)

Despite that assurance, on the date that the evidentiary hearing was set to begin Row's counsel requested another continuance of three to five months to complete the mental examination. Kehne admitted that counsel first contacted a psychological expert only two months before the hearing date, and they received his recommendations just a few weeks before the hearing. (State's Lodging B-13, pp. 93-94.) Citing the lengthy timeline of the case, the court remarked that "it is time to move forward" and denied the request. (*Id*. at 111.) At the close of Row's case, counsel again requested a continuance, which was again denied. (*Id*. at 366.)

These facts demonstrate that the district court did not insist on expeditiousness in

the face of a justifiable request for delay. The court had given counsel considerable latitude in investigating and developing claims, well beyond the strict deadlines mandated by Idaho Code § 19-2719, and the post-conviction case had extended to nearly two years when the evidentiary hearing commenced. Even if another judge facing the same facts might have exercised its discretion and permitted yet another three to five month continuance to follow-up on the mental health investigation, this Court cannot say that the state court's decision not to do so was unreasonable.

To the extent that Row relies on the Sixth Amendment right to the effective assistance of counsel to support this claim, the United States Supreme Court has never held that a convicted defendant has a federal constitutional right to the effective assistance of counsel during state collateral proceedings. *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991); *Murray v. Giarratano*, 492 U.S. 1, 7 (1989) (plurality opinion); *Pennsylvania v. Finley*, 481 U.S. 551 (1987); *see also Leavitt v Arave*, 383 F.3d 809, 839 n.39 (9th Cir. 2004); *Bonin v. Calderon*, 77 F.3d 1155, 1159 (9th Cir. 1996); *Moran v. McDaniel*, 80 F.3d 1261, 1271 (9th Cir. 1996). Consequently, Row has not stated a cognizable claim for relief on this theory. *See also* 28 U.S.C. § 2254(i) (ineffective assistance during state post-conviction matters is not a ground for relief). In the absence of controlling Supreme Court authority recognizing a right to the effective counsel in post-conviction matters, moreover, the state court's rejection of this claim cannot be contrary to or involve an unreasonable application of clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

## Denial of Ex Parte Procedures (Claim 5)

Row next asserts that the state district court's refusal to appoint an independent judge (a "money judge") to review requests for investigative and expert assistance in the post-conviction matter, and its denial of an ex parte procedure for submitting such requests, violated her rights under the Fifth, Sixth, and Fourteenth Amendments. In denying relief, the Idaho Supreme Court noted that although the district court disallowed Row's requests for a money judge and ex parte procedures, she was permitted to file a sealed motion for assistance and "in no way 'tipped her hand' to the State" on that motion. (State's Lodging C-17, p. 10.) In that respect, according to the state court, Row had shown no prejudice. (*Id.*)

The United States Supreme Court has not held that the Constitution demands that a post-conviction petitioner be permitted to submit all funding requests to a so-called money judge; the state court was well within the bounds of established federal law to reject that request. Presumably, nothing in the Constitution would prohibit a state from using such a procedure. But nothing requires it, either.

The state court's conclusion that Row had shown no prejudice was also reasonable. Row was permitted to file her motion for funding under seal, and she later hired a mitigation specialist regardless of the district court's ruling on that motion or the procedures that the court intended to use in deciding future motions for funding, which were never filed.

**Failure to Disclose Exculpatory and Impeachment Evidence (Claim 35)**

In Claim 35, Row contends that the prosecution withheld exculpatory evidence, in violation of her right to due process of law under the principles set out in *Brady v. Maryland*, 363 U.S. 83 (1963). Row asserts that "the State withheld from [her] critical information concerning the criminal activities and criminal history of the State's witnesses, Joan McHugh and Bernard McHugh," and that the State "withheld from defense counsel information regarding the facts surrounding the taking and recording of statements made by [Row] to Joan McHugh." (Dkt. 293, p. 65.)

Respondents argue that this claim is procedurally defaulted because the Idaho Supreme Court dismissed the claim as barred under Idaho Code § 19-2179. Because the cause and prejudice analysis for a defaulted *Brady* claim so closely tracks the elements of such a claim on the merits, *see Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), and because the claim lacks merit, the Court finds that it is more efficient to address the issue on its merits.

### 1.     Standard of Law

It is a violation of due process of law for the prosecution to withhold exculpatory or impeachment evidence from the defense that is material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985). A *Brady* claim contains three essential components: (1) the evidence must be favorable to the accused, either because it is impeaching or exculpatory; (2) the prosecution must have withheld the evidence, either intentionally or inadvertently; and (3) the evidence must be

material to guilt or punishment. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is material to guilt or punishment when there is a reasonable probability that the outcome would have been different had the evidence been disclosed. *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *Bagley*, 473 U.S. at 676. The prosecution's suppression of favorable evidence is prejudicial when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Banks v. Dretke*, 540 U.S. 668, 698 (2004). In assessing materiality, a reviewing court must accumulate all of the withheld exculpatory evidence to determine the net effect on the defendant's right to a fair trial. *Kyles*, 514 U.S. at 436-37.

### 2.    Row was Aware of the McHughs' Criminal Histories

Regardless how the information was disclosed, Row's counsel were well aware before trial that Bernard McHugh had felony convictions for issuing checks with insufficient funds and that Joan McHugh had been charged with this same offense but that the charge was later dismissed. These matters were discussed by the parties on several occasions, and defense counsel cross-examined Joan McHugh at trial about the incident that led to the charges. (State's Lodging A-3, pp. 1161-62; State's Lodging A-4, pp. 1197-98, 1381-82, 1459-60, 1463; State's Lodging A-5, pp. 3087-99.) It is unclear what information Row believes was not available to her counsel in advance of the trial. While she hints that the prosecution suppressed evidence of Joan McHugh's more active involvement in Bernard's fraudulent activities, she has come forward with nothing concrete to back up that theory. When a defendant knows the salient facts that comprise

the alleged *Brady* material such that he could use the information effectively in his defense, it cannot be said that his due process right to a fair trial has been violated. *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (citations omitted); *Lambert v. Blackwell*, 387 F.3d 210, 265 (3d Cir. 2005); *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004).

Row also incorrectly claims that Bernard McHugh was a prosecution witness when he was instead called as a defense witness. (State's Lodging A-5, p. 3087-99.) Because Row used Bernard in her case-in-chief, the Court assumes that his testimony was favorable to her in some way, and she has not explained how a more detailed exploration of his criminal record would have created a reasonable probability of a different outcome.

### 3.    Row Knew the Material Facts Regarding the Taping of the Telephone Calls

The second component of Row's *Brady* claim is that the State withheld evidence that Detective Raney and a deputy prosecutor were present when Joan McHugh taped the calls in which Row made her most incriminating statements.

