Samuel Richard Rubin, ISB No. 5126
Federal Public Defender
Teresa A. Hampton, ISB No. 4364
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:  Teresa_Hampton@fd.org

ELLIOTT LAW FIRM, PLLC
Kathleen J. Elliott, ISB No. 4359
Attorney at Law
P.O. Box 1352
Boise, Idaho 83701
Telephone: (208) 384-5456
Facsimile:  (208) 384-5476
ECF:  kje@elliott-law-firm.com

Attorneys for Petitioner Robin Lee Row

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBIN LEE ROW, | ) | Case No. 98-0240-S-BLW |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | PETITIONER'S BRIEF IN SUPPORT |
| | ) | OF THE AMENDED MOTION TO |
| THOMAS J. BEAUCLAIR, et al, | ) | ALTER OR AMEND JUDGMENT |
| | ) | |
| Respondents. | ) | |
| ————————————————— | ) | |

Petitioner, by and through her counsel of record, Teresa A. Hampton of the Capital

Habeas Unit of the Federal Defender Services of Idaho and Kathleen J. Elliott of the Elliott Law

Firm, PLLC, files this brief addressing the application of *Martinez v. Ryan*, 132 S. Ct. 1309

(2012), in support of her Amended Motion to Alter or Amend Judgment.  Dkt. 572.  This Brief is

filed in accordance with this Court's order.  Dkt. 580.

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 1

I.      **Introduction**

Prior to the Supreme Court's ruling in *Martinez*, this Court found certain ineffective assistance of trial counsel claims procedurally defaulted.  Dkt. 417, p. 13.  With regard to other Trial IAC claims, the Court declined to consider additional supporting facts because they had not been presented in state court.  Dkt. 472.  Federal review of these defaulted claims and facts is now available because Row can establish cause and prejudice to equitably excuse the procedural defaults.  *Martinez*, 132 S. Ct at 1318.  Notably, this Court initially ordered an evidentiary hearing on whether Row was entitled to expand the record under Section 2254(e)(2).  Dkt. 509 (granting hearing limited to resolving whether a lack of funding in initial review post-conviction proceedings rather than a lack of diligence prevented record development there).  However, after *Cullen v. Pinholster*, -- U.S. --, 131 S. Ct. 1388 (2011), but before *Martinez*, the Court rescinded its earlier order and denied Row's request for an evidentiary hearing.  Dkt. 545 at p. 52.

*Martinez* is in keeping with the Supreme Court's precedent.  Due process and the prohibition against suspending the writ of habeas corpus guarantee record expansion in federal habeas proceedings where the state courts denied the petitioner a full and fair opportunity to develop the factual record by appointing ineffective initial review counsel.  U.S. CONST. amend. XIV and art. I, § 9, cl. 2.  *See Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1993); *Boumediene v. Bush*, 553 U.S. 723, 733 (2008).

This Court should amend its Judgment and find the defaults excused and reach or reconsider the merits of the relevant claims.  The Court should conduct an evidentiary hearing in which new evidence may be presented and allow briefing on the merits before deciding the merits of the claims.  *See Barnett v. Roper*, 2013 WL 1721205 (E.D. Mo. Apr. 22, 2013).

**II.     Row's Trial Ineffective Assistance of Counsel Claims Are Subject to Martinez**

Declarations by James R. Merikangas, M.D., and Mark S. Greenberg, Ph.D., were previously filed in this matter.  Dkts. 124, 442, 479, and 449.  These declarations support the Amended Motion to Alter or Amend Judgment.  A declaration from Clay H. Ward, Ph.D., in support of the Motion, is filed contemporaneously with this Brief.

A.     Mitigation Claims

The following claims are impacted by *Martinez*, are collectively referenced as the "Trial IAC" claims and are divided into two sets, Mitigation Claims and Inadequately Raised Claims. The Mitigation Claims include trial counsel's failure to investigate, develop and present mitigating evidence.  These claims were never raised in state court and include the following:

- Ground 7, Para. 80, subsection (h): Failure to secure adequate testing concerning the brain damage that could have affected Petitioner's ability to control her behavior and thus undermines the finding of Petitioner's guilt;

- Ground 7, Para. 81, subsection (a): Failure to prepare, develop and present a coherent sentencing strategy;

- Ground 7, Para. 81, subsection (f): Failure to investigate and present defenses and mitigating circumstances surrounding uncharged criminal activity presented during the trial and at sentencing;

- Ground 7, Para. 81, subsection (g): Failure to research Eighth Amendment jurisprudence as it applies to the preparation and presentation of evidence in mitigation; and

- Ground 7, Para. 81, subsection (h): Failure to investigate, develop and present evidence rebutting aggravating evidence considered by the trial court.

B.      Inadequately Raised Claims

The second set of claims, Inadequately Raised Claims, is also impacted by *Martinez*. These claims were inadequately raised by post-conviction counsel but were exhausted because they were raised by appellate counsel before the Idaho Supreme Court.  These Inadequately Raised Claims include the following:

- Ground 7, Para. 81, subsection (b): Failure to make an independent investigation of matters in mitigation (Dkt. 19, C-14, p. 50);

- Ground 7, Para. 81, subsection (d): Failure to timely retain a qualified mental health expert to address the issues of mental health clearly apparent in Petitioner's case (*Id.* at p. 52);

- Ground 7, Para. 81, subsection (e): Failure to retain a qualified neuropsychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Petitioner revealing an atrophy of the brain (*Id.* at p. 54);

- Ground 7, Para. 81, subsection (n): Permitting an unqualified mental health expert and his assistant to engage in unreliable techniques of memory re-enhancement, including hypnosis (*Id.* at pp. 53-54);

- Ground 7, Para. 81, subsection (o): Failure to research and comprehend the reported results of a psychological evaluation performed by an unqualified person and permitting presentation of a diagnosis of Petitioner as suffering from a condition called alexithymia which was not supported by fact, law, medicine, science or accepted standards of psychological principles (*Id.* at p. 54);

- Ground 7, Para. 81, subsection (p): Permitting Petitioner to make a statement in allocution without knowing that the statement would be making incriminatory admissions based upon unqualified, unreliable memory enhancement (*Id.* at p. 53); and

- Ground 7, Para. 81, subsection (s): Permitting the defense-retained psychologist to engage in practices likely to elicit a false confession from Petitioner and permitting Petitioner to be bullied into making that confession in allocution at sentencing which wholly undermined the theory of defense presented at trial (*Id.*).

