UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

ROBIN LEE ROW,

                 Petitioner,

vs.

THOMAS J. BEAUCLAIR, et al.,

                 Respondents.

Case No. 1:98-cv-00240-BLW

**MEMORANDUM DECISION AND ORDER**

**<u>CAPITAL CASE</u>**

Pending before the Court in this capital habeas corpus case is Petitioner Robin Lee Row's Rule 59(e) Amended Motion to Alter or Amend the Judgment (Dkt. 572), which supersedes her earlier Motion to Alter or Amend the Judgment (Dkt. 547). The motion is fully briefed and ripe for adjudication. (Dkt. 583, 592, 597.) For the reasons that follow, the Court enters the following Order granting in part and denying in part the Amended Motion to Alter or Amend the Judgment.

## BACKGROUND AND SUMMARY OF CLAIMS AT ISSUE

An Order and Judgment denying habeas corpus relief in this case were entered on August 29, 2011. (Dkt. 545.) On the twenty-eighth day after judgment was entered, September 26, 2011, Row filed a Motion to Alter or Amend Judgment requesting, among other relief, that the Court retain this case until the United States Supreme Court issued

its decision in *Martinez v. Ryan,* 132 S.Ct. 1309 (2012). After *Martinez*, the United States Court of Appeals for the Ninth Circuit issued a decision that is particularly relevant to Row's reconsideration request, *Dickens v. Ryan*, 740 F.3d 1302, 1318-19 (9th Cir. 2014) (*en banc*), which held that an inadequately supported claim that was decided on the merits in state court can become a "new" procedurally defaulted claim on federal habeas review if the petitioner tries to offer new evidence that changes the factual basis of the claim such that it has become "fundamentally altered." *Id*. at 1318-19.

Row asks the Court to apply the *Martinez* exception to several of her claims, to permit them to be heard on the merits de novo. Row's *Martinez* claims can be divided into two categories: (1) claims that this Court determined to be procedurally defaulted because they were either not presented to the state courts for adjudication at all or were not presented in a procedurally proper way; and (2) fundamentally altered claims that are in theory the procedurally defaulted companions to those inadequately supported claims that were decided on the merits. (Dkt. 583, pp. 3-5.)

The claims at issue are as follows:

**1. Claims Determined to be Procedurally Defaulted (deemed "Mitigation Claims" by Row)**

   A. Claim 7 ¶80(h), "Counsel failed to secure adequate testing concerning the brain damage that could have affected petitioner's ability to control her behavior, [thus undermining] the finding of petitioner's guilt." (Dkt. 293, p. 23.) (This is the only guilt-phase claim raised.)

B.  Claim 7 ¶ 81(a), "Failure to prepare, develop and present a coherent sentencing strategy." (Dkt. 293, p. 25.)

C.  Claim 7 ¶ 81(f), "Failure to investigate and present defenses and mitigating circumstances surrounding uncharged criminal activity presented during the trial and at sentencing." (Dkt. 293, p. 25.)

D.  Claim 7 ¶ 81(g), "Failure to research Eighth Amendment jurisprudence as it applies to the preparation and presentation of evidence in mitigation." (Dkt. 293, p. 25.)

E.  Claim 7 ¶81(h), "Failure to investigate, develop and present evidence rebutting aggravating evidence considered by the trial court." (Dkt. 293, p. 25.)

**2.  Fundamentally-Altered Companion Claims to Those This Court Decided on the Merits (deemed "Inadequately Presented Claims" by Row)**

A.  Claim 7 ¶ 81(b), "Failure to make an independent investigation of matters in mitigation." (Dkt. 293, p. 25.)

B.  Claim 7 ¶ 81(d), "Failure to timely retain a qualified mental health expert to address the issues of mental health clearly apparent from Petitioner's case." (Dkt. 293, p. 25.)

C.  Claim 7 ¶ 81(e), "Failure to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Petitioner revealing an atrophy of the brain." (Dkt. 293, p. 25.)

D. Claim 7 ¶ 81(n), "Permitting an unqualified mental health expert and his assistant to engage in unreliable techniques of memory re-enhancement, including hypnosis." (Dkt. 293, p. 26.)

E. Claim 7 ¶ 81(o), "Failure to research and comprehend the reported results of a psychological evaluation performed by an unqualified person and permitting presentation of a diagnosis of Petitioner as suffering from a condition called alexithymia which was not supported by fact, law, medicine, science or accepted standards of psychological principles." (Dkt. 293, p. 26.)

F. Claim 7 ¶ 81(p), "Permitting Petitioner to make a statement in allocution without knowing that the statement would be making incriminatory admissions, based upon unqualified, unreliable memory enhancement." (Dkt. 293, p. 26.)

G. Claim 7 ¶ 81(s), "Permitting the defense-retained psychologist to engage in practices likely to elicit a false confession from Petitioner and permitting Petitioner to be bullied into making that confession in allocution at sentencing which wholly undermine the theory of defense presented at trial." (Dkt. 293, p. 27.)[1]

---

[1]   Row also included Claim 7 ¶ 83 in her Amended Motion to Alter or Amend the Judgment. (Dkt. 572, p. 3.) This "claim" is actually a recitation of items supporting the second prong of *Strickland,* prejudice, intended to support the first prong, deficient performance. The Court will not separately address Claim 7 ¶83 because it does not appear to be a separate claim and is subsumed in the other claims addressed herein. To the extent it is beyond the scope of the claims asserted in the Amended Motion to Alter or Amend (Dkt. 583) (Claim 7, ¶¶80-81) , the Court considers this claim to be withdrawn for lack of briefing, or alternatively denies the claim due to failure to show substantiality.

**GOVERNING STANDARDS OF LAW**

## 1. *Martinez v. Ryan*

*Martinez v. Ryan* worked a "remarkable" equitable change in the law governing

procedurally defaulted ineffective assistance of counsel claims. *See Lopez v Ryan*, 678

F.3d 1131, 1136 (9th Cir. 2012). *Martinez* altered the long-standing prohibition of

*Coleman v. Thompson*, 501 U.S. 722 (1991), that post-conviction counsel's

ineffectiveness could not be used to excuse the procedural default of a claim. In effect,

*Martinez* created the potential for an exception to the overall ban on new evidence in §

2254 actions that was pronounced in *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011)

(interpreting the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)).

*Martinez* makes it possible for procedurally defaulted ineffective assistance of trial

counsel claims to be heard de novo, with new supporting evidence, on federal habeas

corpus review. *See Dickens v. Ryan*, 740 F.3d at 1320 ("We reject any argument that

*Pinholster* bars the federal district court's ability to consider Dickens's 'new' IAC

claim." In addition, "*Pinholster* says nothing about whether a court may consider a 'new'

claim, based on 'new' evidence not previously presented to the state courts.").[2]

In *Trevino v. Thaler*, 133 S.Ct. 1911 (2013), the United States Supreme Court

clarified that the *Martinez/Coleman* "cause" test consists of four necessary prongs. The

---

[2]      The United States Court of Appeals for the Ninth Circuit has also determined that *Martinez* applies to
ineffective assistance of direct appeal counsel claims. *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir. 2013).
However, Row has not included any such claims in her Amended Motion to Alter or Amend, which supersedes her
previous Motion to Alter or Amend.

**MEMORANDUM DECISION AND ORDER - 5**

failure to meet any prong means that the *Martinez* exception is unavailable to excuse the procedural default of a claim. *See Martinez*, 132 S.Ct. at 1319.

### A. First Prong of Martinez/Coleman "Cause"—Substantial Ineffective Assistance of Counsel Claim

First, a petitioner must bring forward facts demonstrating that his ineffective assistance of counsel (IAC) claim is substantial. The United States Supreme Court has defined "substantial" as a claim that "has some merit." *Martinez*, 132 S.Ct. at 1318 (comparing the standard for certificates of appealability from *Miller–El v. Cockrell*, 537 U.S. 322 (2003)). Stated inversely, a claim is "*in*substantial" if "it does not have any merit or . . . is wholly without factual support." *Id.* at 1319.

