1            **UNITED STATES DISTRICT COURT**

2                **DISTRICT OF IDAHO**

3

ROBIN LEE ROW,                    )   CASE NO. 1:98-cv-00240-BLW

4                                 )
                 Petitioner,      )   **EVIDENTIARY HEARING DAY 1**

5                                 )
            vs.                   )

6                                 )
BONA MILLER, et al.,              )

7                                 )
                 Respondents.     )

8    _____ )

9

10              **TRANSCRIPT OF PROCEEDINGS – VOLUME 1**
              **BEFORE THE HONORABLE B. LYNN WINMILL**

11                  **MONDAY, JUNE 5, 2017**
                     **BOISE, IDAHO**

12

13   **FOR PETITIONER**
          Deborah A. Czuba

14        Jonah J. Horwitz
          Christopher Sanchez

15        FEDERAL DEFENDER SERVICES, CAPITAL UNIT
          702 W. Idaho, Suite 900

16        Boise, ID 83702

17   **FOR RESPONDENTS**
          Jessica M. Lorello

18        L. LaMont Anderson
          IDAHO ATTORNEY GENERAL'S OFFICE

19        Criminal Law Division/Capital Litigation Unit
          P.O. Box 83720

20        Boise, Idaho 83720-0010

21

Proceedings recorded by mechanical stenography, transcript

22   produced by computer.
     _____

23

24              **TAMARA I. HOHENLEITNER, CSR 619, CRR**
               FEDERAL OFFICIAL COURT REPORTER

25        550 WEST FORT STREET, BOISE, IDAHO  83724

I N D E X

JUNE 5, 2017

| Date | Proceeding | Page |
|------|-----------|------|
| 6/5/17 | Evidentiary Hearing – Day 1 | 1 |

P E T I T I O N E R ' S   W I T N E S S E S

PAGE

**JOHN MICHAEL ADAMS**
    Direct Examination by Mr. Horwitz...................... 11
    Cross-Examination by Mr. Anderson..................... 20
    Redirect Examination by Mr. Horwitz................... 29
    Examination by the Court............................. 31
    Recross-Examination by Mr. Anderson.................. 33

**MARY CAROLYN GOODY**
    Direct Examination by Ms. Czuba...................... 112
    Cross-Examination by Ms. Lorello..................... 132
    Examination by the Court............................. 133
    Further Cross-Examination by Ms. Lorello............. 135
    Redirect Examination by Ms. Czuba................... 136

**ROLF MICHAEL KEHNE**
    Direct Examination by Mr. Horwitz.................... 36
    Examination by the Court............................. 69
    Cross-Examination by Mr. Anderson.................... 73
    Redirect Examination by Mr. Horwitz................. 100
    Examination by the Court............................ 103
    Continued Redirect Examination by Mr. Horwitz........ 104
    Recross Examination by Mr. Anderson................. 111

**JAMES RAY MERIKANGAS**
    Direct Examination by Ms. Czuba..................... 183

**RUSSELL STETLER**
    Direct Examination by Mr. Horwitz................... 138
    Cross-Examination by Mr. Anderson.................... 176
    Redirect Examination by Mr. Horwitz................. 181

1                    **P E T I T I O N E R ' S   E X H I B I T S**

2  **ADMITTED**                                                      **PAGE**

3  **20**      State of Idaho v. Robin Lee Row, Case No.
            18945,
4           Sentencing Transcript, October 21, 1993.......... 45

   **28**      Robin Lee Row v. State of Idaho, Case No.
5           HC3539, Affidavit of Rolf M. Kehne, January 20,
            1995............................................ 45

6  **40**      Robin Lee Row v. State of Idaho, Case No.
            HC3539, Proposed Findings and Conclusions,
7           February 20, 1996............................... 64

   **42**      State of Idaho v. Robin Lee Row, Case No.
8           HC3539, Post-Conviction Relief Evidentiary
            Hearing Transcript, January 13, 1995 – February
9           29, 1996........................................ 54

   **114**     Mary Hudson interview with Craig Beaver, Ph.D.,
10          June 13, 1995................................... 46

   **120**     Mary Hudson interview with Arthur Norman,
11          Ph.D., June 14, 1995............................ 47

   **126**     Robin Lee Row v. State of Idaho, Case No.
12          HC3539, Affidavit of Mary C. Hudson, June 15,
            1995............................................ 49

13

14

15

16

17

18

19

20

21

22

23

24

25

4

PROCEEDINGS

June 5, 2017

1        THE CLERK:  The court will now hear Civil Case 98-240,

2  Row vs. Miller, for day 1 of an evidentiary hearing.

3        THE COURT:  Good morning, Counsel.

4    Counsel, I'm assuming we're going to forego opening

5  statements and move directly into the evidence, but I am not

6  certain of that.

7    Ms. Czuba, do you want to tell me, are you going to -- are

8  we going right into evidence?

9        MS. CZUBA:  No, Your Honor.  We are going to waive

10 both opening and closing.

11       THE COURT:  I'm sorry?

12       MS. CZUBA:  We are going to waive both opening and

13 closing.

14       THE COURT:  Okay.  Very good.  All right.  Then, with

15 that, you may call your first witness.

16       MS. CZUBA:  Your Honor, if we could put some brief

17 things on the record.

18       THE COURT:  Yes.  I'm sorry.  That's right.  We had

19 talked yesterday.  Counsel, I apologize.  I'm a little harried

20 this morning.  I had some things that caused me to come into the

21 office later than I planned, so I am actually a little bit off

22 pace here.  Hopefully, I'll catch my stride here in a bit.

23   I think we're going to preadmit, as I recall, trial

1    exhibits, those that have been admitted by stipulation.  Is that

2    counsel's understanding?  I think we sent an order out to that

3    effect.

4         MS. CZUBA:  Yes, Your Honor.  We received that order.

5         THE COURT:  All right.  Then why don't you go ahead

6    and proceed.  Maybe step to the lectern.  And the lectern is

7    adjustable.  There is a toggle switch that will actually move

8    the lectern up and down to make it more comfortable.

9         MS. CZUBA:  Okay.  I just --

10         THE COURT:  Okay.  Go ahead.

11         MS. CZUBA:  I just have two brief procedural matters

12    this morning that we wanted to put on a joint stipulation on the

13    record.  That with regards to our expert witnesses, Dr. Mark

14    Greenberg, Dr. James Merikangas, Dr. Clay Ward, Dr. Roger Moore,

15    and Dr. Arthur Kowell, that we are going to stipulate that these

16    witnesses are qualified as expert witnesses to testify for the

17    purpose of this hearing so that we don't have to go through the

18    whole entire qualification process, to expedite time here.

19         THE COURT:  All right.  So I'm assuming -- I don't

20    know, Ms. Lorello or Mr. Anderson, who is going to speak for the

21    respondent?  I'm assuming that, since you've reviewed their

22    expert reports, you know what it is they are opining on, that

23    you are satisfied that they are -- they have the requisite

24    expertise to offer those opinions.  Is that correct?

25         I'm a little nervous about stipulating that somebody is an

6

1      expert unless we know what they are an expert of.  But if we're

2      tying it to the expert reports, that gives us --

3              MS. LORELLO:  That's my understanding, Your Honor.

4      And the only caveat I would add to that is, you know, we have

5      had some objections as to relevance of some of those opinions.

6              THE COURT:  Well, certainly.  Certainly.

7              MS. LORELLO:  But, yes, as to the question of

8      expertise, yes.

9              THE COURT:  All right.  That stipulation, then, will

10     be accepted by the court, and the experts of the petitioner will

11     be able to -- will be able to offer all of the opinions set

12     forth in their expert reports.  All right?

13             MS. LORELLO:  And for the respondents.

14             THE COURT:  I'm sorry?

15             MS. LORELLO:  And for the respondents.

16             THE COURT:  Is it as for both parties?

17             MS. CZUBA:  Yes.

18             THE COURT:  Then yes.

19             MS. CZUBA:  And the only one that's left out from that

20     is Russ Stetler.

21             THE COURT:  Okay.  And that one, there will need to be

22     a determination by the court as to expertise?

23             MS. CZUBA:  Yes, sir.

24             THE COURT:  All right.

25             MS. CZUBA:  The only other housekeeping matter we had

1    is we wanted to check -- we know you entered an order regarding

2    the exclusion of witnesses in this case.  We wanted to ask that

3    Christine Hanley, an investigator from our office who will be

4    testifying later in the hearing, be excluded from the

5    sequestration.

6         THE COURT:  Normally, each party is entitled to have

7    one individual who may testify act as a case agent or party

8    representative.  The same thing would apply for the respondent.

9    So that's not a problem.

10         MS. CZUBA:  Okay.  And the other person that we would

11    like excluded is Russ Stetler.  Similar to Dr. Moore, who is

12    sitting here to assess and consult, Mr. Stetler also would be

13    helpful for him to hear the testimony of the trial attorneys and

14    the PCR attorneys and the investigators.

15         THE COURT:  Okay.  Mr. Anderson?

16         MR. ANDERSON:  Your Honor, on that issue, just very

17    briefly, as I read the court's order, Mr. Stetler may be

18    permitted to testify regarding mitigation specialists and

19    mitigation, not particularly render opinions about how counsel

20    performed under those standards.  And that's the reason we'd ask

21    for him to be excluded.

22         MS. CZUBA:  With permission, Your Honor?

23         THE COURT:  Yes.

24         MS. CZUBA:  I think your housekeeping order this

25    morning went further than that and said that with respect to

1    legal conclusions, that you would assess that as the hearing

2    went along.

3              THE COURT:  True.  And I -- for that reason, I'm going

4    to allow him to stay in the courtroom.  Normally, I allow anyone

5    whose opinion or whose testimony may be predicated upon trial

6    testimony, there is -- as to those witnesses that they would

7    rely upon in forming their own opinion or fashioning their own

8    testimony, I'll allow that; but they can't remain in the

9    courtroom for any other purpose.

10        Is that agreeable?

11              MS. CZUBA:  Yes, sir.

12              THE COURT:  All right.

13              MS. CZUBA:  And Mr. Jonah actually -- Mr. Horwitz is

14    actually going to be dealing with the first couple of witnesses

15    today.

16              THE COURT:  All right.  Then there was -- I think we

17    talked about stipulating to the admission of all exhibits that

18    have been stipulated to by the parties.  Perhaps, for the sake

19    of time, I can just indicate that all of those exhibits are

20    admitted.  We can identify them, perhaps, even by a separate

21    order, written order, and admit them by written order rather

22    than take the time here.

23        Is that agreeable, Counsel?  I assume they have been

24    adequately identified that we don't need to spend the time now

25    and identify them further.

1          MS. CZUBA:  The only exception -- and I don't know,

2     Jessica, if you have got the exhibit number -- there is one

3     exhibit that there has been some back-and-forth over that we may

4     have misidentified on our list.  There is a deposition of

5     Mr. Glenn Elam, and that actually did not appear in the state

6     court record.  So, at this point, the stipulation is just as to

7     foundation, not as to admissibility.

8               THE COURT:  All right.  Ms. Lorello, is that agreed?

9               MS. LORELLO:  That's correct, Your Honor.  We

10    understand that it can be used for certain purposes but not for

11    its substance, because he is going to be testifying.  So I don't

12    know --

13              THE COURT:  Okay.  I don't know why, if they are

14    testifying, what they are going to be used for other than

15    impeachment --

16              MS. LORELLO:  Right.

17              THE COURT:  -- or something of that sort.

18         Ms. Czuba, what --

19              MS. CZUBA:  Well, the deposition of Mr. Elam was in

20    1995, and it certainly is a better recollection of his work on

21    the case than his --

22              THE COURT:  And if he testifies that he has forgotten

23    something, he can refer to it as either past recollection --

24    present recollection refreshed or past recollection recorded.

25              MS. CZUBA:  Okay.

1              THE COURT:  But you just lay the foundation for that,

2       and then we can proceed.

3              MS. CZUBA:  Yes, Your Honor.

4              THE COURT:  Okay.  All right.  Then, Mr. Horwitz, do

5       you want to call your first witness?

6              MR. HORWITZ:  Yes, Your Honor.  Ms. Row calls John

7       Adams.

8              THE COURT:  Mr. Adams, would you step before the clerk

9       and be sworn.

10           JOHN MICHAEL ADAMS, PETITIONER'S WITNESS, SWORN

11             THE CLERK:  Please take a seat in the witness stand.

12         Please state your complete name and spell your name for the

13      record.

14             THE WITNESS:  Good morning, Judge.  Nice to see you

15      again.

16             THE COURT:  Yes.  How are you?

17             THE WITNESS:  Good.

18             THE COURT:  Go ahead and take your seat.  Ms. Bracke

19      will direct you from there.

20             THE CLERK:  Please state your complete name and spell

21      your name for the record.

22             THE WITNESS:  John Michael Adams.  J-O-H-N,

23      M-I-C-H-A-E-L, A-D-A-M-S.

24             THE COURT:  You may inquire, Mr. Horwitz.

25             MR. HORWITZ:  Thank you, Your Honor.

11

                              DIRECT EXAMINATION

1    BY MR. HORWITZ:

2    Q.   Can you hear me okay, Mr. Adams?

3    A.   Yes.

4    Q.   What is your current employment status?

5    A.   I retired in March after 35 years of practicing law.  I'm

6    still a member of the state and federal bar, but I'm retired

7    now.

8    Q.   Are you familiar with the Row case?

9    A.   Yes.

10   Q.   How are you familiar with it?

11   A.   Well, I was her appellate and postconviction counsel, along

12   with my partner, Rolf Kehne, back in the early '90s.

13   Q.   What sort of office did you and Mr. Kehne have at that

14   time?  What was the nature of your partnership?

15   A.   Private practice, two-man.  We did mainly criminal defense.

16   Q.   Were there any other attorneys on the Row postconviction,

17   the initial postconviction?

18   A.   No.  Just Rolf Kehne and I.

19   Q.   Who was lead counsel between the two of you?

20   A.   I guess if we had to choose one, we would have Rolf.  We

21   got it under a contract with the Ada County Public Defenders,

22   and the contract was in his name.  So we could designate Rolf as

23   lead counsel.

24   Q.   Was there an investigator on the case?

12

1    A.   We didn't have an investigator.  I think -- you know, we

2    had a mitigation expert, Mary Hudson, that we had hired.  But as

3    far as a criminal investigator like Glenn Elam, we didn't have

4    one of those, no.

5    Q.   Is Mary Hudson also known as Mary Goody?

6    A.   Yes.  She got married to Mr. Goody.  So she is Mary Goody

7    now, I believe.

8    Q.   As a general matter, when you and Mr. Kehne were working on

9    a case, would you keep each other up to speed on the other one's

10   work on the case?

11   A.   Yes.

12   Q.   What was your relationship like with Gus Cahill at the time

13   that you were on the postconviction case?

14   A.   He was a friend of mine.  I had worked for him at the Ada

15   County Public Defender's Office some years earlier.  He had been

16   the chief deputy, and I was a staff attorney.  I considered him

17   not only a colleague but a friend.

18   Q.   What was your relationship like with Mr. Amil Myshin at

19   that time?

20   A.   The same.  I considered him, especially Amil, to be like

21   brothers.  We were brothers.

22   Q.   Did your friendships with Mr. Cahill and Myshin affect your

23   work on Ms. Row's postconviction case?

24   A.   Well, you know, you and I talked about this.  And looking

25   back, I would say that I probably didn't go after them as hard

1   as I might have somebody that I didn't consider a brother.

2       You know, at the same time we were doing that, we were in

3   front of His Honor in Pocatello on a case, and there were a

4   couple of lawyers that we were doing postconvictions against.

5   And I really went after them, but I didn't go after Gus or Amil

6   that way.

7   Q.   What was the financial health of your and Mr. Kehne's

8   partnership like at the time of the Row case?

9   A.   We were spending a lot of time in Bannock County on that

10  case, and the Bannock County commissioners were refusing to pay

11  us.  And I think we were having trouble getting money out of

12  Ada County as well.  And we were mainly doing those appointed

13  cases.  So we were -- we were hurting for income.  We weren't

14  getting paid.

15  Q.   Were you married at that time?

16  A.   Yes.  Married, four children.

17  Q.   How old were your children in 1993 and '94, around that

18  time?

19  A.   You might have to ask my wife that.  She is sitting back

20  there.

21      You know, they were still in school, high school and grade

22  school.  They're all in their 30s now.  So 25 years ago, they

23  were grade school and junior high, I think.

24  Q.   What's a money judge?

25  A.   A money judge is a term that is used in criminal defense

1    litigation when you apply for resources from a judge other than

2    the judge who is going to be the factfinder.

3        So in the Row case, Judge Schwartzman had been the trial

4    judge; and under Idaho law, he was also going to be the judge in

5    the postconviction hearing, which would make him the factfinder

6    as well.

7        And you would ask -- we did ask Judge Schwartzman to give

8    us another judge to whom we could apply for resources so that

9    he, as the factfinder, wasn't privy to our secrets.

10       That's what a money judge is.

11   Q.   How did Judge Schwartzman rule on that request?

12   A.   He denied the request.

13   Q.   What did you do after that to get funding?

14   A.   You know, I think there were two sources.  We either did go

15   to Alan Schwartzman or to Alan Trimming, who was the chief

16   Ada County Public Defender.  Those would have been the only two

17   sources.

18       Like I said, this was a long time ago, but I think we may

19   have asked both of them at one point or another, depending on

20   what we were seeking resources for.  We're still trying to keep

21   our secrets from the factfinder.  If you ask him for money to

22   hire a forensic expert, you don't put on the forensic expert; it

23   sends a message to the finder of fact.

24           THE COURT:  Counsel, I'm just going to ask a

25   follow-up.

1          You indicated that you made application to Judge

2     Schwartzman, and that was denied.  What specifically was asked

3     for?

4               THE WITNESS:  We asked him to appoint us a money judge

5     so when we --

6               THE COURT:  Okay.  So what you were referring to,

7     then, is you applied for a money judge, and they turned it down,

8     and Judge Schwartzman was going to be the factfinder.  So you

9     hadn't made any specific requests that had been denied, just

10    that they hadn't appointed a money judge; is that what you're

11    saying?

12              THE WITNESS:  I'm not sure I follow that.  I'll see if

13    I can straighten -- we asked Judge Schwartzman to appoint

14    another district judge --

15              THE COURT:  Right.  As a money judge.

16              THE WITNESS:  -- as a money judge.  And he denied that

17    and said, "I will be the money judge."

18              THE COURT:  Okay.  I thought it had gone further and

19    that you had actually made some request for investigative

20    expenses which had been denied.  But I understand now.

21         Go ahead and proceed.

22              THE WITNESS:  That comes later.

23              THE COURT:  All right.  Go ahead.

24              MR. HORWITZ:  Thank you, Your Honor.

25    Q.   BY MR. HORWITZ:  And to follow up on the court's questions,

1    did you, after you were denied permission -- or in addition to

2    being denied permission to use a money judge, did you request

3    funding from Judge Schwartzman?

4    A.    You know, as I said, I think -- my recollection is that we

5    applied to both Judge Schwartzman and to Alan Trimming for

6    money, depending on what we wanted the money for.

7    Q.    With respect to Ms. Goody's investigation, do you remember

8    how her work was funded?

9    A.    No.

10   Q.    When we're looking at your billing records in this case,

11   what do the letters "JMA" stand for?

12   A.    Myself, John Michael Adams.

13   Q.    When you were --

14   A.    Kehne is "RMK," Rolf Michael Kehne.

15   Q.    Thank you.  When you were working on a postconviction case,

16   just as a general matter, would you review the correspondence

17   sent to you by a mitigation specialist who you had retained?

18   A.    Yes.

19   Q.    Were there certain experts that you were in the habit of

20   consulting on brain damage issues?

21   A.    Yes.

22   Q.    Who would those have been?

23   A.    Craig Beaver.

24   Q.    Anyone else?

25   A.    There may have been, but I don't recall.  Beaver is the

1    only one I recall.

2    Q.   Do you know whether you ever requested funding for

3    neuropsych -- neuropsychological testing, in Ms. Row's case in

4    particular?

5    A.   I don't have a specific recollection, but I would be

6    surprised if I hadn't.

7    Q.   Do you know whether you had neuropsychological testing done

8    on Ms. Row?

9    A.   I don't recall.

10   Q.   Do you know whether you called lay witnesses at the

11   postconviction evidentiary hearing to testify in support of a

12   brain damage claim?

13   A.   I don't recall.

14   Q.   Do you recall being deposed in this case?

15   A.   I don't recall it, but I did read the deposition.

16   Q.   Would it sound right to you if that deposition was

17   conducted on December 13, 2002?

18   A.   Yes.  I'll take your word for it.

19   Q.   Did you testify truthful during that deposition?

20   A.   Sure.

21   Q.   Was your memory better at that time than it is now?

22   A.   Yes.  I would assume it was, 15 years ago.

23            MR. HORWITZ:  Could I have just a moment, Your Honor?

24            THE COURT:  Yes.

25   Q.   BY MR. HORWITZ:  Mr. Adams, I would like to call your

1    attention to the deposition that you testified at.

2           THE COURT:  Does the witness have a copy, or are you

3    going to show it to him?

4           MR. HORWITZ:  I was going to call it up, yes.

5        And, Your Honor, just for future reference -- well, I

6    guess, actually, this deposition was not admitted.  So I'll just

7    call it up, and I'd ask your permission to show it to the

8    witness?

9           THE COURT:  Yes.  Are you bringing it up on your

10   computer?  All right.  We need to change the input source.

11   There we go.

12       Was this marked as an exhibit, though?

13          MR. HORWITZ:  It was, Your Honor.

14          THE COURT:  Just so we can keep the record straight,

15   that's Petitioner's Exhibit 69.

16   Q.   BY MR. HORWITZ:  Mr. Adams, I'd like -- sorry.  I would

17   like to call your attention to the top of page 26 of the

18   deposition.

19       Do you have that in front of you?

20   A.   Yes.

21   Q.   Could you read -- could you read just to yourself the

22   exchange that opens that page.

23   A.   Okay.

24   Q.   So that begins with, "Had you had additional time and

25   money..."

19

1    A.    I read it.

2    Q.    And read it all the way down to where you say "no" on

3    line 13.

4    A.    Okay.

5    Q.    Does that refresh your recollection as to whether you did

6    have neuropsychology testing conducted on Ms. Row?

7    A.    Well, it refreshes my recollection that we didn't get the

8    resources we asked for to do some testing.  It doesn't

9    necessarily mean that we didn't do any, just that we didn't do

10   these.

11   Q.    And do you -- does this refresh your recollection as to

12   what your reason was for not -- what reason there was for not

13   having conducted the tests that were not conducted?

14   A.    Lack of resources.  I think Judge Schwartzman had denied us

15   requests for resources to do neuropsych testing on Row.

16           MR. HORWITZ:  I have no further questions for the

17   moment, Your Honor.

18           THE COURT:  Cross, Ms. Lorello.

19           MS. LORELLO:  Mr. Anderson will handle this.

20           THE COURT:  Mr. Anderson.

21           MR. ANDERSON:  Could I have just a moment, Your Honor?

22           THE COURT:  Yes.

23       Mr. Horwitz, is Mr. Adams going to be recalled?

24           MR. HORWITZ:  That's not our intention, Your Honor.

25           THE COURT:  All right.

1        Mr. Anderson.

2            MR. ANDERSON:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4   BY MR. ANDERSON:

5   Q.    Mr. Adams, you said that -- you explained that your

6   practice at the time that you were representing Ms. Row in

7   postconviction and appeal, that your work involved primarily

8   criminal defense.

9   A.    That's correct.

10  Q.    Did you have any civil cases at that time that you recall

11  of?

12  A.    You know, I know we did.  I just don't recall what they

13  were.  You know, sometimes -- I did a lot of trial work, and

14  there were civil attorneys in town that would hire me to help

15  them second-seat them in trials.  And there were civil trials

16  that weren't being handled by my firm, but I was being hired to

17  do trial work for these lawyers.

18  Q.    So, as I understand it, you would do work not only with the

19  firm of Kehne & Adams, but then you were retained by other civil

20  attorneys that you would second-chair that was separate and

21  apart from your work at Kehne & Adams?

22  A.    True.  Tony Bohner.  I worked a lot with Tony Bohner as a

23  second seat.

24  Q.    Okay.  And you indicated that you had no investigator

25  during the postconviction proceedings.

21

1    A.    I don't recall having one.  We may have.  I just don't

2    remember it.

3    Q.    But you did have Mary Goody as a mitigation specialist?

4    A.    We did.

5    Q.    And she was consulted fairly early on after your

6    appointment in Ms. Row's case; is that correct?

7    A.    It was my practice to -- the first thing I do in capital

8    cases is hire a mitigator.  So even though I have no

9    recollection, it was my practice.

10   Q.    Okay.  And I realize, Mr. Adams, it's been a very long

11   time, but as you sit here today, do you recall any

12   dissatisfaction with what Ms. Goody did -- or Hudson did?

13   A.    I have no recollection at all of what she did.

14   Q.    You indicated that you tried to get financial resources

15   from Judge Schwartzman?

16   A.    Yes.

17   Q.    Do you recall asking Judge Schwartzman for money for

18   Mary -- I'm going to call her "Mary Hudson."  Do you recall that

19   particular motion that was filed?

20   A.    There may have been more than one motion.  We had a

21   tendency, when Judge Schwartzman said no, to just keep asking

22   him to make sure our record was perfected.

23        I did read some documents that were supplied to me by the

24   federal habeas office, and one was a transcript of some hearings

25   in front of Judge Schwartzman.  And that was a couple weeks ago.

1        My memory -- mind is not working so good these days; that's

2   why I retired.

3        And I think I remember in those transcripts asking Judge

4   Schwartzman for money for a mitigator and him saying no.  That's

5   my recollection, but the record speaks for itself.

6   Q.   Okay.  And you indicated that you retired, at least in

7   part, due to some health reasons?

8   A.   Yep.

9   Q.   And that's affecting your ability to recall some of the

10  things that happened back then?

11  A.   True.

12  Q.   But you didn't have those health issues back when you

13  represented Ms. Row?

14  A.   Not that I know of.  I may have.

15  Q.   Okay.  Fair enough.

16       Do you recall working with Dr. Craig Beaver during 1995

17  in --

18  A.   I don't have a specific recollection of working with him.

19  Q.   -- in the Row case?

20  A.   I have read some documents, transcripts, I think, and maybe

21  some invoices that indicate I did work with him.  I don't have a

22  specific recollection of it.

23  Q.   You have no recollection of being involved with Dr. Beaver

24  during the Row case at all?

25  A.   I don't.

1    Q.   You indicated that you had a pretty good relationship with

2    Mr. Cahill?

3    A.   Yes.

4    Q.   And he was lead counsel in Ms. Row's trial and sentencing

5    case?

6    A.   I don't know whether he or Amil was.  I don't know.  I

7    wasn't part of that.

8    Q.   Okay.  Was it Mr. Cahill that actually called your office

9    to request that you do the Row postconviction case?

10   A.   I doubt it.  It was Alan Trimming.  He was the chief

11   defender.  Gus was the chief deputy.

12   Q.   So that would have been done pursuant to contract?

13   A.   Correct.

14   Q.   You were a conflict -- you had a contract to do conflict

15   cases in Ada County?

16   A.   Yes, Rolf did.  It was under his name.

17   Q.   Right.  And you handled more than just Ms. Row's cases so

18   far as conflict cases at that time?

19   A.   Oh, yes.

20   Q.   You had a pretty healthy caseload of conflict cases, during

21   the time that you represented Ms. Row, from Ada County?

22   A.   I don't remember exactly how many cases we had from the

23   Public Defender's Office.  But we had, yeah, other cases,

24   including other capital cases.

25        We had Thomas Creech.  I had a case that was outside of

24

1    Rolf and I's partnership, with Judge Reinhardt, Mark Lankford.

2    I wrote his postconviction at the time.  We were working in

3    Bannock County in front of His Honor on another case.

4    Q.   That was James Wood?

5    A.   Yeah, James Wood.  You know, there may have been others,

6    too.  It was a long time ago, Counsel.

7    Q.   But your billing records as far as your Ada County conflict

8    cases would tell us how many cases and what work you did as far

9    as a conflict attorney in Ada County?

10   A.   Yeah.  I think we were pretty reliable and our records are

11   pretty reliable.

12   Q.   You also mentioned that you were -- I think you used the

13   word "brothers" with Amil Myshin.

14   A.   Yeah.  I consider Amil a brother.

15   Q.   Did you consider him to be a brother at the time that you

16   represented Ms. Row?

17   A.   Yes.

18   Q.   Were you involved in Keith Wells' case?

19   A.   Yes.

20   Q.   And that was just a year or two prior to Ms. Row's case;

21   correct?

22   A.   I don't know.

23   Q.   Mr. Myshin was representing Mr. Wells during the course of

24   his direct appeal to the Idaho Supreme Court; correct?

25   A.   Rolf and I did the -- Idaho has a consolidated

1    postconviction and direct appeal in capital cases -- not in

2    misdemeanors, but in capital cases they do.  And Rolf and I were

3    appointed to do that.

4         And Keith was a volunteer -- what we called "a volunteer."

5    So he wanted to die.  And we asked the Supreme Court not only to

6    continue us on as his appellate and postconviction counsel but

7    to appoint me as his next best friend for litigation purposes on

8    his desire to drop his appeals and be executed.

9         And I think Keith Wells' wife objected to that.  The

10   Supreme Court denied that request.  And Amil stepped in to

11   assist Keith in having the State of Idaho kill him.

12   Q.   And Mr. Wells didn't want you involved in the

13   postconviction, either; correct?

14   A.   Correct.  He wanted to drop all of his appeals and be

15   killed.

16   Q.   And despite Mr. Wells' desires, his wife's desires, you and

17   Mr. Kehne went ahead and filed various pleadings with both the

18   state court and the federal courts; correct?

19   A.   Yes.  And David Nevin and Andrew Parnes helped us on that.

20   So there were four of us working on that.

21   Q.   And Mr. Myshin was representing Mr. Wells during that

22   period of time?

23   A.   Yes.  During the volunteer stage, yes.

24   Q.   And would it be fair to say that as a result of that -- the

25   work that you and Mr. Kehne did, and the others that you

1    mentioned, that Mr. Myshin was somewhat ostracized from the

2    criminal defense group?

3    A.    Not from me.  Amil was my brother; he still is.

4    Q.    Okay.  But you had no problem litigating the Wells' case in

5    direct contravention of Mr. Wells' request and, for that matter,

6    Mr. Myshin's willingness to assist Mr. Wells in fulfilling that

7    request?

8    A.    Yeah.  I had no problems whatsoever using my position in

9    the bar to help a mentally disabled man through the process of

10   the state trying to kill him.

11   Q.    Well, Mr. Adams, there was never a determination made that

12   he was mentally disabled; correct?

13   A.    There was by me.

14   Q.    Okay.  Fair enough.

15         You indicated that you went to Mr. Trimming for financial

16   assistance.

17   A.    I believe so, yes.

18   Q.    Would those conversations with Mr. Trimming be recorded on

19   your billing statements?

20   A.    Would you repeat that?

21   Q.    Would those requests for financial assistance from

22   Mr. Trimming be recorded or reported on your billing statements?

23   A.    Are you asking me whether I billed Alan for calling him up

24   and asking him for money?  I doubt I would have billed him for a

25   phone call.

1    Q.    Okay.  Do you recall what Mr. Trimming's statement -- well,

2    how many times did you call Mr. Trimming for financial

3    assistance?

4    A.    I don't know.  We probably wrote letters to preserve the

5    record.  We may have had phone conferences with him to set up

6    the writing of the letters.  I don't have a recollection.

7    Q.    Would those letters have been retained in your files?

8    A.    I would hope so.  I haven't seen that file in 25 years.

9    Q.    I understand.

10         Did Mr. Trimming ever refuse to pay a bill in the Row case?

11   A.    I don't recall.

12   Q.    Did Mr. Trimming ever refuse to pay a bill in any of your

13   other Ada County conflict cases?

14   A.    I don't recall.

15   Q.    Did Mr. Billing -- Mr. Billing.  Did Mr. Trimming ever

16   refuse to pay a bill prior to your representing Ms. Row in a

17   conflict case?

18   A.    I don't recall.

19   Q.    How were expenses paid by Ada County in Ms. Row's case?

20   A.    I don't know.

21   Q.    Well, did you -- who would they be submitted to?

22   A.    Who would what have been submitted to?

23   Q.    The bills.  I'm sorry.

24   A.    We probably -- I'm just guessing here that we would have

25   sent an invoice to Alan; and then Alan -- as a former chief

1    public defender myself, the process -- he would have gone to the

2    Ada County Board of County Commissioners, unless he had -- I

3    don't think Alan -- because I never did, and Alan and I did

4    budgets pretty much the same -- did not have a conflict budget

5    for expenses in his annual county commission approved budget.

6    So I assume he went to the county commissioners and asked that

7    the county commissioners fund those invoices.  But I don't know;

8    you would have to ask Alan.

9    Q.   Okay.  Now, I think you indicated the record would speak

10   for itself as far as funding by Judge Schwartzman.

11        Do you recall Judge Schwartzman granting you any money in

12   Row's case?

13   A.   I don't.  I loved working in front of Judge Schwartzman.

14   He was just a delightful person, but I don't recall him granting

15   anything for us.  He may have, but I certainly don't recall it.

16   Q.   Was he pretty firm on that evidentiary hearing date in

17   January of '96?

18   A.   I don't know what you're talking about.

19   Q.   Well, you were appointed in 1994; fair enough?

20   A.   I'll take your word for it, Counsel.

21   Q.   Okay.  All right.

22        THE COURT:  Counsel, I'm assuming that there is a

23   record of requests made to Judge Schwartzman and his decision

24   granting or denying those requests.

25        MR. ANDERSON:  We have a postconviction record; yes,

1     Your Honor.

2              THE COURT:  Well, I'm wondering -- Mr. Adams has just

3     indicated he doesn't remember.  I'm not sure why we're beating

4     this dead horse.

5              MR. ANDERSON:  And I am moving on, Your Honor.

6              THE COURT:  All right.

7              MR. ANDERSON:  Thank you.

8         Just a moment, Your Honor.

9              THE COURT:  Yes.

10             MR. ANDERSON:  Your Honor, I believe that's all the

11    questions I have at this time.  Thank you.

12             THE COURT:  All right.  I'm sorry.

13        Redirect?

14             MR. HORWITZ:  Very briefly, Your Honor.

15                      REDIRECT EXAMINATION

16    BY MR. HORWITZ:

17    Q.  Mr. Adams, in addition to you and Mr. Kehne, were there

18    other attorneys who had conflict contracts with the Ada County

19    Public Defender's Office at the time of the Row case?

20    A.  Yes.

21             MR. HORWITZ:  That's all I have.  I want to thank you,

22    Mr. Adams, for coming down here.  I know the circumstances have

23    been difficult.  We appreciate it.

24             THE WITNESS:  Sure.  You're welcome.

25             MR. HORWITZ:  No further questions, Your Honor.

1           THE COURT:  Before Mr. Adams steps down, I'm assuming,

2     Counsel, that, as I suggested earlier, that what you feel is

3     important for the record can be established through the various

4     requests that were made and those that were turned down, and I

5     guess the supplemental testimony here today by Mr. Adams that he

6     would have done more if he thought he would have been allowed to

7     do it.  Is that fair?

8           I just want to make sure we have got the record clear.  We

9     have his deposition, which I'm assuming is more -- because it

10    was closer in time.  But I just want to make sure we have got

11    the record clear on everything you need on this issue before I

12    discharge Mr. Adams.

13          MR. HORWITZ:  I believe that's true, Your Honor.

14          And just to make our position clear on the prior

15    depositions, I think we would take the view that they are

16    admissible, and they should be considered despite the fact that

17    the witnesses are present to testify, because they are a more

18    accurate and fuller representation of those witnesses' memories

19    closer in time to the events.

20          So I think that's how we would like to approach the

21    depositions.

22          THE COURT:  Well, I guess we'll take that up

23    posttrial.

24          But the problem, Mr. Anderson, and I -- you know, the

25    standards are quite a bit more lenient here in terms of the

1    admissibility of evidence.  And it seems clear -- and I think

2    it's undisputed -- Mr. Adams has indicated that he is having

3    some memory problems, which is why he is no longer practicing.

4    In fact, I may ask a follow-up question.

5                              EXAMINATION

6    BY THE COURT:

7    Q.    Mr. Adams, is it fair to say that essentially your

8    responses here where you have said "I just don't remember," that

9    that's probably a function of maybe a medical issue that you're

10   suffering from?

11   A.    I skipped my meds this morning so I could do my best for

12   you, Judge.  But, yeah, there is.

13   Q.    I'm just trying to make the record clear.  Okay.

14   A.    What I do remember, Judge, is pretty much what you said;

15   that we felt that there was a lot more we wanted to do, but we

16   just didn't have the resources; we didn't have the money; we

17   didn't have the time.  We didn't have the physical stamina to

18   work 18 hours a day.  That's what I recall.

19   Q.    Do you have a specific memory of contemplating retaining a

20   neurological expert?

21   A.    Yes.  I was pretty concerned that there was some atrophied

22   vermillion cortex -- I seem to remember -- and some organicity

23   with her brain that concerned us.  Yes, I remember that.

24   Q.    And whatever request was made of either Mr. Trimming by way

25   of a letter or of Judge Schwartzman by way of a motion, there

1     will be a record -- will be a record of that?

2     A.   I sure hope so.  I know we just bothered Judge Schwartzman

3     to death to make that record.

4             THE COURT:  Counsel, do you want to follow up on my

5     questions at all?

6             MR. HORWITZ:  Could I briefly respond to the court's

7     remarks just now?

8             THE COURT:  Respond or ask a question?

9             MR. HORWITZ:  Respond, if I may.

10            THE COURT:  I'm just trying to make sure the record is

11    clear.  I'm not trying to take a position at all.

12            MR. HORWITZ:  I understand, Your Honor.  I just wanted

13    to make our position clear for the record.

14            THE COURT:  All right.

15            MR. HORWITZ:  Since you had said do we take the view

16    that it was a matter of lack of resources, we honestly aren't

17    sure what the reason that the neuropsychological testing wasn't

18    pursued.

19        I think our position, that we'll set out in more detail in

20    the briefs, will be it was either a timing matter or a funding

21    matter or just simple negligence.  But, in any event, there was

22    no strategic reason for it.  That's our position, Your Honor.

23    Q.   BY THE COURT:  Well, then, as a follow-up, Mr. Adams, do

24    you recall there being a strategic reason why you would not have

25    obtained neuropsychological testing?

33

1    A.    No, I don't recall that, Judge.

2            THE COURT:  Mr. Anderson, anything you want to ask of

3    the witness?

4        And, Counsel, you should be aware I'm going to be much like

5    this throughout the hearing.  The way I put it is:  If I have

6    got an itch, I'm going to scratch it.  So, since I'm the finder

7    of fact, I'm going to feel that I have free rein to ask any

8    questions and to resolve any uncertainty in my mind and to make

9    clear what the witness can offer and what they can't offer.

10       So, Mr. Anderson, do you have any follow-up questions for

11   the witness?

12           MR. ANDERSON:  Yes, Your Honor, just one or two.

13           THE COURT:  Would you step to the lectern --

14           MR. ANDERSON:  Yes, Your Honor.

15           THE COURT:  -- just to make it easier on our court

16   reporter.

17                          RECROSS-EXAMINATION

18   BY MR. ANDERSON:

19   Q.    Mr. Adams, I want to make sure I understand your last

20   response.

21       You don't recall one way or the other if there was a

22   strategic reason for not seeking that additional testing?

23   A.    Well, I'm not going to sit up here and, under oath, and say

24   that I committed malpractice on purpose.  So I think my answer

25   stands.

34

1    Q.   Well, I just need to know one way or the other.  Do you

2    recall whether there was, or you just don't recall anything

3    about that?

4    A.   I don't recall.

5              MR. ANDERSON:  Thank you.

6              THE COURT:  All right.  Well, let me now inquire:

7    Mr. Horwitz, any --

8              MR. HORWITZ:  No further questions, Your Honor.

9              THE COURT:  Mr. Adams, you may step down.

10             THE WITNESS:  I have been subpoenaed by both sides.

11   Can I be excused and go back to Coeur d'Alene?

12             THE COURT:  I assume -- is the witness excused from

13   any subpoena?

14             MS. CZUBA:  Yes, Your Honor.

15             MS. LORELLO:  Yes, Your Honor.

16             MR. ANDERSON:  Ms. Lorello said "Yes, Your Honor."

17             THE COURT:  Since you examined him, what matters is

18   what you say, Mr. Anderson.

19             MR. ANDERSON:  I'm sorry.  Yes, Your Honor, we would

20   excuse Mr. Adams from our subpoena.

21             THE WITNESS:  Nice to see you again, Judge.

22             THE COURT:  Nice to see you again.

23        Call your next witness.

24             MR. HORWITZ:  Your Honor, Ms. Row calls Rolf Kehne.

25             THE COURT:  I assume you will summon Mr. Kehne.  We

1     don't have --

2                THE WITNESS:  If I see him out there.

3                THE COURT:  That would be fine.

4          Mr. Kehne, would you step before Ms. Bracke.  She will

5     place you under oath and then direct you from there.

6                ROLF MICHAEL KEHNE, PETITIONER'S WITNESS, SWORN

7                THE CLERK:  Please take a seat in the witness stand.

8           Please state your complete name and spell your name for the

9     record.

10               THE WITNESS:  My name is Rolf Michael Kehne.  Kehne is

11    K-E-H-N-E.  Did you want me to spell the rest?

12               THE CLERK:  Yes, please.

13               THE WITNESS:  First name is R-O-L-F.  Middle name is

14    M-I-C-H-A-E-L.

15               THE COURT:  You may inquire.

16               MR. HORWITZ:  Thank you, Your Honor.

17          Before I begin my examination, I wanted to ask the court:

18    I have a demonstrative exhibit that I was hoping to use a little

19    later in Mr. Kehne's testimony.  Should I provide that to the

20    court now?

21               THE COURT:  I assume counsel has seen them.  And

22    certainly, in a court trial, I'm going to be very liberal in

23    allowing counsel to use demonstrative exhibits.

24               MR. ANDERSON:  We have seen it as of this morning,

25    Your Honor.  My concern is there is part of it that's incorrect,

1    at least from our perspective.  But it's demonstrative.

2              THE COURT:  You can point that out.

3              MR. ANDERSON:  Yes.

4              MR. HORWITZ:  Thank you, Your Honor.  Should I provide

5    a copy to the court now?

6              THE COURT:  No.  I assume I will see it here on the

7    screen, and that should be sufficient.

8              MR. HORWITZ:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. HORWITZ:

11   Q.   What's your profession, Mr. Kehne?

12   A.   I'm an attorney licensed in Idaho.

13   Q.   Are you familiar with the Row case?

14   A.   Yes.

15   Q.   How are you familiar with it?

16   A.   I was assigned the Row case, Robin Row as a client, after

17   she was sentenced.  I was assigned by -- I got the case from

18   Alan Trimming, who was Ada County Public Defender at the time.

19   Q.   And you worked on the initial postconviction in state court

20   on the Row case?

21   A.   Yes.

22   Q.   And just to be clear, my entire examination will be focused

23   on your work at the trial court level in that proceeding, not

24   the consolidated appeal to the Idaho Supreme Court.

25   A.   All right.

1    Q.   Were you with a firm at the time that you represented

2    Ms. Row?

3    A.   Yes.  I had a firm and with one partner.  We were a

4    partnership, and that was with John Adams.

5    Q.   Who was lead counsel on the Row case?

6    A.   I was.

7    Q.   Was there a mitigation specialist involved?

8    A.   Yes.  We had Mary Hudson, who later was known, after she

9    was married, as Mary Goody.

10   Q.   And how would you describe Ms. Goody's role in the case?

11   What were her duties and responsibilities?

12   A.   She worked as a mitigation specialist, which means she is a

13   highly specialized kind of investigator.  Her job is to gather

14   records throughout a client's life and, if possible, even

15   through before life.

16        And through interviews and record requests,

17   record-gathering, interviewed people who knew her, she is very

18   adept at spotting mental health issues, much better than I am or

19   about any lawyer I have ever met.  And she is in contact with --

20   through conferences, national conferences and just contacts,

21   with a whole lot of experts.  And she helps attorneys decide on

22   experts.

23   Q.   In the Row case, did you or Mr. Adams conduct any

24   interviews of mitigation witnesses yourselves, personally?

25   A.   No, we did not.

1    Q.    Ms. Goody conducted those interviews?

2    A.    Yes, sir.

3    Q.    As a general matter, did you and Mr. Adams keep each other

4    up to speed on what the other one was doing on the case?

5    A.    Yes, very much.

6          It's a real small office.  And not just the Row case but

7    almost every single case we worked together.  And that was

8    certainly true of the Row case.

9    Q.    What was your caseload like at the time of the Row

10   postconviction?

11   A.    I wish I could remember more precisely.  I have looked for

12   records and haven't found them, but I recall throughout that

13   time feeling swamped.  We were extremely busy.  We had some

14   serious case trials.  Ms. Row wasn't our only murder client

15   defendant.

16   Q.    Did you have any other capital cases at that time?

17   A.    We -- well, James Wood's case out of Pocatello overlapped

18   with Ms. Row's case.  And I don't remember exactly the dates,

19   but they were both going on at the same time.

20         And I had -- I recall at least two potential capital cases

21   that both settled, like, on the eve of trial, or one of them we

22   might even have done jury selection before it settled; I can't

23   remember.  That was John Maynard.

24         And the other one that occurs to me right now is Jeff

25   Carsner.  And those, throughout the litigation until right at

1       the eve of trial, were considered -- or the prosecutor and the

2       court were saying this is a death penalty case.

3           And that's all that occurs to me right now.

4       Q.  If the letters -- if the -- if the term "V6," "V" as in

5       Victor, "6," comes up in your billing records, what would that

6       signify?

7       A.  That's a shorthand for violation of the Sixth Amendment

8       right to effective assistance.

9       Q.  And I would like to call your attention to Exhibit 47.

10          Can you see that in front of you?

11      A.  I can.

12      Q.  I was hoping you could just take us through this a little

13      bit, maybe starting with the initials.

14          Do you see the initials at the bottom of the page?

15      A.  Yes.

16      Q.  What do those signify?

17      A.  Those are my initials, and I put them as a footer on the

18      bills I sent to Ada County.  And the "5," of course, is page 5.

19      Q.  And then just looking at this page as sort of a template,

20      what do the names on the left indicate?

21      A.  Those are clients that I was assigned by the Public

22      Defender's Office, the Ada County Public Defender's Office.

23      Q.  What's the language in the middle?

24      A.  That's a very short text to describe the activity that I

25      was engaged in.

1    Q.   What are the numbers on the right?

2    A.   The first vertical column is time spent out of court in

3    tenths of an hour or whole hours.  It's a decimal.  Point 1 is

4    6 minutes, point 2 is 12; and so forth.  And then the column to

5    the right, which is not nearly as full, is time in court.

6    Q.   How did you generate these records?

7    A.   I had a program that generated the records.  It was

8    actually the timekeeping unit of a bookkeeping program.  And so

9    one of the pieces of that program is a little stopwatch you

10   click on; and it opens up, and you enter the client name and

11   write the text that you see in the center, larger column.  And

12   it just keeps track of the time for you.

13   Q.   What was the financial health of your firm like at the time

14   of the Row case?

15   A.   We were struggling, I would say.  We were making overhead,

16   but we weren't earning nearly what our peers in private practice

17   earned.

18        The Ada County Public Defender contract that I had to do

19   these conflicts took on average -- I'm not saying it was

20   specific to this month or even the entire period I represented

21   Robin Row.  But for years, on average, it took about 90 percent

22   of the attorney time and generated 50 percent of the revenue.

23   Q.   Do you remember requesting a money judge in the Row case?

24   A.   I do.

25   Q.   Do you remember what happened with that request, how it was

41

1    disposed of?

2    A.   Judge Schwartzman denied that.

3    Q.   What did you do to get funding after that happened?

4    A.   I wish I could remember everything that happened.  Judge

5    Schwartzman denied the whole money judge thing, and he also

6    denied the first expert assistance we sought, which was the

7    mitigation specialist, to the best of my recollection, with

8    leave to give him more detail and try again.

9         And we did try again directly to Judge Schwartzman, and he

10   turned us down again.  And eventually, I think I talked to Al

11   Trimming -- well, I know I talked to Al Trimming about getting

12   experts in this case, on more than one occasion.  And his

13   reaction was:  I don't want to hear about it.  I have a conflict

14   of interest.  I really can't make these decisions.

15        So I believe that what we did, ultimately, is just go ahead

16   and hire her and explain to her that nobody has officially

17   approved this; please send the bills.  I think she sent them

18   both directly to the County and to us, and we forward

19   them -- forwarded them to the County.

20   Q.   You mentioned that Mr. Trimming believed there was a

21   conflict of interest.

22        What was the nature of that conflict of interest?

23   A.   His firm, and two lawyers in particular in that firm, had

24   represented Ms. Row at her criminal trial throughout the

25   original criminal proceedings.  And in any postconviction,

1    you -- it's almost always alleged that there is ineffective

2    assistance of counsel, and that was -- of trial counsel -- and

3    that was the case here.

4    Q.   I think you referred to Mr. Trimming's firm.  Do you mean

5    the Ada County Public Defender's Office?

6    A.   Yes, I do.

7    Q.   I would like to just briefly show you Exhibit 134.

8         Do you have that up in front of you?

9    A.   Yes.

10   Q.   Could you identify that?  What does that look like to you?

11   A.   That looks like a statement or bill from Mary Hudson, who

12   is also known as Mary Goody.

13   Q.   The handwritten -- oh, I'm sorry, Mr. Kehne.

14   A.   Go ahead.

15   Q.   The handwritten notation in the upper-right corner where it

16   says "Sent original," do you see that?

17   A.   Yes.

18   Q.   What does that signify to you?

19   A.   That our office received this bill and passed -- kept a

20   copy and passed the original to the Ada County Public Defender's

21   Office.

22   Q.   Maybe this has already been established, but why would you

23   have been passing the original to the Ada County Public

24   Defender's Office?

25   A.   Hoping for payment.

43

1    Q.    Was Ms. Row a cooperative client?

2    A.    Yes.  She always was cooperative.  It's -- she didn't

3    volunteer a lot of stuff, but she never hesitated to talk or

4    answer questions.  She was always cheerful.  She wasn't like

5    many capital clients who put up barriers because they don't want

6    you to investigate, for instance, their childhood; or they just

7    flat won't see you or talk to you about certain issues.  She

8    wasn't like that at all.  I would say she was quite cooperative.

9    Q.    Do you remember her obstructing the mitigation

10   investigation in any way?

11   A.    No, I don't.

12   Q.    Would you read the letters that Ms. Row sent to you?

13   A.    Yes.

14   Q.    Would you read the correspondence that Ms. Goody sent to

15   you?

16   A.    Yes.

17   Q.    What was your approach to the drafting of postconviction

18   petitions in capital cases as a general matter in terms of

19   claims selection in particular?

20   A.    Quite simply to raise every claim that I could think of.

21   Q.    Was that the approach you took to the Row case?

22   A.    Yes, it was.

23   Q.    Okay.  I would like to walk you through a few exhibits just

24   to get a timeline in focus here.  And I'm going to start with

25   Exhibit 20.

44

1          Can you see the transcript in front of you, Mr. Kehne?

2     A.   Yes, I can.

3     Q.   What's the date of this proceeding?

4     A.   March 10, 1994.

5     Q.   And who was present?  I should say, who was present for the

6     defendant or what's labeled the defendant in the transcript?

7     A.   Well, for the defendant, it says "August Cahill" --

8     everybody knows him as "Gus" -- and John Adams and myself.

9     Q.   And do you see the last couple lines of transcript page

10    4064?

11    A.   Yes, sir.

12    Q.   Could you read those aloud?

13    A.   Starting with the court:  "And, Mr. Kehne, you will be

14    handling substantive matters on appeal for Ms. Row?"

15         And I answered:  "Yes."

16    Q.   Right.  Okay.  Okay.  And now I would like to go to

17    Exhibit 28.

18         Can you identify that document just from what you see in

19    front of you?

20    A.   It's an affidavit from me filed in the Robin Row case, the

21    postconviction.

22         THE COURT:  Counsel, just for the clarity as we

23    proceed through, any exhibit that's been marked as either

24    stipulated to its admission or is a joint exhibit, when it's

25    referred to, I'll admit it at that time without the need for a

45

1    motion.

2        So at this time, I'll admit Exhibits 20 and 28 since they

3    have both been marked as stipulated to their admission.

4        Go ahead and proceed.

5        (Petitioner's Exhibits 20 and 28 admitted.)

6            MR. HORWITZ:  Sure.  And, Your Honor, would you like

7    me to make that clear --

8            THE COURT:  No.  I want to do this as efficiently as I

9    can.  And since I -- I may, as I noted, file something, a

10   written filing indicating which exhibits are admitted just to

11   clarify the record.

12           MR. HORWITZ:  Sure.  Absolutely, Your Honor.

13       Just to be clear, I believe every exhibit that I'm going to

14   refer to in this direct examination of Mr. Kehne is either on

15   the joint list or on the stipulated list.

16           THE COURT:  Okay.

17   Q.   BY MR. HORWITZ:  Mr. Kehne, do you see on the screen in

18   paragraph 2 where it indicates, at the bottom of the paragraph,

19   when you received the trial transcript?

20   A.   September 22nd, 1994.

21   Q.   Okay.  And I'm going to go to Exhibit 114 now.

22       Can you identify that document from the screen?

23   A.   Yes.  It's a communication from John Adams and me to -- oh,

24   excuse me.  It's from Mary Hudson, also known as Goody, to

25   myself and John Adams.

1    Q.    What's the date of that memo?

2    A.    June 13th, 1995.

3            THE COURT:  And 114 is admitted.

4            MR. HORWITZ:  Thank you, Your Honor.

5        (Petitioner's Exhibit 114 admitted.)

6    Q.    BY MR. HORWITZ:  What's the very last line of that page,

7    Mr. Kehne?  If you could read that out loud.

8    A.    "Craig" -- meaning Dr. Beaver -- "DNK" -- which means "did

9    not know" -- "about the prior discovery or the CAT scan."

10   Q.    And could you just read to yourself silently the final four

11   paragraphs on this page, the second page of the exhibit.

12   A.    I'm sorry.  Which -- did you mention a paragraph?

13   Q.    Yeah.  The -- well, the final four paragraphs.  So

14   beginning with "His attitude" -- do you see where that is? --

15   and down to the bottom of the page.

16   A.    Okay.

17   Q.    What was Dr. Beaver recommending there?

18   A.    He was recommending much more thorough -- he calls it

19   "neurocognitive exploration."  I understand that to mean a

20   general neuropsychological workup and a significant amount of

21   testing that he had not completed earlier in the case of her --

22   in the course of the original criminal proceedings; that he

23   would have approached the case completely differently if he had

24   been aware of the CAT scan that he is referring to.

25           And he lays out some specific tests that he would

47

1    recommend.  And the original testing was only the MMPI, the

2    Minnesota Multiphasic Personality Inventory, and the MCMI --

3    which I don't remember what that stands for right at this

4    minute -- and that's all.  And he lists a whole bunch of testing

5    that he believes should have -- should be done at that point.

6    Q.   And the description of the recommendation from Dr. Beaver

7    that you just gave, would that also have been your understanding

8    at the time?

9    A.   Yes.

10   Q.   Excuse me.  Let's turn to Exhibit 120 now.

11           THE COURT:  120 will also be admitted.

12           MR. HORWITZ:  Thank you, Your Honor.

13       (Petitioner's Exhibit 120 admitted.)

14   Q.   BY MR. HORWITZ:  Could you identify this document,

15   Mr. Kehne?

16   A.   Yes.  This is a communication -- a "Memo," she has titled

17   it -- from Mary Hudson to John Adams and myself about her

18   interview with Art Norman, Dr. Art Norman.

19   Q.   What's the date of that memo?

20   A.   June 14, 1995.

21   Q.   If you could read the line out loud that's four paragraphs

22   from the bottom, on the second page of this exhibit, that begins

23   with "DNR."

24   A.   "DNR seeing records from a suicide attempt."

25           "DNR" is standing for "does not remember" or "do not

1    remember."

2    Q.    And then could you read the three sentences of the

3    paragraph that's three from the bottom, the last three sentences

4    of that paragraph.  So that begins with, "Thinks they requested

5    a full-scale SPECT."

6         Do you see that?

7    A.    Yes.

8    Q.    Could you read those sentences out loud, ending with "full

9    neurological."

10   A.        "Thinks they requested a full-scale SPECT to rule out.

11            They WN do the test."

12        I believe that means they will not do the test.

13            "Wanted full neurological."

14   Q.    What would "full neurological" have meant to you at the

15   time?

16   A.    Well, there is kind of a standard among neuropsychologists

17   for testing, and it includes the battery of tests in the exhibit

18   regarding the interview of Dr. Craig Beaver.  And I assumed that

19   Dr. Art Norman, when he says "full neurological," he is talking

20   about the same thing.

21        And since he said "neurological" as opposed to "neuropsych"

22   or "neuropsychological," I assume that includes medical doctors

23   specializing in neurology.  So that would also include imaging

24   studies, further imaging studies.

25   Q.    And how would you define "neuropsychological" in

1    distinction to "neurological"?

2    A.   Well, "neurological" generally means it's done by a

3    neurologist, meaning a medical doctor; whereas a

4    neuropsychological is done by a psychologist who specializes in

5    brain issues and nerve issues.

6    Q.   Are there certain tests that would be administered by a

7    neurologist versus a neuropsychologist?

8    A.   Well, you need a medical person to do imaging studies.  I

9    believe neurologists employ some of the same testing materials

10   on occasion, or frequently they will associate a

11   neuropsychologist to actually do the testing.

12   Q.   Take a look now at Exhibit 126.

13           THE COURT:  126 will also be admitted.

14           MR. HORWITZ:  Thank you, Your Honor.

15       (Petitioner's Exhibit 126 admitted.)

16   Q.   BY MR. HORWITZ:  What's this exhibit, Mr. Kehne?

17   A.   An affidavit from Mary Hudson.

18   Q.   What's the date?  Oh, I'm sorry.  The date is not on that

19   page.

20   A.   I can't see it.

21   Q.   Do you see the date on this final page?

22   A.   Yes, I do.  June 15, 1995.

23   Q.   And we have got the bottom of page 4 now on the screen.

24   Could you read that, that final paragraph, paragraph 13.

25   A.   Yes.  Out loud, I assume?

1    Q.   No.  You can read this one to yourself.

2    A.   Okay.  Okay.

3    Q.   I'll scroll down just a little bit so you can finish that

4    paragraph.

5    A.   Okay.

6    Q.   What is Dr. Pincus recommending here?

7    A.   He also is recommending full neuropsychological testing and

8    brain -- brain imaging, specifically, MRI, or magnetic resonance

9    imaging.  And he specifies some tests: Wisconsin Card Sorting

10   Test; Trail Making, A and B Categories; and a full neurologic,

11   which is what we were talking about with a medical doctor

12   neurologist.

13        He also specifically says, "a full Halstead-Reitan

14   Battery," and that is that group of tests I was talking about

15   earlier that neuropsychologists are -- I guess never say

16   "universal," but most neuropsychologists that I have ever dealt

17   with accept that as the standard for testing for brain damage

18   issues.

19   Q.   We have seen the recommendations now from Dr. Beaver,

20   Norman, and Pincus.

21        Did you make arrangements for Ms. Row to undergo any of

22   those tests?

23   A.   No, we did not.

24   Q.   Why not?

25   A.   I wish I knew.  I do not know.

51

1    Q.    Was there a strategic -- oh, I'm sorry.

2    A.    I believe -- excuse me?

3    Q.    Sorry for interrupting.

4    A.    Well, I know it was our intention to do it.  There was no

5    reason not to do it that I can think of.  If there was some

6    impediment to it, like somebody had said, "Well, we won't pay

7    for it," or anything like that, I have no recollection of it.

8    You know, all I can say is I don't remember.  And all I can say

9    is we just hadn't got to it by the time we were out of time.

10   Q.    Do you believe there was a strategic reason why those tests

11   weren't administered?

12   A.    No.  When I think of strategy, I think I don't want to do

13   something because it might harm the case.  And there is

14   absolutely no possible harm from investigating these mental

15   health issues.  It's possible that they might not help that

16   much, but they couldn't possibly harm.  There is no -- I can't

17   even imagine a strategy that would call for not getting this

18   testing done.

19   Q.    When you're discussing the testing now, are you referring

20   both to the imaging and to the battery of tests that we have

21   discussed?

22   A.    Right.  All the avenues that these three experts

23   recommended we pursued.

24   Q.    I would like you to take a look at Exhibit 32 now.

25        What is that exhibit?

52

1    A.   This is the amended petition that John Adams and I filed in

2    Robin's case.

3                THE COURT:  Exhibit 32 will be admitted.

4                MR. HORWITZ:  Thank you, Your Honor.

5    Q.   BY MR. HORWITZ:  I have pulled up the top of page 13 of

6    that petition.  Could you read out loud the first full sentence

7    there.

8    A.         "Petitioner needs more time and resources to

9                investigate this area further and prays the court for

10               time to submit supporting materials and to complete a

11               neuropsychological examination of petitioner."

12   Q.   What did you mean here by "neuropsychological examination"?

13   A.   At a minimum, the Halstead-Reitan Battery that we were

14   talking about, plus whatever experts suggested we do.  And I'm

15   sure that would be things like what the three experts we were

16   talking about recommended.

17   Q.   I would like you to take a look now at Exhibit 35.

18        What is this exhibit?

19   A.   This is a report from the trial court, Judge Schwartzman,

20   to the Idaho Supreme Court, pursuant to statute that requires

21   such reports periodically in death penalty cases.

22   Q.   Could you read out loud the final two paragraphs of this

23   page.  So beginning with "On July 7, 1995..."

24   A.   Yes.

25               "On July 7, 1995, this court entered its order on

1              pretrial motions, and on July 31, 1995, entered its

2              scheduling order on matters of discovery, final status

3              conference, and set a court trial for January 8, 1996.

4              No further continuance will be granted.

5                   "Accordingly, I request one final extension,

6              until January 8, 1996, in which to fully resolve the

7              pending petition before final appeal to the Supreme

8              Court of Idaho.  Such extension is necessary and fully

9              warranted, given the extraordinary nature and demands

10             of this case."

11   Q.   What does "court trial" mean to you in this passage?

12   A.   A trial to the court, the presiding judge, without a jury;

13   an evidentiary hearing.

14   Q.   I have pulled up Exhibit 131 on the screen.

15        Could you identify that exhibit, Mr. Kehne?

16   A.   That is a letter from Mary Hudson, August 22nd, 1995, to

17   John Adams and myself, about Robin.

18   Q.   Could you read out loud the whole letter, please.

19   A.        "Dear Rolf and John:  Enclosed please find the x-rays

20             from Robin's CAT scan at the Saint Alphonsus Regional

21             Medical Center.  I have not opened them.  Guard them

22             with your life, but show them to a neurologist or to

23             see what their impressions are.  Certainly, Craig

24             Beaver would be interested.

25                   "What is happening?  I'm assuming nothing, but

```
 1              would at some point love to hear how things are

 2              progressing."

 3    Q.    Thank you.

 4          I have now pulled up Exhibit 42.  This is the transcript of

 5    the postconviction evidentiary hearing.

 6                   THE COURT:  Also admitted.

 7                   MR. HORWITZ:  Thank you, Your Honor.

 8          (Petitioner's Exhibit 42 admitted.)

 9    Q.    BY MR. HORWITZ:  And I have scrolled down to transcript

10    page 85.

11          What's the date of that hearing, Mr. Kehne?

12    A.    January 8, 1996.

13    Q.    And I have scrolled down to transcript page 93.  Could you

14    read aloud the first two sentences of the first paragraph -- I'm

15    sorry -- the second paragraph starting with "In November..."

16    A.         "In November, we first chose a psychologist to look at

17              this material that we hadn't noticed and we hadn't

18              found, and we understood that he could look at it.  We

19              didn't necessarily hire the psychologist as our

20              witness -- In fact, we haven't made that decision even

21              yet -- but, rather, as our consultant to be our expert

22              and tell us where to go next."

23    Q.    Thank you.

24          And in light of the fact that this hearing is January of

25    1996, the reference to "November," what year would that be in
```

55

1    reference to?

2    A.    1995.

3              MR. HORWITZ:  Your Honor, at this point, I would like

4    to use the demonstrative exhibit that we have prepared.

5              THE COURT:  Ms. Bracke, can you change that over.

6    Q.    BY MR. HORWITZ:  Can you see the timeline there, Mr. Kehne?

7    A.    Yes, I can.

8    Q.    So, keeping in mind the exhibits that we just reviewed and

9    in light of this chronology, why hadn't you hired a psychologist

10   sooner than November of 1995?

11   A.    I can't remember what we were doing that kept us from

12   getting on this sooner.  But, I mean, it's just as patent and

13   apparent as it can be that we dropped the ball.

14   Q.    Do you believe there was a strategic reason for not having

15   hired a psychologist earlier?

16   A.    No.  There couldn't possibly be.

17   Q.    Did you file a written motion to continue the January 8,

18   1996, hearing date?

19   A.    I don't think we did.

20   Q.    Did you make an oral motion for a continuance on the day of

21   the hearing?

22   A.    Well, whether you would call it a formal motion -- but yes.

23   I mean, that was -- we went in and made the case for getting the

24   case continued.

25              And although I didn't file anything that we can find, I'm

1    pretty certain -- and I don't recall exactly how we did this,

2    but I'm pretty certain that we notified both the prosecution and

3    the court that we were going to do that, ask for more time, that

4    we weren't ready.

5    Q.   Is there a strategic reason why no written motion was filed

6    for a continuance?

7    A.   No.  I do recall -- and I hadn't when I first spoke with

8    you, Mr. Horwitz -- but I do recall that John Adams and I were

9    all but tearing our hair out as that hearing approached because

10   we knew we were dead; we knew we had really screwed up.  And the

11   question was:  What are we going to do?

12        The judge has said this is -- there will be no more

13   continuances, and a lawyer has to take a judge at his word when

14   he says something like that.  And we knew we weren't ready, but

15   I don't know why we didn't file something.

16   Q.   Were there certain experts you were in the habit of

17   consulting on brain damage at the time of the Row case?

18   A.   Yes.  It's a little hard for me to separate experts I have

19   used since then compared to who I was using then.  But for sure,

20   in the local area, we frequently consulted Dr. Craig Beaver and

21   Dr. Clay Ward, who is also a neuropsychologist here in Boise.

22        I think, although I can't say I would bet my life on it,

23   but in an exhibit we were talking about where I was telling the

24   court -- I think it was the transcript of January 8th -- that we

25   consulted a neuropsychologist in November, I think that would

57

1    have been Clay Ward.

2    Q.    And have you seen any documents to reflect that that would

3    have been Clay Ward?

4    A.    Not recently.  I don't know.

5    Q.    Did you request funding for neuropsych testing from the

6    trial court, from Judge Schwartzman?

7    A.    I don't recall doing that.

8    Q.    Did you request funding for neuropsych testing from the

9    Ada County Public Defender's Office or the Ada County

10   Commissioners?

11   A.    In no formal sense.  I believe I may have told Alan

12   Trimming we need to do this, and whenever -- I did that kind of

13   as a courtesy as time went on because he never changed his

14   position about I'm not going to give you any guidance one way or

15   another.

16   Q.    And when you say in an informal manner, how would that

17   conversation have taken place?

18   A.    Face to face, ordinarily.  I may call him sometimes.

19   Just -- the idea being he has to manage the budget and tell him

20   this is -- just to let him know this is coming down the road.

21   Q.    As a general matter, when you were getting funding from the

22   Ada County Public Defender's Office or the Ada County

23   Commissioners, however you want to consider it, how would that

24   process work?  Would you get funding in advance of the expense

25   that the funding was for, or would you incur the expense and

58

1    then seek reimbursement?

2    A.   Very rarely did I front the money for it.  And for

3    something like this, the testing we have been talking about,

4    particularly the imaging, is very expensive.  There is no way I

5    could have fronted it.  I just contracted it.

6        I tried to let Mr. Trimming know if it was a pretty

7    significant amount of money, that it was -- he would be getting

8    bills.  But I had the experts bill the county, and then we all

9    hoped they paid.

10   Q.   Did you ask Ms. Goody to conduct any of her interviews in

11   person rather than on the phone?

12   A.   I -- we talked about in person rather than on the phone

13   more than once, and her preference is always to do them face to

14   face because people open up.  It's a lot easier to shut a

15   questioner down on the phone.  You can see the person's

16   reactions and tell where you have hit a nerve even though they

17   haven't really said anything that disclosed something emotional

18   or they'd prefer not to talk about.

19       But as -- but she was the one who is the expert

20   interviewer.  When I have sat next to a mitigation specialist

21   doing an interview, on rare occasions, it's obvious to me I need

22   to keep my mouth shut because they are very, very good at it.

23   And so I don't know that I would tell Mary how to conduct her

24   investigation.

25   Q.   And maybe you just answered this question, but did you ask

1    Ms. Goody to travel to any of the places that Ms. Row had lived

2    as part of her investigation?

3    A.   Well, and I -- I don't recall ever making the suggestion.

4    I -- by asking her to do the investigation, I knew that she

5    would travel, or I assumed she would travel.  And, of course,

6    it's a lot more expensive to do it that way.

7        But I think you're trying to find out why she may have used

8    the phone on some occasions and in person on the other, and I

9    can't really say.

10   Q.   Okay.  At the postconviction evidentiary hearing in January

11   of 1996, did you call any lay witnesses to testify about

12   Ms. Row's background or her experiences in support of a brain

13   damage claim?

14   A.   I don't believe so.

15   Q.   Why not?

16   A.   Well, we weren't prepared to conduct that hearing is the

17   short answer.  It's not that there were no witnesses or there

18   was any reason not to give the court the benefit of what they

19   had seen and observed, certainly.  We just weren't prepared.

20   Q.   Did you depose any lay witnesses to get their accounts of

21   Ms. Row's background for potential use at the evidentiary

22   hearing or at the postconviction in support of a brain damage

23   claim?

24   A.   No.

25   Q.   Why not?

1    A.    Well, these are questions I wish I could answer, and I

2    don't know.  We just didn't get around to it.  It's not that

3    there was any reason not to or at least attempt to.

4    Q.    Did you call Ms. Goody to testify at the evidentiary

5    hearing?

6    A.    No.

7    Q.    Why not?

8    A.    There again, because we weren't prepared to do the trial.

9    Now, whether she had a conflict with the time as well −− I saw

10   her outside; I might have asked her −− but I don't remember one

11   way or another.

12        I can't −− she produced literally cubic yards of records

13   and notes of her interviews.  And going through all of that,

14   there was nothing in there that would have harmed Ms. Row, made

15   her situation worse.  So I don't know why not.

16   Q.    Do you believe there was a strategic reason not to call her

17   at the evidentiary hearing?

18   A.    No.  I can't imagine what that would be.

19   Q.    Was there a legal standard of care expert who testified at

20   the evidentiary hearing?

21   A.    No, other than I testified.

22   Q.    And how would you characterize your role as a witness?

23   What function were you serving?

24   A.    Well, I took off my counsel hat and became a witness and

25   gave opinion evidence about standard of care and whether it was

61

1      met in the case, if -- I mean, if I recall right, that's what we

2      intended to do.

3          We -- if we had more time, our intention was not to do it

4      that way but, of course, to hire or retain somebody else.  And

5      we talked about getting somebody locally just because a lot of

6      judges seem to prefer to hear from locals, even if you, in

7      addition -- the point I'm trying to get to is we were going to

8      hire somebody who was national because simply there is nobody in

9      Idaho who is as experienced in capital litigation as people from

10     some of the other states where they have done a tremendous

11     amount more executions of people.

12     Q.   Did you ask a national -- an attorney who had a national

13     stature to serve as the legal standard of care expert?

14     A.   I don't remember doing that.  And if I did, it was like

15     informally at -- when I ran into him for something.  But, no, we

16     never talked like -- made plans to retain anybody.

17     Q.   Did you ever ask -- I'm sorry.

18     A.   There again, it's simply because we hadn't gotten around to

19     it.

20     Q.   Did you ask any local attorneys to play that role?

21     A.   Not that I remember.

22     Q.   Did you know Andy Parnes at that time?

23     A.   Yes.

24     Q.   Did you know David Nevin?

25     A.   Yes.

62

Q.   I'm going to use the same exhibit that's already on
the -- could I switch back to the computer, please.  Thank you.
     I'm going to use the same exhibit that we were looking at
before.  This is Exhibit 42.  This is the postconviction
evidentiary hearing transcript, and this is the fifth page of
the document.  It's unnumbered.
     But what does it say at the top, Mr. Kehne?

A.   What I have here says "Index (continued)."

Q.   Right.  And can you see from that page, what was admitted
into evidence at the postconviction hearing?

A.   Well, I can't -- offered or talked about, I can say for
sure.  Whether admitted or refused, I can't.

Q.   What exhibits --

A.   But it's medical report, Exhibit 1; Exhibit 2, a diagram;
and Exhibit 3, copy of newspaper articles.

Q.   And those are all petitioner's exhibits?

A.   Yes.

Q.   Why wasn't more evidence admitted at the hearing by the
petitioner?

A.   I don't -- I don't know the answer to that, other than
because we weren't prepared for the hearing.  We weren't
prepared to do the hearing.
     But I made some reference somewhere in the transcripts that
I have reviewed to having at least some of Ms. Goody's -- Mary
Hudson's work product, the records she collected, with me there

1       in court.  And so I think -- my guess is that we came thinking

2       we would admit all of those documents, or at least a lot of

3       them, and simply forgot to do it.

4       Q.    Was there a strategic reason why those documents weren't

5       admitted or offered?

6       A.    I can't think -- I can't imagine of one.  I don't know what

7       we were thinking; I wish I did.  But, as I said, I went through

8       that stuff, and there was nothing in there that would hurt the

9       case.

10      Q.    After the January 8, 1996, hearing but before Judge

11      Schwartzman denied postconviction relief, did you make any

12      effort to get neuropsych testing done?

13      A.    No, I don't think so.

14      Q.    Why not?

15      A.    I don't know.

16      Q.    Do you believe there was a strategic reason for not trying

17      at that point?

18      A.    I am certain there was not.

19      Q.    I have pulled up Exhibit 40.

20            Could you identify this document?

21      A.    Yes.  This is proposed findings and conclusions that

22      John Adams and I submitted in Robin's case -- submitted to Judge

23      Schwartzman.

24                  THE COURT:  Exhibit 40 will also be admitted.

25                  MR. HORWITZ:  Thank you, Your Honor.

64

 1          (Petitioner's Exhibit 40 admitted.)

 2          THE COURT:  Counsel, we're going to recess in about

 3     five minutes.

 4          MR. HORWITZ:  Sure.

 5     Q.   BY MR. HORWITZ:  What's the date at the top of that

 6     exhibit, Mr. Kehne?

 7     A.   It says, "Lodged February 20, 1996."

 8     Q.   I have turned to page 36.

 9          Could you read aloud the final paragraph of that page that

10     begins, "It is hereby ordered..."

11     A.          "It is hereby ordered that this court will apply to

12               the Idaho Supreme Court for another extension of time

13               in which to complete these proceedings.  And, if that

14               extension is granted, this case is continued for 90

15               days in order for petitioner's counsel to take

16               whatever trial depositions seem required, to make

17               whatever arrangements for other out-of-state witnesses

18               not deposed to travel to Idaho for testimony, and to

19               secure the presence of Ms. Hudson or any other expert

20               or lay witness.  Petitioner is welcome to continue her

21               investigation into the mental health issues and to use

22               this time to prepare to present any available

23               mitigation such an investigation might suggest."

24     Q.   What are you requesting from the court here?

25     A.   Obviously, time.

65

1    Q.   Why were you requesting more time rather than an order

2    granting postconviction relief?

3    A.   Well, we went there knowing we don't have it.  We have to

4    get more time if we're going to present this case competently

5    and fully and give Judge Schwartzman a chance to decide it on

6    its true merits.

7    Q.   Did you try to get neuropsych testing done after Judge

8    Schwartzman denied postconviction relief?

9    A.   No, we didn't.

10   Q.   Why not?

11   A.   I don't know.  Busy with other business.

12        Well, in fact, I know that I was as busy as I could be.

13   But could I have found -- it seems like I could have found some

14   time to do something, but I didn't; and why not, I can't answer.

15   No good reason.  I dropped the ball.

16        MR. HORWITZ:  Your Honor, I think I have about five

17   more minutes of direct.

18        THE COURT:  Let's go ahead and wrap it up, then.

19        MR. HORWITZ:  Okay.  Thank you, Your Honor.

20        And, Your Honor, the next few questions I have relate to

21   some exhibits dealing with Mr. Kehne's disciplinary proceedings

22   at the Idaho Bar.  These were objected to by the State.  Would

23   you like me to --

24        THE COURT:  Well, Counsel, I think the objection had

25   to do with, you know, the fact that Mr. Kehne had some

1    disciplinary proceedings is not relevant unless the same

2    factors -- and I think they were medical in nature -- were in

3    existence at the time of his representation of Ms. Row on

4    postconviction relief.

5         So I think laying that foundation would be helpful, and

6    then I can determine whether they are or are not relevant.  I

7    think because an attorney had a medical issue at some point in

8    their career does not strike me as being particularly relevant

9    to their performance at another point in their career unless

10   there is some connection established.

11        So proceed.

12             MR. HORWITZ:  Okay.  Thank you, Your Honor.

13        So, just so I understand, I'll lay a foundation now and

14   move for admission at the end of the hearing along with the

15   other --

16             THE COURT:  That's fine.

17             MR. HORWITZ:  Okay.  Thank you, Your Honor.

18   Q.   BY MR. HORWITZ:  Mr. Kehne, did the Idaho State Bar file a

19   disciplinary complaint against you?

20   A.   Yes.

21             MR. ANDERSON:  Your Honor, I'm going to object.  He's

22   got to lay the foundation establishing the connection between

23   that allegation or those proceedings --

24             THE COURT:  Well, Counsel --

25             MR. ANDERSON:  -- versus what happened with Ms. Row's

1    case.

2         MR. HORWITZ:  Could I respond, Your Honor?

3         THE COURT:  Well, Counsel, you have to -- you have to

4    have a starting point.  And I think all that Mr. Horwitz is

5    trying to do is say, okay, there were disciplinary

6    proceedings -- which I don't think is even in dispute.  The

7    question is whether the court can consider those in making its

8    decision in this case.  And that's the issue I'll have to decide

9    at the end.

10        It's not disputed that Mr. Kehne had a disciplinary

11   proceeding.  I don't know a great deal about it, but I think

12   Mr. Horwitz has to have some flexibility to at least start

13   somewhere.

14        So the objection is overruled.  Go ahead and proceed.

15        MR. HORWITZ:  Thank you, Your Honor.

16        THE WITNESS:  The answer was yes.

17        MR. HORWITZ:  Thank you, Mr. Kehne.

18   Q.   BY MR. HORWITZ:  Did depression come up as an issue in

19   those disciplinary proceedings?

20   A.   Yes.

21   Q.   How did it come up?

22   A.   In the time that I committed the actions -- or I think

23   mostly it was failure to do things -- I was in one of the more

24   profound depressions I've had in my life.  I've had depression

25   all my adult life, pretty much, and it waxes and wanes.  This

1    was a particularly bad period so that I -- to the point that I

2    became basically incapacitated.

3    Q.   Did you suffer from depression at the time you were

4    representing Ms. Row?

5    A.   I think it's fair to say that the experts I have dealt with

6    over the decades would say I always suffer from depression; the

7    question is to what degree.  And so I'm always somewhat

8    depressed, pretty much.

9         But in the case of that time period and consistent with

10   most of my life, that I can think of, when I'm real busy is not

11   usually when I get down the most.  And I was very busy then, and

12   I don't recall anything like what happened later that got me in

13   trouble with the authorities of the Bar and the courts.  I

14   didn't feel incapacitated.  I felt overwhelmed.

15        And whether I would have approached that differently if I

16   were -- didn't ever suffer from depression is a complete

17   conjecture; I don't know.  But I wasn't aware -- in looking back

18   on it, I'm not aware that I was -- well, certainly, I wasn't

19   incapacitated in the sense of the -- that I was in the time

20   period that the Bar case is about.

21   Q.   Did sleep apnea come up in your disciplinary proceeding?

22   A.   You know, I don't recall discussing that at that point.  I

23   don't know.

24   Q.   Did you --

25   A.   I think I did, actually.  Instead of being deposed by Bar

1    counsel, I just went in with counsel and let them ask me

2    anything I wanted.  And I think in that conversation that did

3    come up.

4    Q.   Did you suffer from sleep apnea at the time you were

5    representing Ms. Row?

6    A.   Yes.

7    Q.   The stipulation that you entered into with the Bar, the

8    statements in that stipulation, are those correct?

9    A.   Yes.  My recollection -- I haven't read them recently, but

10   that is as accurate about everything as it possibly could be.

11   Q.   Have you been deposed in this case?

12   A.   Yes, I have.

13   Q.   When you were deposed, did you testify truthfully?

14   A.   Yes.

15   Q.   Was your memory of the case more accurate at the time you

16   were deposed than it is now --

17   A.   Yes.

18   Q.   -- or fresher?

19   A.   Yes.  I don't remember when it was, but it was quite some

20   time ago.

21           MR. HORWITZ:  I have no further questions, Your Honor.

22           THE COURT:  Let me just ask -- why don't we take the

23   recess before you start cross.  But before we do that, let me

24   just ask Mr. Kehne to clarify.

25                          EXAMINATION

70

1      BY THE COURT:

2      Q.   What was the time period that was of concern to the State

3      Bar?  I mean, were we talking roughly the same time frame?  10

4      years later?  15 years later?

5           Just -- I just want to clarify that for the record.  And

6      I'm not talking about when the disciplinary proceedings took

7      place, but where were the underlying events which gave rise to

8      the disciplinary proceeding?

9      A.   Seven or eight or nine years later, that there was a period

10     that began and lasted for a year or so.

11     Q.   Okay.  Just to clarify -- and this will perhaps set the

12     stage for Mr. Anderson's cross-examination -- what I heard you

13     just say is that you suffered from depression, which was the

14     underlying medical problem that gave rise to the disciplinary

15     proceedings, all of your life, and that they tend to

16     become -- that depression tends to become more of a problem the

17     more overwhelmed you are by circumstances, work or otherwise.

18     Is that fair to say?

19          I don't want to put words in your mouth.

20     A.   I didn't mean to say that.  If I have a downtime

21     workwise --

22     Q.   "Downtime" meaning?

23     A.   Meaning I'm not that busy.

24     Q.   Okay.

25     A.   -- I'm more likely to start into that slump of depression.

1    When I'm moving a lot because I'm very, very busy, at least I'm

2    not aware of it.

3    Q.   So it's really just the opposite:  The busier you are, the

4    less you suffer from depression?

5    A.   I guess not -- I'm thinking about that, and I never had

6    thought about it exactly in that way.

7    Q.   Well, let me --

8    A.   I guess I can't say that it's the opposite because

9    sometimes when I'm really busy, I start withdrawing from my

10   responsibilities and getting very depressed --

11   Q.   But, in any event, at the time you were representing

12   Ms. Row in her postconviction relief, you were suffering from

13   some depression, but it was not as debilitating as the time of

14   the events which led to the disciplinary proceeding?

15   A.   That's a fair and accurate statement; yes, sir.

16        THE COURT:  Counsel, you can follow up.  I'm sorry.

17   Did I misunderstand, Mr. Horwitz?  I thought you were done with

18   your direct.

19        MR. HORWITZ:  I'm all done.  I just wasn't sure if you

20   wanted me to respond to anything.

21        THE COURT:  No, no.  Let's have -- we'll come back

22   after the recess.  Mr. Anderson can cross-examine Mr. Kehne, and

23   then Mr. Horwitz you will have a chance on rebuttal to cover not

24   only what Mr. Anderson -- not rebuttal -- on redirect, not only

25   cover Mr. Anderson's cross but also the questions that I just

72

1     put to Mr. Kehne.

2          All right.  We'll be in recess for 15 minutes.

3          (Recess at 10:57 a.m. until 11:18 a.m.)

4          THE COURT:  For the record, I'll just remind the

5     witness:  You are still under oath, Mr. Kehne.

6          Mr. Anderson.

7          MS. LORELLO:  Your Honor, can I just clear up

8     something preliminary or clarify something really quick?

9          THE COURT:  You may.

10          MS. LORELLO:  We were talking -- so it was our

11     understanding that, at the outset, everything that is either

12     identified as joint or stipulated as admissible has already been

13     admitted.

14          THE COURT:  Well, we -- I did say that.  Ms. Bracke

15     reminded me of that.

16          MS. LORELLO:  Okay.

17          THE COURT:  But I think we also indicated in our

18     pretrial order that we would actually make kind of a

19     document-by-document determination of that as to those that we

20     needed to consider.  But, Counsel, I'm free to do it either way.

21          MS. LORELLO:  The concern is, Your Honor, because of

22     the time limitations and wanting to be most efficient, there are

23     several exhibits that, because we have agreed to admit them, we

24     are not going to talk to a witness about them.  So

25     that's -- that's our concern.

1          THE COURT:  All right.  Let us -- let me revisit that,

2     then, and just say that all exhibits marked either as joint or

3     stipulated to their admission will be admitted as of this point.

4     And we'll issue -- I'll ask Ms. Dotson to work with me, and

5     we'll prepare an order of the court and goes through and lists

6     those, or we may just actually attach your exhibit lists and

7     indicate those marked with an "admission" in the stipulation

8     column are now admitted and may be considered throughout the

9     trial.  And I will no longer make any reference to an exhibit

10    being admitted or not.

11         It's just that it's awkward to be talking about an exhibit

12    that has not yet been formally admitted, but we can handle it

13    this way.  It's more efficient.

14              MS. LORELLO:  Thank you.

15              THE COURT:  Now, Mr. Anderson.

16              MR. ANDERSON:  Thank you, Your Honor.

17                        CROSS-EXAMINATION

18    BY MR. ANDERSON:

19    Q.   Mr. Kehne, as I understand it, you were appointed to

20    Ms. Row's postconviction case and, for that matter, the appeal

21    sometime in March of 1994.

22    A.   Yes, sir.  Not appointed exactly.  I was assigned it

23    pursuant to the contract I had with the County at the time.

24    Q.   So you didn't need an appointment from Judge Schwartzman;

25    you were just assigned to it by the Ada County Public Defender's

74

1    Office as a conflict attorney?

2    A.    That's correct.

3    Q.    And how did that appointment come about?  Was that a call

4    from Al Trimming or from Gus Cahill?

5    A.    You know, I don't remember.  Sometimes Alan -- well, I

6    guess you didn't ask about "sometimes."  I just don't remember

7    the specific case.

8    Q.    But it's within the realm of possibility that Mr. Cahill is

9    the one that actually called and asked if you would take the

10   case?

11   A.    It's possible.

12   Q.    And at that time, you had a really full caseload of

13   Ada County Public Defender conflict cases?

14   A.    Yes.

15   Q.    Did that --

16   A.    Other cases as well, too.

17   Q.    I'm sorry?

18   A.    And other cases as well.

19   Q.    Right.  I was going to get to those.

20         But that included Tom Creech's resentencing case in

21   Ada County?

22   A.    I did have Tom Creech for resentencing.  I don't remember

23   when that was, Mr. Anderson.

24   Q.    And I believe that you indicated that there were a couple

25   of other murder cases, the Maynard and the Carsner cases?

1    A.    Right.  And there may have been others, too.

2    Q.    What percentage of your practice at that time was

3    Ada County conflict cases?

4    A.    I can't say I figured it out for that specific time.  Over

5    the years that I did the conflict work, my time was near 90

6    percent Ada County conflict work.

7    Q.    But you did have private cases in addition to the

8    Ada County cases?

9    A.    Yes.

10   Q.    And you had conflict cases from other counties?

11   A.    Some.

12   Q.    And that would have included the James Wood case out of

13   Bannock County?

14   A.    Yes.

15   Q.    And that was also a capital postconviction case?

16   A.    Yes, sir.

17   Q.    So I think you said earlier that during the period of time

18   that you were representing Ms. Row, you were swamped?

19   A.    Yes.

20   Q.    That's a pretty fair statement at the time?

21   A.    Yes.

22   Q.    Now, did you work very much on the case from the time of

23   your appointment in April of '94 until you actually received the

24   transcripts?  I believe that was in September of '94.

25   A.    I'm unclear what you mean by "very much."  I worked on it

1    some.  I certainly worked a lot harder, longer hours as soon as

2    we got the transcripts.

3    Q.    Fair enough.

4        You were pretty much waiting for the transcripts before you

5    really dived into the case to see what happened during the trial

6    and the sentencing; correct?

7    A.    I think that's fair.

8    Q.    And you personally went up and picked up those transcripts?

9    A.    I don't know that.  I can't remember.

10   Q.    There -- and I believe that counsel discussed this.  I

11   don't have the exhibit number, but there was an order governing

12   further proceedings on 12/30 of '94 that ordered you to appear

13   and advise the court of the status of the case.

14       Do you recall that?

15   A.    No.  But, I mean, it sounds like something that happened

16   with some regularity.

17   Q.    And in response to that order, you filed an affidavit;

18   correct?

19   A.    I hope so.

20   Q.    I'm not very good at this technical stuff.  I know it's

21   simple stuff, but I'm not very good at it.

22       I believe this was Exhibit 66.  And that's the affidavit

23   that you filed in response to the court's order to have you

24   appear; correct?

25   A.    This is an affidavit that I filed.  I don't remember the

1        context of why exactly I filed it.

2        Q.    Okay.

3        A.    When was -- when was the order you mentioned about

4        governing further proceedings?

5        Q.    That would have been -- I'm sorry.  I didn't mean to

6        interrupt you.

7        A.    That's okay.

8        Q.    That was on December 30th, 1994.

9        A.    Then I think this probably is in response to that order.

10       Q.    And in your affidavit --

11              THE COURT:  Counsel, could I just clarify?

12              The exhibit list indicates that Exhibit 66, if that's the

13       correct number, is actually the affidavit of Mr. Adams.  Is that

14       a misstatement?

15              I am just looking at the exhibit list, Exhibit 66, and it

16       refers to that exhibit as being an affidavit of Mr. Adams.  So

17       we need to clarify that for the record at some point.

18              MR. ANDERSON:  We will need to for the record,

19       Your Honor.  I believe this was an exhibit that was shown to the

20       witness during direct examination.

21              THE COURT:  I think that -- I don't believe so.  I

22       don't think --

23              MR. ANDERSON:  Okay.  Then I'm sorry, Your Honor.  I

24       may have the wrong number.  We'll figure it out, Judge.

25              THE COURT:  All right.

78

1    Q.   BY MR. ANDERSON:  On page 2 of that particular exhibit,

2    though, you indicate you anticipate filing the petition on

3    June 15th -- of that year, I'm assuming.

4    A.   Yes.

5    Q.   Did you expect that your investigation would be completed

6    by that date?

7    A.   Certainly not.

8    Q.   So how would you go about raising claims without completion

9    of your investigation?

10   A.   There is nothing I'm aware of that prevents me from

11   continuously amending petitions as I learn more about the

12   situation in the case.

13        Judges are always eager to have something on file.  The

14   first time will be completely bare bones; and as we go along, we

15   file amended that have more specificity.  And it's just how I

16   have always done it and I think everybody else has done it.

17   Q.   So it was your expectation that you would continue this

18   investigation all the way up to and including the period of time

19   of the evidentiary hearing?

20   A.   I'm not sure I understand the question.  I don't know

21   whether -- you're talking about in this affidavit or at this

22   time I filed the affidavit?

23   Q.   I'm talking generally at the time.

24        It was your expectation that you would continue your

25   investigation all the way through the time of the evidentiary

1    hearing?

2    A.    Well, ideally, I would complete everything I could think of

3    to do.  And everything you uncover suggests more avenues to go.

4    And so at some point, it seems limitless, but it isn't, really.

5    And the ideal situation is you've completed everything well

6    before you start putting on the evidence.

7              MR. ANDERSON:  Your Honor, through co-counsel -- this

8    affidavit is Exhibit No. 28, Petitioner's 28.

9              THE COURT:  28, the one we have been referring to?

10             MR. ANDERSON:  Yes.

11             THE COURT:  The one you have been referring to?

12             MR. ANDERSON:  I have been referring to, yes.  Thank

13   you.

14             THE COURT:  All right.

15   Q.    BY MR. ANDERSON:  Now, you did go to Judge Schwartzman and

16   ask for a mitigation expert in March of 1995?

17   A.    That sounds right.

18   Q.    And Judge Schwartzman was both the trial judge for the

19   trial, the sentencing, and the postconviction case?

20   A.    Correct.

21   Q.    What was Judge Schwartzman's reception to your request for

22   a mitigation expert?

23   A.    He didn't grant it.  Both Mr. Adams and I were quite

24   surprised at how little he seemed to understand what we were

25   talking about, even.

1            Judge Schwartzman has always -- I mean, since he was a

2    magistrate -- impressed me as one of the smarter people I have

3    ever met.  And so here we are in front of him on a motion for a

4    mitigation expert, and he started the hearing talking about a

5    litigation expert, like he had no clue what we were talking

6    about.  And I was pretty surprised about that.

7            Is that what you meant by reaction?  Or do you just -- did

8    you want me to say, "He denied it," and then shut up?

9    Q.   You're fine.  You're fine, Mr. Kehne.

10           In fact, Judge Schwartzman made some very specific

11   references to the O.J. Simpson case out of California?

12   A.   He did.  He did.  "We are not having an O.J. circus or" --

13   Q.   He was --

14   A.   -- "extravaganza."

15   Q.   He was very concerned, in your mind, about the money

16   situation; correct?

17   A.   Well, I guess that's fair.  I don't know that he would have

18   minded spending the money on the case.  But my impression was he

19   is not getting what we're talking about at all, as opposed to:

20   "I understand that perfectly, and it ain't happening, Counsel."

21   That wasn't my impression.  It was that, whoa, we were

22   surprised.

23   Q.   Nevertheless, despite his denial of your motion, you

24   retained Mary Hudson?

25   A.   Right.  I believe -- well, I know we talked to Mary even

1    before the first time.  But tell her to go ahead anyway, we had

2    actually been denied twice, I think.  I think we did -- we

3    renewed the motion -- Judge Schwartzman pretty much said "but

4    without leave or prejudice to come back with some more

5    explanation or detail."  We did that, we thought, and he denied

6    it again.  And then we went ahead and hired her anyway and hoped

7    the County would pay her.

8    Q.   And in hoping that the County would pay for it, how did

9    that actually work?  Did she submit her bills to you?  To

10   Al Trimming?  To the County?  How did that actually function?

11   A.   My belief is she sent them to me, and I forwarded them.

12   But I believe she also billed them directly.  But I have no

13   personal knowledge of that.

14   Q.   "Them" being Al Trimming?

15   A.   Correct.

16   Q.   So there was no need at that time to go before the County

17   Commissioners?  Bills generally that you had were sent to

18   Al Trimming and were then paid?

19   A.   Right.  I'm sure it was more complicated within the County.

20   Al Trimming had to send them to the County Clerk or somebody,

21   treasurer; I don't know.  And I believe every expenditure has to

22   be approved by the Commission, ultimately.

23   Q.   Okay.  Were any of her bills denied by Al Trimming or not

24   paid by the County?

25   A.   I don't think so.

1    Q.    Were any of the other bills that you incurred during the

2    course of representing Robin Row denied by Al Trimming or the

3    County?

4    A.    I don't think so.

5    Q.    Were any of the bills that you sent to the County for the

6    time you and John Adams spent on the case denied?

7    A.    No.

8    Q.    So everything was paid for, that you sent to the County for

9    payment?

10    A.    Yes, I believe so.

11    Q.    And you really had no reason to expect that those bills

12    would not be paid?

13    A.    That's not a yes-or-no.

14    Q.    Go ahead and explain.

15    A.    Because, you know, part of it is tongue-in-cheek and

16    humorous, and part of it is serious.  But, of course, Al

17    Trimming and the commissioners and everybody else I dealt with

18    would joke or half seriously say:  This is way too expensive.

19    We got to cut this off.

20          So I -- you know, it's not like interest getting paid on

21    your U.S. Treasury documents, about the certainty about it.  I

22    believed -- and I believe now -- that my ability under my

23    contract to incur liabilities for the County was not unlimited;

24    and they could, in their judgment, decide, we're not paying

25    anymore.

83

1    Q.   So, as a result of that, you did have some concerns about

2    various aspects of this case being paid by the County?

3    A.   I did, yes.

4    Q.   And that's why you actually went to Judge Schwartzman to

5    have Mary Hudson appointed, was to make sure that she got paid?

6    A.   That's exactly right.  The commissioners might tell me I'm

7    spending County money unnecessarily, but I can't see them

8    telling that to Judge Schwartzman.

9    Q.   And if Judge Schwartzman was going to grant that motion,

10   that would have been a showing of good cause that would have

11   prevented the County from doing that?

12   A.   Yes.

13   Q.   I think you mentioned on your direct testimony that --

14   well, let me just ask it this way, Mr. Kehne:  Are you familiar

15   with a May 1st, 1990- -- excuse me -- a May 1st, 1995, letter

16   from Mary Hudson to Robin Row regarding a release to get Craig

17   Beaver's records?

18   A.   Yes.

19   Q.   And in that particular letter, Ms. Hudson states:

20            "There is apparently no money for a full-blown

21            investigation at this time."  End quote.

22       So, again, there was a money issue, at least on May 1st,

23   1995?

24   A.   Correct.

25   Q.   And you were trying to allocate resources in the best way

1    that you could as far as the use of County monies?

2    A.   Well, I was a lot more concerned about my client than the

3    County.  So I'm not sure I understand the question.

4         I think the context for that letter is, by the time it was

5    written, Judge Schwartzman had denied our second motion for

6    funding the mitigation expert and all she does.

7         And we had talked to Mary about:  Where does this leave us?

8    We don't know -- we want you to go ahead, and we hope you'll get

9    paid by the County, is basically what it was.

10        We did not have a budget.  Nobody was saying here is -- you

11   can only spend this much, but go ahead and spend it, and then

12   we'll consider giving you more depending on what you have come

13   up with and what the leads are that you've uncovered.

14   Q.   But, as a result of those limitations, Mary Hudson never

15   traveled to interview witnesses?  She did them by phone;

16   correct?

17   A.   You know, I don't know the answer to that.  I don't recall.

18   Q.   Okay.  All right.

19        Did Mary Hudson provide you a 1993 report from Charles

20   Steuart which involved the CAT scan?  Do you remember that?

21   A.   I think so.

22   Q.   And within the confines of that report, Dr. Steuart had an

23   impression of antisocial personality disorder, as far as a

24   diagnosis.

25        Do you remember that?

1    A.    I don't, but --

2    Q.    Do you remember a report provided by Mary Hudson -- and

3    these reports would have been provided to you on May 8,

4    1995 -- a 1993 report from Dr. David Giles regarding that same

5    CAT scan?

6          He was the radiologist that reviewed the scan?

7    A.    Right.  I remember Dr. Giles, yes.  And I think I saw his

8    report in -- I don't recall what was in Dr. Steuart's report.  I

9    believe I saw it.

10   Q.    And he indicated there was a possibility of atrophy as a

11   result of reviewing that CAT scan; correct?

12   A.    Dr. Giles, yes.

13   Q.    It's Giles?

14   A.    Pardon?

15   Q.    It's Dr. Giles?

16   A.    Oh.  Maybe it is Giles.  I thought it was Giles, but I

17   wouldn't swear to it.  I guess I'm not sure.

18   Q.    We're talking about the same radiologist, though?

19   A.    Yes, yes.  But I don't believe Dr. Steuart said anything

20   about it, not that comes to mind right now -- atrophy, that is.

21   Q.    But Dr. Giles did?

22   A.    Yes.  And maybe you could straighten me out.  I might be

23   misleading everybody.

24         My recollection is there was more than one CAT scan, one

25   right after her suicide attempt, but I thought there was another

86

1    one from -- I don't know what reason -- that occurred before the

2    crime was even alleged to have been committed.

3    Q.    And I am going to talk about that in just a minute.  There

4    was a 1992 CAT scan.

5    A.    But that is not the one Dr. Giles reported.

6    Q.    Correct.

7    A.    Okay.

8    Q.    Now, in that -- the 1993 CAT scan, Dr. Giles -- Giles said

9    that the atrophy might be caused by the possibility of alcohol

10   abuse.

11        Do you remember that?

12   A.    I don't specifically, no.  But that is consistent with what

13   I recall him telling us in person.

14   Q.    Okay.  Did you have any indication at that time, from any

15   of the investigation that you had done or that trial counsel had

16   done for the sentencing hearing, that Robin Row had abused

17   alcohol?

18   A.    My recollection is that periodically she had.

19   Q.    Periodically she had abused alcohol, or periodically she

20   had used alcohol?

21   A.    My recollection is -- but it's been a long time -- is that

22   she had used enough alcohol possibly to cause some organic

23   changes.

24   Q.    And that was information that you had prior to getting the

25   report from Mary Hudson -- getting Dr. Giles' report from Mary

1    Hudson?

2    A.   Oh, that I can't say at all.  I don't know.

3    Q.   Now, the 1992 report that was read by Dr. Glenn Bothwell --

4    that's the 1992 CAT report -- Dr. Bothwell read that as being

5    within normal limits; correct?

6    A.   Right.

7    Q.   And there was a report from Dr. Charles Carasco --

8    C-A-R-A-S-C-O -- indicating that Robin Row's brain was normal?

9    A.   I don't recall that, but I -- it wouldn't surprise me.

10   Those -- well, no.  Go ahead.  I'm sorry.

11   Q.   That's all right.

12        Did you have the results of a 1982 MMPI involving Robin

13   Row?  Does that sound familiar to you?

14   A.   I don't remember one way or another.

15   Q.   So would it be fair to say, Mr. Kehne, that the first time

16   you had any idea at all that there was any atrophy was on

17   5/8/95, when Mary Hudson sent Dr. Giles' report to you?

18   A.   That is hard for me to answer.  I mean, we can say that

19   when I got that report, I had information about atrophy at that

20   point.  Whether I had any thought about it earlier, I can't say

21   at all.  I don't know.

22   Q.   And prior to that time, the experts that had examined Robin

23   Row included Dr. Beaver, because he was retained by Mr. Cahill

24   and Mr. Myshin; correct?

25   A.   Correct.

1    Q.    And Dr. Beaver had opined that she has an antisocial

2    personality disorder; correct?

3    A.    Probably he did.

4    Q.    And Dr. Norman was -- and Dr. Beaver did not testify at the

5    sentencing; is that correct?

6    A.    I think it is.

7    Q.    And the reason he didn't testify was because his diagnosis

8    of antisocial personality disorder was absolutely the same as

9    the State's expert, Dr. Engle?

10             MR. HORWITZ:  Your Honor, we object to speculation.

11             THE COURT:  Well, I'm not sure there is a question in

12    there.

13    Q.    BY MR. ANDERSON:  The question is:  Did Dr. Beaver's

14    opinion at that time, when he examined Ms. Row prior to the

15    trial, was it consistent with the State's experts, Dr. Engle, in

16    that they both said it was antisocial personality disorder?

17    A.    You have lost me.  Are you asking me is that why Dr. Beaver

18    wasn't called?  In which case, I have no information.

19             THE COURT:  Just a moment.  Just a moment.  The

20    question is whether Dr. Beaver's opinion was consistent with

21    that of Dr. Engle, the State's expert.  Was it consistent, if

22    you know?

23             THE WITNESS:  As to that, yes.

24    Q.    BY MR. ANDERSON:  And Dr. Norman was the expert -- the

25    defense expert that testified at the sentencing hearing;

89

1    correct?

2    A.   Yes.

3    Q.   And he also opined that Robin Row had antisocial

4    personality disorder?

5    A.   I believe he did.

6    Q.   So there were three experts prior to Dr. Giles opining

7    antisocial personality disorder?

8    A.   I don't know that Dr. Giles did a psychiatric workup or

9    diagnosis.

10   Q.   And I understand that.  And actually, that would have been

11   four experts, then.

12        And I understand that there may be a different basis for

13   their opinions, but there were four experts that said antisocial

14   personality disorder; correct?

15   A.   I doubt you would make that up, Mr. Anderson.  But I don't

16   remember Dr. Giles opining about that kind of label, but maybe

17   he did.

18   Q.   And actually, it wasn't Dr. Giles; it was Dr. Steuart.

19   A.   Okay.

20   Q.   Okay.

21   A.   I don't remember him doing it, either, but --

22   Q.   Okay.  Now, Mary Hudson provided you some information

23   regarding a Dr. Pincus, and that would have been sometime in

24   June of 1995.

25        Do you remember that?

1    A.    Yes, I do.

2    Q.    And he was -- and I apologize -- I don't know what his

3    credentials -- I don't remember what his credentials were.

4          But he had an opinion different than those other four

5    experts we have talked about; correct?

6    A.    That's fair to say.

7    Q.    And you actually had from Mary a -- I don't know if I would

8    call it a budget, but you knew what Dr. Pincus was going to

9    charge to be involved in this case, which was $3500 a day?

10   A.    Okay.  Yeah, that sounds right.

11   Q.    How did that compare with Dr. Beaver's rates at the time?

12   A.    You know, I don't remember what Dr. Beaver charged us at

13   the time.  I guess I'll have to leave it at that.  I don't think

14   it was a lot more.  I think Dr. Beaver may have charged by the

15   hour, but it may have been something like 350.  I really don't

16   remember, so I'm --

17   Q.    Fair enough.

18   A.    -- sorry I said that.

19   Q.    Now, you also had a report provided to you by Mary Hudson

20   from Barbara Childers with Trinity County Counseling.

21         Do you remember that?

22   A.    I remember that, but I don't remember what was in it.

23   Q.    Do you remember that she thought that Robin Row might have

24   personality -- multiple personality in combination with

25   posttraumatic stress disorder and a borderline personality

1    disorder?

2    A.   That does sound familiar.  I couldn't have put her name to

3    that notion, but I do remember somebody giving us that opinion.

4    Q.   Okay.  Did you research the issue of brain atrophy?  What I

5    mean by that is:  Did you look for articles and scientific

6    literature on the issue of brain atrophy?

7    A.   I have a lot of the bills.  And, you know, I could refresh

8    my memory maybe looking through that.

9         I don't have a recollection today that I did.  In general,

10   I have done that many times, and by that time in my life -- I

11   mean, they haven't all been since Robin Row, also before then.

12   But to do it specific -- specifically on Robin, I don't know.  I

13   don't remember.

14   Q.   Did you know that Dr. Norman completed a WAIS and a

15   Rorschach with Robin Row?

16   A.   Yes.

17   Q.   What type of test -- what is your understanding of those

18   two types of tests?

19   A.   The WAIS is the Wechsler Adult Intelligence Scale, and it's

20   an IQ test similar to what many people think of as -- the one

21   they are thinking of is the Stanford-Binet, which was the first

22   one that was thoroughly researched.

23        Neuropsychologists prefer the WAIS for a number of reasons

24   regarding -- well, due to the amount of research that's been

25   done for things you can find in, like, where the person does

1      better and worse relative to himself is indicative, based on a

2      lot of research, of certain kinds of organic damage or other

3      neurological disease.

4           And the Rorschach is -- I'm getting old, and sometimes I

5      can't remember words -- a projective test, primarily.  Although

6      a lot of research has been done with it to expand its use and

7      make it more objective, initially it was a fairly subjective

8      interpretation.  But it's the inkblot test.

9      Q.   And those are two neuropsychological tests?

10     A.   Those two tests are used for a number of different reasons.

11     And a lot of neuropsychologists don't use the Rorschach.  I

12     believe it's -- I wouldn't call it a standard.  But definitely

13     the WAIS or some other intellectual measure is very standard,

14     and I think the WAIS is generally accepted as the preferred one

15     to use.

16     Q.   And even the Rorschach would have been generally accepted

17     at the time that you were working on Robin's case?

18     A.   Well, like I say, I mean, even then, I don't think all

19     neuropsychologists or neurologists used it.  And it's one of

20     those things that, over time, experts have disagreed about

21     vehemently.

22     Q.   Now, the MMPI is more of a personality test?

23     A.   Yes.

24     Q.   And then there is the -- I think it's the MMCI.

25     A.   The one I can't remember what it stands for.

93

1    Q.    Yes.  That's also a personality test?

2    A.    I think it is.

3    Q.    And those two tests were completed with Robin by

4    Dr. Beaver?

5    A.    Yes.

6    Q.    And that was prior to the sentencing?

7    A.    Yes.

8    Q.    Now, Dr. Beaver -- you indicated that you had a lot of

9    experience with Dr. Beaver.

10          At that time, Dr. Beaver was also qualified to give a full

11   battery of psycho -- of neuropsychological tests?

12   A.    He was.

13   Q.    Did you talk to Dr. Beaver about this atrophy stuff?

14   A.    I'm pretty sure that John Adams and I did, but I -- I can't

15   say when it was or the circumstances, but I believe we did.

16   Q.    Well, you were sending -- or Mary Hudson -- one of the two

17   of you were sending materials to Dr. Beaver in the summer of

18   1995; correct?

19   A.    Yes.  I know Mary was.  I believe Mary was, I should say.

20   Q.    And so even though Dr. Beaver had not been formally

21   retained until later on, he was involved pretty intricately in

22   the case as early as the summer of 1995?

23   A.    Again, my hesitation is about "pretty intricately."  I

24   don't know what that means, and --

25   Q.    I understand.

94

1    A.   -- I don't think I would agree with it.  But, yes, he was

2    involved.

3    Q.   He was involved.

4         Did he make recommendations during that period of time,

5    meaning the summer of 1995, to do additional neurological

6    testing?

7    A.   Yes, he did.

8    Q.   Are there any notes in your files indicating and confirming

9    or corroborating that?

10   A.   Well, I don't have a file anymore, and so I can't say that.

11   But the -- one of the exhibits Mr. Horwitz pulled up was a memo

12   from Mary to me about her interview with him where he -- she

13   specifically lists the further testing that Dr. Beaver thinks

14   would be appropriate.  And I think that was June 14th or 15th of

15   that year, 1995.

16   Q.   And I do remember that, Mr. Kehne.  You're right.  Thank

17   you.

18        You had -- Dr. Beaver became even more involved in November

19   of 1995?  You were having regular meetings with him?

20   A.   I don't -- I don't remember.

21   Q.   Did you file any motions with Judge Schwartzman to have

22   Dr. Beaver or any other mental health expert -- for funds for

23   any other mental health expert?

24   A.   No.

25   Q.   And you didn't do that even for Dr. Beaver?

1    A.    No, I don't think so.

2    Q.    So Dr. Beaver was going to be treated the same as Mary

3    Goody; he was going to submit his materials, and there would be

4    an expectation of payment by Ada County?

5    A.    I assume so.  Mr. Anderson, I can't say whether Dr. Beaver

6    had an expectation he would be paid for all that time, even.  I

7    don't remember that we talked about it, anyway.

8    Q.    What was your --

9    A.    And maybe we did.

10   Q.    But it was your expectation that he would be paid?

11   A.    If he submitted a bill.  I don't recall seeing one, but --

12   Q.    Mr. Kehne, would there be any reason to do

13   neuropsychological testing after Judge Schwartzman issued his

14   opinion?

15   A.    Well, I think there would.  The statutes don't say, well,

16   you can keep going once the opinion is issued.  The statutes and

17   rules talk about you taking an appeal at that point.

18        On the other hand, if you're forced through a hearing when

19   you know absolutely there is important stuff to be done that

20   wasn't done yet and, you know, it's life or death, why you

21   wouldn't at least try to go ahead and do it after the hearing

22   and then come back to the judge and say, "We want you to

23   reconsider."

24        And if he ruled he didn't have jurisdiction, to take that

25   material to the Supreme Court and say, "We ask you to remand it

96

1    so he can consider this about whether we get a hearing."

2         You know, I don't -- I think -- I really wish, in

3    hindsight, I had done exactly that.  And, yeah, there is no

4    procedure that says you can do it, and I don't know of any case

5    law where it's been tried and anybody said -- or the Supreme

6    Court or anybody else said you can't do that.  To me now, today,

7    it seems like a great thing to do.

8         And if I didn't get paid, well, that wouldn't be the first

9    time.  But I -- you know, there would be risks that the experts

10   couldn't get paid because I know I couldn't afford to do it, but

11   I -- yeah, there is a reason why somebody would go ahead even

12   after the decision.  But I don't recall it ever entering my mind

13   at the time.

14   Q.   You would agree that that would be a pretty novel and

15   extraordinary remedy?

16   A.   It -- it would be a first for me, and I can't say I have

17   heard of anybody else doing it.  But that's what these cases

18   require; that's what they are all about.

19   Q.   And the same would be true for doing neuropsychological

20   testing after the evidentiary hearing had been completed?

21   A.   Yes.

22   Q.   Now, at the beginning of the evidentiary hearing, you

23   requested a continuance?

24   A.   Yes.

25   Q.   And you indicated that you had talked to Dr. Giles, and

1    neither he nor his partner, Dr. Prochaska --

2    P-R-O-C-H-A-S-K-A -- would agree to assist.

3        Do you remember that?

4    A.    Yes.

5    Q.    So you had actually talked to Dr. Giles and his partner or

6    just Dr. Giles?

7    A.    You know, I don't remember if his -- I think -- well, I

8    don't remember whether he represented his partner's viewpoint or

9    we talked to him.  I don't know.

10   Q.    And do you remember the State's response to your motion and

11   your assertion that Dr. Giles -- well, Dr. Giles testifying?

12       Mr. Bourne had indicated that Dr. Giles -- they had talked

13   to Dr. Giles, and Dr. Giles had told them there is, quote,

14   "nothing to this atrophy business.  That perfectly normal people

15   in society have brains, some bigger and some smaller than

16   others, and that there is nothing to this atrophy business."

17       Do you remember that statement from the prosecutor?

18   A.    Yes, I do.

19   Q.    And then you responded to that.

20       So at least at that time, there was yet another expert that

21   indicated there was nothing to this atrophy business?

22   A.    Another in addition to who?

23   Q.    To the four we have talked about.

24   A.    They didn't say anything about brain atrophy.  They weren't

25   even aware of it, to my knowledge.

1    Q.   Fair enough.  Fair enough, Mr. Kehne.

2    A.   And if they had known there was an organic problem --

3    Q.   Okay.  Mr. Kehne, fair enough.  Let me ask my question.

4    That's all right.

5    A.   Yes, sir.

6    Q.   We had four experts that had previously diagnosed

7    antisocial personality disorder --

8    A.   Yes.

9    Q.   -- that we have talked about.

10        And then Dr. Giles saying there is nothing to this brain

11   atrophy stuff?

12            MR. HORWITZ:  Your Honor, I object to that

13   characterization in the record.  What Mr. Anderson is referring

14   to is the prosecutor saying, at the hearing, I spoke to this

15   individual.  That's the only evidence.  It's not --

16            THE COURT:  Is that correct, Mr. Anderson?

17            MR. ANDERSON:  I am just trying to understand

18   Mr. Kehne's thought process, at that time, after having heard --

19            THE COURT:  Restate your question bearing in mind

20   Mr. Horwitz's objection.

21            MR. ANDERSON:  Thank you.

22            THE COURT:  If you're going to characterize the

23   statement, make sure that it's characterized as a

24   characterization by a prosecutor.

25            MR. ANDERSON:  Thank you, Your Honor.

1          THE COURT:  And, Counsel, bear in mind we're on the

2     clock, so we need to be direct and to the point.  So go ahead

3     and proceed.

4          MR. ANDERSON:  Thank you.

5     Q.   BY MR. ANDERSON:  In any event -- well, how did you feel

6     upon hearing the prosecutor's statement about Dr. Giles?

7     A.   How did I feel?

8     Q.   When the prosecutor said, "Dr. Giles has told me there is

9     nothing to this."

10    A.   I felt -- I felt that's typically dumb.  And what I mean by

11    that is it was extremely apparent when we spoke with Dr. Giles

12    that, although we tried to explain just a little bit about what

13    we were doing in trying to develop mitigation, we hadn't got

14    through to him at all.

15         He was highly incensed and insulted because he had it in

16    his mind that we were trying to turn this small thing in the CAT

17    scan or X-ray, or whatever we were looking at at the moment --

18    John and I came to call it "the little worm," but it's the

19    actual atrophy -- into a defense.

20         He was insulted because he thought we wanted to take that

21    imaging and use it somehow to convince people that that means

22    Robin Row was insane -- of course, we didn't have insanity, even

23    then, but something on that order -- that we were trying to have

24    her escape criminal liability, in other words, a defense, as

25    opposed to this may be something big or small that influenced

1    how she developed as a human being and the -- and the whole

2    person who is Robin, and it may help at least a little to

3    explain how she got to this point.

4         So when he said there is nothing to it, that's the context.

5    He was saying:  There is no way this is a defense.  You guys are

6    wasting everybody's time if you go down this road.

7    Q.   And what you've just described was also based upon a

8    conversation that you had with Dr. Giles?

9    A.   What I just described is entirely based on those

10   conversations -- or I only remember one.

11   Q.   Mr. Kehne, you indicated on direct that, in November, it

12   was your recollection today that the consultation that you had

13   with an expert was Dr. Clay Ward.

14        Are you sure it wasn't Dr. Beaver?

15   A.   No, I'm not sure who it was.  And if I said it was Clay

16   Ward, I misspoke a little bit.  Reading that, I assumed that's

17   who it probably was.  But we did -- either way, I believe we

18   talked to Craig Beaver in November.

19             MR. ANDERSON:  If I could have just a moment,

20   Your Honor.

21             THE COURT:  Yes.

22             MR. ANDERSON:  Nothing else, Your Honor.  Thank you.

23             THE COURT:  Mr. Horwitz, redirect.

24             MR. HORWITZ:  Thank you, Your Honor.

25                       REDIRECT EXAMINATION

1    BY MR. HORWITZ:

2    Q.   Mr. Kehne, does a mitigation investigation have to wait

3    until you have the transcript for the case?

4    A.   No, sir.

5    Q.   What can be done sooner than that in the absence of a

6    transcript in terms of gathering materials about the client,

7    that sort of thing?

8    A.   Actually, a great deal can be done before you have the

9    transcript, starting with getting a life history from the

10   client -- Ms. Row in this case -- and finding out the identities

11   of all the people in her life for her entire life, finding out

12   the names and locations of all the schools she attended,

13   churches, medical doctors, if she can find that or remember that

14   stuff, and start collecting records from the get-go -- is

15   usually an obvious place to get started, deeply.

16       I suppose -- I guess that's probably my best answer.

17   Q.   When do you think a mitigation specialist can be retained

18   in a postconviction case?  At what point in the process?

19   A.   Just absolutely as soon as possible.

20   Q.   Is there any reason that that would have to wait until a

21   transcript was obtained?

22   A.   No, absolutely not.

23   Q.   Were you aware of Ms. Goody using a collection agency to

24   get her payment from Ada County?

25   A.   Yes.  Bonneville, I -- well, I shouldn't say.  I don't

1    recall the name of it, but yes.  She called them "factors,"

2    which means, I think, that she gave them a copy of her current

3    bill, and they would cut her a check of -- they would take a

4    slice, and she would get a reduced payment.  But it improved her

5    cash flow.  Then they would get the entire amount, so they made

6    money on it.

7    Q.   As a general matter, was it your practice to refrain from

8    requesting money because you thought there was a possibility

9    that it might be declined to you --

10   A.   No.

11   Q.   -- requesting money for mitigation investigations?

12   A.   No.

13   Q.   Do you recall whether you raised the denial of funding in

14   the postconviction case as an issue on appeal to the Idaho

15   Supreme Court?

16   A.   I should recall that --

17        MR. ANDERSON:  Your Honor, I'm going to object to

18   relevancy.  We're talking appeal.

19        THE COURT:  Counsel, I'm not sure I do see the

20   relevancy.  Sustained.  If you want to reask the question after

21   showing some clear relevance, I'll allow it.  But at this point,

22   I'll sustain the objection.

23        MR. HORWITZ:  Thank you, Your Honor.

24   Q.   BY MR. HORWITZ:  Mr. Kehne, did you decline to get

25   neuropsych testing done of Mrs. Row -- of Ms. Row because she

1    had been described as antisocial personality disorder?

2    A.    Absolutely not.  Not only is it my duty to be skeptical of

3    experts developed by the State or, at the postconviction point,

4    by trial counsel, but also my understanding was if there is

5    evidence of organicity, that disqualifies her from the diagnosis

6    of antisocial personality.

7         Antisocial personality is based mostly on historical

8    things, like truancy at certain ages and other kinds of problems

9    with the law not explainable by other causes.  And if it's

10   related to brain damage, I -- it either disqualifies her -- I'm

11   not -- I haven't reviewed it for so long, I'm not sure -- or at

12   least it takes a lot of the sting out of it.

13              THE COURT:  I want to ask a question in that light.

14                             EXAMINATION

15   BY THE COURT:

16   Q.    Mr. Anderson made a great deal of the fact that apparently

17   three or four or more psychologists had concluded that Ms. Row

18   suffered from an antisocial personality disorder.  And I was

19   aware from something that I had read that you can't make that

20   diagnosis without excluding organic brain injury as a cause.

21        Putting those two together, to your knowledge, in this

22   case, did any of the psychologists who apparently concluded that

23   it was antisocial personality disorder take what would appear to

24   be that step of ruling out organic brain injury as a source

25   of -- I guess "the cause" would be a better word -- of Ms. Row's

1       conduct?

2           If you don't know, you can just so indicate.  Was that part

3       of any report?

4       A.    I believe the experts that Mr. Anderson was talking about

5       were unaware of any evidence of the atrophy or any other --

6       Q.    Okay.  So there is no protocol, to your knowledge, where a

7       psychologist, as a matter of course, before making that

8       diagnosis, particularly in a court of law, rule out certain

9       things?  In other words, actually order that CAT scans be

10      ordered or MRIs to rule out some indication of organic brain

11      injury?

12      A.    My understanding is before one makes a diagnosis -- now, I

13      know it's common that they do this all the time, but they are

14      supposed to exclude the organic.  That's part of the definition

15      of APD.

16      Q.    Was that your understanding in 1995 as opposed --

17      A.    Yes, sir.

18                  THE COURT:  Okay.  Go ahead, Mr. Horwitz.

19                  MR. HORWITZ:  Thank you, Your Honor.

20                      CONTINUED REDIRECT EXAMINATION

21      BY MR. HORWITZ:

22      Q.    And just to follow up on the court's question, Mr. Kehne, I

23      asked you if the reason you didn't pursue further investigation

24      of brain damage was because of descriptions of Ms. Row as

25      suffering from antisocial personality disorder.

1      Would your answer be the same regardless of what type of

2   mental health specialist deemed Ms. Row to be antisocial?

3   A.   Absolutely.

4   Q.   And I think you touched upon this briefly, but just to

5   clarify:  When Drs. Beaver and Norman arguably described

6   personality issues with Ms. Row, did they have the benefit of

7   the CT scan reflecting her atrophy?

8   A.   No.  I am as certain as I can be about Dr. Beaver, that he

9   was unaware of it.  And I know that from Mary's memos about

10   interviews she had with him, that he was taken by surprise, and

11   it changed his entire view of Ms. Row.

12   Q.   And your answer with respect to antisocial personality

13   disorder, would that be the same calculus you would make in

14   terms of a description of Ms. Row as sociopathic or being a

15   psychopath?  In other words, you would still pursue an

16   investigation into brain damage despite that description?

17   A.   Absolutely.

18   Q.   Do you know if borderline personality disorder is

19   consistent with brain damage?

20   A.   I think it's another one where --

21          THE COURT:  Counsel, so we're clear, was the witness

22   aware in 1995?

23          MR. HORWITZ:  Thank you, Your Honor.

24      And all of my questions, please answer in that light,

25   Mr. Kehne.

1          THE COURT:  Well, 1995 is actually not accurate.  The

2     time frame relevant to this case, which is your handling of

3     Ms. Row's postconviction relief proceeding, which I think

4     included '94 and '95.

5          Go ahead and answer.

6          THE WITNESS:  Yes, it's the same, if I recall the

7     question.  Did my answer make any sense in view of the question?

8     Q.    BY MR. HORWITZ:  I think the question was:  Did you know at

9     the time if borderline personality disorder was consistent with

10    brain damage?

11    A.    Oh, they're inconsistent.  Yes, I knew.

12    Q.    Did you know at the time if a Rorschach test could diagnose

13    brain damage?

14    A.    I have to say that I have read of people who make the

15    claim, but I think the majority of experts say no.  But there

16    has been some research that suggests that, but it's not

17    considered a reliable indicator, I don't think -- or was then.

18    Q.    Did you know if an MMPI could diagnose brain damage?

19    A.    I knew that it was not accepted as a reliable indicator.

20    Q.    Did the fact that Ms. Row had been administered these other

21    tests, including an MMPI, is that what prevented you from -- or

22    is that what led you not to investigate brain damage further in

23    her case?

24    A.    In no way, no.

25    Q.    Were you aware at the time that Dr. Engle never saw Ms. Row

1    in person?

2    A.   I may have -- I can't remember.  I may have been.  I

3    think -- now that you say that, that does ring a bell.

4    Q.   Were you aware that Dr. Engle never gave a formal diagnosis

5    of Ms. Row at the time, at sentencing?

6    A.   I'm sure I was at one time, but I don't remember.

7    Q.   Were you aware that a psychologist could not give a

8    diagnosis if they had not spent time with an individual

9    personally?

10   A.   I have heard several do it.  I think it's really bad

11   practice, but yes.

12   Q.   Would you have accepted a diagnosis that was made under

13   those -- under those conditions without a visit?

14   A.   I wouldn't, no.

15   Q.   Would that have prevented you from investigating brain

16   damage further?

17   A.   In no way.

18   Q.   At the time that you were working on Ms. Row's

19   postconviction case, did you consider a presentence

20   investigation report to be an important document that you had to

21   review in preparing for that case?

22   A.   Yes.

23   Q.   And that would include the attached materials to the

24   presentence investigation report?

25   A.   Yes.

1    Q.    Would you have considered yourself at that time an expert

2    in neuropsychological testing?

3    A.    No.

4    Q.    Do you recall Judge Schwartzman mentioning the possibility

5    of a successive postconviction petition presenting additional

6    evidence of brain damage at the postconviction hearing?

7    A.    I don't remember that.

8    Q.    Would it refresh your recollection to review the

9    postconviction hearing transcript?

10   A.    I'm sure it would.

11   Q.    If I could use the computer.

12         I have pulled up Exhibit 42.  This is the postconviction

13   hearing transcript.

14         Mr. Kehne, if you could read to yourself the final

15   paragraph on transcript page 111, beginning with, "I am simply

16   saying, Counselor..."

17         And Let me know when you have reached the end.

18   A.    Okay.

19   Q.    Does that refresh your recollection as to whether there was

20   a reference at the hearing as to the possibility of a successive

21   postconviction petition?

22   A.    Yes, it does.  There was a reference.

23   Q.    And who made that reference?

24   A.    His Honor, Judge Schwartzman.

25   Q.    Did you not investigate brain damage further because of

1    your conversation with Dr. Giles?

2    A.    No.

3    Q.    Or his partner?

4    A.    No.

5    Q.    Did you not investigate brain damage further because of

6    what the prosecutor, Roger Bourne, stated at the evidentiary

7    hearing --

8    A.    Absolutely --

9    Q.    -- in regards to his conversation with Dr. Giles?

10    A.    Absolutely not.

11    Q.    Do you recall whether Dr. Giles was specialized in

12    neuroradiology?

13    A.    No, I don't, actually.  I think he introduced himself as a

14    radiologist, period.

15    Q.    Do you recall whether Dr. Steuart was a neurologist?

16    A.    I don't believe that he was.

17            MR. HORWITZ:  If I could have just one moment,

18    Your Honor.

19            THE COURT:  Yes.

20    Q.    BY MR. HORWITZ:  Mr. Kehne, do you recall whether there was

21    any discussion at the postconviction evidentiary hearing about

22    having testing done of Ms. Row after the conclusion of that

23    hearing but before the initial postconviction had been resolved

24    by Judge Schwartzman?

25    A.    I don't remember one way or the other.

1    Q.   Would it refresh your recollection to review the

2    transcript?

3    A.   Yes.

4    Q.   Could you take a look -- please take a look at transcript

5    page 370.  This is Exhibit 42 still.  And please read to

6    yourself the paragraph that goes from page 370 to page 371 with

7    Mr. Adams speaking and beginning, "Judge, I have a couple other

8    matters..."

9         Just read that paragraph, and let me know when you're done.

10   A.   Okay.

11   Q.   Does that refresh your recollection?

12   A.   Yes.

13   Q.   And what happened in that regard -- or what statement was

14   made at the postconviction hearing?

15   A.   My partner, Mr. Adams, was requesting Ms. Row be moved from

16   the Pocatello Women's Center to a local jail -- for instance,

17   Ada County Jail -- so that she was much more accessible and

18   easier for us to talk to and interview and interact with so that

19   we might continue our efforts in investigation and development

20   of the case that we couldn't put on at the hearing.

21        So, definitely, we -- we were -- I mean, not maybe -- we

22   were considering doing exactly that at that point.

23   Q.   Why wasn't that neuropsych testing done?

24   A.   I don't know; I wish I did.

25            MR. HORWITZ:  No further questions, Your Honor.

1          THE COURT:  Any recross?

2          MR. ANDERSON:  Just one question, Your Honor.

3          THE COURT:  All right.

4                    RECROSS EXAMINATION

5    BY MR. ANDERSON:

6    Q.    Judge Schwartzman denied that motion; correct?

7    A.    I believe he did.

8          MR. ANDERSON:  That's all, Your Honor.  Thank you.

9          THE COURT:  All right.  You may step down.  Thank you,

10   Mr. Kehne.

11         THE WITNESS:  Your Honor, may I be excused?  I was

12   subpoenaed for the whole week.

13         THE COURT:  I assume, Counsel, the witness can be

14   released from his subpoena?

15         MR. HORWITZ:  Yes, Your Honor.

16         MR. ANDERSON:  The State excuses him, Mr. Kehne, also.

17         THE COURT:  Thank you very much.

18         THE WITNESS:  Thank you, Judge.

19         THE COURT:  Ms. Czuba, call your next witness.

20         MS. CZUBA:  Mary Goody.

21         THE COURT:  Ms. Goody, would you please step before

22   the clerk.  Come around to your right there.  You are headed in

23   the right direction.  Ms. Bracke will place you under oath and

24   give you directions from there.

25              MARY CAROLYN GOODY, PETITIONER'S WITNESS, SWORN

1          THE CLERK:  Please take a seat in the witness stand.

2          THE WITNESS:  Thank you.

3          THE CLERK:  Please state your complete name and spell

4     your name for the record.

5          THE WITNESS:  My name is Mary Carolyn Goody,

6     G-O-O-D-Y.

7          THE COURT:  Ms. Czuba, you may inquire.

8                    DIRECT EXAMINATION

9     BY MS. CZUBA:

10    Q.   Good morning still -- afternoon?  Good morning.

11         Very quickly, Ms. Goody, could you tell me, in 1995, were

12    you also known by your maiden name?

13    A.   Yes.  Although my maiden name is actually Costanzi, and

14    Hudson was my married name.

15    Q.   Okay.  And so you were married sometime after your

16    involvement in Ms. Row's case?

17    A.   Yes.

18    Q.   Okay.  Well, for today, I'm going to call you "Ms. Goody."

19    A.   That's correct.

20    Q.   And can you tell me what your current employment is?

21    A.   I am an independent contractor.  I am a mitigation

22    specialist working from an office in Battle Ground, Washington.

23    Q.   Can you tell me what your occupation was in 1994 to 1996?

24    A.   I also was an independent contractor working as a

25    mitigation specialist.

1    Q.   How did you become a mitigation specialist?

2    A.   Becoming a mitigation specialist is often an interesting

3    story for many of us.

4         I worked in the Jackson County Public Defender's Office in

5    Medford, Oregon.  And my family moved to Columbia, Missouri, and

6    I took a position with the Missouri State Public Defender's

7    Office and began working there as -- in sort of an

8    administrative position overseeing all of the death row cases

9    there in Missouri.  And then from there, I also was given a

10   caseload, and I did mitigation work.

11   Q.   How did you become involved in Ms. Row's case?

12   A.   My best recollection is that I received a call from Rolf

13   Kehne asking me if I would be willing to help them out with the

14   mitigation in this case, and I agreed to do so.

15   Q.   Do you recall when this was?

16   A.   It was sometime early in 1995, I believe.  Perhaps April,

17   March.

18   Q.   And what was your understanding of what you were asked to

19   do?

20   A.   Well, Mr. Kehne explained to me that they were having

21   difficulty obtaining any funding for a full mitigation

22   investigation.  And I agreed to work a number -- a certain

23   number of hours for $2500 to develop what I felt were the themes

24   in the mitigation in Ms. Row's case and also provide him with an

25   affidavit that would give the court an idea of how much time and

1     funds would be needed to do a full investigation.

2     Q.    And can you tell me what a mitigation specialist is?

3     A.    A mitigation specialist is an integral part of a capital

4     mitigation defense team.  And the mitigation specialist

5     compiles, through a very thorough investigation, a complete

6     psychosocial history of the defendant.

7          And the investigation must be exhaustive in order to be

8     able to develop the need for experts, what kinds of experts

9     would the team work together to locate to help represent the

10    mitigation in the case, and to develop the background history

11    with regard to future dangerousness and many other aspects of a

12    capital sentencing phase.

13    Q.    Is record collection a part of that process?

14    A.    Yes.

15    Q.    What -- what do you do with regards to record collection?

16    A.    Well, after a number of interviews with the defendant, I

17    would determine where there were sources of information.  And

18    there is a very long list of kinds of places that records are

19    held for any individual.

20         And that would be -- and this is not exhaustive -- medical,

21    educational, correctional, counseling, religious records,

22    military records, and any records also for the family of the

23    defendant in which you would be looking at parents.  You would

24    be going back several generations to try to collect vital

25    records on family members and siblings and any people who really

1    were very important in the defendant's life.

2    Q.   And are witness interviews a part of that process?

3    A.   Yes.

4    Q.   And how expansive is that investigation?

5    A.   Pardon me?

6    Q.   How expansive is that investigation?

7    A.   It has been for a very long time a standard that is termed

8    "exhaustive."

9    Q.   And what types of witness interviews are you looking to do?

10   A.   Well, there would be continuing ongoing interviews of the

11   defendant; interviews of the defendant's immediate family in

12   terms of parents, grandparents, aunts, uncles, sisters,

13   brothers, half-siblings, step-siblings, stepparents; friends of

14   the family; those people who came into contact with the

15   defendant for employment purposes; people who dealt with the

16   defendant in any kind of a correctional situation, in the jail

17   itself pretrial; and personal friends; religious people who had

18   contact with the defendant; lawyers who may have previously

19   represented the defendant; and, of course, mental health

20   professionals or medical professionals.

21   Q.   Okay.  Turning to your work in Ms. Row's case, as part of

22   your work in her case, did you collect social history records?

23   A.   I did.

24   Q.   Do you recall where some of the social history records were

25   from?

GOODY - Direct

1    A.    I collected her educational records as -- as I could within

2    the time frame that I worked on this case.  I collected

3    correctional records for her grandfather.  I collected some of

4    her employment records.  And I collected a lot of medical

5    records for her.

6    Q.    Okay.  Did postconviction counsel give you any input or

7    directive on where to request records from?

8    A.    No.

9    Q.    Can you tell me what you would do with these social history

10   records once you received them?

11   A.    Well, of course, I read them thoroughly.  I note whether or

12   not there are witnesses associated with the records that I need

13   to contact.

14        I keep a running list of all the records that I collect,

15   whether or not the records generate any other sources of

16   information or places where I should collect records.

17        I generally begin to build a chronology of the significant

18   dates and events contained within those records.  And I also

19   examine the records for themes that would be consistent with

20   what I felt the mitigation theory might be or was developing to

21   be.  And also whether or not there were any signs or symptoms of

22   mental health issues that needed to be further explored.

23   Q.    In this case, did you provide copies of these records for

24   the attorneys?

25   A.    Yes.

GOODY - Direct

117

1   Q.   And as part of your work with Ms. Row in this case, did you

2   interview Ms. Row?

3   A.   I did.

4   Q.   And do you remember when that was?

5   A.   I interviewed her as soon as possible after the initial

6   funding was obtained or approved.  I interviewed her in

7   Pocatello at the Women's Correctional Center.  I corresponded

8   with her.  And I also believe I saw her a second time.

9   Q.   And as a part of your work in Ms. Row's case, did you

10  interview other witnesses?

11  A.   I did.

12  Q.   How did you know who to interview?

13  A.   After speaking with Robin, she gave me a list of her family

14  members and her friends and people that she had been in contact

15  with, both in the past and leading up to the time just before

16  her incarceration.

17       And so I contacted as many of those individuals as I could.

18  I think I identified, ultimately, about 38 people that needed to

19  be contacted, but I did not have time to contact all of them.

20  Q.   Did postconviction counsel give you any input or directive

21  on who to contact or interview?

22  A.   No.  Only that I should contact the family members.

23  Q.   How did the bulk of these interviews take place?

24  A.   They took place by telephone.  There was -- there was not

25  time nor funds with which to travel.  And as I said earlier, the

1    whole point of what I was doing was an attempt to try to put

2    together enough information so that we could seek additional

3    funding to travel and interview witnesses personally.

4    Q.    Okay.  Is this a preferable way to conduct interviews?

5    A.    No, it is not.

6    Q.    Why not?

7    A.    Well, it's very important to establish rapport with

8    witnesses and trust with witnesses.  And, of course, when you're

9    not personally in the room with someone and able to talk with

10    them closely, you're not able to establish that kind of trust;

11    and, therefore, often you do not have an opportunity to get to

12    the real important information or explanations or what you're

13    seeking, the knowledge that you're seeking about the individual.

14    Q.    How did you document the information you gathered in this

15    case?

16    A.    I did write in interviews.  I wrote up my interview notes

17    in a fairly cryptic fashion.  I did not elaborate a great deal

18    from handwritten notes, but I do not really recall exactly how I

19    put it all together except from looking at the work product that

20    I have seen since.

21    Q.    Okay.  Do you recall what you did with your file in this

22    case?

23    A.    Pardon me?

24    Q.    Do you recall what you did with your file in this case?

25    A.    Oh.  I gave it to counsel when I was finished with the

1    case.

2    Q.   If I can have the computer, Your Honor.

3         I would like you to take a look at what's been submitted as

4    the petitioner's exhibit list in this case, and I would like you

5    to look at the list from 74 to 155.  I'm going to scroll down

6    for you.

7         Let me know when I can continue scrolling.

8    A.   Okay.

9    Q.   [Scrolling.]

10   A.   All right.

11   Q.   [Scrolling.]

12   A.   All right.

13   Q.   [Scrolling.]

14   A.   All right.

15   Q.   [Scrolling.]

16   A.   All right.

17   Q.   You can just stop with Exhibit 155.

18   A.   Okay.

19   Q.   And did I request that you review these documents for the

20   purpose of identifying if they were generated during the course

21   of your work in the Row case?

22   A.   Yes.

23   Q.   And were they?

24   A.   Yes.

25   Q.   Okay.  Ms. Goody, do you recall there being brain imaging

1    in Ms. Row's case?

2    A.   Yes.

3    Q.   Can you tell me how you uncovered this?

4    A.   I requested records from, I believe, Saint Alphonsus

5    hospital because there had been a serious suicide attempt by

6    Ms. Row.  And I received, as I recall, about a one-foot stack of

7    paper in a box from the medical records custodian.

8    Q.   Okay.  What did you do to follow up with these records?

9    A.   Well, I reviewed the records, and I reviewed them rather

10   quickly; I recall that day, actually.  And as I got about

11   three-fourths of the way through the stack, there was a CT scan

12   report in there that caught my eye.

13   Q.   Okay.  Did you follow up with postconviction counsel

14   regarding the CT scan report?

15   A.   Yes.

16   Q.   And how did you do that?

17   A.   I know I sent them a letter indicating that I was working

18   on this issue, and I then made a telephone call to them about it

19   also.

20   Q.   Okay.  Did you speak with anyone at Saint Alphonsus?

21   A.   I don't recall exactly.

22   Q.   Okay.  If I showed you your medical record request in this

23   case, do you think it would refresh your memory?

24   A.   Yes.

25   Q.   I'm going to show Ms. Goody what's been marked as

GOODY - Direct

121

1     Exhibit 88.

2          And if I can direct your attention to page 2.  Can you tell

3     me what this is?

4     A.   It is a record request that I made to Saint Alphonsus

5     hospital for medical records regarding -- well, the request is

6     for Joshua and -- Joshua Cornelius [*sic*].

7     Q.   Do you see now all the requests?

8     A.   Yes.

9     Q.   I scrolled too quickly.

10         And who was that request for?

11    A.   That was for Joshua and Tabitha Cornellier.

12    Q.   Can I direct you a little further up.  If you go under the

13    date, April 28, 1995, you can see the "to."  And that was to

14    Saint Alphonsus?

15    A.   Mm-hmm.

16    Q.   Can you see the first "re" under that?

17    A.   Regarding Robin Lee Row.

18    Q.   Yes.  And --

19    A.   And Randy Row.

20    Q.   So was this request for all four of these individuals?

21    A.   Yes.

22    Q.   If we go to later on in this report, page 64 through 67 of

23    the Saint Alphonsus records, Exhibit 88.  Can you please

24    identify what this is.

25    A.   It is a transmittal note, very informal, and a check to

**GOODY - Direct**

122

1      Saint Alphonsus for the x-rays for Robin Row.

2      Q.   Okay.  Does this refresh your recollection that you

3      specifically requested the film for the CT scan in this case?

4      A.   Yes.

5      Q.   And did you ultimately receive this film?

6      A.   Yes.

7      Q.   And what did you do with it?

8      A.   I believe I transmitted it immediately to John and Rolf.

9      Q.   Why did you think the CT scan was important in this case?

10     A.   Well, the findings of the radiologist were clearly that

11     there was a brain impairment, specifically an atrophy and -- of

12     the cerebellum.

13         And this was a very important fact concerning her cognitive

14     functioning, and it was the only evidence that I had received in

15     the medical records that I had collected to date that gave me

16     any indication, other than her suffering from depression, that

17     she may have had a serious mental health and cognitive

18     impairment.

19     Q.   Did you follow up by conducting any research into cerebral

20     atrophy?

21     A.   I did.

22     Q.   Do you recall if you informed postconviction counsel about

23     the results of that research?

24     A.   I did -- I do.  And I did.

25     Q.   Do you recall speaking to Dr. Jonathan Pincus in connection

1    with Ms. Row's case?

2    A.    I do.

3    Q.    And who is Dr. Pincus?

4    A.    Dr. Pincus is now deceased, but he was at that time the

5    head of neurology at Georgetown University Hospital.

6    Q.    Had you worked with Dr. Pincus before?

7    A.    I had.

8    Q.    Why did you speak with him?

9    A.    Well, I am not a medical specialist; I do not have any kind

10   of medical training.  But I knew that this was a very

11   serious -- potentially serious impairment, and I wanted his

12   opinion about what it meant.

13   Q.    Okay.  Did you do this at the direction of postconviction

14   counsel?

15   A.    No.

16   Q.    So you did this on your own accord?

17   A.    Yes.

18   Q.    Okay.  What did you take away from your conversation with

19   Dr. Pincus?

20   A.    From my conversation with Dr. Pincus, I realized that I

21   needed to make the request for this film, this scan, and that

22   she needed further testing, neuropsychological testing, a full

23   battery of this testing, which I definitely concurred with him

24   on that, and that a thorough background investigation needed to

25   be conducted on other family members to determine whether or not

124

1    any of them had any such medical impairments.

2    Q.   Do you recall if you conveyed this information to Mr. Kehne

3    and Mr. Adams?

4    A.   I don't specifically recall doing it.

5    Q.   Okay.  I'm going to have you look at Exhibit 110.

6         Can you tell me what that is?

7    A.   Yes.  These are my typed notes regarding my conversation

8    with Dr. Pincus.

9    Q.   Okay.  And is that a fax header at the top?

10   A.   Yes.

11   Q.   Okay.  Do you know if you faxed that to -- does that

12   refresh your recollection in any way whether you faxed that to

13   Mr. Kehne and Mr. Adams?

14   A.   I did.

15   Q.   Thank you.

16        Do you recall speaking with Dr. Donald True in connection

17   with Ms. Row's case?

18   A.   I do not recall speaking with him.

19   Q.   I'm going to show you what is Petitioner's Exhibit 130.  I

20   am going to scroll down a bit to the last page of this exhibit.

21        Can you take a look at this and review it for yourself.

22   A.   Yes.  I have reviewed it.

23   Q.   Okay.  Can you tell me what this document is?

24   A.   It's a letter to me termed a "Confidential Psychological

25   Consultation" written by Dr. True on June 27, 1995.

1    Q.    And who is Dr. True?

2    A.    Dr. True is a Ph.D. psychologist in Portland, Oregon.  He

3    was most probably referred to me by another attorney that I work

4    with in Oregon who works with Dr. True on a regular basis.

5    Q.    And why would you have consulted with him?

6    A.    Again, I was looking for any kinds of assistance that I

7    could get to try to understand what the CAT scan findings may

8    have meant in terms of her functioning and her life and her

9    case.

10   Q.    Do you recall if you conveyed this information to Mr. Kehne

11   and Mr. Adams?

12   A.    I don't recall if I did.

13   Q.    Were you ever asked to provide any of the social history

14   documents you collected on Ms. Row to any experts in this case?

15   A.    No.

16   Q.    Were you ever asked to provide any of the witness

17   interviews you conducted regarding Ms. Row and her family to any

18   experts in this case?

19   A.    No.

20   Q.    I would like you to take a look at Exhibit 89.

21         Once you've had a chance to take a look, can you tell me

22   what this is?

23   A.    This is a letter that I wrote on May 1st of 1995 to Ms. Row

24   asking her to sign a release for Craig Beaver.

25   Q.    And can you go a little bit further down and tell me what

1      the end of that paragraph says.

2      A.        "There is apparently no money for a full-blown

3                investigation at this time, but I will instead do an

4                affidavit regarding my conversations with these people

5                and the records I have received with my preliminary

6                findings."

7      Q.    Ms. Goody, do you recall who told you there was limited

8      funding for this case?

9      A.    Rolf Kehne.  And I believe I spoke with John Adams once

10     about it also.

11     Q.    Do you recall why there was limited funding?

12     A.    My understanding was that the court did not think it was

13     important.

14     Q.    In this letter, you also describe your work as

15     "preliminary."

16     A.    Yes.

17     Q.    Can you tell me what you mean by that?

18     A.    Well, it was exceedingly preliminary because I was unable

19     to personally travel to talk to these very many -- this long

20     list of witnesses that I had put together.  I was unable to

21     complete all of the record requests that I needed to make.  And

22     I was limited in the time that I could spend with Ms. Row, just

23     for the beginning of the explanation.

24     Q.    Okay.  I'm going to show you Exhibit 126 and ask you if you

25     recognize this document.  I'll scroll down a bit so you can see.

1          Can you tell me what that document is?

2    A.   It is an affidavit prepared by me.

3    Q.   I'm going to scroll down so that you can see the last page.

4          Can you tell me when that affidavit was prepared?

5    A.   I signed it on June 15, 1995.

6    Q.   Do you recall who asked you to prepare this affidavit?

7    A.   It was either Rolf or John.

8    Q.   Do you know if Mr. Adams or Mr. Kehne reviewed this

9    declaration before you prepared it, before you signed it?

10    A.   No, they did not.

11    Q.   And I'm going to ask you to quickly just skim through,

12    starting with paragraph 7.

13          Basically, as you're skimming through, if you can

14    just -- the question I'm going to ask you with regard to this

15    is:  Can you recall why you were asked to prepare this

16    affidavit.

17    A.   Well, when I -- if I may digress a little.  When I

18    discovered the CAT scan report and I telephoned Rolf Kehne, I

19    learned from him that they had already prepared the petition and

20    that they were preparing to move forward with filing it without

21    including any mitigation information or any information about

22    her potential mental health problems or disability or medical

23    condition or however you wish to describe it.

24          And so when I made this affidavit, I tried to put as much

25    information in here as I possibly could so that the mitigation

1    that was apparent, to me alone, at this time would be available

2    for anyone who read the affidavit.

3    Q.   So does this affidavit describe the investigative work you

4    had done to that point in Ms. Row's case?

5    A.   Yes.

6    Q.   Would you consider the work you had done to that point to

7    be a complete mitigation investigation?

8    A.   No.

9    Q.   Were you aware that a postconviction hearing occurred in

10   this case?

11   A.   I became aware of it, yes.

12   Q.   In 1996, were you aware that a postconviction hearing had

13   occurred in this case?

14   A.   Yes.

15   Q.   Okay.  When did you become aware?

16   A.   I don't know.

17   Q.   Okay.  Have you testified as a witness before in cases

18   you've worked on?

19   A.   Yes.

20   Q.   Were you ever asked to testify on behalf of Ms. Row in the

21   state postconviction process?

22   A.   No.

23   Q.   If you had asked, would you have been willing to testify?

24   A.   Yes.

25   Q.   If you can, can you tell me a little bit about what your

1    communication was like with Mr. Kehne and Mr. Adams?

2    A.    It was pretty much nonexistent.  I did not hear from them.

3    And I felt that I was communicating with them because I was

4    faxing them the materials I was gathering.  And, you know, I was

5    working fairly furiously during this time period, so I was

6    collecting a lot of things and sending them the information.

7    Q.    When you sent information to them, such as records you had

8    collected, did you receive any feedback from them?

9    A.    No.

10   Q.    Did you receive any further directives on where you should

11   go, from them?

12   A.    The only directive that I recall, which is in the letter

13   that I wrote to Ms. Row, is the directive to contact the family

14   members.

15   Q.    And when you sent Mr. Kehne and Mr. Adams memos regarding

16   the interviews you had conducted, did they give you further

17   direction or give you areas of follow-up for additional

18   questioning?

19   A.    No.

20            THE COURT:  Counsel, we're about where we take the

21   break, but I'll allow you to ask one or two more questions if

22   that will help you round out a line of inquiry.

23            MS. CZUBA:  I think I have just one more document to

24   go over with her.

25            THE COURT:  All right.

1            MS. CZUBA:  I'm going to bring up Exhibit 114.

2       Q.   BY MS. CZUBA:  Can you tell me what this document is?

3       A.   This is an interview of Craig Beaver.

4       Q.   And I'll make it so you can actually see it.

5            Can you tell me who this interview was directed to?

6       A.   Rolf Kehne and John Adams.

7       Q.   And when was your interview?

8       A.   June 13 of 1995.

9       Q.   I'm going to ask you if Dr. Beaver talked about the

10  quantity of information that trial counsel provided him in

11  Ms. Row's case.  And if you can't remember, you can refer to

12  this document.

13      A.   He told me that he had been given very little information

14  and no background information.

15      Q.   Can you recall if Dr. Beaver had access to the CT scan that

16  was done in 1993 in this case?

17      A.   He did not.

18      Q.   And can you tell me if Dr. Beaver proposed testing that he

19  advocated be conducted with Ms. Row?

20      A.   When I discussed the medical information with him, he did

21  indicate that he felt that further testing was warranted.

22      Q.   And do you recall what kind of testing that would have

23  been?

24      A.   Yes.  It was a full neuropsychological battery of tests,

25  and he suggested specifically a full Halstead-Reitan, a --

1          MS. LORELLO:  Your Honor, if I could just clarify if

2     the witness is testifying from her recollection or if she is

3     just reading the exhibit.

4          THE COURT:  I don't know.  Are you referring to just

5     the exhibit, or is this from your memory?

6          THE WITNESS:  I do recall that he suggested she have a

7     full battery of neuropsychological testing.

8     Q.   BY MS. CZUBA:  And would it help your recollection if you

9     looked at this document and could tell me what specific tests?

10    A.   Yes.

11    Q.   Okay.  And what were those specific tests?

12    A.   A full Halstead-Reitan battery, a WAIS, a WREY, a STROOP, a

13    PAYSAK, an MMPI, a HARE -- I have "PL-R" here; it's actually

14    "PCL-R" -- a Rorschach, and the Dissociative Scale was suggested

15    by him in that telephone conversation.

16    Q.   Okay.  And can you tell me, if you recall, did you

17    interview Dr. Beaver at the direction of postconviction counsel?

18    A.   No.

19    Q.   And that was of your own initiative?

20    A.   Yes.

21         MS. CZUBA:  I pass the witness at this time,

22    Your Honor.

23         THE COURT:  All right.  Let's go ahead and take the

24    break at this point, and we'll return, and Ms. Lorello can

25    conduct her cross-examination.

1          We'll be in recess for 15 minutes.

2          (Recess at 1:03 p.m. until 1:20 p.m.)

3              THE COURT:  With that, Ms. Lorello, you may

4     cross-examine the witness.

5          And, Ms. Goody, I'll remind you you are still under oath.

6     Proceed.

7              MS. LORELLO:  Thank you.

8                          CROSS-EXAMINATION

9     BY MS. LORELLO:

10    Q.   Good afternoon, Ms. Goody.

11    A.   Good afternoon.

12    Q.   If I recall, Counsel had you look at the list of exhibits

13    and specifically Nos. 74 through 155.

14         Do you recall that?

15    A.   Yes.

16    Q.   And you, I think, indicated you had reviewed those as

17    documents you had produced during the course of your work in

18    Ms. Row's case?

19    A.   Yes.

20    Q.   And do you have any reason to doubt the accuracy of any of

21    those documents?

22    A.   No.

23    Q.   Any reason to doubt that you provided those documents to

24    postconviction counsel?

25    A.   No.

1          MS. LORELLO:  Thank you.  That's all my questions,

2    Your Honor.

3          THE COURT:  Direct and to the point.  Thank you.

4       Redirect, if any, Ms. Czuba.

5          MS. CZUBA:  No redirect, Your Honor.

6          THE COURT:  All right.  You may step down.

7          THE WITNESS:  Thank you.

8          THE COURT:  Just a moment.  Let me -- I thought there

9    would be a little more time for me to gather my thoughts here if

10   I had any questions.

11                              EXAMINATION

12   BY THE COURT:

13   Q.   Just so I'm clear, if I understand, the chronology is that

14   you, in the process of following up on an apparently serious

15   suicide attempt, at Saint Al's came upon the CAT scan which

16   showed the telltale cerebral atrophy; correct?

17   A.   Yes.

18   Q.   You then conferred with the doctor from Georgetown who

19   indicated it was a serious matter, also with Dr. Beaver, and

20   with the psychologist, I believe, from Portland?

21   A.   Yes.

22   Q.   And this was all communicated to Mr. Kehne and Mr. -- well,

23   to one or both of them by way of the memos that we have gone

24   over earlier?

25   A.   Yes.  And also, Your Honor, a telephone conference.

1    Q.   That was actually going to be my question.  Could you

2    describe what, if any, communications occurred beyond the

3    written documents, that you recall?

4         And, again, this is now 12 years -- well, 22 years ago.

5         Can you recall anything about those conversations that

6    suggested why Mr. Kehne and/or Mr. Adams did not follow up on

7    this or did not ask you to follow up on it?

8    A.   If I may, Your Honor, it was a short period of time that I

9    actually worked diligently on collecting these records and

10   reading them and talking to folks on the phone.  And I did not

11   have any what I would consider to be really meaningful

12   communication with the lawyers during this time other than I was

13   constantly trying to feed them the information that I was

14   obtaining.

15        And when I found this report, I quickly did a little

16   research, saw that perhaps it was linked to schizophrenia in

17   some way, in some medical review articles that I read, and I

18   called them immediately to tell them this.

19        And at that time, then, I was shocked to learn that there

20   had been no continuance obtained, that they were, indeed -- had

21   prepared and were filing a postconviction petition and had not

22   conferred with me at all while drafting that.

23   Q.   Okay.  But, again, your initial retention was really to

24   provide a record upon which they could rely to go to

25   Judge Schwartzman to ask for some real investigative services,

1    not the very limited investigation that you had undertaken;

2    correct?

3    A.    That's true.

4    Q.    And I may -- maybe you were asked this, or maybe everyone

5    here knows this but me:  But you did not -- you weren't involved

6    in any way in the postconviction relief hearing; is that

7    correct?

8    A.    That's correct.

9    Q.    Okay.  So you were never called to testify.  Whatever you

10   did for the $2500 that you were retained on, none of that found

11   its way to the evidentiary hearing, to your understanding?

12   A.    That's correct.

13         THE COURT:  All right.  Counsel, is there any

14   questions in light of my inquiry?  I'm just -- all right.

15   Ms. Lorello.

16                    FURTHER CROSS-EXAMINATION

17   BY MS. LORELLO:

18   Q.    Ms. Goody, is it your testimony, then, that you didn't come

19   to Boise and meet with Mr. Kehne or Mr. Adams at all?

20   A.    My memory -- I believe I came initially to meet with them,

21   to look at their files and obtain documents from their files.

22   And that was the only time that I came to Boise that I recall.

23   Q.    Okay.  And is it your testimony that you didn't do any work

24   on the case after June of 1995?

25   A.    That is not my testimony.  I think that I provided things

1    to them that I received after June of 1995 but only by way of

2    transmittal of documents and perhaps a note that accompanied it

3    saying:  Here is something else that I received late.  You know,

4    records requests often come in later.

5    Q.   Okay.  Thank you.

6    A.   You're welcome.

7               THE COURT:  Ms. Czuba, any follow-up?

8               MS. CZUBA:  Yes, Your Honor.

9                         REDIRECT EXAMINATION

10   BY MS. CZUBA:

11   Q.   Ms. Goody, do you remember whether you were told about the

12   evidentiary hearing before it took place?

13   A.   No.

14   Q.   So is your answer that, no, you weren't told about the

15   evidentiary hearing, or you don't recall?

16   A.   I don't recall that I was told.  I don't recall when I was

17   told.

18   Q.   Okay.  And when Ms. Lorello was asking you on redirect

19   [sic] about your work continuing after June of 1995, did you

20   continue to write letters to Ms. Row?

21   A.   I don't recall.

22   Q.   Do you recall if you continued to get records in on the

23   requests you had sent out?

24   A.   I do.  I did.

25   Q.   And do you recall if you continued to supply those records

1    to postconviction counsel?

2    A.    I did.

3                MS. CZUBA:  Thank you, Your Honor.

4                THE COURT:  Anything else?

5                MS. LORELLO:  No, Your Honor.

6                THE COURT:  Now, Ms. Goody, you may step down.

7                THE WITNESS:  Thank you.

8                THE COURT:  Have a good day.

9         I assume the witness can be released from any subpoena?

10                MS. CZUBA:  Yes, Your Honor.

11                MS. LORELLO:  We did not subpoena her, Your Honor.

12                THE COURT:  Okay.  Thank you very much.

13         Call your next witness, Mr. Horwitz.

14                MR. HORWITZ:  Your Honor, we call Russell Stetler, who

15    I think may have just stepped out to use the restroom.  So we

16    can gather him.

17         Just to let the court know, there has been a slight change

18    in plans.  Mr. Stetler was supposed to testify tomorrow, but we

19    would like to examine him today, and we expect him to take the

20    rest of the session today.

21                THE COURT:  Okay.  And Dr. Merikangas, then, won't be

22    called until tomorrow morning?

23                MS. CZUBA:  Yes, Your Honor.

24                THE COURT:  And I assume that was communicated timely

25    to counsel?

1          MS. LORELLO:  We discussed it at the break,

2     Your Honor.

3          THE COURT:  Mr. Stetler, sir, would you come forward.

4     Step to your right around counsel table, step before Ms. Bracke,

5     and she will place you under oath.

6          THE CLERK:  Right here, sir.

7          RUSSELL STETLER, PETITIONER'S WITNESS, SWORN

8          THE CLERK:  Please take a seat in the witness stand.

9        Please state your complete name and spell your name for the

10    record.

11         THE WITNESS:  Yeah.  My name is Russell Stetler,

12    R-U-S-S-E-L-L, S-T-E-T-L-E-R.

13         THE COURT:  You may inquire, Mr. Horwitz.

14         MR. HORWITZ:  Thank you, Your Honor.

15                       DIRECT EXAMINATION

16    BY MR. HORWITZ:

17    Q.   Mr. Stetler, I would like to begin by showing you a copy of

18    your declaration.  This is labeled Exhibit 8.

19         Is this the declaration you prepared for this case?

20    A.   Yes, it is.

21    Q.   And does this contain a full statement of your

22    qualifications and your experience?

23    A.   Yes, it does.

24    Q.   How are you employed?

25    A.   I'm employed as the national mitigation coordinator for the

**STETLER – Direct**

1    Federal Death Penalty Projects.  And I'm hosted by a public

2    defender office in the Northern District of California, Oakland,

3    California.

4    Q.   How long have you had that position?

5    A.   Since 2005.

6    Q.   What are your responsibilities?

7    A.   I provide assistance to federal public defender staff and

8    court-appointed counsel, under the Criminal Justice Act, who are

9    working on death penalty cases in the federal courts, either

10   direct prosecutions under the Federal Death Penalty Act or in

11   federal court on habeas corpus arising either from state or

12   federal death sentences.

13   Q.   What was your position before the current one that you

14   occupy?

15   A.   For the 10 years before that, 1995 to 2005, I was the

16   director of investigation and mitigation at the New York State

17   Capital Defender Office.

18       That was an office created when the death penalty was

19   reinstated in New York under the laws of 1995, and we had a

20   mandate to see that everyone in the trial courts received

21   effective assistance.  We did both direct representation and

22   provided assistance in the cases where we were not counsel of

23   record.

24   Q.   And what position did you have before that one?

25   A.   For the five years before that, I was the chief

1    investigator at the California Appellate Project in

2    San Francisco.  That was a nonprofit organization founded by the

3    State Bar of California as a resource center for private counsel

4    handling death penalty appeals and state postconviction --

5    actually, state postconviction proceedings and ultimately

6    also -- at that time, also federal habeas corpus proceedings for

7    California prisoners under sentence of death.

8    Q.   Have you had any other positions in connection with the

9    death penalty that we haven't discussed so far?

10   A.   No.  I began working on death penalty cases in a private

11   capacity in 1980 but exclusively death penalty work from 1990

12   onward.

13   Q.   At the time of Ms. Row's prosecution and her initial

14   postconviction, where were you working?  This is 1992 through

15   1996.

16   A.   I was at the California Appellate Project in San Francisco

17   from 1992 to 1995.  And then I was in New York City at the

18   New York Capital Defender Office.

19   Q.   Did you have any contact with Idaho practitioners at that

20   time?

21   A.   Yes.  I mean, as a matter of fact, when I was at the

22   California Appellate Project, that office received some federal

23   funding as what we then called Federal Death Penalty Resource

24   Centers.  And there were a number of those around the country.

25   And so I had some contact with the, you know, equivalent office

**STETLER – Direct**

1    in Idaho.  This is before there were capital habeas units; there

2    were these resource centers.  And in addition, I met Idaho

3    practitioners at national training programs.

4    Q.   You mentioned some training programs.

5         How long have you been attending programs dedicated to

6    capital defense?

7    A.   Well, since I first began working on death penalty cases in

8    1980.  From 19- -- roughly 1990 onwards, I have been much more

9    actively involved in presenting at these programs and helping to

10   organize them.

11        I should have said that one of my responsibilities in my

12   current job is to assist in a number of federal-sponsored

13   training programs.

14   Q.   Have you done any trainings in the state of Idaho?

15   A.   Yes.  I believe five continuing legal education programs in

16   Idaho.

17        I remember there was one at The Grove Hotel, not far from

18   here, where we had a false fire alarm in the middle of the

19   night.  Very memorable.

20        That was sponsored by the National Association of Criminal

21   Defense Lawyers.  They have an annual program that moves around

22   the country.  It's focused on mitigation and jury selection in

23   death penalty cases.

24   Q.   And what are some of the other programs where you

25   participated as a faculty member?

142

A.   Well, we have the largest death penalty training program in
the country, in California, on Presidents Day weekend every
year.  I have attended that program since I began working in
capital cases in 1980.  And I was a co-chair of the planning
committee in 2009 and then for five years from 2011 through
2015.

It started out as a program of approximately 300 attendees.
Now it's become not just a California conference, but people
come from multiple jurisdictions.  We get about 1200 people in
attendance.  And it's kind of a smorgasbord of multiple
workshops and probably six or seven plenary programs spread over
a period from Friday through midday Monday on the Presidents Day
weekend every year.  It's usually in Monterey, California.  It's
been moved around a couple of times when the Monterey Conference
Center was not available.

I have also been in two other significant national programs
that I should mention:  The NAACP Legal Defense Fund since the
early 1980s has held an invitation-only training program that's
referred to as the Airlie Conference -- A-I-R-L-I-E.  Airlie is
just the name of the conference center where the program is held
in Warrenton, Virginia.

And that program invites people from all the death penalty
jurisdictions in order, sort of, to train the trainers, to
impart information about new developments relating to death
penalty defense work, whether they're legal developments or

1   things relating to mental health and mitigation, with the idea

2   that these practitioners will then take that -- that knowledge,

3   the practice tips, the updates back to their own communities, to

4   their own training programs.

5      The one other program I would mention is sponsored by the

6   largest public defender organization.  The National Legal Aid

7   and Defender Association is, you know, an association of all the

8   public defender offices around the country.

9      And since the 1980s, they have been holding a program

10  called "Life in the Balance."  And it was originally designed to

11  have two components -- one mitigation, the other litigation -- a

12  couple days of each.  And you know, I have frequently been on

13  the faculty of that program as I have been on the national --

14  the NAACP Legal Defense Fund program.  And at various times I

15  have served on planning committees for those programs as well.

16  Q.  Have you published any work in the field of mitigation

17  investigation?

18  A.  Yes.  I have done -- well, I helped to edit the first

19  mitigation volume in the *California Trial Manual*.  We have a --

20  you know, now a four- or five-volume defense manual.  And I

21  helped to shape the mitigation section of that manual, a

22  separate volume just devoted to mitigation, beginning in 1993.

23     I have also written articles for the magazine of the

24  National Association of Criminal Defense Lawyers, *The Champion*.

25  I wrote an article called "Mitigation Evidence in Death Penalty

1      Cases"; another one called "Mental Disabilities in Mitigation";

2      and then, you know, three or four others over the years.

3          I have written law review articles about counsel's duty to

4      seek pleas in death penalty cases.  That was in *Hofstra Law*

5      *Review*.  I did an article again in *Hofstra Law Review* on the

6      American Bar Association guidelines on how they relate to

7      prevailing norms in death penalty cases.

8          I did an article in 2014 for the University of Missouri

9      *Kansas City Law Review* on capital mental health assessments.

10         So that's the sort of breadth of things -- I have written a

11     few book chapters as well.  Most recently -- and I think this is

12     not in my declaration because it wasn't published yet -- but the

13     American Bar Association just last month released a book edited

14     by Ed Monaghan and James Clark called *Tell the Client's Story*,

15     and I wrote the opening chapter of that book with Professor John

16     Bloom from Cornell University Law School.  And it's just called

17     "Mitigation Matters."

18     Q.   Have you consulted on postconviction cases in particular?

19     And I mean initial state postconviction matters.

20     A.   Yes.  Yeah.  And that was a large part of what I did in

21     California in 1990 to '95.

22     Q.   Have you written on that subject as well?

23     A.   Yes.  I did an article for the *Champion* magazine on that

24     subject.  And actually, it was quoted heavily in the commentary

25     to the revision of the *ABA Guidelines* in 2003.

STETLER – Direct

145

1    Q.   Can you give us a rough estimate of how many capital cases

2    you have worked on personally, either through your -- by being

3    involved directly in the case or in a consulting capacity?

4    A.   It's very hard to put a number on it.  All I can say is

5    hundreds.

6         In New York, we had effectively first refusal rights on all

7    potential death penalty cases.  Prosecutors were required, under

8    the statute that created our office, to notify us when anybody

9    was arrested for a potential capital charge.  And they were

10   eligible for qualified death penalty counsel until there was a

11   determination affirmatively not to seek the death penalty.  And

12   there were over 800 of those cases.  I wasn't involved in all of

13   them, but I was involved in a very substantial number.

14        I should say, going back to the 1980s, I worked on about

15   100 homicide cases privately in the 1980s, and some were --

16   between a quarter and a third of those were death penalty cases.

17        At the California Appellate Project, similarly, by then,

18   there were already a few hundred people under a sentence of

19   death in California.  And I worked on a large number of cases

20   there as well.

21        So the number is, you know, somewhere in the hundreds.

22   Q.   I think we may have skipped over this earlier.  But when

23   you were in private practice, what was the nature of your work?

24   A.   Just investigation, generally, and then it kind of morphed

25   into mitigation investigation because that was so central in

1    death penalty cases.

2    Q.   Have you previously been qualified and testified as an

3    expert on mitigation investigations?

4    A.   Yes, I have.

5    Q.   Do you have a sense of how many times that's happened?

6    A.   I think it's 29 times.

7    Q.   Where have you been qualified?

8    A.   Fourteen different states.  So both state and federal

9    court, but Alabama, Arizona, Arkansas, California, Colorado,

10   Iowa -- where there is federal death penalty prosecution,

11   although it's a nondeath-penalty state -- Louisiana, Missouri,

12   Nevada, Pennsylvania, South Carolina, Tennessee, Texas, and

13   Wyoming.

14   Q.   Have you testified as an expert in any *Martinez*

15   proceedings?

16   A.   Yes.  A few of the recent cases were *Martinez* cases: one in

17   the Middle District of Louisiana; just this January, in the

18   Northern District of Texas in Amarillo; and in the District of

19   Wyoming.

20        In fact, I testified in the state postconviction case years

21   ago, and then I was brought back in the federal hearing in that

22   case.  So I don't -- I don't have a precise number of how many

23   of these cases were explicitly *Martinez*, but three, four, or

24   five of them, something like that.

25   Q.   Have you testified as an expert in any cases involving

1    judge sentencings?

2    A.    Yes.  I mentioned I testified in a couple of Arizona cases,

3    and the Arizona cases were judge sentencing.

4    Q.    Has any court ever not found you to be qualified as an

5    expert on mitigation investigations?

6    A.    No.

7         MR. HORWITZ:  Your Honor, for purposes of the record,

8    we would tender Mr. Stetler as an expert.  My understanding is

9    you're going to reserve your ruling on that until after the

10   hearing.

11        THE COURT:  Yes, that's correct.  We'll await that.

12        And also, I assume it will be clear from the questions what

13   the scope of the expertise would be.

14        So you can, I guess, just have a continuing objection,

15   Mr. Anderson, and then I'll -- we'll take that up in

16   post-hearing submissions.

17        MR. ANDERSON:  Thank you, Your Honor.

18        THE COURT:  Go ahead and proceed.

19        Counsel, I might note, my normal practice -- and it's not a

20   big deal in front of the jury -- but I never declare somebody to

21   be an expert.  You lay the foundation, ask the question; if

22   there is an objection, I rule he either can or cannot testify.

23   But I never given any witness the imprimatur of being an expert.

24        It's more important in a jury proceeding because I don't

25   want the jury thinking somehow that I, you know, have waved my

1    magic wand over the head of the witness and made them something

2    more than what they are.

3        So don't feel the need to tender them as an expert.  Just

4    go ahead and proceed.

5            MR. HORWITZ:  Okay.  That's good to know, Your Honor.

6            THE WITNESS:  Just to clarify, Your Honor, I think

7    there have been other courts where there has been the same sort

8    of remark from the bench.

9            THE COURT:  Well --

10           THE WITNESS:  But my testimony has been accepted.  But

11   whether I'm officially designated as an expert is often a

12   separate one.

13           THE COURT:  That question is:  Have you been asked to

14   offer an opinion, and were you allowed to do so?

15           THE WITNESS:  Yes.

16           THE COURT:  That makes you an expert.

17       Go ahead and proceed.

18           MR. HORWITZ:  Thank you, Your Honor.

19   Q.   BY MR. HORWITZ:  Mr. Stetler, just so that we're all on the

20   same page, all the questions that I'm going to ask about this

21   case are going to relate to the period of the initial trial and

22   then the first state postconviction.  So, like I said, that's

23   1992 through 1996.  And I would like you to focus on what the

24   state of the profession was at that time.

25       If you feel like there is some distinction between

1  the -- what was -- what the norms were at the time of the trial

2  versus the postconviction, then you can let me know.

3  A.    Thank you.

4  Q.    Thank you.

5       And I would like to begin with just a few more general

6  questions about mitigating evidence and mitigation

7  investigations.

8       How would you define "mitigating evidence"?

9  A.    Well, mitigation is very broadly defined as any evidence

10  that may inspire the sentencer to return a sentence less than

11  death, something that evokes compassion, contextualizes the

12  crime, individualizes the punishment; and, you know, it's

13  something which evokes empathy and mercy.

14       So it's very, very broadly defined in the law.  There is

15  no, you know, specific statutory definitions that are as broad

16  as the Supreme Court jurisprudence in this area.  For the whole

17  modern death penalty, we have had individualized sentencing, and

18  there's been a very broad opportunity to present whatever might

19  provide the sentencer with the evidence relevant to the moral

20  determination.

21  Q.    Does mitigating evidence have to relate to the commission

22  of the crime itself?

23  A.    No.  The Supreme Court has been very clear on that.  There

24  is one Texas case, *Tennard* -- T-E-N-N-A-R-D -- against *Dretke*

25  from about a dozen years ago that specifically said there

**STETLER – Direct**

150

1       doesn't have to be a nexus, a connection to the crime, because

2       some things are inherently mitigating.

3           And they give the specific example of any kind of

4       intellectual impairment not enough to create an exclusion under

5       the formal definition of intellectual disability, but any level

6       of intellectual disability even outside the range of the

7       intellectual disability exclusion has mitigating dimension

8       beyond its effect on one's capacity to deliberate.  So, in

9       itself, it can be mitigating.

10          Often mitigation is explanatory -- I don't want to be

11      misunderstood on that point -- but it doesn't have to be.

12      Q.   How does the defense theory at the guilt phase influence a

13      proper mitigation investigation?

14      A.   Well, the two phases have to be integrated.  And that's

15      something that has been drummed into capital defense team

16      practitioners for as long as I have been going to any kind of

17      training.  You have to have a theory in the first phase of the

18      case that will not be inconsistent in the second phase.

19          And some of it is just common sense.  You can't stand up in

20      the first phase of a case and deny all the facts and then turn

21      around in the second phase and say:  Oh, actually, we admit our

22      client is guilty, but here are some reasons why he or she should

23      not be sentenced to death.

24          So there has been a, you know, a concept of frontloading

25      mitigation, getting that information in front of the jury as

1   early as possible and minimizing the inconsistencies between the

2   two phases.

3       And it isn't just common sense.  It's kind of borne out by

4   empirical research of the academics who have interviewed some

5   1200 actual jurors in real death penalty cases through something

6   called "The Capital Jury Project."

7       One of the researchers, Professor Scott Sundby, University

8   of Miami, quantified it in one of his articles, saying that a

9   denial defense was twice as likely to result in a death sentence

10   if the jury just didn't believe it, because it would undercut

11   counsel's credibility in the second phase as well.

12   Q.   If a trial defense team has made the decision to argue to a

13   jury that their client is innocent of the crime, didn't commit

14   the crime, does that prevent those trial attorneys from

15   presenting at sentencing mental health issues as mitigation?

16   A.   No.  And, in fact, you know, I was thinking about this on

17   the way up.

18       You know, there is a case in Texas that has received a lot

19   of recent publicity, also an arson case in which children were

20   killed.  And the client denied his guilt, and that was

21   vigorously presented in the -- in the first phase; and nothing

22   was done really in the second phase.

23       And so one of the things that mitigation could have done in

24   that case -- that was the client named Willingham -- one of the

25   things they --

**STETLER - Direct**

152

1           MR. ANDERSON:  Your Honor, I'm going to object.  We

2      are getting to a different case.  I don't know what application

3      it can have to this case.

4           MR. HORWITZ:  Your Honor, I think it informs

5      Mr. Stetler's general presentation on what qualified attorneys

6      do to make their guilt phase presentation and their sentencing

7      phase presentation.

8           THE COURT:  But is that an issue in this case on any

9      level?  Is there any suggestion that there was some inherent

10     conflict in the way that trial counsel approached the trial

11     versus sentencing that somehow affected their -- I understand we

12     have ineffective assistance at two levels here, but we have to

13     have ineffective assistance somewhere relevant to this

14     proceeding.

15         So at this point, I'm going to sustain the objection.  You

16     can take another run at it, but you're going to have to ask

17     questions in a way that make it clear why it's relevant to this

18     proceeding.

19          MR. HORWITZ:  Sure.  I understand, Your Honor.

20          THE COURT:  Go ahead and proceed.

21          MR. HORWITZ:  Thank you.

22     Q.   BY MR. HORWITZ:  Are there distinct standards that govern

23     the investigation and presentation of mitigation depending on

24     what state you're in?

25     A.   No.

STETLER – Direct

153

1   Q.   What about states with very few death penalty cases?

2   A.   Well, I think, you know, it's a challenge, whether it's a

3   state or a county, when people don't see a lot of death penalty

4   cases.  But I think the -- there is a need to draw on the

5   experience of people in other areas who do have that relevant

6   experience.

7        So that's why we have so much training.  You go to training

8   programs.  You read the national magazines.  Ideally, you go to

9   the national training programs.  And then, of course, there are

10  manuals that have been produced all over the country.

11       So we have a lot of material to draw on, and it's really

12  that body of material that constitutes the articulation of these

13  prevailing norms all over the country.

14       You know, I referred earlier to the National Legal Aid and

15  Defender Association.  They organize national conferences.

16  Beginning in the 1980s, they published standards because they

17  thought public defenders should have standards that everybody

18  should adhere to, whether they were in a jurisdiction that have

19  a lot of death penalty prosecutions or very few.

20       So I think, you know, the notion of national standards has

21  been important for a long time, certainly dating back to the

22  1980s.

23  Q.   During the era in which judge sentencing was still allowed,

24  did that national standard apply to jurisdictions where a judge

25  sentenced the defendant?

**STETLER – Direct**

154

1    A.    Yes.

2    Q.    Do you see a difference between the mitigation

3    investigation duties of trial counsel as opposed to initial

4    state postconviction counsel?

5    A.    No.  The duty to conduct the life history investigation is

6    pretty much the same whether you're at trial or in

7    postconviction.  You're going to follow the same two tracks of

8    collecting documentary evidence and interviewing as many

9    witnesses as possible who can shed light on the individual's

10   development and adult functioning.  And there is that

11   interaction between documentary evidence and witness

12   interviewing that is the hallmark of mitigation investigation,

13   whether you're doing it at trial or in postconviction.

14   Q.    How does the availability of funding affect the standard of

15   care?

16   A.    Well, funding is an issue in most places.  You know, almost

17   every death penalty case is defended by somebody who is

18   dependent on, you know, a public defender system, some kind of

19   indigent defense system.  So getting the resources that you need

20   in individual cases means making a showing of exactly what you

21   need.

22          I mean, I served on a resource allocation committee at the

23   California Appellate Project in the 1990s, and we didn't just

24   write a blank check to everyone.  People had to come and argue

25   for their cases and use their initial investigation to

STETLER - Direct

155

1    demonstrate what additional resources would be needed.  The same

2    applied when I worked in the trial office in New York.

3        So there is -- you know, there is really no one

4    jurisdiction that just doesn't have the money.  You have to make

5    a record to whoever your funding source is of why you need

6    particular funding.  You have to use your investigation to

7    establish what you need so that you're not just filing

8    boilerplate motions that seem to be asking for, you know, all

9    the resources in the world.  You have to be very, very specific.

10   And actually, in the federal system, now we have case-budgeting

11   attorneys to assist with that process.

12   Q.  How does the availability of time affect the standard of

13   care if attorneys are running low on time or they have pressing

14   deadlines?  How does that affect it?

15   A.  Well, we all operate in a world of deadlines.  And I think

16   that obligates us in mitigation investigation to begin the

17   investigation on day 1, not to put it off for months down the

18   road, not to have a workload that prevents our spending the time

19   that the case requires so that we don't get in that situation

20   where, all of a sudden, you know, we're coming up against a

21   deadline and the work hasn't been done.

22       That's time management.  That's what all capital defense

23   teams have to deal with in any kind of jurisdiction.  And as

24   with funding, so with time, you have to make a record with your

25   court about why you need a specific continuance, an extension of

1    time, whatever it may be called in the jurisdiction.  You can't

2    just say, "I have been very busy."  You have to indicate what

3    you have investigated, what leads have been turned up, and what

4    red flags have been disclosed that require additional

5    investigation.

6        So it's a very common problem that I think people all over

7    the country confront.  And, you know, when they are running out

8    of time, they have to make a very good record.  And sometimes

9    that means asking for a hearing, bringing in neutral outsiders

10   who can talk about the importance of the areas that they are

11   trying to investigate or the mental health inquiries that they

12   are trying to undertake.  But, again, in a word, it's making a

13   record on all those points.

14   Q.   At the trial level, when should a mitigation investigation

15   begin?

16   A.   The day you get the case, trial or postconviction.

17       In New York, we had what we called a "beachhead protocol."

18   So as one person went to see the client in jail, someone else

19   was going to see family members immediately to let them know the

20   seriousness of the case and the kind of mitigation investigation

21   that we would be undertaking.

22   Q.   I would like to ask a few question about Ms. Row's case in

23   particular.

24       Does your declaration accurately set forth the documents

25   you reviewed to analyze Ms. Row's case?

1    A.    Yes.

2    Q.    What was the prevailing standard with respect to brain

3    damage as mitigation at the time of Ms. Row's case?

4    A.    Brain damage has, in my experience, always been viewed as

5    significant mitigation.  Brain damage generally is not a choice

6    made by the client.  You don't choose to be a brain-damaged

7    person.  It's a disadvantage.  It's a disability.  And so we

8    have always been taught to look into it.

9         Ms. Goody referred to her phone conversation with

10   Dr. Pincus in her testimony earlier.  Dr. Pincus and a

11   psychiatrist from New York University wrote an article that was

12   widely circulated in 1986 on the prevalence of brain damage

13   among people on Florida's death row, that they had evaluated

14   when execution was imminent.

15        So there were a lot of people who had offered brain damage

16   and its consequences in mitigation.  There was a lot of training

17   on it.  When we did our California mitigation volume in the

18   *Capital Trial Manual* in the early '90s, we had a specific

19   chapter on neurological disorders.

20        So it was very prominent in our literature and something

21   that was emphasized in lots of training programs.

22   Q.    At the time of Ms. Row's trial in 1992-1993, were there

23   mitigation specialists working?

24   A.    Yes.  In fact, in 1992, an organization was formed called

25   the National Association of Sentencing Advocates and Mitigation

1    Specialists.  It ultimately became a sort of subbranch of the

2    National Legal Aid and Defender Association.

3        And they were, you know -- that organization was part of

4    the National Legal Aid and Defender Association's annual Life in

5    the Balance training program.  They were trying to associate

6    people all over the country who were doing the work, make

7    themselves available for employment.

8        I mean, Ms. Goody's testimony was an interesting example.

9    She had worked both in the state of Missouri, where they had

10   mitigation specialists on staff, as they did also in Ohio in the

11   1980s, but there were also lots of people privately available.

12   And there were many states where there were so few cases that

13   there was not a local core of mitigation specialists, so you had

14   to hire people from another state.  And we see that all the time

15   in the federal death penalty cases, which are sometimes

16   prosecuted in states that don't have the death penalty.

17       So mitigation specialists have been around for, you know --

18   they were certainly around in the early '90s.  They formed this

19   organization in 1992.  And they often crossed state lines to do

20   the work because they were specialized in this specific area of

21   the capital defense function.

22   Q.   What responsibilities do the attorneys have on the case in

23   terms of their interactions with the mitigation specialists?

24   A.   Well, all of the -- all of that responsibility is on the

25   shoulders of the attorneys, not the mitigation specialist, not

159

1    the experts.  It's the attorneys who are expected to provide

2    effective representation.

3        So their job is to engage people to do the mitigation

4    investigation as early as possible and to, you know, get it done

5    as thoroughly as possible.

6        You want to have a functioning team, not just, you know,

7    retaining somebody who is kept at arm's length and sort of does

8    a little work on her own but isn't integrated into the work of

9    the lawyers.  You want lawyers to provide guidance and feedback.

10       We developed, eventually, supplementary guidelines for the

11   mitigation function of defense teams in death penalty cases

12   that, you know, underscores at the outset that the ultimate

13   responsibility is on the shoulders of the lawyers.

14   Q.   I would like to ask a few more specific questions about the

15   elements of a mitigation investigation.

16       What type of records would a reasonable mitigation

17   investigation have gathered at the time of Ms. Row's case?

18   A.   Well, again, Ms. Goody described that pretty well, I

19   thought.  You want to get, obviously, any records relating to

20   mental health issues, psychiatric records, substance abuse

21   records, counseling records, medical records generally --

22       And that's not just of the client but of the mother,

23   because we want to know what may have happened to the client

24   in utero.  We talked a lot in that period of time about brain

25   damage from in utero exposure to alcohol.

STETLER - Direct

160

1      -- educational records, employment records, social services

2      records, correctional records if somebody has had prior criminal

3      history, records from civil and criminal litigation, juvenile

4      records, and so forth.

5          In effect, anything that documents an individual's life you

6      want to try to find.  And it's for a couple of different

7      reasons.  I always think of the records as providing the

8      skeletal architecture of the client's life.  They are produced

9      by objective, neutral outsiders long before the individual faced

10     capital charges.  They provide hard dates and places, and they

11     are going to identify people that the client may not even know

12     by name but who could be important mitigation witnesses -- the

13     school psychologist who did an IQ test when the client was in

14     the fifth grade or when the client's IQ dropped dramatically

15     between one set of tests and another.

16         In addition, the records help you not just identify new

17     witnesses but help you prepare the testimony of the witnesses

18     that you know about.  Because, again, you're going to have, from

19     the records, hard information about where the family was living,

20     what schools the person was attending.

21         You know, we all get a little fuzzy as we get older, and

22     our memories fade.  But we use the records in preparing

23     witnesses to tell the client's story as accurately as possible.

24         And you know -- and, again, the records will tell you

25     things that the -- that the client and the family members may be

**STETLER – Direct**

161

1    very embarrassed about, things that they are reluctant to share

2    even when you've built up trust and rapport, but -- and

3    sometimes they reveal things that never even really registered

4    in memory.

5        So records are very important for all of those sort of

6    multiple reasons.  And, you know, one of the pioneer thinkers in

7    mitigation investigation, Dr. Lee Norton from Florida, described

8    what she called the cyclical process of mitigation

9    investigation, of the interaction between records and witness

10   interviewing.

11   Q.   The principles that you have outlined with respect to

12   gathering records in a mitigation investigation, would those

13   apply to the records in Ms. Row's case that were generated after

14   she was hospitalized for her suicide attempt?

15   A.   Yes, absolutely.

16   Q.   And what would a competent mitigation investigation have

17   done with those records?  What would the next steps have been?

18   A.   Well, you wanted to get -- you would want to get all of the

19   raw records and then have them evaluated by someone who was

20   qualified to interpret them.

21       You would want to find the appropriate expert, not just any

22   old mental health expert who happened to do forensic

23   consultations, but somebody who had some expertise in how the

24   brain functions and who can advise you what further testing

25   might be appropriate to sort of explicate the meaning of this

162

1      atrophy that's, you know, rather vaguely described in the

2      initial records that were obtained.

3      Q.   And I think I neglected to ask this earlier.  But assuming

4      that trial attorneys don't retain a mitigation specialist, does

5      that affect in any way the duty to conduct the mitigation

6      investigation?

7      A.   No.  I should be clear also.  I mean, the mitigation

8      specialist is the most cost-effective way to get the job done

9      because it's somebody who does nothing else and has acquired

10     expertise in that area.  But it doesn't matter who does it.

11     What matters is getting the job done.  And that, again, is on

12     the shoulders of the lawyers.

13     Q.   What are the lawyer's responsibilities with respect to

14     mental health experts?

15     A.   Well, it's a very similar answer.  Again, you don't want to

16     just choose a random mental health expert because they are not

17     fungible; they come in all shapes and sizes.  They have

18     different areas of expertise:  medical doctors, who are

19     psychiatrists; psychologists, who are not and who do mostly

20     testing; neuropsychologists, who are focused on the subtleties

21     of brain behavior relationships and do neuropsychological

22     testing; experts in trauma and its impact on human development;

23     experts on psychopharmacology.

24          And you want to choose experts based on your investigation.

25     You know, we think of mitigation investigation as a

163

1    multigenerational biopsychosocial history of the client.  So we

2    want to see what's running in the family, what's encoded in the

3    DNA, what's passed on from one generation to the next in

4    patterns of behavior, what's biologically there.

5         And then what are the psychological impacts of growing up

6    in a particular home that the client was in?  What was the

7    social impact of the community that the client came from?

8         So when you've done that investigation, then that helps you

9    identify what are the issues that we may want to explore with a

10   mental health expert.  We won't have brain damage in every case,

11   but if that's what we have got, then we want to find someone who

12   has expertise in neuropsychology, neurology, neuropsychiatry.

13   We want various, you know, specific people.  And we also then

14   want them to address the issues which are suggested by the

15   investigation that we have done.

16        So I apologize for the long-winded answer, but it's -- you

17   know, you use your investigation to choose your experts wisely

18   and to frame the referral questions that they will address.  So

19   you're not just sending an expert in to say:  Let me know, Doc,

20   is there something there that I should know?

21        Instead, you want to choose an expert based on what you

22   have already learned about the client.  That's why somebody on

23   the core team, like a mitigation specialist like Ms. Goody, is

24   going to have enough background to screen for mental disorders

25   and impairments and is going to know, you know, this hospital

1    record that I have just obtained is significant; that's

2    something that needs consultation with somebody who knows more

3    about this than all of us lay people.

4    Q.   What kind of obligations do the attorneys have as far as

5    providing documents to their experts goes?

6    A.   Well, documents are, again, the lifeblood of experts.  You

7    know, experts are not magicians who can just go and do a mental

8    status examination and learn everything that's of significance.

9    The more evidence, the more information you can provide to

10   experts, the more reliable their assessment is going to be.

11        It's been widely recognized, you know, dating back to the

12   time of this case, that that was the case; that you didn't just

13   want a mental status exam; you wanted social history information

14   that was independently corroborated, that was documented by all

15   these people who had produced those records that you're

16   gathering as part of the mitigation investigation process.

17        So you want to gather that information, choose your experts

18   appropriately, provide the experts with the records, and then

19   engage in a dialogue with them about potential significance that

20   they have for your mitigation case.

21   Q.   And when you have potential mental health issues, including

22   brain damage, what sort of documents do you need to provide with

23   an expert in that area?

24   A.   Well, the most important ones are going to be psychiatric,

25   medical, and educational.  But, you know, there may be other

1    areas.

2         Where did the client grow up?  Was it near a toxic waste

3    site?  So it may not be in your standard packet of medical

4    information.  It may be information that you'll need to obtain

5    from, you know, entirely other sources.

6         We have to think about all of the potential etiologies of

7    brain damage, whether it's something that may be running in the

8    family.  Is there, you know, any sort of heritable component?

9    Is it something that resulted from in utero experiences, either

10   exposure to neurotoxins or traumatic insult?  Is it something

11   that the client was exposed to in early childhood?

12        So all of the records that relate to any of those specific

13   areas are going to be important to provide to whoever you end up

14   consulting.

15   Q.   At the time of the Row case, how would a trial attorney or

16   postconviction attorney, for that matter, have found appropriate

17   experts to consult with on the brain damage issue?

18   A.   Well, you know, I think, again, Ms. Goody gave a good

19   example of, you know, turning to an expert who appreciated the

20   importance of brain damage in relation to death penalty cases,

21   somebody that she had worked with before; and in that case,

22   Dr. Pincus.

23        Again, I mentioned that he and Dr. Dorothy Lewis, the

24   psychiatrist, had written an article in -- I think it's *Journal*

25   *of American Psychiatry* on brain damage in death row cases back

STETLER – Direct

166

1    in 1986.

2        So you do a literature search.  You talk to colleagues who

3    have used experts in this area.  You look at the literature that

4    is circulated at training programs.  You go to the sessions that

5    talk about brain damage and mental health issues in mitigation.

6    You find the lawyers that have good working relationships with

7    experts who have come to appreciate the difference between what

8    we are looking for in mitigation compared to the traditional

9    forensic questions of competency, insanity.

10       So, you know, you need a dialogue that's going to help you

11   find those experts by drawing on the experience of your

12   colleagues and drawing on the literature that is available.

13   Q.   Did the standard of care require attorneys to vet mental

14   health experts before using them?

15   A.   Yes.  I mean, that's been true as long as I have been

16   involved in cases.  You want to investigate the background of

17   the opposing experts and investigate the background of your own

18   experts.

19       And vetting also just means being sure that they are the

20   right expert for the case, learning enough about their

21   background to see whether they meet the needs of this client and

22   this particular litigation question.

23   Q.   Thinking about Ms. Row's case specifically, what aspects of

24   her background and her upbringing, her experience, et cetera,

25   should an attorney have explored with an expert in investigating

1   brain damage?

2   A.   Well, there are a variety of things that we know about.

3   There was possible heritable mental illness.  There were

4   certainly reports of schizophrenia on the part of her biological

5   father.  Ms. Goody was attentive to that, and she made the

6   connection immediately when she did a little research of her own

7   on the particular abnormality that was disclosed in the -- in

8   the CT scan.

9        But you also just want to go through all that laundry list

10   that I did a moment ago.  You want to know as much as possible

11   about the mother's pregnancy, what happened when Ms. Row was in

12   the womb, what happened to her in early childhood.  Was she

13   living in an area where she was exposed to neurotoxins?  Did she

14   have head injuries in childhood in the period when, you know,

15   the brain is most vulnerable because it's a developmental

16   period?

17        So all -- those are sort of categories that you want to

18   look into.  But then you also want to talk to your witnesses

19   about were there times when her behavior changed.  There is, in

20   this case, that dramatic drop of, you know, one standard

21   deviation in IQ testing.  You know, that's a -- you know, it's a

22   very unusual phenomenon.  So you want to talk to people who knew

23   her in that developmental period and see whether that was

24   associated with other behavioral changes.

25        So, you know, it's not like you're interviewing people

1    about a bank robbery, something they observed for ten minutes.

2    You are interviewing somebody who knew the client over a period

3    of years and sometimes over the entire developmental period.

4    And you want to interview them about how their behaviors changed

5    over time and whether there were particular periods that

6    reflected what we now suspect might be a serious mental

7    disorder.

8    Q.    At the time of Ms. Row's case, how did the capital defense

9    community view antisocial personality disorder?

10   A.    Well, then and now and long before this case, antisocial

11   personality disorder was viewed as a harmful diagnosis that was

12   likely to be offered by jail experts, prosecution experts.

13        There are varying estimates, but a large percentage of

14   people who are in the prison system have had that label attached

15   to them.  And so there has always been a lot of training and

16   articles about how to challenge the diagnosis because it is

17   often unreliable.

18        For example, there was a precursor diagnosis of conduct

19   disorder --

20            MR. ANDERSON:  Your Honor, I'm going to object.  I

21   believe this is outside the area of the witness's expertise.  He

22   is not a medical doctor, for sure.

23            THE COURT:  Counsel.

24            MR. HORWITZ:  Thank you, Your Honor.  I think he can

25   speak to what competent capital defense attorneys were doing

1    with diagnoses of antisocial personality disorder at the time.

2            THE COURT:  I think he can opine.  I would be mindful

3    of the time.  We are going to recess in 35 minutes, and you need

4    to leave time for cross-examination unless this witness is

5    available for recall tomorrow morning.  So if you want him done

6    by 3:00, I would cut to the chase.

7            MR. HORWITZ:  Thank you, Your Honor.  I believe he is

8    available for recall.

9            THE COURT:  All right.

10   Q.   BY MR. HORWITZ:  You mentioned some of the ways that

11   qualified capital defense attorneys try to challenge diagnoses

12   of antisocial personality disorder.

13        How does brain damage fit into that determination?

14   A.   Well, again, when behaviors are attributable to a medical

15   condition -- and that would include a dysfunctional brain --

16   that can be a rule-out.

17        Similarly, if there is a behavior -- let's take a fact like

18   truancy.  The fact is didn't attend school, but if our

19   investigation can help us understand why the client didn't go to

20   school -- was it because the parents were neglectful in not

21   getting the child up in the morning?  Were the parents

22   embarrassed to send the child to school because the child was

23   being physically brutalized and they didn't want the child to go

24   to school with black eyes and bruises that would make teachers

25   think they had to report something? -- that's a different

1    contextual explanation for what might otherwise lead to the

2    label "truant," which years later might lead to the antisocial

3    diagnosis.

4         So, you know, broadly, it's contextualizing the factual

5    predicates.

6    Q.   And maybe you addressed this, but would competent defense

7    attorneys have preferred to characterize their client to a jury

8    or a judge who is sentencing them as brain-damaged as opposed to

9    as suffering from antisocial personality disorder?  Is that

10   considered more favorable?

11   A.   Yes.  Antisocial personality disorder is a harmful label.

12   Q.   How would a competent defense team interview lay witnesses

13   as they are preparing a presentation on brain damage?

14   A.   Well, I think I answered this to some extent before.  I

15   think you want to interview people about the behavioral

16   manifestations associated with brain damage or any other

17   psychiatric disorder.  How did somebody's behavior change?  How

18   was it different from the norm that the individuals were

19   observing?

20        You're talking to teachers and so forth.  It's not just a

21   question of cognitive functioning but emotional functioning,

22   social functioning.  So all of those sort of behavioral areas

23   are relevant to, you know, supporting the importance of brain

24   damage.

25        I should say also that, you know, when you're offering

STETLER – Direct

171

1    brain damage, you are not just using a picture and an expert.

2    You want to have lay testimony that will be credible and will be

3    able to spell out what were some of the behavioral consequences.

4    Q.   In conducting those interviews, do the -- or did the

5    prevailing norms favor in-person interviews over telephone

6    interviews?

7    A.   Yes.  Again, Ms. Goody was, I think, absolutely right about

8    that.

9         What we have always talked about is the need for multiple

10   in-person, face-to-face interviews.  Partly when you talk to

11   somebody over the telephone, they don't even know for sure that

12   you are who you say you are.

13        And when you're trying to talk to people about intimate

14   things in their lives -- Ms. Row, for example, was molested,

15   according to her sister's testimony, by their step-grandfather;

16   that's not a subject that people are going to discuss easily

17   with strangers over the telephone.

18        In addition, if you're thinking of calling people as

19   witnesses, for the same reason that we have live testimony, you

20   want to meet with people one on one, in person, to assess their

21   demeanor and credibility.

22        So you want to -- for all those reasons, you want to do

23   your interviews in person.  You want to do them in the settings

24   that will evoke the memories of the clients.  So you want to go

25   to the homes where they grew up, the schools they attended, and

**STETLER - Direct**

172

1    so forth.

2    Q.   I would like to turn to some questions about postconviction

3    counsel in particular.

4        What sort of documents are most important to review in

5    postconviction when the mitigation investigation is just getting

6    going?

7    A.   Well, you know, you want to look at whatever documents were

8    in the trial file, but you assume that that is not the entire

9    universe.  You take a look at that, and you can sort of

10   summarize what comes from the trial file and then brainstorm

11   with an experienced mitigation specialist about what else might

12   be out there, what is the readily available information that may

13   also be relevant to this individual's functioning.

14   Q.   Would a presentence investigation report be the kind of

15   document that is important for postconviction counsel to review?

16   A.   Absolutely.

17   Q.   When should postconviction counsel -- I'm sorry.  Sorry.

18       When should postconviction counsel begin thinking about

19   experts to retain, especially in the mental health realm?

20   A.   Well, again, my answer is that you want to do as much life

21   history investigation first, so you're not wasting money on

22   experts that may be irrelevant.

23       But when you have got a good chunk of records and when you

24   have a -- some basis for thinking that you have got important

25   information that requires expert attention, that's when you

1    reach out and find the right expert for the job.

2    Q.   You talked about this a little bit, but I was hoping you

3    could elaborate on how postconviction counsel should follow up

4    with an expert after they have provided them with the documents.

5    A.   Well, again, it's always going to be an interactive

6    dialogue.  You are not just giving the documents to the expert

7    and saying, you know, "Tell me what we have got."  But you want

8    to be engaged.  You want to do some research on your own.  What

9    do you think this might -- what significance might this have?

10       And you want to be sure that your expert has fully reviewed

11   all the things that you have sent them.  Because experts can be

12   busy people, also, and may not -- they may have skimmed

13   documents and missed the significance of things.  So you really

14   want to sit down with your experts to be sure that everybody is

15   on the same page and everybody appreciates the significant

16   information that you've provided.

17   Q.   How should postconviction counsel deal with neurology

18   testing in a case where brain damage is potentially at play?

19   A.   Well, I think neurological testing is going to be critical

20   if brain damage is at the center of your case, as is

21   neuropsychological testing.

22   Q.   What resources would have been available to postconviction

23   counsel to assist them in exploring the brain damage issue?

24   A.   Well, again, there were, you know, practice manuals that

25   talked about the importance of brain damage and organicity.

1    There were people who presented on these questions at training

2    programs all over the country, people who had used that kind of

3    information successfully in their cases, and often they wrote

4    about it.  Some were not writers, though, but they are good

5    presenters and are invited to training programs to talk about

6    it.

7         So I think, in a word, it's networking.  It's finding

8    people who have dealt with similar issues in their cases and

9    then drawing on their experience.

10   Q.   If postconviction counsel are dealing with multiple capital

11   cases at a time, how should they approach that issue?

12   A.   Well, that's a potential problem.

13        You know, we haven't talked about this, but when the

14   American Bar Association Guidelines were revised in 2003, they

15   addressed the workload issue twice, once from the point of view

16   of the responsible agency, the defender office or the courts

17   that appointed lawyers, and again from the perspective of the

18   lawyers themselves.  The bottom line being that neither the

19   appointing authority nor the lawyers should allow people to have

20   such a high workload that it interfered with their ability to

21   provide effective representation.

22        So, you know, we saw on this case that the postconviction

23   lawyers were really overwhelmed with three postconviction -- I

24   guess one resentencing case and two postconviction cases that

25   were all very active at the same time and were preventing them

175

1    from spending the time that was needed in Ms. Row's case.

2        So I think once they reached that point, they've either got

3    to get more time on multiple cases or they have got to reduce

4    their caseload.

5    Q.   Are you aware in this case that Mr. Kehne served as the

6    legal standard of care expert at the postconviction evidentiary

7    hearing?

8    A.   Yes, I am.

9    Q.   And that he was also an attorney of record in that

10   proceeding?

11   A.   Yes.

12   Q.   What do you think of that dual role?

13       MR. ANDERSON:  Objection, Your Honor.  That's beyond

14   the scope of this hearing.

15       MR. HORWITZ:  Your Honor, I think it does go to how

16   brain damage was presented at the hearing.

17       THE COURT:  Well, then let's tie it in.  I don't see

18   it.  It's not obvious to me just from the question.

19       The question, as I understand it, is whether there was some

20   conflict of Mr. Kehne testifying as well as being counsel at the

21   postconviction relief proceeding; is that right?

22       MR. HORWITZ:  That's correct, Your Honor.  I guess I

23   would phrase it as -- the question I was going to ask to

24   Mr. Stetler was:  Would that undermine the effectiveness of a

25   presentation on the legal standard of care if it's coming from

1   an advocate in the case; and since he was discussing brain

2   damage while on the stand, whether that would undermine the

3   effectiveness of that.

4        THE COURT:  So Mr. Kehne was discussing brain injury

5   on the stand?

6        MR. HORWITZ:  Mm-hmm.  He was discussing what trial

7   counsel did to investigate and present brain damage.

8        THE COURT:  That, to me, would be relevant, whatever

9   he may have said while on the witness stand with regard to the

10  efficient performance of trial counsel with regard to organic

11  brain injury.  If that's what he testified to -- and I'll admit

12  I don't know that -- if that's what he testified to and this

13  witness's opinion is going to get to that issue, albeit through

14  the issue of a conflict of interest, then I'll allow it.

15       Go ahead and proceed.

16       MR. HORWITZ:  Okay.  I think I'll just withdraw that

17  question, Your Honor.  Thank you.

18       THE COURT:  All right.

19       MR. HORWITZ:  I think those are all the questions I

20  have.  Thank you, Your Honor.

21       THE COURT:  Cross, Mr. Anderson.

22                      CROSS-EXAMINATION

23  BY MR. ANDERSON:

24  Q.  Mr. Stetler, I think the record is pretty clear on this.

25  But just to make sure, you're not an attorney?

STETLER – Cross

1    A.   I am not.

2    Q.   You have not attended law school?

3    A.   That's correct.

4    Q.   You are not a medical doctor?

5    A.   No, I'm not.

6    Q.   No degrees in that area?

7    A.   That's correct.

8    Q.   You're not a mental health expert?

9    A.   No, I am not.

10   Q.   How much of your -- the opinions -- well, let me back up.

11        You have discussed several times the -- I wanted to use

12   your word -- prevailing norms, and then you mentioned the

13   *ABA Guidelines*.

14        How much of your opinion is based upon the ABA Guidelines?

15   A.   Well, you know, I think Justice Stevens said it best

16   shortly before he retired in the noncapital case *Padilla vs.*

17   *Kentucky*.  He talked about how do we find objective indicia of

18   prevailing norms.

19        And he said:  Well, we have always looked to American Bar

20   Association standards and the like because they are, you know,

21   good summaries of what those -- what the norms in the legal

22   community are.  You know, they are not the Ten Commandments;

23   they are not inexorable commands.  They are just guidelines.

24        And then we also look to other sources that reflect the

25   practice at the time.  And so those sources are the publications

1    of the defense bar, the magazines, like the National Association

2    of Criminal Defense Lawyers--

3    Q.   Mr. Stetler, can I interrupt you?

4    A.   Sure.

5    Q.   I'm on a clock.

6    A.   Okay.  Me, too.

7    Q.   My question was:  How much of your opinion is based upon

8    the *ABA Guidelines*?  Is all of it based upon the *ABA Guidelines*?

9    A.   No.  My opinion is based on my experience in the relevant

10   time frames.

11   Q.   And the *ABA Guidelines* have played what amount -- what

12   effect have they had upon your opinion?

13   A.   Well, I think they are good summaries of the norms at the

14   times that they are published.  But, you know, the practice

15   continues to evolve, and so what was published in 1980 or 1989

16   or 2003 reflects a sort of snapshot at that time.

17   Q.   So are the standards during the relevant time of Row's case

18   that you've alluded to and discussed, are they the same today?

19   A.   No.  There's a continuing evolution.

20   Q.   How have they changed?

21   A.   Well, I think, for example, today the use of a mitigation

22   specialist, a separate retention of a fact investigator, and two

23   lawyers in the case is just an absolute given in a way that it

24   wasn't in the mid-1980s, for example.

25   Q.   How about the relevant time of Row's case?  You mentioned

1    the mitigation expert --

2    A.    Yeah.

3    Q.    -- an investigator, and two attorneys?

4    A.    Yeah.  Yeah.  And I probably didn't do it very

5    articulately.

6         In 1989, when the first edition of the *ABA Guidelines* was

7    published, they alluded to mitigation specialists and

8    investigators.  But by the time they revised the guidelines in

9    2003, they said you really need a core of at least four people:

10   two lawyers, a fact investigator, and a mitigation specialist.

11        You know, I went to New York in 1995 to help set up this

12   Capital Defender Office trial-level office --

13   Q.    Mr. Stetler, I'm sorry to interrupt you again.  That's not

14   responsive to my question.

15   A.    I would like to finish the answer.  I think this is --

16        THE COURT:  All right.  I'll allow you to answer.

17        Counsel, let's ask questions "yes" or "no" if you want a

18   direct answer.  If you ask for a narrative response, you're

19   going to get a narrative response.

20        MR. ANDERSON:  I understand, Your Honor.

21        THE COURT:  I'll allow the witness to answer the

22   question fully, and I would suggest proceeding with a little

23   more direct yes-or-no questions.

24        Go ahead and proceed.

25        THE WITNESS:  I'll be as brief as I can.

1          I went to New York in 1995.  We set up an office in a state

2     that had not had the death penalty up to that time, but we hired

3     people who had worked in death penalty states, people that came

4     from Alabama, California, Texas, Georgia, Florida, and so forth.

5          We didn't look in a book to determine what -- how we should

6     staff the office, but we had a consensus among the people who

7     had done death penalty work in these various states.  And so we

8     staffed the office with as many nonlawyers as lawyers.  We hired

9     people as mitigation specialists and fact investigators.

10          That was not in the *ABA Guidelines* in 1989.  It became, you

11     know, something in the *ABA Guidelines* as revised in 2003, and it

12     just reflected the evolving practice.

13     Q.   What year was that?

14     A.   1995.

15     Q.   And that was for the state of New York?

16     A.   Correct.

17     Q.   And do you know of any other state that adopted what

18     New York did?

19     A.   Well, yes, I know of several.

20     Q.   Did Idaho?

21     A.   Not that I'm aware of, but --

22     Q.   My understanding is that you testified that these standards

23     are national standards that you're referring to; is that

24     correct?

25     A.   Yes.  What I'm talking about there is the need to conduct

 1    thorough mitigation investigation.  Again, doesn't matter who

 2    does it, how it's done, but it has to be thorough.

 3    Q.   And I also understand you to say that the *ABA Guidelines*

 4    were modified between 1989 and what year?

 5    A.   2003.

 6    Q.   2003.

 7         And in 1989, there wasn't a suggestion or a guideline for a

 8    mitigation specialist; is that correct?

 9    A.   They did not define a core team of four.  They referred to

10    mitigation specialists and investigators.

11    Q.   And two attorneys?

12    A.   I would have to go back and look.  But by 2003 revision, it

13    was definitely a core team of at least four.

14              MR. ANDERSON:  Thank you, Your Honor.

15              THE COURT:  Mr. Horwitz.

16              MR. HORWITZ:  Very briefly, Your Honor.  Thank you.

17                        REDIRECT EXAMINATION

18    BY MR. HORWITZ:

19    Q.   Mr. Stetler, in 1992, were competent capital defense

20    attorneys aware of the *ABA Guidelines*?

21    A.   Yes.  In fact, Mr. Kehne referred to them in a footnote in

22    his application for a money judge and ex parte funding

23    applications.  He referred to both the treatise on federal

24    habeas corpus and the 1989 edition of the *ABA Guidelines*.  They

25    were widely circulated through the training programs that he

1    attended.

2    Q.    And at that time, how would a qualified capital defense

3    attorney have viewed the *ABA Guidelines*?

4    A.    Well, I think they viewed them as important summaries of

5    the standards all across the country.

6          You know, they didn't come arbitrarily from some separate

7    authority.  They really came as a direct reflection of capital

8    defenders' work, whether it's public defenders, court-appointed

9    lawyers, pro bono volunteers.

10    Q.    And in 1992, just to clarify your testimony, even if the

11    *ABA Guidelines* didn't possibly insist upon a mitigation

12    specialist, they did still indicate that the mitigation

13    investigation had to be conducted by someone?

14    A.    Yes.

15                MR. HORWITZ:  No further questions.

16                THE COURT:  Mr. Anderson, anything else?

17                MR. ANDERSON:  No, Your Honor.  Thank you.

18                THE COURT:  With that, then, the witness may step

19    down.  I assume the witness can be released, although I am not

20    sure he is subject to any subpoena since he is not from within

21    the district and would not be recalled.

22                MR. HORWITZ:  We don't plan on recalling him,

23    Your Honor.

24                THE COURT:  Mr. Anderson?

25                MR. ANDERSON:  No, Your Honor, we don't.

1          THE COURT:  All right.  Thank you very much.

2     We have 15 minutes.  Call your next witness.

3          MS. CZUBA:  The defense calls Dr. Merikangas.

4          THE COURT:  Mr. Merikangas, if you'll step before

5     Ms. Bracke and be sworn as a witness, she will direct from you

6     there.

7          JAMES RAY MERIKANGAS, PETITIONER'S WITNESS, SWORN

8          THE CLERK:  Please take a seat in the witness stand.

9          MS. CZUBA:  Your Honor, I am going to quickly show

10     opposing counsel some demonstratives that I have noted.

11          THE CLERK:  Please state your complete name and spell

12     your name for the record.

13          THE WITNESS:  James Ray Merikangas,

14     M-E-R-I-K-A-N-G-A-S.

15          THE COURT:  You may inquire.

16                         DIRECT EXAMINATION

17     BY MS. CZUBA:

18     Q.   Good afternoon, Dr. Merikangas.

19     A.   Good afternoon.

20     Q.   I would like to quickly start.  We are not going to go over

21     your entire history.  I do have just a few questions I would

22     like to go through.

23          Can you tell me your occupation?

24     A.   I'm a medical doctor specializing in neurology and

25     psychiatry.

1   Q.   And can you tell me what a neurologist does?

2   A.   Neurologist is the medical specialty, a subspecialty of

3   internal medicine that deals with the nervous system, the brain,

4   the spine, and the nerves and their relationships with all the

5   other physiologic functions of the body, both in health and

6   disease.

7   Q.   And can you tell me how this differs from the work of a

8   neuropsychiatrist?

9   A.   A neuropsychiatrist is a doctor who originally was both a

10  psychiatrist, which is a separate medical specialty, and a

11  neurologist, which is what I am.  I'm both a neurologist,

12  board-certified and trained, and a psychiatrist separately

13  board-certified and trained.

14      Neuropsychiatry has evolved to being that branch of

15  medicine that deals with the thoughts, emotions, mental

16  illnesses, and the like, in the context of medical aspects of a

17  human being, how the brain works.

18  Q.   Can you tell me what the term "neuroimaging" means?

19  A.   Neuroimaging refers to the various ways to look at

20  the -- at the brain and the spine through x-rays, CAT scans, MRI

21  scans, PET scans, SPECT scans, and the various varieties of

22  ultrasound that allow you to see the substrate of the nervous

23  system.

24  Q.   Okay.  You mentioned a number of different types of imaging

25  with that.  I would just like to unpack a few.

1          Can you tell me what a CT scan is?

2     A.    That stands for computerized axial tomogram.  That's a type

3     of image made on a computer using x-rays which go through the

4     body at various degrees, and then the image is synthesized from

5     the results of that.

6          As opposed to a plain x-ray, which just is a flat screen, a

7     two-dimensional image, the CAT scan gives you what amounts to

8     three-dimensional images from various aspects, slices,

9     basically, through what you're looking at.  So it allows you to

10    see the inside of the body in what would amount to be serial

11    sections.

12    Q.    You referred to "slices."  Can you tell me what that means?

13    A.    Well, if you were to take a person's body and cut through

14    it and then look at the side view of what you just cut through,

15    that would be a slice.

16         These slices can be from any particular direction.

17    Generally, they are sagittal, which is side views; coronal,

18    which are front views; and axial, which are views from the top.

19    So it allows you to see a three-dimensional object in a

20    two-dimensional plane.

21    Q.    Can slices differ?

22    A.    Yes.  There are various orientations, various thicknesses.

23    Q.    And does that matter to what you see?

24    A.    It does.

25    Q.    Okay.  Can you tell me what an MRI scan is?

1    A.   Magnetic resonance image is an image also generated on a

2    computer in the same basic aspect as a CAT scan, but it's done

3    with magnetism and radio waves rather than x-rays.

4         So, by putting the body of the person in a large magnet

5    with a gradient magnetic field and putting in not x-rays but

6    radio waves, you cause the atoms of water in this case to put

7    out their own radiation, which is then analyzed to give you,

8    again, slices through the body that are made with magnetism and

9    radio waves rather than x-rays.

10        The result is what you're imaging is not just shadows, like

11   an X-ray, but the chemical relationships of the hydrogen atoms.

12   So it gives you a much better view of what's going on in terms

13   of structure because the bones are transparent in an MRI scan;

14   whereas in a CAT scan, the bones are what show up the most.

15   Q.   And can you tell me what a SPECT scan is?

16   A.   SPECT is single-photon computed tomogram.  It's a type of

17   image made of brain blood flow by putting in a radioisotope into

18   the blood and looking at how it is, again, imaged by the same

19   type of computer display as the x-rays -- I mean the CAT scans,

20   the MRI scans.  But it's radiation emitted through blood flow of

21   the brain.  It actually measures blood flow.

22   Q.   And how is this different from a PET scan?

23   A.   A PET scan is a positron emission tomogram.  The SPECT scan

24   sends out radiation in random waves, and, as a result, the image

25   displays of brain blood flow is not very precise.

1          PET scan uses radioisotope -- in this case, the oxyglucose,

2     which goes to metabolic areas in the brain the same way that the

3     fuel of the brain -- that is, sugar, glucose -- goes, and

4     therefore allows you to see the activity of various parts of the

5     brain in their anatomic representation.  So it shows you how the

6     various parts of the brain are functioning, not just their

7     anatomy or their location.

8     Q.   So there is a difference in these types of scan in

9     demonstrating structure of the brain versus function?

10    A.   Yes.  And they all demonstrate different aspects of the

11    nervous system.

12    Q.   Okay.  What's an EEG?

13    A.   EEG is an electroencephalogram.  That's a recording of the

14    electrical activity of the brain.  The brain has spontaneous

15    electrical activity which can be recorded from electrodes placed

16    about the scalp and gives you patterns which are then

17    distinguishable in various frequencies and amplitudes in

18    different locations of the brain, particularly useful for things

19    like epilepsy, which are characteristically abnormal electrical

20    discharges in the brain.

21    Q.   So is this, again, a functional test?

22    A.   It's a functional test, but it doesn't give you an image.

23    It gives you waves on a screen or a piece of paper.

24    Q.   And of the CT, MRI, SPECT, and PET, which one of those are

25    structural versus functional?

1    A.    The CT and the MRI are structural, and the SPECT and the

2    PET are functional.

3    Q.    Okay.  And how long have you been using these techniques

4    for examination?

5    A.    As long as they have been in existence.

6         I was a neurologist before CAT scans were used, and I'm

7    the -- studied MRI scans.  I was co-owner of the first MRI

8    scanner in the state of Connecticut.  So I have been doing these

9    images ever since they have been in use.

10        And on SPECT scans, I was on the investigational drug

11   permit for the isotope used in SPECT scans.  And PET scans I

12   have also been using in my practice since they were available.

13   Q.    Would you characterize this as decades or --

14   A.    Yes.  At least back to 1988.

15   Q.    Okay.  And when you say using these scans, do you interpret

16   them and use them in diagnosing patients?

17   A.    I do.

18   Q.    Have you conducted research into the area of affective

19   disorders?

20   A.    Yes, I have.

21   Q.    What is an affective disorder?

22   A.    Affective disorders are psychiatric conditions that are

23   manifested by mood problems.  Depression, mania, manic

24   depression, things of that nature are affective disorders as

25   opposed to the thought disorders, like schizophrenia or the

1    anxiety disorders or obsessive-compulsive disorder.

2    Q.   And how does that intersect with your work in neurology and

3    neuroimaging?

4    A.   Well, the brain is the organ of behavior.  It is that which

5    allows you to act, to think, to feel.  I mean, it's everything

6    that has to do with being a human.

7         And so any condition that affects the brain, either

8    anatomic or functional or disease, all those things are what I

9    deal with.  And it has to do with your emotions, your mood, your

10   thinking.  All those problems that -- mental illnesses are

11   really biologically based.  They are certainly modified by

12   psychological factors, how you were raised, what you have

13   learned, where you live, the adversity, the trauma, and all of

14   those.  But anything your brain actually does is a biological

15   phenomenon.

16   Q.   Okay.  And when did you start practicing?

17   A.   I have been practicing since 1969.

18   Q.   And so over the -- your practice over the past 40 years,

19   has it been focused exclusively on neurology, psychiatry, and

20   neuroimaging?

21   A.   Yes.  Taking care of sick people with complaints that

22   relate to those problems.

23   Q.   Can you tell me what the difference is between your areas

24   of expertise and the field of psychology?

25   A.   Psychologists have not studied medicine.  I mean,

1    psychiatry and neurology and neuropsychiatry are medical

2    disciplines, which means you went to medical school, you

3    examined patients, do physical exams, and you can prescribe

4    medication.

5         Psychologists don't touch the patient.  They can do testing

6    in terms of, like, IQ tests or the Halstead-Reitan, that's been

7    referred to today, tests of function, basically, input-output.

8    You give a test, you see how the person responds.

9         Neuropsychologists are frequently referred to.  I refer to

10   them to quantify those deficits of functioning that people have.

11        Psychologists also use psychotherapy to treat people.  They

12   are experts in how the brain functions in learning and lots of

13   things like that, but they don't generally do neuroimaging.

14   They don't -- they cannot prescribe medication except in very

15   rare instances with supervision.

16   Q.   Okay.  So when you're making a diagnosis as a neurologist,

17   does input from a clinical psychologist or a neuropsychologist

18   play a role?

19   A.   Yes.  I frequently refer to them when I want to quantify

20   the level of intelligence, for instance, or whether I have seen

21   someone whose executive functions are not good and they have a

22   frontal lobe problem or a cerebellar problem.  I will get a

23   neuropsychologist to do the kind of testing that will actually

24   quantify that.

25             THE COURT:  Counsel, I think we are where we need to

1          take the break.  Is this a good breaking point?

2                    MS. CZUBA:  It actually is.  I was just about to turn

3          to Robin's case.

4                    THE COURT:  I sensed maybe that's where you were, and

5          I thought this would be a good time.

6                Counsel, I -- we're going to take a recess and reconvene

7          tomorrow morning at 8:30.

8                The whole issue of the ABA standards, you know, we're going

9          to take the recess now, but tomorrow morning I may give you my

10         thoughts as to what my perception of the ABA standards and how

11         they play or do not play a role in *Strickland* ineffective

12         assistance of counsel analysis.  I just want to make sure that

13         we're not kind of barking up the wrong tree in some of the

14         discussions we are having here or that I'm not barking up the

15         wrong tree.  Because my perception could be flat wrong.  There

16         may be case law that suggests that the ABA standard fully

17         informs the *Strickland* analysis.  My sense is that it's more of

18         a systemic approach, where the ABA standard applies minimum

19         requirements of competency of counsel going into the proceeding,

20         how much experience they have, requirements of funding for

21         investigative sources, things of that sort.

22               And my thought was it did not really focus on individual

23         decision-making of counsel during the trial and sentencing

24         process.  If I'm mistaken about that, I would love to hear from

25         counsel on that tomorrow, very briefly, just to make sure that

1    my understanding is correct.

2         And I am not in any way suggesting that I have got that all

3    figured out.  I'm just giving you the benefit of what my

4    understanding has been, which could have been misinformed.

5         All right.  Counsel, we'll be in recess, then, until

6    tomorrow morning at 8:30 a.m.

7         Ms. Dotson will give you a heads-up on where you are in

8    terms of time so that you can govern yourself accordingly.

9         All right.  We'll be in recess until 8:30 tomorrow morning.

10        (Court recessed at 3:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6            I, Tamara Hohenleitner, Federal Official Realtime

7    Court Reporter, in and for the United States District Court for

8    the District of Idaho, do hereby certify that pursuant to

9    Section 753, Title 28, United States Code, that the foregoing

10   is a true and correct transcript of the stenographically

11   reported proceedings held in the above-entitled matter and that

12   the transcript page format is in conformance with the

13   regulations of the Judicial Conference of the United States.

14

15                     Dated this 24th day of July, 2017.

16

17

18                     /S/ TAMARA I. HOHENLEITNER
                       _____
19                     TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                       FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

**$2500** [2] - 113:23, 135:10
**$3500** [1] - 90:9
**'90s** [3] - 11:13, 157:18, 158:18
**'94** [5] - 13:17, 75:23, 75:24, 76:12, 106:4
**'95** [2] - 106:4, 144:21
**'96** [1] - 28:17
**1** [4] - 4:4, 40:3, 62:14, 155:17
**10** [3] - 44:4, 70:3, 139:15
**100** [1] - 145:15
**10:57** [1] - 72:3
**110** [1] - 124:5
**111** [1] - 108:15
**114** [4] - 45:21, 46:3, 46:5, 130:1
**11:18** [1] - 72:3
**12** [2] - 40:4, 134:4
**12/30** [1] - 76:12
**120** [3] - 47:10, 47:11, 47:13
**1200** [2] - 142:9, 151:5
**126** [4] - 49:12, 49:13, 49:15, 126:24
**13** [5] - 17:17, 19:3, 49:24, 52:5, 130:8
**130** [1] - 124:19
**131** [1] - 53:14
**134** [1] - 42:7
**13th** [1] - 46:2
**14** [1] - 47:20
**14th** [1] - 94:14
**15** [7] - 17:22, 49:22, 70:4, 72:2, 127:5, 132:1, 183:2
**155** [3] - 119:5, 119:17, 132:13
**15th** [2] - 78:3, 94:14
**18** [1] - 31:18
**19** [1] - 141:8
**1969** [1] - 189:17
**1980** [4] - 140:11, 141:8, 142:4, 178:15
**1980s** [7] - 142:18, 143:9, 145:14, 145:15, 153:16, 153:22, 158:11
**1982** [1] - 87:12
**1986** [2] - 157:12, 166:1
**1988** [1] - 188:14
**1989** [6] - 178:15, 179:6, 180:10, 181:4, 181:7, 181:24
**1990** [4] - 83:15, 140:11, 141:8, 144:21

**1990s** [1] - 154:23
**1992** [10] - 86:4, 87:3, 87:4, 140:14, 140:17, 148:23, 157:24, 158:19, 181:19, 182:10
**1992-1993** [1] - 157:22
**1993** [6] - 13:17, 84:19, 85:4, 86:8, 130:16, 143:22
**1994** [6] - 28:19, 44:4, 45:20, 73:21, 77:8, 112:23
**1995** [39] - 9:20, 22:16, 46:2, 47:20, 49:22, 52:25, 53:1, 53:16, 55:2, 55:10, 79:16, 83:15, 83:23, 85:4, 89:24, 93:18, 93:22, 94:5, 94:15, 94:19, 104:16, 105:22, 106:1, 112:11, 113:16, 121:13, 124:25, 125:23, 127:5, 130:8, 135:24, 136:1, 136:19, 139:15, 139:19, 140:17, 179:11, 180:1, 180:14
**1995..** [1] - 52:23
**1996** [12] - 53:3, 53:6, 54:12, 54:25, 55:18, 59:11, 63:10, 64:7, 112:23, 128:12, 140:15, 148:23
**1:03** [1] - 132:2
**1:20** [1] - 132:2
**1st** [4] - 83:15, 83:22, 125:23
**2** [5] - 40:4, 45:18, 62:14, 78:1, 121:2
**20** [4] - 43:25, 45:2, 45:5, 64:7
**2002** [1] - 17:17
**2003** [8] - 144:25, 174:14, 178:16, 179:9, 180:11, 181:5, 181:6, 181:12
**2005** [2] - 139:5, 139:15
**2009** [1] - 142:5
**2011** [1] - 142:5
**2014** [1] - 144:8
**2015** [1] - 142:6
**2017** [1] - 4:2
**22** [1] - 134:4
**22nd** [2] - 45:20, 53:16
**25** [2] - 13:22, 27:8
**26** [1] - 18:17

**27** [1] - 124:25
**28** [7] - 44:17, 45:2, 45:5, 79:8, 79:9, 121:13
**29** [1] - 146:6
**3** [1] - 62:15
**300** [1] - 142:7
**30s** [1] - 13:22
**30th** [1] - 77:8
**31** [1] - 53:1
**32** [2] - 51:24, 52:3
**35** [3] - 11:6, 52:17, 169:3
**350** [1] - 90:15
**36** [1] - 64:8
**370** [2] - 110:5, 110:6
**371** [1] - 110:6
**38** [1] - 117:18
**3:00** [1] - 169:6
**3:01** [1] - 192:10
**4** [1] - 49:23
**40** [4] - 63:19, 63:24, 64:1, 189:18
**4064** [1] - 44:10
**42** [5] - 54:4, 54:8, 62:4, 108:12, 110:5
**47** [1] - 39:9
**5** [3] - 4:2, 39:18
**5/8/95** [1] - 87:17
**50** [1] - 40:22
**6** [2] - 39:5, 40:4
**64** [1] - 121:22
**66** [3] - 76:22, 77:12, 77:15
**67** [1] - 121:22
**69** [1] - 18:15
**7** [3] - 52:23, 52:25, 127:12
**74** [2] - 119:5, 132:13
**8** [7] - 53:3, 53:6, 54:12, 55:17, 63:10, 85:3, 138:18
**800** [1] - 145:12
**85** [1] - 54:10
**88** [2] - 121:1, 121:23
**89** [1] - 125:20
**8:30** [3] - 191:7, 192:6, 192:9
**8th** [1] - 56:24
**90** [3] - 40:21, 64:14, 75:5
**93** [1] - 54:13
**98-240** [1] - 4:3
**A-D-A-M-S** [1] - 10:23
**A-I-R-L-I-E** [1] - 142:19
**a.m** [3] - 72:3, 192:6
**ABA** [18] - 144:25, 177:13, 177:14,

178:8, 178:11, 179:6, 180:10, 180:11, 181:3, 181:20, 181:24, 182:3, 182:11, 191:8, 191:10, 191:16, 191:18
**ability** [2] - 22:9, 82:22, 174:20
**able** [6] - 6:11, 114:8, 118:9, 118:10, 171:3
**abnormal** [1] - 187:19
**abnormality** [1] - 167:7
**absence** [1] - 101:5
**absolute** [2] - 178:23
**absolutely** [14] - 45:12, 51:14, 88:8, 95:19, 101:19, 101:22, 103:2, 105:3, 105:17, 109:8, 109:10, 161:15, 171:7, 172:16
**abuse** [2] - 86:10, 159:20
**abused** [2] - 86:16, 86:19
**academics** [1] - 151:4
**accept** [1] - 50:17
**accepted** [6] - 6:10, 92:14, 92:16, 106:19, 107:12, 148:10
**access** [1] - 130:15
**accessible** [1] - 110:17
**accompanied** [1] - 136:2
**accord** [1] - 123:16
**according** [1] - 171:15
**accordingly** [2] - 53:5, 192:8
**accounts** [1] - 59:20
**accuracy** [1] - 130:20
**accurate** [5] - 30:18, 69:10, 69:15, 71:15, 106:1
**accurately** [2] - 156:24, 160:23
**acquired** [2] - 162:9
**Act** [2] - 139:8, 139:10
**act** [2] - 7:7, 189:5
**actions** [1] - 67:22
**active** [1] - 174:25
**actively** [1] - 141:9
**activity** [4] - 39:24, 187:4, 187:14, 187:15
**actual** [2] - 99:19,

151:5
**Ada** [32] - 11:22, 12:14, 13:12, 14:16, 23:15, 23:21, 24:7, 24:9, 27:13, 27:19, 28:2, 29:18, 36:18, 39:18, 39:22, 40:18, 42:5, 42:20, 42:23, 57:9, 57:22, 73:25, 74:13, 74:21, 75:3, 75:6, 75:8, 95:4, 101:24, 110:17
**Adams** [53] - 10:7, 10:8, 10:22, 11:3, 16:12, 17:25, 18:16, 19:23, 20:5, 20:19, 20:21, 21:10, 26:11, 29:2, 29:17, 29:22, 30:1, 30:5, 30:12, 31:2, 31:7, 32:23, 33:19, 34:9, 34:20, 37:4, 37:23, 38:3, 44:8, 45:23, 45:25, 47:17, 52:1, 53:17, 56:8, 63:22, 77:13, 77:16, 79:23, 82:6, 93:14, 110:7, 110:15, 124:3, 124:13, 125:11, 126:9, 127:8, 129:1, 129:15, 130:6, 134:6, 135:19
**ADAMS** [1] - 10:10
**add** [1] - 6:4
**addition** [8] - 16:1, 29:17, 61:7, 75:7, 97:22, 141:2, 160:16, 171:18
**additional** [8] - 18:24, 33:22, 94:5, 108:5, 118:2, 129:17, 155:1, 156:4
**address** [2] - 163:14, 163:18
**addressed** [2] - 170:6, 174:15
**adept** [1] - 37:18
**adequately** [1] - 8:24
**adhere** [1] - 153:18
**adjustable** [1] - 5:7
**administered** [3] - 49:6, 51:11, 106:20
**administrative** [1] - 113:8
**admissibility** [2] - 9:7, 31:1
**admissible** [2] - 30:16, 72:12
**admission** [6] - 8:17, 44:24, 45:3, 66:14,

73:3, 73:7
**admit** [7] - 8:21, 44:25, 45:2, 63:2, 72:23, 150:21, 176:11
**admitted** [25] - 5:1, 8:20, 18:6, 45:5, 45:10, 46:3, 46:5, 47:11, 47:13, 49:13, 49:15, 52:3, 54:6, 54:8, 62:9, 62:12, 62:18, 63:5, 63:24, 64:1, 72:13, 73:3, 73:8, 73:10, 73:12
**adopted** [1] - 180:17
**Adult** [1] - 91:19
**adult** [2] - 67:25, 154:10
**advance** [1] - 57:24
**adversity** [1] - 189:13
**advise** [2] - 76:13, 161:24
**advocate** [1] - 176:1
**advocated** [1] - 130:19
**Advocates** [1] - 157:25
**affect** [5] - 12:22, 154:14, 155:12, 155:14, 162:5
**affected** [1] - 152:11
**affecting** [1] - 22:9
**affective** [4] - 188:18, 188:21, 188:22, 188:24
**affects** [1] - 189:7
**affidavit** [20] - 44:20, 49:17, 76:17, 76:22, 76:25, 77:10, 77:13, 77:16, 78:21, 78:22, 79:8, 113:25, 126:4, 127:2, 127:4, 127:6, 127:16, 127:24, 128:2, 128:3
**affirmatively** [1] - 145:11
**afford** [1] - 96:10
**afternoon** [5] - 112:10, 132:10, 132:11, 183:18, 183:19
**agency** [2] - 101:23, 174:16
**agent** [1] - 7:7
**ages** [1] - 103:8
**ago** [10] - 13:22, 14:18, 17:22, 21:25, 24:6, 69:20, 134:4, 146:21, 149:25, 167:10

**agree** [3] - 94:1, 96:14, 97:2
**agreeable** [2] - 8:10, 8:23
**agreed** [4] - 9:8, 72:23, 113:14, 113:22
**ahead** [29] - 5:5, 5:10, 10:18, 15:21, 15:23, 25:17, 41:15, 42:14, 45:4, 65:18, 67:14, 81:1, 81:6, 82:14, 84:8, 84:11, 87:10, 95:21, 96:11, 99:2, 104:18, 106:5, 131:23, 147:18, 148:4, 148:17, 152:20, 176:15, 179:24
**Aid** [4] - 143:6, 153:14, 158:2, 158:4
**ain't** [1] - 80:20
**Airlie** [2] - 142:19
**AI** [10] - 41:10, 41:11, 74:4, 81:10, 81:14, 81:18, 81:20, 81:23, 82:2, 82:16
**Al's** [1] - 133:15
**Alabama** [2] - 146:9, 180:4
**Alan** [13] - 14:15, 16:5, 23:10, 26:23, 27:25, 28:3, 28:8, 36:18, 57:11, 74:5
**alarm** [1] - 141:18
**albeit** [1] - 176:13
**alcohol** [6] - 86:9, 86:17, 86:19, 86:20, 86:22, 159:25
**allegation** [1] - 66:23
**alleged** [2] - 42:1, 86:2
**allocate** [1] - 83:25
**allocation** [1] - 154:22
**allow** [10] - 8:4, 8:8, 102:21, 129:21, 174:19, 176:14, 179:16, 179:21, 184:22
**allowed** [3] - 30:6, 148:14, 153:23
**allowing** [1] - 35:23
**allows** [4] - 185:9, 185:19, 187:4, 189:5
**alluded** [2] - 178:18, 179:7
**almost** [3] - 38:7, 42:1, 154:16
**alone** [1] - 128:1
**aloud** [3] - 44:12, 54:14, 64:9

**Alphonsus** [7] - 53:20, 120:4, 120:20, 121:4, 121:14, 121:23, 122:1
**Amarillo** [1] - 146:18
**amended** [2] - 52:1, 78:15
**amending** [1] - 78:11
**Amendment** [1] - 39:7
**American** [5] - 144:6, 144:13, 165:25, 174:14, 177:19
**Amil** [8] - 12:18, 12:20, 13:5, 23:6, 24:13, 24:14, 25:10, 26:3
**amount** [7] - 46:20, 58:7, 61:11, 91:24, 102:5, 178:11, 185:10
**amounts** [1] - 185:7
**amplitudes** [1] - 187:17
**analysis** [2] - 191:12, 191:17
**analyze** [1] - 156:25
**analyzed** [1] - 186:7
**anatomic** [2] - 187:5, 189:8
**anatomy** [1] - 187:7
**Anderson** [24] - 5:20, 7:15, 19:19, 19:20, 20:1, 30:24, 33:2, 33:10, 34:18, 71:22, 71:24, 72:6, 73:15, 74:23, 89:15, 95:5, 98:13, 98:16, 103:16, 104:4, 147:15, 176:21, 182:16, 182:24
**ANDERSON** [50] - 7:16, 19:21, 20:2, 20:4, 28:25, 29:5, 29:7, 29:10, 33:12, 33:14, 33:18, 34:5, 34:16, 34:19, 35:24, 36:3, 66:21, 66:25, 73:16, 73:18, 77:18, 77:23, 78:1, 79:7, 79:10, 79:12, 79:15, 88:13, 88:24, 98:17, 98:21, 98:25, 99:4, 99:5, 100:19, 100:22, 102:17, 111:2, 111:5, 111:8, 111:16, 147:17, 152:1, 168:20, 175:13, 176:23, 179:20, 181:14,

182:17, 182:25
**Anderson's** [2] - 70:12, 71:25
**Andrew** [1] - 25:19
**Andy** [1] - 61:22
**annual** [3] - 28:5, 141:21, 158:4
**answer** [23] - 33:24, 43:4, 59:17, 60:1, 62:20, 65:14, 67:16, 84:17, 87:18, 101:16, 105:1, 105:12, 105:24, 106:5, 106:7, 136:14, 162:15, 163:16, 172:20, 179:15, 179:16, 179:18, 179:21
**answered** [3] - 44:15, 58:25, 170:14
**anticipate** [1] - 78:2
**antisocial** [23] - 84:23, 88:1, 88:8, 88:16, 89:3, 89:7, 89:13, 98:7, 103:1, 103:6, 103:7, 103:18, 103:23, 104:25, 105:2, 105:12, 168:9, 168:10, 169:1, 169:12, 170:2, 170:9, 170:11
**anxiety** [1] - 189:1
**anyway** [3] - 81:1, 81:6, 95:7
**apart** [1] - 20:21
**APD** [1] - 104:15
**apnea** [2] - 68:21, 69:4
**apologize** [3] - 4:21, 90:2, 163:16
**apparent** [3] - 55:13, 99:11, 128:1
**appeal** [10] - 20:7, 24:24, 25:1, 36:24, 44:14, 53:7, 73:20, 95:17, 102:14, 102:18
**appeals** [3] - 25:8, 25:14, 140:4
**appear** [4] - 9:5, 76:12, 76:24, 103:23
**appellate** [2] - 11:12, 25:6
**Appellate** [5] - 140:1, 140:16, 140:22, 145:17, 154:23
**application** [3] - 15:1, 152:2, 181:22
**applications** [1] - 181:23
**applied** [3] - 15:7,

16:5, 155:2
**applies** [1] - 191:18
**apply** [6] - 7:8, 14:1, 14:8, 64:11, 153:24, 161:13
**appoint** [3] - 15:4, 15:13, 25:7
**appointed** [10] - 13:12, 15:10, 25:3, 28:19, 73:19, 73:22, 83:5, 139:8, 174:17, 182:8
**appointing** [1] - 174:19
**appointment** [4] - 21:6, 73:24, 74:3, 75:23
**appreciate** [2] - 29:23, 166:7
**appreciated** [1] - 165:19
**appreciates** [1] - 173:15
**approach** [5] - 30:20, 43:17, 43:21, 174:11, 191:18
**approached** [4] - 46:23, 56:9, 68:15, 152:10
**appropriate** [4] - 94:14, 161:21, 161:25, 165:16
**appropriately** [1] - 164:18
**approved** [4] - 28:5, 41:17, 81:22, 117:6
**April** [3] - 75:23, 113:16, 121:13
**arbitrarily** [1] - 182:6
**architecture** [1] - 160:8
**area** [11] - 52:9, 56:20, 149:16, 158:20, 162:10, 164:23, 166:3, 167:13, 168:21, 177:6, 188:18
**areas** [9] - 129:17, 153:5, 156:10, 162:18, 165:1, 165:13, 170:22, 187:2, 189:23
**arguably** [1] - 105:5
**argue** [2] - 151:12, 154:24
**arising** [1] - 139:11
**Arizona** [3] - 146:9, 147:2, 147:3
**Arkansas** [1] - 146:9
**arm's** [1] - 159:7

**arrangements** [2] - 50:21, 64:17
**arrested** [1] - 145:9
**arson** [1] - 151:19
**Art** [3] - 47:18, 48:19
**Arthur** [1] - 5:15
**article** [6] - 143:25, 144:5, 144:8, 144:23, 157:11, 165:24
**articles** [7] - 62:15, 91:5, 134:17, 143:23, 144:3, 151:8, 168:16
**articulately** [1] - 179:5
**articulation** [1] - 153:12
**aspect** [1] - 186:2
**aspects** [6] - 83:2, 114:11, 166:23, 184:16, 185:8, 187:10
**assertion** [1] - 97:11
**assess** [3] - 7:12, 8:1, 171:20
**assessment** [1] - 164:10
**assessments** [1] - 144:9
**assigned** [5] - 36:16, 36:17, 39:21, 73:22, 73:25
**assist** [6] - 25:11, 26:6, 97:2, 141:12, 155:11, 173:23
**assistance** [13] - 26:16, 26:21, 27:3, 39:8, 41:6, 42:2, 125:6, 139:7, 139:21, 139:22, 152:12, 152:13, 191:12
**associate** [2] - 49:10, 158:5
**associated** [3] - 116:12, 167:24, 170:16
**association** [1] - 143:7
**Association** [11] - 141:20, 143:7, 143:24, 144:6, 144:13, 153:15, 157:25, 158:2, 174:14, 177:20, 178:1
**Association's** [1] - 158:4
**assume** [16] - 8:23, 17:22, 28:6, 34:12,

34:25, 35:21, 36:6, 48:22, 49:25, 95:5, 111:13, 137:9, 137:24, 147:12, 172:8, 182:19
**assumed** [3] - 48:18, 59:5, 100:16
**assuming** [9] - 4:6, 5:19, 5:21, 28:22, 30:1, 30:9, 53:25, 78:3, 162:3
**atoms** [2] - 186:6, 186:11
**atrophied** [1] - 31:21
**atrophy** [20] - 85:10, 85:20, 86:9, 87:16, 87:19, 91:4, 91:6, 93:13, 97:14, 97:16, 97:21, 97:24, 98:11, 99:19, 104:5, 105:7, 122:11, 122:20, 133:16, 162:1
**attach** [1] - 73:6
**attached** [2] - 107:23, 168:14
**attempt** [7] - 47:24, 60:3, 85:25, 118:1, 120:5, 133:15, 161:14
**attend** [1] - 169:18
**attendance** [1] - 142:10
**attended** [5] - 101:12, 142:3, 171:25, 177:2, 182:1
**attendees** [1] - 142:7
**attending** [2] - 141:5, 160:20
**attention** [5] - 18:1, 18:17, 39:9, 121:2, 172:25
**attentive** [1] - 167:5
**attitude** [1] - 46:14
**attorney** [14] - 12:16, 24:9, 36:12, 40:22, 61:12, 66:7, 74:1, 125:3, 165:15, 165:16, 166:25, 175:9, 176:25, 182:3
**attorneys** [25] - 7:13, 7:14, 11:17, 20:14, 20:20, 29:18, 37:21, 61:20, 116:24, 151:14, 152:5, 155:11, 155:13, 158:22, 158:25, 159:1, 162:4, 164:4, 166:13, 168:25, 169:11, 170:7, 179:3, 181:11,

181:20
**attributable** [1] - 169:14
**August** [2] - 44:7, 53:16
**aunts** [1] - 115:12
**authorities** [1] - 68:13
**authority** [2] - 174:19, 182:7
**availability** [2] - 154:14, 155:12
**available** [11] - 64:22, 128:1, 142:15, 158:7, 158:11, 166:12, 169:5, 169:8, 172:12, 173:22, 188:12
**avenues** [2] - 51:22, 79:3
**average** [2] - 40:19, 40:21
**await** [1] - 147:11
**aware** [20] - 33:4, 46:24, 68:17, 68:18, 71:2, 78:10, 97:25, 101:23, 103:19, 105:22, 106:25, 107:4, 107:7, 128:9, 128:11, 128:12, 128:15, 175:5, 180:21, 181:20
**awkward** [1] - 73:11
**axial** [2] - 185:2, 185:18
**back-and-forth** [1] - 9:3
**background** [10] - 59:12, 59:21, 114:10, 123:24, 130:14, 163:24, 166:16, 166:17, 166:21, 166:24
**bad** [2] - 68:1, 107:10
**Balance** [2] - 143:10, 158:5
**ball** [2] - 55:13, 65:15
**bank** [1] - 168:1
**Bannock** [4] - 13:9, 13:10, 24:3, 75:13
**Bar** [12] - 65:22, 66:18, 68:13, 68:20, 68:25, 69:7, 70:3, 140:3, 144:6, 144:13, 174:14, 177:19
**bar** [3] - 11:7, 26:9, 178:1
**Barbara** [1] - 90:20
**bare** [1] - 78:14
**barking** [2] - 191:13, 191:14

**barriers** [1] - 43:5
**based** [11] - 92:1, 100:7, 100:9, 103:7, 162:24, 163:21, 177:14, 178:7, 178:8, 178:9, 189:11
**basic** [1] - 186:2
**basis** [3] - 89:12, 125:4, 172:24
**Battery** [2] - 50:14, 52:13
**battery** [7] - 48:17, 51:20, 93:11, 123:23, 130:24, 131:7, 131:12
**Battle** [1] - 112:22
**beachhead** [1] - 156:17
**bear** [1] - 99:1
**bearing** [1] - 98:19
**beating** [1] - 29:3
**Beaver** [38] - 16:23, 22:16, 22:23, 46:8, 46:17, 47:6, 48:18, 53:24, 56:20, 87:23, 88:1, 88:4, 88:17, 90:12, 90:14, 93:4, 93:8, 93:9, 93:10, 93:13, 93:17, 93:20, 94:13, 94:18, 94:22, 94:25, 95:2, 95:5, 100:14, 100:18, 105:8, 125:24, 130:3, 130:9, 130:15, 130:18, 131:17, 133:19
**beaver** [3] - 16:25, 50:19, 105:5
**Beaver's** [4] - 83:17, 88:13, 88:20, 90:11
**became** [6] - 60:24, 62:2, 94:18, 128:11, 158:1, 180:10
**become** [6] - 70:16, 113:1, 113:11, 128:15, 142:8
**becoming** [1] - 113:2
**began** [5] - 70:10, 113:7, 140:10, 141:7, 142:3
**begin** [7] - 35:17, 116:17, 138:17, 149:5, 155:16, 156:15, 172:18
**beginning** [8] - 46:14, 52:23, 96:22, 108:15, 110:7, 126:23, 143:22, 153:16
**begins** [4] - 18:24,

47:22, 48:4, 64:10
**behalf** [1] - 128:20
**behavior** [6] - 162:21, 163:4, 167:19, 169:17, 170:17, 189:4
**behavioral** [4] - 167:24, 170:15, 170:22, 171:3
**behaviors** [2] - 168:4, 169:14
**belief** [1] - 81:11
**believes** [1] - 47:5
**bell** [1] - 107:3
**bench** [1] - 148:8
**benefit** [3] - 59:18, 105:6, 192:3
**best** [7] - 25:7, 31:11, 41:7, 83:25, 101:16, 113:12, 177:15
**bet** [1] - 56:22
**better** [6] - 9:20, 17:21, 37:18, 92:1, 103:25, 186:12
**between** [12] - 11:20, 66:22, 145:16, 148:25, 151:1, 154:2, 154:11, 160:15, 161:9, 166:7, 181:4, 189:23
**beyond** [3] - 134:2, 150:8, 175:13
**big** [2] - 99:25, 147:20
**bigger** [1] - 97:15
**bill** [8] - 27:10, 27:12, 27:16, 42:11, 42:19, 58:8, 95:11, 102:3
**billed** [3] - 26:23, 26:24, 81:12
**billing** [5] - 16:10, 24:7, 26:19, 26:22, 39:5
**Billing** [2] - 27:15
**bills** [11] - 27:23, 39:18, 41:17, 58:8, 81:9, 81:17, 81:23, 82:1, 82:5, 82:11, 91:7
**Binet** [1] - 91:21
**biological** [2] - 167:4, 189:14
**biologically** [2] - 163:4, 189:11
**biopsychosocial** [1] - 163:1
**bit** [12] - 4:23, 4:24, 30:25, 39:13, 50:3, 99:12, 100:16, 124:20, 125:25, 126:25, 128:25,

173:2
**black** [1] - 169:24
**blank** [1] - 154:24
**blood** [5] - 186:17,
186:18, 186:20,
186:21, 186:25
**Bloom** [1] - 144:16
**blown** [2] - 83:20,
126:2
**board** [2] - 184:12,
184:13
**Board** [1] - 28:2
**board-certified** [2] -
184:12, 184:13
**body** [7] - 153:12,
184:5, 185:4,
185:10, 185:13,
186:4, 186:8
**Bohner** [2] - 20:22
**boilerplate** [1] - 155:8
**Boise** [3] - 56:21,
135:19, 135:22
**bones** [2] - 78:14,
186:13, 186:14
**Bonneville** [1] -
101:25
**bono** [1] - 182:9
**book** [4] - 144:11,
144:13, 144:15,
180:5
**bookkeeping** [1] -
40:8
**borderline** [3] - 90:25,
105:18, 106:9
**borne** [1] - 151:3
**bothered** [1] - 32:2
**Bothwell** [1] - 87:3
**bothwell** [1] - 87:4
**bottom** [7] - 39:14,
45:18, 46:15, 47:22,
48:3, 49:23, 174:18
**Bourne** [2] - 97:12,
109:6
**box** [1] - 120:7
**Bracke** [7] - 10:18,
35:4, 55:5, 72:14,
111:23, 138:4, 183:5
**brain** [85] - 16:20,
17:12, 31:23, 49:5,
50:8, 50:17, 56:17,
59:12, 59:22, 87:8,
91:4, 91:6, 97:24,
98:10, 103:10,
103:20, 103:24,
104:10, 104:24,
105:16, 105:19,
106:10, 106:13,
106:18, 106:22,
107:15, 108:6,
108:25, 109:5,

119:25, 122:11,
157:2, 157:4, 157:5,
157:6, 157:12,
157:15, 159:24,
161:24, 162:21,
163:10, 164:22,
165:7, 165:17,
165:20, 165:25,
166:5, 167:1,
167:15, 169:13,
169:15, 170:8,
170:13, 170:16,
170:23, 171:1,
173:18, 173:20,
173:23, 173:25,
175:16, 176:1,
176:4, 176:7,
176:11, 184:3,
184:17, 184:20,
186:17, 186:21,
186:25, 187:2,
187:3, 187:5, 187:6,
187:9, 187:14,
187:18, 187:20,
189:4, 189:7,
189:14, 190:12
**brain-damaged** [2] -
157:6, 170:8
**brains** [1] - 97:15
**brainstorm** [1] -
172:10
**branch** [1] - 184:14
**breadth** [1] - 144:10
**break** [4] - 129:21,
131:24, 138:1, 191:1
**breaking** [1] - 191:1
**brief** [3] - 4:18, 5:11,
179:25
**briefly** [7] - 7:17,
29:14, 32:6, 42:7,
105:4, 181:16,
191:25
**briefs** [1] - 32:20
**bring** [1] - 130:1
**bringing** [2] - 18:9,
156:9
**broad** [2] - 149:15,
149:18
**broadly** [3] - 149:9,
149:14, 170:4
**brother** [4] - 13:1,
24:14, 24:15, 26:3
**brothers** [4] - 12:21,
24:13, 115:13
**brought** [1] - 146:21
**bruises** [1] - 169:24
**brutalized** [1] - 169:23
**budget** [5] - 28:4,
28:5, 57:19, 84:10,
90:8

**budgeting** [1] - 155:10
**budgets** [1] - 28:4
**build** [1] - 116:17
**built** [1] - 161:2
**bulk** [1] - 117:23
**bunch** [1] - 47:4
**busier** [1] - 71:3
**business** [4] - 65:11,
97:14, 97:16, 97:21
**busy** [10] - 38:13,
65:11, 65:12, 68:10,
68:11, 70:23, 71:1,
71:9, 156:2, 173:12
**BY** [48] - 11:2, 15:25,
17:25, 18:16, 20:4,
29:16, 31:6, 32:23,
33:18, 36:10, 45:17,
46:6, 47:14, 49:16,
52:5, 54:9, 55:6,
64:5, 66:18, 67:18,
70:1, 73:18, 78:1,
79:15, 88:13, 88:24,
99:5, 101:1, 102:24,
103:15, 104:21,
106:8, 109:20,
111:5, 112:9, 130:2,
131:8, 132:9,
133:12, 135:17,
136:10, 138:16,
148:19, 152:22,
169:10, 176:23,
181:18, 183:17
**Cahill** [8] - 12:12,
12:22, 23:2, 23:8,
44:7, 74:4, 74:8,
87:23
**calculus** [1] - 105:13
**California** [19] - 80:11,
139:2, 139:3, 140:1,
140:3, 140:7,
140:16, 140:22,
142:2, 142:8,
142:13, 143:19,
144:21, 145:17,
145:19, 146:9,
154:23, 157:17,
180:4
**cannot** [2] - 147:22,
190:14
**capacity** [3] - 140:11,
145:3, 150:8
**capital** [29] - 21:7,
23:24, 25:1, 25:2,
38:16, 38:20, 43:5,
43:18, 61:9, 75:15,
114:3, 114:12,
141:1, 141:6, 142:4,
144:9, 145:1, 145:9,
150:15, 155:22,
158:21, 160:10,

168:8, 168:25,
169:11, 174:10,
181:19, 182:2, 182:7
**Capital** [5] - 139:17,
140:18, 151:6,
157:18, 179:12
**Carasco** [1] - 87:7
**CARASCO** [1] - 87:8
**Card** [1] - 50:9
**care** [9] - 60:19, 60:25,
61:13, 154:15,
155:13, 166:13,
175:6, 175:25,
189:21
**career** [2] - 66:8, 66:9
**Carolina** [1] - 146:12
**CAROLYN** [1] -
111:25
**Carolyn** [1] - 112:5
**Carsner** [2] - 38:25,
74:25
**Case** [1] - 4:3
**case** [187] - 7:2, 7:7,
9:21, 11:9, 11:25,
12:9, 12:10, 12:13,
12:23, 13:3, 13:8,
13:10, 14:3, 16:10,
16:15, 17:3, 17:14,
21:6, 22:19, 22:24,
23:5, 23:9, 23:25,
24:3, 24:18, 24:20,
26:4, 27:10, 27:17,
27:19, 28:12, 29:19,
36:13, 36:16, 36:17,
36:20, 37:5, 37:10,
37:23, 38:4, 38:6,
38:7, 38:8, 38:14,
38:17, 38:18, 39:2,
40:14, 40:23, 41:12,
42:3, 43:21, 44:20,
46:21, 46:23, 51:13,
52:2, 53:10, 55:23,
55:24, 56:17, 61:1,
63:9, 63:22, 64:14,
65:4, 67:1, 67:8,
68:9, 68:20, 69:11,
69:15, 73:20, 74:7,
74:10, 74:20, 75:12,
75:15, 75:22, 76:5,
76:13, 78:12, 79:19,
80:11, 80:18, 82:6,
83:2, 88:18, 90:9,
92:17, 93:22, 96:4,
101:3, 101:10,
101:18, 102:14,
103:22, 106:2,
106:23, 107:19,
107:21, 110:20,
112:16, 113:11,
113:14, 113:24,

114:10, 115:21,
115:22, 116:2,
116:23, 117:1,
117:9, 118:15,
118:22, 118:24,
119:1, 119:4,
119:21, 120:1,
120:23, 122:3,
122:9, 123:1,
124:17, 125:9,
125:14, 125:18,
126:8, 128:4,
128:10, 128:13,
130:11, 130:16,
132:18, 135:24,
138:19, 145:3,
146:20, 146:22,
148:21, 149:24,
150:18, 150:20,
151:18, 151:19,
151:24, 152:2,
152:3, 152:8,
154:17, 155:10,
155:19, 156:16,
156:20, 156:22,
156:25, 157:3,
158:22, 159:17,
161:13, 163:10,
164:12, 164:20,
165:15, 165:21,
166:20, 166:23,
167:20, 168:8,
168:10, 173:18,
173:20, 174:22,
174:24, 175:1,
175:5, 176:1,
177:16, 178:17,
178:23, 178:25,
186:6, 187:1, 191:3,
191:16
**case-budgeting** [1] -
155:10
**caseload** [5] - 23:20,
38:9, 74:12, 113:10,
175:4
**Cases** [1] - 144:1
**cases** [69] - 13:13,
20:10, 21:8, 23:15,
23:17, 23:18, 23:20,
23:22, 23:23, 23:24,
24:8, 25:1, 25:2,
27:13, 38:16, 38:20,
43:18, 52:21, 74:13,
74:16, 74:18, 74:25,
75:3, 75:7, 75:8,
75:10, 96:17, 113:8,
128:17, 139:9,
139:22, 140:10,
141:7, 141:23,
142:4, 144:4, 144:7,
144:18, 145:1,

145:7, 145:12, 145:15, 145:16, 145:19, 146:1, 146:16, 146:23, 146:25, 147:2, 147:3, 151:5, 153:1, 153:4, 154:20, 154:25, 158:12, 158:15, 159:11, 165:20, 165:25, 166:16, 174:3, 174:8, 174:11, 174:24, 175:3

**cash** [1] - 102:5

**CAT** [21] - 46:9, 46:24, 53:20, 84:20, 85:5, 85:11, 85:24, 86:4, 86:8, 87:4, 99:16, 104:9, 125:7, 127:18, 133:15, 184:20, 185:7, 186:2, 186:14, 186:19, 188:6

**catch** [1] - 4:24

**categories** [1] - 167:17

**Categories** [1] - 50:10

**caught** [1] - 120:12

**caused** [2] - 4:22, 86:9

**causes** [1] - 103:9

**caveat** [1] - 6:4

**center** [4] - 40:11, 140:3, 142:20, 173:20

**Center** [4] - 53:21, 110:16, 117:7, 142:15

**Centers** [1] - 140:24

**centers** [1] - 141:2

**central** [1] - 145:25

**cerebellar** [1] - 190:22

**cerebellum** [1] - 122:12

**cerebral** [2] - 122:19, 133:16

**certain** [14] - 4:8, 9:10, 16:19, 43:7, 49:6, 56:1, 56:2, 56:16, 63:18, 92:2, 103:8, 104:8, 105:8, 113:22

**certainly** [15] - 6:6, 9:20, 28:15, 35:22, 38:8, 53:23, 59:19, 68:18, 76:1, 78:7, 153:21, 158:18, 167:4, 189:11

**certainty** [1] - 82:21

**certified** [2] - 184:12, 184:13

**cetera** [1] - 166:24

**chair** [2] - 20:20, 142:4

**challenge** [3] - 153:2, 168:16, 169:11

**Champion** [2] - 143:24, 144:23

**chance** [3] - 65:5, 71:23, 125:21

**change** [4] - 18:10, 55:5, 137:17, 170:17

**changed** [5] - 57:13, 105:11, 167:19, 168:4, 178:20

**changes** [2] - 86:23, 167:24

**chapter** [2] - 144:15, 157:19

**chapters** [1] - 144:11

**characteristically** [1] - 187:19

**characterization** [2] - 98:13, 98:24

**characterize** [4] - 60:22, 98:22, 170:7, 188:13

**characterized** [1] - 98:23

**charge** [2] - 90:9, 145:9

**charged** [2] - 90:12, 90:14

**charges** [1] - 160:10

**Charles** [2] - 84:19, 87:7

**chase** [1] - 169:6

**check** [4] - 7:1, 102:3, 121:25, 154:24

**cheek** [1] - 82:15

**cheerful** [1] - 43:4

**chemical** [1] - 186:11

**chief** [6] - 12:16, 14:15, 23:10, 23:11, 27:25, 139:25

**child** [4] - 169:21, 169:22, 169:23

**Childers** [1] - 90:20

**childhood** [4] - 43:6, 165:11, 167:12, 167:14

**children** [3] - 13:16, 13:17, 151:19

**choice** [1] - 157:5

**choose** [7] - 11:21, 157:6, 162:16, 162:24, 163:17, 163:21, 164:17

**chose** [1] - 54:16

**Christine** [1] - 7:3

**chronology** [2] - 55:9, 116:17, 133:13

**chunk** [1] - 172:23

**churches** [1] - 101:13

**circulated** [3] - 157:12, 166:4, 181:25

**circumstances** [3] - 29:22, 70:17, 93:15

**circus** [1] - 80:12

**City** [2] - 140:17, 144:9

**civil** [5] - 20:10, 20:14, 20:15, 20:19, 160:3

**Civil** [1] - 4:3

**claim** [5] - 17:12, 43:20, 59:13, 59:23, 150:15

**claims** [2] - 43:19, 78:8

**clarify** [11] - 45:11, 69:24, 70:5, 70:11, 72:8, 77:11, 77:17, 105:5, 131:1, 148:6, 182:10

**clarity** [1] - 44:22

**Clark** [1] - 144:14

**Clay** [6] - 5:14, 56:21, 57:1, 57:3, 100:13, 100:15

**clear** [20] - 30:8, 30:11, 30:14, 31:1, 31:13, 32:11, 32:13, 33:9, 36:22, 45:7, 45:13, 72:7, 102:21, 105:21, 133:13, 147:12, 149:23, 152:17, 162:7, 176:24

**clearly** [1] - 122:10

**Clerk** [1] - 81:20

**clerk** [2] - 10:8, 111:22

**CLERK** [11] - 4:3, 10:11, 10:20, 35:7, 35:12, 112:1, 112:3, 138:6, 138:8, 183:8, 183:11

**click** [1] - 40:10

**client** [28] - 36:16, 38:14, 40:10, 43:1, 84:2, 101:6, 101:10, 150:22, 151:13, 151:20, 151:24, 156:18, 157:6, 159:22, 159:23, 160:11, 160:13, 160:25, 163:1, 163:6, 163:7, 163:22, 165:2, 165:11, 166:21, 168:2, 169:19, 170:7

**Client's** [1] - 144:14

**client's** [4] - 37:14, 160:8, 160:14, 160:23

**clients** [3] - 39:21, 43:5, 171:24

**clinical** [1] - 190:17

**clock** [2] - 99:2, 178:5

**closely** [1] - 118:10

**closer** [2] - 30:10, 30:19

**closing** [2] - 4:12, 4:15

**clue** [1] - 80:5

**co** [3] - 79:7, 142:4, 188:7

**co-chair** [1] - 142:4

**co-counsel** [1] - 79:7

**co-owner** [1] - 188:7

**Coeur** [1] - 34:11

**cognitive** [3] - 122:13, 122:17, 170:21

**colleague** [1] - 12:17

**colleagues** [2] - 166:2, 166:12

**collect** [4] - 114:24, 115:22, 116:14, 116:16

**collected** [6] - 62:25, 116:1, 116:2, 116:3, 116:4, 122:15, 125:14, 129:8

**collecting** [4] - 101:14, 129:6, 134:9, 154:8

**collection** [3] - 101:23, 114:13, 114:15

**Colorado** [1] - 146:9

**Columbia** [1] - 113:5

**column** [4] - 40:2, 40:4, 40:11, 73:8

**combination** [1] - 90:24

**comfortable** [1] - 5:8

**coming** [4] - 29:22, 57:20, 155:20, 175:25

**Commandments** [1] - 177:22

**commands** [1] - 177:23

**commentary** [1] - 144:24

**commission** [2] - 28:5, 149:21

**Commission** [1] - 81:22

**commissioners** [5] - 13:10, 28:6, 28:7, 82:17, 83:6

**Commissioners** [4] - 28:2, 57:10, 57:23, 81:17

**commit** [1] - 151:13

**committed** [3] - 33:24, 67:22, 86:2

**committee** [2] - 142:5, 154:22

**committees** [1] - 143:15

**common** [4] - 104:13, 150:19, 151:3, 156:6

**communicated** [2] - 133:22, 137:24

**communicating** [1] - 129:3

**communication** [4] - 45:23, 47:16, 129:1, 134:12

**communications** [1] - 134:2

**communities** [1] - 143:3

**community** [3] - 163:7, 168:9, 177:22

**compare** [1] - 90:11

**compared** [2] - 56:19, 166:8

**compassion** [1] - 149:11

**competency** [2] - 166:9, 191:19

**competent** [5] - 161:16, 168:25, 170:6, 170:12, 181:19

**competently** [1] - 65:4

**compiles** [1] - 114:5

**complaint** [1] - 66:19

**complaints** [1] - 189:21

**complete** [13] - 10:12, 10:20, 35:8, 52:10, 64:13, 68:16, 79:2, 112:3, 114:5, 126:21, 128:7, 138:9, 183:11

**completed** [6] - 46:21, 78:5, 79:5, 91:14, 93:3, 96:20

**completely** [2] - 46:23, 78:14

**completion** [1] - 78:8

**complicated** [1] - 81:19

**component** [1] - 165:8

**components** [1] - 143:11

**compulsive** [1] - 189:1

**computed** [1] - 186:16
**computer** [7] - 18:10, 62:2, 108:11, 119:2, 185:3, 186:2, 186:19
**computerized** [1] - 185:2
**concept** [1] - 150:24
**concern** [4] - 35:25, 70:2, 72:21, 72:25
**concerned** [4] - 31:21, 31:23, 80:15, 84:2
**concerning** [1] - 122:13
**concerns** [1] - 83:1
**concluded** [2] - 103:17, 103:22
**conclusion** [1] - 109:22
**conclusions** [2] - 8:1, 63:21
**concurred** [1] - 123:23
**condition** [3] - 127:23, 169:15, 189:7
**conditions** [2] - 107:13, 188:22
**conduct** [11] - 37:23, 58:10, 58:23, 59:16, 104:1, 118:4, 131:25, 154:5, 162:5, 168:18, 180:25
**conducted** [11] - 17:17, 19:6, 19:13, 38:1, 123:25, 125:17, 129:16, 130:19, 182:13, 188:18
**conducting** [2] - 122:19, 171:4
**Conference** [2] - 142:14, 142:19
**conference** [4] - 53:3, 133:25, 142:8, 142:20
**conferences** [4] - 27:5, 37:20, 153:15
**conferred** [2] - 133:18, 134:22
**Confidential** [1] - 124:24
**confines** [1] - 84:22
**confirming** [1] - 94:8
**conflict** [23] - 23:14, 23:18, 23:20, 24:7, 24:9, 27:13, 27:17, 28:4, 29:18, 41:13, 41:21, 41:22, 60:9, 74:1, 74:13, 75:3, 75:5, 75:6, 75:10, 152:10, 175:20,

176:14
**conflicts** [1] - 40:19
**confront** [1] - 156:7
**conjecture** [1] - 68:17
**Connecticut** [1] - 188:8
**connection** [7] - 66:10, 66:22, 122:25, 124:16, 140:8, 150:1, 167:6
**consensus** [1] - 180:6
**consequences** [2] - 157:16, 171:3
**consider** [11] - 13:1, 24:14, 24:15, 57:23, 67:7, 72:20, 84:12, 96:1, 107:19, 128:6, 134:11
**considered** [8] - 12:16, 12:20, 30:16, 39:1, 73:8, 106:17, 108:1, 170:10
**considering** [1] - 110:22
**consistent** [8] - 68:9, 86:12, 88:15, 88:20, 88:21, 105:19, 106:9, 116:19
**consolidated** [1] - 24:25, 36:24
**constantly** [1] - 134:13
**constitutes** [1] - 153:12
**consult** [2] - 7:12, 165:17
**consultant** [1] - 54:21
**consultation** [2] - 100:12, 164:2
**Consultation** [1] - 124:25
**consultations** [1] - 161:23
**consulted** [5] - 21:5, 56:20, 56:25, 125:5, 144:18
**consulting** [4] - 16:20, 56:17, 145:3, 165:14
**contact** [11] - 37:19, 115:14, 115:18, 116:13, 117:14, 117:19, 117:21, 117:22, 129:13, 140:19, 140:25
**contacted** [2] - 117:17, 117:19
**contacts** [1] - 37:20
**contain** [1] - 138:21
**contained** [1] - 116:18
**contemplating** [1] -

31:19
**context** [4] - 77:1, 84:4, 100:4, 184:16
**contextual** [1] - 170:1
**contextualizes** [1] - 149:11
**contextualizing** [1] - 170:4
**continuance** [6] - 53:4, 55:20, 56:6, 96:23, 134:20, 155:25
**continuances** [1] - 56:13
**continue** [8] - 25:6, 55:17, 64:20, 78:17, 78:24, 110:19, 119:7, 136:20
**CONTINUED** [1] - 104:20
**continued** [4] - 55:24, 64:14, 136:22, 136:25
**continued)** [1] - 62:8
**continues** [1] - 178:15
**continuing** [5] - 115:10, 136:19, 141:15, 147:14, 178:19
**continuously** [1] - 78:11
**contract** [7] - 11:22, 11:23, 23:12, 23:14, 40:18, 73:23, 82:23
**contracted** [1] - 58:5
**contractor** [2] - 112:21, 112:24
**contracts** [1] - 29:18
**contravention** [1] - 26:5
**conversation** [10] - 57:17, 69:2, 100:8, 109:1, 109:9, 123:18, 123:20, 124:7, 131:15, 157:9
**conversations** [4] - 26:18, 100:10, 126:4, 134:5
**conveyed** [2] - 124:2, 125:10
**convince** [1] - 99:21
**cooperative** [3] - 43:1, 43:2, 43:8
**coordinator** [1] - 138:25
**copies** [1] - 116:23
**copy** [6] - 18:2, 36:5, 42:20, 62:15, 102:2, 138:17
**core** [5] - 158:13,

163:23, 179:9, 181:9, 181:13
**Cornelius** [1] - 121:6
**Cornell** [1] - 144:16
**Cornellier** [1] - 121:11
**corner** [1] - 42:15
**coronal** [1] - 185:17
**corpus** [3] - 139:11, 140:6, 181:24
**Correctional** [1] - 117:7
**correctional** [4] - 114:21, 115:16, 116:3, 160:2
**corresponded** [1] - 117:7
**correspondence** [2] - 16:16, 43:14
**corroborated** [1] - 164:14
**corroborating** [1] - 94:9
**cortex** [1] - 31:22
**cost** [1] - 162:8
**cost-effective** [1] - 162:8
**Costanzi** [1] - 112:13
**Counsel** [14] - 4:5, 8:23, 24:6, 28:20, 30:2, 33:4, 65:24, 66:24, 67:3, 72:20, 80:20, 99:1, 111:13, 132:12
**counsel** [73] - 4:6, 4:21, 7:19, 11:12, 11:20, 11:24, 14:24, 23:4, 25:6, 28:22, 32:4, 35:21, 35:23, 37:5, 42:2, 44:22, 60:24, 64:2, 64:15, 69:1, 71:16, 76:10, 77:11, 79:7, 86:15, 102:19, 103:4, 105:21, 116:6, 117:20, 118:25, 120:13, 122:22, 123:14, 129:20, 130:10, 131:17, 132:24, 135:13, 137:1, 137:25, 138:4, 139:8, 139:22, 140:3, 145:10, 147:19, 152:10, 154:3, 154:4, 168:23, 172:3, 172:15, 172:17, 172:18, 173:3, 173:17, 173:23, 174:10, 175:20, 176:7,

176:10, 179:17, 183:10, 190:25, 191:6, 191:12, 191:19, 191:23, 191:25, 192:5
**counsel's** [3] - 5:2, 144:3, 151:11
**counseling** [2] - 114:21, 159:21
**Counseling** [1] - 90:20
**Counselor..** [1] - 108:16
**counties** [1] - 75:10
**country** [10] - 140:24, 141:22, 142:2, 143:8, 153:10, 153:13, 156:7, 158:6, 174:2, 182:5
**county** [5] - 28:5, 28:6, 28:7, 58:8, 153:3
**County** [59] - 11:22, 12:15, 13:9, 13:10, 13:12, 14:16, 23:15, 23:21, 24:3, 24:7, 24:9, 27:13, 27:19, 28:2, 29:18, 36:18, 39:18, 39:22, 40:18, 41:18, 41:19, 42:5, 42:20, 42:23, 57:9, 57:22, 73:23, 73:25, 74:13, 74:21, 75:3, 75:6, 75:8, 75:13, 81:7, 81:8, 81:10, 81:16, 81:19, 81:20, 81:24, 82:3, 82:5, 82:8, 82:23, 83:2, 83:7, 83:11, 84:1, 84:3, 84:9, 90:20, 95:4, 101:24, 110:17, 113:4
**couple** [6] - 8:14, 13:4, 21:25, 44:9, 74:24, 110:7, 142:14, 143:12, 147:2, 160:6
**course** [15] - 24:23, 39:18, 46:22, 59:5, 61:4, 82:2, 82:16, 99:22, 104:7, 115:19, 116:11, 118:8, 119:20, 132:17, 153:9
**court's** [5] - 7:17, 15:25, 32:6, 76:23, 104:22
**court-appointed** [2] - 139:8, 182:8
**courtesy** [1] - 57:13

courtroom [2] - 8:4, 8:9
courts [6] - 25:18, 68:13, 139:9, 139:20, 148:7, 174:16
cover [2] - 71:23, 71:25
Craig [10] - 16:23, 22:16, 46:8, 48:18, 53:23, 56:20, 83:16, 100:18, 125:24, 130:3
create [1] - 150:4
created [2] - 139:18, 145:8
credentials [2] - 90:3
credibility [2] - 151:11, 171:21
credible [1] - 171:2
Creech [3] - 23:25, 74:22
Creech's [1] - 74:20
crime [6] - 86:2, 149:12, 149:22, 150:1, 151:13, 151:14
criminal [11] - 11:16, 12:3, 13:25, 20:8, 26:2, 41:24, 41:25, 46:22, 99:24, 160:2, 160:3
Criminal [4] - 139:8, 141:20, 143:24, 178:2
critical [1] - 173:19
cross [9] - 19:18, 69:23, 70:12, 71:22, 71:25, 131:25, 132:4, 169:4, 176:21
CROSS [5] - 20:3, 73:17, 132:8, 135:16, 176:22
cross-examination [3] - 70:12, 131:25, 169:4
CROSS-EXAMINATION [5] - 20:3, 73:17, 132:8, 135:16, 176:22
cross-examine [2] - 71:22, 132:4
crossed [1] - 158:19
cryptic [1] - 118:17
CT [10] - 105:7, 120:11, 120:14, 122:3, 122:9, 130:15, 167:8, 185:1, 187:24, 188:1
cubic [1] - 60:12

current [5] - 11:5, 102:2, 112:20, 139:13, 141:12
custodian [1] - 120:7
cut [5] - 82:19, 102:3, 169:6, 185:13, 185:14
cyclical [1] - 161:8
Czuba [6] - 4:9, 9:18, 111:19, 112:7, 133:4, 136:7
CZUBA [37] - 4:11, 4:14, 4:18, 5:4, 5:9, 5:11, 6:17, 6:19, 6:23, 6:25, 7:10, 7:22, 7:24, 8:11, 8:13, 9:1, 9:19, 9:25, 10:3, 34:14, 111:20, 112:9, 129:23, 130:1, 130:2, 131:8, 131:21, 133:5, 136:8, 136:10, 137:3, 137:10, 137:23, 183:3, 183:9, 183:17, 191:2
d'Alene [1] - 34:11
damage [45] - 16:20, 17:12, 50:17, 56:17, 59:13, 59:22, 92:2, 103:10, 104:24, 105:16, 105:19, 106:10, 106:13, 106:18, 106:22, 107:16, 108:6, 108:25, 109:5, 157:3, 157:4, 157:5, 157:12, 157:15, 159:25, 163:10, 164:22, 165:7, 165:17, 165:20, 165:25, 166:5, 167:1, 169:13, 170:13, 170:16, 170:24, 171:1, 173:18, 173:20, 173:23, 173:25, 175:16, 176:2, 176:7
damaged [2] - 157:6, 170:8
dangerousness [1] - 114:11
date [13] - 28:16, 44:3, 46:1, 47:19, 49:18, 49:21, 54:11, 55:18, 64:5, 78:6, 121:13, 122:15
dates [3] - 38:18, 116:18, 160:10
dating [2] - 153:21, 164:11

David [3] - 25:19, 61:24, 85:4
days [3] - 22:1, 64:15, 143:12
dead [2] - 29:4, 56:10
deadline [1] - 155:21
deadlines [2] - 155:14, 155:15
deal [8] - 67:11, 101:8, 103:16, 118:17, 147:20, 155:23, 173:17, 189:9
dealing [3] - 8:14, 65:21, 174:10
deals [2] - 184:3, 184:15
dealt [5] - 50:16, 68:5, 82:17, 115:15, 174:8
dear [1] - 53:19
death [45] - 32:3, 39:2, 52:21, 95:20, 113:8, 139:9, 139:12, 139:18, 140:4, 140:7, 140:9, 140:10, 140:11, 141:7, 141:23, 142:1, 142:22, 142:24, 144:4, 144:7, 145:7, 145:10, 145:11, 145:16, 145:19, 146:1, 146:10, 149:11, 149:17, 150:23, 151:5, 151:9, 153:1, 153:3, 153:19, 154:17, 157:13, 158:15, 158:16, 159:11, 165:20, 165:25, 180:2, 180:3, 180:7
Death [4] - 139:1, 139:10, 140:23, 143:25
debilitating [1] - 71:13
decades [2] - 68:6, 188:13
deceased [1] - 123:4
December [2] - 17:17, 77:8
decide [13] - 28:16, 44:3, 65:5, 67:8, 82:24
decimal [1] - 40:3
decision [6] - 28:23, 54:20, 67:8, 96:12, 151:12, 191:23
decision-making [1] - 191:23
decisions [1] - 41:14
declaration [5] - 127:9, 138:18,

138:19, 144:12, 156:24
declare [1] - 147:20
decline [1] - 102:24
declined [1] - 102:9
dedicated [1] - 141:5
deemed [1] - 105:2
deeply [1] - 101:15
defendant [13] - 38:15, 44:6, 44:7, 114:6, 114:16, 114:23, 115:11, 115:15, 115:16, 115:18, 115:19, 153:25
defendant's [2] - 115:1, 115:11
defended [1] - 154:17
Defender [11] - 14:16, 36:18, 40:18, 74:13, 139:17, 140:18, 143:7, 153:15, 158:2, 158:4, 179:12
defender [8] - 23:11, 28:1, 139:2, 139:7, 143:6, 143:8, 154:18, 174:16
Defender's [3] - 12:15, 23:23, 29:19, 39:22, 42:5, 42:20, 42:24, 57:9, 57:22, 73:25, 113:4, 113:6
defenders [2] - 153:17, 182:8
Defenders [1] - 11:22
defenders' [1] - 182:8
Defense [5] - 141:21, 142:17, 143:14, 143:24, 178:2
defense [29] - 11:16, 13:25, 20:8, 26:2, 88:25, 99:19, 99:24, 100:5, 114:4, 141:6, 142:25, 143:20, 150:12, 150:15, 151:9, 151:12, 154:19, 155:22, 158:21, 159:11, 168:8, 168:25, 169:11, 170:6, 170:12, 178:1, 181:19, 182:2, 183:3
deficits [1] - 190:10
define [3] - 48:25, 149:8, 181:9
defined [2] - 149:9, 149:14
definitely [4] - 92:12, 110:21, 123:23, 181:13

definition [2] - 104:14, 150:5
definitions [1] - 149:15
degree [1] - 68:7
degrees [2] - 177:6, 185:4
deliberate [1] - 150:8
delightful [1] - 28:14
demands [1] - 53:9
demeanor [1] - 171:21
demonstrate [2] - 155:1, 187:10
demonstrating [1] - 187:9
demonstrative [4] - 35:18, 35:23, 36:1, 55:4
demonstratives [1] - 183:10
denial [3] - 80:23, 102:13, 151:9
denied [23] - 14:12, 15:2, 15:9, 15:16, 15:20, 16:1, 16:2, 19:14, 25:10, 41:2, 41:5, 41:6, 63:11, 65:8, 80:8, 81:2, 81:5, 81:23, 82:2, 82:6, 84:5, 111:6, 151:20
deny [1] - 150:20
denying [1] - 28:24
dependent [1] - 154:18
depose [1] - 59:20
deposed [6] - 17:14, 64:18, 68:25, 69:11, 69:13, 69:16
deposition [9] - 9:4, 9:19, 17:15, 17:16, 17:19, 18:1, 18:6, 18:18, 30:9
depositions [3] - 30:15, 30:21, 64:16
depressed [2] - 68:8, 71:10
depression [13] - 67:18, 67:24, 68:3, 68:6, 68:16, 70:13, 70:16, 70:25, 71:4, 71:13, 122:16, 188:23, 188:24
depressions [1] - 67:24
deputy [2] - 12:16, 23:11
describe [6] - 37:10, 39:24, 126:14, 127:23, 128:3, 134:2

**described** [7] - 100:7, 100:9, 103:1, 105:5, 159:18, 161:7, 162:1
**description** [3] - 47:6, 105:14, 105:16
**descriptions** [1] - 104:24
**designate** [1] - 11:23
**designated** [1] - 148:11
**designed** [1] - 143:10
**desire** [1] - 25:8
**desires** [2] - 25:16
**despite** [4] - 25:16, 30:16, 80:23, 105:16
**detail** [3] - 32:19, 41:8, 81:5
**determination** [6] - 6:22, 26:11, 72:19, 145:11, 149:20, 169:13
**determine** [4] - 66:6, 114:17, 123:25, 180:5
**develop** [4] - 99:13, 113:23, 114:8, 114:10
**developed** [3] - 100:1, 103:3, 159:10
**developing** [1] - 116:20
**development** [3] - 110:19, 154:10, 162:22
**developmental** [3] - 167:15, 167:23, 168:3
**developments** [2] - 142:24, 142:25
**deviation** [1] - 167:21
**devoted** [1] - 143:22
**diagnose** [2] - 106:12, 106:18
**diagnosed** [1] - 98:6
**diagnoses** [2] - 169:1, 169:11
**diagnosing** [1] - 188:16
**diagnosis** [15] - 84:24, 88:7, 89:9, 103:5, 103:20, 104:8, 104:12, 107:4, 107:8, 107:12, 168:11, 168:16, 168:18, 170:3, 190:16
**diagram** [1] - 62:14
**dialogue** [3] - 164:19, 166:10, 173:6
**die** [1] - 25:5

**differ** [1] - 185:21
**difference** [4] - 154:2, 166:7, 187:8, 189:23
**different** [13] - 89:12, 90:4, 92:10, 146:8, 152:2, 160:6, 162:18, 169:25, 170:18, 184:24, 186:22, 187:10, 187:18
**differently** [2] - 46:23, 68:15
**differs** [1] - 184:7
**difficult** [1] - 29:23
**difficulty** [1] - 113:21
**digress** [1] - 127:17
**diligently** [1] - 134:9
**dimension** [1] - 150:7
**dimensional** [4] - 185:7, 185:8, 185:19, 185:20
**direct** [21] - 10:19, 24:24, 25:1, 26:5, 35:5, 45:14, 65:17, 71:18, 77:20, 83:13, 99:2, 100:11, 121:2, 121:12, 133:3, 139:10, 139:21, 179:18, 179:23, 182:7, 183:5
**DIRECT** [5] - 11:1, 36:9, 112:8, 138:15, 183:16
**directed** [1] - 130:5
**direction** [5] - 111:23, 123:13, 129:17, 131:17, 185:16
**directions** [1] - 111:24
**directive** [4] - 116:7, 117:20, 129:12, 129:13
**directives** [1] - 129:10
**directly** [5] - 4:7, 41:9, 41:18, 81:12, 145:3
**director** [1] - 139:16
**Disabilities** [1] - 144:1
**disability** [5] - 127:22, 150:5, 150:6, 150:7, 157:7
**disabled** [2] - 26:9, 26:12
**disadvantage** [1] - 157:7
**disagreed** [1] - 92:20
**discharge** [1] - 30:12
**discharges** [1] - 187:20
**disciplinary** [11] - 65:21, 66:1, 66:19, 67:5, 67:10, 67:19,

68:21, 70:6, 70:8, 70:14, 71:14
**disciplines** [1] - 190:2
**disclosed** [3] - 58:17, 156:4, 167:7
**discovered** [1] - 127:18
**discovery** [2] - 46:9, 53:2
**discuss** [1] - 171:16
**discussed** [7] - 51:21, 76:10, 130:20, 138:1, 140:9, 177:11, 178:18
**discussing** [5] - 51:19, 68:22, 176:1, 176:4, 176:6
**discussion** [1] - 109:21
**discussions** [1] - 191:14
**disease** [3] - 92:3, 184:6, 189:8
**disorder** [28] - 84:23, 88:2, 88:8, 88:16, 89:4, 89:7, 89:14, 90:25, 91:1, 98:7, 103:1, 103:18, 103:23, 104:25, 105:13, 105:18, 106:9, 168:7, 168:9, 168:11, 168:19, 169:1, 169:12, 170:9, 170:11, 170:17, 188:21, 189:1
**disorders** [7] - 157:19, 163:24, 188:19, 188:22, 188:24, 188:25, 189:1
**display** [1] - 186:19
**displays** [1] - 186:25
**disposed** [1] - 41:1
**dispute** [1] - 67:6
**disputed** [1] - 67:10
**disqualifies** [2] - 103:5, 103:10
**dissatisfaction** [1] - 21:12
**Dissociative** [1] - 131:14
**distinct** [1] - 152:22
**distinction** [2] - 49:1, 148:25
**distinguishable** [1] - 187:17
**District** [4] - 139:2, 146:17, 146:18
**district** [2] - 15:14, 182:21

**dived** [1] - 76:5
**DNA** [1] - 163:3
**DNK** [1] - 46:8
**DNR** [3] - 47:23, 47:24, 47:25
**Doc** [1] - 163:19
**doctor** [7] - 49:3, 50:11, 133:18, 168:22, 177:4, 183:24, 184:9
**doctors** [3] - 48:22, 101:13, 162:18
**document** [17] - 44:18, 45:22, 47:14, 62:6, 63:20, 72:19, 107:20, 118:14, 124:23, 126:25, 127:1, 129:23, 130:2, 130:12, 131:9, 172:15
**document-by-document** [1] - 72:19
**documentary** [2] - 154:8, 154:11
**documented** [1] - 164:14
**documents** [24] - 21:23, 22:20, 57:2, 63:2, 63:4, 82:21, 119:19, 125:14, 132:17, 132:21, 132:23, 134:3, 135:21, 136:2, 156:24, 160:5, 164:5, 164:6, 164:22, 172:4, 172:7, 173:4, 173:6, 173:13
**Donald** [1] - 124:16
**done** [47] - 17:7, 23:12, 30:6, 38:22, 47:5, 49:2, 49:4, 51:18, 61:10, 63:12, 65:7, 71:17, 71:19, 78:16, 86:15, 86:16, 91:10, 91:25, 92:6, 95:19, 95:20, 96:3, 101:5, 101:8, 102:25, 109:22, 110:9, 110:23, 128:4, 128:6, 130:16, 141:14, 143:18, 151:22, 151:23, 155:21, 159:4, 161:17, 162:8, 162:11, 163:8, 163:15, 169:5, 180:7, 181:2, 186:2
**Dorothy** [1] - 165:23

**Dotson** [2] - 73:4, 192:7
**doubt** [5] - 23:10, 26:24, 89:15, 132:20, 132:23
**down** [27] - 5:8, 15:7, 19:2, 29:22, 30:1, 30:4, 34:9, 41:10, 46:15, 50:3, 54:9, 54:13, 57:20, 58:15, 68:11, 100:6, 111:9, 119:5, 124:20, 125:25, 126:25, 127:3, 133:6, 137:6, 155:17, 173:14, 182:19
**downtime** [2] - 70:20, 70:22
**dozen** [1] - 149:25
**Dr** [116] - 5:13, 5:14, 5:15, 7:11, 22:16, 22:23, 46:8, 46:17, 47:6, 47:18, 48:18, 48:19, 50:6, 50:19, 56:20, 56:21, 84:22, 85:4, 85:7, 85:8, 85:12, 85:15, 85:19, 85:21, 86:5, 86:8, 86:25, 87:3, 87:4, 87:7, 87:17, 87:23, 88:1, 88:4, 88:9, 88:13, 88:15, 88:17, 88:20, 88:21, 88:24, 89:6, 89:8, 89:16, 89:18, 89:23, 90:8, 90:11, 90:12, 90:14, 91:14, 93:4, 93:8, 93:9, 93:10, 93:13, 93:17, 93:20, 94:13, 94:18, 94:2, 94:25, 95:2, 95:5, 96:25, 97:1, 97:5, 97:6, 97:11, 97:12, 97:13, 98:10, 99:6, 99:8, 99:11, 100:8, 100:13, 100:14, 105:8, 106:25, 107:4, 109:1, 109:9, 109:11, 109:15, 122:25, 123:3, 123:4, 123:6, 123:19, 123:20, 124:8, 124:16, 124:25, 125:1, 125:2, 125:4, 130:9, 130:15, 130:18, 131:17, 133:19, 137:21, 157:10, 161:7, 165:22, 165:23, 183:3,

183:18
**drafting** [2] - 43:17, 134:22
**dramatic** [1] - 167:20
**dramatically** [1] - 160:14
**draw** [2] - 153:4, 153:11
**drawing** [3] - 166:11, 166:12, 174:9
**Dretke** [1] - 149:24
**drop** [3] - 25:8, 25:14, 167:20
**dropped** [3] - 55:13, 65:15, 160:14
**Drs** [1] - 105:5
**drug** [1] - 188:10
**drummed** [1] - 150:15
**dual** [1] - 175:12
**due** [2] - 22:7, 91:24
**dumb** [1] - 99:10
**during** [20] - 17:19, 20:25, 22:16, 22:24, 23:20, 24:23, 25:21, 25:23, 75:17, 76:5, 77:20, 82:1, 94:4, 119:20, 129:5, 132:17, 134:12, 153:23, 178:17, 191:23
**duties** [2] - 37:11, 154:3
**duty** [4] - 103:2, 144:3, 154:5, 162:5
**dysfunctional** [1] - 169:15
**eager** [1] - 78:13
**early** [11] - 11:13, 21:5, 93:22, 113:16, 142:18, 151:1, 157:18, 158:18, 159:4, 165:11, 167:12
**earned** [1] - 40:17
**earning** [1] - 40:16
**easier** [3] - 33:15, 58:14, 110:18
**easily** [1] - 171:16
**Ed** [1] - 144:14
**edit** [1] - 143:18
**edited** [1] - 144:13
**edition** [2] - 179:6, 181:24
**education** [1] - 141:15
**educational** [4] - 114:21, 116:1, 160:1, 164:25
**EEG** [2] - 187:12, 187:13
**effect** [4] - 5:3, 150:8,

160:5, 178:12
**effective** [5] - 39:8, 139:21, 159:2, 162:8, 174:21
**effectively** [1] - 145:6
**effectiveness** [2] - 175:24, 176:3
**efficient** [3] - 72:22, 73:13, 176:10
**efficiently** [1] - 45:8
**effort** [1] - 63:12
**efforts** [1] - 110:19
**eight** [1] - 70:9
**either** [21] - 9:23, 14:14, 25:13, 31:24, 32:20, 44:23, 45:14, 72:11, 72:20, 73:2, 89:21, 100:17, 103:10, 127:7, 139:9, 139:11, 145:2, 147:22, 165:9, 175:2, 189:7
**elaborate** [2] - 118:17, 173:3
**Elam** [3] - 9:5, 9:19, 12:3
**electrical** [3] - 187:14, 187:15, 187:19
**electrodes** [1] - 187:15
**electroencephalogra m** [1] - 187:13
**elements** [1] - 159:15
**eligible** [1] - 145:10
**embarrassed** [2] - 161:1, 169:22
**emission** [1] - 186:23
**emitted** [1] - 186:20
**emotional** [2] - 58:17, 170:21
**emotions** [2] - 184:15, 189:9
**empathy** [1] - 149:13
**emphasized** [1] - 157:21
**empirical** [1] - 151:4
**employ** [1] - 49:9
**employed** [2] - 138:24, 138:25
**employment** [6] - 11:5, 112:20, 115:15, 116:4, 158:7, 160:1
**enclosed** [1] - 53:19
**encoded** [1] - 163:2
**end** [6] - 66:14, 67:9, 83:21, 108:17, 126:1, 165:13
**ending** [1] - 48:8
**engage** [2] - 159:3,

164:19
**engaged** [2] - 39:25, 173:8
**Engle** [5] - 88:9, 88:15, 88:21, 106:25, 107:4
**enter** [1] - 40:10
**entered** [4] - 7:1, 52:25, 53:1, 69:7
**entering** [1] - 96:12
**entire** [9] - 5:18, 36:22, 40:20, 101:11, 102:5, 105:11, 168:3, 172:8, 183:21
**entirely** [2] - 100:9, 165:5
**entitled** [1] - 7:6
**epilepsy** [1] - 187:19
**equivalent** [1] - 140:25
**era** [1] - 153:23
**escape** [1] - 99:24
**especially** [2] - 12:20, 172:19
**essentially** [1] - 31:7
**establish** [3] - 118:7, 118:10, 155:7
**established** [3] - 30:3, 42:22, 66:10
**establishing** [1] - 66:22
**estimate** [1] - 145:1
**estimates** [1] - 168:13
**et** [1] - 166:24
**etiologies** [1] - 165:6
**evaluated** [2] - 157:13, 161:19
**eve** [2] - 38:21, 39:1
**event** [3] - 32:21, 71:11, 99:5
**events** [4] - 30:19, 70:7, 71:14, 116:18
**eventually** [2] - 41:10, 159:10
**evidentiary** [21] - 4:4, 17:11, 28:16, 53:13, 54:5, 59:10, 59:21, 60:4, 60:17, 60:20, 62:5, 78:19, 78:25, 96:20, 96:22, 109:6, 109:21, 135:11, 136:12, 136:15, 175:6
**evoke** [1] - 171:24
**evokes** [2] - 149:11, 149:13
**evolution** [1] - 178:19
**evolve** [1] - 178:15
**evolved** [1] - 184:14

**evolving** [1] - 180:12
**ex** [1] - 181:22
**exactly** [12] - 23:22, 38:18, 56:1, 71:6, 73:22, 77:1, 83:6, 96:3, 110:22, 118:18, 120:21, 154:20
**exam** [1] - 164:13
**EXAMINATION** [21] - 11:1, 20:3, 29:15, 31:5, 33:17, 36:9, 69:25, 73:17, 100:25, 103:14, 104:20, 111:4, 112:8, 132:8, 133:11, 135:16, 136:9, 138:15, 176:22, 181:17, 183:16
**examination** [11] - 35:17, 36:22, 45:14, 52:11, 52:12, 70:12, 77:20, 131:25, 164:8, 169:4, 188:4
**examine** [4] - 71:22, 116:19, 132:4, 137:19
**examined** [4] - 34:17, 87:22, 88:14, 190:3
**example** [7] - 150:3, 158:8, 165:19, 168:18, 171:14, 178:21, 178:24
**exams** [1] - 190:3
**exceedingly** [1] - 126:18
**except** [2] - 118:19, 190:14
**exception** [1] - 9:1
**exchange** [1] - 18:22
**exclude** [1] - 104:14
**excluded** [3] - 7:4, 7:11, 7:21
**excluding** [1] - 103:20
**exclusion** [3] - 7:2, 150:4, 150:7
**exclusively** [2] - 140:11, 189:19
**excuse** [5] - 34:20, 45:24, 47:10, 51:2, 83:15
**excused** [3] - 34:11, 34:12, 111:11
**excuses** [1] - 111:16
**executed** [1] - 25:8
**execution** [1] - 157:14
**executions** [1] - 61:11
**executive** [1] - 190:21
**exhaustive** [3] - 114:7,

114:20, 115:8
**existence** [2] - 66:3, 188:5
**expand** [1] - 92:6
**expansive** [2] - 115:4, 115:6
**expect** [3] - 78:5, 82:11, 137:19
**expectation** [5] - 78:17, 78:24, 95:4, 95:6, 95:10
**expected** [1] - 159:1
**expedite** [1] - 5:18
**expenditure** [1] - 81:21
**expense** [2] - 57:24, 57:25
**expenses** [3] - 15:20, 27:19, 28:5
**expensive** [3] - 58:4, 59:6, 82:18
**experience** [10] - 93:9, 138:22, 153:5, 153:6, 157:4, 166:11, 166:24, 174:9, 178:9, 191:20
**experienced** [2] - 61:9, 172:11
**experiences** [2] - 59:12, 165:9
**expert** [60] - 5:13, 5:16, 5:22, 6:1, 6:2, 6:12, 12:2, 14:22, 31:20, 41:6, 54:21, 58:19, 60:19, 61:13, 64:19, 79:16, 79:22, 80:4, 80:5, 84:6, 88:9, 88:21, 88:24, 88:25, 94:22, 94:23, 97:20, 100:13, 108:1, 146:3, 146:14, 146:25, 147:5, 147:8, 147:21, 147:23, 148:3, 148:11, 148:16, 161:21, 161:22, 162:16, 163:10, 163:19, 163:21, 164:23, 165:19, 166:20, 166:25, 171:1, 172:25, 173:1, 173:4, 173:6, 173:10, 175:6, 177:8, 179:1
**expertise** [10] - 5:24, 6:8, 6:22, 147:13, 161:23, 162:10, 162:18, 163:12, 168:21, 189:24

**experts** [54] - 6:10, 16:19, 37:21, 37:22, 41:12, 51:22, 52:14, 52:15, 56:16, 56:18, 58:8, 68:5, 87:22, 88:15, 89:6, 89:11, 89:13, 90:5, 92:20, 96:9, 98:6, 103:3, 104:4, 106:15, 114:8, 125:14, 125:18, 159:1, 162:14, 162:22, 162:23, 162:24, 163:17, 164:5, 164:6, 164:7, 164:10, 164:17, 164:18, 165:17, 166:3, 166:7, 166:11, 166:14, 166:17, 166:18, 168:12, 172:19, 172:22, 173:11, 173:14, 190:12

**explain** [4] - 41:16, 82:14, 99:12, 100:3

**explainable** [1] - 103:9

**explained** [2] - 20:5, 113:20

**explanation** [3] - 81:5, 126:23, 170:1

**explanations** [1] - 118:12

**explanatory** [1] - 150:10

**explicate** [1] - 161:25

**explicitly** [1] - 146:23

**exploration** [1] - 46:19

**explore** [1] - 163:9

**explored** [2] - 116:22, 166:25

**exploring** [1] - 173:23

**exposed** [2] - 165:11, 167:13

**exposure** [2] - 159:25, 165:10

**extension** [5] - 53:5, 53:8, 64:12, 64:14, 155:25

**extent** [1] - 170:14

**extraordinary** [2] - 53:9, 96:15

**extravaganza** [1] - 80:14

**extremely** [2] - 38:13, 99:11

**eye** [1] - 120:12

**eyes** [1] - 169:24

**face** [6] - 57:18, 58:13, 58:14, 171:10

**face-to-face** [1] - 171:10

**faced** [1] - 160:9

**fact** [42] - 14:23, 30:16, 31:4, 33:7, 54:20, 54:24, 65:12, 65:25, 80:10, 103:16, 106:20, 122:13, 140:21, 146:20, 151:16, 157:24, 169:17, 169:18, 178:22, 179:10, 180:9, 181:21

**factfinder** [5] - 14:2, 14:5, 14:9, 14:21, 15:8

**factors** [3] - 66:2, 102:1, 189:12

**facts** [1] - 150:20

**factual** [1] - 170:4

**faculty** [2] - 141:25, 143:13

**fade** [1] - 160:22

**failure** [1] - 67:23

**fair** [19] - 22:15, 25:24, 26:14, 28:19, 30:7, 31:7, 68:5, 70:18, 71:15, 75:20, 76:3, 76:7, 80:17, 87:15, 90:6, 90:17, 98:1, 98:3

**fairly** [4] - 21:5, 92:7, 118:17, 129:5

**false** [1] - 141:18

**familiar** [7] - 11:9, 11:11, 36:13, 36:15, 83:14, 87:13, 91:2

**family** [15] - 113:5, 114:22, 114:25, 115:11, 115:14, 117:13, 117:22, 123:25, 125:17, 129:13, 156:19, 160:19, 160:25, 163:2, 165:8

**far** [10] - 12:3, 23:18, 24:7, 24:8, 28:10, 84:1, 84:23, 140:9, 141:17, 164:4

**fashion** [1] - 118:17

**fashioning** [1] - 8:7

**father** [1] - 167:5

**favor** [1] - 171:5

**favorable** [1] - 170:10

**fax** [1] - 124:9

**faxed** [2] - 124:11, 124:12

**faxing** [1] - 129:4

**February** [1] - 64:7

**Federal** [3] - 139:1, 139:10, 140:23

**federal** [11] - 7:1, 21:24, 25:18, 139:7, 139:9, 139:11, 139:12, 140:6, 140:22, 141:12, 146:8, 146:10, 146:21, 155:10, 158:15, 181:23

**federal-sponsored** [1] - 141:12

**feed** [1] - 134:13

**feedback** [2] - 129:8, 159:9

**felt** [8] - 31:15, 68:14, 99:10, 113:23, 116:20, 129:3, 130:21

**few** [13] - 43:23, 65:20, 144:11, 145:18, 146:16, 149:5, 153:1, 153:19, 156:22, 158:12, 159:14, 183:21, 184:25

**field** [3] - 143:16, 186:5, 189:24

**fifth** [2] - 62:5, 160:14

**figure** [1] - 77:24

**figured** [2] - 75:4, 192:3

**file** [14] - 27:8, 45:9, 55:17, 55:25, 56:15, 66:18, 78:13, 78:15, 94:10, 94:21, 118:21, 118:24, 172:8, 172:10

**filed** [10] - 21:19, 25:17, 44:20, 52:1, 56:5, 76:17, 76:23, 76:25, 77:1, 78:22

**files** [4] - 27:7, 94:8, 135:21

**filing** [5] - 45:10, 78:2, 127:20, 134:21, 155:7

**film** [3] - 122:3, 122:5, 123:21

**final** [10] - 46:10, 46:13, 49:21, 49:24, 52:22, 53:2, 53:5, 53:7, 64:9, 108:14

**financial** [6] - 13:7, 21:14, 26:15, 26:21, 27:2, 40:13

**finder** [2] - 14:23, 33:6

**findings** [4] - 63:21, 122:10, 125:7, 126:6

**fine** [4] - 35:3, 66:16, 80:9

**finish** [2] - 50:3, 179:15

**finished** [1] - 118:25

**fire** [1] - 141:18

**firm** [9] - 20:16, 20:19, 28:16, 37:1, 37:3, 40:13, 41:23, 42:4

**first** [29] - 4:17, 8:14, 10:5, 21:7, 35:13, 40:2, 41:6, 52:6, 54:14, 54:16, 56:7, 78:14, 81:1, 87:15, 91:21, 96:8, 96:16, 121:16, 141:7, 143:18, 145:6, 148:22, 150:17, 150:20, 151:21, 172:21, 179:6, 188:7

**fit** [1] - 169:13

**five** [7] - 64:3, 65:16, 139:25, 141:15, 142:5, 143:20, 146:24

**five-volume** [1] - 143:20

**flags** [1] - 156:4

**flat** [3] - 43:7, 185:6, 191:15

**flexibility** [1] - 67:12

**Florida** [2] - 161:7, 180:4

**Florida's** [1] - 157:13

**flow** [5] - 102:5, 186:17, 186:20, 186:21, 186:25

**focus** [3] - 43:24, 148:23, 191:22

**focused** [4] - 36:22, 141:22, 162:20, 189:19

**folks** [1] - 134:10

**follow** [18] - 14:25, 15:12, 15:25, 31:4, 32:4, 32:23, 33:10, 71:16, 104:22, 120:8, 120:13, 122:19, 129:17, 134:6, 134:7, 136:7, 154:7, 173:3

**follow-up** [6] - 14:25, 31:4, 32:23, 33:10, 129:17, 136:7

**following** [1] - 133:14

**foot** [1] - 120:6

**footer** [1] - 39:17

**footnote** [1] - 181:21

**forced** [1] - 95:18

**forego** [1] - 4:6

**forensic** [4] - 14:22, 80:9

**finish** [2] - 50:3, 179:15

**finished** [1] - 118:25

**fire** [1] - 141:18

**firm** [9] - 20:16, 20:19, 28:16, 37:1, 37:3, 40:13, 41:23, 42:4

**first** [29] - 4:17, 8:14, 10:5, 21:7, 35:13, 40:2, 41:6, 52:6, 54:14, 54:16, 56:7, 78:14, 81:1, 87:15, 91:21, 96:8, 96:16, 121:16, 141:7, 143:18, 145:6, 148:22, 150:17, 150:20, 151:21, 172:21, 179:6, 188:7

**161:22, 166:9**

**forgot** [1] - 63:3

**forgotten** [1] - 9:22

**formal** [4] - 55:22, 57:11, 107:4, 150:5

**formally** [2] - 73:12, 93:20

**formed** [2] - 157:24, 158:18

**former** [1] - 27:25

**forming** [1] - 8:7

**forth** [8] - 6:12, 9:3, 40:4, 156:24, 160:4, 170:20, 172:1, 180:4

**forward** [3] - 41:18, 127:20, 138:3

**forwarded** [2] - 41:19, 81:11

**foundation** [6] - 9:7, 10:1, 66:5, 66:13, 66:22, 147:21

**founded** [1] - 140:2

**four** [18] - 13:16, 25:20, 46:10, 46:13, 47:21, 89:11, 89:13, 90:4, 97:23, 98:6, 103:17, 121:20, 143:20, 144:2, 146:23, 179:9, 181:9, 181:13

**fourteen** [1] - 146:8

**fourths** [1] - 120:11

**frame** [4] - 70:3, 106:2, 116:2, 163:18

**frames** [1] - 178:10

**Francisco** [2] - 140:2, 140:16

**free** [2] - 33:7, 72:20

**frequencies** [1] - 187:17

**frequently** [5] - 49:10, 56:20, 143:12, 190:9, 190:19

**fresher** [1] - 69:18

**Friday** [1] - 142:12

**friend** [3] - 12:14, 12:17, 25:7

**friends** [3] - 115:13, 115:17, 117:14

**friendships** [1] - 12:22

**front** [14] - 13:3, 18:19, 21:25, 24:3, 28:13, 39:10, 42:8, 44:1, 44:19, 58:2, 80:3, 147:20, 150:25, 185:18

**frontal** [1] - 190:22

**fronted** [1] - 58:5

**frontloading** [1] - 150:24

**fuel** [1] - 187:3
**fulfilling** [1] - 26:6
**full** [23] - 40:5, 48:5, 48:8, 48:10, 48:13, 48:14, 48:19, 50:7, 50:10, 50:13, 52:6, 74:12, 83:20, 93:10, 113:21, 114:1, 123:22, 126:2, 130:24, 130:25, 131:7, 131:12, 138:21
**full-blown** [2] - 83:20, 126:2
**full-scale** [2] - 48:5, 48:10
**fuller** [1] - 30:18
**fully** [6] - 53:6, 53:8, 65:5, 173:10, 179:22, 191:16
**function** [7] - 31:9, 60:23, 81:10, 158:21, 159:11, 187:9, 190:7
**functional** [5] - 187:21, 187:22, 187:25, 188:2, 189:8
**functioning** [10] - 122:14, 125:8, 154:10, 159:6, 170:21, 170:22, 172:13, 187:6, 190:10
**functions** [4] - 161:24, 184:5, 190:12, 190:21
**Fund** [2] - 142:17, 143:14
**fund** [1] - 28:7
**funded** [1] - 16:8
**funding** [26] - 14:13, 16:3, 17:2, 28:10, 32:20, 41:3, 57:5, 57:8, 57:21, 57:24, 57:25, 84:6, 102:13, 113:21, 117:6, 118:3, 126:8, 126:11, 140:23, 154:14, 154:16, 155:5, 155:6, 155:24, 181:22, 191:20
**funds** [3] - 94:22, 114:1, 117:25
**fungible** [1] - 162:17
**furiously** [1] - 129:5
**FURTHER** [1] - 135:16
**future** [2] - 18:5, 114:11
**fuzzy** [1] - 160:21

**G-O-O-D-Y** [1] - 112:6
**gather** [4] - 37:13, 133:9, 137:16, 164:17
**gathered** [2] - 118:14, 159:17
**gathering** [5] - 37:17, 101:6, 129:4, 161:12, 164:16
**general** [10] - 12:8, 16:16, 38:3, 43:18, 46:20, 57:21, 91:9, 102:7, 149:5, 152:5
**generally** [11] - 49:2, 78:23, 81:17, 92:14, 92:16, 116:17, 145:24, 157:5, 159:21, 185:17, 190:13
**generate** [2] - 40:6, 116:15
**generated** [5] - 40:7, 40:22, 119:20, 161:13, 186:1
**generation** [1] - 163:3
**generations** [1] - 114:24
**Georgetown** [2] - 123:5, 133:18
**Georgia** [1] - 180:4
**get-go** [1] - 101:14
**Giles** [31] - 85:4, 85:7, 85:12, 85:13, 85:15, 85:16, 85:21, 86:5, 86:8, 89:6, 89:8, 89:16, 89:18, 96:25, 97:5, 97:6, 97:11, 97:12, 97:13, 98:10, 99:6, 99:8, 99:11, 100:8, 109:1, 109:9, 109:11
**Giles'** [2] - 86:25, 87:17
**given** [5] - 53:9, 113:9, 130:13, 147:23, 178:23
**Glenn** [3] - 9:5, 12:3, 87:3
**glucose** [1] - 187:3
**GOODY** [1] - 111:25
**Goody** [34] - 12:5, 12:6, 21:3, 21:12, 37:9, 38:1, 42:12, 43:14, 45:24, 58:10, 59:1, 60:4, 95:3, 101:23, 111:20, 111:21, 112:5, 112:11, 112:18, 119:25, 120:25, 126:7, 132:5,

132:10, 135:18, 136:11, 137:6, 157:9, 159:18, 163:23, 165:18, 167:5, 171:7
**Goody's** [4] - 16:7, 37:10, 62:24, 158:8
**govern** [2] - 152:22, 192:8
**governing** [2] - 76:11, 77:4
**grade** [3] - 13:21, 13:23, 160:14
**gradient** [1] - 186:5
**grandfather** [2] - 116:3, 171:15
**grandparents** [1] - 115:12
**grant** [2] - 79:23, 83:9
**granted** [2] - 53:4, 64:14
**granting** [4] - 28:11, 28:14, 28:24, 65:2
**great** [5] - 67:11, 96:7, 101:8, 103:16, 118:17
**Greenberg** [1] - 5:14
**grew** [1] - 171:25
**Ground** [1] - 112:22
**group** [2] - 26:2, 50:14
**Grove** [1] - 141:17
**grow** [1] - 165:2
**growing** [1] - 163:5
**guard** [1] - 53:21
**guess** [17] - 11:21, 18:6, 30:5, 30:22, 50:15, 63:1, 71:5, 71:8, 74:6, 80:17, 85:17, 90:13, 101:16, 103:25, 147:14, 174:24, 175:22
**guessing** [1] - 27:24
**guidance** [2] - 57:14, 159:9
**guideline** [1] - 181:7
**Guidelines** [15] - 144:25, 174:14, 177:13, 177:14, 178:8, 178:11, 179:6, 180:10, 180:11, 181:3, 181:20, 181:24, 182:3, 182:11
**guidelines** [4] - 144:6, 159:10, 177:23, 179:8
**guilt** [2] - 150:12, 151:20, 152:6
**guilty** [1] - 150:22

**Gus** [5] - 12:12, 13:5, 23:11, 44:8, 74:4
**guys** [1] - 100:5
**habeas** [5] - 21:24, 139:11, 140:6, 141:1, 181:24
**habit** [2] - 16:19, 56:16
**hair** [1] - 56:9
**half** [2] - 82:18, 115:13
**half-siblings** [1] - 115:13
**hallmark** [1] - 154:12
**Halstead** [5] - 50:13, 52:13, 130:25, 131:12, 190:6
**Halstead-Reitan** [5] - 50:13, 52:13, 130:25, 131:12, 190:6
**hand** [1] - 95:18
**handle** [2] - 19:19, 73:12
**handled** [2] - 20:16, 23:17
**handling** [3] - 44:14, 106:2, 140:4
**handwritten** [3] - 42:13, 42:15, 118:18
**Hanley** [1] - 7:3
**hard** [6] - 12:25, 56:18, 87:18, 145:4, 160:10, 160:19
**harder** [1] - 76:1
**HARE** [1] - 131:13
**harm** [3] - 51:13, 51:14, 51:16
**harmed** [1] - 60:14
**harmful** [2] - 168:11, 170:11
**harried** [1] - 4:21
**hat** [1] - 60:24
**head** [3] - 123:5, 148:1, 167:14
**headed** [1] - 111:22
**header** [1] - 124:9
**heads** [1] - 192:7
**heads-up** [1] - 192:7
**health** [29] - 13:7, 22:7, 22:12, 37:18, 40:13, 51:15, 64:21, 94:22, 94:23, 105:2, 115:19, 116:22, 122:17, 127:22, 143:1, 144:9, 151:15, 156:11, 159:20, 161:22, 162:14, 162:16, 163:10, 164:21, 166:5, 166:14,

172:19, 177:8, 184:5
**healthy** [1] - 23:20
**hear** [8] - 4:3, 7:13, 11:3, 41:13, 54:1, 61:6, 129:2, 191:24
**heard** [62] - 4:4, 5:17, 7:4, 8:1, 14:5, 17:11, 28:16, 33:5, 53:13, 54:5, 54:11, 54:24, 55:18, 55:21, 56:9, 59:10, 59:16, 59:22, 60:5, 60:17, 60:20, 62:5, 62:10, 62:18, 62:21, 62:22, 63:10, 66:14, 78:19, 79:1, 80:4, 86:16, 88:25, 95:18, 95:21, 96:1, 96:20, 96:22, 98:14, 99:6, 108:6, 108:9, 108:13, 108:20, 109:7, 109:21, 109:23, 110:14, 110:20, 128:9, 128:12, 135:6, 135:11, 136:12, 136:15, 146:21, 147:10, 147:16, 156:9, 175:7, 175:14, 175:16
**hearings** [1] - 21:24
**heavily** [1] - 144:24
**held** [3] - 114:19, 142:18, 142:20
**help** [13] - 20:14, 26:9, 51:15, 100:2, 113:13, 114:9, 129:22, 131:8, 160:16, 160:17, 166:10, 169:19, 179:11
**helped** [3] - 25:19, 143:18, 143:21
**helpful** [2] - 7:13, 66:5
**helping** [1] - 141:9
**helps** [2] - 37:21, 163:8
**hereby** [2] - 64:10, 64:11
**heritable** [2] - 165:8, 167:3
**hesitated** [1] - 43:3
**hesitation** [1] - 93:23
**high** [3] - 13:21, 13:23, 174:20
**highly** [2] - 37:13, 99:15
**himself** [2] - 92:1,

109:13
hindsight [1] - 96:3
hire [8] - 14:22, 20:14, 21:8, 41:16, 54:19, 61:4, 61:8, 158:14
hired [7] - 12:2, 20:16, 55:9, 55:15, 81:6, 180:2, 180:8
historical [1] - 103:7
history [13] - 101:9, 114:6, 114:10, 115:22, 115:24, 116:9, 125:13, 154:5, 160:3, 163:1, 164:13, 172:21, 183:21
hit [1] - 58:16
hmm [2] - 121:15, 176:6
Hofstra [2] - 144:4, 144:5
holding [1] - 143:9
home [1] - 163:6
homes [1] - 171:25
homicide [1] - 145:15
honestly [1] - 32:16
hope [4] - 27:8, 32:2, 76:19, 84:8
hoped [2] - 58:9, 81:6
hopefully [1] - 4:24
hoping [5] - 35:18, 39:12, 42:25, 81:8, 173:2
horse [1] - 29:4
HORWITZ [93] - 10:6, 10:25, 11:2, 15:24, 15:25, 17:23, 17:25, 18:4, 18:13, 18:16, 19:16, 19:24, 29:14, 29:16, 29:21, 29:25, 30:13, 32:6, 32:9, 32:12, 32:15, 34:8, 34:24, 35:16, 36:4, 36:8, 36:10, 45:6, 45:12, 45:17, 46:4, 46:6, 47:12, 47:14, 49:14, 49:16, 52:4, 52:5, 54:7, 54:9, 55:3, 55:6, 63:25, 64:4, 64:5, 65:16, 65:19, 66:12, 66:17, 66:18, 67:2, 67:15, 67:17, 67:18, 69:21, 71:19, 88:10, 98:12, 100:24, 101:1, 102:23, 102:24, 104:19, 104:21, 105:23, 106:8, 109:17, 109:20, 110:25, 111:15,

137:14, 138:14, 138:16, 147:7, 148:5, 148:18, 148:19, 152:4, 152:19, 152:21, 152:22, 168:24, 169:7, 169:10, 175:15, 175:22, 176:6, 176:16, 176:19, 181:16, 181:18, 182:15, 182:22
Horwitz [16] - 8:13, 10:4, 10:24, 19:23, 34:7, 56:8, 67:4, 67:12, 71:17, 71:23, 94:11, 100:23, 104:18, 137:13, 138:13, 181:15
Horwitz's [1] - 98:20
hospital [2] - 120:5, 121:5, 163:25
Hospital [1] - 123:5
hospitalized [1] - 161:14
hosted [1] - 139:1
Hotel [1] - 141:17
hour [2] - 40:3, 90:15
hours [4] - 31:18, 40:3, 76:1, 113:23
housekeeping [2] - 6:25, 7:24
Hudson [25] - 12:2, 12:5, 21:12, 21:18, 37:8, 42:11, 45:24, 47:17, 49:17, 53:16, 64:19, 80:24, 83:5, 83:16, 83:19, 84:14, 84:19, 85:2, 86:25, 87:1, 87:17, 89:22, 90:19, 93:16, 112:14
Hudson's [1] - 62:25
human [4] - 100:1, 162:22, 184:17, 189:6
humorous [1] - 82:16
hundred [1] - 145:18
hundreds [2] - 145:5, 145:21
hurt [1] - 63:8
hurting [1] - 13:13
hydrogen [1] - 186:11
I's [1] - 24:1
idea [4] - 57:19, 87:16, 113:25, 143:1
ideal [1] - 79:5
ideally [2] - 79:2, 153:8
identified [3] - 8:24, 72:12, 117:18

identify [12] - 8:20, 8:25, 42:10, 44:18, 45:22, 47:14, 53:15, 63:20, 121:24, 160:11, 160:16, 163:9
identifying [1] - 119:20
identities [1] - 101:10
illness [1] - 167:3
illnesses [2] - 184:16, 189:10
image [8] - 185:3, 185:4, 185:7, 186:1, 186:17, 186:24, 187:22
imaged [1] - 186:18
images [2] - 185:8, 188:9
imagine [3] - 51:17, 60:18, 63:6
imaging [11] - 48:23, 48:24, 49:8, 50:8, 50:9, 51:20, 58:4, 99:21, 119:25, 184:24, 186:10
immediate [1] - 115:11
immediately [4] - 122:8, 134:18, 156:19, 167:6
imminent [1] - 157:14
impact [2] - 162:22, 163:7
impacts [1] - 163:5
impairment [4] - 122:11, 122:18, 123:11, 150:4
impairments [2] - 124:1, 163:25
impart [1] - 142:24
impeachment [1] - 9:15
impediment [1] - 51:6
importance [4] - 156:10, 165:20, 170:23, 173:25
important [19] - 30:3, 95:19, 107:20, 115:1, 118:7, 118:12, 122:9, 122:13, 126:13, 147:24, 153:21, 160:12, 161:5, 164:24, 165:13, 172:4, 172:15, 172:24, 182:4
impressed [1] - 80:2
impression [3] - 80:18, 80:21, 84:23

impressions [1] - 53:23
imprimatur [1] - 147:23
improved [1] - 102:4
in-person [2] - 171:5, 171:10
incapacitated [3] - 68:2, 68:14, 68:19
incarceration [1] - 117:16
incensed [1] - 99:15
include [3] - 48:23, 107:23, 169:15
included [4] - 74:20, 75:12, 87:23, 106:4
includes [2] - 48:17, 48:22
including [5] - 23:24, 78:18, 106:21, 127:21, 164:21
income [1] - 13:13
inconsistencies [1] - 151:1
inconsistent [2] - 106:11, 150:18
incorrect [1] - 35:25
incur [2] - 57:25, 82:23
incurred [1] - 82:1
indeed [1] - 134:20
independent [2] - 112:21, 112:24
independently [1] - 164:14
Index [1] - 62:8
indicate [9] - 8:19, 22:21, 39:20, 73:7, 78:2, 104:2, 130:21, 156:2, 182:12
indicated [19] - 15:1, 20:24, 21:14, 22:6, 23:1, 26:15, 28:9, 29:3, 31:2, 72:17, 74:24, 85:10, 93:8, 96:25, 97:12, 97:21, 100:11, 132:16, 133:19
indicates [2] - 45:18, 77:12
indicating [4] - 45:10, 87:8, 94:8, 120:17
indication [3] - 86:14, 104:10, 122:16
indicative [1] - 92:1
indicator [2] - 106:17, 106:19
indicia [1] - 177:17
indigent [1] - 154:19
individual [8] - 7:7,

98:15, 107:8, 114:19, 118:13, 154:20, 160:9, 191:22
individual's [3] - 154:9, 160:5, 172:13
individualized [1] - 149:17
individualizes [1] - 149:12
individuals [3] - 117:17, 121:20, 170:18
ineffective [4] - 42:1, 152:12, 152:13, 191:11
inexorable [1] - 177:23
influence [1] - 150:12
influenced [1] - 99:25
informal [2] - 57:16, 121:25
informally [1] - 61:15
information [33] - 86:24, 87:19, 88:18, 89:22, 114:17, 116:16, 118:2, 118:12, 118:14, 124:2, 125:10, 127:21, 127:25, 129:6, 129:7, 130:10, 130:13, 130:14, 130:20, 134:13, 142:24, 150:25, 160:19, 164:9, 164:13, 164:17, 165:4, 172:12, 172:25, 173:16, 174:3
informed [1] - 122:22
informs [2] - 152:4, 191:17
inherent [1] - 152:9
inherently [1] - 150:2
initial [11] - 11:18, 36:19, 109:23, 117:5, 134:23, 140:13, 144:19, 148:21, 154:3, 154:25, 162:2
initials [3] - 39:13, 39:14, 39:17
initiative [1] - 131:19
injuries [1] - 167:14
injury [5] - 103:20, 103:24, 104:11, 176:4, 176:11
inkblot [1] - 92:8
innocent [1] - 151:13
input [5] - 18:10,

116:6, 117:20, 190:7, 190:17
**input-output** [1] - 190:7
**inquire** [6] - 10:24, 34:6, 35:15, 112:7, 138:13, 183:15
**inquiries** [1] - 156:11
**inquiry** [2] - 129:22, 135:14
**insane** [1] - 99:22
**insanity** [2] - 99:22, 166:9
**inside** [1] - 185:10
**insist** [1] - 182:11
**inspire** [1] - 149:10
**instance** [3] - 43:6, 110:16, 190:20
**instances** [1] - 190:15
**instead** [3] - 68:25, 126:3, 163:21
**insult** [1] - 165:10
**insulted** [2] - 99:15, 99:20
**integral** [1] - 114:3
**integrated** [2] - 150:14, 159:8
**intellectual** [5] - 92:13, 150:4, 150:5, 150:6, 150:7
**intelligence** [1] - 190:20
**Intelligence** [1] - 91:19
**intended** [1] - 61:2
**intention** [2] - 19:24, 51:4, 61:3
**interact** [1] - 110:18
**interaction** [2] - 154:11, 161:9
**interactions** [1] - 158:23
**interactive** [1] - 173:5
**interest** [5] - 41:14, 41:21, 41:22, 82:20, 176:14
**interested** [1] - 53:24
**interesting** [2] - 113:2, 158:8
**interfered** [1] - 174:20
**internal** [1] - 184:3
**interpret** [2] - 161:20, 188:15
**interpretation** [1] - 92:8
**interrupt** [3] - 77:6, 178:3, 179:13
**interrupting** [1] - 51:3
**intersect** [1] - 189:2
**interview** [19] - 47:18,

48:18, 58:21, 84:15, 94:12, 110:18, 117:2, 117:10, 117:12, 117:21, 118:3, 118:16, 130:3, 130:5, 130:7, 131:17, 168:4, 170:12, 170:15
**interviewed** [4] - 37:17, 117:5, 117:6, 151:4
**interviewer** [1] - 58:20
**interviewing** [5] - 154:8, 154:12, 161:10, 167:25, 168:2
**interviews** [21] - 37:16, 37:24, 38:1, 58:10, 60:13, 105:10, 114:16, 115:2, 115:9, 115:10, 115:11, 117:23, 118:4, 118:16, 125:17, 129:16, 171:4, 171:5, 171:6, 171:10, 171:23
**intimate** [1] - 171:13
**intricately** [2] - 93:21, 93:23
**introduced** [1] - 109:13
**Inventory** [1] - 47:2
**investigate** [9] - 43:6, 52:9, 106:22, 108:25, 109:5, 156:11, 166:16, 166:17, 176:7
**investigated** [1] - 156:3
**investigating** [3] - 51:14, 107:15, 166:25
**investigation** [65] - 16:7, 43:10, 58:24, 59:2, 59:4, 64:21, 64:23, 78:5, 78:9, 78:18, 78:25, 83:21, 86:15, 101:2, 104:23, 105:16, 107:20, 107:24, 110:19, 113:22, 114:1, 114:5, 114:7, 115:4, 115:6, 123:24, 126:3, 128:7, 135:1, 139:16, 143:17, 145:24, 145:25, 150:13, 152:23, 154:3, 154:5,

154:12, 154:25, 155:6, 155:16, 155:17, 156:5, 156:14, 156:20, 159:4, 159:15, 159:17, 161:7, 161:9, 161:12, 161:16, 162:6, 162:24, 162:25, 163:8, 163:15, 163:17, 164:16, 169:19, 172:5, 172:14, 172:21, 181:1, 182:13
**investigational** [1] - 188:10
**investigations** [4] - 102:11, 146:3, 147:5, 149:7
**investigative** [4] - 15:19, 128:3, 134:25, 191:21
**investigator** [10] - 7:3, 11:25, 12:1, 12:3, 20:24, 37:13, 140:1, 178:22, 179:3, 179:10
**investigators** [4] - 7:14, 179:8, 180:9, 181:10
**invitation** [1] - 142:18
**invitation-only** [1] - 142:18
**invited** [1] - 174:5
**invites** [1] - 142:22
**invoice** [1] - 27:25
**invoices** [2] - 22:21, 28:7
**involved** [18] - 20:7, 22:23, 24:18, 25:12, 37:7, 84:20, 90:9, 93:21, 94:2, 94:3, 94:18, 113:11, 135:5, 141:9, 145:3, 145:12, 145:13, 166:16
**involvement** [1] - 112:16
**involving** [2] - 87:12, 146:25
**Iowa** [1] - 146:10
**IQ** [5] - 91:20, 160:13, 160:14, 167:21, 190:6
**irrelevant** [1] - 172:22
**isotope** [1] - 188:11
**issue** [21] - 7:16, 30:11, 31:9, 66:7, 67:8, 67:18, 73:4, 83:22, 91:4, 91:6,

102:14, 120:18, 152:8, 154:16, 165:17, 173:23, 174:11, 174:15, 176:13, 176:14, 191:8
**issued** [2] - 95:13, 95:16
**issues** [18] - 16:20, 22:12, 37:18, 43:7, 49:5, 50:18, 51:15, 64:21, 105:6, 116:22, 151:15, 159:20, 163:9, 163:14, 164:21, 166:5, 174:8
**itch** [1] - 33:6
**itself** [5] - 22:5, 28:10, 115:17, 149:22, 150:9
**Jackson** [1] - 113:4
**jail** [4] - 110:16, 115:16, 156:18, 168:12
**Jail** [1] - 110:17
**James** [7] - 5:14, 24:4, 24:5, 38:17, 75:12, 144:14, 183:13
**JAMES** [1] - 183:7
**January** [10] - 28:17, 53:3, 53:6, 54:12, 54:24, 55:17, 56:24, 59:10, 63:10, 146:17
**Jeff** [1] - 38:24
**Jessica** [1] - 9:2
**JMA** [1] - 16:11
**job** [6] - 37:13, 141:12, 159:3, 162:8, 162:11, 173:1
**John** [22] - 10:6, 10:22, 16:12, 37:4, 38:23, 44:8, 45:23, 45:25, 47:17, 52:1, 53:17, 53:19, 56:8, 63:22, 82:6, 93:14, 99:18, 122:8, 126:9, 127:7, 130:6, 144:15
**JOHN** [2] - 10:10, 10:22
**joint** [5] - 5:12, 44:24, 45:15, 72:12, 73:2
**joke** [1] - 82:18
**Jonah** [1] - 8:13
**Jonathan** [1] - 122:25
**Joshua** [3] - 121:6, 121:11
**Journal** [1] - 165:24
**Judge** [56] - 10:14, 14:3, 14:7, 14:11, 15:1, 15:8, 15:13,

16:3, 16:5, 19:14, 21:15, 21:17, 21:21, 21:25, 22:3, 24:1, 28:10, 28:11, 28:13, 28:23, 31:12, 31:14, 31:25, 32:2, 33:1, 34:21, 41:2, 41:4, 41:9, 52:19, 57:6, 63:10, 63:22, 65:5, 65:7, 73:24, 77:24, 79:15, 79:18, 79:21, 80:1, 80:10, 81:3, 83:4, 83:8, 83:9, 84:5, 94:21, 95:13, 108:4, 108:24, 109:24, 110:7, 111:6, 111:18, 134:25
**judge** [29] - 13:24, 13:25, 14:1, 14:2, 14:4, 14:8, 14:10, 15:4, 15:7, 15:10, 15:14, 15:15, 15:16, 15:17, 16:2, 40:23, 41:5, 53:12, 56:12, 56:13, 79:18, 95:22, 147:1, 147:3, 153:23, 153:24, 170:8, 181:22
**judges** [2] - 61:6, 78:13
**judgment** [1] - 82:24
**July** [3] - 52:23, 52:25, 53:1
**junior** [1] - 13:23
**jurisdiction** [5] - 95:24, 153:18, 155:4, 155:23, 156:1
**jurisdictions** [3] - 142:9, 142:23, 153:24
**jurisprudence** [1] - 149:16
**jurors** [1] - 151:5
**Justice** [2] - 139:8, 177:15
**juvenile** [1] - 160:3
**K-E-H-N-E** [1] - 35:11
**Kansas** [1] - 144:9
**keep** [8] - 12:9, 14:20, 18:14, 21:21, 38:3, 58:22, 95:16, 116:14
**keeping** [1] - 55:8
**keeps** [1] - 40:12
**Kehne** [73] - 11:13, 11:14, 11:19, 12:8, 16:14, 20:19, 20:21, 25:17, 25:25, 29:17, 34:24, 34:25, 35:4, 35:10, 36:11, 42:13,

44:1, 44:13, 45:14,
45:17, 46:7, 47:15,
49:16, 53:15, 54:11,
55:6, 62:7, 64:6,
65:25, 66:18, 67:10,
67:17, 69:24, 71:22,
72:1, 72:5, 73:19,
80:9, 83:14, 87:15,
94:16, 95:12, 98:1,
98:3, 100:11, 101:2,
102:24, 104:22,
105:25, 108:14,
109:20, 111:10,
111:16, 113:13,
113:20, 124:2,
124:13, 125:10,
126:9, 127:8,
127:18, 129:1,
129:15, 130:6,
133:22, 134:6,
135:19, 175:5,
175:20, 176:4,
181:21
**KEHNE** [1] - 35:6
**Kehne's** [4] - 13:7,
35:19, 65:21, 98:18
**Keith** [4] - 24:18, 25:4,
25:9, 25:11
**Kentucky** [1] - 177:17
**kept** [3] - 42:19, 55:11,
159:7
**kill** [2] - 25:11, 26:10
**killed** [2] - 25:15,
151:20
**kind** [22] - 37:13,
48:16, 57:12, 72:18,
89:16, 115:16,
118:10, 123:9,
130:22, 142:10,
145:24, 150:3,
150:16, 151:3,
154:18, 155:23,
156:20, 164:4,
172:14, 174:2,
190:23, 191:13
**kinds** [5] - 92:2, 103:8,
114:8, 114:18, 125:6
**knowing** [1] - 65:3
**knowledge** [6] -
81:13, 97:25,
103:21, 104:6,
118:13, 143:2
**known** [6] - 12:5, 37:8,
42:12, 45:24, 98:2,
112:12
**knows** [3] - 44:8,
135:5, 164:2
**Kowell** [1] - 5:15
**label** [4] - 89:16,
168:14, 170:2,

170:11
**labeled** [2] - 44:6,
138:18
**lack** [2] - 19:14, 32:16
**language** [1] - 39:23
**Lankford** [1] - 24:1
**large** [4] - 144:20,
145:19, 168:13,
186:4
**larger** [1] - 40:11
**largest** [2] - 142:1,
143:6
**last** [7] - 33:19, 44:9,
46:6, 48:3, 124:20,
127:3, 144:13
**lasted** [1] - 70:10
**late** [1] - 136:3
**laundry** [1] - 167:9
**Law** [4] - 144:4, 144:5,
144:9, 144:16
**law** [9] - 11:6, 14:4,
96:5, 103:9, 104:8,
144:3, 149:14,
177:2, 191:16
**laws** [1] - 139:19
**lawyer** [2] - 37:19,
56:13
**lawyer's** [1] - 162:13
**lawyers** [18] - 13:4,
20:17, 41:23,
115:18, 134:12,
159:9, 159:13,
162:12, 166:6,
174:17, 174:18,
174:19, 174:23,
178:23, 179:10,
180:8, 182:9
**Lawyers** [11] - 141:21,
143:24, 178:2
**lay** [11] - 10:1, 17:10,
59:11, 59:20, 64:20,
66:13, 66:22,
147:21, 164:3,
170:12, 171:2
**laying** [1] - 66:5
**lays** [1] - 46:25
**lead** [6] - 11:20, 11:24,
23:4, 37:5, 170:1,
170:2
**leading** [1] - 117:15
**leads** [2] - 84:13,
156:3
**learn** [3] - 78:11,
134:19, 164:8
**learned** [3] - 127:19,
163:22, 189:13
**learning** [2] - 166:20,
190:12
**least** [16] - 22:6, 36:1,
38:20, 60:3, 62:24,

63:2, 67:12, 71:1,
83:22, 95:21, 97:20,
100:2, 103:12,
179:9, 181:13,
188:14
**leave** [5] - 41:8, 81:4,
84:7, 90:13, 169:4
**lectern** [4] - 5:6, 5:8,
33:13
**led** [2] - 71:14, 106:22
**Lee** [2] - 121:17, 161:7
**left** [2] - 6:19, 39:20
**legal** [8] - 8:1, 60:19,
61:13, 141:15,
142:25, 175:6,
175:25, 177:21
**Legal** [6] - 142:17,
143:6, 143:14,
153:14, 158:2, 158:4
**length** [1] - 159:7
**lenient** [1] - 30:25
**less** [2] - 71:4, 149:10
**letter** [11] - 31:25,
53:16, 53:18, 83:15,
83:19, 84:4, 120:17,
124:24, 125:23,
126:14, 129:12
**letters** [7] - 16:11,
27:4, 27:6, 27:7,
39:4, 43:12, 136:20
**level** [6] - 36:23,
36:24, 150:5, 152:9,
156:14, 179:12,
190:20
**levels** [1] - 152:12
**Lewis** [1] - 165:23
**liabilities** [1] - 82:23
**liability** [1] - 99:24
**liberal** [1] - 35:22
**licensed** [1] - 36:12
**Life** [2] - 143:10, 158:4
**life** [19] - 37:14, 37:15,
53:22, 56:22, 67:24,
67:25, 68:10, 70:15,
91:10, 95:20, 101:9,
101:11, 115:1,
125:8, 154:5, 160:5,
160:8, 172:20
**lifeblood** [1] - 164:6
**light** [6] - 54:24, 55:9,
103:13, 105:24,
135:14, 154:9
**likely** [3] - 70:25,
151:9, 168:12
**limitations** [2] - 72:22,
84:14
**limited** [4] - 126:7,
126:11, 126:22,
135:1
**limitless** [1] - 79:4

**limits** [1] - 87:5
**line** [5] - 19:3, 46:6,
47:21, 129:22,
174:18
**lines** [2] - 44:9, 158:19
**linked** [1] - 134:16
**list** [13] - 9:4, 45:15,
77:12, 77:15,
114:18, 116:14,
117:13, 119:4,
119:5, 126:20,
132:12, 167:9
**lists** [4] - 47:4, 73:5,
73:6, 94:13
**literally** [1] - 60:12
**literature** [5] - 91:6,
157:20, 166:2,
166:3, 166:12
**litigating** [1] - 26:4
**litigation** [8] - 14:1,
25:7, 38:25, 61:9,
80:5, 143:11, 160:3,
166:22
**live** [2] - 171:19,
189:13
**lived** [1] - 59:1
**lives** [1] - 171:14
**living** [2] - 160:19,
167:13
**lobe** [1] - 190:22
**local** [4] - 56:20,
61:20, 110:16,
158:13
**locally** [1] - 61:5
**locals** [1] - 61:6
**locate** [1] - 114:9
**location** [1] - 187:7
**locations** [2] - 101:12,
187:18
**Lodged** [1] - 64:7
**long-winded** [1] -
163:16
**look** [27] - 42:10,
49:12, 51:24, 52:17,
54:16, 54:18, 91:5,
110:4, 119:3, 119:5,
124:5, 124:21,
125:20, 125:21,
132:12, 135:21,
157:8, 166:3,
167:18, 172:7,
172:9, 177:24,
180:5, 181:12,
184:19, 185:14
**looked** [3] - 38:11,
131:9, 177:19
**looking** [15] - 12:24,
16:10, 39:19, 62:3,
68:17, 77:15, 91:8,
99:17, 114:23,

115:9, 118:19,
125:6, 166:8, 185:9,
186:18
**looks** [1] - 42:11
**Lorello** [8] - 5:20, 9:8,
19:18, 34:16,
131:24, 132:3,
135:15, 136:18
**LORELLO** [21] - 6:3,
6:7, 6:13, 6:15, 9:9,
9:16, 19:19, 34:15,
72:7, 72:10, 72:16,
72:21, 73:14, 131:1,
132:7, 132:9, 133:1,
135:17, 137:5,
137:11, 138:1
**lost** [1] - 88:17
**loud** [7] - 46:7, 47:21,
48:8, 49:25, 52:6,
52:22, 53:18
**Louisiana** [2] -
146:11, 146:17
**love** [2] - 54:1, 191:24
**loved** [1] - 28:13
**low** [1] - 155:13
**M-E-R-I-K-A-N-G-A-S**
[1] - 183:14
**M-I-C-H-A-E-L** [1] -
35:14
**magazine** [2] - 143:23,
144:23
**magazines** [2] - 153:8,
178:1
**magic** [1] - 148:1
**magicians** [1] - 164:7
**magistrate** [1] - 80:2
**magnet** [1] - 186:4
**magnetic** [2] - 50:8,
186:1, 186:5
**magnetism** [2] -
186:3, 186:8
**maiden** [2] - 112:12,
112:13
**majority** [1] - 106:15
**malpractice** [1] -
33:24
**man** [2] - 11:16, 26:9
**manage** [1] - 57:19
**management** [1] -
155:22
**mandate** [1] - 139:20
**mania** [1] - 188:23
**manic** [1] - 188:23
**manifestations** [1] -
170:16
**manifested** [1] -
188:23
**manner** [1] - 57:16
**Manual** [2] - 143:19,
157:18

**manual** [2] - 143:20, 143:21
**manuals** [2] - 153:10, 173:24
**March** [5] - 11:6, 44:4, 73:21, 79:16, 113:17
**Mark** [2] - 5:13, 24:1
**marked** [6] - 18:12, 44:23, 45:3, 73:2, 73:7, 120:25
**married** [6] - 12:6, 13:15, 13:16, 37:9, 112:14, 112:15
**Martinez** [3] - 146:14, 146:16, 146:23
**MARY** [1] - 111:25
**Mary** [38] - 12:2, 12:5, 12:6, 21:3, 21:18, 37:8, 37:9, 42:11, 42:12, 45:24, 47:17, 49:17, 53:16, 58:23, 62:24, 80:24, 80:25, 83:5, 83:16, 84:7, 84:14, 84:19, 85:2, 86:25, 87:17, 89:22, 90:7, 90:19, 93:16, 93:19, 94:12, 95:2, 111:20, 112:5
**Mary's** [1] - 105:9
**material** [4] - 54:17, 95:25, 153:11, 153:12
**materials** [7] - 49:9, 52:10, 93:17, 95:3, 101:6, 107:23, 129:4
**matter** [19] - 6:25, 12:8, 16:16, 26:5, 32:16, 32:20, 32:21, 38:3, 43:18, 57:21, 73:20, 102:7, 104:7, 133:19, 140:21, 162:10, 165:16, 181:1, 185:23
**Matters** [1] - 144:17
**matters** [6] - 5:11, 34:17, 44:14, 53:2, 144:19, 162:11
**matters..** [1] - 110:8
**Maynard** [2] - 38:23, 74:25
**MCMI** [1] - 47:2
**mean** [30] - 19:9, 42:4, 46:19, 52:12, 53:11, 55:12, 55:23, 61:1, 70:3, 70:20, 75:25, 76:15, 77:5, 80:1, 87:18, 91:5, 91:11, 92:18, 99:10, 110:21, 126:17, 140:21, 144:19,

154:22, 158:8, 162:7, 166:15, 186:19, 189:5, 189:25
**meaning** [6] - 46:8, 49:3, 70:22, 70:23, 94:5, 161:25
**meaningful** [1] - 134:11
**means** [13] - 37:12, 46:8, 48:12, 49:2, 93:24, 99:21, 102:2, 154:20, 156:9, 166:19, 184:18, 185:12, 190:2
**meant** [4] - 48:14, 80:7, 123:12, 125:8
**measure** [1] - 92:13
**measures** [1] - 186:21
**Medford** [1] - 113:5
**medical** [36] - 31:9, 48:22, 49:3, 49:8, 50:11, 62:14, 66:2, 66:7, 70:14, 101:13, 114:20, 115:20, 116:4, 120:7, 120:22, 121:5, 122:15, 123:9, 123:10, 124:1, 127:22, 130:20, 134:17, 159:21, 162:18, 164:25, 165:3, 168:22, 169:14, 177:4, 183:24, 184:2, 184:10, 184:16, 190:1, 190:2
**Medical** [1] - 53:21
**medication** [2] - 190:4, 190:14
**medicine** [3] - 184:3, 184:15, 189:25
**meds** [1] - 31:11
**meet** [4] - 135:19, 135:20, 166:21, 171:20
**meetings** [1] - 94:19
**member** [2] - 11:7, 141:25
**members** [7] - 114:25, 117:14, 117:22, 123:25, 129:14, 156:19, 160:25
**Memo** [1] - 47:16
**memo** [3] - 46:1, 47:19, 94:11
**memorable** [1] - 141:19
**memories** [3] - 30:18, 160:22, 171:24

**memory** [10] - 17:21, 22:1, 31:3, 31:19, 69:15, 91:8, 120:23, 131:5, 135:20, 161:4
**memos** [3] - 105:9, 129:15, 133:23
**Mental** [1] - 144:1
**mental** [31] - 37:18, 51:14, 64:21, 94:22, 94:23, 105:2, 115:19, 116:22, 122:17, 127:22, 143:1, 144:9, 151:15, 156:11, 159:20, 161:22, 162:14, 162:16, 163:10, 163:24, 164:7, 164:13, 164:21, 166:5, 166:13, 167:3, 168:6, 172:19, 177:8, 184:15, 189:10
**mentally** [2] - 26:9, 26:12
**mention** [3] - 46:12, 142:17, 143:5
**mentioned** [12] - 24:12, 26:1, 41:20, 77:3, 83:13, 141:4, 147:2, 165:23, 169:10, 177:12, 178:25, 184:24
**mentioning** [1] - 108:4
**mercy** [1] - 149:13
**MERIKANGAS** [1] - 183:7
**Merikangas** [6] - 5:14, 137:21, 183:3, 183:4, 183:13, 183:18
**merits** [1] - 65:6
**message** [1] - 14:23
**met** [4] - 37:19, 61:1, 80:3, 141:2
**metabolic** [1] - 187:2
**Miami** [1] - 151:8
**Michael** [4] - 10:22, 16:12, 16:14, 35:10
**MICHAEL** [3] - 10:10, 10:23, 35:6
**mid-1980s** [1] - 178:24
**midday** [1] - 142:12
**Middle** [1] - 146:17
**middle** [3] - 35:13, 39:23, 141:18
**might** [23] - 13:1, 13:19, 38:22, 51:13, 51:15, 60:10, 64:23, 83:6, 85:22, 86:9,

90:23, 102:9, 110:19, 116:20, 147:19, 149:18, 161:25, 168:6, 170:1, 170:2, 172:11, 173:9
**military** [1] - 114:22
**Miller** [1] - 4:4
**mind** [9] - 22:1, 33:8, 55:8, 80:15, 85:20, 96:12, 98:19, 99:1, 99:16
**minded** [1] - 80:18
**mindful** [1] - 169:2
**mine** [1] - 12:14
**minimizing** [1] - 151:1
**minimum** [2] - 52:13, 191:18
**Minnesota** [1] - 47:2
**minute** [2] - 47:4, 86:3
**minutes** [8] - 40:4, 64:3, 65:17, 72:2, 132:1, 168:1, 169:3, 183:2
**misdemeanors** [1] - 25:2
**misidentified** [1] - 9:4
**misinformed** [1] - 192:4
**misleading** [1] - 85:23
**missed** [1] - 173:13
**Missouri** [6] - 113:5, 113:6, 113:9, 144:8, 146:11, 158:9
**misspoke** [1] - 100:16
**misstatement** [1] - 77:14
**mistaken** [1] - 191:24
**misunderstand** [1] - 71:17
**misunderstood** [1] - 150:11
**mitigating** [6] - 149:6, 149:8, 149:21, 150:2, 150:7, 150:9
**Mitigation** [4] - 143:25, 144:1, 144:17, 157:25
**mitigation** [102] - 7:18, 7:19, 12:2, 16:17, 21:3, 37:7, 37:12, 37:24, 41:7, 43:9, 58:20, 64:23, 79:16, 79:22, 80:4, 84:6, 99:13, 101:2, 101:17, 102:11, 112:21, 112:25, 113:1, 113:2, 113:10, 113:14, 113:21, 113:24,

114:2, 114:3, 114:4, 114:10, 116:20, 127:21, 127:25, 128:7, 138:25, 139:16, 141:22, 143:1, 143:11, 143:16, 143:19, 143:21, 143:22, 145:25, 146:3, 147:5, 149:6, 149:9, 150:10, 150:13, 150:25, 151:15, 151:23, 152:23, 154:2, 154:12, 155:16, 156:14, 156:20, 157:3, 157:5, 157:16, 157:17, 157:23, 158:10, 158:13, 158:17, 158:23, 158:25, 159:3, 159:11, 159:15, 159:16, 160:12, 161:7, 161:8, 161:12, 161:16, 162:4, 162:5, 162:7, 162:25, 163:23, 164:16, 164:20, 166:5, 166:8, 172:5, 172:11, 178:21, 179:1, 179:7, 179:10, 180:9, 181:1, 181:8, 181:10, 182:11, 182:12
**mitigator** [2] - 21:8, 22:4
**MMCI** [1] - 92:24
**MMPI** [6] - 47:1, 87:12, 92:22, 106:18, 106:21, 131:13
**modern** [1] - 149:17
**modified** [2] - 181:4, 189:11
**molested** [1] - 171:14
**moment** [11] - 17:23, 19:17, 19:21, 29:8, 88:19, 99:17, 100:19, 109:17, 133:8, 167:10
**Monaghan** [1] - 144:14
**Monday** [1] - 142:12
**money** [35] - 13:11, 13:24, 13:25, 14:10, 14:21, 15:4, 15:7, 15:10, 15:15, 15:16, 15:17, 16:2, 16:6, 21:17, 22:4, 26:24, 28:11, 31:16, 40:23,

41:5, 58:2, 58:7,
80:15, 80:18, 83:7,
83:20, 83:22, 102:6,
102:8, 102:11,
126:2, 155:4,
172:21, 181:22
**money..** [1] - 18:25
**monies** [1] - 84:1
**Monterey** [2] - 142:13,
142:14
**month** [2] - 40:20,
144:13
**months** [1] - 155:17
**mood** [2] - 188:23,
189:9
**Moore** [2] - 5:14, 7:11
**moral** [1] - 149:19
**morning** [16] - 4:5,
4:22, 5:12, 7:25,
10:14, 31:11, 35:24,
112:10, 137:22,
169:5, 169:21,
191:7, 191:9, 192:6,
192:9
**morphed** [1] - 145:24
**most** [12] - 50:16,
68:10, 68:11, 72:22,
125:3, 144:11,
154:16, 162:8,
164:24, 167:15,
172:4, 186:14
**mostly** [3] - 67:23,
103:7, 162:19
**mother** [1] - 159:22
**mother's** [1] - 167:11
**motion** [15] - 21:19,
21:20, 31:25, 45:1,
55:17, 55:20, 55:22,
56:5, 80:3, 80:23,
81:3, 83:9, 84:5,
97:10, 111:6
**motions** [3] - 53:1,
94:21, 155:8
**mouth** [2] - 58:22,
70:19
**move** [4] - 4:7, 5:7,
66:14, 127:20
**moved** [3] - 110:15,
113:5, 142:14
**moves** [1] - 141:21
**moving** [2] - 29:5,
71:1
**MRI** [9] - 50:8, 184:20,
185:25, 186:13,
186:20, 187:24,
188:1, 188:7
**MRIs** [1] - 104:10
**MS** [58] - 4:11, 4:14,
4:18, 5:4, 5:9, 5:11,
6:3, 6:7, 6:13, 6:15,

6:17, 6:19, 6:23,
6:25, 7:10, 7:22,
7:24, 8:11, 8:13, 9:1,
9:9, 9:16, 9:19, 9:25,
10:3, 19:19, 34:14,
34:15, 72:7, 72:10,
72:16, 72:21, 73:14,
111:20, 112:9,
129:23, 130:1,
130:2, 131:1, 131:8,
131:21, 132:7,
132:9, 133:1, 133:5,
135:17, 136:8,
136:10, 137:3,
137:5, 137:10,
137:11, 137:23,
138:1, 183:3, 183:9,
183:17, 191:2
**multigenerational** [1]
- 163:1
**Multiphasic** [1] - 47:2
**multiple** [7] - 90:24,
142:9, 142:10,
161:6, 171:9,
174:10, 175:3
**murder** [2] - 38:14,
74:25
**must** [1] - 114:7
**Myshin** [7] - 12:18,
12:22, 24:13, 24:23,
25:21, 26:1, 87:24
**Myshin's** [1] - 26:6
**NAACP** [2] - 142:17,
143:14
**name** [27] - 10:12,
10:20, 10:21, 11:23,
23:16, 35:8, 35:10,
35:13, 40:10, 91:2,
102:1, 112:3, 112:4,
112:5, 112:12,
112:13, 112:14,
138:9, 138:11,
142:20, 160:12,
183:11, 183:12
**named** [1] - 151:24
**names** [2] - 39:20,
101:12
**narrative** [2] - 179:18,
179:19
**National** [3] - 141:20,
143:6, 143:24,
153:14, 157:25,
158:2, 158:4, 178:1
**national** [14] - 37:20,
61:8, 61:12, 138:25,
141:3, 142:16,
143:13, 153:8,
153:9, 153:15,
153:20, 153:24,
180:23

**nature** [6] - 11:15,
41:22, 53:9, 66:2,
145:23, 188:24
**near** [2] - 75:5, 165:2
**nearly** [2] - 40:5, 40:16
**necessarily** [2] - 19:9,
54:19
**necessary** [1] - 53:8
**need** [31] - 6:21, 8:24,
18:10, 30:11, 34:1,
44:25, 49:8, 57:12,
58:21, 73:24, 77:17,
77:18, 81:16, 99:2,
114:8, 116:12,
148:3, 153:4,
154:19, 154:21,
155:5, 155:7,
155:25, 164:22,
165:4, 166:10,
169:3, 171:9, 179:9,
180:25, 190:25
**needed** [10] - 72:20,
114:1, 116:22,
117:18, 123:21,
123:22, 123:24,
126:21, 155:1, 175:1
**needs** [3] - 52:8,
164:2, 166:21
**neglected** [1] - 162:3
**neglectful** [1] - 169:20
**negligence** [1] - 32:21
**nerve** [2] - 49:5, 58:16
**nerves** [1] - 184:4
**nervous** [4] - 5:25,
184:3, 184:22,
187:11
**networking** [1] - 174:7
**neurocognitive** [1] -
46:19
**neuroimaging** [5] -
184:18, 184:19,
189:3, 189:20,
190:13
**neurologic** [1] - 50:10
**neurological** [12] -
31:20, 48:9, 48:13,
48:14, 48:19, 48:21,
49:1, 49:2, 92:3,
94:5, 157:19, 173:19
**neurologist** [11] -
49:3, 49:7, 50:12,
53:22, 109:15,
184:1, 184:2,
184:11, 188:6,
190:16
**neurologists** [2] -
49:9, 92:19
**neurology** [8] - 48:23,
123:5, 163:12,
173:17, 183:24,

189:2, 189:19, 190:1
**neuropsych** [9] - 17:3,
19:15, 48:21, 57:5,
57:8, 63:12, 65:7,
102:25, 110:23
**neuropsychiatrist** [2]
- 184:8, 184:9
**neuropsychiatry** [3] -
163:12, 184:14,
190:1
**neuropsychological**
[21] - 17:3, 17:7,
32:17, 32:25, 46:20,
48:22, 48:25, 49:4,
50:7, 52:11, 52:12,
92:9, 93:11, 95:13,
96:19, 108:2,
123:22, 130:24,
131:7, 162:21,
173:21
**neuropsychologist**
[6] - 49:7, 49:11,
56:21, 56:25,
190:17, 190:23
**neuropsychologists**
[8] - 48:16, 50:15,
50:16, 91:23, 92:11,
92:19, 162:20, 190:9
**neuropsychology** [2]
- 19:6, 163:12
**neuroradiology** [1] -
109:12
**neurotoxins** [2] -
165:10, 167:13
**neutral** [2] - 156:9,
160:9
**Nevada** [1] - 146:12
**never** [14] - 26:11,
28:3, 43:3, 50:15,
57:13, 61:16, 71:5,
84:14, 106:25,
107:4, 135:9,
147:20, 147:23,
161:3
**nevertheless** [1] -
80:23
**Nevin** [2] - 25:19,
61:24
**new** [2] - 142:24,
160:16
**New** [12] - 139:16,
139:19, 140:17,
140:18, 145:6,
155:2, 156:17,
157:11, 179:11,
180:1, 180:15,
180:18
**newspaper** [1] - 62:15
**next** [10] - 25:7, 34:23,
54:22, 58:20, 65:20,

111:19, 137:13,
161:17, 163:3, 183:2
**nexus** [1] - 150:1
**nice** [3] - 10:14, 34:21,
34:22
**night** [1] - 141:19
**nine** [1] - 70:9
**nobody** [3] - 41:16,
61:8, 84:10
**noncapital** [1] -
177:16
**nondeath** [1] - 146:11
**nondeath-penalty** [1]
- 146:11
**none** [1] - 135:10
**nonexistent** [1] -
129:2
**nonlawyers** [1] -
180:8
**nonprofit** [1] - 140:2
**norm** [1] - 170:18
**normal** [4] - 87:5,
87:8, 97:14, 147:19
**normally** [2] - 7:6, 8:4
**Norman** [8] - 47:18,
48:19, 50:20, 88:4,
88:24, 91:14, 105:5
**norms** [8] - 144:7,
149:1, 153:13,
171:5, 177:12,
177:18, 177:21,
178:13
**Northern** [2] - 139:2,
146:18
**Norton** [1] - 161:7
**Nos** [1] - 132:13
**notation** [1] - 42:15
**note** [4] - 116:11,
121:25, 136:2,
147:19
**noted** [2] - 45:9,
183:10
**notes** [5] - 60:13,
94:8, 118:16,
118:18, 124:7
**nothing** [13] - 53:25,
60:14, 63:8, 78:10,
97:14, 97:16, 97:21,
98:10, 99:9, 100:4,
100:22, 151:21,
162:9
**noticed** [1] - 54:17
**notified** [1] - 56:2
**notify** [1] - 145:8
**notion** [2] - 91:3,
153:20
**novel** [1] - 96:14
**November** [7] - 54:16,
54:25, 55:10, 56:25,
94:18, 100:11,

100:18
**November..** [1] - 54:15
**number** [17] - 9:2,
76:11, 77:13, 77:24,
91:23, 92:10,
113:22, 113:23,
114:16, 140:24,
141:12, 145:4,
145:13, 145:19,
145:21, 146:22,
184:24
**numbers** [1] - 40:1
**O.J** [2] - 80:11, 80:12
**Oakland** [1] - 139:2
**oath** [6] - 33:23, 35:5,
72:5, 111:23, 132:5,
138:5
**object** [7] - 66:21,
88:10, 98:12,
102:17, 152:1,
168:20, 185:19
**objected** [2] - 25:9,
65:22
**objection** [8] - 65:24,
67:14, 98:20,
102:22, 147:14,
147:22, 152:15,
175:13
**objections** [1] - 6:5
**objective** [3] - 92:7,
160:9, 177:17
**obligates** [1] - 155:16
**obligations** [1] - 164:4
**observed** [2] - 59:19,
168:1
**observing** [1] - 170:19
**obsessive** [1] - 189:1
**obsessive-
compulsive** [1] -
189:1
**obstructing** [1] - 43:9
**obtain** [2] - 135:21,
165:4
**obtained** [6] - 32:25,
101:21, 117:6,
134:20, 162:2, 164:1
**obtaining** [2] - 113:21,
134:14
**obvious** [3] - 58:21,
101:15, 175:18
**obviously** [2] - 64:25,
159:19
**occasion** [2] - 41:12,
49:10
**occasions** [2] - 58:21,
59:8
**occupation** [2] -
112:23, 183:23
**occupy** [1] - 139:14
**occurred** [4] - 86:1,

128:9, 128:13, 134:2
**occurs** [2] - 38:24,
39:3
**offer** [5] - 5:24, 6:11,
33:9, 148:14
**offered** [4] - 62:11,
63:5, 157:15, 168:12
**offering** [1] - 170:25
**office** [19] - 4:23, 7:3,
11:14, 21:24, 23:8,
38:6, 42:19, 112:22,
139:2, 139:18,
140:22, 140:25,
145:8, 155:2,
174:16, 179:12,
180:1, 180:6, 180:8
**Office** [16] - 12:15,
23:23, 29:19, 39:22,
42:5, 42:21, 42:24,
57:9, 57:22, 74:1,
113:4, 113:7,
139:17, 140:18,
179:12
**offices** [1] - 143:8
**officially** [2] - 41:16,
148:11
**often** [8] - 113:2,
118:11, 136:4,
148:11, 150:10,
158:19, 168:17,
174:3
**Ohio** [1] - 158:10
**old** [3] - 13:17, 92:4,
161:22
**older** [1] - 160:21
**once** [7] - 58:13,
95:16, 116:10,
125:21, 126:9,
174:15, 175:2
**one's** [2] - 12:9, 150:8
**one-foot** [1] - 120:6
**ones** [1] - 164:24
**ongoing** [1] - 115:10
**onward** [1] - 140:12
**onwards** [1] - 141:8
**open** [1] - 58:14
**opened** [1] - 53:21
**opening** [4] - 4:6,
4:12, 4:14, 144:15
**opens** [2] - 18:22,
40:10
**operate** [2] - 155:15
**opine** [1] - 169:2
**opined** [2] - 88:1, 89:3
**opining** [3] - 5:22,
89:6, 89:16
**opinion** [16] - 8:5, 8:7,
60:25, 88:14, 88:20,
90:4, 91:3, 95:14,
95:16, 123:12,

148:14, 176:13,
177:14, 178:7,
178:9, 178:12
**opinions** [6] - 5:24,
6:5, 6:11, 7:19,
89:13, 177:10
**opportunity** [2] -
118:11, 149:18
**opposed** [8] - 48:21,
80:19, 99:25,
104:16, 154:3,
170:8, 185:6, 188:25
**opposing** [2] - 166:17,
183:10
**opposite** [2] - 71:3,
71:8
**oral** [1] - 55:20
**order** [23] - 5:2, 5:4,
7:1, 7:17, 7:24, 8:21,
52:25, 53:2, 64:15,
65:1, 72:18, 73:5,
76:11, 76:17, 76:23,
77:3, 77:9, 99:23,
104:9, 114:7, 142:23
**ordered** [3] - 64:11,
76:12, 104:10
**ordered..** [1] - 64:10
**ordinarily** [1] - 57:18
**Oregon** [3] - 113:5,
125:2, 125:4
**organ** [1] - 189:4
**organic** [8] - 86:22,
92:2, 98:2, 103:20,
103:24, 104:10,
104:14, 176:10
**organicity** [3] - 31:22,
103:5, 173:25
**organization** [5] -
140:2, 143:6,
157:24, 158:3,
158:19
**organize** [2] - 141:10,
153:15
**orientations** [1] -
185:22
**original** [6] - 41:25,
42:16, 42:20, 42:23,
46:22, 47:1
**originally** [2] - 143:10,
184:9
**ostracized** [1] - 26:1
**otherwise** [2] - 70:17,
170:1
**out-of-state** [1] -
64:17
**outlined** [1] - 161:11
**output** [1] - 190:7
**outset** [2] - 72:11,
159:12
**outside** [4] - 23:25,

60:10, 150:6, 168:21
**outsiders** [2] - 156:9,
160:9
**overhead** [1] - 40:15
**overlapped** [1] - 38:17
**overruled** [1] - 67:14
**overseeing** [1] - 113:8
**overwhelmed** [3] -
68:14, 70:17, 174:23
**own** [11] - 8:7, 123:16,
131:19, 143:3,
143:4, 159:8,
166:17, 167:6,
173:8, 186:7
**owner** [1] - 188:7
**oxyglucose** [1] -
187:1
**p.m** [3] - 132:2, 192:10
**pace** [1] - 4:24
**packet** [1] - 165:3
**Padilla** [1] - 177:16
**page** [33] - 18:17,
18:22, 39:14, 39:18,
39:19, 44:9, 46:6,
46:11, 46:15, 47:22,
49:19, 49:21, 49:23,
52:5, 52:23, 54:10,
54:13, 62:5, 62:9,
64:8, 64:9, 78:1,
108:15, 110:5,
110:6, 121:2,
121:22, 124:20,
127:3, 148:20,
173:15
**paid** [15] - 13:14,
27:19, 58:9, 81:18,
81:24, 82:8, 82:12,
82:20, 83:2, 83:5,
84:9, 95:6, 95:10,
96:8, 96:10
**paper** [2] - 120:7,
187:23
**paragraph** [16] -
45:18, 46:12, 48:3,
48:4, 49:24, 50:4,
54:14, 54:15, 64:9,
108:15, 110:6,
110:9, 126:1, 127:12
**paragraphs** [4] -
46:11, 46:13, 47:21,
52:22
**pardon** [3] - 85:14,
115:5, 118:23
**parents** [4] - 114:23,
115:12, 169:20,
169:21
**Parnes** [2] - 25:19,
61:22
**part** [18] - 22:7, 23:7,
35:25, 59:2, 82:15,

82:16, 104:2,
104:14, 114:3,
114:13, 115:2,
115:21, 117:1,
117:9, 144:20,
158:3, 164:16, 167:4
**parte** [1] - 181:22
**participated** [1] -
141:25
**particular** [15] - 17:4,
21:19, 41:23, 43:19,
78:1, 83:19, 144:18,
155:6, 156:23,
163:6, 166:22,
167:7, 168:5, 172:3,
185:16
**particularly** [6] - 7:19,
58:4, 66:8, 68:1,
104:8, 187:18
**parties** [2] - 6:16, 8:18
**partly** [1] - 171:10
**partner** [6] - 11:13,
37:3, 97:1, 97:5,
109:3, 110:15
**partner's** [1] - 97:8
**partnership** [4] -
11:15, 13:8, 24:1,
37:4
**parts** [2] - 187:4,
187:6
**party** [2] - 7:6, 7:7
**pass** [1] - 131:21
**passage** [1] - 53:11
**passed** [3] - 42:19,
42:20, 163:3
**passing** [1] - 42:23
**past** [4] - 9:23, 9:24,
117:15, 189:18
**patent** [1] - 55:12
**patient** [1] - 190:5
**patients** [2] - 188:16,
190:3
**patterns** [2] - 163:4,
187:16
**pay** [7] - 13:10, 27:10,
27:12, 27:16, 51:6,
81:7, 81:8
**paying** [1] - 82:24
**payment** [5] - 42:25,
82:9, 95:4, 101:24,
102:4
**PAYSAK** [1] - 131:13
**PCL** [1] - 131:14
**PCL-R** [1] - 131:14
**PCR** [1] - 7:14
**peers** [1] - 40:16
**penalty** [35] - 39:2,
52:21, 139:9,
139:18, 140:4,
140:9, 140:10,

140:11, 141:7,
141:23, 142:1,
142:22, 142:25,
144:4, 144:7, 145:7,
145:10, 145:11,
145:16, 146:1,
146:10, 146:11,
149:17, 151:5,
153:1, 153:3,
153:19, 154:17,
158:15, 158:16,
159:11, 165:20,
180:2, 180:3, 180:7
**Penalty** [4] - 139:1,
139:10, 140:23,
143:25
**pending** [1] - 53:7
**Pennsylvania** [1] -
146:12
**people** [56] - 37:17,
58:14, 61:9, 61:11,
80:2, 91:20, 97:14,
99:21, 101:11,
106:14, 114:25,
115:14, 115:15,
115:17, 117:14,
117:18, 126:4,
142:8, 142:9,
142:22, 145:18,
153:3, 153:5,
154:24, 156:6,
157:13, 157:15,
158:6, 158:11,
158:14, 159:3,
160:11, 163:13,
164:3, 164:15,
167:22, 167:25,
168:14, 170:15,
171:13, 171:16,
171:18, 171:20,
173:12, 174:1,
174:2, 174:8,
174:19, 179:9,
180:3, 180:6, 180:9,
189:21, 190:10,
190:11
**percent** [3] - 40:21,
40:22, 75:6
**percentage** [2] - 75:2,
168:13
**perception** [2] -
191:10, 191:15
**perfected** [1] - 21:22
**perfectly** [2] - 80:20,
97:14
**performance** [2] -
66:9, 176:10
**performed** [1] - 7:20
**perhaps** [6] - 8:18,
8:20, 70:11, 113:16,

134:16, 136:2
**period** [21] - 25:22,
40:20, 68:1, 68:9,
68:20, 70:2, 70:9,
75:17, 78:18, 94:4,
109:14, 129:5,
134:8, 142:12,
148:21, 159:24,
167:14, 167:16,
167:23, 168:2, 168:3
**periodically** [4] -
52:21, 86:18, 86:19
**periods** [1] - 168:5
**permission** [4] - 7:22,
16:1, 16:2, 18:7
**permit** [1] - 188:11
**permitted** [1] - 7:18
**person** [19] - 7:10,
28:14, 49:8, 58:11,
58:12, 59:8, 86:13,
91:25, 100:2, 107:1,
156:18, 157:7,
160:20, 171:5,
171:10, 171:20,
171:23, 186:4, 190:8
**person's** [2] - 58:15,
185:13
**personal** [2] - 81:13,
115:17
**Personality** [1] - 47:2
**personality** [29] -
84:23, 88:2, 88:8,
88:16, 89:4, 89:7,
89:14, 90:24, 90:25,
92:22, 93:1, 98:7,
103:1, 103:6, 103:7,
103:18, 103:23,
104:25, 105:6,
105:12, 105:18,
106:9, 168:9,
168:11, 169:1,
169:12, 170:9,
170:11
**personally** [7] - 37:24,
76:8, 107:9, 118:3,
118:9, 126:19, 145:2
**perspective** [2] - 36:1,
174:17
**PET** [7] - 184:21,
186:22, 186:23,
187:1, 187:24,
188:2, 188:11
**petition** [8] - 52:1,
52:6, 53:7, 78:2,
108:5, 108:21,
127:19, 134:21
**petitioner** [5] - 6:10,
52:8, 52:11, 62:19,
64:20
**PETITIONER'S** [5] -

10:10, 35:6, 111:25,
138:7, 183:7
**petitioner's** [3] -
62:16, 64:15, 119:4
**Petitioner's** [9] -
18:15, 45:5, 46:5,
47:13, 49:15, 54:8,
64:1, 79:8, 124:19
**petitions** [2] - 43:18,
78:11
**Ph.D** [1] - 125:2
**phase** [11] - 114:12,
150:12, 150:17,
150:18, 150:20,
150:21, 151:11,
151:21, 151:22,
152:6, 152:7
**phases** [2] - 150:14,
151:2
**phenomenon** [2] -
167:22, 189:15
**phone** [9] - 26:25,
27:5, 58:11, 58:12,
58:15, 59:8, 84:15,
134:10, 157:9
**photon** [1] - 186:16
**phrase** [1] - 175:23
**physical** [2] - 31:17,
190:3
**physically** [1] - 169:23
**physiologic** [1] -
184:5
**picked** [1] - 76:8
**picture** [1] - 171:1
**piece** [1] - 187:23
**pieces** [1] - 40:9
**Pincus** [14] - 50:6,
50:20, 89:23, 90:8,
122:25, 123:3,
123:4, 123:6,
123:19, 123:20,
124:8, 157:10,
165:22
**pioneer** [1] - 161:6
**PL** [1] - 131:13
**PL-R** [1] - 131:13
**place** [9] - 35:5, 57:17,
70:7, 101:15,
111:23, 117:23,
117:24, 136:12,
138:5
**placed** [1] - 187:15
**places** [5] - 59:1,
114:18, 116:16,
154:16, 160:10
**plain** [1] - 185:6
**plan** [1] - 182:22
**plane** [1] - 185:20
**planned** [1] - 4:23
**planning** [2] - 142:4,

143:15
**plans** [2] - 61:16,
137:18
**play** [5] - 61:20,
173:18, 190:18,
191:11
**played** [1] - 178:11
**pleadings** [1] - 25:17
**pleas** [1] - 144:4
**plenary** [1] - 142:11
**plus** [1] - 52:14
**Pocatello** [4] - 13:3,
38:17, 110:16, 117:7
**point** [36] - 9:6, 14:19,
36:2, 40:3, 40:4,
47:5, 54:1, 55:3,
61:7, 63:17, 66:7,
66:9, 67:4, 68:1,
68:22, 73:3, 77:17,
79:4, 87:20, 95:17,
99:2, 100:3, 101:18,
102:21, 103:3,
110:22, 118:1,
128:4, 128:6,
131:24, 133:3,
150:11, 152:15,
174:15, 175:2, 191:1
**points** [1] - 156:13
**Portland** [2] - 125:2,
133:20
**position** [12] - 26:8,
30:14, 32:11, 32:13,
32:19, 32:22, 57:14,
113:6, 113:8, 139:4,
139:13, 139:24
**positions** [1] - 140:8
**positron** [1] - 186:23
**possibility** [6] - 74:8,
85:10, 86:9, 102:8,
108:4, 108:20
**possible** [13] - 37:14,
51:14, 51:15, 74:11,
101:19, 117:5,
151:1, 154:9, 159:4,
159:5, 160:23,
167:3, 167:10
**possibly** [6] - 51:16,
55:16, 69:10, 86:22,
127:25, 182:11
**post** [1] - 147:16
**post-hearing** [1] -
147:16
**postconviction** [87] -
11:12, 11:17, 11:18,
12:13, 12:23, 14:5,
16:15, 17:11, 20:7,
20:25, 23:9, 24:2,
25:1, 25:6, 25:13,
28:25, 36:19, 38:10,
41:25, 43:17, 44:21,

54:5, 59:10, 59:22,
62:4, 62:10, 63:11,
65:2, 65:8, 66:4,
71:12, 73:20, 75:15,
79:19, 101:18,
102:14, 103:3,
106:3, 107:19,
108:5, 108:6, 108:9,
108:12, 108:21,
109:21, 109:23,
110:14, 116:6,
117:20, 120:13,
122:22, 123:13,
128:9, 128:12,
128:21, 131:17,
132:24, 134:21,
135:6, 137:1, 140:4,
140:5, 140:14,
144:18, 144:19,
146:20, 148:22,
149:2, 154:4, 154:7,
154:13, 156:16,
165:16, 172:2,
172:5, 172:15,
172:17, 172:18,
173:3, 173:17,
173:22, 174:10,
174:22, 174:23,
174:24, 175:6,
175:21
**postconvictions** [1] -
13:4
**posttraumatic** [1] -
90:25
**posttrial** [1] - 30:23
**potential** [9] - 38:20,
59:21, 127:22,
145:7, 145:9,
164:19, 164:21,
165:6, 174:12
**potentially** [2] -
123:11, 173:18
**practice** [17] - 11:16,
20:6, 21:7, 21:9,
40:16, 75:2, 102:7,
107:11, 143:3,
145:23, 147:19,
173:24, 177:25,
178:14, 180:12,
188:12, 189:18
**practicing** [4] - 11:6,
31:3, 189:16, 189:17
**practitioners** [4] -
140:19, 141:3,
143:2, 150:16
**prays** [1] - 52:9
**preadmit** [1] - 4:25
**precise** [2] - 146:22,
186:25
**precisely** [1] - 38:11

**precursor** [1] - 168:18
**predicated** [1] - 8:5
**predicates** [1] - 170:5
**prefer** [3] - 58:18, 61:6, 91:23
**preferable** [1] - 118:4
**preference** [1] - 58:13
**preferred** [2] - 92:14, 170:7
**pregnancy** [1] - 167:11
**prejudice** [1] - 81:4
**preliminary** [4] - 72:8, 126:5, 126:15, 126:18
**prepare** [5] - 64:22, 73:5, 127:6, 127:15, 160:17
**prepared** [12] - 55:4, 59:16, 59:19, 60:8, 62:21, 62:22, 127:2, 127:4, 127:9, 127:19, 134:21, 138:19
**preparing** [4] - 107:21, 127:20, 160:22, 170:13
**prescribe** [2] - 190:3, 190:14
**presence** [1] - 64:19
**present** [8] - 9:24, 30:17, 44:5, 64:22, 65:4, 149:18, 176:7
**presentation** [6] - 152:5, 152:6, 152:7, 152:23, 170:13, 175:25
**presented** [3] - 151:21, 174:1, 175:16
**presentence** [3] - 107:19, 107:24, 172:14
**presenters** [1] - 174:5
**presenting** [3] - 108:5, 141:9, 151:15
**preserve** [1] - 27:4
**Presidents** [2] - 142:2, 142:12
**presiding** [1] - 53:12
**pressing** [1] - 155:13
**pretrial** [3] - 53:1, 72:18, 115:17
**pretty** [25] - 23:1, 23:20, 24:10, 24:11, 28:4, 28:16, 31:14, 31:21, 56:1, 56:2, 58:6, 67:25, 68:8, 75:20, 76:4, 80:6, 81:3, 93:14, 93:21,

93:23, 96:14, 129:2, 154:6, 159:18, 176:24
**prevailing** [6] - 144:7, 153:13, 157:2, 171:5, 177:12, 177:18
**prevalence** [1] - 157:12
**prevent** [1] - 151:14
**prevented** [2] - 83:11, 106:21, 107:15
**preventing** [1] - 174:25
**prevents** [2] - 78:10, 155:18
**previously** [3] - 98:6, 115:18, 146:2
**primarily** [2] - 20:7, 92:5
**principles** [1] - 161:11
**prison** [1] - 168:14
**prisoners** [1] - 140:7
**private** [6] - 11:16, 40:16, 75:7, 140:3, 140:10, 145:23
**privately** [2] - 145:15, 158:11
**privy** [1] - 14:9
**pro** [1] - 182:9
**problem** [10] - 7:9, 26:4, 30:24, 70:14, 70:16, 98:2, 156:6, 174:12, 190:22
**problems** [7] - 26:8, 31:3, 103:8, 127:22, 188:23, 189:10, 189:22
**procedural** [1] - 5:11
**procedure** [1] - 96:4
**proceed** [15] - 5:6, 10:2, 15:21, 44:23, 45:4, 66:11, 67:14, 99:3, 132:6, 147:18, 148:4, 148:17, 152:20, 176:15, 179:24
**proceeding** [14] - 36:23, 44:3, 67:11, 68:21, 70:8, 71:14, 106:3, 147:24, 152:14, 152:18, 175:10, 175:21, 179:22, 191:19
**proceedings** [16] - 20:25, 41:25, 46:22, 64:13, 65:21, 66:1, 66:23, 67:6, 67:19, 70:6, 70:15, 76:12, 77:4, 140:5, 140:6,

146:15
**process** [14] - 5:18, 26:9, 28:1, 57:24, 98:18, 101:18, 114:13, 115:2, 128:21, 133:14, 155:11, 161:8, 164:16, 191:24
**Prochaska** [1] - 97:1
**PROCHASKA** [1] - 97:2
**produced** [5] - 60:12, 132:17, 153:10, 160:8, 164:15
**product** [2] - 62:25, 118:19
**profession** [2] - 36:11, 148:24
**professionals** [2] - 115:20
**Professor** [2] - 144:15, 151:7
**profound** [1] - 67:24
**program** [15] - 40:7, 40:8, 40:9, 141:21, 142:1, 142:3, 142:7, 142:18, 142:20, 142:22, 143:5, 143:9, 143:13, 143:14, 158:5
**programs** [18] - 141:3, 141:4, 141:5, 141:9, 141:13, 141:15, 141:24, 142:11, 142:16, 143:4, 143:15, 153:8, 153:9, 157:21, 166:4, 174:2, 174:5, 181:25
**progressing** [1] - 54:2
**Project** [6] - 140:1, 140:16, 140:22, 145:17, 151:6, 154:23
**projective** [1] - 92:5
**Projects** [1] - 139:1
**prominent** [1] - 157:20
**proper** [1] - 150:13
**proposed** [2] - 63:21, 130:18
**prosecuted** [1] - 158:16
**prosecution** [4] - 56:2, 140:13, 146:10, 168:12
**prosecutions** [2] - 139:10, 153:19
**prosecutor** [6] - 39:1, 97:17, 98:14, 98:24,

99:8, 109:6
**prosecutor's** [1] - 99:6
**prosecutors** [1] - 145:7
**protocol** [2] - 104:6, 156:17
**provide** [18] - 35:19, 36:4, 84:19, 113:24, 116:23, 125:13, 125:16, 134:24, 139:7, 149:19, 159:1, 159:9, 160:10, 164:9, 164:18, 164:22, 165:13, 174:21
**provided** [10] - 85:2, 85:3, 89:22, 90:19, 130:10, 132:23, 135:25, 139:22, 173:4, 173:16
**providing** [2] - 160:7, 164:5
**psychiatric** [5] - 89:8, 159:20, 164:24, 170:17, 188:22
**psychiatrist** [4] - 157:11, 165:24, 184:10, 184:12
**psychiatrists** [1] - 162:19
**psychiatry** [3] - 183:25, 189:19, 190:1
**Psychiatry** [1] - 165:25
**psycho** [1] - 93:11
**Psychological** [1] - 124:24
**psychological** [2] - 163:5, 189:12
**psychologist** [11] - 49:4, 54:16, 54:19, 55:9, 55:15, 104:7, 107:7, 125:2, 133:20, 160:13, 190:17
**psychologists** [6] - 103:17, 103:22, 162:19, 189:25, 190:5, 190:11
**psychology** [1] - 189:24
**psychopath** [1] - 105:15
**psychopharmacology** [1] - 162:23
**psychosocial** [1] - 114:6
**psychotherapy** [1] -

190:11
**Public** [18] - 11:22, 12:15, 14:16, 23:23, 29:19, 36:18, 39:21, 39:22, 40:18, 42:5, 42:20, 42:23, 57:9, 57:22, 73:25, 74:13, 113:4, 113:6
**public** [8] - 28:1, 139:1, 139:7, 143:6, 143:8, 153:17, 154:18, 182:8
**publications** [1] - 177:25
**publicity** [1] - 151:19
**published** [6] - 143:16, 144:12, 153:16, 178:14, 178:15, 179:7
**pulled** [6] - 52:5, 53:14, 54:4, 63:19, 94:11, 108:12
**punishment** [1] - 149:12
**purpose** [4] - 5:17, 8:9, 33:24, 119:20
**purposes** [4] - 9:10, 25:7, 115:15, 147:7
**pursuant** [3] - 23:12, 52:20, 73:23
**pursue** [2] - 104:23, 105:15
**pursued** [2] - 32:18, 51:23
**put** [17] - 4:18, 5:12, 14:22, 33:5, 39:17, 43:5, 70:19, 72:1, 91:2, 110:20, 118:1, 118:19, 126:20, 127:24, 145:4, 155:17, 186:6
**putting** [5] - 79:6, 103:21, 186:4, 186:5, 186:17
**qualification** [1] - 5:18
**qualifications** [1] - 138:22
**qualified** [10] - 5:16, 93:10, 145:10, 146:2, 146:7, 147:4, 152:5, 161:20, 169:11, 182:2
**quantified** [1] - 151:8
**quantify** [3] - 190:10, 190:19, 190:24
**quantity** [1] - 130:10
**quarter** [1] - 145:16
**questioner** [1] - 58:15
**questioning** [1] - 129:18

**questions** [33] - 15:25, 19:16, 29:11, 29:25, 32:5, 33:8, 33:10, 34:8, 43:4, 60:1, 65:20, 69:21, 71:25, 105:24, 110:25, 129:21, 133:1, 133:10, 135:14, 147:12, 148:20, 149:6, 152:17, 159:14, 163:18, 166:9, 172:2, 174:1, 176:19, 179:17, 179:23, 182:15, 183:21
**quick** [1] - 72:8
**quickly** [7] - 112:11, 120:10, 121:9, 127:11, 134:15, 183:9, 183:20
**quite** [5] - 30:25, 43:8, 43:20, 69:19, 79:23
**quote** [2] - 83:21, 97:13
**quoted** [1] - 144:24
**R-O-L-F** [1] - 35:13
**radiation** [3] - 186:7, 186:20, 186:24
**radio** [3] - 186:3, 186:6, 186:9
**radioisotope** [2] - 186:17, 187:1
**radiologist** [4] - 85:6, 85:18, 109:14, 122:10
**raise** [1] - 43:20
**raised** [2] - 102:13, 189:12
**raising** [1] - 78:8
**ran** [1] - 61:15
**random** [2] - 162:16, 186:24
**Randy** [1] - 121:19
**range** [1] - 150:6
**rapport** [2] - 118:7, 161:2
**rare** [2] - 58:21, 190:15
**rarely** [1] - 58:2
**rates** [1] - 90:11
**rather** [9] - 8:21, 54:21, 58:11, 58:12, 65:1, 120:9, 162:1, 186:3, 186:9
**raw** [1] - 161:19
**ray** [3] - 99:17, 185:6, 186:11
**RAY** [1] - 183:7
**Ray** [1] - 183:13
**rays** [8] - 53:19, 122:1,

184:20, 185:3, 186:3, 186:5, 186:9, 186:19
**re** [1] - 121:16
**reach** [1] - 173:1
**reached** [2] - 108:17, 175:2
**reaction** [2] - 41:13, 80:7
**reactions** [1] - 58:16
**read** [35] - 7:17, 17:15, 18:21, 19:1, 19:2, 21:23, 22:20, 43:12, 43:14, 44:12, 46:7, 46:10, 47:21, 48:2, 48:8, 49:24, 50:1, 52:6, 52:22, 53:18, 54:14, 64:9, 69:9, 87:3, 87:4, 103:19, 106:14, 108:14, 110:5, 110:9, 116:11, 128:2, 134:17, 153:8
**readily** [1] - 172:12
**reading** [3] - 100:16, 131:3, 134:10
**ready** [2] - 56:4, 56:14
**real** [5] - 38:6, 68:10, 118:12, 134:25, 151:5
**realize** [1] - 21:10
**realized** [1] - 123:20
**really** [29] - 13:5, 41:14, 56:10, 58:17, 59:9, 71:3, 71:9, 72:8, 74:12, 76:5, 79:4, 82:11, 90:15, 96:2, 107:10, 114:25, 118:18, 134:11, 134:23, 151:22, 153:11, 155:3, 161:3, 173:13, 174:23, 179:9, 182:7, 189:11, 191:22
**realm** [2] - 74:8, 172:19
**reask** [1] - 102:20
**reason** [28] - 7:20, 8:3, 19:12, 32:17, 32:22, 32:24, 33:22, 51:5, 51:10, 55:14, 56:5, 59:18, 60:3, 60:16, 63:4, 63:16, 65:15, 82:11, 86:1, 88:7, 95:12, 96:11, 101:20, 104:23, 132:20, 132:23, 171:19
**reasonable** [1] -

159:16
**reasons** [7] - 22:7, 91:23, 92:10, 150:22, 160:7, 161:6, 171:22
**rebuttal** [2] - 71:23, 71:24
**recalled** [2] - 19:23, 182:21
**recalling** [1] - 182:22
**receive** [2] - 122:5, 129:8, 129:10
**received** [14] - 5:4, 42:19, 45:19, 75:23, 113:12, 116:10, 120:6, 122:14, 126:5, 136:1, 136:3, 139:20, 140:22, 151:18
**recent** [2] - 146:16, 151:19
**recently** [3] - 57:4, 69:9, 144:11
**reception** [1] - 79:21
**recess** [10] - 64:2, 69:23, 71:22, 72:2, 132:1, 169:3, 191:6, 191:9, 192:5, 192:9
**Recess** [2] - 72:3, 132:2
**recessed** [1] - 192:10
**recognize** [1] - 126:25
**recognized** [1] - 164:11
**recollection** [33] - 9:20, 9:23, 9:24, 16:4, 17:5, 19:5, 19:7, 19:11, 21:9, 21:13, 22:5, 22:18, 22:22, 22:23, 27:6, 41:7, 51:7, 69:9, 85:24, 86:18, 86:21, 91:9, 100:12, 108:8, 108:19, 110:1, 110:11, 113:12, 122:2, 124:12, 131:2, 131:8
**recommend** [1] - 47:1
**recommendation** [1] - 47:6
**recommendations** [2] - 50:19, 94:4
**recommended** [2] - 51:23, 52:16
**recommending** [4] - 46:17, 46:18, 50:6, 50:7
**reconsider** [1] - 95:23
**reconvene** [1] - 191:6
**record** [48] - 4:19,

5:13, 9:6, 10:13, 10:21, 18:14, 21:22, 22:5, 27:5, 28:9, 28:23, 28:25, 30:3, 30:8, 30:11, 31:13, 32:1, 32:3, 32:10, 32:13, 35:9, 37:16, 37:17, 45:11, 70:5, 72:4, 77:17, 77:18, 98:13, 112:4, 114:13, 114:15, 120:22, 121:4, 126:21, 134:24, 138:10, 139:23, 147:7, 155:5, 155:24, 156:8, 156:13, 164:1, 175:9, 176:24, 183:12
**record-gathering** [1] - 37:17
**recorded** [4] - 9:24, 26:18, 26:22, 187:15
**recording** [1] - 187:13
**records** [74] - 16:10, 24:7, 24:10, 37:14, 38:12, 39:5, 40:6, 40:7, 47:24, 60:12, 62:25, 83:17, 101:14, 114:18, 114:21, 114:22, 114:25, 115:22, 115:24, 116:1, 116:3, 116:4, 116:5, 116:7, 116:10, 116:12, 116:14, 116:15, 116:16, 116:18, 116:19, 116:23, 120:4, 120:7, 120:8, 120:9, 121:5, 121:23, 122:15, 126:5, 129:7, 134:9, 136:4, 136:22, 136:25, 159:16, 159:19, 159:20, 159:21, 160:1, 160:2, 160:3, 160:4, 160:7, 160:16, 160:19, 160:22, 160:24, 161:5, 161:9, 161:12, 161:13, 161:17, 161:19, 162:2, 164:15, 164:18, 165:12, 172:23
**RECROSS** [2] - 33:17, 111:4
**recross** [1] - 111:1
**RECROSS-**

**EXAMINATION** [1] - 33:17
**red** [1] - 156:4
**redirect** [6] - 29:13, 71:24, 100:23, 133:4, 133:5, 136:18
**REDIRECT** [5] - 29:15, 100:25, 104:20, 136:9, 181:17
**reduce** [1] - 175:3
**reduced** [1] - 102:4
**refer** [5] - 9:23, 45:14, 130:11, 190:9, 190:19
**reference** [8] - 18:5, 54:25, 55:1, 62:23, 73:9, 108:20, 108:22, 108:23
**references** [1] - 80:11
**referral** [1] - 163:18
**referred** [12] - 42:4, 44:25, 125:3, 142:19, 153:14, 157:9, 181:9, 181:21, 181:23, 185:12, 190:7, 190:9
**referring** [9] - 15:6, 46:24, 51:19, 79:9, 79:11, 79:12, 98:13, 131:4, 180:23
**refers** [2] - 77:16, 184:19
**reflect** [2] - 57:2, 177:24
**reflected** [2] - 168:6, 180:12
**reflecting** [1] - 105:7
**reflection** [1] - 182:7
**reflects** [1] - 178:16
**refrain** [1] - 102:7
**refresh** [10] - 19:5, 19:11, 91:7, 108:8, 108:19, 110:1, 110:11, 120:23, 122:2, 124:12
**refreshed** [1] - 9:24
**refreshes** [1] - 19:7
**refusal** [1] - 145:6
**refuse** [3] - 27:10, 27:12, 27:16
**refused** [1] - 62:12
**refusing** [1] - 13:10
**regard** [5] - 110:13, 114:11, 127:14, 176:9, 176:10
**regarding** [14] - 7:1, 7:18, 48:18, 83:16, 85:4, 89:23, 91:24, 120:14, 121:5, 121:17, 124:7,

125:17, 126:4, 129:15

**regardless** [1] - 105:1

**regards** [3] - 5:13, 109:9, 114:15

**Regional** [1] - 53:20

**registered** [1] - 161:3

**regular** [2] - 94:19, 125:4

**regularity** [1] - 76:16

**reimbursement** [1] - 58:1

**rein** [1] - 33:7

**Reinhardt** [1] - 24:1

**reinstated** [1] - 139:19

**Reitan** [5] - 50:13, 52:13, 130:25, 131:12, 190:6

**relate** [2] - 65:20, 144:6, 148:21, 149:21, 165:12, 189:22

**related** [1] - 103:10

**relating** [3] - 142:24, 143:1, 159:19

**relation** [1] - 165:20

**relationship** [3] - 12:12, 12:18, 23:1

**relationships** [4] - 162:21, 166:6, 184:4, 186:11

**relative** [1] - 92:1

**release** [2] - 83:16, 125:24

**released** [4] - 111:14, 137:9, 144:13, 182:19

**relevance** [2] - 6:5, 102:21

**relevancy** [2] - 102:18, 102:20

**relevant** [14] - 66:1, 66:6, 66:8, 106:2, 149:19, 152:13, 152:17, 153:5, 170:23, 172:13, 176:8, 178:9, 178:17, 178:25

**reliable** [5] - 24:10, 24:11, 106:17, 106:19, 164:10

**relief** [8] - 63:11, 65:2, 65:8, 66:4, 71:12, 106:3, 135:6, 175:21

**religious** [2] - 114:21, 115:17

**reluctant** [1] - 161:1

**rely** [2] - 8:7, 134:24

**remain** [1] - 8:8

**remand** [1] - 95:25

**remark** [1] - 148:8

**remarks** [1] - 32:7

**remedy** [1] - 96:15

**remember** [68] - 16:7, 21:2, 22:3, 23:22, 29:3, 31:8, 31:14, 31:22, 31:23, 38:11, 38:18, 38:23, 40:23, 40:25, 41:4, 43:9, 47:3, 47:25, 48:1, 51:8, 55:11, 60:10, 61:14, 61:21, 69:19, 74:5, 74:6, 74:22, 76:9, 76:25, 84:20, 84:25, 85:2, 85:7, 86:11, 87:14, 89:16, 89:21, 89:25, 90:3, 90:12, 90:16, 90:21, 90:22, 90:23, 91:3, 91:13, 92:5, 92:25, 94:16, 94:20, 95:7, 97:3, 97:7, 97:8, 97:10, 97:17, 100:10, 101:13, 107:2, 107:6, 108:7, 109:25, 117:4, 130:11, 136:11, 141:17

**remind** [2] - 72:4, 132:5

**reminded** [1] - 72:15

**render** [1] - 7:19

**renewed** [1] - 81:3

**repeat** [1] - 26:20

**report** [26] - 52:19, 62:14, 84:19, 84:22, 85:2, 85:4, 85:8, 86:25, 87:3, 87:4, 87:7, 87:17, 87:19, 90:19, 104:3, 107:20, 107:24, 120:12, 120:14, 121:22, 127:18, 134:15, 169:25, 172:14

**reported** [2] - 26:22, 86:5

**reporter** [1] - 33:16

**reports** [6] - 5:22, 6:2, 6:12, 52:21, 85:3, 167:4

**represent** [1] - 114:9

**representation** [6] - 30:18, 66:3, 139:21, 159:2, 174:21, 187:5

**representative** [1] - 7:8

**represented** [8] - 22:13, 23:21, 24:16, 37:1, 40:20, 41:24,

97:8, 115:19

**representing** [9] - 20:6, 24:23, 25:21, 27:16, 68:4, 69:5, 71:11, 75:18, 82:2

**request** [22] - 14:11, 14:12, 15:19, 16:2, 23:9, 25:10, 26:5, 26:7, 31:24, 40:25, 53:5, 57:5, 57:8, 79:21, 116:7, 119:19, 120:22, 121:4, 121:5, 121:10, 121:20, 123:21

**requested** [6] - 17:2, 48:4, 48:10, 96:23, 120:4, 122:3

**requesting** [6] - 40:23, 64:24, 65:1, 102:8, 102:11, 110:15

**requests** [11] - 15:9, 19:15, 26:21, 28:23, 28:24, 30:4, 37:16, 121:7, 126:21, 136:4, 136:23

**require** [2] - 96:18, 156:4, 166:13

**required** [2] - 64:16, 145:7

**requirements** [2] - 191:19, 191:20

**requires** [3] - 52:20, 155:19, 172:25

**requisite** [1] - 5:23

**research** [12] - 91:4, 91:24, 92:2, 92:6, 106:16, 122:19, 122:23, 134:16, 151:4, 167:6, 173:8, 188:18

**researched** [1] - 91:22

**researchers** [1] - 151:7

**resentencing** [3] - 74:20, 74:22, 174:24

**reserve** [1] - 147:9

**resolve** [2] - 33:8, 53:6

**resolved** [1] - 109:23

**resonance** [2] - 50:8, 186:1

**resource** [3] - 140:3, 141:2, 154:22

**Resource** [1] - 140:23

**resources** [15] - 14:1, 14:8, 14:20, 19:8, 19:14, 19:15, 21:14, 31:16, 32:16, 52:8, 83:25, 154:19, 155:1, 155:9, 173:22

**respect** [6] - 7:25, 16:7, 105:12, 157:2, 161:11, 162:13

**respond** [5] - 32:6, 32:8, 32:9, 67:2, 71:20

**responded** [1] - 97:19

**respondent** [2] - 5:21, 7:8

**respondents** [2] - 6:13, 6:15

**responds** [1] - 190:8

**response** [7] - 33:20, 76:17, 76:23, 77:9, 97:10, 179:18, 179:19

**responses** [1] - 31:8

**responsibilities** [6] - 37:11, 71:10, 139:6, 141:11, 158:22, 162:13

**responsibility** [2] - 158:24, 159:13

**responsible** [1] - 174:16

**responsive** [1] - 179:14

**rest** [2] - 35:11, 137:20

**restate** [1] - 98:19

**restroom** [1] - 137:15

**result** [7] - 25:24, 83:1, 84:14, 85:11, 151:9, 186:10, 186:24

**resulted** [1] - 165:9

**results** [3] - 87:12, 122:23, 185:5

**retain** [4] - 61:4, 61:16, 162:4, 172:19

**retained** [8] - 16:17, 20:19, 27:7, 80:24, 87:23, 93:21, 101:17, 135:10

**retaining** [2] - 31:19, 159:7

**retention** [2] - 134:23, 178:22

**retired** [5] - 11:6, 11:7, 22:2, 22:6, 177:16

**return** [2] - 131:24, 149:10

**reveal** [1] - 161:3

**revenue** [1] - 40:22

**Review** [3] - 144:5, 144:9

**review** [10] - 16:16, 107:21, 108:8, 110:1, 119:19, 124:21, 134:17, 144:3, 172:4, 172:15

**reviewed** [12] - 5:21, 55:8, 62:24, 85:6, 103:11, 120:9, 124:22, 127:8, 132:16, 156:25, 173:10

**reviewing** [1] - 85:11

**revised** [2] - 174:14, 179:8, 180:11

**revision** [1] - 144:25, 181:12

**revisit** [1] - 73:1

**rights** [1] - 145:6

**ring** [1] - 107:3

**rise** [2] - 70:7, 70:14

**risks** [1] - 96:9

**RMK** [1] - 16:14

**road** [2] - 57:20, 100:6, 155:18

**robbery** [1] - 168:1

**Robin** [21] - 36:16, 40:21, 44:20, 53:17, 82:2, 83:16, 86:16, 87:8, 87:12, 87:22, 89:3, 90:23, 91:11, 91:12, 91:15, 93:3, 99:22, 100:2, 117:13, 121:17, 122:1

**Robin's** [5] - 52:2, 53:20, 63:22, 92:17, 191:3

**Roger** [2] - 5:14, 109:6

**role** [6] - 37:10, 60:22, 61:20, 175:12, 190:18, 191:11

**Rolf** [18] - 11:13, 11:19, 11:21, 11:23, 16:14, 23:16, 24:1, 24:25, 25:2, 34:24, 35:10, 53:19, 113:12, 122:8, 126:9, 127:7, 127:18, 130:6

**ROLF** [1] - 35:6

**room** [1] - 118:9

**Rorschach** [6] - 91:15, 92:4, 92:11, 92:16, 106:12, 131:14

**rough** [1] - 145:1

**roughly** [2] - 70:3, 141:8

**round** [1] - 129:22

**row** [3] - 113:8, 157:13, 165:25

**Row** [92] - 4:4, 10:6, 11:9, 11:17, 13:8, 14:3, 17:8, 19:6, 19:15, 20:6, 22:13,

22:19, 22:24, 23:9,
23:21, 24:16, 27:10,
27:16, 29:19, 34:24,
36:13, 36:16, 36:20,
37:2, 37:5, 37:23,
38:6, 38:8, 38:9,
38:14, 40:14, 40:21,
40:23, 41:24, 43:1,
43:12, 43:21, 44:14,
44:20, 50:21, 56:17,
59:1, 60:14, 66:3,
68:4, 69:5, 71:12,
75:18, 82:2, 83:16,
86:16, 87:13, 87:23,
88:14, 89:3, 90:23,
91:11, 91:15, 99:22,
101:10, 102:25,
103:17, 104:24,
105:2, 105:6,
105:11, 105:14,
106:20, 106:25,
107:5, 109:22,
110:15, 117:1,
117:2, 119:21,
120:6, 121:17,
121:19, 122:1,
125:14, 125:17,
125:23, 126:22,
128:20, 129:13,
130:19, 136:20,
165:15, 167:11,
171:14
**Row's** [40] - 12:23,
17:3, 21:6, 23:4,
23:17, 24:20, 27:19,
28:12, 38:18, 59:12,
59:21, 66:25, 73:20,
87:8, 103:25, 106:3,
107:18, 112:16,
113:11, 113:24,
115:21, 117:9,
120:1, 123:1,
124:17, 128:4,
130:11, 132:18,
140:13, 156:22,
156:25, 157:3,
157:22, 159:17,
161:13, 166:23,
168:8, 175:1,
178:17, 178:25
**rule** [6] - 14:11, 48:10,
104:8, 104:10,
147:22, 169:16
**rule-out** [1] - 169:16
**ruled** [1] - 95:24
**rules** [1] - 95:17
**ruling** [2] - 103:24,
147:9
**run** [1] - 152:16
**running** [5] - 116:14,

155:13, 156:7,
163:2, 165:7
**Russ** [2] - 6:20, 7:11
**Russell** [2] - 137:14,
138:11
**RUSSELL** [2] - 138:7,
138:12
**S-T-E-T-L-E-R** [1] -
138:12
**sagittal** [1] - 185:17
**Saint** [8] - 53:20,
120:4, 120:20,
121:4, 121:14,
121:23, 122:1,
133:15
**sake** [1] - 8:18
**San** [2] - 140:2,
140:16
**sat** [1] - 58:20
**satisfied** [1] - 5:23
**saw** [7] - 60:9, 85:7,
85:9, 106:25, 117:8,
134:16, 174:22
**Scale** [2] - 91:19,
131:14
**scale** [2] - 48:5, 48:10
**scalp** [1] - 187:16
**scan** [34] - 46:9,
46:24, 53:20, 84:20,
85:5, 85:6, 85:11,
85:24, 86:4, 86:8,
99:17, 105:7,
120:11, 120:14,
122:3, 122:9,
123:21, 125:7,
127:18, 130:15,
133:15, 167:8,
185:1, 185:7,
185:25, 186:2,
186:13, 186:14,
186:15, 186:22,
186:23, 187:1, 187:8
**scanner** [1] - 188:8
**scans** [13] - 104:9,
184:20, 184:21,
186:19, 186:20,
188:6, 188:7,
188:10, 188:11,
188:15
**scheduling** [1] - 53:2
**schizophrenia** [3] -
134:16, 167:4,
188:25
**school** [11] - 13:21,
13:22, 13:23,
160:13, 169:18,
169:20, 169:22,
169:24, 177:2, 190:2
**School** [1] - 144:16
**schools** [3] - 101:12,

160:20, 171:25
**Schwartzman** [47] -
14:3, 14:7, 14:11,
14:15, 15:2, 15:8,
15:13, 16:3, 16:5,
19:14, 21:15, 21:17,
21:21, 21:25, 22:4,
28:10, 28:11, 28:13,
28:23, 31:25, 32:2,
41:2, 41:5, 41:9,
52:19, 57:6, 63:11,
63:23, 65:5, 65:8,
73:24, 79:15, 79:18,
80:1, 80:10, 81:3,
83:4, 83:8, 83:9,
84:5, 94:21, 95:13,
108:4, 108:24,
109:24, 111:6,
134:25
**Schwartzman's** [1] -
79:21
**scientific** [1] - 91:5
**scope** [2] - 147:13,
175:14
**Scott** [1] - 151:7
**scratch** [1] - 33:6
**screen** [8] - 36:7,
45:17, 45:22, 49:23,
53:14, 163:24,
185:6, 187:23
**screwed** [1] - 56:10
**scroll** [5] - 50:3,
119:5, 124:20,
126:25, 127:3
**scrolled** [3] - 54:9,
54:13, 121:19
**scrolling** [1] - 119:7
**Scrolling** [4] - 119:9,
119:11, 119:13,
119:15
**search** [1] - 166:2
**seat** [8] - 10:11, 10:18,
20:15, 20:23, 35:7,
112:1, 138:8, 183:8
**second** [12] - 20:15,
20:20, 20:23, 46:11,
47:22, 54:15, 84:5,
117:8, 150:18,
150:21, 151:11,
151:22
**second-chair** [1] -
20:20
**second-seat** [1] -
20:15
**secrets** [2] - 14:9,
14:21
**section** [1] - 143:21
**sections** [1] - 185:11
**secure** [1] - 64:19
**seeing** [2] - 47:24,

95:11
**seek** [4] - 58:1, 118:2,
144:4, 145:11
**seeking** [4] - 14:20,
33:22, 118:13
**seem** [4] - 31:22, 61:6,
64:16, 155:8
**selection** [3] - 38:22,
43:19, 141:22
**send** [3] - 41:17,
81:20, 169:22
**sending** [4] - 93:16,
93:17, 129:6, 163:19
**sends** [2] - 14:23,
186:24
**sense** [7] - 57:11,
68:19, 106:7, 146:5,
150:19, 151:3,
191:17
**sensed** [1] - 191:4
**sent** [17] - 5:2, 16:17,
27:25, 39:18, 41:17,
43:12, 43:14, 81:11,
81:17, 82:5, 82:8,
87:17, 120:17,
129:7, 129:15,
136:23, 173:11
**Sent** [1] - 42:16
**sentence** [5] - 52:6,
140:7, 145:18,
149:10, 151:9
**sentenced** [3] - 36:17,
150:23, 153:25
**sentencer** [2] -
149:10, 149:19
**sentences** [5] - 48:2,
48:3, 48:8, 54:14,
139:12
**Sentencing** [1] -
157:25
**sentencing** [17] - 23:4,
76:6, 79:19, 86:16,
88:5, 88:25, 93:6,
107:5, 114:12,
147:3, 149:17,
151:15, 152:6,
152:11, 153:23,
170:8, 191:23
**sentencings** [1] -
147:1
**separate** [8] - 8:20,
20:20, 56:18,
143:22, 148:12,
178:22, 182:6,
184:10
**separately** [1] -
184:12
**September** [2] - 45:20,
75:24
**sequestration** [1] -

7:5
**serial** [1] - 185:10
**serious** [5] - 38:14,
82:16, 120:5,
122:17, 123:11,
133:14, 133:19,
168:6
**seriously** [1] - 82:18
**seriousness** [1] -
156:20
**serve** [1] - 61:13
**served** [3] - 143:15,
154:22, 175:5
**services** [2] - 134:25,
160:1
**serving** [1] - 60:23
**session** [1] - 137:20
**sessions** [1] - 166:4
**set** [9] - 6:11, 27:5,
32:19, 53:3, 70:11,
156:24, 160:15,
179:11, 180:1
**settings** [1] - 171:23
**settled** [2] - 38:21,
38:22
**seven** [2] - 70:9,
142:11
**several** [6] - 72:23,
107:10, 114:24,
177:11, 180:19
**shadows** [1] - 186:10
**shape** [1] - 143:21
**shapes** [1] - 162:17
**share** [1] - 161:1
**shed** [1] - 154:9
**shocked** [1] - 134:19
**short** [3] - 39:24,
59:17, 134:8
**shorthand** [1] - 39:7
**shortly** [1] - 177:16
**shoulders** [3] -
158:25, 159:13,
162:12
**show** [9] - 18:3, 18:7,
42:7, 53:22, 120:25,
124:19, 126:24,
183:9, 186:14
**showed** [2] - 120:22,
133:16
**showing** [4] - 83:10,
102:21, 138:17,
154:20
**shown** [1] - 77:19
**shows** [1] - 187:5
**shut** [3] - 58:14,
58:22, 80:8
**siblings** [3] - 114:25,
115:13
**sic** [1] - 136:19
**sic]** [1] - 121:6

**sick** [1] - 189:21
**side** [2] - 185:14, 185:17
**sides** [1] - 34:10
**sign** [1] - 125:24
**signed** [2] - 127:5, 127:9
**significance** [4] - 164:8, 164:19, 173:9, 173:13
**significant** [7] - 46:20, 58:7, 116:17, 142:16, 157:5, 164:1, 173:15
**signify** [3] - 39:6, 39:16, 42:18
**signs** [1] - 116:21
**silently** [1] - 46:10
**similar** [4] - 7:11, 91:20, 162:15, 174:8
**similarly** [2] - 145:17, 169:17
**simple** [2] - 32:21, 76:21
**simply** [5] - 43:20, 61:8, 61:18, 63:3, 108:15
**Simpson** [1] - 80:11
**single** [2] - 38:7, 186:16
**single-photon** [1] - 186:16
**sister's** [1] - 171:15
**sisters** [1] - 115:12
**sit** [3] - 21:11, 33:23, 173:14
**site** [1] - 165:3
**sitting** [2] - 7:12, 13:19
**situation** [6] - 60:15, 78:12, 79:5, 80:16, 115:16, 155:19
**six** [1] - 142:11
**Sixth** [1] - 39:7
**sizes** [1] - 162:17
**skeletal** [1] - 160:8
**skeptical** [1] - 103:2
**skim** [1] - 127:11
**skimmed** [1] - 173:12
**skimming** [1] - 127:13
**skipped** [2] - 31:11, 145:22
**sleep** [2] - 68:21, 69:4
**slice** [2] - 102:4, 185:15
**slices** [5] - 185:8, 185:12, 185:16, 185:21, 186:8
**slight** [1] - 137:17
**slump** [1] - 70:25

**small** [3] - 38:6, 99:16, 99:25
**smaller** [1] - 97:15
**smarter** [1] - 80:2
**smorgasbord** [1] - 142:10
**snapshot** [1] - 178:16
**social** [8] - 115:22, 115:24, 116:9, 125:13, 160:1, 163:7, 164:13, 170:22
**society** [1] - 97:15
**sociopathic** [1] - 105:14
**someone** [6] - 118:9, 156:18, 161:19, 163:11, 182:13, 190:21
**sometime** [4] - 73:21, 89:23, 112:15, 113:16
**sometimes** [10] - 20:13, 57:18, 71:9, 74:5, 74:6, 92:4, 156:8, 158:15, 161:3, 168:3
**somewhat** [2] - 26:1, 68:7
**somewhere** [4] - 62:23, 67:13, 145:21, 152:13
**soon** [3] - 76:1, 101:19, 117:5
**sooner** [3] - 55:10, 55:12, 101:5
**sorry** [23] - 4:13, 4:20, 6:14, 18:16, 27:23, 29:12, 34:19, 42:13, 46:12, 49:18, 51:1, 51:3, 54:15, 61:17, 71:16, 74:17, 77:5, 77:23, 87:10, 90:18, 172:17, 179:13
**sort** [20] - 9:17, 11:14, 39:19, 101:7, 113:7, 142:23, 144:10, 148:7, 158:1, 159:7, 161:5, 161:25, 164:22, 165:8, 167:17, 170:22, 172:4, 172:9, 178:16, 191:21
**Sorting** [1] - 50:9
**sought** [1] - 41:6
**sound** [3] - 17:16, 87:13, 91:2
**sounds** [3] - 76:15, 79:17, 90:10
**source** [3] - 18:10,

103:24, 155:5
**sources** [8] - 14:14, 14:17, 114:17, 116:15, 165:5, 177:24, 177:25, 191:21
**South** [1] - 146:12
**speaking** [5] - 110:7, 117:13, 122:25, 124:16, 124:18
**speaks** [1] - 22:5
**specialist** [25] - 16:17, 21:3, 37:7, 37:12, 41:7, 58:20, 101:17, 105:2, 112:22, 112:25, 113:1, 113:2, 114:2, 114:3, 114:4, 123:9, 158:25, 162:4, 162:8, 163:23, 172:11, 178:22, 179:10, 181:8, 182:12
**specialists** [9] - 7:18, 157:23, 158:10, 158:13, 158:17, 158:23, 179:7, 180:9, 181:10
**Specialists** [1] - 158:1
**specialized** [3] - 37:13, 109:11, 158:20
**specializes** [1] - 49:4
**specializing** [2] - 48:23, 183:24
**specialty** [2] - 184:2, 184:10
**specific** [22] - 15:9, 17:5, 22:18, 22:22, 31:19, 40:20, 46:25, 74:7, 75:4, 80:10, 91:12, 131:9, 131:11, 149:15, 150:3, 155:9, 155:25, 157:18, 158:20, 159:14, 163:13, 165:12
**specifically** [13] - 15:2, 50:8, 50:13, 86:12, 91:12, 94:13, 122:3, 122:11, 124:4, 130:25, 132:13, 149:25, 166:23
**specificity** [1] - 78:15
**specifies** [1] - 50:9
**SPECT** [10] - 48:5, 48:10, 184:21, 186:15, 186:16, 186:23, 187:24,

188:1, 188:10, 188:11
**speculation** [1] - 88:10
**speed** [2] - 12:9, 38:4
**spell** [8] - 10:12, 10:20, 35:8, 35:11, 112:3, 138:9, 171:3, 183:11
**spend** [4] - 8:24, 84:11, 126:22
**spending** [5] - 13:9, 80:18, 83:7, 155:18, 175:1
**spent** [3] - 40:2, 82:6, 107:8
**spine** [2] - 184:4, 184:20
**sponsored** [3] - 141:12, 141:20, 143:5
**spontaneous** [1] - 187:14
**spotting** [1] - 37:18
**spread** [1] - 142:11
**stack** [2] - 120:6, 120:11
**staff** [4] - 12:16, 139:7, 158:10, 180:6
**staffed** [1] - 180:8
**stage** [2] - 25:23, 70:12
**stamina** [1] - 31:17
**stand** [10] - 10:11, 16:11, 35:7, 112:1, 138:8, 150:19, 176:2, 176:5, 176:9, 183:8
**standard** [19] - 48:16, 50:17, 60:19, 60:25, 61:13, 92:12, 92:13, 115:7, 153:24, 154:14, 155:12, 157:2, 165:3, 166:13, 167:20, 175:6, 175:25, 191:16, 191:18
**standards** [7] - 7:20, 30:25, 152:22, 153:16, 153:17, 153:20, 177:20, 178:17, 180:22, 180:23, 182:5, 191:8, 191:10
**standing** [1] - 47:25
**stands** [4] - 33:25, 47:3, 92:25, 185:2
**Stanford** [1] - 91:21
**Stanford-Binet** [1] - 91:21

**start** [9] - 43:24, 67:12, 69:23, 70:25, 71:9, 79:6, 101:14, 183:20, 189:16
**started** [3] - 80:4, 101:15, 142:7
**starting** [6] - 39:13, 44:13, 54:15, 67:4, 101:9, 127:12
**state** [33] - 9:5, 10:12, 10:20, 11:7, 25:18, 26:10, 35:8, 36:19, 64:17, 112:3, 128:21, 138:9, 139:11, 140:4, 140:5, 141:14, 144:19, 146:8, 146:11, 146:20, 148:22, 148:24, 152:24, 153:3, 154:4, 158:9, 158:14, 158:19, 180:1, 180:15, 180:17, 183:11, 188:8
**State** [9] - 25:11, 65:22, 66:18, 70:2, 103:3, 111:16, 113:6, 139:16, 140:3
**State's** [4] - 88:9, 88:15, 88:21, 97:10
**statement** [9] - 27:1, 42:11, 71:15, 75:20, 97:17, 98:23, 99:6, 110:13, 138:21
**statements** [4] - 4:7, 26:19, 26:22, 69:8
**states** [8] - 61:10, 83:19, 146:8, 153:1, 158:12, 158:16, 180:3, 180:7
**stature** [1] - 61:13
**status** [5] - 11:5, 53:2, 76:13, 164:8, 164:13
**statute** [2] - 52:20, 145:8
**statutes** [2] - 95:15, 95:16
**statutory** [1] - 149:15
**stay** [1] - 8:4
**step** [16] - 5:6, 10:8, 33:13, 34:9, 35:4, 103:24, 111:9, 111:21, 115:13, 133:6, 137:6, 138:4, 171:15, 182:18, 183:4
**step-grandfather** [1] - 171:15
**step-siblings** [1] -

115:13
stepparents [1] - 115:13
stepped [2] - 25:10, 137:15
steps [2] - 30:1, 161:17
STETLER [1] - 138:7
Stetler [16] - 6:20, 7:11, 7:12, 7:17, 137:14, 137:18, 138:3, 138:11, 138:17, 147:8, 148:19, 175:24, 176:24, 178:3, 179:13, 181:19
Stetler's [1] - 152:5
Steuart [5] - 84:20, 84:22, 85:19, 89:18, 109:15
Steuart's [1] - 85:8
Stevens [1] - 177:15
still [11] - 11:7, 13:21, 14:20, 26:3, 72:5, 105:15, 110:5, 112:10, 132:5, 153:23, 182:12
sting [1] - 103:12
stipulate [1] - 5:15
stipulated [6] - 8:18, 44:24, 45:3, 45:15, 72:12, 73:3
stipulating [2] - 5:25, 8:17
stipulation [7] - 5:1, 5:12, 6:9, 9:6, 69:7, 69:8, 73:7
stop [1] - 119:17
stopwatch [1] - 40:9
Story [1] - 144:14
story [2] - 113:3, 160:23
straight [1] - 18:14
straighten [2] - 15:13, 85:22
strangers [1] - 171:17
strategic [10] - 32:22, 32:24, 33:22, 51:1, 51:10, 55:14, 56:5, 60:16, 63:4, 63:16
strategy [2] - 51:12, 51:17
stress [1] - 90:25
Strickland [2] - 191:11, 191:17
stride [1] - 4:24
strike [1] - 66:8
STROOP [1] - 131:12
structural [2] - 187:25, 188:1

structure [2] - 186:13, 187:9
struggling [1] - 40:15
studied [2] - 188:7, 189:25
studies [3] - 48:24, 49:8
stuff [8] - 43:3, 63:8, 76:20, 76:21, 93:13, 95:19, 98:11, 101:14
subbranch [1] - 158:1
subject [4] - 144:22, 144:24, 171:16, 182:20
subjective [1] - 92:7
submissions [1] - 147:16
submit [3] - 52:10, 81:9, 95:3
submitted [6] - 27:21, 27:22, 63:22, 95:11, 119:3
subpoena [6] - 34:13, 34:20, 111:14, 137:9, 137:11, 182:20
subpoenaed [2] - 34:10, 111:12
subspecialty [1] - 184:2
substance [2] - 9:11, 159:20
substantial [1] - 145:13
substantive [1] - 44:14
substrate [1] - 184:22
subtleties [1] - 162:20
successfully [1] - 174:3
successive [2] - 108:5, 108:20
sudden [1] - 155:20
suffer [5] - 68:3, 68:6, 68:16, 69:4, 71:4
suffered [2] - 70:13, 103:18
suffering [5] - 31:10, 71:12, 104:25, 122:16, 170:9
sufficient [1] - 36:7
sugar [1] - 187:3
suggest [2] - 64:23, 179:22
suggested [7] - 30:2, 52:14, 130:25, 131:6, 131:14, 134:6, 163:14
suggesting [1] - 192:2
suggestion [3] - 59:3,

152:9, 181:7
suggests [3] - 79:3, 106:16, 191:16
suicide [5] - 47:24, 85:25, 120:5, 133:15, 161:14
summaries [3] - 177:21, 178:13, 182:4
summarize [1] - 172:10
summer [3] - 93:17, 93:22, 94:5
summon [1] - 34:25
Sundby [1] - 151:7
supervision [1] - 190:15
supplemental [1] - 30:5
supplementary [1] - 159:10
supplied [1] - 21:23
supply [1] - 136:25
support [3] - 17:11, 59:12, 59:22
supporting [2] - 52:10, 170:23
suppose [1] - 101:16
supposed [2] - 104:14, 137:18
Supreme [12] - 24:24, 25:5, 25:10, 36:24, 52:20, 53:7, 64:12, 95:25, 96:5, 102:15, 149:16, 149:23
surprise [2] - 87:9, 105:10
surprised [4] - 17:6, 79:24, 80:6, 80:22
suspect [1] - 168:6
sustain [2] - 102:22, 152:15
sustained [1] - 102:20
swamped [2] - 38:13, 75:18
swear [1] - 85:17
switch [2] - 5:7, 62:2
sworn [2] - 10:9, 183:5
SWORN [5] - 10:10, 35:6, 111:25, 138:7, 183:7
symptoms [1] - 116:21
synthesized [1] - 185:4
system [7] - 154:18, 154:19, 155:10, 168:14, 184:3, 184:23, 187:11

systemic [1] - 191:18
Tabitha [1] - 121:11
table [1] - 138:4
taught [1] - 157:8
teachers [2] - 169:24, 170:20
team [9] - 114:4, 114:9, 150:15, 151:12, 159:6, 163:23, 170:12, 181:9, 181:13
teams [2] - 155:23, 159:11
tearing [1] - 56:9
technical [1] - 76:20
techniques [1] - 188:3
telephone [7] - 117:24, 120:18, 131:15, 133:25, 171:5, 171:11, 171:17
telephoned [1] - 127:18
telltale [1] - 133:16
template [1] - 39:19
ten [1] - 168:1
Ten [1] - 177:22
tend [1] - 70:15
tendency [1] - 21:21
tender [2] - 147:8, 148:3
tends [1] - 70:16
Tennard [1] - 149:24
TENNARD [1] - 149:24
Tennessee [1] - 146:12
tenths [1] - 40:3
term [3] - 13:25, 39:4, 184:18
termed [2] - 115:7, 124:24
terms [10] - 30:25, 43:18, 101:6, 105:14, 115:12, 125:8, 158:23, 186:12, 190:6, 192:8
test [13] - 48:11, 48:12, 91:17, 91:20, 92:5, 92:8, 92:22, 93:1, 106:12, 160:13, 187:21, 187:22, 190:8
Test [1] - 50:10
testified [13] - 18:1, 60:19, 60:21, 88:25, 128:17, 146:2, 146:14, 146:20, 146:25, 147:2, 176:11, 176:12, 180:22

testifies [1] - 9:22
testify [16] - 5:16, 7:7, 7:18, 17:11, 17:19, 30:17, 59:11, 60:4, 69:13, 88:4, 88:7, 128:20, 128:23, 135:9, 137:18, 147:22
testifying [6] - 7:4, 9:11, 9:14, 97:11, 131:2, 175:20
testimony [19] - 7:13, 8:5, 8:6, 8:8, 30:5, 35:19, 64:18, 83:13, 135:18, 135:23, 135:25, 148:10, 157:10, 158:8, 160:17, 171:2, 171:15, 171:19, 182:10
testing [47] - 17:3, 17:7, 19:6, 19:8, 19:15, 32:17, 32:25, 33:22, 46:21, 47:1, 47:4, 48:17, 49:9, 49:11, 50:7, 50:17, 51:18, 51:19, 57:5, 57:8, 58:3, 63:12, 65:7, 94:6, 94:13, 95:13, 96:20, 102:25, 108:2, 109:22, 110:23, 123:22, 123:23, 130:18, 130:21, 130:22, 131:7, 161:24, 162:20, 162:22, 167:21, 173:18, 173:19, 173:21, 190:5, 190:23
tests [21] - 19:13, 46:25, 48:17, 49:6, 50:9, 50:14, 50:22, 51:10, 51:20, 91:18, 92:9, 92:10, 93:3, 93:11, 106:21, 130:24, 131:9, 131:11, 160:15, 190:6, 190:7
Texas [5] - 146:12, 146:18, 149:24, 151:18, 180:4
text [2] - 39:24, 40:11
themes [2] - 113:23, 116:19
themselves [2] - 158:7, 174:18
theory [3] - 116:20, 150:12, 150:17
therefore [2] - 118:11,

187:4
they've [1] - 175:2
thicknesses [1] - 185:22
thinkers [1] - 161:6
thinking [11] - 63:1, 63:7, 71:5, 91:21, 147:25, 151:16, 166:23, 171:18, 172:18, 172:24, 189:10
Thinks [1] - 48:4
thinks [2] - 48:10, 94:13
third [1] - 145:16
Thomas [1] - 23:25
thorough [5] - 46:18, 114:5, 123:24, 181:1, 181:2
thoroughly [3] - 91:22, 116:11, 159:5
thoughts [3] - 133:9, 184:15, 191:10
three [13] - 48:2, 48:3, 51:22, 52:15, 89:6, 103:17, 120:11, 144:2, 146:23, 174:23, 185:8, 185:19
three-dimensional [2] - 185:8, 185:19
three-fourths [1] - 120:11
throughout [6] - 33:5, 37:14, 38:12, 38:25, 41:24, 73:8
tie [1] - 175:17
timekeeping [1] - 40:8
timeline [2] - 43:24, 55:6
timely [1] - 137:24
timing [1] - 32:20
tips [1] - 143:3
titled [1] - 47:16
today [12] - 8:15, 21:11, 30:5, 91:9, 96:6, 100:12, 112:18, 137:19, 137:20, 178:18, 178:21, 190:7
together [6] - 38:7, 103:21, 114:9, 118:2, 118:19, 126:20
toggle [1] - 5:7
Tom [2] - 74:20, 74:22
tomogram [3] - 185:2, 186:16, 186:23
tomorrow [8] - 137:18, 137:22,

169:5, 191:7, 191:9, 191:25, 192:6, 192:9
tongue [1] - 82:15
tongue-in-cheek [1] - 82:15
Tony [2] - 20:22
took [8] - 40:19, 40:21, 43:21, 60:24, 70:6, 113:6, 117:24, 136:12
top [6] - 18:17, 52:5, 62:7, 64:5, 124:9, 185:18
touch [1] - 190:5
touched [1] - 105:4
town [1] - 20:14
toxic [1] - 165:2
track [1] - 40:12
tracks [1] - 154:7
traditional [1] - 166:8
Trail [1] - 50:10
train [1] - 142:23
trained [2] - 184:12, 184:13
trainers [1] - 142:23
training [19] - 123:10, 141:3, 141:4, 141:13, 142:1, 142:18, 143:4, 150:17, 153:7, 153:9, 157:16, 157:21, 158:5, 166:4, 168:15, 174:1, 174:5, 181:25
trainings [1] - 141:14
transcript [19] - 21:24, 44:1, 44:6, 44:9, 45:19, 54:4, 54:9, 54:13, 56:24, 62:5, 101:3, 101:6, 101:9, 101:21, 108:9, 108:13, 108:15, 110:2, 110:4
transcripts [7] - 22:3, 22:20, 62:23, 75:24, 76:2, 76:4, 76:8
transmittal [2] - 121:25, 136:2
transmitted [1] - 122:8
transparent [1] - 186:13
trauma [2] - 162:22, 189:13
traumatic [1] - 165:10
travel [7] - 59:1, 59:5, 64:18, 117:25, 118:3, 126:19
traveled [1] - 84:15
treasurer [1] - 81:21
Treasury [1] - 82:21

treat [1] - 190:11
treated [1] - 95:2
treatise [1] - 181:23
tree [2] - 191:13, 191:15
tremendous [1] - 61:10
trial [51] - 4:25, 7:13, 8:5, 14:3, 20:13, 20:17, 23:4, 35:22, 36:23, 38:21, 39:1, 41:24, 42:2, 45:19, 52:19, 53:3, 53:11, 53:12, 57:6, 60:8, 64:16, 73:9, 76:5, 79:18, 79:19, 86:15, 88:15, 103:4, 130:10, 130:20, 148:21, 149:1, 151:12, 151:14, 152:10, 154:3, 154:6, 154:13, 155:2, 156:14, 156:16, 157:22, 162:4, 165:15, 172:8, 172:10, 176:6, 176:10, 179:12, 191:23
Trial [2] - 143:19, 157:18
trial-level [1] - 179:12
trials [3] - 20:15, 38:14
tried [5] - 21:14, 58:6, 96:5, 99:12, 127:24
Trimming [25] - 14:15, 16:5, 23:10, 26:15, 26:18, 26:22, 27:2, 27:10, 27:12, 27:15, 31:24, 36:18, 41:11, 41:20, 57:12, 58:6, 74:4, 81:10, 81:14, 81:18, 81:20, 81:23, 82:2, 82:17
Trimming's [2] - 27:1, 42:4
Trinity [1] - 90:20
trouble [2] - 13:11, 68:13
truancy [2] - 103:8, 169:18
truant [1] - 170:2
True [5] - 124:16, 124:25, 125:1, 125:2, 125:4
true [9] - 8:3, 20:22, 22:11, 30:13, 38:8, 65:6, 96:19, 135:3, 166:15
trust [3] - 118:8,

118:10, 161:2
truthful [1] - 17:19
truthfully [1] - 69:13
try [9] - 41:8, 41:9, 65:7, 95:21, 114:24, 118:1, 125:7, 160:6, 169:11
trying [19] - 14:20, 26:10, 31:13, 32:10, 32:11, 59:7, 61:7, 63:16, 67:5, 83:25, 98:17, 99:13, 99:16, 99:23, 134:13, 156:11, 156:12, 158:5, 171:13
turn [5] - 47:10, 99:16, 150:20, 172:2, 191:2
turned [5] - 15:7, 30:4, 41:10, 64:8, 156:3
turning [2] - 115:21, 165:19
twice [3] - 81:2, 151:9, 174:15
two [31] - 5:11, 11:16, 11:20, 14:14, 14:16, 24:20, 33:12, 38:20, 41:23, 52:22, 54:14, 91:18, 92:9, 92:10, 93:3, 93:16, 103:21, 129:21, 142:16, 143:11, 150:14, 151:2, 152:12, 154:7, 174:24, 178:22, 179:3, 179:10, 181:11, 185:7, 185:20
two-dimensional [2] - 185:7, 185:20
two-man [1] - 11:16
tying [1] - 6:2
type [6] - 91:17, 105:1, 159:16, 185:2, 186:16, 186:19
typed [1] - 124:7
types [4] - 91:18, 115:9, 184:24, 187:8
typically [1] - 99:10
U.S [1] - 82:21
ultimate [1] - 159:12
ultimately [6] - 41:15, 81:22, 117:18, 122:5, 140:5, 158:1
ultrasound [1] - 184:22
unable [2] - 126:18, 126:20
unaware [2] - 104:5, 105:9
uncertainty [1] - 33:8
unclear [1] - 75:25

uncles [1] - 115:12
uncover [1] - 79:3
uncovered [2] - 84:13, 120:3
under [22] - 7:20, 11:22, 14:4, 23:16, 33:23, 35:5, 72:5, 82:22, 107:12, 107:13, 111:23, 121:12, 121:16, 132:5, 138:5, 139:8, 139:10, 139:19, 140:7, 145:7, 145:18, 150:4
undercut [1] - 151:10
undergo [1] - 50:21
underlying [2] - 70:7, 70:14
undermine [2] - 175:24, 176:2
underscores [1] - 159:12
understood [1] - 54:18
undertake [1] - 156:12
undertaken [1] - 135:1
undertaking [1] - 156:21
undisputed [1] - 31:2
unit [1] - 40:8
units [1] - 141:1
universal [1] - 50:16
universe [1] - 172:9
University [5] - 123:5, 144:8, 144:16, 151:7, 157:11
unless [5] - 6:1, 28:2, 66:1, 66:9, 169:4
unlimited [1] - 82:23
unnecessarily [1] - 83:7
unnumbered [1] - 62:6
unpack [1] - 184:25
unreliable [1] - 168:17
unusual [1] - 167:22
up [74] - 5:8, 12:9, 14:25, 15:25, 18:4, 18:7, 18:9, 26:23, 27:5, 30:22, 31:4, 32:4, 32:23, 33:10, 33:23, 38:4, 39:5, 40:10, 42:8, 43:5, 52:5, 53:14, 54:4, 56:10, 58:14, 63:19, 65:18, 67:18, 67:21, 68:21, 69:3, 71:16, 72:7, 76:8, 78:18, 80:8, 84:13, 89:15, 94:11, 104:22,

108:12, 117:15, 118:16, 120:8, 120:13, 121:12, 122:19, 129:17, 130:1, 133:14, 134:6, 134:7, 136:7, 147:15, 150:19, 151:17, 155:20, 156:3, 161:2, 163:5, 165:2, 165:13, 169:21, 171:25, 173:3, 177:10, 179:11, 180:1, 180:2, 186:14, 191:13, 191:14, 192:7
**upbringing** [1] - 166:24
**updates** [1] - 143:3
**upper** [1] - 42:15
**upper-right** [1] - 42:15
**useful** [1] - 187:18
**uses** [1] - 187:1
**utero** [3] - 159:24, 159:25, 165:9
**V6** [1] - 39:4
**vaguely** [1] - 162:1
**varieties** [1] - 184:21
**variety** [1] - 167:2
**various** [15] - 25:17, 30:3, 83:2, 143:14, 163:13, 180:7, 184:19, 184:21, 185:4, 185:8, 185:22, 187:4, 187:6, 187:17
**varying** [1] - 168:13
**vehemently** [1] - 92:21
**vermillion** [1] - 31:22
**versus** [6] - 49:7, 66:25, 149:2, 152:11, 187:9, 187:25
**vertical** [1] - 40:2
**vet** [1] - 166:13
**vetting** [1] - 166:19
**Victor** [1] - 39:5
**view** [8] - 30:15, 32:15, 105:11, 106:7, 168:9, 174:15, 185:14, 186:12
**viewed** [4] - 157:4, 168:11, 182:3, 182:4
**viewpoint** [1] - 97:8
**views** [3] - 185:17, 185:18
**vigorously** [1] - 151:21

**violation** [1] - 39:7
**Virginia** [1] - 142:21
**visit** [1] - 107:13
**vital** [1] - 114:24
**volume** [4] - 143:19, 143:20, 143:22, 157:17
**volunteer** [4] - 25:4, 25:23, 43:3
**volunteers** [1] - 182:9
**vs** [2] - 4:4, 177:16
**vulnerable** [1] - 167:15
**WAIS** [6] - 91:14, 91:19, 91:23, 92:13, 92:14, 131:12
**wait** [2] - 101:2, 101:20
**waiting** [1] - 76:4
**waive** [2] - 4:11, 4:14
**walk** [1] - 43:23
**wand** [1] - 148:1
**wanes** [1] - 67:25
**Ward** [6] - 5:14, 56:21, 57:1, 57:3, 100:13, 100:16
**warranted** [2] - 53:9, 130:21
**Warrenton** [1] - 142:21
**Washington** [1] - 112:22
**waste** [1] - 165:2
**wasting** [2] - 100:6, 172:21
**water** [1] - 186:6
**waved** [1] - 147:25
**waves** [5] - 186:3, 186:6, 186:9, 186:24, 187:23
**waxes** [1] - 67:25
**ways** [2] - 169:10, 184:19
**Wechsler** [1] - 91:19
**week** [1] - 111:12
**weekend** [2] - 142:2, 142:13
**weeks** [1] - 21:25
**welcome** [3] - 29:24, 64:20, 136:6
**wells** [4] - 24:23, 25:12, 25:21, 26:6
**wells'** [2] - 25:16, 26:5
**Wells'** [3] - 24:18, 25:9, 26:4
**whatsoever** [1] - 26:8
**whereas** [2] - 49:3, 186:14
**whoa** [1] - 80:21
**whole** [11] - 5:18,

37:21, 40:3, 41:5, 47:4, 53:18, 100:1, 111:12, 118:1, 149:16, 191:8
**widely** [3] - 157:12, 164:11, 181:25
**wife** [2] - 13:19, 25:9
**wife's** [1] - 25:16
**willing** [2] - 113:13, 128:23
**Willingham** [1] - 151:24
**willingness** [1] - 26:6
**winded** [1] - 163:16
**Wisconsin** [1] - 50:9
**wisely** [1] - 163:17
**wish** [8] - 38:11, 41:4, 50:25, 60:1, 63:7, 96:2, 110:24, 127:23
**withdraw** [1] - 176:16
**withdrawing** [1] - 71:9
**witness** [44] - 4:17, 10:5, 10:11, 18:2, 18:8, 33:3, 33:9, 33:11, 34:12, 34:23, 35:7, 54:20, 60:22, 60:24, 64:20, 72:5, 72:24, 77:20, 105:21, 111:13, 111:19, 112:1, 115:2, 115:9, 125:16, 128:17, 131:2, 131:21, 132:4, 137:9, 137:13, 138:8, 147:23, 148:1, 154:11, 161:9, 169:4, 176:9, 179:21, 182:18, 182:19, 183:2, 183:5, 183:8
**WITNESS** [34] - 10:10, 10:14, 10:17, 10:22, 15:4, 15:12, 15:16, 15:22, 29:24, 34:10, 34:21, 35:2, 35:6, 35:10, 35:13, 67:16, 88:23, 106:6, 111:11, 111:18, 111:25, 112:2, 112:5, 131:6, 133:7, 137:7, 138:7, 138:11, 148:6, 148:10, 148:15, 179:25, 183:7, 183:13
**witness's** [2] - 168:21, 176:13
**witnesses** [28] - 5:13, 5:16, 7:2, 8:6, 8:14,

17:10, 30:17, 37:24, 59:11, 59:17, 59:20, 64:17, 84:15, 116:12, 117:10, 118:3, 118:8, 126:20, 154:9, 160:12, 160:17, 160:23, 167:18, 170:12, 171:19
**witnesses'** [1] - 30:18
**WN** [1] - 48:11
**womb** [1] - 167:12
**Women's** [2] - 110:16, 117:7
**wondering** [1] - 29:2
**Wood** [3] - 24:4, 24:5, 75:12
**Wood's** [1] - 38:17
**word** [8] - 17:18, 24:13, 28:20, 56:13, 103:25, 156:12, 174:7, 177:12
**words** [5] - 70:19, 92:5, 99:24, 104:9, 105:15
**workload** [3] - 155:18, 174:15, 174:20
**works** [2] - 125:4, 184:17
**workshops** [1] - 142:11
**workup** [2] - 46:20, 89:8
**workwise** [1] - 70:21
**world** [2] - 155:9, 155:15
**worm** [1] - 99:18
**worse** [2] - 60:15, 92:1
**wrap** [1] - 65:18
**WREY** [1] - 131:12
**write** [4] - 40:11, 118:16, 136:20, 154:24
**writers** [1] - 174:4
**writing** [1] - 27:6
**written** [13] - 8:21, 45:10, 55:17, 56:5, 84:5, 124:25, 134:3, 143:23, 144:3, 144:10, 144:22, 165:24
**wrote** [9] - 24:2, 27:4, 118:16, 125:23, 129:13, 143:25, 144:15, 157:11, 174:3
**Wyoming** [2] - 146:13, 146:19
**x-ray** [1] - 185:6
**X-ray** [2] - 99:17,

186:11
**x-rays** [8] - 53:19, 122:1, 184:20, 185:3, 186:3, 186:5, 186:9, 186:19
**yards** [1] - 60:12
**year** [9] - 24:20, 54:25, 70:10, 78:3, 94:15, 142:3, 142:13, 180:13, 181:4
**years** [1] - 11:6, 12:15, 13:22, 17:22, 27:8, 40:21, 70:4, 70:9, 75:5, 134:4, 139:15, 139:25, 142:5, 144:2, 146:20, 149:25, 168:3, 170:2, 189:18
**yes-or-no** [2] - 82:13, 179:23
**yesterday** [1] - 4:21
**York** [12] - 139:16, 139:19, 140:17, 140:18, 145:6, 155:2, 156:17, 157:11, 179:11, 180:1, 180:15, 180:18
**yourself** [8] - 18:21, 46:10, 50:1, 108:1, 108:14, 110:6, 124:21, 192:8
**yourselves** [1] - 37:24