**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

ROBIN LEE ROW,              )  CASE NO. 1:98-cv-00240-BLW
                             )
            Petitioner,  )  **EVIDENTIARY HEARING DAY 5**
                             )
         vs.            )
                             )
BONA MILLER, et al.,      )
                             )
            Respondents.  )
_____ )

**TRANSCRIPT OF PROCEEDINGS — VOLUME 5**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**FRIDAY, JUNE 9, 2017**
**BOISE, IDAHO**

**FOR PETITIONER**
    Deborah A. Czuba
    Jonah J. Horwitz
    Christopher Sanchez
    Bruce Livingston
    FEDERAL DEFENDER SERVICES, CAPITAL UNIT
    702 W. Idaho, Suite 900
    Boise, ID 83702

**FOR RESPONDENTS**
    Jessica M. Lorello
    L. LaMont Anderson
    IDAHO ATTORNEY GENERAL'S OFFICE
    Criminal Law Division/Capital Litigation Unit
    P.O. Box 83720
    Boise, Idaho 83720-0010

Proceedings recorded by mechanical stenography, transcript
produced by computer.

_____

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

<u>I N D E X</u>

JUNE 9, 2017 – VOLUME 5

| Date | Proceeding | Page |
|------|-----------|------|
| 6/9/17 | Evidentiary Hearing – Day 5 | 742 |

<u>R E S P O N D E N T ' S   W I T N E S S</u>

PAGE

**ARTHUR KOWELL, M.D.**
    Direct Examination by Ms. Lorello.................... 744
    Cross-Examination by Ms. Czuba....................... 763
    Examination by the Court............................. 765
    Further Cross-Examination by Ms. Czuba............... 773


<u>P E T I T I O N E R ' S   E X H I B I T S</u>

**ADMITTED**                                                        PAGE

    All exhibits admitted pursuant to Case
    Management Order Docket No. 687 and as itemized
    in Docket No. 665................................ 778
**178**    Billing for Dr. Beaver........................... 778


<u>R E S P O N D E N T ' S   E X H I B I T S</u>

**ADMITTED**                                                        PAGE

    All exhibits admitted pursuant to Case
    Management Order Docket No. 687 and as itemized
    in Docket No. 667................................ 778

744

P R O C E E D I N G S

June 9, 2017

THE CLERK:  The court will now hear Civil Case 98-240,
Row vs. Miller, for day 5 of an evidentiary hearing.

THE COURT:  Good morning, Counsel.

I believe the respondent was prepared to call her next and,
as I understand it, last witness.

MS. LORELLO:  Yes, Your Honor.

THE COURT:  Announce the name of --

MS. LORELLO:  Dr. Arthur Kowell.

THE COURT:  Doctor, would you step before the clerk
and be sworn.

ARTHUR KOWELL, M.D., RESPONDENT'S WITNESS, SWORN

THE CLERK:  Please take a seat in the witness stand.

Please state your complete name and spell your name for the
record.

THE WITNESS:  My first name is Arthur, A-R-T-H-U-R.
Last name is Kowell, K-O-W-E-L-L.

THE COURT:  You may inquire.

MS. LORELLO:  Thank you.

DIRECT EXAMINATION

BY MS. LORELLO:

Q.   Good morning, Dr. Kowell.

A.   Good morning.

Q.   What is your profession?

745

1    A.    I'm a neurologist.

2    Q.    Can you just briefly describe the nature of your practice.

3    A.    Well, neurology is a medical subspecialty that deals with

4    disorders of the nervous system.  That would include the brain,

5    spinal cord, peripheral nerves, nerve roots, and neuromuscular

6    junction.

7         I'm in private practice in Encino, California.  I do

8    forensic work as a part of my practice.  I'm also a clinical

9    professor of neurology at UCLA where, on some Tuesday mornings,

10   I'm supervising residents and seeing patients over there as

11   well.

12   Q.    In your private practice, do you see patients?

13   A.    I do.

14   Q.    And your curriculum vitae has previously been admitted as

15   Exhibit 1000.

16        Does that accurately state your training and experience?

17   A.    It does.

18   Q.    And you prepared a report in this case; is that correct?

19   A.    Yes.

20   Q.    That report has also been admitted as part of Exhibit 1000.

21        Does it accurately reflect the materials you reviewed?

22   A.    Yes.

23   Q.    Can you just generally describe those materials.

24   A.    Yes.  There were medical records from a number of sources,

25   including the Idaho Department of Corrections Medical Services,

1    Physicians Immediate Care Center, Pocatello Regional Medical

2    Center, Saint Alphonsus Regional Medical Center, St. Joseph's

3    Hospital, and Trinity General Hospital.

4        I received documents from James R. Merikangas, M.D., and

5    there was a document called "MRI procedures."  There was an

6    order for additional testing to complete neuropsychiatric

7    evaluation that was dated September 4, 2001.

8        There is a report of Mark S. Greenberg, Ph.D., 12/29/2016;

9    a psychosocial report by Cessie Alfonso, A-L-F-O-N-S-O, licensed

10   clinical social worker, September 2, 1999.

11       There were radiology reports regarding CT scans of the

12   brain, MR -- two MRI scans of the brain, a SPECT scan of the

13   brain, and an FDG PET CT scan of the brain.

14       Then there were copies of radiologic studies that I

15   actually looked at, not just the reports but the studies

16   themselves, which include the CT scans of the brain January 28,

17   1992, January 12, 1993.

18       There was a SPECT scan of the brain on October the 16th,

19   2001, an MRI of the brain without contrast on October 15, 2001.

20       There was a report by Clay Ward, Ph.D., dated 1/3/2017.  An

21   interview of Robin Row on February the 12th, 1992.  Interview of

22   Robin Row, edited, with Gary Raney, R-A-N-E-Y, on February the

23   12th, 1992.

24       And then Ada County Jail incident reports regarding an

25   incident on January the 12th, 1993.

1    Q.   Did you also have the -- I'm not sure I heard you.  Did you

2    also have the opportunity to review some materials related to

3    some 2016 imaging?

4    A.   Yes.  That was in the radiology reports as -- there was

5    a -- an MRI of the brain without contrast on August 2, 2016.

6    And the FDG PET scan of the brain was on August 2, 2016.

7    Q.   Setting aside the imaging materials, just with respect to

8    the medical records you reviewed, did those records include any

9    information regarding Ms. Row's neurological status?

10   A.   Yes.  Some of the records indicated some neurologic -- or

11   portions of neurologic function were evaluated, yes.

12   Q.   And was there anything clinically significant you noted

13   neurologically in those materials?

14   A.   Yes.  Except for -- there was one occasion, I believe,

15   where the patient had a medication overdose where I believe

16   there was some abnormal neurologic findings.  But other than

17   that, at least in the records I reviewed, I didn't find anything

18   wrong on the neurologic examination.

19   Q.   And on the records related to the overdose, you said there

20   was something --

21   A.   I believe there were what we call an abnormal -- an

22   extensor-plantar response or positive Babinski response, I

23   believe, upgoing toes.

24   Q.   And what would the significance of that be in the context

25   in which that was noted?

1    A.    It would be consistent with many types of drug overdose

2    affecting the brain and/or spinal cord.

3    Q.    With respect to the imaging studies, did all of those

4    basically include a view of the cerebellum?

5    A.    I believe they -- they all did.  I would have to go back.

6    As far as the SPECT scan is concerned, I believe so.  I would

7    have to look at those images again.

8    Q.    Okay.  Does a CT of the brain and an MRI generally look at

9    the cerebellum?

10   A.    Yes, they do.  The MRI is a better imaging technique in

11   most cases for the cerebellum than CT scan, but they both do

12   image the cerebellum.

13   Q.    And what is -- what is the cerebellum?

14   A.    Cerebellum means "little brain."  Okay?  It is -- it is a

15   structure that lies beneath or inferior to the cerebral

16   hemispheres.  It deals primarily with balance and coordination

17   of various activities.

18   Q.    Okay.  And is that -- where is the cerebellum in relation

19   to the frontal lobe?

20   A.    Well, it does -- ultimately, it does have some connections

21   through the central nervous system to the frontal lobe.

22   Q.    Regarding the imaging studies that -- well, actually, let

23   me ask you about lab work first.

24         Did you review any lab results as part of your report?

25   A.    I did.

749

1    Q.   And did you find anything clinically significant from a

2    neurological perspective with respect to those?

3    A.   No.

4    Q.   Starting with the 1992 CT of the brain, you indicated, I

5    believe, that you reviewed that -- that actual image; is that

6    right?

7    A.   I did.

8    Q.   And what, if anything, did you note about that image?

9    A.   I think there was cortical atrophy and cerebellar atrophy

10   when I looked at the copies of the -- of the study.

11   Q.   And do you know if that was a different finding than what

12   was reported on the 1992 report that went with that study?

13   A.   My finding was different than the radiologist's report.

14   The radiologist who interpreted the study indicated that the

15   study was normal.

16   Q.   And do you have the ability to account for that potential

17   difference?

18   A.   There was some artifact, I think, on the study in that the

19   radiologist may have said:  Okay.  Even though there is

20   artifact, there might be atrophy, but the radiologist didn't

21   mention that.  So the radiologist may have passed it because

22   maybe it was too artifactual for that radiologist.

23        Given the fact that the cerebellum is a -- is part of why

24   we're here today, I looked at it in particular.  But if you were

25   a radiologist and no specific history is given to you -- in

1    other words, was there any concern at that time about a

2    cerebellar problem -- I could see that the radiologist might not

3    make any notation that there was anything different from a

4    normal study.

5    Q.   Okay.  With respect to the 1993 CT, did you also review

6    that image?

7    A.   I did.

8    Q.   And what did you find on that?

9    A.   Again, the -- this study again showed the cerebellar

10   atrophy, and there was some cerebral cortical atrophy.

11   Q.   Was there anything different in your review between the '92

12   and the '93?

13   A.   I don't think that there -- I don't see anything

14   tremendously different.  It was probably -- it may have been a

15   little easier to see the cortical atrophy on the -- on the later

16   study.

17   Q.   And so there is a difference between the cerebellar atrophy

18   and then the cerebral cortical atrophy?

19   A.   Yes, that would be correct.

20   Q.   Is there any relationship between those two types of

21   atrophy?

22   A.   There may be.  In other words, there may be one process

23   that's responsible for both.  And there are different

24   pathologies that could be responsible for both.

25   Q.   Is there a reason that you -- that the cortical atrophy

1    would not be viewable, I guess, on the '92 CT?

2    A.    Could be a difference in technique and the cuts.  In other

3    words, when the studies are done, there are slices taken through

4    the brain.  You don't see all of the brain; you see slices which

5    are a certain number of -- certain distance between the slices.

6    And depending upon where the slices are and how close together

7    they are, you may or may not see certain findings on the scan.

8    Q.    So is it possible, then, that the cortical atrophy could

9    have been in existence in '92 as well?

10   A.    Yes.

11          And I indicated -- as I indicated in my report, there was

12   cortical atrophy and cerebellar atrophy when I reviewed it.

13   Q.    Okay.  And then in terms of the, I guess, I'll call it the

14   scope of the cerebellar atrophy between 1992 and 1993, was that

15   the same?

16   A.    I think -- I don't believe there was any significant

17   difference.  Normally if I thought there was a significant

18   difference, I would have made a notation of it.

19   Q.    And is there a medical way to characterize the severity, I

20   guess, of that atrophy?

21   A.    I would say mild as far as the cortical atrophy is

22   concerned, yes.

23   Q.    And what about the cerebellar atrophy?

24   A.    The cerebellar atrophy or the smallness of the cerebellum,

25   more noticeable.  Certainly not what I would say is severe, but

1    it could be in the mild-to-moderate range.

2    Q.   And then turning to the 2001 MRI.  You also reviewed that

3    as well?

4    A.   Yes.

5    Q.   Any findings different than what you noted with respect to

6    the '92 and '93 CT scans?

7    A.   No.  Again, you usually get a better appreciation of the

8    structure of the cerebellum on the MRI scan as compared to the

9    CT scan.  But, basically, similar areas were noted to have

10   changes that we've mentioned in terms of the cortical atrophy

11   and the cerebellar atrophy.

12   Q.   But consistent in its severity since '92 and '93?

13   A.   Yes.

14   Q.   Did any of those images allow you to look at the frontal

15   lobe?

16   A.   Yes.

17   Q.   Did you find any anomalies in the frontal lobe for Ms. Row?

18   A.   I didn't think there was anything significant regarding the

19   frontal lobe or frontal lobes.

20   Q.   And in your report with respect to the 2001 MRI, you, I

21   believe, indicated, if anything, the parietal lobes were more

22   affected than the other lobes?

23   A.   Correct.

24   Q.   And what does that mean?

25   A.   Well, it showed changes which were interpreted as being

1    atrophied, meaning less tissue in the parietal lobes as compared

2    to other areas of the brain, meaning in terms of the cerebrum.

3    Q.    And in your review of the other images, was it the same

4    over time in terms of the finding?

5    A.    In terms of the MRs or the MRI scans, yes, I would say that

6    would be the case.  Because we have more recent -- we have

7    recent MRI scans in -- MRI scan in 2016.

8    Q.    And they all essentially, then, revealed the same thing?

9    A.    Yes.

10   Q.    Okay.  What are the possible etiologies for those findings?

11   A.    Well, in terms of -- a wide variety.  Number one, could be

12   certainly a congenital anomaly.  And frequently, either in utero

13   or at the time of birth, there may have been some type of

14   damaging event, such as ischemia, meaning decreased blood flow

15   to certain parts of the brain.

16        As far as the cerebellar atrophy or cerebellar hypoplasia,

17   I would like to get that in.  I think I got it in my decision.

18   The cerebellum is small, and the -- that could mean that you

19   have a process where the cerebellum was normal size, and it just

20   became smaller due to some process, perhaps a degenerative

21   process, a genetic process; or it's -- if in terms of a

22   developmental thing, it never fully developed.

23        I think a better term to say is the cerebellum -- parts of

24   the cerebellum is small.  But you could call it "atrophy" or you

25   could call it "hypoplasia."  Whatever it is, it's not a normal

754

1    size.

2         And certainly causes for that can be congenital.  In fact,

3    particularly CMV, or cytomegalic viruses.