Earlier in this habeas matter, the Court recounted the factual background of this claim and agreed with the Idaho Supreme Court "that Row cannot establish materiality of the [allegedly withheld] evidence because there is no reasonable probability of a different trial or sentencing outcome." (Dkt. 472, p. 10.) This is so because Row and her counsel knew before trial that Detective Raney had suggested to McHugh (1) that she tape the telephone calls and (2) that she lie to Row regarding her whereabouts on the night of the fire, which elicited an incriminating response. These were the critical facts establishing

the State's use of McHugh as a conduit to get to Row, and whether Raney offered his suggestions to McHugh in person, and whether he and a deputy prosecutor were physically present and listening when McHugh queried Row, add nothing of legal significance beyond the already known facts. In addition, as the Court previously noted, it "is unable to find any instance where Raney squarely testified that he was *not* present when the calls were made" such that the new information might have held impeachment value. (Dkt. 472, p. 9.) (Emphasis in original.)

The Court reaffirms its view that the allegedly undisclosed evidence would not have been material to Row's guilt or innocence, or to the trial court's decision to impose a death sentence.

## Prosecutorial Misconduct (Claim 36)

Row alleges "egregious" prosecutorial misconduct because of the prosecutor's "misrepresentations and silence" about various matters. Her primary complaints are that the prosecuting attorney downplayed the severity of Joan and Bernard McHugh's involvement in writing bad checks, failed to prosecute John Blackwell for perjury based on his misleading testimony at a magistrate's inquiry about his sexual relationship with Row, misrepresented the State's involvement in the telephone taping, and misrepresented evidence about a CT scan showing that Row has possible brain atrophy. (Dkt. 480, pp. 49-54.) As with the Claim 35, the Court finds it easier to dispose of this claim on the merits rather than engage in the difficult parsing that accompanies a cause and prejudice analysis.

MEMORANDUM DECISION AND ORDER - 34

The standard for a claim of prosecutorial misconduct on habeas review is a "narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). A prosecutor's comments or actions that may be considered inappropriate under rules of fair advocacy, or even reversible error on direct review, will not warrant federal habeas relief unless the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. To the extent that some of these allegations implicate the prosecutor's duties of disclosure under *Brady*, Row must establish that materially favorable evidence was withheld.

Row's allegation that the prosecutor misrepresented the State's involvement in the taping of he phone calls is meritless for the same reasons given on Claim 35, and the Court will not tread that ground a second time. Likewise, Row has provided no explanation for how the State's discretionary decision not to prosecute John Blackwell for perjury amounts to prosecutorial misconduct or violated her due process rights.

The prosecutor's assertion in the post-conviction matter that "there is nothing to this [brain] atrophy business," was just that, an assertion. Row has offered no evidence that the prosecutor's characterization of what a doctor had told him was prejudicial, particularly because Dr. Craig Beaver testified about the 1993 CT scan at the post-conviction hearing and the district court noted in its written findings that the evidence suggested the lingering possibility of a neurological problem. (State's Lodging B-11, pp. 295-96.) Row's implicit claim that the prosecutor's off-hand remark must have carried

great weight with the court is without support in the record.

The one subject about which the Court partially agrees with Row is that the prosecutor appears to have gone out of his way to downplay the fraudulent check writing activities of the McHughs. In his opening statement, he recast the circumstances of these offenses as the McHughs essentially operating under the mistaken impression that they had money in a bank account. (State's Lodging A-4, p. 1211.) After defense counsel cross-examined Joan McHugh about her involvement, the prosecutor mocked this line of inquiry, calling her "Ma Barker" and eliciting testimony from her that the whole thing was a misunderstanding. (State's Lodging A-4, pp. 1463-65.) A fair interpretation of the record is that the prosecutor characterized the incident as a minor episode that was largely the result of an oversight. Yet the State charged both Joan and Bernard with check fraud, and it prosecuted Bernard to conviction for knowingly passing two bad checks.

Even so, the charges against Joan McHugh *were* dropped, and her "criminal history" consisted of an arrest and dismissed charges. Despite the absence of a conviction, defense counsel was permitted to cross-examine her on the matter to a certain extent, and the jury was aware that some fraudulent activity had occurred. Aside from a detective's hearsay opinion in written documents, Row has pointed to no evidence showing that Joan McHugh had a more active and dominant role in the incident than was portrayed, and she has offered nothing that would cast doubt on the remainder of Joan McHugh's testimony about Row's actions in the weeks leading up to the arson. Incriminating evidence against Row came from many sources other than Joan McHugh, and the State's case was quite

strong. Therefore, whatever else could be said about the prosecutor's decision to spin the facts on this subject, the Court does not find that it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. Row's other allegations that the McHughs received favorable treatment from the State as benefits for their assistance are wholly speculative.

## PENALTY PHASE CLAIMS

### Ineffective Assistance of Counsel at Sentencing (Claim 7)

Row contends that she was deprived of her Sixth Amendment right to the effective assistance of counsel during the capital sentencing proceeding. The Court has dismissed all of Row's claims of ineffective assistance except allegations that her counsel failed to conduct a reasonable mitigation investigation, retain qualified mental health experts, supervise the efforts of those experts that were retained, or advise Row about giving a statement to the court at the sentencing hearing. The Court now concludes that she is not entitled to relief on any of these remaining allegations.

### 1. The Mitigation Case

During the penalty phase, defense counsel presented the testimony of three witnesses, and Row gave an unsworn statement to the sentencing court. Letters were also offered in support of Row.

First, Row's sister, Terry Cornellier, testified about the circumstances of Row's difficult childhood. Their mother and father fought openly and often in front of the children, leading to a divorce when Row was in her early teenage years. (State's Lodging

A-6, pp. 3757-59.) Row's father, with whom she was close, left the family and Row felt abandoned by him. (*Id*. at 3762.) She was not close to her mother, whom Cornellier described as not a loving or nurturing person. (*Id*.) Cornellier testified that she had been sexually abused by a step-grandfather for many years, and that Row had recently admitted to her that she had also been sexually abused by the same man. (*Id*. at 3767-69.)

After her sister testified, Row chose to make a statement to the court. (State's Lodging B-13.) In it, she claimed that "through many hours of intense interviews and hypnosis" she had come to realize that she was not "completely innocent," and, for the first time, she admitted that she was at the Seneca Street residence on the night of the fire. (*Id*. at 2.) She asserted that the fire was intended to cause only minor property damage so that Randy would move back with his family. (*Id*. 3.) Row also admitted that she had been upstairs and had seen Tabitha asleep. (*Id*.)