## III.   **Application of *Martinez***

A.      Martinez Allows a Petitioner to Excuse Default of Trial IAC claims

Federal habeas review has long been guided by the doctrine of procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 84-85 (1977), *Coleman v. Thompson*, 501 U.S. 722, 747-748 (1991).  This doctrine barring federal review of a state-court judgment may be overcome by showing "cause for the default and prejudice from a violation of federal law."  *Martinez*, 132 S. Ct. at 1316 (citing *Coleman*).  The "cause and prejudice" exception was limited to exclude negligence by a petitioner's post-conviction attorney.  *Coleman*, 501 U.S. at 753.  The Supreme Court – concerned that petitioners may face the denial of the right to effective assistance of trial counsel without the benefit of judicial review – established a narrow exception to *Coleman's* limitation on cause to excuse procedural default.  *See Martinez*, 132 S. Ct at 1317.  "Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial."  *Id.* at 1315.

The Supreme Court's ruling in *Martinez* established a gateway through which federal habeas petitioners may pass to have procedurally-defaulted substantive, constitutional claims considered on their merits.  The Court was concerned that challenges to the right to effective assistance of counsel, a "bedrock principle," could be defaulted without court review.  *Martinez*, 132 S. Ct. at 1317.

> ***Allowing a federal habeas court to hear a claim of ineffective assistance of trial counsel when an attorney's errors … caused a procedural default in an initial-***

> ***review collateral proceeding*** acknowledges, as an equitable matter, that the initial-review collateral proceeding, if undertaken … with ineffective counsel, ***may not have been sufficient to ensure that proper consideration was given to a substantial claim***.

*Martinez*, 132 S. Ct. at 1318-19 (emphasis added).

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default ***will not bar*** a federal habeas court from hearing a ***substantial*** claim of ineffective assistance at trial ***if***, in the initial-review collateral proceeding, … ***counsel in that proceeding was ineffective***.

*Id*. at 1320 (emphasis added).

The Court applied *Martinez* to a substantially similar factual setting in *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).  The Court's overriding concern in *Martinez* – that prisoners have a meaningful opportunity to present trial IAC claims – was echoed in *Trevino*.  "This opinion [*Trevino*] considers whether, as a systematic matter, Texas affords *meaningful review of a claim of ineffective assistance of trial counsel*.  The present capital case illustrates why it does not." *Trevino*, 133 S. Ct. at 1919 (emphasis added).  The Court reaffirmed its approach to meeting the exception to *Coleman*.

> [In *Martinez*, we] read *Coleman* as containing an exception, allowing a federal habeas court to find "cause," ***thereby excusing a defendant's procedural default***, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding."

*Trevino* at 1918 (bold emphasis added).  In meeting these requirements, a petitioner establishes that the federal court is allowed to "consider the merits of a claim that otherwise would have been procedurally defaulted."  *Martinez* at 1320.

However, meeting the *Martinez* requirements is not the same as establishing a ground for relief. *Martinez* requires a lesser quantum of proof than is needed to prevail on the merits of a trial IAC claim and a petitioner is not held to this higher burden at this juncture. To proceed through the cause and prejudice gateway, the underlying claim at issue need only have "some merit." *Martinez* at 1318. The determination of the merits of the substantial claim cannot be made on the inadequate factual record developed in state court proceedings; it should be made after Row has a full and fair opportunity to develop and present the relevant facts in the federal habeas court.

     B.     Applying *Martinez* to Selected Claims in this Case

          1.     The Underlying Trial IAC Claims Raise *Strickland* Violations

The underlying Trial IAC claims allege, in general, that trial counsel failed to investigate and present mitigating evidence that calls into question the reliability of the conviction or sentence. Trial counsel's inadequate efforts violated the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984). *See* Dkt. 293, ¶ 79.

Trial counsel's work on both the Mitigation Claims and the Inadequately Raised Claims is subject to the *Strickland* standard. The *Strickland* standard has two prongs: 1) the deficient performance prong assessing the competence of counsel's performance; and 2) the prejudice prong assessing whether counsel's deficient performance was so damaging that there is a reasonable probability of a different result. *Strickland*, 466 U.S. at 687.

          2.     The Underlying Trial IAC Claims Are Substantial

Under *Martinez*, Row must also "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that

the claim has some merit." *Martinez*, 132 S. Ct. at 1318-19.  In setting out the substantial claim

standard, *Martinez* relies upon *Miller-El v. Cockrell*, 537 U.S. 322 (2003).

      *Miller-El* interpreted what constituted a "substantial showing of the denial of a

constitutional right" under 28 U.S.C. §2253(c)(2), the standard needed to obtain a certificate of

appealability (COA).  *Miller-El v. Cockrell*, 537 U.S. at 327.  Under the *Miller-El* standard, a

COA should issue if "jurists of reason could disagree with the district court's resolution of [the]

constitutional claims or that jurists could conclude the issues presented are adequate to deserve

encouragement to proceed further."  *Id*.  While issuance of a COA requires a "general

assessment of [the claim's] merits," *id*. at 336, issuance is not dependent on whether the court

believes that the petitioner will ultimately "demonstrate an entitlement to relief."  *Id*. at 337.  To

obtain a COA, a petitioner need "not … prove … that some jurists would grant the petition for

habeas corpus."  *Id.* at 338.