Determining whether an IAC claim is substantial requires a federal court to examine the claim under *Strickland v. Washington*, 466 U.S. 668 (1984). A petitioner asserting ineffective assistance of counsel under *Strickland* must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Under the first *Strickland* prong, whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. A reviewing court's inquiry into the reasonableness of counsel's actions must not rely on hindsight:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was

unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689 (internal citations and quotation marks omitted).

Strategic decisions, such as the choice of a defense or which witnesses or other evidence to present, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Id.* at 690. Moreover, an attorney who decides not to investigate a particular theory or issue in the case is not ineffective so long as the decision to forego investigation is itself objectively reasonable. *Id.* at 690-91.

If a petitioner shows that counsel's performance was deficient, the next step in the *Strickland* inquiry is the prejudice analysis. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To satisfy the prejudice standard, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability" is defined as a "probability sufficient to undermine confidence in the outcome." *Id*.

These standards from *Strickland* for determining deficient performance and prejudice, are, of course, the standards for an eventual review of the merits of the IAC claim. The first *Martinez* prong is not the same as a merits review, but, as the *Martinez* Court explained, it is more akin to a preliminary review of a *Strickland* claim for purposes of determining whether a certificate of appealability should issue. *See Martinez*, 132 S.Ct. at 1318-19 (comparing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). Under this standard, a court may conclude that a claim is substantial when a petitioner has shown that "resolution" of the merits of the *Strickland* claim would be "debatable among jurists of reason," or that the issues presented are "adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336.

### B. Second Prong of Martinez/Coleman "Cause"—Post-Conviction Review Counsel is Constitutionally Ineffective

Second, a petitioner must demonstrate that he had no counsel on initial post-conviction review, or that post-conviction review (PCR) counsel was "ineffective under the standards of *Strickland,*" which includes a showing of deficient performance and a reasonable probability of prejudice caused by the deficient performance. *Martinez*, 132 S.Ct. at 1318; *see Strickland,* 466 U.S. at 694, 700.

### 1) Deficient Performance

Not just any error or omission of PCR counsel will be deemed "deficient performance" that will satisfy *Martinez*. If the PCR "attorney in the initial-review collateral proceeding did not perform below constitutional standards," the PCR attorney's performance does not constitute "cause." *Martinez*, 132 S.Ct. at 1319.

2) <u>Prejudice</u>

As to prejudice, the petitioner must show that, if PCR counsel would not have

performed deficiently, the result of the post-conviction proceedings would have been

different. *Clabourne v. Ryan*, 745 F.3d 362, 376-77 (9th Cir. 2014) (cumulating all

opinions from *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc plurality

opinion)). That determination "is necessarily connected to the strength of the argument

that trial counsel's assistance was ineffective." *Id.* at 377-78.

3) <u>No Additional *Coleman* "Actual Prejudice" Showing is Required</u>

Once a petitioner has met Prong 1, a showing of substantiality of the merits of the

underlying IAC claim (deficient performance of trial or direct appeal counsel plus

prejudice), and Prong 2, that PCR was ineffective (deficient performance plus prejudice

in the PCR action), the *Coleman* "cause" is met. *Clabourne*, 745 F.3d at 378. *Coleman*

"actual prejudice" is met by a showing of substantiality of the merits of the underlying

IAC claim (Prong 1 of the "cause" test). *Id.* at 377.

**C. Prong 3—Initial State Collateral Review Proceeding**

Prong 3 of the *Martinez/Coleman* test is that the state collateral review proceeding

must have been the "initial" post-conviction review proceeding where the IAC claim

could have been raised. *Trevino*, 133 S.Ct. at 1918 (citing *Martinez*, 132 S.Ct. at 1318–

19, 1320–21). In other words, the post-conviction proceeding must have been "the

equivalent of a prisoner's direct appeal" for the IAC claim. *Martinez*, 132 S.Ct. at 1317.

A petitioner may not use as cause attorney error that occurred in "appeals from initial-

review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts." 132 S.Ct. at 1320.

### D. Prong 4—State Law Requires IATC Claims to be Brought in Initial State Collateral Review Proceeding

Prong 4 of the *Martinez/Coleman* test is that state law must require (by law or by reason of design and operation) that an ineffective assistance of trial counsel or appellate counsel claim be raised in an initial-review collateral proceeding. *Trevino*, 133 S.Ct. at 1918, 1921. In Idaho, the post-conviction setting is the "preferred forum for bringing claims of ineffective assistance of counsel," although in limited instances such claims may be brought on direct appeal "on the purported errors that arose during the trial, as shown on the record" (as opposed to matters arising outside the record). *Matthews v. State*, 839 P.2d 1215, 1220 (Idaho 1992).

### 2. Post-Judgment *Martinez* Motions

The Federal Rules of Civil Procedure apply in habeas corpus proceedings only "to the extent that they are not inconsistent with any statutory provisions or [the Rules Governing Section 2254 Cases]." Rule 12, Rules Governing § 2254 Cases; *see also* Fed. R. Civ. P 81(a)(4). The Supreme Court has not addressed whether or how Rule 59(e) is to be applied in federal habeas corpus cases subject to AEDPA, but it has addressed Rule 60(b) in that context.

### A. Rule 60(b) and 28 U.S.C. § 2244 (the Successive Petitions Bar)

Habeas corpus law is clear that all claims arising from a particular state court judgment must be brought in a single federal habeas corpus petition; otherwise, the

claims may be barred, or may be brought only after a petitioner secures authorization

from the United States Court of Appeals to file a second or successive petition. 28 U.S.C.

§ 2244(a)-(b). In *Gonzalez v. Crosby*, 545 U.S. 524, 532 (2005), the Supreme Court

determined that, as a result of § 2244's successive petitions rule, a Rule 60(b) post-

judgment motion that seeks to present newly discovered evidence, that seeks to add a

new ground for relief, that attacks the resolution of a claim on the merits, or that seeks to

vacate the judgment because of a subsequent change in substantive law going to the

merits decision is subject to § 2244. 545 U.S. at 531. However, *Gonzalez* emphasized that

a petitioner may use Rule 60(b) when she "merely asserts that a previous ruling which

precluded a merits determination was in error-for example, a denial for such reasons as

failure to exhaust, procedural default, or statute-of-limitations bar." 545 U.S. at 532 n.4.

**B.  *Rule 60(b), 28 U.S.C. § 2244, and* Martinez**

*Gonzalez*, clarifying the intersection of Rule 60(b) and § 2244, was issued many

years before *Martinez v. Ryan.* After *Martinez* was decided, the United States Court of

Appeals for the Ninth Circuit issued several opinions clarifying whether petitioners could

bring Rule 60(b) post-judgment motions to reconsider or consider anew procedurally

defaulted claims subject to *Martinez*, without running afoul of §2244.

In *Jones v. Ryan*, 733 F.3d 825, 836 (9th Cir.), *cert. denied*, 134 S.Ct. 503 (2013),

the Ninth Circuit Court of Appeals clarified: "*Gonzalez* firmly stands for the principle

that new claims cannot be asserted under the format of a Rule 60(b) motion, and instead

Rule 60(b) is properly applied when there is some problem going to the integrity of the

court process on the claims that were previously asserted." *Jones*, 733 F.3d at 836. In that

case, Jones was trying to take advantage of *Martinez* to assert in a Rule 60(b) motion new claims that had *not* been asserted in his federal habeas corpus petition. The Ninth Circuit explained that, "the rule announced in *Gonzalez*, that a valid Rule 60(b) motion 'attacks ... some defect in the integrity of the federal habeas proceedings,'… must be understood in context generally to mean the integrity of the prior proceeding with regard to the claims *that were actually asserted* in that proceeding. 'That [Jones] did not raise in his first [habeas] proceeding the claim[s] he wants to raise here does not render the adjudication of the claims that he did raise suspect.'" *Id.* at 836 (citation omitted).