4              THE REPORTER:  Could you repeat that, please.

5              THE WITNESS:  C-Y-T-O-M-E-G-A-L-I-C virus, which may

6    occur certainly during pregnancy.

7         Certain types of toxic material, alcoholism, metabolic

8    disorders.  There are a wide variety of these things which

9    involve -- some of them very exotic, mitochondrial disorders.

10   Chromosomal abnormalities, including trisomy 21 or trisomy 18.

11   And then some of the congenital muscular dystrophies can be

12   associated with it.

13        So there are a wide variety of things that can cause a

14   small cerebellum.

15   Q.   BY MS. LORELLO:  And you mentioned toxic -- toxic exposures

16   as one possibility.

17        And would that be part of a degenerative process as opposed

18   to a congenital issue?

19   A.   It could be -- well, okay.  The toxic process could have

20   occurred, you know, during pregnancy with the patient.  There

21   are some degenerative disorders that can occur in response to or

22   seem to be associated with toxins.  For example, Parkinson's

23   disease has been -- within certainly last 20 years, certainly

24   insecticides have been mentioned as being associated with that

25   disorder.

1           But, by and large, usually these would occur earlier in

2      life in terms of toxic exposure.

3               THE COURT:  Did I understand you to say, just so I'm

4      clear, when you refer to alcoholism, exposure to toxins, is that

5      in utero with the mother's consumption or the patient's use

6      later in life but still early in their life or both?

7               THE WITNESS:  Could be either, either or both.  Either

8      or both.

9               THE COURT:  And you referred to metabolic disorders.

10     Same?

11              THE WITNESS:  Exactly.

12              THE COURT:  All right.

13     Q.   BY MS. LORELLO:  Beyond alcohol, potential toxin, and I

14     think you also mentioned insecticide, if you had exposure to an

15     insecticide that resulted in this atrophy or hypoplasia, would

16     there be other findings generally associated with that?

17     A.   Usually.

18     Q.   Like what?

19     A.   Well, you could have some cognitive problems; you could

20     have memory problems; you may have motor problems associated

21     with it.

22          And, again, it depends upon the type of exposure.  You can

23     have a single intense, you know, over a period of perhaps

24     several hours, depending upon the type of exposure -- let's say

25     inhalation exposure.

1          As far as insecticides and field workers are concerned,

2     there is some literature out there regarding certainly

3     Parkinson's disease.  But certainly there are -- you know, it's

4     not necessarily going to result in a neurologic problem.  It

5     depends on the intensity and the frequency of exposure.

6     Q.    And in terms of the exposure potentially creating cognitive

7     things, what sorts of things would that be?

8     A.    Could be almost anything.  In other words, slow thinking,

9     language problems, geographic visuospatial disorientation.

10    Q.    In your review of both the medical records and the imaging

11    studies, did you think there was -- it's more likely that it's

12    congenital versus degenerative?

13    A.    If you're asking my opinion, I think my opinion would be it

14    would be more likely congenital.

15          Can I say it's medically probable?  I can't say that.  I

16    don't have as much information as I would like.  But if you're

17    asking me to tip the scale at this point in time, I would go --

18    as far as the cerebellum is concerned, certainly more

19    congenital.

20    Q.    And is part of that because of the consistency of the

21    atrophy over time?

22    A.    That would be one.  But number two and a very important

23    part of an opinion in that regard, is the fact that, at least in

24    the records I looked at, I did not see any evidence of

25    cerebellar dysfunction on this patient's neurologic exams or

1    parts of the nervous system which were examined by physicians or

2    medical providers.

3    Q.   And that's -- the cerebellar dysfunction is something you

4    would expect if it was --

5    A.   If this was something that was acquired, if it wasn't

6    present at birth -- and I think that's an important thing.

7    Because, number one, a small cerebellum or cerebellar hypoplasia

8    of congenital origin, patients will -- many of the patients will

9    adapt to it; meaning, as they develop, they develop means for

10   compensating for the small cerebellum or lack of cerebellar

11   tissue.

12        Whereas if it were -- if this phenomenon were occurring

13   later, then I would be -- more likely, I would expect to see

14   behavioral evidence of it, such as gait problems, nystagmus,

15   speech abnormalities associated with it.

16   Q.   And were any of those things that you just listed noted in

17   the medical records you reviewed?

18   A.   I don't recall seeing those -- those abnormalities, no.

19   Q.   Was there any indication that the cerebellar issues were

20   the result of trauma?

21   A.   No.

22   Q.   Are you familiar with cerebellar cognitive affective

23   disorder?

24   A.   To some extent.  I'm not a psychiatrist, but I know it's

25   been reported in the literature.  And certainly the cerebellum

1    has been implicated in certainly a number of psychiatric

2    disorders.

3    Q.   Is that a -- is that association a recent development?

4            MS. CZUBA:  Objection, Your Honor.  He is going beyond

5    the scope of his expert report.  He didn't provide any opinion

6    regarding cerebellar cognitive affective disorder, its temporal

7    element, anything of that nature in his expert report.

8            MS. LORELLO:  I think --

9            THE COURT:  Ms. Lorello.

10           MS. LORELLO:  My recollection is that this was

11   specifically explored at his deposition.

12           MS. CZUBA:  Your Honor, it's not my duty to compensate

13   for their expert report at a deposition I conduct.

14           THE COURT:  Well, Counsel, if this were a civil

15   proceeding, I generally take -- I mean, just straight-up civil

16   litigation, I've generally taken the position that an expert

17   witness can only be examined on topics or opinions specifically

18   set forth in their filed report and items specifically covered

19   in deposition.

20       Because the rule, as I read it at the time -- and it may

21   have changed -- seemed to suggest that that was the proper scope

22   of an expert report -- expert opinion.

23       What I'm going to do is allow him to go ahead and offer the

24   opinion.  You can include that in your briefing whether it is

25   proper to offer not only opinions stated in the report but also

1       opinions stated during deposition, and we'll take that up in

2       that way.

3           I don't want foreclose hearing the evidence.  I can

4       obviously ignore it.  I'm not sure it's going to be that

5       critical, in any event, but -- so at this point, I'll allow it

6       subject to the objection, which I'll resolve as part of our

7       final decision in the case.

8           Go ahead and proceed.

9           MS. LORELLO:  Just for the record, Your Honor, I'm not

10      asking for his opinion on that as it relates to Ms. Row.  I am

11      just asking about his knowledge of it as a syndrome and when

12      that developed.

13          THE WITNESS:  Yes, I'm aware of it.

14          THE COURT:  No -- just -- okay.  But then why is it

15      relevant to the proceeding?

16          MS. LORELLO:  Why is it relevant?  I think the other

17      individuals have talked about that particular disorder.

18          THE COURT:  Well, I understand that.  But you're -- at

19      least as I understood your statement, you're not asking for an

20      opinion as to Ms. Row; you're asking as to his knowledge

21      generically of the syndrome.

22          And why is his knowledge of it, unrelated to Ms. Row,

23      relevant to the proceeding?

24          MS. LORELLO:  Well, I am just asking about when it

25      became a syndrome.  That's all I'm asking.  I mean, he talked

1       about it in his deposition in terms of the --

2               THE COURT:  Well, let's go ahead and proceed.  Like I

3       said, we'll sort this out during the --

4               MS. CZUBA:  Can I make one more brief record with

5       respect to that?

6               THE COURT:  Yes.

7               MS. CZUBA:  Again, I know you said we could say this

8       in briefing, but Dr. Kowell was clearly not asked his opinion on

9       whether this -- when this disorder originated or -- even in his

10      deposition.

11              THE COURT:  Well, if it wasn't covered in his

12      deposition, I'm going to sustain the objection.  Because if

13      you're asking the question, I'm assuming you think it has some

14      probative value.  And if it has probative value but was not

15      disclosed, that's improper.

16          So, I mean, if it's -- in other words, if it is important

17      when the syndrome was recognized or adopted as an issue in the

18      case, then an opinion should have been filed pretrial or

19      prehearing.

20              MS. LORELLO:  And I was actually just trying to follow

21      up on his statement about the link between the psychiatric, but

22      that's fine.

23              THE COURT: All right.

24              MS. LORELLO:  I don't need to go into it further.

25              THE COURT:  Okay.

761

1    Q.    BY MS. LORELLO:  And just to clarify, I think you testified

2    that there was no findings on the imaging studies with respect

3    to the frontal lobe; is that right?

4    A.    Correct.

5    Q.    Okay.  And in your practice, have you treated people that

6    had cerebellar atrophy or cerebellar hypoplasia?

7    A.    Yes.

8    Q.    And are there any findings that you see consistent across

9    that group in terms of behavioral impact or adaptive

10   functioning?

11   A.    Most of the patients that I have -- first of all, many of

12   the patients that I see that have some degree of cerebellar

13   hypoplasia are asymptomatic in terms of the cerebellar function.

14   And being a neurologist, many of the patients that I see and

15   that have that have no psychiatric issues.

16       They maybe are being treated for -- it's a coincidental

17   finding, meaning the cerebellar hypoplasia.  They may have

18   migraine headaches.  Maybe they are in for a lumbosacral nerve

19   root problem due to a disc herniation.  Maybe that have a

20   peripheral neuropathy.

21       So I treat patients now.  There are some patients who have

22   disorders which are related to the cerebellar hypoplasia and

23   they are symptomatic.  Many of the cerebellar ataxias that I

24   see, many of which are genetic, we attempt to treat.  We can't

25   cure them at this point in time, but there are things that we

1    can do to help them.

2        But -- so there are patients who have cerebellar hypoplasia

3    who are symptomatic because of the cerebellar hypoplasia that we

4    treat, but there are many patients who have it that, really,

5    it's an incidental finding.

6    Q.   And what was your overall opinion based upon your review of

7    the materials provided?

8    A.   My overall opinion was this patient does have some

9    abnormalities on the neuroimaging studies, with some degree of

10   cerebral atrophy primarily in the parietal lobe and certainly a

11   small cerebellum, which certainly is consistent with a

12   congenital cerebellar hypoplasia.

13       But, given the limited information that I have -- when I

14   say "limited," I didn't have access to all of the records in

15   this case or genetic history, et cetera -- I can't say that this

16   patient doesn't have a degenerative disorder, either.  I just

17   don't know.

18       But my opinion is I couldn't -- in the absence of any

19   cerebellar dysfunction on her examination such as I was able to

20   glean from the records, as I have indicated in my report, I

21   can't say that it's -- that it's medically probable that these

22   abnormalities or these findings on the neuroimaging studies have

23   caused any neurologic -- impaired neurologic function or

24   behavioral abnormality.

25           MS. LORELLO:  Thank you.  I have no further questions

1      at this time.

2                  THE COURT:  Okay.  Just a moment.

3            Okay.  I'm sorry.  I wanted to look at the doctor's last

4      statement to make sure I understood it, and I think I do.  I may

5      have a question as a follow-up.

6            Cross-examination, Ms. Czuba.

7                           CROSS-EXAMINATION

8      BY MS. CZUBA:

9      Q.   Good morning, Dr. Kowell.

10     A.   Good morning.

11     Q.   So in your testimony on direct here, you indicated -- I

12     think several times -- that the '92 CT, the '93 CT, the MRI in

13     2001, the MRI in 2016 findings were all consistent across those

14     spectrums of imaging?

15     A.   Correct.

16     Q.   And so that would be a 14-year period where the atrophy and

17     the other findings were consistent?

18     A.   True.

19     Q.   You also testified that the cerebellum is connected to the

20     frontal lobe functioning?

21     A.   It does -- it connects.  I mean, information from the

22     cerebellum gets to the frontal lobe.

23     Q.   Okay.  And you indicated that an MRI is better at assessing

24     atrophy conditions than a CT scan?

25     A.   Atrophy, I would say overall, yes, and particularly the

1    cerebellum.

2    Q.   And you're not a neuropsychologist?

3    A.   I am not.

4    Q.   And you're not a psychiatrist?

5    A.   No.

6    Q.   But you opine that a mild -- or would you agree that a mild

7    brain injury can have significant impacts on psychological

8    functioning?

9    A.   Yes.

10   Q.   And you said that the etiology, you would come down on the

11   side that it was congenital?

12   A.   Yes.

13   Q.   Were you given records regarding Ms. Row's time spent in

14   juvenile hall that included mental health evaluations?

15   A.   I don't believe that I did.  I have listed the records that

16   I reviewed.  I'm not -- I'm not aware if such information was

17   mentioned in there, but I don't believe that I had juvenile hall

18   records.

19   Q.   And did you have any social history interviews from lay

20   witnesses?

21   A.   I don't believe so.

22   Q.   Did you have any interviews of her mom or dad or siblings,

23   childhood friends, aunts and uncles?

24   A.   I don't believe so.

25   Q.   Did you review the testimony of Dr. Norman or Dr. Beaver?

765

1    A.    I don't think so.

2    Q.    And I think -- and would you agree that your assessment is

3    based entirely on the records that you were provided by the

4    state?

5    A.    Correct.

6    Q.    And would you agree that it's fair that sometimes the side

7    that hires you does not give you all the information you need?

8    A.    True.

9         MS. CZUBA:  Nothing further, Your Honor.

10         THE COURT:  All right.  Let me -- I may have some

11    questions here.  Let me -- I'm going to look at my notes for a

12    moment.

13                         EXAMINATION

14    BY THE COURT:

15    Q.    You indicated that, I think, the primary reason you feel

16    that this is congenital is that if it were something that had

17    occurred later in life or in life -- since congenital I assume

18    means at birth or something that was -- right?

19    A.    Correct.  Correct.

20    Q.    Okay.  So if it happened anytime after birth, you would

21    have expected to see gait problems, nystagmus, speech

22    abnormalities, things of that sort.  In other words, because if

23    it had occurred in utero or it was congenital in nature, that's

24    an -- there is an adaption process that the brain would

25    undertake and basically self-correct for this abnormality?

1    A.   Correct.

2         In other words, if you want to get -- take it down even

3    further, not only congenital but probably an ischemic process,

4    meaning a decreased blood flow problem.

5    Q.   Okay.  Well --

6    A.   Which means it would be static.  In other words, once --

7    once the patient was born, that event is done.