Defense counsel next presented testimony from a psychologist, Dr. Art Norman, and his assistant, Carla Anderson, regarding Row's mental health and emotional makeup. Dr. Norman found Row's affect to be fixed, flat, and inappropriate in light of the circumstances of this case. (State's Lodging A-6, pp. 3838-40.) He concluded that she suffered from "alexithymia," which he described as a pathological condition that causes a person to be unable to express their emotions or feelings. (*Id*. at 3847.) Dr. Norman delegated much of the interviewing of Row, however, to his assistant, Carla Anderson. (Id. at 3788.) Anderson testified that Row eventually came to express remorse about these events, and that Row had told her that John Blackwell aided or possibly started the fire.

(*Id*. at 3791-92.)

In rebuttal, the State offered the opinion of Dr. Robert Engle, a clinical psychologist, who claimed that "alexithymia" is nothing more than a description of a person's emotional state and is not a formal diagnosis of a mental illness. (State's Lodging A-6, pp. 3925-26.) Dr. Engle interpreted Row's psychological test results as reflecting a person who had an antisocial personality disorder with histrionic, impulsive, dishonest, and manipulative tendencies. (*Id*. at 3921-23.) He also believed that the results showed that she suffered from mild chronic depression. (*Id*. at 3922.)

In assessing the proper penalty, the trial court considered the mitigating evidence. In seven numbered paragraphs in its written decision, it noted the instances of hardship and abuse that Row had suffered during her developmental years. (State's Lodging A-2, pp. 423-24.) It also found that Row did not have a record of violent crimes, possessed some good qualities, and was involved in a mutually abusive and strained relationship with Randy. (*Id*. at 424-25.) With respect to the mental health evidence, the court remarked that it "has no difficulty in referring to Robin Row as mentally ill or having a mental disorder," but not in sense that she was psychotic or could not understand the difference between right and wrong. (*Id*. at 426.) The court instead found that she had an antisocial personality disorder and that she exhibited "alexithymia" as described by Dr. Norman. (*Id*. at 426-27.)

The court weighed all of the mitigating facts against what it determined was the most compelling statutory aggravating factor — that Row had simultaneously committed

three willful and deliberate murders, Idaho Code § 19-2515(g)(2)  — and concluded that "the murders of Randy, Joshua and Tabitha weigh like a boulder over against the pebbles of those mitigating circumstances articulated above." (State's Lodging A-2, p. 430.) The court declined to weigh each of the remaining aggravating circumstances against all mitigating factors, because "[s]uch analysis would amount to nothing more than an exercise in legal futility as the issue of the penalty has already been decided," and it determined that the death penalty was appropriate. (*Id*. at 432.)

### 2. The Post-Conviction Evidence

Row's trial counsel, Amil Myshin and August Cahill, testified extensively at the post-conviction evidentiary hearing.

Myshin claimed that defense counsel had received a wealth of discovery from the State, and that they looked through this material with an eye toward mitigation in the penalty phase, but "a lot of the people that were involved in her life had both good and bad things to say about her." (State's Lodging B-12, pp. 209-11.) Myshin was aware that Row had a "very difficult childhood," was "quite at odds with her mother," and was close to her father "but he was in prison and really wasn't someone you could communicate with." (*Id*. at 211.)

With respect to counsel's decision to offer Dr. Norman's diagnosis of alexithymia, Myshin testified that the defense was searching for any hint of evidence to explain the troubling lack of emotion that Row had displayed throughout the proceeding. (State's Lodging B-12, p. 215.) The defense team had also previously consulted with another

mental health expert, Dr. Craig Beaver, who concluded that Row was a "pathological liar, probably sociopathic, [and] clearly depressed." (*Id*. at 220.) While Dr. Norman did not disagree with Dr. Beaver's general impression of Row's mental condition, defense counsel believed that Dr. Norman's finding that Row suffered from alexithymia would assist them in placing her inappropriate emotional responses in context for the court at the sentencing hearing. (*Id*. at 222-23.)

In his testimony, Cahill confirmed that the defense team had consulted with Dr. Beaver and determined his opinion about Row would not have been helpful. (State's Lodging B-12, pp. 298-99.) Cahill also agreed that Dr. Norman's opinion was not "far off" from Dr. Beaver's opinion, and that counsel limited the scope of Dr. Norman's sentencing testimony to what they believed would be the most favorable to their case. (*Id*.) Cahill conceded that defense counsel did not direct an investigator specifically to get records from Row's past or to go to the many different states that Row had lived. But like Myshin, he claimed that by the sentencing hearing the defense team had nonetheless received numerous institutional records and witness contacts through the discovery process, which included police reports, Randy Row's Veteran's Administration file, California Health and Welfare records, presentence investigation reports from previous criminal cases, and YWCA records. (*Id*. at 300-02.) Myshin and Cahill's investigator also testified that the defense team had received boxes of material on Row, but he admitted that he received no particular instruction targeted toward compiling mitigation evidence, and he personally contacted only a few witnesses from "back east." (*Id*. at 321, 323.)

Both Myshin and Cahill claimed that they were aware of the general nature of the statement that Row intended to give to the court at the sentencing hearing, in which she admitted, for the first time, to being present at the scene of the arson. (State's Lodging B-11, pp. 233, 291.)

The trial court allowed one of Row's post-conviction attorneys, Rolf Kehne, to testify as an "expert" on representing criminal defendants in a capital prosecution. Kehne offered his opinion that Myshin and Cahill's mitigation investigation was deficient because they relied on the discovery process to obtain information about her, and because they failed to investigate all aspects of Row's life history from birth until the present. (State's Lodging B-13, pp. 158-70.) He questioned trial counsel's decisions to use Dr. Norman as an expert witness and to allow Row to make an incriminating statement to the trial court. (*Id*. at 172-73.)

Dr. Beaver was also called to testify about the potential significance of a CT scan that had been taken of Row's brain before the criminal trial in 1993. Dr. Beaver interpreted the radiologist's report of the scan as indicating "two areas of mild atrophy" in the brain with evidence of "more diffuse cerebral cortical atrophy." (State's Lodging B-13, p. 121.) Dr. Beaver claimed that, assuming these findings were correct, they would be considered "neurological findings that can effect behavior and affect." (*Id*. at 121, 122.) To reach a more definitive answer, he suggested that a radiological expert should compare the 1993 CT scan with an earlier, normal scan that was taken of Row's brain in 1991 to determine why the abnormalities appeared in the interim, and that Row should

undergo a complete neuropsychological examination that included an MRI. (*Id.* at 122-23.) When asked if his opinion of Row's personality and mental state had changed in light of the 1993 CT scan, evidence of which he had previously been unaware, he claimed that he would need further information to determine whether Row could have a brain dysfunction that might have contributed to her aberrant behavior. (*Id.* at 130-31.) Some aspects of his opinion might change, but others would probably not. (*Id.*)

In addition to presenting the above evidence, Kehne and Adams requested a continuance of the evidentiary hearing so that they could develop additional mitigating evidence that they believed Myshin and Cahill had failed to present, including the possibility that Row had a brain dysfunction as suggested by the 1993 CT scan. Kehne explained that counsel needed more time to consult with an imagining expert to review the brain scan evidence, and, depending on the outcome of the consultation, counsel intended to follow-up with an MRI. (*Id.* at 91.) Kehne conceded that they first contacted a psychological consultant only two months before the hearing date. (*Id.* at 93.) The court denied the continuance as speculative and because of the significant delays that had occurred up to that point. (State's Lodging B-13, p. 93, 366.)