      As with *Miller-El*, *Martinez* presents a preliminary, threshold question to determine

whether the petitioner will be able to litigate on the merits.  The *Martinez* Court's reliance on

*Miller-El* reflects the similar procedural postures – in both, what is being sought is an

incremental step towards a merits decision – and the corresponding logical conclusion that the

burden is less than that required to prevail on the merits.  *See Barnett*, 2013 WL 1721205 at *10

(citing *Miller-El* and *Martinez*).  A court determining the threshold *Martinez* question – whether

the underlying trial IAC claim is substantial or has some merit – must evaluate only whether the

claim is "debatable among reasonable jurists," and not whether the claim is actually meritorious

under *Strickland*.  *See Barnett*, 2013 WL 1721205 at *10 n.16.

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 8

*Prong 1: Deficient Performance by Trial Counsel*

*Duty to Investigate Well Established*

Counsel's duty to investigate the petitioner's background and present mitigating evidence was well established at the time of Row's trial. *Strickland*, 466 U.S. at 691, *(Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000), *Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Wiggins v. Smith*, 539 U.S. 510 (2003) (mitigation investigation should encompass efforts to discover all reasonably available mitigating evidence)(citing with approval to ABA Guidelines as well-defined norms and applying *Strickland*). A reasonable investigation uncovers both mitigating evidence and a "range of mitigation leads" that counsel should then follow up on. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005). These leads, or red flags, can be taken from low achievement tests found in school records, medical history indicating organic brain disorder, a background of abuse and abandonment and even incarceration records. *Rompilla*, 545 U.S. at 392 (citing *Rompilla v. Horn*, 355 F.3d 233, 279-280 (Sloviter, J., dissent)).

The rationale for investigating a petitioner's background is also well established. A petitioner's background and character is relevant "because of the belief, long held by this society, that [individuals] who commit criminal acts that are attributable to a disadvantaged background … may be less culpable than [those] who have no such excuse…." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989). The investigation conducted by Row's trial counsel fell woefully short in the areas targeted by both the Mitigation Claims and the Inadequately Raised Claims.

*Counsel failed to investigate Row's background*

The Second Amended Petition alleges trial counsel failed to conduct the necessary investigation into Row's background. Dkt. 293, ¶ 81(a), (f), (g) & (h). That Petition also alleged trial counsel failed to conduct an independent investigation and failed to investigate and present

mental health evidence from qualified professionals.  Dkt. 293, ¶ 81 (b), (d), (e), (n), (o), (p) & (s).  Both sets of claims assert trial counsel conducted unreasonable and deficient investigation into Row's mental health, organic brain disorder, childhood environment and other historical background and the interrelated nature of these factors.

Instead of a reasonable investigation, trial counsel engaged in an anemic effort.  No trial counsel investigator was assigned to the case notwithstanding the availability of one.  Dkt. 400, 02, p. 44.  Nor was an outside investigator used.  Dkt. 19, B-12, p. 320.  Trial counsel made no independent efforts to obtain available and material documents, including medical records, regarding Row's life history.  Dkt. 19, B-12, pp. 188-90, 288-90, 320-23.  Rather, trial counsel limited their document review efforts to reviewing documents obtained from the state in discovery.  Dkt. 19, B-12, p. 190, 214, 321.

Trial counsel talked to one family member, a sister.  They did not talk, not even by phone, with Row's mother, father, grandmother, aunts, uncles or other siblings.  Dkt. 400, 06, pp. 81-83; Dkt. 19, B-12, pp. 191-94.  Trial counsel did not seek, much less obtain, any documents, reports or files relating to any of Row's family members.  *Id.* at pp. 213-14.  Counsel knew Row's father had been incarcerated and was "difficult" to talk with.  Dkt. 19, B-12, p. 211.  At sentencing, the defense mental health expert could not provide a diagnosis and was reduced to a simple description – Row's father seemed paranoid – because no supporting documents were gathered.  Dkt. 19, A-06, p. 3867.  Notwithstanding knowing that Row's family members had institutional histories, trial counsel did not seek documents from legal and social services agencies involved in the family's life.

Trial counsel relied solely on Row for her personal and family history.  Dkt. 19, A-7, pp. 4-11.  However, according to Dr. Merikangas, "her memory is intrinsically unreliable and

without external corroboration, hard physical evidence or witnesses it is impossible to know where the truth may lie.  There are psychological methods to measure memory and these include neuropsychological testing and forced choice paradigms by qualified neuropsychologists." Dkt. 124, pp. 4-5, ¶ 3J.

Prior to trial, counsel limited their document review to the state's discovery and consequently did not have Row's medical records including references to two CT scans.  The first scan was done shortly before the crime and the second shortly before the trial.  Dkt. 19, B-12, p. 359.  Both CT scans showed brain atrophy – clear anatomical damage.  The PSI completed prior to sentencing included the physician's report about the second scan.  Dkt. 19, A-07.  That report referenced the brain atrophy and recommended clinical follow up.  However, trial counsel did not discuss that report or scan or the recommendation with Art Norman, Ph.D., trial counsel's selected mental health expert.  Dkt. 130, p. 3, ¶ 7; Dkt. 19, B-12, 172-73.  Nor did they inform Craig Beaver, Ph.D., trial counsel's pre-trial expert, about the demonstrated brain atrophy.  Dkt. 19, B-12, 123, l. 20-25.  Nor did trial counsel request Dr. Beaver or Dr. Norman conduct or obtain neuropsychological testing.  Trial counsel had no reasonable basis for ignoring the recommended follow-up and not taking other associated investigative steps.  Instead, notwithstanding the written recommendation for follow-up that accompanied the second CT scan, trial counsel took no steps to investigate Row's brain atrophy and did not request neuropsychological or neuropsychiatric tests.  Dkt. 19, B-12, pp. 126-28.