In *Lopez v. Ryan*, 678 F.3d 1131 (9th Cir. 2012), the Ninth Circuit determined that *Gonzalez* permits a petitioner to raise the *Martinez* exception with regard to a *procedurally defaulted* claim in a Rule 60(b) motion. The Ninth Circuit declined to address Lopez's argument that it should expand the *Martinez* exception from post-conviction counsel's failure to raise a claim, to failure to develop the factual basis of a claim. *Id.* at 1137. Instead, the court merely "note[d] tension" between that theory and *Cullen v. Pinholster*,[3] and then determined that the underlying ineffective assistance of trial counsel claim was insubstantial. *Id.* at 1137-39.

---

[3]    *Pinholster* also left this question unresolved. The *Pinholster* majority declined the invitation to decide where to draw the line between new claims and claims adjudicated on the merits, but suggested that new evidence brought forward to supplement a claim decided on the merits could "present a new claim." 131 S.Ct. at 1401 n.10. The Court did not resolve the parties' dispute over whether new evidence rendered a claim unadjudicated (the State's position) or whether new evidence should be deemed mere support for a properly exhausted claim (the convicted felon's position). *Id.* at 1402 n.11. Interestingly, after *Martinez*, the positions of the parties on ineffective assistance of trial counsel claims often are reversed.

### C. *Martinez* and Fundamentally-Altered Claims in the Pre-Judgment Context

In *Dickens v. Ryan*, the Ninth Circuit addressed the question left open in *Lopez*, although not in a post-judgment motion setting. In state court, Dickens had presented a conclusory or "naked" *Strickland* claim without sufficient factual support—simply "that sentencing counsel did not effectively evaluate whether Dickens suffer[ed] from any medical or mental impairment." 740 F.3d at 1319. In his federal petition, Dickens "substantially improved" or "fundamentally altered" the "evidentiary posture" of this claim by asserting that his attorney failed to discover that Dickens suffered from Fetal Alcohol Syndrome (FAS) and organic brain damage. *Id*.

Having asserted only the fundamentally altered claim in his federal petition, Dickens was faced with a motion to dismiss on grounds of procedural default. The federal district court granted the motion to dismiss, and on appeal Dickens asserted that *Martinez* provided him with a new path for his procedurally claim to be heard. The *Dickens* Court concluded that, notwithstanding the fact that the Arizona courts had adjudicated the original inadequately raised claim on the merits, Dickens could proceed to a *Martinez* hearing on the claim that Dickens's trial counsel was ineffective at sentencing for failing to raise the FAS and organic brain damage facts as a defense, because it was a "fundamentally altered" claim that was different from the claim that had been decided on the merits. *Id*. at 1319. *Dickens* further instructed that § 2254(e)(2) did not bar the federal court from hearing new evidence in the Martinez hearing. *Id*. at 1321-22.

**D.** *Title 28 U.S.C. § 2244,* **Martinez,** *Rule 59(e),* **and Fundamentally Altered** *Claims*

The foregoing cases do not completely address how to handle Row's claims, which add the new elements of (1) a Rule 59(e) context and (2) fundamentally altered, procedurally defaulted claims that are companion claims to the "naked" *Strickland* claims decided on the merits in *both* state court *and* in this federal habeas corpus action.

The circuits are split on the issue of whether §2244 and *Gonzalez* apply to Rule 59(e) motions. The Fifth, Eighth, Tenth, and Fourth Circuits have determined or implied that a Rule 59(e) motion should be treated as a second or successive petition if it in substance challenges the same conviction or sentence. *See Williams v. Thaler*, 602 F.3d 291, 303–04 (5th Cir. 2010); *Ward v. Norris*, 577 F.3d 925, 931–35 (8th Cir. 2009); *United States v. Pedraza*, 466 F.3d 932, 933 (10th Cir. 2006); *United States v. Martin*, 132 Fed.Appx. 450, 451 (4th Cir. 2005) (unpublished pre-*Gonzalez* decision reaching the same conclusion as *Gonzalez*). The Third and Sixth Circuits have concluded that §2244 and *Gonzalez* do not apply to timely filed Rule 59(e) motions. *See Blystone v. Horn*, 664 F.3d 397, 414–15 (3d Cir. 2011); *Howard v. United States*, 533 F.3d 472, 475 (6th Cir. 2008). All of these cases were issued before *Martinez*.

The Ninth Circuit has not yet decided the question of whether *Gonzalez* (interpreting §2244 in the 60(b) context) applies to Rule 59(e) motions, or how *Martinez* affects that question. Within the Ninth Circuit, the United States District Court for the Western District of Washington has determined that the Third and Sixth Circuit's reasoning and conclusions are true to the distinctions between Rule 59(e) and Rule 60(b)

and do not transgress § 2244's principles. *See Rishor v. Ferguson*, --- F.Supp 3d ---, 2014 WL 6862506 (W.D Wash. 2014). *Rishor* did not address *Martinez*, but this Court agrees that Rule 59(e) can be applied without transgressing 28 U.S.C. §2244 (the successive petitions bar), with or without a *Martinez* question.

There is good reason two different post-judgment motion rules exist—although the modern distinction between the two stems, not from which Rule the motion is brought under, but from whether the motion was filed within 28 days of judgment. *See American Ironworks & Erectors, Inc. v. North American Const. Corp.*, 248 F.3d 892, 898-99 (9th Cir. 2001) (explaining rules under former 10-day time period). A motion for reconsideration filed within 28 days of judgment suspends finality of the judgment and tolls the time for appeal until the motion is resolved. *See* Fed. R. App. P. 4(a)(4)(A). Motions filed *after* 28 days—regardless of their designation under 59(e) or 60(b)—face a tougher reconsideration battle because the judgment has become final.

The United States Supreme Court has explained that Rule 59(e) was adopted "'to mak[e] clear that the district court possesses the power' to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982) (citing 1946 Amendment Advisory Committee Notes to Rule 59(e)). This rule serves judicial economy: if the district court can fix its own errors, thereby obviating the time and expense of an appeal, the court should be permitted to do so. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1249 (9th Cir. 1982).

Title 28 U.S.C. § 2244, the successive petitions bar, as interpreted by *Gonzalez*, prohibits petitioners from using Rule 60(b) post-finality motions to add a new ground for relief or attack the court's previous resolution of a claim on the merits. On the other hand, because Rule 59(e) is a pre-finality rule, its purpose permits a petitioner to assert that a judgment on the merits should be altered, amended, or vacated because there was an error in the judgment that can be corrected during the 28-day time period while the judgment is suspended. *See Howard*, 533 F.3d at 475 ("If the holding of *Gonzalez* applied to Rule 59(e) motions, it would almost always be effectively impossible for a district court to correct flaws in its reasoning, even when the problems were immediately pointed out and could be easily fixed by that court," without the petitioner having to resort to applying for permission to the court of appeals). While Rule 59(e) suspends the finality of the judgment, a Rule 60(b) motion is filed after finality occurs and is thus "a collateral attack on a judgment, which is to say an effort to set aside a judgment that has become final." *Id*. at 474.

Suspending the finality of a challenged judgment does not mean that Rule 59(e) provides a 28-day "open season" on that judgment. While a Rule 59(e) motion to alter or amend a judgment may be used to substantively challenge a court's entry of judgment, it "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 485 n. 5 (2008). A Rule 59(e) motion should not be granted unless there is a showing of highly unusual circumstances, such as when the district court is presented with newly discovered evidence, the court committed clear error, there is an intervening

change in the controlling law, or the decision was "manifestly unjust." *Ybarra v. McDaniel*, 656 F.3d 984, 998 (9th Cir. 2011). The law is well-settled that "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." *McDowell v. Calderon*, 197 F.3d 1253, 1255 n.1 (9th Cir. 1999).