8    Q.   Okay.  But wouldn't -- okay.  All right.  But blood supply,

9    it could be genetic; I mean it could be other things?

10   A.   It could be -- it could be other things which could also

11   present at birth which were not ischemic.

12   Q.   I mean, the brain is a complex organism, obviously.  And

13   you, of all people, certainly would know that.  Wouldn't --

14   let's say something occurred ages 5 to 8, exposure to a toxin, a

15   traumatic brain injury, wouldn't it also be possible that there

16   could be some adaption occur at that point?

17   A.   Early in the game, yes.

18   Q.   Okay.  So what you're saying is it's probably congenital,

19   but it could have been also early in life?

20   A.   Correct.

21   Q.   Because the same adaptation would have occurred.  But, of

22   course, if you could have probed deeply, you could have sorted

23   out whether the nystagmus, gait problems, speech abnormalities

24   occurred at ages 5, 6, 7, 8, which might be an indication there

25   was an onset at that point?

767

1    A.    Correct.

2    Q.    Okay.  The other thing I did want to ask you about, and I'm

3    looking -- I tried to copy your exact words from the transcript

4    that Ms. Hohenleitner is preparing; and if I don't get this

5    right, please correct me.

6          What I understood your final opinion to be is that there

7    are abnormalities in the CT scans, including cerebral atrophy

8    and a small cerebellum; but your opinion is that, in the absence

9    of any cerebellar dysfunction -- and by "cerebellar

10   dysfunction," I'm assuming you're again referring to gait

11   problems, things of that sort.

12   A.    That's correct.

13   Q.    Okay.

14         -- that in the absence of that, you can't say that these

15   abnormalities have caused any neurologic or impaired neurologic

16   function or behavioral abnormality?

17   A.    Correct.

18   Q.    Did I get that right?

19   A.    That's correct.

20   Q.    Okay.  Now, in that regard, we have Ms. Row, who, I think

21   everyone agrees, had a small cerebellum and some atrophy of

22   whatever cause in the cortex as well.  We also know that she

23   suffers from personality disorders.  I mean, she has been

24   diagnosed antisocial personality disorder, possible borderline

25   disorder.

1          Why shouldn't we connect the dots between those two?

2   A.     Interesting question.  I don't know that you can.  In other

3   words, this gets into the certifying board for neurologists and

4   psychiatrists, the American Board of Psychiatry and Neurology.

5          And, certainly, when I was in training and took my boards,

6   I was tested on psychiatric material, and the psychiatrists are

7   tested on the neurologic material and have training in neurology

8   as well.

9          So, as a neurologist, if you don't have any nerve cells,

10  you don't have psychiatry, at least not in this dimension.  Now,

11  the issue is you mentioned something very interesting in terms

12  of connecting the dots and personality disorder.  Personality

13  disorder means that something develops -- we think, at least

14  from the neurology standpoint, these are behavior patterns that

15  are, quote, ingrained, unquote, in individuals.

16         For example, obsessive-compulsive disorder.  We know that

17  patients who have been diagnosed with obsessive-compulsive

18  disorder actually can have abnormalities on PET scans in the

19  brain.  So there is some overlap.

20         But I don't know that, at least my knowledge of the

21  field -- and I have spent a lot of time at this -- that I can

22  always connect the dots.  In other words, I'm not a

23  psychiatrist.

24         Do I know something about psychiatry?  Sure.  It's part of

25  my training.  But there are patients who have psychiatric

1    disorders, psychological disorders and neurology and neurologic

2    exams and neuroimaging studies that are entirely normal.

3        So, obviously, these individuals have been diagnosed by

4    psychiatrists as not functioning normally according to the

5    psychiatric set of rules, so there must be something wrong with

6    them.  The question is:  What's wrong with them?

7        For example, patients who have -- who are bipolar patients,

8    manic-depressive patients in some of the older nomenclature, if

9    you do FDG PET scans on these individuals when they are manic,

10   you will see increased metabolic activity in the brain.  When

11   they are very depressed, it's decreased.  When they are

12   euthymic, or normal mood, then they have a normal brain.

13       So this is where functional neuroimaging comes in.  So can

14   you connect the dots?  Sometimes you can.

15   Q.   What does it take to connect the dots?  And why can't you

16   connect the dots here?

17   A.   I can't connect the dots because there are patients that I

18   see, as a neurologist, who have psychiatric issues that come in.

19   They may come in for a back problem, or maybe they have got a

20   spinal cord issue, and maybe they have had scans and workups for

21   their psychiatric disorder by a very sophisticated psychiatrist

22   and nothing is found.

23       So I can't always make that connection.  Some cases I can.

24   Some cases I can do it.

25   Q.   Okay.  Then my question is:  What would -- what would you

1    need to see in this case to make the connection?  What's missing

2    in this case?

3    A.   What's missing for me is certainly a lot of the early

4    developmental records, certainly any type of neurologic exams

5    that may have been done early in life.

6    Q.   So if none were done, then we are just left in this state

7    of uncertainty that we can't resolve?

8    A.   Correct.

9    Q.   Okay.  And that's really what you're saying, is

10   uncertainty; not -- you're not saying that there is no

11   relationship, just that you can't offer an opinion that there is

12   because you can't -- as I put it, you can't connect the dots?

13   A.   That's exactly the reason I wrote my opinion that way.  I

14   can't connect dots.  I can't say in a forensic situation that

15   it's medically probable.  I can't exclude it, but I can't -- I

16   don't have enough information to give you the 51 percent.

17   Q.   Okay.  One other question, and this may have been covered.

18   Sometimes I think my memory is -- well, it's not what it used to

19   be and --

20   A.   Cerebral atrophy.

21   Q.   Yeah, yeah.  I was waiting for somebody to say that.  It's

22   normal, age-related, I'm sure -- I hope, I should say.

23        I do have kind of an interest in a field called behavioral

24   economics, and the reason I do is because they're trying to

25   actually do studies to connect the dots and find out why certain

1        things occur in the world and particularly in human behavior.

2        And one thing that kind of cries out is that -- for me at least

3        -- is that somebody should have done some studies to indicate

4        that when a person has cerebellar or cortex atrophy, that there

5        is a correlation which might lead us to conclude that there is a

6        causation to various personality disorders.

7            Has that work just simply not been done, or is it simply

8        not a clear enough indicator where you could rely upon that

9        alone to say:  If I have a patient who presents with certain

10       personality disorders and I see that they have atrophy -- or is

11       the word --

12       A.    Hypoplasia.

13       Q.    -- hypoplasia, which I understand is -- means small.  I

14       understand that.

15           -- that that is enough to connect the dots?

16           I'm assuming there have been no such studies or at least

17       whatever studies have been done are not so --

18       A.    Work is being done in this.  And, in fact, at least in

19       Southern California, I have been involved in a number of cases

20       with fetal alcohol spectrum disorder.  It turns out -- we have

21       talked about neuroimaging studies -- there is a technique in

22       which an MRI scan can be conventionally acquired except for a

23       few extra cuts through a structure in the -- sort of in the

24       center of the brain that connects the cerebrum called the

25       "corpus callosum."

772

1          And there is a -- there is a lab at the University of

2     Washington where when we are looking for patients who may have

3     fetal alcohol spectrum disorder that results in behavioral

4     personality abnormalities, that we can make a diagnosis of high

5     probability that the patient does have it.

6          In other words, you might have someone who has no -- has no

7     knowledge of their family history -- maybe they were adopted --

8     and they started having some behavioral abnormalities.

9          And what this technology does is it looks at the

10    morphology, the shape of the corpus callosum, and compares it to

11    a normative group.  And if it deviates from it, there is --

12    there are good studies that show correlation that, yes, there is

13    a probability the patient has fetal alcohol spectrum disorder

14    based on the morphology of the corpus callosum.

15         So those studies are being done.

16    Q.   But not in this particular area?

17    A.   In this case, they did not do that.

18              THE COURT:  Okay.  All right.  Ms. Lorello.

19              MS. LORELLO:  Nothing on that, Your Honor.

20              THE COURT:  No redirect?

21              MS. LORELLO:  No.

22              THE COURT:  Any questions in light of my inquiry,

23    then?

24              MS. CZUBA:  Yes.

25              THE COURT:  All right.

1                    FURTHER CROSS-EXAMINATION

2      BY MS. CZUBA:

3      Q.   Dr. Kowell, when you say "impact on neurologic

4      functioning," you are referring to things like ataxia, gait,

5      muscle tone; is that correct?

6      A.   Sure.  Those are part of neurologic functions, yes.

7      Q.   And are you saying in response to Judge Winmill that you

8      can't connect the dots?

9      A.   I can't connect the dots in this case.

10     Q.   Could a neuropsychologist connect the dots in this case?

11     A.   I can't say that, either.  I would have to hear the opinion

12     of the neuropsychologist and what evidence that the

13     neuropsychologist would base the opinion on.

14     Q.   Okay.  And do you recall providing a declaration in the

15     Carlos Hawthorne case?

16     A.   No.

17               MS. LORELLO:  Object.  This is beyond the scope,

18     Your Honor.

19               MS. CZUBA:  This relates directly to questions that

20     Judge Winmill was asking.

21               THE COURT:  I have no idea where this is going.  I'm

22     going to give you some leeway.

23          Renew the objection, and I may strike the testimony, but

24     I'm going to give counsel some leeway.

25               Go ahead and proceed.

1          MS. CZUBA:  And I just would like to establish just a

2     tiny bit of foundation first, before --

3          THE COURT:  Yes.

4     Q.   BY MS. CZUBA:  Can you tell me -- let's start with -- is

5     this your signature on the bottom here?

6     A.   Yeah.  It hasn't changed much in four years.  That's pretty

7     good.

8     Q.   And so this is a declaration you gave in 2013?

9     A.   Apparently it is.

10     Q.   And if you can just review paragraph 7 here.  And tell me,

11     when you've finished reviewing it, when Mr. Hawthorne's trial

12     was.

13     A.   1997.

14          THE COURT:  Counsel, what are those blue markings?

15          MS. CZUBA:  I apologize.  They are not markings; they

16     are sticky tabs.  They are not anything -- they're just for me.

17          THE COURT:  Our evidence system allows you to put

18     marks, and I wondered if there was some new --

19          MS. CZUBA:  No.  That was my late-night remember.

20     Q.   BY MS. CZUBA:  In this declaration which you provided, you

21     advised Mr. Hawthorne's trial attorney to conduct neurological

22     testing?

23     A.   I would have to look at that.  I don't remember the case.

24     But if it says that in the declaration, then that would be

25     correct.

1        Yeah.  There it is.  Okay.  That's under section 11.

2   Q.   And can you read paragraph 13?

3   A.   I'm looking at it.

4   Q.   Okay.  And so, again, in this capital case in 1997, you

5   would have recommended his trial attorneys to consult with

6   qualified mental health experts, such as a neurologist or a

7   neuropsychologist, to determine effects on cognitive

8   functioning?

9        THE COURT:  Don't answer yet.

10       Ms. Lorello?

11       MS. LORELLO:  I'm still going to object as beyond the

12   scope.

13       MS. CZUBA:  Your Honor, I think this connects the dots

14   again that a neuropsychologist could make conclusions regarding

15   impact on functioning that Dr. Kowell is not necessarily

16   qualified to make.

17       THE COURT:  Well, I don't know exactly what -- all he

18   is saying is that he would have recommended that there be more

19   studies done by a neurologist or a psychiatrist or a

20   neuropsychiatrist.  And I don't know that that -- well, I'm

21   going to overrule the objection because I think it is relevant

22   that -- and given my questions, it probably opened up a line of

23   inquiry.  But it's relevant to show that -- and it seems that a

24   fairly obvious thing that doesn't require any opinion is that

25   sometimes when we don't know enough, we need to ask more

1       questions, which is why you bring in other experts to do more

2       thorough evaluation, which I guess is part of what the

3       petitioner's claim is here, is that counsel at postconviction

4       relief and perhaps at trial or sentencing should have followed

5       up and done more, which is what Dr. Kowell did, apparently, in

6       this case, is to recommend that more be done.

7               For that limited purpose, I'll allow it, but I don't know

8       that it tells us much more than what common sense tells us.

9               Anything else?

10              MS. CZUBA:  No.

11              THE COURT:  Now, do you have any follow-up?

12              MS. LORELLO:  No, Your Honor.

13              THE COURT:  And I don't.  So, Dr. Kowell, you're off

14      the hook.  Thank you.

15              THE WITNESS:  Okay.  Thank you.

16              THE COURT:  Well, I won't say you're off the hook.

17              THE WITNESS:  I have been married a long time.  You're

18      never off the hook.

19              THE COURT:  That's true.

20              Any further witnesses from the respondent?

21              MS. LORELLO:  No, Your Honor.

22              THE COURT:  Any rebuttal?

23              MS. CZUBA:  No, Your Honor.

24              THE COURT:  All right.  Counsel, let me just cover

25      some housekeeping matters.

1          First of all, does either counsel want to have closing

2     argument?

3          I will tell you I generally find it not to be particularly

4     helpful, because you're going to be submitting written briefs

5     that are going to be much more helpful because you will have the

6     transcript, and you can give us chapter and verse; whereas now

7     you can just offer statements of your position, which I think I

8     pretty well understand without having to be reminded.

9          Does either side wish to have oral argument at this time?

10              MS. LORELLO:  No, Your Honor.

11              MS. CZUBA:  Absolutely not.

12              THE COURT:  It is possible, after I see the briefs,

13     that I may ask for oral argument after we review the briefs.

14     But at this point, then, we will just forego that.

15          The issue of the exhibits, I -- frankly, I kind of bollixed

16     things up a bit early on.  I think we had an understanding, and

17     then I started proceeding in a different way.

18          My understanding now is that every exhibit marked either

19     stipulated to or a joint exhibit is now admitted.  I think we

20     did that by a separate order on maybe the second day of trial.

21          Is that accurate to your understanding?

22              MR. HORWITZ:  Your Honor, I believe that's accurate

23     with the exception of Glenn Elam's deposition, which was marked

24     as stipulated as to admissibility but which the state clarified

25     it actually does object to.  And that was mentioned in the order

1    as well.

2            THE COURT:  Okay.  So you will take that up, along

3    with objections to any other exhibits, in your post-hearing

4    submissions; correct?