### 3.    The State Court's Decision

The district court, who had served as the trial and sentencing judge, concluded that Row had not been deprived of her Sixth Amendment right to the effective assistance of counsel. The court noted that it "took into consideration virtually every facet of background information alluded to by Mr. Kehne in one form or another on the basis of

materials and testimony submitted to the Court for its review," and no new compelling evidence had been offered. (State's Lodging B-11, p. 291.) The court found that trial counsel's choices about the witnesses and evidence to present generally fell "within the broad range of strategic and tactical decisions that should not be second-guessed." (*Id*.) It further concluded that counsel's decisions to use Dr. Norman and to allow Row to present here statement to the court were tactical and based on counsel's desire to humanize Row. (State's Lodging B-11, p. 294.) Row's incriminating statement, according to the court, made no difference in its decision to impose a death sentence. (*Id*.)

Finally, the court found the neurological evidence based on the 1993 CT scan and Dr. Beaver's post-conviction testimony to be speculative, but it "defer[ed] to higher judicial authority on this issue and le[ft] open the possibility of filing a successive (second) post-conviction petition pursuant to Idaho Code Section 19-2719(5)." (State's Lodging B-11, p. 296.)

On appeal, the Idaho Supreme Court affirmed. In doing so, it agreed with the lower court's findings and conclusions:

> [C]ounsel did go to great lengths to present evidence from several of Row's friends, Health and Welfare records from the state of California, letters from friends and family, and Veteran's Administration records concerning her husband's previous injuries and the couple's relationship. Counsel was not required to investigate Row's entire life in order to objectively and reasonably present Row's mitigation evidence. Trial counsel's decisions concerning Row's mental health and her allocution statement were strictly strategic and shall not be second-guessed by this Court. Finally, we note that Row has failed to provide a record of any evidence which was not presented by trial counsel,

and thus failing to show prejudice.

(State's Lodging C-17, p. 14.)

### 4. Clearly Established Federal Law

To establish a violation of the Sixth Amendment, a petitioner must show that her counsel's performance was unreasonably deficient and the defense was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984).

The standard for attorney performance in a criminal case is that of reasonably effective assistance, measured under prevailing professional norms. *Strickland*, 668 U.S. at 687-88. In assessing whether the representation fell below an objective standard of reasonableness, counsel's conduct must be viewed under the facts that existed at the time that the challenged act or omission occurred, rather than through the benefit of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

To prove actual prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*. at 694. A reasonable probability is one that is "sufficient to undermine confidence in the result." *Id*.

In a post-AEDPA case, as here, a state court has significant leeway to apply rules of general applicability, such as the rule for ineffective assistance of counsel, to the different fact patterns that come before it. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). The Supreme Court has recently reaffirmed that "[w]hen §2254(d) applies, the

question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S.Ct. 770, 778 (2011).

### 5. Discussion

The state court did not unreasonably apply *Strickland*'s first prong when it determined that Row had failed to establish that her counsel's mitigation investigation and decision-making at the capital sentencing hearing fell below an objective standard of reasonableness. The relevant inquiry is not whether counsel should have presented a certain type of evidence, but whether the investigation supporting counsel's decisions was itself reasonable, measured under prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). A defense attorney's tactical or strategic choices made after an adequate inquiry into the facts and law are virtually unchallengeable under *Strickland*. *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997).

The record before the state court showed that Myshin and Cahill received abundant information in discovery about Row's life history, which was well-documented in the institutional records from the states in which she had lived, and that they were familiar with her background. This included her difficult and impoverished childhood, her estrangement from her mother, and her close relationship with her father. Counsel believed that much of this evidence presented a double-edged sword; many witnesses who had good things to say about Row would also offer damaging testimony about aspects of her character and record. As but one example, Row was initially considered a

success story at the YWCA – rising from homelessness to a position of authority – but she lied to those close to her and embezzled money from the bingo operation. This was a recurring theme throughout her life. Charting a reasonably straight path through that particular thicket was a delicate task that required the exercise of professional judgment, which, under *Strickland*, is not to be second-guessed through hindsight. *See*, *e.g.*, *Wong v. Belmontes*, 130 S.Ct. 383, 389–90 (2009) (taking into account that certain mitigating evidence would have exposed the petitioner to further aggravating evidence).

Regarding the scope of the investigation into Row's mental health, trial counsel first consulted with Dr. Beaver, and Dr. Beaver informed counsel that Row was probably a pathological liar, sociopathic, clearly depressed, competent to stand trial, and not psychotic. (*Id*. at 220.) This opinion lined up fairly well with other mental health opinions and was not helpful to the defense, so counsel retained Dr. Norman to take another look at Row. By then, Cahill and Myshin had personally observed her demeanor throughout the trial and were confounded by her lack of emotion despite the tragic circumstances of the case. To offset this, they decided to steer the mitigation case in a direction that might humanize Row in the eyes of the trial court, so that the court would have something on which to base a life sentence. It is within that context that Dr. Norman's opinion about alexithymia was developed and pursued, and it is immaterial that counsel's strategy was largely unsuccessful once the State effectively unmasked Dr. Norman's "diagnosis" as really nothing more than a description. A defense attorney's actions must be viewed within the context of the factual situation existing at the time, and here counsel faced a

daunting task of compiling a case for life in the face of a very aggravated set of facts and a client who had displayed little emotion.

This holds equally true with respect to trial counsel's decision to allow Row to admit to the court for the first time at the sentencing hearing that she was present when the fire was started, which the state district court noted fell within the "heart and soul of discretionary strategy." (State's Lodging B-11, p. 293.) The Idaho Supreme Court agreed. (State's Lodging C-17, p. 14.) To be sure, this was a risky decision that other attorneys might not have made, but the state court was operating well within *Strickland* in determining that the decision was not an objectively unreasonable decision in light of the circumstances that confronted counsel. The state district court aptly summarized the deficient performance issue by noting, "that counsel could have done <u>more</u> does not mean that they did not do <u>enough</u>." (State's Lodging B-11, p. 288.) (Emphasis in original.)

The Idaho Supreme Court alternatively concluded that Row had not established actual prejudice from any alleged errors that trial counsel may have committed. (State's Lodging C-17, p. 14.) This conclusion was likewise reasonable.