### Prong 2: Prejudice stemming from the inadequate investigation of Mitigation Claims

Trial counsel's failure to conduct a mitigation investigation prejudiced Petitioner.  Dkt. 293, ¶ 83.  Had trial counsel conducted the needed mitigation investigation, "sufficient information would have been presented" at sentencing compelling the court to find the

mitigating circumstances outweighed the aggravating factor.  *Id.* ¶ 83(b).  Likewise, the evidence

of organic brain damage would have compelled a finding of reduced culpability and "probably

resulted in a life sentence."  *Id.* ¶ 83(c).  Without the reasonable investigation, trial counsel could

not discern the available mitigation evidence and instead presented unsupported and inaccurate

information regarding Row's background, mental health and brain disorder.  The prejudice

stemming from counsel's deficient performance is discussed in each of the individual claims

below.

> Claim ¶ 80 (h) failure to secure adequate testing concerning the brain
> damage that could have affected Petitioner's ability to control her behavior
> and thus undermines the finding of Petitioner's guilt.

Qualified and informed medical and neuropsychological experts have now discovered

classic mitigation evidence in Row's background.  The abnormal, brain-disorder finding

indicated an MRI scan of the brain (Dkt. 124, p. 3, ¶ 3B), SPECT scan and blood tests (Dkt. 124,

p. 3, ¶ 3E), and medical neurological examination (Dkt. 124, pp. 4-5,¶ 3G & L) were warranted.

The recommended follow-up testing was completed at the direction of federal habeas counsel.

The results were significant.

The MRI, administered on October 15, 2001, showed cerebellar atrophy and mild

associate cerebral atrophy.  Dkt. 442, p. 3, ¶ 6C.  That MRI confirmed a stable pattern of

abnormalities in Row's brain structure.  Dkt. 479, p. 3, ¶ 6.  Based upon the additional medical

tests conducted in accordance with the standard of care, Dkt. 124, p. 4, ¶ 3G, review of Row's

medical and psychiatric history and a personal interview, Dr. Merikangas found that Row suffers

from cerebellar hypoplasia and cortical atrophy.  Dkt. 442, pp. 5-6, ¶¶ 5 & 6 (duplicatively

numbered).

According to Dr. Merikangas, the definite abnormality or organic condition of Row's brain has the probable neuropsychiatric outcome of reducing her ability to control her behavior and, further, conditions of emotional distress may have affected her ability to appreciate the wrongfulness of her behavior.  Dkt. 124, p. 3, ¶ 3F.

Although her behavior was referenced as antisocial at sentencing, Dr. Merikangas opined that "it should be noted that having an organic brain syndrome is one of the conditions that must be ruled out before making a diagnosis of antisocial personality disorder … [A]n organic brain syndrome … would take precedence and the symptoms of poor impulse control, lack of empathy, manipulation, pathological lying, paranoia, histrionic style and chronic depression are all symptoms of organic brain syndrome."  *Id*. at p. 4, ¶ 3H.

From a neuropsychological perspective, Dr. Greenberg concluded, "had the appropriate and comprehensive neuropsychological examination been carried out in concert with a review of the existing brain scans and a [follow-up] neurological examination in early 1993, an alternative explanation for Ms. Row's behavioral tendencies would have been available for consideration." Dkt. 449, p 8.  Specifically, proper neuropsychological examination would have uncovered a "biologically-based brain defect that may have directly impacted her behavioral control that would have raised a substantial source of clinical data in favor of mitigation."  *Id*.

Dr. Clay Ward, also supports this methodology and approach.  He states that this approach was the standard of practice at the time of Row's trial proceedings.  Dkt. 582, p. 2, ¶ 6.

Claim ¶ 81 (a), (f), (g), (h) Sentencing failures: no strategy; no investigation regarding uncharged conduct; no research; no rebuttal

These claims are closely interrelated.  They demonstrate how the deficient performance – failing to investigate Row's background – can have multiple, exponential effects.  Counsel missed the medical, social, familial and other background histories that would have triggered

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 13

neuropsychological and neuropsychiatric evaluations.  Absent background investigation,

evaluations and research, trial counsel was without any meaningful strategy, research or

mitigation evidence to proffer.

Even a basic investigation would have led to review of available medical records and

family history.  According to Dr. Merikangas, "[i]t is not speculative or suppositional to carry

out the medical evaluation of a differential diagnosis which would represent the standard of care

that any reasonable and prudent physician would undertake."  Dkt. 124, p. 4, ¶ 3G.

Dr. Greenberg stated "[t]he possibility of an inherited degenerative disorder ([a] cause[ ]

of cerebellar atrophy) should have been carefully investigated [ ], especially in light of her family

history which is positive [for] longstanding behavioral disturbance in her biological father (with

reported problems with self-control in the form of violence, substance abuse, anti-social conduct

as well as signs of apparent major mental illness, including paranoia and hallucinations)."  Dkt.

449, p. 7.  Dr. Greenberg goes on to state the "[p]sychiatric and medical records of Ms. Row's

father … reported to suffer from mental illness, possibly schizophrenia, which could impact Ms.

Row both genetically and by exposure to rearing by a parent suffering" from schizophrenia

should have been obtained and considered.  Dkt. 442, p. 6, ¶ 7.  A family history is therefore

significant for neuropsychological assessments.

A strategy and research effort by counsel based upon the brain abnormality would have

triggered investigation and recognition of the need for further expert assistance.  Trial counsel

were attempting to explain Row's flat affect.  Dkt. 19, B-12, pp. 222-23.  A cogent presentation

of the organic brain disorder would have gone far in explaining her behavior.