This Court concludes that Rule 59(e), with its narrow application, does not transgress the purposes of § 2244—that habeas corpus petitioners must bring all of their claims in one, and only one, petition, absent authorization from the circuit court. The limitations of Rule 59(e) prohibit a habeas petitioner from bringing *new* claims in a Rule 59(e) motion under the guise of *Martinez*; rather, a petitioner must make a showing that she had raised the claims in her habeas corpus petition prior to judgment. Neither may a petitioner challenge adjudication of claims decided on the merits unless the district court is presented with newly discovered evidence, the court committed clear error, there is an intervening change in the controlling law, or the decision was "manifestly unjust." These limitations on the use of a Rule 59(e) motion act as a gatekeeper against new claims during the 28-day time period; § 2244 acts as a gate-keeping mechanism after the 28-day time period expires. The Court concludes that the *Martinez* exception qualifies as a Rule 59(e) "intervening change in the controlling law," and otherwise fits within the procedural bounds exempted by § 2244 as interpreted by *Gonzalez*, 545 U.S. at 532 n. 4, thereby permitting a Court to revisit a procedural default judgment, subject to the limitations of Rule 59(e).

The slightly different question inherent in Row's reconsideration motion is whether *Dickens* permits a petitioner to use a Rule 59(e) motion to raise *Martinez* by

creating a procedurally defaulted companion claim based on *Pinholster*-barred

supplemental facts from the fully exhausted but inadequately raised claim that was

decided on the merits by the state and federal courts. By definition, such a *Martinez* claim

must be a fundamentally altered claim that is in a "significantly different and stronger

evidentiary posture" than it was when the state courts considered the merits of the

original claim. *Dickens*, 740 F.3d at 1318. The Court concludes that *Dickens* permits a

Petitioner to create a fundamentally altered and procedurally defaulted claim from a

merits-decided claim for *Martinez* purposes in a Rule 59(e) motion, so long as (1) the

significantly different and stronger evidentiary posture of the claim was presented in the

habeas corpus petition prior to entry of judgment (whether as a separate companion claim

or as an additional factual basis for a properly-exhausted claim), and (2) the resulting

procedurally defaulted claim is actually fundamentally different from the one decided on

the merits by the federal district court.

## DISCUSSION

### 1.  Fundamentally Altered Claims

Row alleges that her first post-conviction counsel raised ineffective assistance of

trial counsel claims in a conclusory and inadequate manner in the first state post-

conviction proceeding. In the second state post-conviction proceeding, Row presented

them as fundamentally altered claims, bolstered by new supporting evidence (including

expert witness affidavits), together with other new claims arising from the new

supporting evidence. The Idaho Supreme Court refused to address the claims, because

they could have been brought during the first post-conviction action, resulting in their

default in state and federal court. In her Second Amended Petition for Writ of Habeas Corpus, Row presented the claims in a hybrid manner, as permitted by the status of the law at that time period—as properly exhausted claims, but supplemented with the new evidence that the state courts had refused to hear. She also included in the Second Amended Petition the allegation that post-conviction counsel had been ineffective for failing to properly present the new evidence on state post-conviction review. (Dkt. 293.) The Court earlier concluded that Row could proceed on the properly exhausted claims, and could attempt to persuade the Court to allow her to present the new evidence in federal court. However, *Pinholster* intervened to prevent the Court from hearing the original claim with the new evidence.

For application of *Martinez* and *Dickens* in the Rule 59(e) context, the Court finds no substantial difference among any of the ways a petitioner chose to bring her claims in her petition at a time when *Martinez*, *Dickens*, and *Pinholster* did not exist: (1) as only a fundamentally altered and procedurally defaulted claim (as in *Dickens*); (2) as two separate claims (one exhausted and one fundamentally altered and procedurally defaulted); or (3) as a single exhausted claim with an attempt to supplement it with substantially improved evidence (now prohibited by *Pinholster*). Because Row raised the original claims plus the additional evidence in her Second Amended Petition before judgment was entered, the Court concludes that it is appropriate to construe Petitioner's Second Amended Petition as presenting alternative claims (original and fundamentally altered), to the extent that the procedurally defaulted claim is fundamentally different from the original merits-decided claim.

Therefore, the Court will consider whether each of Row's merits-decided claims at issue in her motion can be separated into two fundamentally different claims. To the extent a claim is different and potentially substantial, the Court will permit Row to proceed to a *Martinez* hearing. To the extent that a claim is not fundamentally different from the claim this Court adjudicated on the merits, or is not substantial, she will not be permitted to proceed. The Court's analysis of the claims at issues in the remainder of this Order will follow a substance-related rather than a chronological outline.

## 2. Row's State Court Representation

Row was represented by Ada County Public Defenders August Cahill and Amil Myshin at trial and sentencing. On direct appeal and during the first post-conviction action, Row was represented by John Adams and Ralph Kehne, whose office had a conflicts contract with the Ada County Public Defender at that time. (Petitioner's Fifth Supplemental Lodging, Exhibit 5, Deposition of John Adams, p. 8.)

## 3. Claim 7 ¶ 81(b), "Failure to make an independent investigation of matters in mitigation."

In its previous Order, this Court concluded that Claim 7 ¶ 81(b) – that trial counsel failed to make an independent investigation of matters in mitigation – was raised and adjudicated in state court in the first post-conviction action and was not procedurally defaulted. (Dkt. 417, p. 13.) As a result, the Court considered and denied this claim on the merits. (Dkt. 545. pp. 37-50.)

## A. *The Claim Has Been Fundamentally Altered*

Row's substantially improved evidence that the state district court did not hear before adjudicating the mitigation investigation claim includes the following. In 2001, Dr. James Merikangas, a medical doctor specializing in neurology and psychiatry, reviewed Row's CT scans, obtained MRI and SPECT scans, and conducted a neurological examination of Row. Dr. Merikangas concluded that Row has cerebellar atrophy or cerebellar hypoplasia and cortical atrophy. He also believes that "[t]his organic condition has the probable neuropsychiatric outcome of reducing [Row's] ability to control her behavior and under conditions of emotional distress may have affected her ability to appreciate the wrongfulness of her behavior." (Dr. James Merikangas Declaration, Dkt. 442.)

Dr. Merikangas further opined that, "[i]n regard to the question of whether Robin Row has antisocial personality disorder, it should be noted that having an organic brain dysfunction is one of the conditions that must be ruled out before making a diagnosis of antisocial personality disorder." (Merikangas Declaration, Dk. 442.) Dr. Merikangas specifically identified the symptoms of organic brain dysfunction as "poor impulse control, lack of empathy, manipulation, pathological lying, paranoia, histrionic style and chronic depression." (*Id.*) He also identified involuntary behavioral manifestations including poor judgment, poor executive function, and poor impulse control." (*Id.*)

Because the state courts did not evaluate this new evidence when they considered Row's mitigation investigation claim in the first post-conviction action, the Court concludes that this claim qualifies as a fundamentally altered, procedurally defaulted

claim regarding trial counsel's failure to make an independent investigation of matters in mitigation, only to the extent that it relates to the organic brain disfunction defense in the sentencing phase of trial. Row may not relitigate in a Rule 59(e) motion the aspects of the mitigation investigation claim already decided by this Court on the merits.

**B.** ***First Prong of Martinez—Substantiality—Whether Trial Counsel Performed Deficiently and Whether Row's Defense was Prejudiced***

For the following reasons, the Court concludes that Row may proceed to a *Martinez* hearing to attempt to show substantiality of her mitigation investigation claim. The record shows that the defense lawyers,[4] the prosecutor,[5] the sentencing judge,[6] and the mental health professionals[7] were all generally aware that behavior typically leading

---

[4]   In cross-examining Dr. Engle about what causes a person to have a sociopathic personality, trial counsel's question implied that he understood a "neurological thing" or a "chemical imbalance" could be a contributing factor. (State's Lodging A-6, pp. 3931-33.)