5            MR. HORWITZ:  Correct, Your Honor.  That would be our

6    preference.

7        (All exhibits admitted pursuant to Case Management Order

8    Docket No. 687 and as itemized in Docket Nos. 665 and 667.)

9            MR. HORWITZ:  I did want to make it clear that there

10   is one exhibit that only came up at the hearing itself.  This

11   was Exhibit 178, and it was mentioned during Dr. Beaver's

12   testimony.

13           THE COURT:  His billing.  I have got a note here

14   that --

15           MR. HORWITZ:  Exactly.  And that was not on our

16   exhibit list.  We apologize for that.  We only encountered it

17   when we were preparing for the hearing.  And Ms. Bracke was kind

18   enough to copy it and provide it to the state this morning.

19       So we just wanted to make it clear that we would like this

20   to be considered post hearing, and we're happy to make our

21   arguments for why that should be the case.

22           THE COURT:  That's fine.

23       (Petitioner's Exhibit 178 admitted.)

24           THE COURT:  And I assume there may be a few others.  I

25   think most of the other exhibits I either ruled on or they were

```
 1        stipulated to or they were joint exhibits.  I assume there is

 2        really only going to be a handful of exhibits -- well, that's

 3        probably not accurate.

 4            There was all the declarations.  So there was quite a bit

 5        more than just a handful.  So we will have to -- I had

 6        forgotten.  Ms. Bracke is helping me compensate for my cerebral

 7        atrophy here.

 8            All right.  So we'll take that up, then.  It will be part

 9        of your post-hearing submissions.

10                MR. HORWITZ:  Okay.  And just to clarify,

11        Your Honor --

12                THE COURT:  Could I, before we go further on that,

13        just recommend that counsel, now that you have had the hearing,

14        you may be able to go through and say:  Look, we don't

15        need -- we're going to agree now to the admission of certain of

16        these exhibits just to avoid having to spend time in

17        post-hearing submissions arguing about it.

18            So I would ask that you first do that, sit down and go

19        through the entire exhibit list; and where there was not a

20        stipulation, see if you can now agree that some of those

21        exhibits can be admitted by stipulation.

22                MR. HORWITZ:  Absolutely, Your Honor.  Actually, our

23        plan is to agree to the admission of all of the state's exhibits

24        and just argue about their relevance in the post-hearing

25        briefing.
```

1              THE COURT:  Okay.

2              MR. HORWITZ:  I did want to just clarify.  When you

3      refer to the post-hearing briefing, would you like us to address

4      the status of the exhibits in whatever the first pleading we

5      file at the conclusion of this hearing, or do you want us to

6      address the exhibits preliminarily in some kind of -- in some

7      separate document that just discusses the exhibits?

8              THE COURT:  Actually, as I think about it, it might be

9      helpful to me and to you to proceed in this fashion.  I'm just

10     thinking out loud here, which might be dangerous.  But I don't

11     think you need to see the transcript to indicate and resolve

12     objections to exhibits.

13        It seems to me you know what the exhibits are.  You know

14     what the arguments are.  And it may be helpful to you to know

15     whether I'm going to consider or not consider exhibits in making

16     your final submissions.

17        So what I wondered is whether it would be appropriate to

18     maybe require briefing on that issue in fairly short order.  And

19     I'm not going to require a submission of your final briefing

20     until after the transcript has been prepared.

21        And so I was thinking we might be able to do it in kind of

22     a staged basis.  And what I may do is leave it to Ms. Dotson and

23     Ms. Davis to sit down with you and kind of work that out, a

24     schedule as to -- starting with Ms. Hohenleitner, when she

25     anticipates the transcript might be ready, and then proceed in

1          that fashion.

2                In other words, you will meet with her or with them,

3          perhaps today or early next week, and come up with a

4          post-hearing briefing schedule.  What I envisioned was that we

5          might first address admission of documents, including whether

6          you can all reach agreement on most of them so I don't have to

7          actually rule on it, and that we can be addressing that while

8          we're waiting for the transcript to be prepared.

9                And then hopefully we'll have a ruling on those exhibits,

10         and you can then, in your final briefing, know what exhibits are

11         admitted and thereby focus your briefing a little more crisply.

12               Your thoughts?

13               MR. HORWITZ:  Your Honor, I think that's a very

14         sensible plan.  And just to inform the court, we haven't worked

15         out all the details, but my sense is that if we can't come to an

16         agreement with the state on some of our exhibits and whether

17         they are admissible, we may file a written motion to expand the

18         record.  So that's just another, I guess, complication for the

19         court to consider.

20               THE COURT:  Well, it's a free country.  You can file

21         anything you want.

22               MR. HORWITZ:  Thank you, Your Honor.

23               THE COURT:  Ms. Lorello, Mr. Anderson, is that --

24               MS. LORELLO:  Well, I guess I'm confused, because I

25         thought they just said they were going to stipulate to the

1   admission of all of our exhibits.  So I don't know what we're

2   briefing as to the exhibits other than relevance.

3        THE COURT:  If you want to stipulate to the admission

4   of all of the petitioner's exhibits, then we don't need to do

5   anything.  They are offering to stipulate to all of the exhibits

6   that you've offered, but you have not made a reciprocal

7   agreement.  So, therefore, there is a dispute that is not yet

8   resolved.

9        If you want to say now, for the record, that you have no

10  objection to any of the proffered exhibits from the petitioner,

11  then we have no need for any further briefing on that issue.

12       MS. LORELLO:  So we are not going to have to argue

13  about relevance in a pre --

14       THE COURT:  Well, you can --

15       MS. LORELLO:  -- in a predecision brief or

16  pre-post-hearing brief.  That seems weird to me.

17       THE COURT:  Well, it's kind of a chicken and egg.

18       MS. LORELLO:  Right.

19       THE COURT:  Yeah.  I think you probably, just in your

20  final briefing, can make your argument.  And where there are

21  exhibits you think are not relevant, you can indicate why.

22  Because that's really part of your argument.  It's not relevant

23  that...

24       But if you -- for some reason, I have never had this come

25  up in this context.  I guess -- I think you could just roll

1    those arguments all into your final brief, but I don't know why

2    I need to make a separate determination of relevance.  If I rely

3    upon it, it means I found it to be relevant in making my

4    decision.

5              MS. LORELLO:  That's what I was figuring.

6              THE COURT:  Yeah.  So I don't know that we need to

7    spend a lot of time briefing an issue of relevance when the very

8    same arguments are going to be part of your final briefing as to

9    what is relevant or not relevant.

10             MS. LORELLO:  I agree.

11             THE COURT:  Okay.  Then it sounds like that you can

12   put your heads together over the next few days and probably will

13   not require any further briefing on the admission of the

14   exhibits.  They will all be admitted subject to an objection of

15   relevance which the court will, in essence, resolve by either

16   considering them or not considering them in our final decision.

17      If I consider them and specifically address an exhibit and

18   rely upon it, then obviously I will have found it to be relevant

19   to the proceedings.

20             MR. HORWITZ:  Yes, Your Honor.  And if the state -- if

21   the state has some objections to our exhibits that aren't based

22   on relevance, would you like --

23             THE COURT:  That's what you need to work out between

24   now and maybe Monday.

25             MR. HORWITZ:  Okay.

1          THE COURT:  Okay?

2          MS. LORELLO:  Okay.

3          THE COURT:  Hopefully, we will need no further

4     briefing and no further even discussion on admissibility of

5     exhibits other than you can, in your final submission, indicate

6     why the court should or should not consider them in its final

7     decision, which really is a question of relevance.  All right?

8          The other thing, I had suggested that it might be

9     appropriate to make your posttrial submission in the form of

10    kind of proposed findings of fact and conclusions of law.  I

11    have now kind of rethought that, and I'm not sure it's

12    absolutely necessary.

13         And I certainly do not want both findings of fact and

14    conclusions of law and a brief, because it should be almost

15    complete overlap between the two.  I think it might be just more

16    helpful just to have a post-hearing briefing without there being

17    conclusions -- separate findings of fact and conclusions of law.

18    Because that will be incorporated in the court's final decision

19    anyway.

20         But if counsel feels that you want to submit it in that

21    format, you can do so.  It's a little more clunky, and it's

22    easier for me to read if it's more just straight-up briefing.

23         MS. LORELLO:  The state -- I was actually going to

24    suggest a brief in the form of essentially a closing argument.

25         THE COURT:  That's almost precisely what it will be.

1          MR. HORWITZ:  That works for us, too, Your Honor.

2          THE COURT:  All right.  Let me see if there is

3     anything else.  Let me -- I'm going to give you a preview of my

4     thinking.

5          Given the fact that Ms. Goody clearly brought to the

6     attention of Mr. Kehne and Mr. Adams the -- the abnormal 1993

7     CT scans, I think that establishes deficient performance under

8     *Strickland*.  And I -- now, maybe -- you know, again, the state

9     is free to argue to the contrary; but that, of course, doesn't

10    end the inquiry.  Because as a *Martinez* hearing, there is -- we

11    have to also look at the prejudice prong, which then leads us to

12    have to consider whether -- even if they had explored the issue

13    -- whether that would have led Judge Schwartzman to, in

14    postconviction relief, find that there was ineffective

15    assistance of counsel at the trial/sentencing level.

16         And, moreover, the next step is that, upon granting such a

17    hearing, the evidence would have resulted in some likelihood,

18    some probability of a sentence other than death.

19         So I guess what I'm suggesting is that I'm going to be more

20    interested in hearing those follow-on arguments and not a lot of

21    focus on Mr. Kehne and Mr. Adams, because I think that the

22    harder issues are those follow-on issues that need to be

23    addressed.

24         I'm just going to throw that out there.  You are free to

25    argue -- and maybe you should to make the record -- if you

786

1    firmly believe that there was not a deficient performance under

2    the *Strickland* standard by Mr. Kehne and Mr. Adams, but I am

3    just offering that observation.  All right?

4         Okay.  Anything else, Counsel?

5              MR. HORWITZ:  Not from us, Your Honor.

6              MS. LORELLO:  No, Your Honor.

7              THE COURT:  From -- let me ask:  Ms. Dotson,

8    Ms. Davis, are there any procedural things that I should have

9    covered but did not?

10        All right.  I'll leave it to the two of you, then, to get

11   with counsel and come up with a briefing schedule, but it's

12   going to have to, obviously, be tiered upon Ms. Hohenleitner's

13   completion of the transcript.  And she is quite busy, so I'm not

14   going to promise on her behalf anything.  I'll leave it up to

15   her as to what she can reasonably have for you.

16        All right.  We'll be in recess.

17        (Proceedings concluded at 9:41 a.m.)

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Tamara Hohenleitner, Federal Official Realtime Court Reporter, in and for the United States District Court for the District of Idaho, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 24th day of July, 2017.