In assessing prejudice, a reviewing court must weigh the evidence in aggravation against the totality of the available mitigating evidence, including that which was not presented at the sentencing hearing. *Wiggins*, 539 U.S. at 534. On the aggravating side of the balance, the trial court found that four statutory aggravating circumstances had been proven beyond a reasonable doubt. Of these, the court detremined that the multiple murders aggravator to be by far the weightiest. (State's Lodging A-1, p. 429.)

The court considered several mitigating circumstances unique to Row, including that she endured a difficult and violent childhood that included physical and emotional abuse, that she had some good qualities and traits, that she was in a mutually abusive relationship with Randy, and that while she was not psychotic she did suffer from mental instability and emotional problems. (State's Lodging A-1, pp. 423-27.) The court was not persuaded that the cumulative weight of these mitigating factors ("pebbles") came close to outweighing the multiple murder aggravator (a "boulder"). (State's Lodging A-2, p. 430.)

"[A] penalty phase ineffective assistance claim depends on the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004). The discrepancy before the state court was not large. Though post-conviction counsel made much of the fact that Myshin and Cahill relied largely on the discovery process to obtain documents and information about Row's background, post-conviction counsel did not offer anything new or compelling that trial counsel had missed. The state district court remarked that it had already considered almost all of the background information that Row alleged should have been uncovered when it assessed the appropriate penalty. (State's Lodging B-11, p. 291.) In a similar vein, it found that Row's statement in allocution had no effect on its decision to impose a death sentence. (*Id*. at 295.)

Admittedly, the CT scan suggesting that Row's brain may have atrophied caused

the district court some concern, and it appears that trial counsel failed to present this evidence to Dr. Beaver or Dr. Norman. When Dr. Beaver was questioned about the evidence, he indicated that aspects of his earlier opinion might need to be modified depending on the results of a new neurological evaluation. In denying post-conviction relief, the court noted Dr. Beaver's testimony but found that the inquiry was nonetheless "speculative and suppositional" and did not warrant yet another delay in the case. (State's Lodging B-12, pp. 295-96.) In affirming the lower court, the Idaho Supreme Court did not discuss the significance of the evidence. At best, then, the record before the state court revealed that Row might have mild brain atrophy, which in turn might have informed Dr. Beaver's opinion in some respects but not others, and a conclusive opinion one way or the other was missing. As a result, the state court acted well within the bounds of *Strickland* in finding that there was no reasonable probability of a different outcome even if this speculative evidence had been added to the mix of mitigating evidence.

Row has not shown that the state court's adjudication of this constitutional claim was contrary to or involved an unreasonable application of *Strickland* and its progeny, or that it was based on an unreasonable determination of the facts in light of the evidence presented in state court. 28 U.S.C. § 2254(d).

### 6.     The Court Will Not Hold an Evidentiary Hearing

In an attempt to avoid this result, Row asks the Court to consider new evidence that she has proffered in this habeas proceeding and she seeks an evidentiary hearing, primarily to establish that she has a brain dysfunction that her trial counsel failed to

uncover. She also contends that the evidence of childhood abuse and deprivation, though mentioned at sentencing, was not fully developed.

The Court reserved its final ruling on whether it would grant this request. (Dkt. 472, pp. 12-14.) After the parties submitted oral argument on the merits, the Court decided to set an evidentiary hearing on the preliminary question of post-conviction counsel's diligence in pursuing this claim in state court. (Dkt. 509, p. 1.) At the time, the Court understood AEDPA, and specifically 28 U.S.C. § 2254(e)(2), as prohibiting an evidentiary hearings in federal court, absent two narrow exceptions, *unless* the petitioner could show that she had exercised reasonable diligence in developing the claim in state court. Once diligence was established, the petitioner would be entitled to an evidentiary hearing if she could show a colorable claim for relief on the merits.

The United States Supreme Court has recently clarified this issue and reaffirmed that when a state court has adjudicated a federal constitutional claim on the merits in a habeas case that is governed by AEDPA's standards, "review [of the claim] under § 2254(d)(1) is limited to the record that was before the state court." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011). New evidence developed in federal court is irrelevant to that determination, and whether the petitioner exercised reasonable diligence in state court – a pertinent question under § 2254(e)(2) – is not a part of the analysis. *See Pape v. Thaler*, 2011 WL 2476437 at *3 (5th Cir. 2011) (noting that "§ 2254(e)(2) [is] not applicable to § 2254(d)(1) petitions"); *cf. Pinholster*, 131 S.Ct. at 1417 (Sotomayor, J., dissenting) (interpreting the majority's rule as creating a "potential bar to federal habeas relief for

diligent petitioners who cannot present evidence to a state court.").

A federal court's focus when reviewing claims adjudicated on the merits by the state court must be trained on § 2254(d), not § 2254(e)(2), and is limited in scope to the same record that was before the state court. Row notes correctly that *Pinholster* did not squarely resolve whether district courts are prohibited from *ever* choosing to hold an evidentiary hearing before reaching the § 2254(d) question. But this Court is convinced that, absent unusual circumstances not present here, it would be contrary to AEDPA's core purposes of comity and reducing delay to hold an evidentiary hearing to develop evidence that the Court is prohibited from considering until a petitioner has either survived § 2254(d) review, or has shown that the statutory provision is not applicable. Because Row has not cleared that hurdle, her request for an evidentiary hearing on the merits is denied, and a hearing on the preliminary diligence issue is now moot.[4]

### Relying on the Jury's Verdict to Find the Multiple Murder Aggravator (Claim 8)

In this claim, Row argues that the trial court unconstitutionally abdicated its duty as sentencing factfinder by relying on the jury's guilty verdicts on three counts of first

---

[4] Notably, Row does not claim that the state court failed to adjudicate this claim on the merits, removing the claim from § 2254(d) review. Nor could she, as the record shows that Row raised a claim of ineffective assistance of sentencing counsel in state court, had an evidentiary hearing on that claim, and it was denied as meritless. In addition, while the diligence question is no longer relevant, the Court seriously doubts that Row and her post-conviction counsel were diligent in developing all of the evidence that she now claims supports the claim. Despite her assertion that her post-conviction counsel were hamstrung by a lack of time and resources, the record shows that they eventually obtained funds from an unknown source, were able to hire a mitigation specialist several months before the evidentiary hearing, and later consulted with a mental health expert. That counsel waited to consult with a psychological expert until very near the beginning of the evidentiary hearing, nearly two years after counsel entered the case, speaks more to a lack of diligence than any fault that can be attributed to the State.

degree murder to find that the multiple murder aggravating circumstance was proven beyond a reasonable doubt. (Dkt. 293, p. 52.)