Trial counsel should have known about the existence of cellebellar atrophy.  The next

reasonable step would have been to research its importance and impact on Row's behavior.

Based upon the review of existing records and his examination, Dr. Merikangas concluded, "Row suffers from a cerebellar hypoplasia, and cortical atrophy."  These are "defects of the brain in areas of cognition and impulse control, which has as a consequence involuntary behavioral manifestations including poor judgment, poor executive function, and poor impulse control." Rather than an antisocial diagnosis, Dr. Merikangas relied upon the Diagnostic and Statistical Manual of Mental Disorders IV-TR to conclude the following:  Row has "310.1 Personality Change Due to a General medical Condition, Disinhibited type, and 293.83 Mood Disorder Due to a General Medical Condition.  In this case the medical condition is cerebellar hypoplasia and cortical atrophy."  Dkt. 442, pp. 5-6, ¶ 6 (original emphasis deleted).

Dr. Greenberg conducted an evaluation in 2002 and found significant signs of frontal lobe dysfunction.  The deficits he found "all fall under the rubric of 'executive dysfunction' and associated with impairment of the frontal regions of the brain."  Dkt. 449, p. 5-6.  "The relevance of such frontal dysfunction is clear for understanding Ms. Row's affect and behavior, since it is universally accepted that the frontal lobes are the brain's seat of decision making, judgment, planning, foresight, impulse control, rule-adherence and emotional regulation … [s]uch frontal dysfunction is compatible with a lifetime of rule-breaking, poor decision making, impulsive dyscontrol, prolonged enuresis (bed-wetting) and inappropriate affective reactions/responses."  Dkt. 449, pp. 5-6.

Dr. Greenberg and Dr. Ward both opined that research into the professional literature would have uncovered the relevance of Row's brain disorder.  "Though knowledge of these brain-behavior associations are ever evolving, there were clear and readily available indications of such relationships in the professional literature in the timeframe of the crime in question and subsequent trial.  For example, Graffman et al. produced a set of papers that address the higher

cognitive aspects of cerebellar regions in major journals in the early 1990s." Dkt. 449, p 8; *See also* Dkt. 582, p. 2, ¶ 6.

> *Prong 2: Prejudice stemming from trial counsel's inadequate investigation for*
> *Inadequately Raised Claims*

It is beyond question that organic brain damage impairing cognitive functions is the type of "mitigating evidence, taken as a whole, [that] 'might well have influenced the [trial court's] appraisal' of the [petitioner's] culpability." *Rompilla v. Beard*, 545 U.S. at 393 (quoting *Wiggins v. Smith*, 539 U.S. at 538). Yet such mitigating evidence was never explored or developed by trial counsel, even though significant evidence of Row's brain damage was in counsel's possession several months prior to sentencing. Dkt. 19, A-7, p. 1 (PSI received May 28, 1993). Thus, the trial court sentenced Row to death without receiving critical mitigating evidence.

The evidence of organic brain damage presented in concert with the available life history and additional medical and neuropsychological testing would have explained that Row's behavior was directly impacted by a biological brain defect for which she was not responsible. The trial court's appraisal of Row's behavior and level of culpability was based upon the woefully incomplete picture of Row presented by trial counsel. The full explanation and presentation of the mitigating evidence supports the "likelihood of a different result if this evidence had been presented is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. at 393 (quoting *Strickland v. Washington*, 466 U.S. at 694).

Claim ¶ 81 (b) failure to make independent investigation

Cerebellar hypoplasia "has as a consequence *involuntary* behavioral manifestations including poor judgment, poor executive function, and poor impulse control." Dkt. 442, p. 6, ¶ 6 (emphasis added). Cerebellar hypoplasia could be the result of congenital error, existing at birth,

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 16

developmental problems or an event during one's lifetime. *Id.* at p. 3, ¶ 6E. Whatever the cause, "Ms. Row is not responsible for the atrophy of her brain." *Id*. at p. 5, ¶ 6J. The effect of the brain damage on Row's behavior provides a complete picture of Row, one with all her human frailties, that should have been presented to the sentencing court.

As discussed by Dr. Greenberg, there is a connection between the frontal functional deficits identified in the neuropsychological testing and the structural damage of the cerebellum. Dkt. 449, p. 7. He explains, "the output of the cerebellum is thought to be a primary inhibitory" or modulator control on the frontal lobes, the area associated with executive function. *Id*. The cerebellum works as a braking function on impulses. *Id*. Thus, the physical findings of brain damage and the neuropsychological findings of executive functional deficits converge providing a compelling link between a non-volitional physical deficit and non-volitional behavioral deficits. *Id*. This comprehensive neuropsychological information developed from appropriate examinations used in concert with the existing brain scans presents an alternative explanation for Row's behavior. *Id*. at p. 8. Presenting the organic brain damage and its impact on Row's behavioral control undeniably is more likely to impact the sentencing entity in favor of a sentence of life than the simple list of "mitigation" offered by the trial counsel. *See* Dkt. 19, A-02, pp. 405-410.

> Claim ¶ 81(d) failure to timely retain a qualified mental health expert to address the issues of mental health clearly apparent in Petitioner's case

Counsel's handling of mental health issues mirrors their handling of the brain atrophy – uninvestigated, unfocused and ill-prepared. As previously discussed, counsel failed to investigate Row's mental and medical health and life history. This failure impacted the development of independent mitigation including presentation of mental health issues.

Dr. Beaver was retained prior to trial.  Dkt. 19, A-03, 38-39.  He administered basic psychological tests and interviewed Row in the summer of 1992.  Dkt. 19, B-12, 126.  Dr. Beaver was not asked to and did not conduct a neuropsychological examination.