[5]   To justify imposition of the death penalty at sentencing, the prosecutor made the following specific points:

> The second thing that I find significant is the psychological testing results that have come before the court as part of sentencing. The – the 1982 MMPI results that we have, while somewhat abbreviated, and of course we don't have the testing material there, indicate that she will have – or predicts that she will have effective judgment, unacceptable behavior. . . .

> Ten years later or eleven years later the 1983 MMPI shows that she is a sociopath…. And basically she tests the same way the general criminal population tests. That she has – *that she doesn't have some mental disease or defect*, but that she is a sociopath.

(State's Lodging A-6, pp. 3979-80 (emphasis added).)

[6]   As mitigating factors, the sentencing judge took in to consideration Row's "mental, psychological and personality problems," including that her "'alexithymic' condition may be related to some organic problem with brain functioning." (*Id.*, pp. 8-9.) (Findings of the Court in Considering Death Penalty and Imposition of Sentence, p. 13.)

[7]   Trial counsel's question to Dr. Norman on direct examination regarding treatment options for Row drew out Dr. Norman's knowledge of an organic basis to behaviors. Dr. Norman testified:

> There's [sic] different theories about how to treat. They refer to it now as primary and secondary. Primary is more neurological I guess where they know that there's this part of the brain, either the corpus callosum or lower part of the

to a sociopathic diagnosis *can* have a physiological basis. Row asserts that that there was not enough evidence in the record at sentencing to show that Row had an organic brain issue, and that further evidence would have been able to explain some of her sociopathic-type behavior and would have resulted in a different sentence. For example, some of the aggravating factors the sentencing court found, such as that Row had "utter disregard for human life," meaning a "lack of conscientious scruples," and that she was a "pathological liar who will bend and distort the truth and reality to suit her own purposes," share a common basis with organic brain dysfunction symptoms. (Compare Findings of the Court in Considering Death Penalty and Imposition of Sentence, pp. 8-10, with Dr. James Merikangas Declaration, Dkt. 442.)

The present record inadequately addresses the relationship, if any, between the organic brain dysfunction and the extensive evidence of motive and planning that led the sentencing court to reject the suggestion that Row's mental, emotional, or organic issues caused her to act involuntarily. In weighing the aggravating and mitigating circumstances, the court noted that "Row was rational in the sense that any rational

---

> brain has been affected. Secondary not that it's less, but it's social through trauma or PTSD or, you know, extreme – an extremely dramatic event could cause somebody to go into this state.

(State's Lodging A-6, pp. 3872-3873.)

Dr. Beaver did not testify at trial, but his testimony at the post-conviction hearing reflected his understanding that an organic brain disorder may have a role in sociopathic-like behavior. (State's Lodging B-12, pp. 128-29.) On cross-examination, Dr. Beaver said that there would need to be further testing and analysis done to "say whether or not those abnormalities in emotionality are more related to her social, developmental and genetic history versus some organically induced condition or some combination thereof." (*Id.*, p. 131.)

person would know and intend that the logical consequences of setting the fires would be the deaths of the sleeping victims." (*Id.*, p. 15.)

A key question for the *Martinez* hearing is whether any prejudice arose from the failure to bring forward additional physiological evidence because of the extensive evidence of motive and planning. The ability to plan, for example, is one of the factors medical experts and jurists have used to reject a theory that an organic brain problem is compelling enough to affect findings of mens rea, mitigation, or aggravating factors. *See, e.g., Commonwealth v. Massachusetts*, 440 Mass. 234, 244, 797 N.E.2d 371, 378 (Mass. 2003) ("where there were multiple expressions of an intent to kill and unmistakable indicia of planning (references to insurance, cremation, taking the whole family with him), expert opinion that the defendant was incapable of intending or premeditating what he obviously did was unlikely to create a reasonable doubt").

The evidence at trial tended to show that Row (1) had employed a well-thought-out, multi-step premeditated plan (she made up instances of spousal abuse, she moved only her items but none of the children's items to a storage unit, she obtained a series of life insurance policies, and she had a plan to move to a different state with a new love interest); (2) had several motives, including receiving over $250,000 in life insurance proceeds, ridding herself of familial entanglements to start over with a new lover, and ridding herself of a recently-brain-damaged husband who made life more difficult; and (3) had set the fires with intent to kill, not simply to scare or to destroy property (the furnace fan was turned on, the smoke detectors were turned off, the fires were set at

locations to block the occupants from leaving the residence, a large amount of fire accelerant was use, and the occupants were asleep when the fires were set).

It also is unclear whether or to what extent the prior mysterious deaths of Row's other two children were used at the sentencing phase of trial,[8] and whether that played into any strategy of trial counsel to present only the theory they did. It is unknown how these additional historical facts would impact an organic brain dysfunction theory, for example, whether the prior deaths tend to show a long history of sociopathic-like behavior because of a brain dysfunction, or whether they tend to show a longstanding ability to premeditate despite the brain dysfunction.

What is clear is that evidence relevant to whether Row had an organic brain dysfunction was available to Row's trial counsel and the reviewing psychologists during the pre-sentence investigation. A 1993 post-crime CT scan was contained in the pretrial sentence investigation (PSI) report. The doctor who interpreted the CT scan, Dr. David Giles, observed:

> The basal cisterns are normal. The cerebellar folia are mildly deepened and sulci near the vertex are mildly deepened for a patient of this age. Combined cerebellar vermian and cerebral cortical atrophy can be caused by a number of irreversible etiologies, but reversible etiologies should be considered and the findings suggest the possibility of alcohol abuse, clinical correlation is advised.

---

[8] At sentencing, the trial court observed that Petitioner "had meticulously kept up these [life insurance] policies over an extended period of time and had even purchased one as late as seventeen (17) days prior to the fire. Based upon historical facts in her life (the tragic death of her son Keith in an accidental albeit similar type of house fire in 1980), Robin Row had every reason to expect and anticipate insurance proceeds from another accidental fire that would claim the lives of her family." (Findings of the Court In Considering Death Penalty and Imposition of Sentence, p. 8.) In its opinion affirming the conviction and sentence, the Idaho Supreme Court observed that during the investigation, the "police discovered Row had lost a daughter to Sudden Infant Death Syndrome in 1977, and that her son, Keith, had died in a house fire in California in 1980. (State's Lodging C-17, p. 2.)

(State's Lodging A-7, p. 65.) It is unclear from the record to what extent, if any, Row's trial counsel or psychologists reviewed this record or attributed any significance to it for the mitigation defense. Other relevant evidence available during the pre-sentence investigation was a 1991 pre-crime CT scan that could be used for comparison.

### C. *Second Prong of* **Martinez**: *Deficient Performance of Post-Conviction Counsel*

If Row is able to meet *Martinez*'s first prong, then several particular facts may be relevant to *Martinez*'s second prong — ineffective assistance of *post-conviction* counsel. First, Row's post-conviction counsel could have been laboring under the existence of a conflict of interest regarding remuneration for attorney services. In a December 13, 2002, deposition, post-conviction counsel John Adams discussed how the following placed great economic stress on their office: (1) Kehne and Adams were working on two other death penalty cases at the same time; (2) the cases paid only about $40 an hour; and (3) they were having difficulties collecting their fees from the Bannock County Commissioners on the Wood capital case. Adams said he and Kehne recognized there was a conflict of interest regarding Adams and Kehne's financial interests and the appropriate representation of Row between their office and the Ada County Public Defender's Office/Ada County Commissioners. (John M. Adams deposition, December 13, 2002, pp. 27-28.) Adams described barely being able to pay office overhead, feed their families, and pay their mortgages during the time they worked on Row's post-conviction matter.