/S/ TAMARA I. HOHENLEITNER
_____
TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
FEDERAL OFFICIAL COURT REPORTER

**'92** [6] - 750:11, 751:1, 751:9, 752:6, 752:12, 763:12

**'93** [4] - 750:12, 752:6, 752:12, 763:12

**1/3/2017** [1] - 746:20

**1000** [2] - 745:15, 745:20

**11** [1] - 775:1

**12** [1] - 746:17

**12/29/2016** [1] - 746:8

**12th** [3] - 746:21, 746:23, 746:25

**13** [1] - 775:2

**14-year** [1] - 763:16

**15** [1] - 746:19

**16th** [1] - 746:18

**178** [2] - 778:11, 778:23

**18** [1] - 754:10

**1992** [6] - 746:17, 746:21, 746:23, 749:4, 749:12, 751:14

**1993** [5] - 746:17, 746:25, 750:5, 751:14, 785:6

**1997** [2] - 774:13, 775:4

**1999** [1] - 746:10

**2** [3] - 746:10, 747:5, 747:6

**20** [1] - 754:23

**2001** [6] - 746:7, 746:19, 752:2, 752:20, 763:13

**2013** [1] - 774:8

**2016** [5] - 747:3, 747:5, 747:6, 753:7, 763:13

**2017** [1] - 744:2

**21** [1] - 754:10

**28** [1] - 746:16

**4** [1] - 746:7

**5** [3] - 744:4, 766:14, 766:24

**51** [1] - 770:16

**6** [1] - 766:24

**665** [1] - 778:8

**667** [1] - 778:8

**687** [1] - 778:8

**7** [2] - 766:24, 774:10

**8** [2] - 766:14, 766:24

**9** [1] - 744:2

**98-240** [1] - 744:3

**9:41** [1] - 786:17

**A-R-T-H-U-R** [1] - 744:17

**a.m** [1] - 786:17

**ability** [1] - 749:16

**able** [3] - 762:19, 779:14, 780:21

**abnormal** [3] - 747:16, 747:21, 785:6

**abnormalities** [12] - 754:10, 757:15, 757:18, 762:9, 762:22, 765:22, 766:23, 767:7, 767:15, 768:18, 772:4, 772:8

**abnormality** [3] - 762:24, 765:25, 767:16

**absence** [3] - 762:18, 767:8, 767:14

**absolutely** [3] - 777:11, 779:22, 784:12

**access** [1] - 762:14

**according** [1] - 769:4

**account** [1] - 749:16

**accurate** [3] - 777:21, 777:22, 779:3

**accurately** [2] - 745:16, 745:21

**acquired** [2] - 757:5, 771:22

**activities** [1] - 748:17

**activity** [1] - 769:10

**actual** [1] - 749:5

**Ada** [1] - 746:24

**Adams** [3] - 785:6, 785:21, 786:2

**adapt** [1] - 757:9

**adaptation** [1] - 766:21

**adaption** [2] - 765:24, 766:16

**adaptive** [1] - 761:9

**additional** [1] - 746:6

**address** [4] - 780:3, 780:6, 781:5, 783:17

**addressed** [1] - 785:23

**addressing** [1] - 781:7

**admissibility** [2] - 777:24, 784:4

**admissible** [1] - 781:17

**admission** [6] - 779:15, 779:23, 781:5, 782:1, 782:3, 783:13

**admitted** [8] - 745:14, 745:20, 777:19, 778:7, 778:23, 779:21, 781:11, 783:14

**adopted** [2] - 760:17, 772:7

**advised** [1] - 774:21

**affected** [1] - 752:22

**affecting** [1] - 748:2

**affective** [2] - 757:22, 758:6

**age** [1] - 770:22

**age-related** [1] - 770:22

**ages** [2] - 766:14, 766:24

**agree** [7] - 764:6, 765:2, 765:6, 779:15, 779:20, 779:23, 783:10

**agreement** [3] - 781:6, 781:16, 782:7

**agrees** [1] - 767:21

**ahead** [4] - 758:23, 759:8, 760:2, 773:25

**alcohol** [4] - 755:13, 771:20, 772:3, 772:13

**alcoholism** [2] - 754:7, 755:4

**Alfonso** [1] - 746:9

**ALFONSO** [1] - 746:9

**allow** [4] - 752:14, 758:23, 759:5, 776:7

**allows** [1] - 774:17

**almost** [3] - 756:8, 784:14, 784:25

**alone** [1] - 771:9

**Alphonsus** [1] - 746:2

**American** [1] - 768:4

**Anderson** [1] - 781:23

**announce** [1] - 744:9

**anomalies** [1] - 752:17

**anomaly** [1] - 753:12

**answer** [1] - 775:9

**anticipates** [1] - 780:25

**antisocial** [1] - 767:24

**anytime** [1] - 765:20

**anyway** [1] - 784:19

**apologize** [2] - 774:15, 778:16

**appreciation** [1] - 752:7

**appropriate** [2] - 780:17, 784:9

**area** [1] - 772:16

**areas** [2] - 752:9, 753:2

**argue** [4] - 779:24, 782:12, 785:9, 785:25

**arguing** [1] - 779:17

**argument** [6] - 777:2, 777:9, 777:13, 782:20, 782:22, 784:24

**arguments** [5] - 778:21, 780:14, 783:1, 783:8, 785:20

**Arthur** [2] - 744:10, 744:17

**ARTHUR** [1] - 744:13

**artifact** [2] - 749:18, 749:20

**artifactual** [1] - 749:22

**aside** [1] - 747:7

**assessing** [1] - 763:23

**assessment** [1] - 765:2

**assistance** [1] - 785:15

**associated** [6] - 754:12, 754:22, 754:24, 755:16, 755:20, 757:15

**association** [1] - 758:3

**assume** [3] - 765:17, 778:24, 779:1

**assuming** [3] - 760:13, 767:10, 771:16

**asymptomatic** [1] - 761:13

**ataxia** [1] - 773:4

**ataxias** [1] - 761:23

**atrophied** [1] - 753:1

**atrophy** [35] - 749:9, 749:20, 750:10, 750:15, 750:17, 750:18, 750:21, 750:25, 751:8, 751:12, 751:14, 751:20, 751:21, 751:23, 751:24, 752:10, 752:11, 753:16, 753:24, 755:15, 756:21, 761:6, 762:10, 763:16, 763:24, 763:25, 767:7, 767:21, 770:20, 771:4, 771:10, 779:7

**attempt** [1] - 761:24

**attention** [1] - 785:6

**attorney** [1] - 774:21

**attorneys** [1] - 775:5

**August** [2] - 747:5, 747:6

**aunts** [1] - 764:23

**avoid** [1] - 779:16

**aware** [2] - 759:13,

764:16

**Babinski** [1] - 747:22

**balance** [1] - 748:16

**base** [1] - 773:13

**based** [4] - 762:6, 765:3, 772:14, 783:21

**basis** [1] - 780:22

**Beaver** [1] - 764:25

**Beaver's** [1] - 778:11

**became** [2] - 753:20, 759:25

**behalf** [1] - 786:14

**behavior** [2] - 768:14, 771:1

**behavioral** [7] - 757:14, 761:9, 762:24, 767:16, 770:23, 772:3, 772:8

**beneath** [1] - 748:15

**better** [4] - 748:10, 752:7, 753:23, 763:23

**between** [9] - 750:11, 750:17, 750:20, 751:5, 751:14, 760:21, 768:1, 783:23, 784:15

**beyond** [4] - 755:13, 758:4, 773:17, 775:11

**billing** [1] - 778:13

**bipolar** [1] - 769:7

**birth** [5] - 753:13, 757:6, 765:18, 765:20, 766:11

**bit** [3] - 774:2, 777:16, 779:4

**blood** [3] - 753:14, 766:4, 766:8

**blue** [1] - 774:14

**board** [1] - 768:3

**Board** [1] - 768:4

**boards** [1] - 768:5

**bollixed** [1] - 777:15

**borderline** [1] - 767:24

**born** [1] - 766:7

**bottom** [1] - 774:5

**Bracke** [2] - 778:17, 779:6

**brain** [26] - 745:4, 746:12, 746:13, 746:16, 746:18, 746:19, 747:5, 747:6, 748:2, 748:8, 748:14, 749:4, 751:4, 753:2, 753:15, 764:7, 765:24, 766:12,

766:15, 768:19,
769:10, 769:12,
771:24
**brief** [6] - 760:4,
782:15, 782:16,
783:1, 784:14,
784:24
**briefing** [19] - 758:24,
760:8, 779:25,
780:3, 780:18,
780:19, 781:4,
781:10, 781:11,
782:2, 782:11,
782:20, 783:7,
783:8, 783:13,
784:4, 784:16,
784:22, 786:11
**briefly** [1] - 745:2
**briefs** [3] - 777:4,
777:12, 777:13
**bring** [1] - 776:1
**brought** [1] - 785:5
**busy** [1] - 786:13
**BY** [9] - 744:22,
754:15, 755:13,
761:1, 763:8,
765:14, 773:2,
774:4, 774:20
**California** [2] - 745:7,
771:19
**callosum** [3] - 771:25,
772:10, 772:14
**capital** [1] - 775:4
**Care** [1] - 746:1
**Carlos** [1] - 773:15
**Case** [2] - 744:3, 778:7
**case** [15] - 745:18,
753:6, 759:7,
760:18, 762:15,
770:1, 770:2,
772:17, 773:9,
773:10, 773:15,
774:23, 775:4,
776:6, 778:21
**cases** [4] - 748:11,
769:23, 769:24,
771:19
**causation** [1] - 771:6
**caused** [2] - 762:23,
767:15
**causes** [1] - 754:2
**cells** [1] - 768:9
**Center** [3] - 746:1,
746:2
**center** [1] - 771:24
**central** [1] - 748:21
**cerebellar** [32] - 749:9,
750:2, 750:9,
750:17, 751:12,
751:14, 751:23,

751:24, 752:11,
753:16, 756:25,
757:3, 757:7,
757:10, 757:19,
757:22, 758:6,
761:6, 761:12,
761:13, 761:17,
761:22, 761:23,
762:2, 762:3,
762:12, 762:19,
767:9, 771:4
**cerebellum** [25] -
748:4, 748:9,
748:11, 748:12,
748:13, 748:14,
748:18, 749:23,
751:24, 752:8,
753:18, 753:19,
753:23, 753:24,
754:14, 756:18,
757:7, 757:10,
757:25, 762:11,
763:19, 763:22,
764:1, 767:8, 767:21
**cerebral** [7] - 748:15,
750:10, 750:18,
762:10, 767:7,
770:20, 779:6
**cerebrum** [2] - 753:2,
771:24
**certain** [8] - 751:5,
751:7, 753:15,
754:7, 770:25,
771:9, 779:15
**certainly** [18] - 751:25,
753:12, 754:2,
754:6, 754:23,
756:2, 756:3,
756:18, 757:25,
758:1, 762:10,
762:11, 766:13,
768:5, 770:3, 770:4,
784:13
**certifying** [1] - 768:3
**Cessie** [1] - 746:9
**cetera** [1] - 762:15
**changed** [2] - 758:21,
774:6
**changes** [2] - 752:10,
752:25
**chapter** [1] - 777:6
**characterize** [1] -
751:19
**chicken** [1] - 782:17
**childhood** [1] - 764:23
**chromosomal** [1] -
754:10
**civil** [2] - 758:14,
758:15
**Civil** [1] - 744:3

**claim** [1] - 776:3
**clarified** [1] - 777:24
**clarify** [3] - 761:1,
779:10, 780:2
**Clay** [1] - 746:20
**clear** [4] - 755:4,
771:8, 778:9, 778:19
**clearly** [2] - 760:8,
785:5
**CLERK** [2] - 744:3,
744:14
**clerk** [1] - 744:11
**clinical** [2] - 745:8,
746:10
**clinically** [2] - 747:12,
749:1
**close** [1] - 751:6
**closing** [2] - 777:1,
784:24
**clunky** [1] - 784:21
**CMV** [1] - 754:3
**cognitive** [5] - 755:19,
756:6, 757:22,
758:6, 775:7
**coincidental** [1] -
761:16
**common** [1] - 776:8
**compared** [2] - 752:8,
753:1
**compares** [1] - 772:10
**compensate** [2] -
758:12, 779:6
**compensating** [1] -
757:10
**complete** [3] - 744:15,
746:6, 784:15
**completion** [1] -
786:13
**complex** [1] - 766:12
**complication** [1] -
781:18
**compulsive** [2] -
768:16, 768:17
**concern** [1] - 750:1
**concerned** [4] - 748:6,
751:22, 756:1,
756:18
**conclude** [1] - 771:5
**concluded** [1] -
786:17
**conclusion** [1] - 780:5
**conclusions** [5] -
775:14, 784:10,
784:14, 784:17
**conditions** [1] -
763:24
**conduct** [2] - 758:13,
774:21
**confused** [1] - 781:24
**congenital** [15] -

753:12, 754:2,
754:11, 754:18,
756:12, 756:14,
756:19, 757:8,
762:12, 764:11,
765:16, 765:17,
765:23, 766:3,
766:18
**connect** [13] - 768:1,
768:22, 769:14,
769:15, 769:16,
769:17, 770:12,
770:14, 770:25,
771:15, 773:8,
773:9, 773:10
**connected** [1] -
763:19
**connecting** [1] -
768:12
**connection** [2] -
769:23, 770:1
**connections** [1] -
748:20
**connects** [3] - 763:21,
771:24, 775:13
**consider** [6] - 780:15,
781:19, 783:17,
784:6, 785:12
**considered** [1] -
778:20
**considering** [2] -
783:16
**consistency** [1] -
756:20
**consistent** [6] - 748:1,
752:12, 761:8,
762:11, 763:13,
763:17
**consult** [1] - 775:5
**consumption** [1] -
755:5
**context** [2] - 747:24,
782:25
**contrary** [1] - 785:9
**contrast** [2] - 746:19,
747:5
**conventionally** [1] -
771:22
**coordination** [1] -
748:16
**copies** [2] - 746:14,
749:10
**copy** [2] - 767:3,
778:18
**cord** [3] - 745:5,
748:2, 769:20
**corpus** [3] - 771:25,
772:10, 772:14
**Corrections** [1] -
745:25

**correlation** [2] -
771:5, 772:12
**cortex** [2] - 767:22,
771:4
**cortical** [9] - 749:9,
750:10, 750:15,
750:18, 750:25,
751:8, 751:12,
751:21, 752:10
**Counsel** [3] - 744:5,
758:14, 786:4
**counsel** [9] - 773:24,
774:14, 776:3,
776:24, 777:1,
779:13, 784:20,
785:15, 786:11
**country** [1] - 781:20
**County** [1] - 746:24
**course** [2] - 766:22,
785:9
**court's** [1] - 784:18
**cover** [1] - 776:24
**covered** [4] - 758:18,
760:11, 770:17,
786:9
**creating** [1] - 756:6
**cries** [1] - 771:2
**crisply** [1] - 781:11
**critical** [1] - 759:5
**cross** [1] - 763:6
**CROSS** [2] - 763:7,
773:1
**cross-examination** [1]
- 763:6
**CROSS-
EXAMINATION** [2] -
763:7, 773:1
**CT** [15] - 746:11,
746:13, 746:16,
748:8, 748:11,
749:4, 750:5, 751:1,
752:6, 752:9,
763:12, 763:24,
767:7, 785:7
**cure** [1] - 761:25
**curriculum** [1] -
745:14
**cuts** [2] - 751:2,
771:23
**cytomegalic** [1] -
754:3
**CYTOMEGALIC** [1] -
754:5
**Czuba** [1] - 763:6
**CZUBA** [18] - 758:4,
758:12, 760:4,
760:7, 763:8, 765:9,
772:24, 773:2,
773:19, 774:1,
774:4, 774:15,

774:19, 774:20,
775:13, 776:10,
776:23, 777:11
**dad** [1] - 764:22
**damaging** [1] - 753:14
**dangerous** [1] -
780:10
**dated** [2] - 746:7,
746:20
**Davis** [2] - 780:23,
786:8
**days** [1] - 783:12
**deals** [2] - 745:3,
748:16
**death** [1] - 785:18
**decision** [6] - 753:17,
759:7, 783:4,
783:16, 784:7,
784:18
**declaration** [4] -
773:14, 774:8,
774:20, 774:24
**declarations** [1] -
779:4
**decreased** [3] -
753:14, 766:4,
769:11
**deeply** [1] - 766:22
**deficient** [2] - 785:7,
786:1
**degenerative** [5] -
753:20, 754:17,
754:21, 756:12,
762:16
**degree** [2] - 761:12,
762:9
**Department** [1] -
745:25
**deposition** [8] -
758:11, 758:13,
758:19, 759:1,
760:1, 760:10,
760:12, 777:23
**depressed** [1] -
769:11
**depressive** [1] - 769:8
**describe** [2] - 745:2,
745:23
**details** [1] - 781:15
**determination** [1] -
783:2
**determine** [1] - 775:7
**develop** [2] - 757:9
**developed** [2] -
753:22, 759:12
**development** [1] -
758:3
**developmental** [2] -
753:22, 770:4
**develops** [1] - 768:13