As Row indicates, the trial court noted that the "verdicts themselves" establish the multiple murder aggravator as "a matter of law," but the court also independently reviewed the evidence and found that Row had committed more than one murder at the same time. (State's Lodging A-2, pp. 415-16.) Specifically, the court wrote that the verdicts "are fully supported by the evidence beyond all reasonable doubt," and it expressed its "full agreement" with the jury's view of the evidence and its judgment. (*Id.* at 416.) Therefore, Row's claim that the trial court did not make an independent determination of the facts is incorrect.

Moreover, Row has cited no clearly established federal law, and this Court is aware of none, that would prohibit the sentencer from referring to the jury's verdict when that verdict necessarily included findings beyond a reasonable doubt that would establish an aggravating circumstance. The cases that she does cite – *Creech v. Arave*, 947 F.2d 873 (9th Cir. 1991), *Clemons v. Mississippi*, 494 U.S. 738 (1990), *Cartwright v. Maynard*, 822 F.2d 1447 (10th Cir. 1987) – address when a death sentence must be vacated if the weighing process is corrupted by an invalid aggravating factor and are not relevant to the question at hand.

Row has not carried her burden to show that the state court's rejection of this claim was contrary to or involved an unreasonable application clearly established federal law as

determined by the United States Supreme Court.[5]

## The Utter Disregard Aggravator (Claim 9)

Row next contends that the trial court impermissibly based its finding that she had exhibited an utter disregard for human life solely on her status as a mother. (Dkt. 293, p. 35.) Again, the Court does not share Row's narrow view of the trial court's findings.

The Idaho Supreme Court has determined that the "utter disregard" aggravator is meant "to be reflective of acts or circumstances surrounding the crime which exhibit the highest, utmost callous disregard for human life, i.e., the cold-blooded, pitiless slayer." *State v. Osborn*, 631 P.2d 187, 201 (Idaho 1981). In upholding this construction against a vagueness challenge, the United States Supreme Court declared that a "cold blooded, pitiless slayer" is one who kills "without feeling or sympathy," and that a sentencer can find this fact objectively based upon the defendant's "attitude toward his conduct and his victim." *Arave v. Creech*, 507 U.S. 463, 475 (1993).

Here, the trial court found that Row's "lack of conscientious scruples against the killing of her natural-born, pre-adolescent, innocent and helpless children, along with her husband, catapult this case into the heightened dimension of utter disregard for human life as defined by the Idaho Supreme Court." (State's Lodging A-2, p. 423.) The court remarked that "[m]aternal 'pedocide' – the killing of one's own children – is the

---

[5] The Court previously determined that this claim has been properly exhausted under the principles in *Beam v. Paskett*, 3 F.3d 1301, 1306-07 (9th Cir.1993) (holding that the Idaho Supreme Court expressly or implicitly reviews all claims within the scope of Idaho Code § 19-2827). Because the Idaho Supreme Court at least implicitly rejects all "*Beam* claims" on their merits, it is entitled to AEDPA deference as to those claims.

**MEMORANDUM DECISION AND ORDER - 54**

embodiment of the cold-blooded, pitiless slayer – a descent into the blackened heart of darkness." (*Id.*)

This Court has little doubt that it would be questionable to impose a death sentence solely because of the defendant's status as a mother or as a woman, without regard to whether that status had any nexus to the charged crimes, but that is not what occurred in this case. Rather, the dispositive facts for the trial court were that Row, a mother, killed her own young children in a cold, calculated, and violent manner, seemingly without feeling or sympathy. It was her attitude toward her conduct and her victims that established the aggravator, not her status.

More important, the trial court did not weigh the mitigating circumstances against this aggravating fact, choosing instead to rely exclusively on the multiple murder aggravator. Any error in the utter disregard aggravating factor had no effect on the outcome, and will not serve as a basis for habeas relief. *Pizzuto v. Arave*, 280 F.3d 949, 970-71 (9th Cir. 2002).

**Sufficient Evidence Supported the Utter Disregard Aggravator (Claim 10)**

Row also challenges the sufficiency of the evidence supporting the utter disregard aggravating factor. This claim fails for similar reasons.

When a petitioner alleges that an aggravating factor is unsupported by the evidence, a reviewing court must decide whether, after viewing the evidence in a light most favorable to the prosecution, "any rational trier of fact could have found the aggravating factor beyond a reasonable doubt." *Lewis v. Jeffers*, 497 U.S. 764, 781 (1990)

(emphasis in original).

Ample evidence beyond Row's motherhood supported the trial court's finding. She started the fire in the early morning hours while Randy, Joshua, and Tabitha slept upstairs in their bedrooms. The fire was well-planned and executed to deadly effect. The circuit breaker to the smoke alarm was shut off or tripped and the exhaust fan was set to run continuously, feeding the smoke and flames throughout the house without warning. Row used a quick and hot burning petroleum product. She stood to gain financially from the deaths of the three victims and had lied about Randy abusing her in the weeks leading up to the arson. Collectively, these are the acts of a cold blooded, pitiless slayer, someone who kills without feeling or sympathy.

Also like the last claim, any error in an aggravator that was not included in the weighing calculus would be harmless and would not provide a basis for upsetting Row's death sentence on habeas review. *Pizzuto*, 280 F.3d at 970-71.

### Weighing of the Aggravating and Mitigating Circumstances (Claim 11)

Row alleges that the trial court erred when it chose to discontinue weighing aggravating and mitigating circumstances after it had concluded that all of the mitigating evidence did not outweigh the multiple murder aggravating circumstance. Row argues that state law, specifically Idaho Code § 19-2515(c), required the trial court to weigh all mitigating circumstances against each aggravating factor individually and that the court had no discretion to forgo that process.

In *State v. Charboneau*, 774 P.2d 299 (1989), the Idaho Supreme Court construed

Idaho Code § 19-2515(c) as requiring district courts to weigh all mitigating evidence collectively against each aggravating circumstance individually, rather than weighing all mitigation against all aggravating factors. *Id*. at 323. In the present case, however, the Idaho Supreme Court found no error in the lower court's decision to weigh all collective mitigation against the single multiple murder aggravator and to then stop the formal weighing process at that point, which is a question that was not addressed by *Charboneau*. Whether the Idaho Supreme Court correctly interpreted and applied state law does not present a cognizable claim on which relief may be granted. *Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir.1994); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions").

Still, Row argues that the failure of the trial court to engage in the total weighing process deprived her of her right to automatic review of a complete record on appeal under Idaho Code § 19-2827. In support, she cites *Parker v. Dugger*, 498 U.S. 308 (1991), but that case only addresses whether a state appellate court may reweigh aggravators and mitigators, when an aggravating circumstance has been stricken as invalid, to determine whether the error was harmless. In this case, the Idaho Supreme Court did not strike any aggravator, and *Parker* is inapplicable. *Gardner v. Florida*, 430 U.S. 349 (1977), also does not help Row, because there is no indication in this case that the trial court relied on secret or confidential information that Row had no opportunity to explain or deny.