Counsel hired Dr. Norman prior to sentencing.  Trial counsel did not investigate his qualifications or effectiveness in a capital case and instead relied exclusively on Dr. Norman's vitae and listened to Dr. Norman's personal representations.  Dkt. 19, B-12, pp. 206-07 (Myshin); Dkt. 400, 06, p. 71 (Cahill).  "He portrayed himself as being an expert in death penalty mitigation and he told us he had done lots of cases, blah, blah, blah."  Dkt. 19, B-12, p. 286 (Cahill).  Even though counsel were advised by Dr. Norman that he had worked elsewhere, neither attorney attempted to confirm Norman's effectiveness and scope of experience.  Dkt. 400, 06, pp. 70-71.  As a psychologist, Dr. Norman was not qualified to administer neuropsychological tests.  Dkt. 442, p. 4, ¶ 6I.  Trial counsel hired Dr. Norman without vetting him and then failed to direct or supervise his work.  Without direction or supervision, Norman used questionable techniques and unqualified personnel and applied a "diagnosis" to Row that was not recognized by the mental health profession.

In addition to failing to oversee the experts, trial counsel failed to provide the CT scans and accompanying reports to either Dr. Norman or Dr. Beaver.  Neither of these experts was made aware of Dr. Giles's recommendation for follow-up on the atrophy; the most significant mental health evidence was not provided to them by trial counsel.  Both Drs. Norman and Beaver would have requested follow-up neuropsychological testing based upon the Giles report.  Dkt. 19, B-12, pp. 121-123; Dkt. 130, p. 3 ¶ 7.

Instead, armed with inadequate and inappropriate testing results and no available medical information, Dr. Norman sent an unqualified assistant to "break through" Row's façade.  He, in

the meantime, diagnosed Row with "alexythimia."  As the state correctly pointed out at the

sentencing hearing, Dkt. 19, A-6, pp. 3924-26, that "diagnosis" in fact describes a symptom –

ironically, the flat affect symptom Dr. Norman planned to break through.

Trial counsel failed to investigate its experts, and failed to direct, inform and supervise

them.  The result was that unqualified "experts," lacking the necessary medical and social history

of Row, administered basic psychological tests.  No neuropsychological tests were administered

to Row during her trial or post-conviction proceedings.  The least qualified psychologist, Dr.

Norman, the one with no neuropsychological or neurological training and the only retained

expert at the time of sentencing, then misdiagnosed Row.  The result was a failure to address

Row's readily apparent mental health issues.

> Claim ¶ 81(e) failure to retain a qualified neuropsychiatrist to conduct
> appropriate medical testing regarding the apparent organic brain damage
> revealed by CT scans taken of Petitioner revealing an atrophy of the brain

Testimony that Row's medical condition affects cognition and impulse control would

have been available during the time of Row's trial and sentencing.  Dkt. 582, p. 2, ¶ 4.

Competent counsel, upon discovery of this highly relevant medical information, should have

developed the connection between the physical evidence of organic brain damage and Row's

behavior through informed, competent expert testimony.  The prejudice stemming from the

failed investigation has been discussed *infra*.

The brain structure, a key red flag for mitigation, needed medical testing.  Anatomical

brain pathology is outside the expertise of psychology, and neither Drs. Norman nor Beaver were

qualified to speak to the issues raised by the brain damage.  Dkt. 442, pp. 4-5, ¶ 6I.  Dr.

Merikangas concluded "[a]ny indication by the prosecution or witness that the atrophy is

meaningless is wrong.  Only an [medical doctor] is qualified to comment on the meaning of this neuropathological abnormality."  Dkt. 124, p. 3, ¶ 3D.

> Claim ¶ 81 (n) permitting an unqualified mental health expert and his assistant to engage in unreliable techniques of memory enhancement, including hypnosis

Dr. Norman's use of hypnosis further undermined the demonstrated organic brain disorder.  Dr. Merikangas found the use of hypnosis especially troubling and that it interfered with the mitigation investigation.  "'Hypnotically induced memory' really is hypnotically induced suggestibility and does not relate to actual memory.  Anything produced by a patient under the circumstances of hypnosis is intrinsically unreliable and it [ ] more likely produced confabulation than real memory.  Confabulation refers to false memories produced by patients with memory deficits and the person producing such a statement has no way of knowing whether it is true or false."  Dkt. 124, p. 4, ¶ 3I.

Dr. Norman undertook a course of action following Ms. Row's conviction that was seriously compromised by a number of significant missteps according to Dr. Greenberg.  Most critically, trial counsel failed to define or supervise Dr. Norman's role and the essential purpose of his involvement in the defense team.  Cahill and Myshin testified that they left Dr. Norman to his own devices, and Dr. Norman himself testified that he was given little or no guidance and oversight.  Dkt. 130, p. 2, ¶ 4.  In this climate of ambiguity it was somehow determined to pursue a psychological intervention in the period of time between Ms. Row's conviction and sentencing.  This intervention was intended to "break through Ms. Row's pervasive stoicism and the blunted emotional demeanor that she had apparently demonstrated throughout much of the time frame following the fire and persisting though the guilt-innocence phase of her trial."  Dkt. 449, p. 9.

Dr. Norman's approach was highly irregular.  *Id*. at pp. 9-10.  Dr. Norman's self-described approach included one part forensic evaluation, one part psychotherapy, one part trial coach/consultant and one part law enforcement agent.  Such approach lacked clarity of purpose, compromised the result and was fatally flawed.  *Id* at p. 10.

Instead of having face to face contact with Row, Dr. Norman sent his untrained assistant to meet with her for fifty hours over several months time.  The assistant had no educational or professional credentials that would qualify her for such a task.  She was enrolled at a community college majoring in psychology, but lacked an advanced degree, certification, licensure and formal training in interrogation, hypnosis or psychotherapy.  *Id*.