In addition, post-conviction counsel may have been laboring under a conflict of interest due to a close personal relationship with trial counsel. Mr. Adams stated that the case "was not as well done as one might have hoped" as to "[d]evelopment of issues, particularly ineffective assistance of trial counsel." (Adams Deposition, p. 31.) Mr. Adams attributed this circumstance to "a few things," including his close personal relationship to trial counsel Myshin and Cayhill. "I considered them my brothers. We spent a lot of time together. And I think that really affected the way I was willing to deal with them. I think if they had been strangers, I would have dealt with them in a significantly different way than I did deal with them." (Adams Deposition, pp. 31-32.)

A third factor is some evidence suggesting that the post-conviction attorneys were immediately aware of the organic brain dysfunction issue, but did little to develop or investigate it: (1) counsel's first request for expert funding was denied without prejudice to Row's counsel returning to show the need for the funding; (2) counsel had knowledge of the organic brain dysfunction issue as early as June 1995, when that information was attached to the amended post-conviction petition; (3) counsel failed to renew the motion for funding for an expert; and (4) counsel failed to request a continuance of the hearing until the day of the hearing.

Another issue raised by the record is that the lack of funding contributed to post-conviction counsel's inability to present this evidence. Adams testified: 'If we'd have had the mental health resources that we had wanted, I'm sure I would have developed issues with them about why they had not done it…. So I think besides the personal relationship there was also a general lack of resources and apparently basic information that we were

operating with that interfered with it." (Adams Deposition, p. 32.) For example, in the

Court's pre-*Pinholster* Order of September 15, 2010, the Court determined that an

evidentiary hearing was necessary to determine whether the failure to raise this claim in

the first post-conviction action was due to limited resources, or a lack of diligence. At

that time, the Court identified:

> [s]everal factual issues that appear to be material to
> this dispute [that] cannot be resolved by referring to the
> existing record, including the following: the degree to which
> funding was available through the Ada County Public
> Defender's Office for "conflict" post-conviction counsel to
> retain investigative and expert services; the extent of post-
> conviction counsel's efforts to seek funding from the Public
> Defender for those services; the nature of the supposed
> conflict that the Public Defender believed that he had when
> reviewing funding requests; how counsel paid for the services
> that they ultimately did retain; and how counsel expected to
> pay for the services that they intended to retain had the
> district court granted a continuance of the post-conviction
> hearing.

(Order of September 15, 2010, Dkt. 509, p. 2.)

### D. *Conclusion*

Row may be able to meet Prong 1, substantiality of the ineffective assistance of

trial counsel claim as to Claim 7 ¶81(b), but key to the determination will be the issues

related to strategy. Under *Strickland*:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that
> reasonable professional judgments support the limitations on
> investigation. In other words, counsel has a duty to make
> reasonable investigations or to make a reasonable decision
> that makes particular investigations unnecessary. In any
> ineffectiveness case, a particular decision not to investigate
> must be directly assessed for reasonableness in all the

circumstances, applying a heavy measure of deference to
counsel's judgments.

466 U.S. at 690-91.

More evidence is needed before the Court can determine whether this claim is
substantial, and whether, under Prong 2, Row's post-conviction attorneys were
ineffective. Prongs 3 and 4 of *Martinez* are not at issue. Row will be permitted to move
forward to develop her facts to demonstrate why *Martinez* should be applied to Claim 7
¶81(b).

### 4. Claim 7 ¶ 81(a), "Failure to prepare, develop and present a coherent sentencing strategy."

Claim 7 ¶81(a) is that trial counsel failed "to prepare, develop and present a
coherent sentencing strategy." (Dkt. 293, p. 25.) The Second Amended Petition presents
this statement as a "fact" supporting the ineffective assistance of counsel claim, but it is a
mere conclusory statement unsupported by any facts. (*Id.*, p. 22.) This claim was
determined to be procedurally defaulted. (Dkt. 417, p. 13 *et seq.*)

For Row to proceed with this claim, it must be fundamentally different from the
similar ineffective assistance claims that the state and federal courts decided on the merits
(otherwise, it would not have been deemed procedurally defaulted). Row explains this
claim as follows: "Absent background investigation, evaluations and research, trial
counsel was without any meaningful strategy.' (Dkt. 572, p. 14.) In other words, trial
counsel could not have developed a meaningful or coherent strategy because counsel did
not do adequate background investigation or evaluation. Petitioner further explains: "A

strategy and research effort by counsel based upon the brain abnormality would have triggered investigation and recognition of the organic brain disorder would have gone far in explaining her behavior." *Id*.

In the course of determining Row's similar ineffective assistance of counsel at sentencing, the state district court determined that trial counsels' presentation of Row's mental health issues at sentencing is the type of decision that "remains at the heart and core of strategy and tactics in presenting their defense of Ms. Row." (State's Lodging B-11, p. 293.) On appeal, the Idaho Supreme Court found and concluded that (1) trial counsel reviewed and presented extensive amounts of background and other information about Row; (2) that the sentencing judge had considered "every facet of background information in one form or another"; and (3) "[t]rial counsel's decisions concerning Row's mental health ... were strictly strategic and shall not be second-guessed by this Court." (*Id*.) The record supports this decision, demonstrating that trial counsel chose the alexithymia theory as a matter of strategy and tactics. Accordingly, Row's claim is not fundamentally different from the one already decided by this Court on the merits, and, thus, Rule 59(e) prohibits Row from relitigating the same issues. To the extent that a portion of this claim can be considered fundamentally different, it is subsumed in Claim 7 ¶ 81(b).

**5. Claim 7 ¶ 81(d), "Failure to timely retain a qualified mental health expert to address the issues of mental health clearly apparent from Petitioner's case."**

Claim 7 ¶ 81(d), that trial counsel failed "to timely retain a qualified mental health expert to address the issues of mental health clearly apparent from Petitioner's case"

(Dkt. 293, p. 25), was not deemed procedurally defaulted, but was denied on the merits in this federal habeas action. (Dkt. 545, pp. 37-50.) Based on the reasoning above, the Court concludes that the only fundamentally different portion of Claim 7 ¶ 81(d) — that trial counsel should have retained a neuropsychiatrist — is actually the subject of a separate claim, 7 ¶81(e). Row may proceed only on Claim 7 ¶81(e), not both claims. Because a merits decision determined that trial counsel retained qualified mental health experts other than a neuropsychiatrist, it is not subject to *Martinez*.

6. **Claim 7 ¶ 81(e), "Failure to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Petitioner revealing an atrophy of the brain."**

Claim 7 ¶ 81(e) is that trial counsel failed "to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Row revealing an atrophy of the brain." (Dkt. 293, p. 25.) The state courts refused to hear this fundamentally altered claim on state law procedural grounds in the second post-conviction action. This Court reviewed this claim on the merits on evidence that was presented to the state courts in the first post-conviction action —Dr. Beaver's speculative post-conviction testimony—and determined that it did not warrant habeas corpus relief. The Court declined to hear new evidence on this claim, because it was foreclosed by *Pinholster*.

Row is not contesting this Court's merits conclusion, but is asserting that her fundamentally altered companion claim is procedurally defaulted. Row seeks opportunity to show that her trial counsel performed deficiently and that prejudice resulted, based on

the new organic brain dysfunction evidence. (See Dkt. 417, p. 13.) To that limited extent, she will be permitted to proceed to a *Martinez* hearing.

**7. Claim 7 ¶ 81(n), "Permitting an unqualified mental health expert and his assistant to engage in unreliable techniques of memory re-enhancement, including hypnosis."**

In the first post-conviction action, Row alleged "that her counsel were deficient in the presentation of mental health issues, including the hiring, work and testimony of Dr. Norman; the inadequacy of his psychological investigation and work-up; and inadequate presentation of such issues at sentencing." (B-11, p. 292.) It is clear that Row raised the issue of whether the mental health professionals that were hired by her counsel were adequate. This claim was determined to be adjudicated on the merits in state court, and was adjudicated on the merits in this action. The "fundamentally altered" claim is not actually fundamentally different from the merits-decided claim. Therefore, Row may not proceed on this claim.