**deviates** [1] - 772:11
**diagnosed** [3] -
767:24, 768:17,
769:3
**diagnosis** [1] - 772:4
**difference** [5] -
749:17, 750:17,
751:2, 751:17,
751:18
**different** [8] - 749:11,
749:13, 750:3,
750:11, 750:14,
750:23, 752:5,
777:17
**dimension** [1] -
768:10
**direct** [1] - 763:11
**DIRECT** [1] - 744:21
**directly** [1] - 773:19
**disc** [1] - 761:19
**disclosed** [1] - 760:15
**discusses** [1] - 780:7
**discussion** [2] - 784:4
**disease** [2] - 754:23,
756:3
**disorder** [16] - 754:25,
757:23, 758:6,
759:17, 760:9,
762:16, 767:24,
767:25, 768:12,
768:13, 768:16,
768:18, 769:21,
771:20, 772:3,
772:13
**disorders** [12] - 745:4,
754:8, 754:9,
754:21, 755:9,
758:2, 761:22,
767:23, 769:1,
771:6, 771:10
**disorientation** [1] -
756:9
**dispute** [1] - 782:7
**distance** [1] - 751:5
**Docket** [2] - 778:8
**Doctor** [1] - 744:11
**doctor's** [1] - 763:3
**document** [2] - 746:5,
780:7
**documents** [2] -
746:4, 781:5
**done** [12] - 751:3,
766:7, 770:5, 770:6,
771:3, 771:7,
771:17, 771:18,
772:15, 775:19,
776:5, 776:6
**dots** [15] - 768:1,
768:12, 768:22,
769:14, 769:15,

769:16, 769:17,
770:12, 770:14,
770:25, 771:15,
773:8, 773:9,
773:10, 775:13
**Dotson** [2] - 780:22,
786:7
**down** [4] - 744:10,
766:2, 779:18,
780:23
**Dr** [11] - 744:10,
744:23, 760:8,
763:9, 764:25,
773:3, 775:15,
776:5, 776:13,
778:11
**drug** [1] - 748:1
**due** [2] - 753:20,
761:19
**during** [5] - 754:6,
754:20, 759:1,
760:3, 778:11
**duty** [1] - 758:12
**dysfunction** [5] -
756:25, 757:3,
762:19, 767:9,
767:10
**dystrophies** [1] -
754:11
**dystrophy** [2] -
754:11
**early** [7] - 755:6,
766:17, 766:19,
770:3, 770:5,
777:16, 781:3
**easier** [2] - 750:15,
784:22
**economics** [1] -
770:24
**edited** [1] - 746:22
**effects** [1] - 775:7
**egg** [1] - 782:17
**either** [11] - 753:12,
755:7, 762:16,
773:11, 777:1,
777:9, 777:18,
778:25, 783:15
**Elam's** [1] - 777:23
**element** [1] - 758:7
**Encino** [1] - 745:7
**encountered** [1] -
778:16
**end** [1] - 785:10
**entire** [1] - 779:19
**entirely** [1] - 765:3,
769:2
**envisioned** [1] - 781:4
**essence** [1] - 783:15
**essentially** [2] - 753:8,
784:24
**establish** [1] - 774:1
**establishes** [1] -

785:7
**et** [1] - 762:15
**etiologies** [1] - 753:10
**etiology** [1] - 764:10
**euthymic** [1] - 769:12
**evaluated** [1] - 747:11
**evaluation** [2] - 746:7,
776:2
**evaluations** [1] -
764:14
**event** [2] - 753:14,
759:5, 766:7
**evidentiary** [1] - 744:4
**exact** [1] - 767:3
**exactly** [4] - 755:11,
770:13, 775:17,
778:15
**examination** [3] -
747:18, 762:19,
763:6
**EXAMINATION** [4] -
744:21, 763:7,
765:13, 773:1
**examined** [2] - 757:1,
758:17
**example** [3] - 754:22,
768:16, 769:7
**exams** [3] - 756:25,
769:2, 770:4
**except** [2] - 747:14,
771:22
**exception** [1] - 777:23
**exclude** [1] - 770:15
**existence** [1] - 751:9
**exotic** [1] - 754:9
**expand** [1] - 781:17
**expect** [2] - 757:4,
757:13
**expected** [1] - 765:21
**experience** [1] -
745:16
**expert** [6] - 758:5,
758:7, 758:13,
758:16, 758:22
**experts** [2] - 775:6,
776:1
**explored** [2] - 758:11,
785:12
**exposure** [9] - 755:2,
755:4, 755:14,
755:22, 755:24,
755:25, 756:5,
756:6, 766:14
**exposures** [1] -
754:15
**extensor** [1] - 747:22
**extensor-plantar** [1] -
747:22
**extent** [1] - 757:24
**extra** [1] - 771:23

**fact** [8] - 749:23,
754:2, 756:23,
771:18, 784:10,
784:13, 784:17,
785:5
**fair** [1] - 765:6
**fairly** [2] - 775:24,
780:18
**familiar** [1] - 757:22
**family** [1] - 772:7
**far** [5] - 748:6, 751:21,
753:16, 756:1,
756:18
**fashion** [2] - 780:9,
781:1
**FDG** [3] - 746:13,
747:6, 769:9
**February** [2] - 746:21,
746:22
**fetal** [3] - 771:20,
772:3, 772:13
**few** [3] - 771:23,
778:24, 783:12
**field** [3] - 756:1,
768:21, 770:23
**figuring** [1] - 783:5
**file** [3] - 780:5, 781:17,
781:20
**filed** [2] - 758:18,
760:18
**final** [12] - 759:7,
767:6, 780:16,
769:19, 781:10,
782:20, 783:1,
783:8, 783:16,
784:5, 784:6, 784:18
**findings** [13] - 747:16,
751:7, 752:5,
753:10, 755:16,
761:2, 761:8,
762:22, 763:13,
763:17, 784:10,
784:13, 784:17
**fine** [2] - 760:22,
778:22
**finished** [1] - 774:11
**firmly** [1] - 786:1
**first** [8] - 744:17,
748:23, 761:11,
774:2, 777:1,
779:18, 780:4, 781:5
**flow** [2] - 753:14,
766:4
**focus** [1] - 781:11,
785:21
**follow** [5] - 760:20,
763:5, 776:11,
785:20, 785:22
**follow-on** [2] - 785:20,
785:22

**follow-up** [2] - 763:5, 776:11
**followed** [1] - 776:4
**foreclose** [1] - 759:3
**forego** [1] - 777:14
**forensic** [2] - 745:8, 770:14
**forgotten** [1] - 779:6
**form** [2] - 784:9, 784:24
**format** [1] - 784:21
**forth** [1] - 758:18
**foundation** [1] - 774:2
**four** [1] - 774:6
**frankly** [1] - 777:15
**free** [3] - 781:20, 785:9, 785:24
**frequency** [1] - 756:5
**frequently** [1] - 753:12
**friends** [1] - 764:23
**frontal** [9] - 744:19, 748:21, 752:14, 752:17, 752:19, 761:3, 763:20, 763:22
**fully** [1] - 753:22
**function** [4] - 747:11, 761:13, 762:23, 767:16
**functional** [1] - 769:13
**functioning** [7] - 761:10, 763:20, 764:8, 769:4, 773:4, 775:8, 775:15
**functions** [1] - 773:6
**FURTHER** [1] - 773:1
**gait** [5] - 757:14, 765:21, 766:23, 767:10, 773:4
**game** [1] - 766:17
**Gary** [1] - 746:22
**General** [1] - 746:3
**generally** [6] - 745:23, 748:8, 755:16, 758:15, 758:16, 777:3
**generically** [1] - 759:21
**genetic** [4] - 753:21, 761:24, 762:15, 766:9
**geographic** [1] - 756:9
**given** [6] - 749:23, 749:25, 762:13, 764:13, 775:22, 785:5
**glean** [1] - 762:20
**Glenn** [1] - 777:23
**Goody** [1] - 785:5
**granting** [1] - 785:16

**Greenberg** [1] - 746:8
**group** [2] - 761:9, 772:11
**guess** [8] - 751:1, 751:13, 751:20, 776:2, 781:18, 781:24, 782:25, 785:19
**hall** [2] - 764:14, 764:17
**handful** [2] - 779:2, 779:5
**happy** [1] - 778:20
**harder** [1] - 785:22
**Hawthorne** [1] - 773:15
**Hawthorne's** [2] - 774:11, 774:21
**headaches** [1] - 761:18
**heads** [1] - 783:12
**health** [2] - 764:14, 775:6
**hear** [2] - 744:3, 773:11
**heard** [1] - 747:1
**hearing** [18] - 744:4, 759:3, 778:3, 778:10, 778:17, 778:20, 779:9, 779:13, 779:17, 779:24, 780:3, 780:5, 781:4, 782:16, 784:16, 785:10, 785:17, 785:20
**help** [1] - 762:1
**helpful** [5] - 777:4, 777:5, 780:9, 780:14, 784:16
**helping** [1] - 779:6
**hemispheres** [1] - 748:16
**herniation** [1] - 761:19
**high** [1] - 772:4
**hires** [1] - 765:7
**history** [4] - 749:25, 762:15, 764:19, 772:7
**Hohenleitner** [2] - 767:4, 780:24
**Hohenleitner's** [1] - 786:12
**hook** [3] - 776:14, 776:16, 776:18
**hope** [1] - 770:22
**hopefully** [2] - 781:9, 784:3
**HORWITZ** [13] - 777:22, 778:5,

778:9, 778:15, 779:10, 779:22, 780:2, 781:13, 781:22, 783:20, 783:25, 785:1, 786:5
**Hospital** [2] - 746:3
**hours** [1] - 755:24
**housekeeping** [1] - 776:25
**human** [1] - 771:1
**hypoplasia** [13] - 753:16, 753:25, 755:15, 757:7, 761:6, 761:13, 761:17, 761:22, 762:2, 762:3, 762:12, 771:12, 771:13
**idea** [1] - 773:21
**ignore** [1] - 759:4
**image** [4] - 748:12, 749:5, 749:8, 750:6
**images** [3] - 748:7, 752:14, 753:3
**imaging** [8] - 747:3, 747:7, 748:3, 748:10, 748:22, 756:10, 761:2, 763:14
**Immediate** [1] - 746:1
**impact** [3] - 761:9, 773:3, 775:15
**impacts** [1] - 764:7
**impaired** [2] - 762:23, 767:15
**implicated** [1] - 758:1
**important** [3] - 756:22, 757:6, 760:16
**improper** [1] - 760:15
**incident** [2] - 746:24, 746:25
**incidental** [1] - 762:5
**include** [5] - 745:4, 746:16, 747:8, 748:4, 758:24
**included** [1] - 764:14
**including** [4] - 745:25, 754:10, 767:7, 781:5
**incorporated** [1] - 784:18
**increased** [1] - 769:10
**indicate** [4] - 771:3, 780:11, 782:21, 784:5
**indicated** [10] - 747:10, 749:4, 749:14, 751:11, 752:21, 762:20, 763:11, 763:23,

765:15
**indication** [2] - 757:19, 766:24
**indicator** [1] - 771:8
**individuals** [4] - 759:17, 768:15, 769:3, 769:9
**ineffective** [1] - 785:14
**inferior** [1] - 748:15
**inform** [1] - 781:14
**information** [7] - 747:9, 756:16, 762:13, 763:21, 764:16, 765:7, 770:16
**ingrained** [1] - 768:15
**inhalation** [1] - 755:25
**injury** [2] - 764:7, 766:15
**inquire** [1] - 744:19
**inquiry** [3] - 772:22, 775:23, 785:10
**insecticide** [2] - 755:14, 755:15
**insecticides** [2] - 754:24, 756:1
**intense** [1] - 755:23
**intensity** [1] - 756:5
**interest** [1] - 770:23
**interested** [1] - 785:20
**interesting** [2] - 768:2, 768:11
**interpreted** [2] - 749:14, 752:25
**interview** [1] - 746:21
**interviews** [2] - 764:19, 764:22
**involve** [1] - 754:9
**involved** [1] - 771:19
**ischemia** [1] - 753:14
**ischemic** [2] - 766:3, 766:11
**issue** [10] - 754:18, 760:17, 768:11, 769:20, 777:15, 780:18, 782:11, 783:7, 785:12
**issues** [5] - 757:19, 761:15, 769:18, 785:22
**itemized** [1] - 778:8
**items** [1] - 758:18
**itself** [1] - 778:10
**Jail** [1] - 746:24
**James** [1] - 746:4
**January** [3] - 746:16, 746:17, 746:25
**joint** [2] - 777:19, 779:1

**Joseph's** [1] - 746:2
**Judge** [3] - 773:7, 773:20, 785:13
**junction** [1] - 745:6
**juvenile** [2] - 764:14, 764:17
**K-O-W-E-L-L** [1] - 744:18
**Kehne** [3] - 785:6, 785:21, 786:2
**kind** [10] - 770:23, 771:2, 777:15, 778:17, 780:6, 780:21, 780:23, 782:17, 784:10, 784:11
**knowledge** [5] - 759:11, 759:20, 759:22, 768:20, 772:7
**Kowell** [9] - 744:10, 744:18, 744:23, 760:8, 763:9, 773:3, 775:15, 776:5, 776:13
**KOWELL** [1] - 744:13
**lab** [3] - 748:23, 748:24, 772:1
**lack** [1] - 757:10
**language** [1] - 756:9
**large** [1] - 755:1
**last** [4] - 744:7, 744:18, 754:23, 763:3
**late** [1] - 774:19
**late-night** [1] - 774:19
**law** [3] - 784:10, 784:14, 784:17
**lay** [1] - 764:19
**lead** [1] - 771:5
**leads** [1] - 785:11
**least** [9] - 747:17, 756:23, 759:19, 768:10, 768:13, 768:20, 771:2, 771:16, 771:18
**leave** [3] - 780:22, 786:10, 786:14
**led** [1] - 785:13
**leeway** [2] - 773:22, 773:24
**left** [1] - 770:6
**less** [1] - 753:1
**level** [1] - 785:15
**licensed** [1] - 746:9
**lies** [1] - 748:15
**life** [7] - 755:2, 755:6, 765:17, 766:19, 770:5
**light** [1] - 772:22