The Court also fails to see how Row was prejudiced or harmed by any alleged technical error. The existence of a single aggravating circumstance, found beyond a reasonable doubt, is sufficient to warrant a death sentence under Idaho law unless the collective weight of the mitigating circumstances outweighs the single aggravator such that the death penalty would be unjust. Idaho Code § 19-2515(c),(e). Even if Row were correct that the trial court erred in failing to weigh all mitigation against each aggravator that it had found, its decision to impose a death sentence on the multiple murder aggravating factor would stand undisturbed.

### The Utter Disregard Aggravator is not Unconstitutionally Vague (Claim 12)

Row next contends that the utter disregard aggravator should be struck down as unconstitutionally vague.

To minimize the risk of wholly arbitrary and capricious infliction of a death sentence, states seeking to impose the death penalty must sufficiently narrow the sentencer's discretion. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 189, 206-207 (1976). A state's death penalty "system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing . . . could occur." *Id.* at 195 n.46. Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes assert that the challenged provision fails adequately to inform sentencers of what they must find to impose the death penalty. *Maynard v. Cartwright*, 486 U.S. 356, 361-62 (1988).

The United States Supreme Court has already held, in *Arave v. Creech*, that the Idaho Supreme Court's interpretative gloss on the unadorned statutory "utter disregard" aggravating circumstance survives a vagueness challenge. 507 U.S. at 475. Row acknowledges *Creech* but contends that the Idaho Supreme Court's later varying applications of this aggravating circumstance have so muddied the waters as to inject vagueness or overbreadth back into the calculus. Row's argument is unavailing because the state trial court applied the precise definition that the *Creech* Court affirmed. Even if the utter disregard aggravator were constitutionally infirm, it had no affect on the outcome in this case because the trial court found that the death penalty was supportable on the multiple murder aggravator alone.

## Alternatives to the Death Penalty (Claim 21)

Row asserts that the state district court failed to consider non-capital sentencing alternatives before imposing a death sentence. Although she has cited United States Supreme Court cases, none of those cases stand for a constitutional principle that a state sentencing body must consider such alternatives. This is either solely a state law claim that is not reviewable in a federal habeas proceeding, *see Estelle*, 502 U.S. at 67-68, or, if cognizable, it does not provide an entitlement to habeas relief because there is no clearly established Supreme Court authority that requires the consideration of sentencing alternatives.

In any case, the trial court did consider sentencing alternatives short of death, at least implicitly, as part of its reasoning. The only other realistic possibility was a sentence

of life sentence in prison, but the court found that a "fixed life sentence would simply not achieve the theoretical punishment/retribution goals posited above." (State's Lodging A-2, p. 432.) This language shows that the state court did not believe that a life sentence, or anything short of that, would be an appropriate disposition of the case.

## Consideration of Row's Mental Condition (Claim 22)

For her next claim, Row asserts that the trial court "failed to consider her mental illness as a mitigating factor under the sentencing guidelines of Idaho Code 19-2523." (Dkt. 480, p. 75.) She contends that the failure to follow this statutory provision deprived her of her Eighth and Fourteenth Amendment rights.

Under Idaho Code § 19-2523, "[e]vidence of mental condition shall be received, if offered, at the time of sentencing of any person convicted of a crime." The trial court must then review a number of factors, including the extent to which the defendant is mentally ill, the degree of illness or defect and the level of functional impairment, and the prognosis for improvement or rehabilitation, among others. *Id*. The Idaho Supreme Court has interpreted the statute as not requiring a sentencing court to recite each of the factors expressly, so long as the record shows that the court adequately considered the substance of the factors in arriving at its sentencing decision. *State v. Strand*, 50 P.3d 472, 476 (Idaho 2002); *Hollon v. State*, 976 P.2d 927 (Idaho 1999).

This issue – the extent to which the trial court complied with Idaho Code § 19-2523 – is govern solely by state law, and this Court is not persuaded by Row's effort to turn it into a federal constitutional claim. In attempting to do so, she relies on *Hicks v.*

*Oklahoma*, 447 U.S. 343 (1980). That reliance is misplaced.

In *Hicks*, the jury was instructed that it was required to impose a 40-year prison sentence under Oklahoma's recidivist statute. 447 U.S. at 344-45. The statute was later struck down as unconstitutional, but the state appellate court refused to vacate Hicks's sentence. *Id*. at 345. The Supreme Court found a due process violation and reversed, holding that the defendant had "a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion." *Id*. at 346. According to the Supreme Court, Oklahoma had denied the defendant "the jury sentence to which he was entitled under state law, simply on the frail conjecture that a jury might have imposed a sentence equally as harsh as that mandated by the invalid habitual offender provision." *Id*. "Such an arbitrary disregard of the petitioner's right to liberty," the Court held, "is a denial of due process of law." *Id*.

*Hicks* did not alter the basic rule that a federal habeas court does not sit as an expositor of state law or as an appellate court of last resort on state law issues. *See*, *e.g.*, *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011). In *Hicks*, there was no dispute that the defendant had been sentenced under an unconstitutional statute; the only issue was whether the state appellate court's finding that he had suffered no prejudice implicated his federal due process rights. *Id*. at 346. The Supreme Court determined that it did because the defendant was deprived of his right to have the jury exercise its discretion in sentencing him and because of the significant possibility that, had it done so, his sentence could have been short as ten years. *Id*. at 346-47. Only extreme deprivations of a state

created right such as this, infecting the integrity of the entire proceeding, implicate a defendant's due process rights. *See, e.g.*, *Estelle*, 502 U.S. at 72. Unlike *Hicks*, no state court has found that Row was deprived of a right to which she was entitled under state law, and her claim of error does not rise to the level of a federal constitutional issue.

It is also clear from the trial court's written decision imposing the death penalty that it thoroughly considered Row's mental condition when assessing the appropriate sentence. The court listed, as "facts and circumstances found in mitigation," Row's "Mental, Psychological and Personality Problems." (State's Lodging A-2, p. 426.) The court had no difficulty finding that Row had a "mental disorder" but not in the sense that she was psychotic or failed to know the difference between right and wrong. (*Id.*) It also found that she had an "antisocial personality disorder, evidenced by poor impulse control, lack of empathy, manipulative [sic], a pathological liar, somewhat paranoid with a histrionic personality style, suffering also from chronic depression. (*Id.* at 426-27.) According to the court, Row's mental and emotional make-up caused her to be unhealthily dependent in relationships, and the court discussed her "alexithymia," which "may be related to some organic problem with brain functioning," that was manifested as a severe disconnection with her feelings. (*Id.* at 427.)