Dr. Norman and his assistant failed to adequately document their interactions with Row.  There was no informed consent procedure, the dates and times of the sessions were never recorded and, most troubling, Row's reactions and ongoing response to their efforts were not captured.  *Id*. at pp. 10-11.

> Claim ¶ 81(o) failure to research and comprehend the reported results of a psychological evaluation performed by an unqualified person and permitting presentation of a diagnosis of Petitioner as suffering from a condition called alexithymia which was not supported by fact, law, medicine, science or accepted standards of psychological principles

Dr. Merikangas reviewed Dr. Norman's testimony and declaration (dated November 2, 1999) regarding his participation in Row's defense.  According to Dr. Merikangas, Drs. Norman and Beaver had "insufficient information to arrive at a correct diagnosis or to explain the significance of her mental problems on her statements, her actions and her reactions to stress."  Dkt. 442, p. 4, ¶ 6H.  Dr. Greenberg described Dr. Norman's testimony as "over time he came up with a putative explanation for Ms. Row's apparent lack of normal feelings though a process of research and clinical intuition.  He described her as 'alexithymic' and the nature and severity of

this alleged condition formed the crux of his professional opinions and testimony."  Dkt. 449, p. 11.

In 1993, alexythymia was a "highly controversial and poorly understood construct."  Dkt. 449, p. 12.  "Most critically, alexithymia was not recognized – or even mentioned in passing – in the reigning 1987 edition of the official handbook of psychiatric nosology – the Diagnostic and Statistical Manual of Mental Disorders Third Edition-Revised (DSM-III-R)."  *Id.*

As. Dr. Merikangas summarized, "[t]here is simply no basis for the diagnosis of 'alexithymia' given to her, a diagnosis not recognized by the American Psychiatric Association ...  The psychological evaluations did not properly incorporate her family, developmental, social, occupational or marital history according to the standard of care for similar assessments.  Even if Dr. Norman was correct in his diagnosis of alexithymia, it has nothing to do with behavior, but with the inability to express emotions and is an effectively meaningless diagnosis."  Dkt. 442, p. 4, ¶ 6H.

Trial counsel failed to even review the DSM for "alexithymia."  Instead, counsel proffered Dr. Norman's testimony at the sentencing hearing that alexithymia is a mental illness. The state correctly countered that alexithymia was not a diagnosed mental illness under the DSM, undermining the credibility of the only defense expert witness.  Dkt. 19, A-6, pp. 3924-26. Row's current experts agree that alexithymia was not a mental illness under the DSM.  Dkt. 449, pp. 11-14 and Dkt. 442, p. 4, ¶ 6H.  The prejudice in presenting a "meaningless" diagnosis when significant organic brain disorder existed is substantial.

> Claim ¶ 81 (p) permitting Petitioner to make a statement in allocution without knowing that the statement would be making incriminatory admissions based upon unqualified, unreliable memory enhancement
>
> Claim ¶ 81 (s) permitting the defense-retained psychologist to engage in practices likely to elicit a false confession from Petitioner and permitting

Petitioner to be bullied into making that confession in allocution at
sentencing which wholly undermined the theory of defense presented at trial

Ms. Row provided the state court with a "statement of offenses" during the sentencing

hearing.  Dkt. 19, A-06, p. 3782.  The statement was based upon the hypnotic sessions Row was

put through.  *Id*. at 3702-83, Dkt. 19, B-12, 291-92.  Despite advising the state court that they

had reviewed the statement, trial counsel were only generally aware of the statement's contents.

Dkt. 19, B-12, 185, 290-91.  They were clearly unaware of the problems with hypnotically

"refreshed" memory.  *See* prejudice discussion Claim ¶ 81(n).

Dr. Greenberg reviewed Dr. Norman's use of confrontation with Row.  Norman and his

assistant utilized powerful confrontation techniques to attempt to break through Ms. Row's

perceived façade of emotional neutrality.  Dkt. 449, p. 14.  In the assistant's words, the sessions

were "brutal" and involved her repeatedly challenging Row.  *Id*.  "While the use of intense

confrontation in the proper context and with the proper checks and balances can achieve

therapeutic gains and personal growth, the misuse of these same approaches lead to political

indoctrination ('brainwashing') and generalization of false confessions.  Carried out by an

untrained assistant with minimal supervision and no established protocol, the potential for

misuse was high."  *Id.*

"At some point hypnosis proper was induced in an ill-fated attempt to uncover the 'real'

Robin Row they assumed was hidden behind the stoical public façade."  Dkt. 449, p. 14.  Dr.

Norman conducted the hypnosis sessions.  Dkt. 130, p. 2, ¶ 5-6.  As discussed by Dr. Greenberg,

hypnosis induces an altered state of consciousness.  Dkt. 449, p. 14.  Suggestibility is heightened

and "fact and fiction blend and memory and fantasy merge."  *Id*.  The subject tends to

uncritically accept ideas and opinions suggested by a trusted outside authority.  *Id.*  Hypnotically

enhanced memories are known to be unreliable and the use of hypnosis in legal settings requires

strict attention to safeguards. *Id*. This includes the provision that sessions be conducted by an experienced hypnotist who is neutral with respect to the case and that all sessions be fully recorded. *Id*. at pp. 14-15. None of these safeguards were in place for Row's sessions. Dkt. 19, B-12, p. 284.

"Whatever the ultimate end product of these interventions - emotional outpourings, heartfelt remorse, recalled memories, frank confession, accusations, protestations of innocence - none could be trusted as genuine given the context in which they were generated." Dkt. 449, p. 15.

      C.     "Initial Review" Post-Conviction Counsel was Ineffective

          1.     Post-conviction proceedings in Idaho are initial review proceedings

Idaho's unified post-conviction and appeal procedure for capital cases requires trial IAC claims to be raised in a petition for post-conviction relief filed within 42 days of judgment and prior to a direct appeal. I.C. §19-2719(2), *Stuart v. Fisher*, No. 02-cv-020 (D. Idaho), Dkt. 126 at 33. Any claim of ineffective assistance of counsel not included in this initial petition is deemed waived. I.C. §19-2719(5), *Pizzuto v. State*, 127 Idaho 469, 472, 903 P.2d 58, 61 (1995). This "unique expedited review system in capital cases" is an initial review proceeding for the purposes of *Martinez*. *Leavitt v. Arave*, 2012 WL 1995091 at *8 (D. Idaho June 1, 2012).

Each of the Inadequately Raised Claims was raised to the Idaho Supreme Court by post-conviction appellate counsel. *See* Section B, pp. 4-5. The default of the factual basis occurred at the initial review and not at the appellate level. Appellate counsel did not abandon the claims, even though inadequately developed.

          2.     Post-Conviction Counsel Was Ineffective under *Strickland*

The *Strickland* requirements applicable to trial counsel are also applicable to post-conviction counsel. "Claims of ineffective assistance at trial often require *investigative work*…."

*Martinez*, 132 S. Ct. at 1317 (emphasis added).  Row's initial review counsel were ineffective.
They did not conduct a reasonable investigation into Row's background, including medical and
psychological histories, school records and social services records.  Dkt. 400, 06, pp. 72-73.
And, they failed to follow-up on the organic brain disorder, conducting no neuropsychological
testing.  This inadequate investigation led to abbreviated evidence at post-conviction on the
issues of trial IAC.

 This Court has evaluated the investigative work of Row's post-conviction counsel.
"Though post-conviction counsel made much of the fact that Myshin and Cahill relied largely on
the discovery process to obtain documents and information about Row's background, post-
conviction counsel did not offer anything new or compelling that trial counsel had missed."  Dkt.
545, p. 49.

 Likewise, this Court has commented on the strength of the new evidence federal habeas
counsel has been able to uncover.

> Admittedly, the CT scan suggesting that Row's brain may have atrophied
> caused the [state] district court some concern, and it appears that trial counsel
> failed to present this evidence to Dr. Beaver or Dr. Norman. When Dr. Beaver
> was questioned about the evidence, he indicated that aspects of his earlier opinion
> might need to be modified depending on the results of a new neurological
> evaluation. In denying post-conviction relief, the [state] court noted Dr. Beaver's
> testimony but found that the inquiry was nonetheless "speculative and
> suppositional" and did not warrant yet another delay in the case.  (State's Lodging
> B-12, pp. 295-96.)  In affirming the lower court, the Idaho Supreme Court did not
> discuss the significance of the evidence.  At best, then, the record before the state
> court revealed that Row might have mild brain atrophy, which in turn might have
> informed Dr. Beaver's opinion in some respects but not others, and a conclusive
> opinion one way or the other was missing.  As a result, the state court acted well
> within the bounds of *Strickland* in finding that there was no reasonable probability
> of a different outcome even if this speculative evidence had been added to the mix
> of mitigating evidence.

Dkt. 545, pp. 49-50.  As with trial counsel, the clear, specific direction to follow-up on an
anatomical brain disorder was ignored by post-conviction counsel.

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 25

The prejudice resulting from the inadequate post-conviction counsel's investigation is failing to adequately, or in some regards at all, challenge trial counsel's ineffective assistance in the investigation and presentation of mitigating evidence – claims that are substantial. Post-conviction counsel failed to raise the Mitigation Claims and failed to support the Inadequately Raised Claims. It is on this ineffectively-developed record that the Court has previously deferred to state court judgment. *Id*. at pp. 51-52. After *Martinez*, the Court no longer should.

Initial review post-conviction counsel were ineffective in failing to raise the mitigation claims and investigate and develop the facts of the inadequately raised claims. The new facts developed by federal habeas counsel fundamentally altered the Inadequately Raised Claims, rendering those claims unexhausted and procedurally defaulted. *See Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Kunkle v. Dretke*, 352 F.3d 980, 988 (5th Cir. 2003); *Beaty v. Stewart*, 303 F.3d 975, 989-90 (9th Cir. 2002). Alternatively, initial review counsel's deficient performance resulted in procedural default of the substantial facts supporting the Inadequately Raised Claims. *See Keeney v. Tamayo-Reyes*, 504 U.S. at 7-8 ("it is similarly irrational to distinguish between failing to properly assert a federal claim in state court and failing in state court to properly develop such a claim"). *See also McQuiggin v. Perkins*, --U.S.--, 133 S. Ct. 1924, 1938 (2013) (Scalia, J., dissenting) ("failure adequately to develop material facts in state court" is a "variant of procedural default"). Under *Martinez*, all of the defaults arising from deficient performance by initial review post-conviction counsel are excused. *Martinez*, 132 S. Ct. at 1318-19.

The United States Supreme Court has two cases (*Strouth v. Colson*, No. 12-7720 and *Hammond v. Sheets*, No. 12-691) scheduled for conference on September 30, 2013 on the application of *Martinez* to inadequately raised claims. Row will seek a stay in this matter in the event certiorari is granted in either of these cases.

Brief In Support of Amended Motion to Alter or Amend Judgment – Page 26

IV.     **Conclusion**

Row's Petition raises substantial Trial IAC claims that have not been reviewed in state court because of initial post-conviction counsel's ineffective assistance.  The default of these Trial IAC claims is excused under *Martinez*.  This Court should grant an evidentiary hearing in order to evaluate the merits of those claims.

DATED this 3rd day of September 2013.

_____
/s/
Teresa A. Hampton

_____
/s/
Kathleen J. Elliott

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of September, 2013, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

Jessica Lorello                                    L. Lamont Anderson
jessica.lorello@ag.idaho.gov                       Lamont.anderson@ag.idaho.gov

_____
/s/
Teresa A. Hampton