**8. Claim 7 ¶ 81(o), "Failure to research and comprehend the reported results of a psychological evaluation performed by an unqualified person and permitting presentation of a diagnosis of Petitioner as suffering from a condition called alexithymia which was not supported by fact, law, medicine, science or accepted standards of psychological principles."**

Claim 7 ¶ 81(o) is that trial counsel failed "to research and comprehend the reported results of a psychological evaluation performed by an unqualified person and permitting presentation of a diagnosis of Row as suffering from a condition called alexithymia which was not supported by fact, law, medicine, science or accepted standards of psychological principles." (Dkt. 293, p. 26.) This claim was adjudicated on

the merits in state district court and in this Court. (Dkt. 471, p. 13; Dkt. 545, pp. 37-50.) This is the same claim that was adjudicated on the merits, and, thus, it cannot be deemed procedurally defaulted. Row may not proceed with this claim.

### 9. Claim 7 ¶ 81(p), "Permitting Petitioner to make a statement in allocution without knowing that the statement would be making incriminatory admissions, based upon unqualified, unreliable memory enhancement."

Claim 7 ¶ 81(p) is that trial counsel was ineffective for "[p]ermitting Row to make a statement in allocution without knowing that the statement would be making incriminatory admissions, based upon unqualified, unreliable memory enhancement." (Dkt. 293, p. 26.) This claim was adjudicated on the merits in state district court and in this Court. (Dkt. 471, p. 13; Dkt. 545, pp. 37-50.) Row has not convinced the Court that her claim is fundamentally altered such that she should be permitted to proceed.

Alternatively, in Idaho allocution is a defendant's right; therefore, as with Row's claim of actual innocence in the guilt phase, Row's decision to allocute was her own, and counsel did not perform deficiently by not attempting to convince Row not to allocute. Row's allocution added little, and merely confirmed her role in the fires, which was already plainly evident from the other evidence presented at trial. The sentencing court determined on post-conviction review that Row's allocution, including its content and source, "made no difference whatsoever to this Court's ultimate decision to impose the death penalty." (State's Lodging B-11, p. 295.)

Based on all of the foregoing, the Court alternatively concludes that Row has failed to show deficient performance or prejudice, rendering the claim insubstantial.

**10. Claim 7 ¶ 81(s), "Permitting the defense-retained psychologist to engage in practices likely to elicit a false confession from Petitioner and permitting Petitioner to be bullied into making that confession in allocution at sentencing which wholly undermined the theory of defense presented at trial."**

Petitioner may not proceed to a *Martinez* hearing on Claim 7 ¶ 81(s), that trial counsel was ineffective in "[p]ermitting the defense-retained psychologist to engage in practices likely to elicit a false confession from Petitioner and permitting Petitioner to be bullied into making that confession in allocution at sentencing which wholly undermined the theory of defense presented at trial." (Dkt. 293, p. 27.) This claim is not fundamentally different from the claim the Court determined on the merits.

**11. Claim 7 ¶ 81(f), "Failure to investigate and present defenses and mitigating circumstances surrounding uncharged criminal activity presented during the trial and at sentencing."**

Claim 7 ¶ 81(f) is that trial counsel failed "to investigate and present defenses and mitigating circumstances surrounding uncharged criminal activity presented during the trial and at sentencing." (Dkt. 293, p. 24.) There are no particular facts in the Second Amended Petition or in the Brief in support of the Amended Motion to Alter or Amend to explain this claim. In Row's Reply, she asserts that trial counsel should not have filtered out evidence that they considered a "mixed bag," but should have recognized that "lying, criminal convictions, and lack of emotion were actually the result of the brain dysfunction." (Dkt. 597, p. 25.) Row argues: "A reasonable investigation would have led trial counsel to the appropriate conclusion: these facts were not bad acts, but symptoms that prove Petitioner's brain dysfunction." (*Id.*) The Court concludes that this claim is not

separate from Claim 7 ¶81(b), the mitigation investigation claim, or ¶81(h), the rebuttal to aggravating factors claim. Therefore, Row cannot pursue this claim separately.

**12. Claim 7 ¶ 81(g), "Failure to research Eighth Amendment jurisprudence as it applies to the preparation and presentation of evidence in mitigation."**

Claim 7 ¶ 81(g) is that trial counsel failed "to research Eighth Amendment jurisprudence as it applies to the preparation and presentation of evidence in mitigation." (Dkt. 293, p. 25.) Row has presented no particular facts or argument in her Second Amended Petition or in her briefing in support of her Motion to Alter or Amend Judgment to show how Claim 7 ¶ 81(g) is a substantial claim. The argument in the Reply confirms that Row's claim is based on speculation. (Dkt. 597, pp. 26-27.) The Court concludes that this claim is not substantial.

**13. Claim 7 ¶ 81(h), "Failure to investigate, develop, and present evidence rebutting aggravating evidence considered by the trial court."**

Claim 7 ¶ 81(h) is that trial counsel were ineffective for their "[f]ailure to investigate, develop, and present evidence rebutting aggravating evidence considered by the trial court." (Dkt. 293, p. 25.) This claim was determined to be procedurally defaulted.

As noted above, some of the aggravating factors appear to be the same as some of the symptoms of organic brain dysfunction, such as pathological lying, lack of empathy, manipulation, and poor judgment. The Court concludes that Row should be given further opportunity to show that this claim is substantial, but only to the limited extent (1) that this claim relies on the failure to present evidence of the organic brain dysfunction, and

(2) that it is separate and distinct from the mitigation claims that the state and federal courts decided on the merits, as discussed above.

## 14. Guilt Phase: Claim 7 ¶80(h)

Claim 7 ¶80(h) is that "counsel failed to secure adequate testing concerning the brain damage that could have affected petitioner's ability to control her behavior, [thus undermining] the finding of petitioner's guilt." (Dkt. 293, p. 23.) This claim was determined to be procedurally defaulted. (Dkt. 417, p. 13.)

Row maintained not only her innocence, but also her complete non-involvement in the crimes throughout the guilt phase of the trial. Row is now asserting, through her expert opinions, that counsel could have used the fact of an organic brain disorder to negate the mens rea element of the crimes, and, therefore, Row could have been acquitted.

Respondent persuasively counters that a mental defect defense would have been inconsistent with Row's actual innocence assertion; hence, counsel acted appropriately in crafting a defense that was compatible with her actual innocence stance. *See Doe v. Woodford*, 508 F.3d 563, 569 (9th Cir. 2007) (trial counsel made a reasonable strategic choice to rely on petitioner's claims of innocence and decided not to pursue further investigations into petitioner's mental state since he testified that a mental state defense "would have been inconsistent" with the theory of the case); *Gilson v. Sirmons*, 520 F.3d 1196, 1247 (10th Cir. 2008) (counsel's decision was a reasonable trial strategy because to have also raised a mental disorder defense based on Gilson's brain scans would have been inconsistent with a defense of actual innocence and would have considerably

weakened both defenses). When a client asserts her actual innocence via non-involvement, an attorney need not attempt to persuade her to instead assert a mens rea defense that implicates her involvement.

Accordingly, the Court concludes that Row has not established that this claim is substantial for failure to show deficient performance of trial counsel. Rule 59(e) relief is not warranted, and Row may not proceed further on this claim.

## 15. Conclusion

The Court concludes that the following claims are eligible for a *Martinez v. Ryan* hearing: 7 ¶ 81(b), (e), and (h) (all limited to organic brain dysfunction subject matter). Row may not proceed on Claims 7 ¶ 80(h); ¶ 81(a), (d), (f), (g), (n), (o), (p), or (s).

The Court will hold an evidentiary hearing to determine whether *Martinez* should be applied to excuse the procedural default of Claim 7 ¶ 81(b), (e), and (h). Row may consider whether there is any value in attempting to return to state court to properly exhaust her claims.[9]

---

[9]    The Court is aware of the Idaho Supreme Court's holding in *Murphy v. State*, 327 P.3d 365 (Idaho 2014). Prior to *Murphy*, Idaho courts allowed petitioners to raise ineffective assistance of post-conviction counsel as a "sufficient reason" under Idaho Code § 19–4908 to bring a successive post-conviction petition. *See Palmer v. Dermitt*, 635 P.2d 955, 959-60 (Idaho 1981). In *Murphy*, the Idaho Supreme Court relied upon *Coleman v. Thompson*, 501 U.S. 722 (1991), for the general proposition that there is no federal constitutional right to post-conviction counsel, but it did not discuss the new exception to that case, which permits a petitioner to assert ineffective assistance of initial post-conviction counsel as cause to excuse the procedural default of claims of ineffective assistance of trial or appellate counsel. *See Martinez v. Ryan*, 132 S.Ct. 1309 (2012); *Trevino v. Thaler*, 133 S.Ct. 1911 (2013); *Nguyen v. Curry*, 736 F.3d 1287, 1293 (9th Cir.2013) (applying *Martinez* to underlying claims of ineffective assistance of appellate counsel).

    The practical effect of the *Murphy* holding may be that the state courts have unknowingly relinquished the opportunity to be first to adjudicate ineffective assistance of trial counsel and direct appeal counsel claims that were not properly raised due to ineffective assistance of post-conviction counsel during the first post-conviction action, because *Martinez v. Ryan* opened the door to such claims for the first time in twenty years since *Coleman*. If the state courts will no longer consider whether the ineffective assistance of post-conviction counsel prevented a petitioner's claims from being raised properly (or at all) in the first post-conviction proceeding, the federal courts will be required to consider both issues (ineffective assistance of post-conviction counsel as cause, and the merits of ineffective assistance of trial and direct appeal counsel claims) de novo, including holding de novo hearings where

## PLANNING FOR THE EVIDENTIARY HEARING

Row has a formidable task ahead to meet the first prong of the *Martinez* analysis—a showing that her trial counsel performed deficiently and that it amounted to prejudice at sentencing. This preliminary hearing will lay the foundation for a merits hearing on the underlying ineffective assistance of trial counsel claims, if such a hearing is warranted.

Counsel for the parties are ordered to conference via phone or in person to discuss and stipulate to as many issues regarding the hearing as possible (after which the Court will determine whether or when a pre-hearing conference is needed), including but not limited to the following.

- Several available dates for the hearing

- Length of hearing

- Place of hearing

- Scope of hearing

- Scope of discovery, if any

- Deadlines for discovery

- Disclosure of witnesses' expected testimony

- Disclosure of expert witness reports, opinions, and expected testimony

- Disclosure of exhibits.

---

necessary. The federal courts are reluctant to take this course of action in federal habeas corpus proceedings, preferring to have these issues heard first in state court, out of comity and deference to the state's strong interest in its own criminal cases, particularly those that have already been resolved by the state courts.

Many of the *Martinez* legal issues lie in uncharted territory. The Court gives the parties notice that it intends to apply the following points of law, unless the parties convince the Court otherwise, or unless clarifying precedent is issued in the interim.

1. **Standards of Law**. In a *Martinez* hearing, the standard for success is like a certificate of appealability (COA)—the *Strickland* claim has "some merit." In a de novo merits hearing, the *Strickland* standard applies: the petitioner must show deficient performance of trial counsel and a reasonable probability of a different outcome. The overlap of these standards is obvious.

2. **New Evidence**. New evidence is permissible under *Dickens* because a *Martinez* claim is not a constitutional "claim" subject to *Pinholster* or section 2254(e)(2).

3. **Discovery**. The parties can conduct discovery for the hearing and present evidence at the hearing to show (1) the ineffective assistance of trial counsel claim has some merit (deficient performance and prejudice), and (2) post-conviction relief counsel in the initial post-conviction relief action were ineffective (deficient performance and prejudice).

4. **Presumption of Correctness of State Court Findings of Fact**. The 28 U.S.C. § 2254(e)(1) presumption of correctness applies to state court findings of fact that may have relevance in a *Martinez* procedural default setting. *See Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010) (where the state court had explicitly determined that particular witnesses were not credible, the federal district court will defer to the state court's factual findings). The process by which the state court made findings, if any, "may have some bearing" on Row's efforts to rebut the presumption of

correctness by clear and convincing evidence. *Id.* ("Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part.").

5. **Applicability of §2254(e)(2) in De Novo Setting**. If the Court finds *Martinez* cause and prejudice and determines that it is permitted to review the merits de novo, the question remains whether "§ 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Pinholster*, 131 S.Ct. at 1401. Section 2254(e)(2) restricts factual development in federal court if the applicant or his counsel failed to develop the factual basis of the claim in state court, *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). In what may seem like a Catch-22, to qualify for *Martinez* a petitioner must show that post-conviction counsel was ineffective in failing to develop the factual (and/or legal) basis of the claim in state court, but on a merits review a petitioner can bring forward new facts only if he shows diligence in trying to present the evidence to the state courts under § 2254(e)(2). It seems the purpose of *Martinez* would be defeated if new evidence were permitted at the *Martinez* qualifying-round hearing, but not at the actual merits final-round hearing. Legal justification theories for permitting new evidence in a de novo hearing appear to be: (1) if 2254(e)(2) is met; (2) if a petitioner goes back to state court to try to develop facts and obtains a merits ruling, in effect, trying to fulfill 2254(e)(2)'s pre-requisites by having asked for

evidentiary development in state court, but she is rejected;[10] or (3) if 2254(e)(2) is rendered inapplicable by the equitable exception of *Martinez*.

6. **Related Nature of *Martinez* and Merits Hearing**. The question of the merits of the underlying ineffective assistance of counsel claims may or may not be developed enough at the *Martinez* hearing to affect whether a second de novo hearing on the merits is required. It may be that no hearing or only a narrow second hearing is required, given the evidence that was developed in the *Martinez* hearing.

The parties may briefly comment on these issues of law in their stipulation/notices, but any full-fledged arguments should be addressed in prehearing memoranda.

## ORDER

**IT IS ORDERED:**

1. Petitioner's Motion for Leave to File Excess Pages (Dkt. 598) is GRANTED.

2. Petitioner's Amended Motion to Alter or Amend Judgment (Dkt. 572) is GRANTED in part, to the extent that Petitioner has demonstrated that Claims 7 ¶ 81 (b), (e), and (h) (all limited to organic brain dysfunction subject matter) may proceed to a hearing to determine whether *Martinez v. Ryan* should be applied. The Motion is denied as to all other claims: Claim 7, ¶ 80(h); ¶81(a), (d), (f), (g), (n), (o), (p), and (s).

---

[10] A state court's rejection on the merits would implicate AEDPA review upon return to federal court; rejection on procedural grounds may fulfill §2254(e)(2)'s prerequisite of a diligent effort to present the claim to the state court.

3. Counsel for the parties shall follow the Court's instructions set forth above for preparation and planning for the evidentiary hearing. A stipulation and notice of any issues of scheduling or application of the law that is to be applied to any aspect of the hearing upon which the parties could not agree shall be filed **within 60 days after entry of this Order**. The parties may agree between themselves as to an extension of time for this deadline, if necessary, and need only inform the Court of that agreement, rather than seek approval. The notice shall be in an outline form; the parties will be given the opportunity to brief their arguments at a later time.

DATED: March 31, 2015

B. Lynn Winmill
Chief Judge
United States District Court