**likelihood** [1] - 785:17
**likely** [3] - 756:11, 756:14, 757:13
**limited** [3] - 762:13, 762:14, 776:7
**line** [1] - 775:22
**link** [1] - 760:21
**list** [2] - 778:16, 779:19
**listed** [2] - 757:16, 764:15
**literature** [2] - 756:2, 757:25
**litigation** [1] - 758:16
**lobe** [9] - 748:19, 748:21, 752:15, 752:17, 752:19, 761:3, 762:10, 763:20, 763:22
**lobes** [4] - 752:19, 752:21, 752:22, 753:1
**look** [8] - 748:7, 748:8, 752:14, 763:3, 765:11, 774:23, 779:14, 785:11
**looked** [4] - 746:15, 749:10, 749:24, 756:24
**looking** [3] - 767:3, 772:2, 775:3
**looks** [1] - 772:9
**LORELLO** [31] - 744:8, 744:10, 744:20, 744:22, 754:15, 755:13, 758:8, 758:10, 759:9, 759:16, 759:24, 760:20, 760:24, 761:1, 762:25, 772:19, 772:21, 773:17, 775:11, 776:12, 776:21, 777:10, 781:24, 782:12, 782:15, 782:18, 783:5, 783:10, 784:2, 784:23, 786:6
**Lorello** [4] - 758:9, 772:18, 775:10, 781:23
**loud** [1] - 780:10
**lumbosacral** [1] - 761:18
**M.D** [2] - 744:13, 746:4
**Management** [1] - 778:7
**manic** [2] - 769:8, 769:9
**manic-depressive** [1]

- 769:8
**Mark** [1] - 746:8
**marked** [2] - 777:18, 777:23
**markings** [2] - 774:14, 774:15
**marks** [1] - 774:18
**married** [1] - 776:17
**Martinez** [1] - 785:10
**material** [3] - 754:7, 768:6, 768:7
**materials** [6] - 745:21, 745:23, 747:2, 747:7, 747:13, 762:7
**matters** [1] - 776:25
**mean** [9] - 752:24, 753:18, 758:15, 759:25, 760:16, 763:21, 766:9, 766:12, 767:23
**meaning** [6] - 753:1, 753:2, 753:14, 757:9, 761:17, 766:4
**means** [7] - 748:14, 757:9, 765:18, 766:6, 768:13, 771:13, 783:3
**Medical** [3] - 745:25, 746:1, 746:2
**medical** [7] - 745:3, 745:24, 747:8, 751:19, 756:10, 757:2, 757:17
**medically** [3] - 756:15, 762:21, 770:15
**medication** [1] - 747:15
**meet** [1] - 781:2
**memory** [2] - 755:20, 770:18
**mental** [2] - 764:14, 775:6
**mention** [1] - 749:21
**mentioned** [8] - 752:10, 754:15, 754:24, 755:14, 764:17, 768:11, 777:25, 778:11
**Merikangas** [1] - 746:4
**metabolic** [3] - 754:7, 755:9, 769:10
**might** [12] - 749:20, 750:2, 766:24, 771:5, 772:6, 780:8, 780:10, 780:21, 780:25, 781:5, 784:8, 784:15
**migraine** [1] - 761:18
**mild** [4] - 751:21,

752:1, 764:6
**mild-to-moderate** [1] - 752:1
**Miller** [1] - 744:4
**missing** [2] - 770:1, 770:3
**mitochondrial** [1] - 754:9
**moderate** [1] - 752:1
**mom** [1] - 764:22
**moment** [2] - 763:2, 765:12
**Monday** [1] - 783:24
**mood** [1] - 769:12
**moreover** [1] - 785:16
**morning** [6] - 744:5, 744:23, 744:24, 763:9, 763:10, 778:18
**mornings** [1] - 745:9
**morphology** [2] - 772:10, 772:14
**most** [4] - 748:11, 761:11, 778:25, 781:6
**mother's** [1] - 755:5
**motion** [1] - 781:17
**motor** [1] - 755:20
**MRI** [16] - 746:5, 746:12, 746:19, 747:5, 748:8, 748:10, 752:2, 752:8, 752:20, 753:5, 753:7, 763:12, 763:13, 763:23, 771:22
**MS** [49] - 744:8, 744:10, 744:20, 744:22, 754:15, 755:13, 758:4, 758:8, 758:10, 758:12, 759:9, 759:16, 759:24, 760:4, 760:7, 760:20, 760:24, 761:1, 762:25, 763:8, 765:9, 772:19, 772:21, 772:24, 773:2, 773:17, 773:19, 774:1, 774:4, 774:15, 774:19, 774:20, 775:11, 775:13, 776:10, 776:12, 776:21, 776:23, 777:10, 777:11, 781:24, 782:12, 782:15, 782:18, 783:5, 783:10, 784:2,

784:23, 786:6
**muscle** [1] - 773:5
**muscular** [1] - 754:11
**must** [1] - 769:5
**name** [5] - 744:9, 744:15, 744:17, 744:18
**nature** [3] - 745:2, 758:7, 765:23
**necessarily** [2] - 756:4, 775:15
**necessary** [1] - 784:12
**need** [13] - 760:24, 765:7, 770:1, 775:25, 779:15, 780:11, 782:4, 782:11, 783:2, 783:6, 783:23, 784:3, 785:22
**nerve** [3] - 745:5, 761:18, 768:9
**nerves** [1] - 745:5
**nervous** [3] - 745:4, 748:21, 757:1
**neuroimaging** [5] - 762:9, 762:22, 769:2, 769:13, 771:21
**neurologic** [15] - 747:10, 747:11, 747:16, 747:18, 756:4, 756:25, 762:23, 767:15, 768:7, 769:1, 770:4, 773:3, 773:6
**neurological** [3] - 747:9, 749:2, 774:21
**neurologically** [1] - 747:13
**neurologist** [6] - 745:1, 761:14, 768:9, 769:18, 775:6, 775:19
**neurologists** [1] - 768:3
**neurology** [5] - 745:3, 745:9, 768:7, 768:14, 769:1
**Neurology** [1] - 768:4
**neuromuscular** [1] - 745:5
**neuropathy** [1] - 761:20
**neuropsychiatric** [1] - 746:6
**neuropsychiatrist** [1] - 775:20
**neuropsychologist** [6] - 764:2, 773:10, 773:12, 773:13,

775:7, 775:14
**never** [3] - 753:22, 776:18, 782:24
**new** [1] - 774:18
**next** [4] - 744:6, 781:3, 783:12, 785:16
**night** [1] - 774:19
**nomenclature** [1] - 769:8
**none** [1] - 770:6
**normal** [8] - 749:15, 750:4, 753:19, 753:25, 769:2, 769:12, 770:22
**normally** [2] - 751:17, 769:4
**Norman** [1] - 764:25
**normative** [1] - 772:11
**Nos** [1] - 778:8
**notation** [2] - 750:3, 751:18
**note** [2] - 749:8, 778:13
**noted** [5] - 747:12, 747:25, 752:5, 752:9, 757:16
**notes** [1] - 765:11
**nothing** [5] - 765:9, 769:22, 772:19
**noticeable** [1] - 751:25
**number** [7] - 745:24, 751:5, 753:11, 756:22, 757:7, 758:1, 771:19
**nystagmus** [3] - 757:14, 765:21, 766:23
**object** [3] - 773:17, 775:11, 777:25
**objection** [7] - 758:4, 759:6, 760:12, 773:23, 775:21, 782:10, 783:14
**objections** [3] - 778:3, 780:12, 783:21
**observation** [1] - 786:3
**obsessive** [2] - 768:16, 768:17
**obsessive-compulsive** [2] - 768:16, 768:17
**obvious** [1] - 775:24
**obviously** [5] - 759:4, 766:12, 769:3, 783:18, 786:12
**occasion** [1] - 747:14
**occur** [5] - 754:6, 754:21, 755:1,

766:16, 771:1
**occurred** [6] - 754:20, 765:17, 765:23, 766:14, 766:21, 766:24
**occurring** [1] - 757:12
**October** [2] - 746:18, 746:19
**offer** [4] - 758:23, 758:25, 770:11, 777:7
**offered** [1] - 782:6
**offering** [2] - 782:5, 786:3
**older** [1] - 769:8
**once** [2] - 766:6, 766:7
**onset** [1] - 766:25
**opened** [1] - 775:22
**opine** [1] - 764:6
**opinion** [20] - 756:13, 756:23, 758:5, 758:22, 758:24, 759:10, 759:20, 760:8, 760:18, 762:6, 762:8, 762:18, 767:6, 767:8, 770:11, 770:13, 773:11, 773:13, 775:24
**opinions** [3] - 758:17, 758:25, 759:1
**opportunity** [1] - 747:2
**opposed** [1] - 754:17
**oral** [2] - 777:9, 777:13
**order** [4] - 746:6, 777:20, 777:25, 780:18
**Order** [1] - 778:7
**organism** [1] - 766:12
**origin** [1] - 757:8
**originated** [1] - 760:9
**overall** [3] - 762:6, 762:8, 763:25
**overdose** [3] - 747:15, 747:19, 748:1
**overlap** [2] - 768:19, 784:15
**overrule** [1] - 775:21
**paragraph** [2] - 774:10, 775:2
**parietal** [3] - 752:21, 753:1, 762:10
**Parkinson's** [2] - 754:22, 756:3
**part** [14] - 745:8, 745:20, 748:24, 749:23, 754:17, 756:20, 756:23,

759:6, 768:24, 773:6, 776:2, 779:8, 782:22, 783:8
**particular** [3] - 749:24, 759:17, 772:16
**particularly** [4] - 754:3, 763:25, 771:1, 777:3
**parts** [2] - 753:15, 753:23, 757:1
**passed** [1] - 749:21
**pathologies** [1] - 750:24
**patient** [8] - 747:15, 754:20, 762:8, 762:18, 766:7, 771:9, 772:5, 772:13
**patient's** [2] - 755:5, 756:25
**patients** [18] - 745:10, 745:12, 757:8, 761:11, 761:12, 761:14, 761:21, 762:2, 762:4, 768:17, 768:25, 769:7, 769:8, 769:17, 772:2
**patterns** [1] - 768:14
**people** [2] - 761:5, 766:13
**percent** [1] - 770:16
**performance** [2] - 785:7, 786:1
**perhaps** [4] - 753:20, 755:23, 776:4, 781:3
**period** [2] - 755:23, 763:16
**peripheral** [2] - 745:5, 761:20
**person** [1] - 771:4
**personality** [4] - 767:23, 767:24, 768:12, 771:6, 771:10, 772:4
**perspective** [1] - 749:2
**PET** [4] - 746:13, 747:6, 768:18, 769:9
**petitioner** [1] - 782:10
**petitioner's** [2] - 776:3, 782:4
**Petitioner's** [1] - 778:23
**Ph.D** [2] - 746:8, 746:20
**phenomenon** [1] - 757:12
**Physicians** [1] - 746:1
**physicians** [1] - 757:1
**plan** [2] - 779:23,

781:14
**plantar** [1] - 747:22
**pleading** [1] - 780:4
**Pocatello** [1] - 746:1
**point** [6] - 756:17, 759:5, 761:25, 766:16, 766:25, 777:14
**portions** [1] - 747:11
**position** [2] - 758:16, 777:7
**positive** [1] - 747:22
**possibility** [1] - 754:16
**possible** [5] - 751:8, 753:10, 766:15, 767:24, 777:12
**post** [9] - 778:3, 778:20, 779:9, 779:17, 779:24, 780:3, 781:4, 782:16, 784:16
**post-hearing** [7] - 778:3, 779:9, 779:17, 779:24, 780:3, 781:4, 784:16
**postconviction** [2] - 776:3, 785:14
**posttrial** [1] - 784:9
**potential** [2] - 749:16, 755:13
**potentially** [1] - 756:6
**practice** [5] - 745:2, 745:7, 745:8, 745:12, 761:5
**pre** [2] - 782:13, 782:16
**pre-post-hearing** [1] - 782:16
**precisely** [1] - 784:25
**predecision** [1] - 782:15
**preference** [1] - 778:6
**pregnancy** [2] - 754:6, 754:20
**prehearing** [1] - 760:19
**prejudice** [1] - 785:11
**preliminarily** [1] - 780:6
**prepared** [4] - 744:6, 745:18, 780:20, 781:8
**preparing** [2] - 767:4, 778:17
**present** [2] - 757:6, 766:11
**presents** [1] - 771:9
**pretrial** [1] - 760:18
**pretty** [2] - 774:6,

777:8
**preview** [1] - 785:3
**previously** [1] - 745:14
**primarily** [2] - 748:16, 762:10
**primary** [1] - 765:15
**private** [2] - 745:7, 745:12
**probability** [3] - 772:5, 772:13, 785:18
**probable** [3] - 756:15, 762:21, 770:15
**probative** [2] - 760:14
**probed** [1] - 766:22
**problem** [5] - 750:2, 756:4, 761:19, 766:4, 769:19
**problems** [8] - 755:19, 755:20, 756:9, 757:14, 765:21, 766:23, 767:11
**procedural** [1] - 786:8
**procedures** [1] - 746:5
**proceed** [5] - 759:8, 760:2, 773:25, 780:9, 780:25
**proceeding** [4] - 758:15, 759:15, 759:23, 777:17
**proceedings** [1] - 783:19
**Proceedings** [1] - 786:17
**process** [9] - 750:22, 753:19, 753:20, 753:21, 754:17, 754:19, 765:24, 766:3
**profession** [1] - 744:25
**professor** [1] - 745:9
**proffered** [1] - 782:10
**promise** [1] - 786:14
**prong** [1] - 785:11
**proper** [2] - 758:21, 758:25
**proposed** [1] - 784:10
**provide** [2] - 758:5, 778:18
**provided** [3] - 762:7, 765:3, 774:20
**providers** [1] - 757:2
**providing** [1] - 773:14
**psychiatric** [8] - 758:1, 760:21, 761:15, 768:6, 768:25, 769:5, 769:18, 769:21
**psychiatrist** [5] -

757:24, 764:4, 768:23, 769:21, 775:19
**psychiatrists** [3] - 768:4, 768:6, 769:4
**Psychiatry** [1] - 768:4
**psychiatry** [2] - 768:10, 768:24
**psychological** [2] - 764:7, 769:1
**psychosocial** [1] - 746:9
**purpose** [1] - 776:7
**pursuant** [1] - 778:7
**put** [3] - 770:12, 774:17, 783:12
**qualified** [2] - 775:6, 775:16
**questions** [6] - 762:25, 765:11, 772:22, 773:19, 775:22, 776:1
**quite** [2] - 779:4, 786:13
**quote** [1] - 768:15
**radiologic** [1] - 746:14
**radiologist** [7] - 749:14, 749:19, 749:20, 749:21, 749:22, 749:25, 750:2
**radiologist's** [1] - 749:13
**radiology** [2] - 746:11, 747:4
**Raney** [1] - 746:22
**RANEY** [1] - 746:22
**range** [1] - 752:1
**reach** [1] - 781:6
**read** [3] - 758:20, 775:2, 784:22
**ready** [5] - 762:4, 770:9, 779:2, 782:22, 784:7
**reason** [5] - 750:25, 765:15, 770:13, 770:24, 782:24
**reasonably** [1] - 786:15
**rebuttal** [1] - 776:22
**received** [1] - 746:4
**recent** [3] - 753:6, 753:7, 758:3
**recess** [1] - 786:16
**reciprocal** [1] - 782:6
**recognized** [1] - 760:17
**recollection** [1] - 758:10

**recommend** [2] - 776:6, 779:13
**recommended** [2] - 775:5, 775:18
**record** [6] - 744:16, 759:9, 760:4, 781:18, 782:9, 785:25
**records** [16] - 745:24, 747:8, 747:10, 747:17, 747:19, 756:10, 756:24, 757:17, 762:14, 762:20, 764:13, 764:15, 764:18, 765:3, 770:4
**redirect** [1] - 772:20
**refer** [2] - 755:4, 780:3
**referred** [1] - 755:9
**referring** [2] - 767:10, 773:4
**reflect** [1] - 745:21
**regard** [2] - 756:23, 767:20
**regarding** [9] - 746:11, 746:24, 747:9, 748:22, 752:18, 756:2, 758:6, 764:13, 775:14
**Regional** [2] - 746:1, 746:2
**related** [4] - 747:2, 747:19, 761:22, 770:22
**relates** [2] - 759:10, 773:19
**relation** [1] - 748:18
**relationship** [2] - 750:20, 770:11
**relevance** [8] - 779:24, 782:2, 782:13, 783:2, 783:7, 783:15, 783:22, 784:7
**relevant** [11] - 759:15, 759:16, 759:23, 775:21, 775:23, 782:21, 782:22, 783:3, 783:9, 783:18
**relief** [2] - 776:4, 785:14
**rely** [3] - 771:8, 783:2, 783:18
**remember** [2] - 774:19, 774:23
**reminded** [1] - 777:8
**renew** [1] - 773:23
**repeat** [1] - 754:4
**report** [17] - 745:18,

745:20, 746:8, 746:9, 746:20, 748:24, 749:12, 749:13, 751:11, 752:20, 758:5, 758:7, 758:13, 758:18, 758:22, 758:25, 762:20
**reported** [2] - 749:12, 757:25
**REPORTER** [1] - 754:4
**reports** [4] - 746:11, 746:15, 746:24, 747:4
**require** [4] - 775:24, 780:18, 780:19, 783:13
**residents** [1] - 745:10
**resolve** [4] - 759:6, 770:7, 780:11, 783:15
**resolved** [1] - 782:8
**respect** [8] - 747:7, 748:3, 749:2, 750:5, 752:5, 752:20, 760:5, 761:2
**respondent** [2] - 744:6, 776:20
**RESPONDENT'S** [1] - 744:13
**response** [4] - 747:22, 754:21, 773:7
**responsible** [2] - 750:23, 750:24
**result** [2] - 756:4, 757:20
**resulted** [2] - 755:15, 785:17
**results** [2] - 748:24, 772:3
**rethought** [1] - 784:11
**revealed** [1] - 753:8
**review** [10] - 747:2, 748:24, 750:5, 750:11, 753:3, 756:10, 762:6, 764:25, 774:10, 777:13
**reviewed** [8] - 745:21, 747:8, 747:17, 749:5, 751:12, 752:2, 757:17, 764:16
**reviewing** [1] - 774:11
**Robin** [2] - 746:21, 746:22
**roll** [1] - 782:25
**root** [1] - 761:19
**roots** [1] - 745:5

**Row** [8] - 744:4, 746:21, 746:22, 752:17, 759:10, 759:20, 759:22, 767:20
**Row's** [2] - 747:9, 764:13
**rule** [2] - 758:20, 781:7
**ruled** [1] - 778:25
**rules** [1] - 769:5
**ruling** [1] - 781:9
**Saint** [1] - 746:2
**scale** [1] - 756:17
**scan** [12] - 746:12, 746:13, 746:18, 747:6, 748:6, 748:11, 751:7, 752:8, 752:9, 753:7, 763:24, 771:22
**scans** [11] - 746:11, 746:12, 746:16, 752:6, 753:5, 753:7, 767:7, 768:18, 769:9, 769:20, 785:7
**schedule** [3] - 780:24, 781:4, 786:11
**Schwartzman** [1] - 785:13
**scope** [5] - 751:14, 758:5, 758:21, 773:17, 775:12
**seat** [1] - 744:14
**second** [1] - 777:20
**section** [1] - 775:1
**seeing** [2] - 745:10, 757:18
**seem** [1] - 754:22
**self** [1] - 765:25
**self-correct** [1] - 765:25
**sense** [2] - 776:8, 781:15
**sensible** [1] - 781:14
**sentence** [1] - 785:18
**sentencing** [1] - 776:4
**separate** [4] - 777:20, 780:7, 783:2, 784:17
**September** [2] - 746:7, 746:10
**Services** [1] - 745:25
**set** [2] - 758:18, 769:5
**setting** [1] - 747:7
**several** [2] - 755:24, 763:12
**severe** [1] - 751:25
**severity** [2] - 751:19, 752:12
**shape** [1] - 772:10
**short** [1] - 780:18

**show** [2] - 772:12, 775:23
**showed** [2] - 750:9, 752:25
**siblings** [1] - 764:22
**side** [3] - 764:11, 765:6, 777:9
**signature** [1] - 774:5
**significance** [1] - 747:24
**significant** [6] - 747:12, 749:1, 751:16, 751:17, 752:18, 764:7
**similar** [1] - 752:9
**simply** [2] - 771:7
**single** [1] - 755:23
**sit** [2] - 779:18, 780:23
**situation** [1] - 770:14
**size** [2] - 753:19, 754:1
**slices** [4] - 751:3, 751:4, 751:5, 751:6
**slow** [1] - 756:8
**small** [9] - 753:18, 753:24, 754:14, 757:7, 757:10, 762:11, 767:8, 767:21, 771:13
**smaller** [1] - 753:20
**smallness** [1] - 751:24
**social** [2] - 746:10, 764:19
**someone** [1] - 772:6
**sometimes** [4] - 765:6, 769:14, 770:18, 775:25
**sophisticated** [1] - 769:21
**sorry** [1] - 763:3
**sort** [4] - 760:3, 765:22, 767:11, 771:23
**sorted** [1] - 766:22
**sorts** [1] - 756:7
**sounds** [1] - 783:11
**sources** [1] - 745:24
**Southern** [1] - 771:19
**specific** [1] - 749:25
**specifically** [4] - 758:11, 758:17, 758:18, 783:17
**SPECT** [3] - 746:12, 746:18, 748:6
**spectrum** [3] - 771:20, 772:3, 772:13
**spectrums** [1] - 763:14
**speech** [3] - 757:15, 765:21, 766:23

**spell** [1] - 744:15
**spend** [2] - 779:16, 783:7
**spent** [2] - 764:13, 768:21
**spinal** [3] - 745:5, 748:2, 769:20
**St** [1] - 746:2
**staged** [1] - 780:22
**stand** [1] - 744:14
**standard** [1] - 786:2
**standpoint** [1] - 768:14
**start** [1] - 774:4
**started** [2] - 772:8, 777:17
**starting** [2] - 749:4, 780:24
**state** [11] - 744:15, 745:16, 765:4, 770:6, 777:24, 778:18, 781:16, 783:20, 783:21, 784:23, 785:8
**state's** [1] - 779:23
**statement** [2] - 759:19, 760:21, 763:4
**statements** [1] - 777:7
**static** [1] - 766:6
**status** [2] - 747:9, 780:4
**step** [2] - 744:11, 785:16
**sticky** [1] - 774:16
**still** [2] - 755:6, 775:11
**stipulate** [3] - 781:25, 782:3, 782:5
**stipulated** [3] - 777:19, 777:24, 779:1
**stipulation** [2] - 779:20, 779:21
**straight** [2] - 758:15, 784:22
**straight-up** [2] - 758:15, 784:22
**Strickland** [2] - 785:8, 786:2
**strike** [1] - 773:23
**structure** [3] - 748:15, 752:8, 771:23
**studies** [18] - 746:14, 746:15, 748:3, 748:22, 751:3, 756:11, 761:2, 762:9, 762:22, 769:2, 770:25, 771:3, 771:16, 771:17, 771:21,

772:12, 772:15, 775:19

**study** [8] - 749:10, 749:12, 749:14, 749:15, 749:18, 750:4, 750:9, 750:16

**subject** [2] - 759:6, 783:14

**submission** [3] - 780:19, 784:5, 784:9

**submissions** [4] - 778:4, 779:9, 779:17, 780:16

**submit** [1] - 784:20

**submitting** [1] - 777:4

**subspecialty** [1] - 745:3

**suffers** [1] - 767:23

**suggest** [2] - 758:21, 784:24

**suggested** [1] - 784:8

**suggesting** [1] - 785:19

**supervising** [1] - 745:10

**supply** [1] - 766:8

**sustain** [1] - 760:12

**sworn** [1] - 744:12

**SWORN** [1] - 744:13

**symptomatic** [2] - 761:23, 762:3

**syndrome** [4] - 759:11, 759:21, 759:25, 760:17

**system** [4] - 745:4, 748:21, 757:1, 774:17

**tabs** [1] - 774:16

**technique** [3] - 748:10, 751:2, 771:21

**technology** [1] - 772:9

**temporal** [1] - 758:6

**term** [1] - 753:23

**terms** [13] - 751:13, 752:10, 753:2, 753:4, 753:5, 753:11, 753:21, 755:2, 756:6, 760:1, 761:9, 761:13, 768:11

**tested** [2] - 768:6, 768:7

**testified** [2] - 761:1, 763:19

**testimony** [4] - 763:11, 764:25, 773:23, 778:12

**testing** [2] - 746:6, 774:22

**that..** [1] - 782:23

**themselves** [1] - 746:16

**thereby** [1] - 781:11

**therefore** [1] - 782:7

**thinking** [4] - 756:8, 780:10, 780:21, 785:4

**thorough** [1] - 776:2

**thoughts** [1] - 781:12

**throw** [1] - 785:24

**tiered** [1] - 786:12

**tiny** [1] - 774:2

**tip** [1] - 756:17

**tissue** [2] - 753:1, 757:11

**today** [2] - 749:24, 781:3

**toes** [1] - 747:23

**together** [2] - 751:6, 783:12

**tone** [1] - 773:5

**took** [1] - 768:5

**topics** [1] - 758:17

**toxic** [5] - 754:7, 754:15, 754:19, 755:2

**toxin** [2] - 755:13, 766:14

**toxins** [2] - 754:22, 755:4

**training** [4] - 745:16, 768:5, 768:7, 768:25

**transcript** [7] - 767:3, 777:6, 780:11, 780:20, 780:25, 781:8, 786:13

**trauma** [1] - 757:20

**traumatic** [1] - 766:15

**treat** [3] - 761:21, 761:24, 762:4

**treated** [2] - 761:5, 761:16

**tremendously** [1] - 750:14

**trial** [5] - 774:11, 774:21, 775:5, 776:4, 777:20

**trial/sentencing** [1] - 785:15

**tried** [1] - 767:3

**Trinity** [1] - 746:3

**trisomy** [2] - 754:10

**true** [3] - 763:18, 765:8, 776:19

**trying** [2] - 760:20, 770:24

**Tuesday** [1] - 745:9

**turning** [1] - 752:2

**turns** [1] - 771:20

**two** [6] - 746:12, 750:20, 756:22, 768:1, 784:15, 786:10

**type** [4] - 753:13, 755:22, 755:24, 770:4

**types** [3] - 748:1, 750:20, 754:7

**UCLA** [1] - 745:9

**ultimately** [1] - 748:20

**uncertainty** [2] - 770:7, 770:10

**uncles** [1] - 764:23

**under** [3] - 775:1, 785:7, 786:1

**understood** [3] - 759:19, 763:4, 767:6

**undertake** [1] - 765:25

**University** [1] - 772:1

**unquote** [1] - 768:15

**unrelated** [1] - 759:22

**up** [16] - 758:15, 759:1, 760:21, 763:5, 775:22, 776:5, 776:11, 777:16, 778:2, 778:10, 779:8, 781:3, 782:25, 784:22, 786:11, 786:14

**upgoing** [1] - 747:23

**utero** [3] - 753:12, 755:5, 765:23

**value** [2] - 760:14

**variety** [3] - 753:11, 754:8, 754:13

**various** [2] - 748:17, 771:6

**verse** [1] - 777:6

**versus** [1] - 756:12

**view** [1] - 748:4

**viewable** [1] - 751:1

**virus** [1] - 754:5

**viruses** [1] - 754:3

**visuospatial** [1] - 756:9

**vitae** [1] - 745:14

**vs** [1] - 744:4

**waiting** [2] - 770:21, 781:8

**Ward** [1] - 746:20

**Washington** [1] - 772:2

**week** [1] - 781:3

**weird** [1] - 782:16

**whereas** [2] - 757:12, 777:6

**wide** [3] - 753:11, 754:8, 754:13

**Winmill** [2] - 773:7, 773:20

**wish** [1] - 777:9

**witness** [3] - 744:7, 744:14, 758:17

**WITNESS** [8] - 744:13, 744:17, 754:5, 755:7, 755:11, 759:13, 776:15, 776:17

**witnesses** [2] - 764:20, 776:20

**wondered** [2] - 774:18, 780:17

**word** [1] - 771:11

**words** [13] - 750:1, 750:22, 751:3, 756:8, 760:16, 765:22, 766:2, 766:6, 767:3, 768:3, 768:22, 772:6, 781:2

**worker** [1] - 746:10

**workers** [1] - 756:1

**works** [1] - 785:1

**workups** [1] - 769:20

**world** [1] - 771:1

**written** [2] - 777:4, 781:17

**wrote** [1] - 770:13

**years** [2] - 754:23, 774:6