During the explanation of its weighing process, the court further noted that Row's alexithymic condition may explain Row's ability to cope emotionally with her crimes, but "provides no justification to outweigh the gravity of [the multiple murder] aggravating circumstance." (State's Lodging A-1, p. 429.) The court later mused whether Row's

ability to block out her feelings of guilt and remorse would render a life sentence insufficient to serve the ends of justice. (*Id*. at 432.)

This Court concludes that Row has not stated a federal claim on which relief may be granted. In the alternative, Row was not deprived of any state created liberty interest because the state trial court considered her mental condition before imposing sentence.

**Consideration of Row's Mental Illness as an Aggravating Factor (Claim 32)**

In a related claim, Row contends that the trial court used her mental condition as a non-statutory aggravating factor rather than solely as evidence that mitigated the punishment, in violation of her rights under the Eighth and Fourteenth Amendments.[6]

Row is correct that she had a constitutional right to have the sentencer consider all relevant evidence that may call for a sentence less than death, but the Constitution does not demand that the factfinder place any particular weight on the evidence that is offered. *Eddings v. Oklahoma*, 455 U.S. 104, 114-115 (1982). The trial court in this case considered the evidence that Row put forward, and it listed her mental, psychological, and personality problems as a mitigating circumstances. (State's Lodging A-2, pp. 426-28.)

While the court also mused on, among other things, whether Row's ability to block any feelings of guilt or remorse would render a sentence of life in prison an insufficient punishment for her crimes, Row has cited no clearly established law that prohibited it from considering the evidence in that manner. True, the court also found that non-

---

[6] Row also alleges that the Idaho Supreme Court "abdicated its review responsibilities to conduct a constitutionally adequate appellate review" (Dkt. 480, p. 80), but the Court is unable to discern the nature of this allegation and will not speculate.

statutory aggravating factors existed in this case, but so long as the sentencer's discretion is sufficiently guided to comply with the Eighth Amendment's narrowing requirement, "nothing in the Constitution limits the consideration of non-statutory aggravating factors." *Babbitt v. Calderon*, 151 F.3d 1170, 1178 (9th Cir. 1998) (citing *Barclay v. Forida*, 463 U.S. 939, 956 (1983).

### *Estelle* Violation (Claim 37)

For her final non-dismissed claim, Row argues that her constitutional rights to remain silent, not be compelled to incriminate herself, and to have legal counsel were violated during the presentence investigation. This claim lacks merit.

In *Estelle v. Smith*, 451 U.S. 454 (1981), the United States Supreme Court held that a criminal defendant, who neither initiates a psychiatric examination nor attempts to introduce psychiatric evidence, has a right under the Fifth Amendment not to be compelled to answer a psychiatrist's questions if his answers may be used against him at trial or sentencing proceeding. *Id*. at 468. The Court further held that a criminal defendant has a Sixth Amendment right to consult with an attorney before submitting to such an examination. *Id*. at 469-71. The Ninth Circuit has extended the reasoning in *Estelle* to include a Fifth Amendment privilege against self-incrimination, and a Sixth Amendment right to the advice of counsel, during the presentence investigation stage of a criminal case. *Jones v. Cardwell*, 686 F.2d 754, 756 (9th Cir. 1982) (Fifth Amendment); *Hoffman v. Arave*, 236 F.3d 523, 538-40 (9th Cir. 2001) (Sixth Amendment).

Because *Estelle* has not been extended by the Supreme Court beyond psychiatric

examinations to include all presentence investigations, Row is unable to show that the Idaho Supreme Court's implicit rejection of this claim is contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The Ninth Circuit's decision to extend *Estelle* in pre-AEDPA matters is immaterial.

Furthermore, Row did not make any incriminating statements about the crimes for which she was prosecuted during the presentence investigation, and she chose to waive any privilege that she may have had when she made a statement concerning that topic at the sentencing hearing. Though Row submitted a written version of her childhood and life history to the presentence investigator, the information in that statement was confirmed by testimony and evidence at the sentencing hearing and was used by the trial court largely in mitigation of punishment. The record also shows that Row received the advice of counsel before being contacted by the presentence investigator. If any error occurred, then, Row cannot show that it had a substantial and injurious influence or effect on the trial court's decision to impose a death sentence in this case. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

## CONCLUSION

The Court previously denied or dismissed Claims 7 (in part), 13-20, 23-31, 33, 34, 38-41. (Dkt. 417, p. 41.) In this Memorandum Decision, the Court now denies relief on Claims 1-6, 7 (remainder), 8-12, 21, 22, 32, 35-37. The Court also denies, with prejudice, Row's request for new evidentiary development on the previously non-dismissed

allegations of ineffective assistance of counsel in Claim 7.

There being no claims left to be adjudicated, the case shall be dismissed.

## CERTIFICATE OF APPEALABILITY

As required by Rule 11 of the Rules Governing Section 2254 Cases, the Court evaluates this case for suitability of a certificate of appealability ("COA"). *See also* 28 U.S.C. § 2253(c).

A habeas petitioner cannot appeal unless a COA has issued. 28 U.S.C. § 2253. A COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Mindful that this is a capital case, the Court will certify an appeal over the Court's resolution of Claims 1, 2, 7 (limited to the allegations ineffective assistance of counsel at the capital sentencing proceeding addressed herein), 35, and 36 in the Second Amended Petition, including its decision to deny Row's requests for discovery, expansion of the record, or an evidentiary hearing on any of these claims, if applicable. The Court has reviewed its other decisions and orders in this case, and it does not find them to be reasonably debatable. The COA shall be limited to the claims listed above.

Row may seek to broaden the COA in the Ninth Circuit Court of Appeals,

pursuant to Rule 22 of the Federal Rules of Appellate Procedure and Local Ninth Circuit Rule 22-1. She is advised that she must still file a timely notice of appeal in this Court.

## ORDER

**IT IS ORDERED:**

1.   The Second Amended Petition for Writ of Habeas Corpus is DENIED, and this cause of action is DISMISSED with prejudice.

2.   The Court issues a Certificate of Appealability over the Court's resolution of Claims 1, 2, 7 (limited to the allegations ineffective assistance of counsel at the capital sentencing proceeding addressed herein), 35, and 36 in the Second Amended Petition, which shall also include the Court's decision to deny discovery, expansion of the record, or an evidentiary hearing on any of these claims, if applicable. The Court shall not certify any other issue or claim for appeal.

3.   Upon the filing of a timely notice of appeal in this case, and not until such time, the Clerk of Court shall forward the necessary paperwork to the Court of Appeals for the Ninth Circuit for the docketing of an appeal in a civil case.

DATED:  **August 29, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge