Deborah A. Czuba, ID Bar No. 9648
Jonah J. Horwitz, ID Bar No. 10494
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone:  (208) 331-5530
Facsimile:  (208) 331-5559
ECF:   Deborah_A_Czuba@fd.org
        Jonah_Horwitz@fd.org

Attorneys for Petitioner Robin Lee Row

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBIN LEE ROW, | ) | Case No. 98-0240-S-BLW |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | PETITIONER'S REPLACEMENT |
| | ) | POST-HEARING |
| THOMAS J. BEAUCLAIR, et al, | ) | OPENING BRIEF |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

## TABLE OF CONTENTS

I.   Introduction .................................................................................................. 1

    A.   *Martinez* Test ...................................................................................... 1

    B.   Overarching Questions of Law ........................................................... 6

II.  Argument ...................................................................................................... 16

    A.   Trial Counsel and PCR Counsel Were Deficient .............................. 17

        1.   Trial Counsel Rendered Deficient Performance ......................... 18

            a.   Trial Counsel's Investigation Was Inadequate ............................ 19

            b.   Trial Counsel's Errors Were Not Reasonably Strategic .............. 40

        2.   State Post-Conviction Counsel Rendered Deficient Performance ............ 45

        3.   Conclusion to Deficient Performance ......................................... 55

    B.   Prejudice ............................................................................................ 56

        1.   Presentation of Mitigating Evidence .......................................... 57

            a.   Mitigating Effect of the Brain Damage ...................................... 57

            b.   The Mitigating Effect of Etiology ............................................... 64

                i.   Mitigating Effect of Childhood Development ................. 64

                ii.   Mitigating Effect of Environmental Exposure ................. 70

            c.   Mitigating Effect of the Neuropsychological Outcome of Frontal Lobe Impairment ........................................................... 75

        2.   Rebuttal of Aggravation .............................................................. 80

            a.   Rebuttal of Antisocial Personality Disorder ............................... 82

            b.   Rebuttal of Planning and Prior Misconduct ................................ 84

            c.   Rebuttal of Inappropriate Affect ................................................. 87

            d.   Rebuttal on Brutality of Crime .................................................... 88

            e.   Rebutting the State's *Martinez* Experts ...................................... 89

        3.   Conclusion to Prejudice .............................................................. 95

III. Certificate of Appealability ......................................................................... 96

IV.  Conclusion and Prayer for Relief ................................................................. 98

Ms. Row suffered from severe brain dysfunction at the time of her offense and sentencing. Such dysfunction would have been powerful mitigating evidence but was never presented by her prior attorneys. Now that it can be taken into account under *Martinez v. Ryan*, 566 U.S. 1 (2012), Ms. Row must be granted federal habeas relief, and her unconstitutional death sentence must be vacated.

## I.   Introduction

An evidentiary hearing was held in this Court in June 2017 on three sub-claims[1] asserting ineffective assistance of counsel ("IAC") at trial for failure to present evidence of brain damage in mitigation at Ms. Row's capital sentencing. *See* Dkts. 701–05; *see also* Dkt. 600 at 37 (noting that the sub-claims upon which a hearing was granted were "all limited to organic brain dysfunction subject matter").[2] Pursuant to Court orders, *see* Dkt. 706 at 1; Dkt. 749 at 2, Ms. Row files this replacement opening brief on the sub-claims in light of the hearing.

### A.  *Martinez* Test

Federal habeas relief is available to a state prisoner "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition here was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and it is therefore subject to the provisions of that Act. *See* Dkt. 545 at 10. Under AEDPA, if the state courts adjudicated a claim on the merits then a federal court must afford deference to their ruling. *See* 28 U.S.C. § 2254(d). However, "[a]ny federally reviewable claim that was not adjudicated on the merits in state court is reviewed de novo." *Runningeagle*

---

[1] "Separate errors by counsel . . . are . . . not separate claims, but rather aspects of a single claim of ineffective assistance of trial counsel." *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003). As a consequence, Ms. Row refers to the separate errors at issue here as "sub-claims."

[2] Henceforth, Ms. Row will refer to the June 2017 hearing as "the *Martinez* hearing."

Petitioner's Replacement Post-Hearing Opening Brief – 1

*v. Ryan*, 825 F.3d 970, 978 (9th Cir. 2016).[3]  That is the case with Ms. Row's underlying trial-IAC sub-claims, as those were defaulted and thus never addressed head-on in state court.  Claim 7, ¶ 81(b) has already been found by this Court to have been "fundamentally altered" from the corresponding sub-claim raised in state court, and thus new.  *See* Dkt. 600 at 21–22.  Consequently, this claim has not been analyzed by the state courts and should be reviewed here de novo.  *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc).  With respect to the remaining two claims, Ms. Row will demonstrate below why they too are fundamentally altered from their state-court analogues and why they too should be considered de novo.  *See infra* at 45–55.

Like Ms. Row's challenges to the performance of her trial attorneys, her arguments alleging ineffectiveness of the counsel who pursued her initial state petition for post-conviction relief ("PCR") have likewise never been addressed on the merits by the Idaho courts.  *See Row v. State*, 21 P.3d 895, 900 (Idaho 2001) (*Row II*) (declining to consider the effectiveness of Ms. Row's PCR counsel).  Accordingly, this Court must make an independent assessment of PCR counsel as well, without deferring to any state-court rulings on that question.[4]

Turning to the *Martinez* test, it consists of four criteria: (1) the underlying trial-IAC claim is "substantial"; (2) the petitioner was either not represented in state PCR proceedings or received IAC at such proceedings; (3) the state PCR proceeding was the initial-review proceeding; and (4) state law required—either expressly or as a practical matter—the petitioner

---

[3] All internal quotation marks are omitted from citations and, unless otherwise noted, all emphasis is added.

[4] With respect to every issue argued in this brief, Ms. Row takes the position that even if the Court applies a higher standard of review, she prevails for the same reasons relied upon herein.

Petitioner's Replacement Post-Hearing Opening Brief – 2

to bring the claim in the initial-review collateral proceeding.  *See Woods v. Sinclair*, 764 F.3d 1109, 1137 (9th Cir. 2014).  Ms. Row will take each criterion in turn.

The first prong requires that the underlying trial-IAC claim be substantial.  As *Martinez* emphasized, the prong sets a relatively low, threshold standard, demanding only a demonstration "that the claim has *some* merit."  566 U.S. at 14.  In *Martinez* cases, the underlying IAC claims are reviewed in light of *Strickland v. Washington*, 466 U.S. 668 (1984).  *See Runningeagle*, 825 F.3d at 982.  Under *Strickland*, a defendant's Sixth Amendment right to effective assistance of counsel is violated when there is both deficient performance and prejudice.  466 U.S. at 687. Because this is a capital case, counsel's duties were weightier and this Court's scrutiny of their performance is more searching.  *See Frierson v. Woodford*, 463 F.3d 982, 993 (9th Cir. 2006) ("We have recognized that in our analysis of IAC claims, particularly for those arising from a death sentence, the reasonableness of counsel's investigatory and preparatory work at the penalty phase should be examined in a different, more exacting, manner than other parts of the trial.").

Under the second prong, PCR counsel must be ineffective.  To measure ineffectiveness, courts look to the deficient-performance test set forth by *Strickland*.  *See Martinez*, 566 U.S. at 14.  Following that test, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  Two important questions arise concerning the second prong: (1) whether PCR counsel is best analogized to trial counsel or appellate counsel when evaluating their effectiveness, and (2) what type of prejudice must flow from PCR counsel's ineffectiveness.  Ms. Row is mindful that the Court has addressed these issues in prior rulings.  *See, e.g.*, *Creech v. Ramirez*, No. 1:99-cv-224, 2017 WL 1129938, at *3–4 (D. Idaho March 24, 2017).  Undersigned counsel respectfully

disagree with the earlier resolution of these questions and will briefly state their position to preserve the record for appeal.

With respect to the first question, Ms. Row believes that PCR counsel are most aptly compared to trial counsel because they are obligated to conduct the same sort of sweeping, independent investigation into the case.  That is corroborated by the profession's own internal literature.  *See* American Bar Association ("ABA"), Manual for Attorneys Representing Death-Sentenced Prisoners in Postconviction Proceedings (1988), at 2 ("[PCR counsel] must not only be thoroughly familiar with the entire record below, he must also do a great deal of independent factual investigation outside the record."); ABA, The Defense Function, Ch. 4 (1979), at 115 ("Since a postconviction proceeding is fundamentally an original judicial proceeding, involving problems of investigation, preparation, and trial, the standards governing lawyers in these tasks are essentially the same as those outlined in these standards for the defense of a criminal case.").[5] The same rule is also supported by well-reasoned, persuasive precedent.  *See Trevino v. Davis*, 829 F.3d 328, 347 (5th Cir. 2016) ("*Martinez* suggests that a similar standard should apply to both state trial counsel and state habeas counsel."); *accord Thomas v. Kelley*, No. 6:14-cv-6038, 2017 WL 1239148, at *25 (W.D. Ark. March 31, 2017).

Another key question that arises in relation to this prong is what sort of prejudice must accrue from PCR counsel's ineffectiveness.  There are two possibilities: (1) absent the ineffectiveness, a substantial claim would not have been defaulted; and (2) absent the ineffectiveness, post-conviction relief would have been awarded.  Ms. Row regards the first

---

[5] At the *Martinez* hearing, there was some discussion of the ABA Guidelines, their role in the Court's inquiry, and the possibility of briefing the issue.  *See* Dkt. 707 at 176–83.  Undersigned counsel stated their basic position on the Guidelines at the hearing, *see id.*, which is simply that they are useful as "guides to determining what is reasonable" in evaluating an IAC claim, *Wiggins v. Smith*, 539 U.S. 510, 524 (2003).

option as the right one.  She has already explained why she takes that view, *see* Dkt. 597 at 2–6, and will stand on her prior briefing here.

Although Ms. Row continues to respectfully disagree with the Court's approach to these two questions, she will use the Court's chosen framework here.  Because the Court's framework imposes a more demanding test than Ms. Row's, she would also prevail—a fortiori—under her own construction of *Martinez*.

Pursuant to *Martinez*'s third prong, the PCR ineffectiveness must occur in "the initial review proceeding."  *Woods*, 764 F.3d at 1137.  As explained fully below, *see infra* at 45–55, the underlying trial-IAC claims asserted below were all inadequately developed in Ms. Row's application for state post-conviction relief.  Consequently, she easily meets this "self explanatory" element of the test.  *Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013).[6]

The fourth and final prong demands a showing that "state law required (or forced as a practical matter) the petitioner to bring" the relevant IAC claims "in the initial review collateral proceeding."  *Woods*, 764 F.3d at 1137.  The Court has already rightly found the prong satisfied.  *See* Dkt. 600 at 10; *accord Johnson v. State*, 395 P.3d 1246, 1261 (Idaho 2017) ("*Martinez* applies in Idaho.").

---

[6] At one point during the initial PCR proceedings, the state judge averred that he was "leaving open the possibility or option of filing a successive post-conviction petition" to raise the brain-damage IAC claim with more facts behind it.  *See Martinez* Hearing Exhibit (henceforth "HE") 23 at 365.  This was not a realistic suggestion.  *See Pizzuto v. State*, 903 P.2d 58, 61 (Idaho 1995) (ruling that IAC claims must be raised shortly after trial).  In any event, there was no strategic reason that counsel failed to do the testing after the judge denied relief.  *See* Dkt. 701 at 65.

Where a document is available in either the lodgings or the federal docket and also available as an exhibit at the *Martinez* hearing, Ms. Row has endeavored to cite to the hearing exhibit number.  For exhibits that do not have consecutive pagination throughout, Ms. Row cites the PDF page number.

Petitioner's Replacement Post-Hearing Opening Brief – 5

### B.  Overarching Questions of Law

In its order granting a *Martinez* hearing, the Court set forth several "points of law," and announced its intention to follow them unless it was persuaded to the contrary.  *See* Dkt. 600 at 39.[7]  Ms. Row pauses here to briefly take up two of the evidentiary issues highlighted by the Court.[8]

First, the Court expressed its preliminary determination that, with respect to the ineffectiveness of PCR counsel, "[n]ew evidence is permissible under *Dickens* because a *Martinez* claim is not a constitutional 'claim' subject to" *Cullen v. Pinholster*, 563 U.S. 170 (2011) or 28 U.S.C. § 2254(e)(2).  Dkt. 600 at 39.  Ms. Row agrees completely with the Court's tentative assessment, which is solidly supported by the law.

Section 2254(e)(2) provides that if a habeas petitioner "has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant" satisfies various statutory exceptions.  As this Court rightly noted, Ms. Row's *Martinez* arguments are not "claims."  That is, they are not freestanding bases for the granting of habeas relief.  Rather, they are arguments for why the Court should excuse procedural defaults imposed on trial-IAC claims.  As such, they are not subject to § 2254(e)(2) *See Dickens*, 740 F.3d at 1321 ("Section 2254(e)(2), however, does not bar a hearing before the

---

[7] The Court has already ruled that the consideration of additional evidence in these federal habeas proceedings under *Martinez* is not precluded by the successive petitions provision in 28 U.S.C. § 2244.  *See* Dkt. 600 at 10–18.  Ms. Row believes that ruling is correct and assumes it will not be revisited here, particularly as the parties have already expended considerable time and effort in actually presenting such evidence at the Court's own direction.  If the Court is inclined to reopen the question, Ms. Row respectfully requests an opportunity to brief the matter prior to any decision.

[8] The Court encouraged the parties to address these points of law in "prehearing memoranda." Dkt. 600 at 41.  No such memoranda were filed, however, and Ms. Row therefore considers it appropriate to address the points here.

district court to allow a petitioner to show 'cause' under *Martinez*."); *see also Detrich*, 740 F.3d at 1247 ("'[C]ause' to excuse a procedural default under *Martinez* is not a 'claim.'  A finding of IAC by the PCR counsel under *Martinez* is only an 'equitable' ruling that there is 'cause' excusing the state-court procedural default.").

In addition, a federal habeas petitioner is only limited to the state-court record with respect to claims that were "adjudicated on the merits in state-court proceedings."  *Pinholster*, 563 U.S. at 187.  The challenge to PCR counsel's effectiveness in this case was not resolved in state court.  To the contrary, the Idaho courts explicitly refused to consider those attorneys' performance.  *See Row II*, 21 P.3d at 900.  Therefore, the analysis of PCR counsel's performance is not constrained to the state-court record.  *See Detrich*, 740 F.3d at 1247 (allowing new evidence to be admitted under *Martinez* because the "question of PCR-counsel ineffectiveness has [not] been adjudicated on the merits in a state-court proceeding").

Moreover, the state-court diligence requirement in section § 2254(e)(2) does not apply in the *Martinez* context.  For when a default has been excused under *Martinez*, it has been excused because PCR counsel was ineffective for failing to raise or develop a claim.  *See, e.g.*, *Woods*, 764 F.3d at 1137.  It would be odd to prohibit a hearing on the rationale that a petitioner insufficiently developed the record on a claim in the PCR state court when the very reason his claim is being considered in federal court is IAC of PCR counsel.  Surely, the Supreme Court did not create a new avenue to habeas relief only to shut the avenue down at the same time.  *See McLaughlin v. Laxalt*, 665 F. App'x 590, 593 (9th Cir. 2016) (per curiam) ("[A]lthough a state habeas lawyer's errors normally are imputed to a habeas petitioner for purposes of determining whether the petitioner has been diligent under § 2254(e)(2), such imputation makes no sense in the context of a claim rescued from procedural default by *Martinez*.").

The fact that new evidence is permitted under *Martinez* is reflected by the numerous courts that have granted evidentiary hearings, including this one in the very case at bar, *see* Dkt. 600, the Ninth Circuit itself, *see Hill v. Glebe*, 654 F. App'x 294, 295 (9th Cir. 2016) (per curiam), and other district courts within the Ninth Circuit, *see Jones v. Ryan*, No. 4:01-cv-592, 2017 WL 264500, at *21 (D. Ariz. Jan. 20, 2017); *Hill v. Glebe*, No. 3:14-cv-5330, 2015 WL 1221386, at *7–12 (W.D. Wash. Mar. 17, 2015), *aff'd, Hill*, 654 F. App'x 294.

The Court posed the same question—whether new evidence is precluded under § 2254(e)(2)—with respect to the underlying trial-IAC claim. *See* Dkt. 600 at 40–41.[9]  In positing that question, the Court recognized that it would create a "Catch-22" if petitioners had to first show that PCR counsel were ineffective and then show that they were diligent. *Id.* at 40. Again, Ms. Row's analysis is fully consistent with the thoughts expressed by the Court.  It would indeed be irrational for the Supreme Court to have opened up a new route for challenging trial counsel under *Martinez* while at the same time foreclosing the petitioner's ability to use any evidence to support such a challenge.  The reasons why largely track the reasons, outlined above, for why new evidence is allowed on the matter of PCR counsel's effectiveness.

In addition to those reasons, *Martinez* itself plainly envisions factual development on the underlying trial-IAC claims.  The Court there lamented that prisoners who are given inept—or no—PCR attorneys are "in no position to *develop the evidentiary basis* for a claim of ineffective assistance."  566 U.S. at 12.  Similarly, *Trevino v. Thaler*, 569 U.S. 413, 425 (2013), surveyed the new evidence that could come in if the default were excused and acknowledged that a capital

---

[9] In granting a *Martinez* hearing on the question of cause and prejudice, the Court noted that it would consider after hearing the testimony whether a second hearing was necessary on the ultimate question of the underlying IAC claims and their merits.  *See* Dkt. 600 at 41.  Ms. Row believes the evidence admitted at the hearing demonstrates her entitlement to habeas relief. However, if the Court concludes that the ultimate showing has not yet been made, she respectfully requests a second hearing to make the showing.

defense lawyer must, on post-conviction, "investigate [his client's] background, determine whether trial counsel had adequately done so, and then develop evidence about additional mitigating background circumstances."  The whole purpose of these cases was to prevent a scenario in which "no court will review" such evidence, *Martinez*, 566 U.S. at 11, and keeping out new material about trial counsel would do just that.

Finally, even if 28 U.S.C. § 2254(e) was relevant here, an evidentiary hearing would be permissible under § 2254(e)(2)(A)(i), as relying on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable. The Supreme Court has repeatedly applied *Martinez* retroactively.  *See Buck v. Davis*, 137 S. Ct. 759, 771–80 (2017) (applying Martinez to a case in which the conviction became final in 1999); *Trevino*, 569 U.S. at 421–29 (same); *Martinez*, 566 U.S. at 1316–21 (early 2000s).

In the alternative, if the Court disagrees with Ms. Row's position that she is entitled to submit new evidence even in the absence of a diligence showing, she should be found to have made that showing.  Section 2254(e)(2) prohibits evidentiary development where "the applicant has failed to develop the factual basis of a claim in State court proceedings."  Ms. Row has not so failed.  In her second state petition, Ms. Row alleged and sought an evidentiary hearing on her claim that prior counsel, including PCR counsel, were ineffective because they "failed to secure adequate testing concerning . . . brain damage."  Dkt. 333, Lodging A at 24.  The Idaho courts rejected the claim on procedural grounds.  *See* Dkt. 333, Lodging D at 17; *Row II*, 21 P.3d at 900.  Ms. Row took reasonable efforts to obtain factual development of her brain-damage claims in state court, and those efforts were rebuffed.  Assuming that a diligence requirement applies, she has consequently fulfilled it.  Ms. Row recognizes that the first state post-conviction proceeding is ordinarily the one considered in a diligence inquiry.  However, since the whole

point of *Martinez* is to allow litigation of claims neglected by the attorneys in that very same proceeding, it would not make sense to use their omissions to Ms. Row's detriment. The second petition is therefore the most pertinent one here, where new PCR counsel diligently sought to develop the claim.

Although Ms. Row concedes that the brain damage evidence offered in her second state post-conviction proceeding was not as fully evolved as the evidence presented in the federal habeas litigation, it did include the key ingredients. *See* Dkt. 333, Lodging A at 22 & sources cited therein. In any event, it would be curious to rule that Ms. Row had an obligation to go back to state court yet again with additional material along the same lines. For if brain-damage evidence was kept out as too late in 2000, any further evidence in the same category would surely have been kept out under identical reasoning at any point thereafter.[10]

The Court opined in its March 31, 2015 order that "[t]he 28 U.S.C. § 2254(e)(1) presumption of correctness applies to state court findings of fact that may have relevance in a *Martinez* procedural default setting." Dkt. 600 at 39. For several different reasons, the presumption does not foreclose relief here.

First, the presumption is categorically inappropriate in the *Martinez* context. Here, one of the primary reasons the litigation is occurring at all is because of serious questions regarding the performance of PCR counsel. It would not make sense, as an equitable matter, to give deference to a record created by those very attorneys. *See Rico-Arreola v. Smith*, No. 3:13-cv-580, 2015 WL 5766263, at *2 (D. Nev. Sept. 30, 2015) (suggesting that the presumption of correctness

---

[10] Alternatively, if the Court decides that there is a diligence requirement that Ms. Row has not satisfied, it should stay these federal habeas proceedings to give Ms. Row an opportunity to present to the state courts the full factual basis for her brain-damage claims. *See Rhines v. Weber*, 544 U.S. 269, 277–78 (2005); *Blake v. Baker*, 745 F.3d 977, 984 (9th Cir. 2014).

Petitioner's Replacement Post-Hearing Opening Brief – 10

does not apply in a *Martinez* analysis); *see also Brown v. Brown*, 847 F.3d 502, 521–22 (7th Cir. 2017) (implying the same).

Second, there are effectively no factual findings to which the presumption even could apply. On deficient performance, the statements by the Idaho courts regarding counsel's mitigation presentation were conclusory assertions that the attorneys did enough. *See State v. Row*, 955 P.2d 1082, 1092 (Idaho 1998) (*Row I*); HE 43 at 7, 9–14. There was no specific discussion of who counsel interviewed, what records they obtained, what testing they administered, or anything of the sort. The state courts' analysis was thus effectively an entirely legal one. As such, there are no factual findings to defer to—only legal questions to consider de novo.

On prejudice it is even more obvious that the state courts made no pertinent findings. Evidence of brain damage was not presented at sentencing at all, so the sentencing court had no occasion to make findings about it. *See* Dkt. 19, Lodging A-2 at 427[11] (stating only that Ms. Row's psychological "condition *may* be related to some organic problem with brain functioning"). In the initial state post-conviction proceeding, counsel *asserted* a brain-damage claim but then completely failed to support it with any evidence, so the state courts again were unable to establish a meaningful record on the matter. *See* HE 43 at 14 (the PCR court stating: "Since no neurological tests were ever administered to Ms. Row, there is no real way of knowing to what extent, if any, this perceived organic condition might have affected her behavior and/or emotionality."); *Row I*, 955 P.2d at 1092 ("Finally, we note that Row has failed to provide a record of any evidence which was not presented by trial counsel, thus failing to show any prejudice.").

---

[11] Documents in the state-court lodgings that can be cited in the format above are referenced in that manner.

Third, even if the presumption were relevant, it could not be applied here, as several exceptions apply.  To begin, "the material facts were not adequately developed at the state court hearing."  *Morris v. Reynolds*, 264 F.3d 38, 47 (2d Cir. 2001).  As discussed below, PCR counsel wholly failed to determine and present evidence on what Ms. Row's brain damage actually entailed, as they failed to have done the necessary neuropsychological testing, neurological imaging, and evaluation.  *See infra* at 45–55.  These are the crucial facts at issue now.  For the same reason—PCR counsel's incompetence—Ms. Row was not provided "a full, fair, and adequate hearing," which dissolves the presumption as well.  *Mayes v. Gibson*, 210 F.3d 1284, 1289 (10th Cir. 2000).

In addition, the state court findings on deficient performance were not "fairly supported by the record as a whole," *Harris v. Dennison*, No. 1:06-cv-1508, 2007 WL 2398821, at *3 n.9 (S.D.N.Y. Aug. 15, 2007), *aff'd*, 548 F.3d 200 (2d Cir. 2000), even when that record is considered the incomplete one before the PCR court.  Judge Schwartzman's conclusion that trial counsel "exercised reasonable professional judgment on matters of evidentiary import and strategic decision making," HE 43 at 7, and the Idaho Supreme Court's agreement, *see Row I*, 955 P.2d at 1092, were contradicted by the testimony at the PCR hearing.  At that hearing, it became clear that trial counsel conducted almost *no* mitigation interviews, collected almost *no* mitigation records, and failed to provide pivotal information to their mental-health experts and/or follow up on that information.  *See infra* at 18–40.  Having left themselves in the dark, counsel were not in a position to make any strategic decisions, and the state courts' conclusion to the contrary is not supported by their own record and thus not entitled to the presumption of correctness.

Finally, to the extent the presumption of correctness applies, it has been rebutted by clear and convincing evidence.  The evidence relied upon here shows that trial counsel did almost nothing to investigate mitigation and completely failed to follow up on obvious red flags signaling brain damage.  *See infra* at 18–40.  (As noted, there are no findings on prejudice to rebut, as no evidence of brain damage was truly presented in state court.  *See supra* at 11.)  The presumption of correctness has no bearing here.

One other essential rule of law to keep in mind when reviewing Ms. Row's IAC claims is that the prejudice arising from the various errors committed by counsel must be considered cumulatively, and not in isolation.  *See Harris v. Wood*, 64 F.3d 1432, 1438–39 (9th Cir. 1995) (granting habeas relief because the petitioner's separate claims of ineffectiveness cumulatively demonstrated prejudice); *Cooper v. Fitzharris*, 586 F.2d 1325, 1333 (9th Cir. 1978) (recognizing the availability of cumulative-prejudice arguments in the Ninth Circuit).

The Ninth Circuit recently emphasized this point, chiding a district court for slicing a petitioner's IAC arguments into narrow, discrete, fact-specific inquiries in ruling on a certificate of appealability ("COA") instead of recognizing the common claim the arguments collectively advanced.  *See Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 2608 (2018).  Taking that more general approach, the Ninth Circuit reframed the claim as alleging that the prisoner "was denied effective assistance of counsel by his trial lawyer's wholesale failure to investigate and prepare for trial."  *Id.*  Applied here, the *Browning* method suggests that the three sub-claims at issue here should be regarded as a single claim alleging trial counsel's failure to gather and introduce evidence of brain damage as mitigation at sentencing. *See* Dkt. 600 at 37 (granting a hearing on the three sub-claims and noting that the hearing was, with respect to all three sub-claims, "limited to organic brain dysfunction subject matter").

Indeed, even that depiction of the sub-claims is far less general than the Ninth Circuit's articulation in *Browning*. *See* 875 F.3d at 471 (certifying the question of whether the prisoner "was denied effective assistance of counsel by his trial lawyer's wholesale failure to investigate and prepare for trial").[12]

Under *Browning*, it is also appropriate for the Court to consider various factual matters relating to trial counsel's representation that may be seen as not strictly contained within the sub-claims on which a hearing was granted, but which nevertheless shed important light on those sub-claims. That is especially true of two areas in particular: the use of Dr. Arthur Norman and the general social-history investigation. Ms. Row acknowledges that the Court excluded certain aspects of these areas from the hearing on the basis that they were already decided on the merits and thus un-defaulted and not subject to *Martinez*. *See* Dkt. 600 at 22, 32–33. However, the Court also recognized that there may be overlap between sub-claims that were allowed to go forward to the hearing and sub-claims that were not. *See id.* at 30.

In this brief, Ms. Row addresses some facts relating to the use of Dr. Norman and the general social-history investigation because she believes—in keeping with *Browning*—that it is impossible to accurately resolve the sub-claims set for hearing without taking into account those facts. For instance, the retention of Dr. Norman is closely related to trial counsel's failure to present a *qualified* expert to testify to brain damage. That is, the ineffectiveness in not presenting brain damage involves both the use of the wrong expert and the inextricably related failure to use the right expert. It also involves the failure to properly prepare Dr. Norman in such a way that would have potentially allowed him to testify about brain damage himself. In that

---

[12] Because the sub-claims at issue here all relate to brain damage, Ms. Row will address them collectively. She contends that each sub-claim was prejudicial standing alone and that they were also prejudicial in aggregate. Because of how much overlap there is between the claims and issues here, Ms. Row incorporates every section of this brief into every other section.

Petitioner's Replacement Post-Hearing Opening Brief – 14

way, the arguments about Dr. Norman relate to "the three claims at issue," and they are allowed under this Court's pre-hearing order on the matter.  Dkt. 683 at 3.

Moreover, to defend against a finding of deficient performance, the State was clearly attempting to lay a foundation at the hearing for an argument that trial counsel acted appropriately on the brain-damage front because they reasonably relied upon Dr. Norman's investigation and findings on Ms. Row's mental health.  *See* Dkt. 703 at 31–33, 40–41.  Ms. Row is entitled to respond and establish that counsel's reliance on Dr. Norman does not in fact insulate them from ineffectiveness, as Dr. Norman was not properly prepared by the attorneys. *See infra* at 25–26.

Similarly, the general social-history investigation is inextricably tied up in the brain-damage issue.  An adequate investigation into the possibility of brain damage involves extensive social-history work, both to provide one's experts with the information they need in order to properly determine whether the defendant suffers from brain damage and where it might come from, and to establish evidence about the defendant's behavior and experience that helps confirm the expert's conclusion in the eyes of the fact-finder.  *See infra* at 30–38; *see also* Dkt. 669 at 5 (this Court finding that evidence from lay witnesses who knew Ms. Row is relevant to the sub-claims at issue now because they illuminate "when the onset of Petitioner's organic brain anomaly and/or changes occurred and whether or how they affected her abilities that weigh into mitigating or aggravating factors," which "goes to both the questions of deficient performance and prejudice of all counsel"); HE 7 at 32[13] ("[C]apital defense counsel are well advised not to

---

[13] Ms. Row does not yet know the details of the objections the State might have to the exhibits she offered at the *Martinez* hearing that have not yet been admitted.  Therefore, she will reserve her responses to those objections for her second post-hearing brief.  Because Ms. Row believes this capital case should be decided on the fullest record possible, Ms. Row does not object to the admission of any of the State's exhibits.

rely on expert testimony without the corroborative lay witnesses whose identity and potential evidence can only be discovered through life-history investigation. . . .  [I]t is equally important to offer well-prepared expert testimony to explain the effects of life experiences on an individual's functioning and behavior.").  As before, the State's approach at the hearing confirms the point, for it delved into counsel's social-history investigation in order to try to shore up the conclusion that counsel did enough on that front.  *See, e.g.*, Dkt. 703 at 14, 42–44.  Again, Ms. Row should be able to rebut that erroneous argument.

To be clear, Ms. Row is not arguing in this brief that she should be granted relief on any sub-claim other than the brain-damage matters covered by the Court's order granting a hearing, as she understands that such issues can now only be litigated on appeal.  *See* Dkt. 600 at 22.  Ms. Row is simply submitting that these factual areas help *demonstrate* why she is entitled to a granting of the writ on the three sub-claims at issue here.  If the Court determines that such matters fall outside of the instant proceedings, Ms. Row submits in the alternative, for the reasons below, that relief is warranted on the basis of the more limited set of facts that are directly tied to the brain-damage issue proper.

## II.    Argument

Ms. Row has already demonstrated that the fourth prong of *Martinez* is satisfied, i.e., that that state law required her to bring her IAC claims in her initial-review post-conviction proceedings.  *See supra* at 5.  Here, she will show that she meets the first two prongs as well, by showing that her representation at both trial and post-conviction was ineffective.  In establishing the second prong—that PCR counsel was ineffective—Ms. Row will simultaneously establish the third prong: that the claims at issue were defaulted in those initial post-conviction proceedings.

The factual matter relating to deficient performance of both trial counsel and PCR counsel is quite similar, in that both sets of attorneys failed to present the same compelling brain damage. Likewise, the factual matter relating to prejudice of both trial counsel and PCR counsel is identical: it comes from the impact the missing evidence has on the case. Therefore, Ms. Row will first separately address the deficient performance of both sets of attorneys in the following two sections, and will then address prejudice in a single section. Even if the Court finds that one of the two prongs is unsatisfied, Ms. Row respectfully requests that both be addressed in the interest of facilitating appellate review in this capital case. *See, e.g.*, *Abdul-Salaam v. Beard*, 16 F. Supp. 3d 420, 494–501 (M.D. Pa. 2014) (finding that counsel performed deficiently in failing to present mitigating evidence even though there was no prejudice).

### A. Trial Counsel and PCR Counsel Were Deficient

Deficient performance is present when an attorney's "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Although strategic choices made after a comprehensive investigation are insulated from ineffectiveness, tactical decisions made on the basis of inadequate investigation are not. *See id.* at 691. At trial and again in post-conviction, Ms. Row's attorneys fell well short of the professional standards by failing to investigate and present critical evidence of brain damage.[14] Ms. Row will take each in turn. Because the same duties applied at both stages, and because many of the failures by counsel were the same, she incorporates each section into the other.

---

[14] Because the evidence of ineffectiveness comes not just from the *Martinez* hearing but also from a host of other documents before the Court, and because this brief is making the ultimate argument for merits relief, Ms. Row will rely on multiple sources for the following argument.

### 1. Trial Counsel Rendered Deficient Performance

There is no doubt that trial counsel had a Sixth Amendment duty to investigate and present mitigating evidence during the relevant time period, to show that "the defendant, despite the crime, [was] worth saving as a human being." *Mak v. Blodgett*, 970 F.2d 614, 619 (9th Cir. 1992). The U.S. Supreme Court has repeatedly found deficient performance on similar claims in cases where the trial proceedings took place before Ms. Row's. *See Sears v. Upton*, 561 U.S. 945 (2010) (per curiam) (involving a 1993 sentencing); *Porter v. McCollum*, 558 U.S. 30 (2009) (per curiam) (involving a 1988 sentencing); *Rompilla v. Beard*, 545 U.S. 374 (2005) (same); *Wiggins*, 539 U.S. 510 (involving a 1989 sentencing); *Williams v. Taylor*, 529 U.S. 362 (2000) (involving a 1986 sentencing). In keeping with that precedent, the Ninth Circuit has emphasized that "[i]t is imperative that all relevant mitigation information be unearthed for consideration." *Caro v. Calderon*, 165 F.3d 1223, 1227 (9th Cir. 1999) (*Caro I*).

It is equally clear that the duty to present brain damage as mitigating evidence was established at the time. *See* HE 7 at 69 (noting that all five of the cases in which the Supreme Court found counsel ineffective for failing to present mitigation at trials earlier than 1993 involved brain damage); *see also Summerlin v. Schriro*, 427 F.3d 623, 630, 641 (9th Cir. 2005) (en banc) (granting habeas relief on an IAC claim where counsel failed to present evidence of organic brain damage at a 1982 capital sentencing, and noting that "counsel should also examine the defendant's physical health history, particularly for evidence of potential organic brain damage" because such material constitutes "significant mitigating evidence"). Indeed, trial counsel were aware at the time that brain damage was a potential mitigating circumstance, *see* Dkt. 707 at 143, 169, and the science existed in Boise at the time to prove it in Ms. Row's case,

*see id.* at 127–28.  Counsel's abject failure to investigate and present such evidence, in the face of obvious signs that it was present, ran directly contrary to the Sixth Amendment.

### a.  Trial Counsel's Investigation Was Inadequate

In death penalty cases, counsel have an obligation to begin investigating potential mitigation as soon as they are assigned.  *See Outten v. Kearney*, 464 F.3d 401, 417 (3d Cir. 2006); Dkt. 701 at 155.  Here, that occurred on May 13, 1992, by which time it was established that Ada County Public Defender's Office ("ACPD") attorneys August Cahill and Amil Myshin would be handling the case, Dkt. 19, Lodging A-3 at 16, with Mr. Cahill serving as lead counsel, HE 42 at 264; Dkt. 400, Lodging 2 at 8; Dkt. 707 at 137.  They were assisted by their office's only investigator, Glenn Elam.[15]  *See* Dkt. 707 at 137; Dkt. 703 at 11–12; HE 42 at 319–20.

Counsel were hamstrung at the outset by a crushing caseload.  Both attorneys were juggling between 100 and 150 felony matters at the same time they were handling Ms. Row's capital case.  *See* Dkt. 707 at 138–39.  The defense team's lack of training was also problematic.  Counsel's sole investigator was Mr. Elam, who had no specialized training for his position.  *See* HE 42 at 319–20; Dkt. 703 at 107.  From Mr. Elam's account of his methods and his position on the team, it is evident that he was not a mitigation investigator, but rather a fact investigator focused on the guilt phase.  *See* HE 42 at 322–23.  There was no reason to forsake a mitigation specialist, as they were practicing in the Pacific Northwest at the time of Ms. Row's sentencing. *See Pinnell v. Palmateer*, 114 P.3d 515, 519–20 (Or. 2005) (1994 resentencing); *State v. Stenson*, 940 P.2d 1239, 1279 (Wash. 1997) (1994 trial); Dkt. 701 at 157–58.  Indeed, Ms. Row's PCR counsel hired a mitigation specialist only a year later in the same case, *see infra* at 46, so it was

---

[15] In a *Strickland* analysis, counsel are responsible for any deficiencies in the actions taken by their investigator.  *See Wharton v. Chappell*, 765 F.3d 953, 975 n.8 (9th Cir. 2014).  Therefore, when Ms. Row discusses the failures of Mr. Elam below, those failures should be understood as going to the ultimate ineffectiveness of the attorneys who were ostensibly supervising him.

undeniably an option.  Trial counsel's failure to bring on board a professional most suited to gathering the information they needed to stave off a death sentence is strongly suggestive of deficient performance.  *See Jells v. Mitchell*, 538 F.3d 478, 494–96 (6th Cir. 2008) (finding counsel deficient for not retaining a mitigation specialist, despite one's availability, at a 1987 trial); HE 7 at 67–68.  What is more, the absence of a mitigation specialist hobbled counsel's investigation and prevented the defense from gathering the mitigation information they needed to establish Ms. Row's brain damage.  Even with the absence of a mitigation specialist, however, counsel were not relieved of the investigatory duties attendant to a death penalty case.  *See* Dkt. 701 at 162.

Turning to the more specific facts of the case and investigation, and by way of brief background, on January 12, 1993, approximately a month prior to her trial, Ms. Row was brought into the emergency room at St. Alphonsus Hospital after she attempted to commit suicide by taking an overdose of anti-depressants.  HE 15 at 63.[16]  A computed tomography ("CT") scan was taken, which radiologist David Giles interpreted to show "mild vermian and cerebral cortical atrophy" and recommended "clinical correlation."  *Id.* at 65.  Trial counsel were made aware of the hospitalization right after the suicide attempt.  *See* Dkt. 707 at 145; Dkt. 703 at 54–55; Dkt. 19, Lodging A-3 at 38; HE 1022 at 1[17]; HE 1158 at 1.  The report was included in

---

[16] The presentence investigation report ("PSI") is HE 15.  There is consecutive pagination in the PSI in the numbers that are handwritten and circled in the lower right-hand corner of each page.  On Ms. Row's version of the PSI, many of those numbers are cut off.  Ms. Row therefore cites to the PDF page number on her version, which she believes is consistent with the version that is lodged with the Court.  If the Court is unable to locate any of the PSI pages cited herein, undersigned counsel would be happy to provide more details to indicate where the document is.

[17] The descriptions in this brief of what was in the files of Ms. Row's trial and PCR attorneys' files, respectively, is based on undersigned counsel's review of the boxes.

the PSI, which was prepared after the guilt phase had concluded and before the penalty phase

began—the accompanying scans were not in the PSI.  *See* HE 15 at 65.

Since the duty to investigate mitigating evidence begins with appointment, since medical

records are invaluable sources of mitigation, and since counsel knew about the incident, they had

a professional responsibility to seek out the paperwork generated by the hospital during the

suicide episode as soon as it was available.  *See Correll v. Ryan*, 539 F.3d 938, 945 (9th Cir.

2008) (finding counsel deficient where he "made no inquiry into whether an X-ray or other

diagnostic test was performed to determine whether [the defendant] suffered any brain injury

following an incident in which a wall fell on [his] head"); *Lambright v. Schriro*, 490 F.3d 1103,

1118 (9th Cir. 2007) (finding counsel deficient where he failed to request the defendant's

medical or hospital records despite knowing "that he had attempted suicide on two prior

occasions, and that he had been hospitalized in a psychiatric facility as a result").

It is not clear whether the defense obtained the Giles report before it was provided to

them in the PSI.  Shortly after the trial, Mr. Cahill could not recall whether he had seen the report

prior to sentencing, though he appeared to suggest he had not reviewed it until later.  *See* HE 22

at 16–17 ("But the last thing from my notes to him say he would like to see the hospital reports.

So that tells me he hadn't seen the reports.  Now, I think I seen them.  I have the jail incident

report, which talks about what the paramedics did and the cops did.  I don't know that I saw the

hospital records until the PSI."); *id.* at 41 ("[D]id I have the medical records from the hospital, I

don't think so.").[18]  Similarly, Mr. Myshin had "no recollection of any alleged brain atrophy."
HE 25 at 18.[19]  More specifically, he did not know if he had Ms. Row's medical records prior to
trial.  *Id.* at 57–58.  Finally, Mr. Elam did not believe that he either was directed to obtain, or that
he independently requested, any medical records from the suicide attempt, nor did he review
such records.  HE 27 at 12, 30.  Later, Mr. Elam added that he never heard any discussion on the
defense team regarding Ms. Row's CT scans.  *See* HE 42 at 325.

It seems most likely that the defense failed to obtain the Giles report prior to trial, as no
member of the team remembers reviewing the report before sentencing.  (It is clearer that the
defense failed to obtain the underlying scans, as no one suggested that they did, and Mr. Cahill
expressed doubt that he would have.  *See* Dkt. 707 at 151.)  Ultimately, though, the question is
not essential.  For regardless of whether or not counsel acquired the report, they were still
ineffective.  If counsel did not seek out the report, they were certainly deficient.  *See supra* at 21.
However, even if they did secure it, they were deficient for not following up on this crucial piece
of evidence.

"[W]hen tantalizing indications in the record suggest that certain mitigating evidence
may be available, those leads must be pursued."  *Lambright*, 490 F.3d at 1117.  A report of brain
damage, accompanied by a radiologist's recommendation for further medical exploration, is self-

---

[18] At the *Martinez* hearing, Mr. Cahill had no independent recollection of the Giles report, when
he saw it, or whether anyone else on the team requested it.  *See* Dkt. 707 at 145–46.  He stated
that he did not "recall making a specific request" for the records.  *Id.* at 149.  Nevertheless, he
later testified: "I think we had [the report] from discovery, not from the PSI."  *Id.* at 150–51.
Since Mr. Cahill suggested far closer in time to the trial that he did *not* believe he had the 1993
brain scan material until the PSI was transmitted to him, and since his testimony at the *Martinez*
hearing was so indefinite, it would be more appropriate for the Court to credit his earlier position
and conclude that he did not obtain the material prior to sentencing.

[19] Mr. Myshin did not testify at the *Martinez* hearing because he passed away in 2011.  *See*
https://www.legacy.com/obituaries/idahopress/obituary.aspx?page=lifestory&pid=153013454.

evidently such a lead.  *See Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002) (*Caro II*)

("We have repeatedly held that counsel may render ineffective assistance if he is on notice that

his client may be mentally impaired, yet fails to investigate his client's mental condition as a

mitigating factor in a penalty phase hearing."); *Daniels v. Woodford*, 428 F.3d 1181, 1204 (9th

Cir. 2005) (finding counsel deficient where he had a preliminary examination indicating mental

illness but "did not follow up on these important leads by seeking a comprehensive evaluation by

more qualified and experienced practitioners").

And unlike the question of whether counsel reviewed the Giles report prior to trial, about

which there is some ambiguity, there is no reasonable basis for concluding that they followed up

on the report in any meaningful way.

The most rudimentary and indispensable way to explore a red flag for brain damage is to

bring it to the attention of a qualified expert.  "Counsel has an affirmative duty to provide mental

health experts with information needed to develop an accurate profile of the defendant's mental

health."  *Caro II*, 280 F.3d at 1254; *accord* Dkt. 701 at 164.

Ms. Row's attorneys had two mental health experts, Dr. Craig Beaver, a

neuropsychologist, and Dr. Norman, a forensic psychologist.  In considering whether Ms. Row's

attorneys satisfied their duty to explore the Giles report with an expert, there are thus two

questions: (1) whether they did so with Dr. Beaver; (2) whether they did so with Dr. Norman.

Both questions must be answered in the negative.

Dr. Beaver was consulted with the defense team prior to trial.  Dkt. 19, A-3 at 38; HE

178.  It is clear from the record that Dr. Beaver was never provided with the 1993 CT scan or the

Giles report.  *See* HE 114 (noting in post-conviction that Dr. Beaver did not know about the

"prior discovery or the CAT scan" and that Dr. Beaver's "attitude toward [Ms. Row's] diagnosis

would be absolutely changed now with the addition of the CAT scan report"); HE 42 at 121–25
(Dr. Beaver testifying at length in post-conviction to what he *would have* recommended to Mr.
Cahill *had* he known about the report); HE 22 at 42, 43 (Mr. Cahill indicating at his PCR
deposition that he did not believe he gave the report to Dr. Beaver); HE 25 at 59 (Mr. Myshin
doing the same); *accord* Dkt. 707 at 148 (Mr. Cahill testifying at the federal hearing: "I don't
think I sent it to Dr. Beaver, but I don't know that.  I may have."); Dkt. 707 at 151 (Mr. Cahill
answering the question of whether he requested the "scans underlying the [Giles] report" with
the response, "I doubt that I did"); Dkt. 703 at 151 (Dr. Beaver testifying: "That CAT scan I
didn't know about until—as best I can tell from this note, because I don't have an independent
recollection, I did not know about it until I talked with [the PCR investigator]"); Dkt. 701 at 130
(PCR investigator Mary Hudson[20] testifying that Dr. Beaver did not have access to the 1993 CT
at the time of trial).  Since counsel had a duty to explore mitigating evidence with an expert as
soon as it was available, and since Dr. Beaver was the only expert they had worked with at the
time of the suicide attempt, it was deficient of trial counsel not to provide Dr. Beaver with the
1993 CT scan.

Their failure to do so was actually even more deficient because it appears that Dr. Beaver
specifically requested the records.  *See* HE 22 at 16–17 (Mr. Cahill testifying that Dr. Beaver
told him that "he would like to see the hospital reports"); *Bean v. Calderon*, 163 F.3d 1073,
1078–79 (9th Cir. 1998) (finding counsel deficient where they failed to give their expert
materials that he requested); *Bloom v. Calderon*, 132 F.3d 1267, 1277–78 (9th Cir. 1997)

---

[20] Ms. Hudson remarried after her involvement in the Row case and became Ms. Goody.  *See*
Dkt. 701 at 112.  Because she was known as Ms. Hudson at the time of the events at issue here,
and in the interest of uniformity, she will be referred to as Ms. Hudson throughout this brief.

(same).[21]  If this request did not occur, however, counsel was still deficient.  Although the State

hinted at the *Martinez* hearing that counsel may have been assuming that Dr. Beaver would

request any further records that he needed, *see* Dkt. 703 at 17, such an assumption does not

foreclose a finding of deficient performance.  Regardless of whether a defense expert requests

specific information relevant to a defendant's background, it is defense counsel's duty to seek

out such evidence and bring it to the attention of the experts.  *See Hovey v. Ayers*, 458 F.3d 892,

925 (9th Cir. 2006).

Dr. Norman was retained for purposes of assisting trial counsel with the sentencing.  *See*

Dkt. 707 at 150.  By the time of sentencing, trial counsel *did* presumably have the 1993 brain

scan report, even if they did not have it earlier.  *See supra* at 20–21 (describing how the report

was in the PSI); Dkt. 707 at 146–48 (Mr. Cahill testifying that it was his practice to review PSIs

as soon as they were given to him and that he doubtlessly read everything in Ms. Row's).  Now

in possession of the Giles report, counsel had an unambiguous duty to provide it to their penalty-

phase mental-health expert, Dr. Norman.  *See Blystone v. Horn*, 664 F.3d 397, 421 (3d Cir. 2011)

(finding counsel deficient where counsel failed to provide a pre-trial competency evaluation to

an expert when the evaluation "contained clinically significant 'red flags,' which a qualified

expert would have found to require follow-up prior to sentencing").  But as with Dr. Beaver,

counsel did not give Dr. Norman the crucial report.  Dr. Norman stated unequivocally in a sworn

affidavit: "I do know that I never saw any CT scans and was not advised that such scans had

---

[21] Mr. Cahill testified at the *Martinez* hearing that as a general matter he would give Dr. Beaver
any records he requested, *see* Dkt. 703 at 17, but that vague statement is outweighed by the more
specific information highlighted above, which suggests that with the hospitalization records he
did not.

shown abnormalities in Ms. Row's brain."  HE 3, Tab 204 at 3; Dkt. 130 at 3.[22]  This was in keeping with his impression from shortly after the trial, where he stated that he did not remember "seeing records from a suicide attempt."  HE 120 at 2.

Although Mr. Cahill speculated that Dr. Norman did have the report because it was contained in the PSI, HE 22 at 17; Dkt. 707 at 150–51; Dkt. 703 at 33, he had "[n]o specific recollection" of that, Dkt. 703 at 82.  Such conjecture cannot outweigh Dr. Norman's own definitive statement made under penalty of perjury, and the more reasonable conclusion that he was not in fact given the scan.  Mr. Cahill himself agreed.  *See id.* at 104 ("Q.  If other experts took the position that they were not shown the 1993 CT scan, would you defer to their recollection, given the problems that you have recalling it yourself?  A.  Yes, I would.").

The omission was incontrovertibly *not* strategic, as counsel themselves understood their obligation: their method of consulting with experts on brain damage was to take brain scans and "vet[ them] with our psychiatrist and our psychologist" and to "get a radiologist to read the thing for us."  Dkt. 707 at 145; *accord id.* at 151 ("[I]f I thought it was an issue, again, I typically would have vetted it to my doctor or my expert.").  Moreover, Mr. Cahill acknowledged that he would have interpreted the Giles report at the time to mean that something was wrong with Ms. Row's brain, that further medical investigation was called for, and that he would have needed an expert to explain to him the ramifications of the problem.  *See id.* at 155–56.

In any event, even if trial counsel supplied the report to Dr. Norman, they were still ineffective.  This is true first because, regardless of whether counsel provided the document, it is nevertheless undisputed that they utterly failed to follow up with Dr. Norman on it, as they were

---

[22] Dr. Norman and his assistant Carla Anderson did not testify at the *Martinez* hearing because they had both passed away earlier.  *See* http://www.legacy.com/obituaries/heraldtribune/obituary.aspx?page=lifestory&pid=86256182.

required to under professional standards.  *See* Dkt. 701 at 173 ("And you want to be sure that your expert has fully reviewed all the things that you have sent them.").  Mr. Myshin testified that he did not follow up or do anything in response to the report indicating brain atrophy.  *See* HE 25 at 57–59; HE 42 at 188.  In the same vein, Mr. Cahill did not recall ever discussing with Dr. Norman the issue of brain atrophy.  *See* HE 22 at 18; Dkt. 707 at 151.  In sum, then, of the three players involved, two deny that any follow-up occurred, and the third does not remember. The only reasonable inference to draw is that trial counsel never approached Dr. Norman to delve into the Giles report.  Not consulting with one's chosen mental-health expert on a scientifically demonstrated possibility—vouched for by a neutral doctor with no interest in the case whatsoever—is about as flagrant an instance of incompetent lawyering imaginable in the capital context.  It is even more flagrant where the report in question recommended "clinical correlation," HE 15 at 65, which Mr. Cahill rightfully took to mean "further testing."  Dkt. 707 at 156.  There is even evidence to suggest that counsel not only failed to consult with Dr. Norman on brain damage, but actually refused to conduct testing that might have found such damage against his recommendation.  *See* HE 120 at 2 (Dr. Norman stating shortly after the trial that he believes he "requested a full scale SPECT[23] to rule out" brain damage and counsel would not "do the test," even though Dr. Norman desired a "full neurological").

Even if the Court concludes—despite strong indications to the contrary—that Dr. Norman reviewed the Giles report and that counsel followed up with him on it, counsel were still deficient.  For counsel have a duty to seek out the *appropriate* expert for their case and client. *See Caro II*, 280 F.3d at 1255; *Mayfield v. Woodford*, 270 F.3d 915, 928 (9th Cir. 2001) (en banc); Dkt. 701 at 162–63.  Ms. Row's attorneys recognized those duties.  *See* Dkt. 707 at 143.

---

[23] SPECT is an abbreviation for Single Photon Emission Computed Tomography.

In fact, counsel's go-to expert on brain damage, had they been diligent enough to assess the possibility, would have been Dr. Beaver.  *See* Dkt. 707 at 144; Dkt. 703 at 15.  Dr. Beaver *was* in fact qualified to opine on the issue at least in terms of administering neuropsychological tests, *see* HE 42 at 114–16; Dkt. 703 at 144–45, if not in terms of conducting and analyzing the imaging that was required, *see* Dkt. 701 at 163, 173.  (Experts for those latter tasks were also available, as the PCR investigator showed by finding some.  *See infra* at 46–47; *accord* Dkt. 701 at 165–66).  Unfortunately, however, counsel told Dr. Beaver prior to sentencing that they had no further need of his services.  *See* Dkt. 703 at 149–50.

Counsel also required the services of a neurologist to adequately explore the implications of the Giles report, recommend imaging, and analyze the results of that imaging.  There is no evidence in the record that they ever retained one, a deficient omission in and of itself.  *See Frierson*, 463 F.3d at 990 (finding counsel deficient where he "did not seek the services of a neurologist even when alerted to evidence of possible organic brain damage").

That leaves only Dr. Norman, who by contrast was not qualified to opine on brain damage.  He did not have a degree or professional experience in neurology, neuropsychology or neuropsychiatry.  *See* HE 3, Tab 85; HE 20 at 3832–35.   Instead, Dr. Norman billed himself as someone who specialized in "clinical" and "forensic psychology," whose main training was in juvenile mental health, and whose publication focus was on the organization of mental-health systems and juvenile mental health.  *See generally* HE 3, Tab 85.  Mr. Cahill had no reason to believe that Dr. Norman was an expert on the brain, and at the *Martinez* hearing he did not claim otherwise.  *See* Dkt. 703 at 93.

There is also no basis for finding that counsel's reliance on Dr. Norman precluded them from exploring brain damage.  The thrust of Dr. Norman's testimony was that Ms. Row

demonstrated "the most extreme case" of a condition called "alexithymia," a "sort of a rare condition where people just seem to be totally out of touch with their feelings . . . to a severe pathological degree where they almost don't have words to describe how they feel."  HE 20 at 3847–48.  First, contrary to Dr. Norman's assertion that alexithymia was "in all the psychiatric textbooks," it was not in the Diagnostic and Statistical Manual ("DSM") in effect at the time, the preeminent authority on mental illness, *see Moore v. Texas*, 137 S. Ct. 1039, 1048–49 (2017).  Second, alexithymia was not a diagnosis but rather, as the State's expert rightly put it at sentencing, a "general descriptor of one's psychological state."  HE 20 at 3926, 3929; *see* HE 4 at 13 ("[A]t the time of Ms. Row's trial [alexithymia] was a highly controversial and poorly understood construct.  There was no professional consensus regarding its conceptual boundaries, its prevalence, or its necessary and sufficient criteria.").  Third, alexithymia is not a mitigating descriptor, as it simply paints the defendant as cold and emotionless.  *See* HE 20, at 3847–48; Dkt. 703 at 79–80.[24]  Fourth, alexithymia did not even describe Ms. Row, who "was at times capable of expressing a range of emotions," HE 4 at 14, as counsel well knew, *see* HE 1057 (noting that fellow inmates had observed Ms. Row's "emotional distress"); HE 1130 at 1; *infra* at 87.  Fifth, alexithymia was not mutually exclusive with brain damage.  *See* HE 4 at 14 ("Ironically, had Dr. Norman followed up on [his] hunch [that Ms. Row's alexithymia stemmed from brain damage], he may have uncovered the more established clinical entity of cerebellar damage."); *accord* HE 9 at 2; *Paulk*, 2013 WL 6008918, at *3 (referring to a defendant who attributed alexithymia to brain damage).  Relying on a non-mitigating, scientifically dubious

---

[24] It is a strong reflection of how un-mitigating alexithymia is that it has only been referred to in two opinions as a condition that potentially mitigates a sentence, *see Taylor v. Culliver*, No. 4:09-cv-251, 2012 WL 4479151, at *120 (M.D. Ala. Sept. 26, 2012), *aff'd*, 638 F. App'x 809 (11th Cir. 2015); *State v. Paulk*, No. 39534, 2013 WL 6008918, at *3 (Idaho Ct. App. Sept. 10, 2013).  In neither case did the defendant obtain relief, as compared to the numerous cases in which evidence of brain damage led to favorable decisions for defendants.  *See supra* at 18–19.

label that did not accurately describe Ms. Row would not have been a reasonable basis for failing to investigate the far more promising possibility of brain damage. *See Pruitt v. Neal*, 788 F.3d 248, 272–73 (7th Cir. 2015) (finding counsel deficient where they presented intellectual disability and not schizophrenia because the two were not "mutually exclusive" and because they consequently "did not have to concentrate on one defense or the other").

Moreover, if trial counsel were relying on Drs. Beaver and Norman to look into brain damage on their own initiative, they were deficient in yet another regard: namely, by not equipping the experts with nearly enough social-history evidence for them to adequately evaluate the question. Brain damage does not exist in a vacuum. It interacts pervasively with social history, both in the sense that a defendant's social history can illuminate the cause of the brain damage and in the sense that social history can demonstrate the effects of the brain damage. *See* Dkt. 707 at 16–20; Dkt. 703 at 174–75. For that reason, among many others, if defense counsel wish to adequately investigate brain damage, they must educate their experts about the client's life story. *See* Dkt. 701 at 164–65. Relatedly, there is a freestanding duty to gather social-history information for its mitigating value. *See id.* at 159. That is true even if brain damage is not at issue. *See, e.g.*, *Robinson v. Schriro*, 595 F.3d 1086, 1108–09 (9th Cir. 2010) ("Certain forms of investigation are fundamental to preparing for virtually every capital sentencing proceeding. At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records, and obtain information about the defendant's character and background." (citations omitted)). But such a general mitigation investigation dovetails with the brain-damage inquiry when the two are both on the table, making it doubly important. Ms. Row's trial attorneys abysmally failed to discharge that duty.

Instead of undertaking the thorough, wide-ranging, independent investigation they were duty-bound to conduct on Ms. Row's life history, counsel relied almost exclusively on the PSI and the materials handed over by the State in discovery, with some unspecified information coming from Ms. Row herself. *See* Dkt. 703 at 14. They did so in lieu of both conducting their own interviews and in lieu of undertaking their own record collection. *See* Dkt. 707 at 152, 158; Dkt. 703 at 13–14, 76, 92, 111; HE 42 at 189–90, 288–89, 300, 307, 321–22, 325–27; HE 27 at 5–8. Counsel's belief that the police and probation officer could do their work for them— through discovery and the PSI—was fundamentally at odds with the law. *See Wiggins*, 539 U.S. at 524 (finding counsel deficient where they chose "not to expand their investigation beyond the PSI and [social service] records"); *Lambright*, 490 F.3d at 1120 ("Counsel may not rely for the development and presentation of mitigating evidence on the probation officer and a court appointed psychologist."). Reliance on the PSI was made even more unreasonable by the fact that the individual who authored it conducted very few interviews herself. *See* HE 15 at 24 (listing only six people who could even arguably be considered mitigation witnesses, only one of whom had knowledge of Ms. Row during her childhood). Counsel could not simply assume that the probation officer was serving as their mitigation investigator. Nor could counsel assume that the author of the PSI had any training in social work or psychology, that her questioning of witnesses would extend beyond basic areas, or that she would do interviews instead of just getting letters. This was not someone conducting for counsel the sort of wide-ranging mitigation investigation that they were required to do. And finally, judged even by their own low standards, the defense team's reliance on the PSI was not sufficient, as their own investigator never read it, *see* HE 42 at 329, and as Mr. Cahill himself realized the PSI author was not his agent, *see* HE 42 at 309, 313; Dkt. 703 at 74, 75.

To be clear, Ms. Row is not suggesting that counsel should have ignored the PSI as they conducted their investigation. Quite to the contrary, the PSI was a rich source of leads on mitigation. What was deficient was not to *follow up* on those leads made available by the PSI. *See Stankewitz v. Wong*, 698 F.3d 1163, 1171 (9th Cir. 2012) (finding counsel deficient where they had possession of the prior attorney's files but "did not investigate *any* of the evidence contained within them," and noting that the fact that the attorney "had this evidence at his fingertips but did not investigate or present it is further proof of his deficiency" (emphasis in original)). There was a multitude of information in the PSI that would have kick-started competent counsel into a sweeping investigation. Because the PSI was prepared five months before the sentencing hearing, *see* HE 15 at 1; HE 20 at 3753, there was plenty of time to run down the leads it contained.

Perhaps the most ironic red flag in the PSI is the suggestion by a victim of one of Ms. Row's thefts, in 1982, that "a brain scan would be helpful" for figuring out what made her tick. HE 15 at 46. A lay person, with neither medical nor legal training, had the presence of mind to suggest neurological testing in 1982 in a minor fraud case, based only on her observations of Ms. Row's behavior. Ten years later, her two death-penalty lawyers had a report telling them that her brain was damaged and calling for further testing—not to mention the 1982 suggestion itself—and they still failed to follow up.

More mundanely, the PSI also notes the full names of numerous relatives, both immediate—including four siblings—and extended. *See id.* at 5–6. Counsel could and should have conducted probing, in-person interviews with each of those individuals, *see Doe v. Ayers*, 782 F.3d 425, 438–39 (9th Cir. 2015), instead of limiting their interviews to a single sister and possibly the mother and one other sibling, *see infra* at 35–36. Such interviews were made even

more obviously imperative by the evidence in the PSI that Ms. Row's father suffered from mental-health problems.  *See* HE 15 at 35; *Daniels*, 428 F.3d at 1204.  Important witnesses in other categories likewise appear throughout the PSI, crying out for interviews by defense counsel, including social workers, *see* HE 15 at 16, former romantic partners, *see id.* at 41, 177, 180, friends, *see id.* at 74, 139, 142, 169, 185, neighbors, *see id.* at 81, 177–78, and co-workers, *see id.* at 175.  The various places where Ms. Row lived over the course of her life were also referenced in the PSI, *see id.* at 42–43, which would have allowed counsel or their investigator to visit those places in search of more witnesses, *see Doe*, 782 F.3d at 438–39.  Ironically, the only investigator who did any traveling was the lead detective, who was amassing information to *harm* Ms. Row.  *See* HE 1153; *Lambright*, 490 F.3d at 1121 ("The responsibility to afford effective representation is not delegable to parties who have no obligation to protect or further the interests of the defendant.").  In terms of record collection, the PSI is a veritable gold mine of sources that counsel should have contacted for documents on Ms. Row's life, including schools, social service agencies, medical institutions, mental health facilities, employers, and correctional entities.  *See generally* HE 15.

The PSI additionally contains red flags indicating that Ms. Row's behavior might reflect mental-health problems, including brain damage.  For instance, the PSI mentions that Ms. Row wet her bed until she was around twelve years old, *see id.* at 7, a medical issue which may be caused by impairment in neurological development, *see* HE 4, at 7.  Other witnesses observed Ms. Row inventing bizarre and easily disproven stories.  *See* HE 15 at 16–17, 85–87, 153–5, 175–76.  That, too, was another neuropsychological indicator of possible brain damage.  *See infra* at 77.  So was Ms. Row's inability to learn from her mistakes.  *See* HE 15 at 35 (describing that inability); *id.* at 33, 40 (reflecting that Ms. Row stole checks from two acquaintances in

ways that would inevitably be detected in two separate incidents only a few years apart).  Ms. Row's penchant for lying falls in the same category.  *See*, *e.g.*, *id.* at 44, 46, 68, 74, 75, 85–88, 92, 159, 169, 182; HE 1147 at 1; HE 1196 at 2; *see infra* at 87.

A great deal of material in the PSI relates to Ms. Row's criminal history, which included numerous offenses dating back to her adolescence, *see* HE 15 at 11, 12–15, a track record that is—again—consistent with brain damage, *see* HE 4 at 7 (concluding that Ms. Row's "frontal lobe dysfunction is compatible with her lifetime of rulebreaking" and "problematic decision-making").  Some of these crimes are particularly telling, especially the ones that involve poorly thought-out, easily detected scams.  *See infra* at 85–87; HE 15 at 33.  In fact, the circumstances of the capital offense itself and Ms. Row's behavior in its aftermath should have alerted counsel to the possibility of planning deficits.  *See* HE 15 at 160, 166 (noting that Ms. Row purchased insurance policies for her husband and children about two weeks before the fire, submitted a change-of-address form on the day they died, and later claimed as her alibi that she was talking to her psychiatrist in his car in the middle of the night).  Such behavior is indicative of a compromised ability to form reasoned plans, and should have been investigated further.  *See infra* at 76; HE 4 at 7.

Still other red flags appeared in the PSI—violence in the home, neglectful parenting, and sexual abuse of Ms. Row during her childhood.  *See* HE 15 at 6–8, 10, 12.  Those would have presented further reasons, if any more were needed, to thoroughly investigate Ms. Row's background and life experiences.  *See Wade v. Calderon*, 29 F.3d 1312, 1323 (9th Cir. 1994), *overruled on other grounds by Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003).  And that investigation would have provided stories about Ms. Row's behavior that would have both helped an expert diagnose brain damage, present neuropsychological evidence of

impairment in brain functioning, and help convince the judge that it was present and meaningful. *See infra* at 64–70.

The records that counsel failed to request and obtain were obvious and easily available. As proof, consider the tremendous amount of records that Ms. Row's PCR investigator promptly obtained. *See* HE 151 at 1–3; HE 152. The same is true of interviews. Even the truncated PCR investigation involved interviews with a dozen people, *see* HEs 112–25, 1261, and there were dozens more that the PCR team identified, *see* HE 151 at 4–5. All of these records should have been requested by trial counsel, and all of these people should have been interviewed. Instead, trial counsel did next to nothing.

To find sources of information on Ms. Row outside of the PSI, counsel did little more than simply ask their client who they might talk to. *See* Dkt. 707 at 153–54; *see* Dkt. 707 at 157. Relying on a client to manage her own mitigation investigation is not effective. *See Robinson*, 595 F.3d at 1110; *McKinney v. Fisher*, No. 1:96-cv-177, 2009 WL 3151106, at *24 (D. Idaho Sept. 25, 2009). Such reliance is especially misplaced in a capital case where the defendant had demonstrable problems with honesty and accuracy. *See infra* at 76–79; *see also* HE 7 at 35 (observing that "the individuals being evaluated" in capital cases "are often poor historians"). And even that effort was remedial on its own terms. Ms. Row did in fact provide counsel with plenty of information that would have been a great boon to a legitimate mitigation investigation, including the names and locations of family members, friends, and co-workers. *See* HE 1056 at 1–2; HE 1058; HE 1061. Counsel simply never utilized the information properly, conducting almost no interviews and collecting almost no records.

Other than their client, there is one single person that the record confirms was interviewed by the trial team: Terry Cornellier (now Terry Theriault), Ms. Row's sister. *See* Dkt.

400, Lodging 6 at 67.  Then there is the possibility that Ms. Row's mother was interviewed, *see id.* at 68, something the mother herself contradicted, *see* HE 1277 at 4, and Mr. Cahill's vague recollection that Mr. Elam tried unsuccessfully to speak with one of Ms. Row's other siblings, *see* Dkt. 707 at 153, while Mr. Elam himself indicated that he only spoke to Terry, *see* Dkt. 703 at 111.  And that is it.  It is most likely counsel interviewed a single mitigation witness (other than the weak good-character witnesses discussed below, *see infra* at 37–38) and at best they interviewed three.  By any standard, that does not pass muster under the Sixth Amendment.  *See Debruce v. Comm'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1269–79 (11th Cir. 2014) (finding capital defense counsel deficient where they conducted only two social-history interviews, with the defendant and his mother, and where the only social-history witness they called at the penalty phase was the mother).

Even the single social-history-type interview that we know was conducted—with Ms. Row's sister Terry—was still conducted deficiently.  For instance, Terry had important information about how much industrial activity and waste there was in the immediate environs of the house that she and Ms. Row lived in as children.  *See* Dkt. 704 at 5–8.  It could have been supportive of a brain-damage theory and should also have tipped off counsel that there was a possibility of brain damage to begin with.  *See infra* at 70–75.  Similarly, Terry could have told counsel that she and Ms. Row both had experience with wetting the bed into their adolescence, *see* Dkt. 704 at 9, and that Ms. Row had suffered potential head injuries, *see id.* at 10–11, both of which should also have alerted counsel to the need for investigating mental-health issues, *see* HE 4 at 7.  All of this information could have been obtained by defense counsel months in advance of sentencing and should have been presented at the penalty phase.  Instead, they brought her to Idaho without telling her even that her sister had been convicted, "[k]ept [her] in the dark about

what was going on," HE 1286 at 5, and interviewed her shortly before the sentencing for an hour at most, *see* Dkt. 704 at 14–15.  The defense's interview notes also reflect brief, fairly superficial conversations conducted on the eve of sentencing.  *See* HEs 1069–71.  For the discussion with the defense's *only* lay witness at sentencing, this was well short of the Sixth Amendment's requirements.  *See Hamilton v. Ayers*, 583 F.3d 1100, 1121 (9th Cir. 2009) (finding counsel deficient where he failed to elicit available mitigating evidence from a lay witness because he inadequately prepared her to testify).

Aside from the single, hurried interview of Terry, the only effort that defense counsel made to find lay witnesses for sentencing was to ask a few people to write letters vouching for Ms. Row's good character.  *See* HE 42 at 194–96; HE 1287 at 4; HE 1289 at 2; HE 1291 at 3.  This was not nearly enough.  The fact that a handful of people considered Ms. Row a decent person was not a reason to forego an investigation into mental-health mitigation, which would have served to enhance that anemic good-character showing into a far more powerful mitigation presentation.

In this case in particular, the "good person" letters were only weakly helpful at best.  Several of them insisted that some of Ms. Row's finest attributes were the care and devotion she exhibited as a wife and mother, and some insisted that such attributes proved her innocence.  *See* HE 15 at 26, 46, 353–56.  Given that Ms. Row had just been convicted of murdering her husband and children, and given that the judge declared prior to sentencing that he considered it "as strong a circumstantial case as I have ever seen," Dkt. 19, A-6 at 3692, this appeal was exceedingly unlikely to bear fruit, *see Outten*, 464 F.3d at 415 (finding counsel deficient where his "strategy was to argue to the jury—which had convicted [the defendant] of murder unanimously and beyond a reasonable doubt—that he was a good guy and that his life should be

spared because he was actually innocent"); HE 20 at 4057 (the sentencing judge calling mitigation based on Ms. Row's strengths as a mother "the ultimate irony").  This is simply not a case where it was feasible to win a life sentence by portraying Ms. Row as a nice person. Counsel's only hope was to explain in a sympathy-inducing manner what had gone wrong in Ms. Row's life that led her to make so many serious mistakes.  That explanation was brain damage and impairment in neuropsychological functioning, and the character evidence did not absolve counsel of their duty to investigate it.[25]

The State attempted to show at the *Martinez* hearing that there was more of an independent investigation, but its effort bore no fruit.  First, the State led Mr. Cahill through a series of notes from trial counsel's file, some of which refer to individuals who interacted with Ms. Row at various points of her life.  *See* Dkt. 703 at 58–60.  However, when asked whether the "notes reflect interviews conducted by the defense team or whether they might have reflected interviews and investigation conducted by others, such as PSI investigators or law enforcement," Mr. Cahill responded: "I don't think any of them are reflective of independent investigation that we took with those witnesses other than perhaps a few, very few."  *Id.* at 98–99.

A similar exchange occurred with Mr. Elam.  The State showed Mr. Elam several pages of notes listing potential witnesses, designed to "weed" out the people worth calling.  *See id.* at 113–14.  But the notes were almost certainly written with an eye to the guilt phase rather than the sentencing.  Numerous names on the notes belong to people who did in fact testify at the guilt

---

[25] At the PCR hearing, Mr. Myshin did his best to justify the failure to put on more mitigation witnesses at trial on the basis that he believed such witnesses "had both good and bad things to say about her."  HE 42 at 211.  That excuse is inadequate, because (1) it does not justify a failure to interview nearly *anyone* as part of a mitigation *investigation*, and (2) people will obviously have negative things to say about a person convicted of murdering her husband and two children, and counsel's job is to deal with that negative material in the most mitigating way possible.  *See Johnson v. Bagley*, 544 F.3d 592, 600 (6th Cir. 2008) ("That someone may make a bad witness is no explanation for not interviewing her first.").

phase.  *Compare* HE 1033, 1037, 1113, *with* Dkt. 19, A-3 at vi–xiv.  The final page of the notes

includes a list of witnesses with two dates, *see* HE 1113 at 4, which was clearly a tentative list of

individuals who were set to testify during the guilt phase, *see* Dkt. 19, A-5 at 2863–3135.

A glance at the defense team's interview notes confirms that counsel were plumbing

witnesses for details that went to the perpetration of the offense and whether it was committed by

Ms. Row or instead her husband, as the defense wished to argue.  For instance, there is extensive

discussion in these notes about the sequence of events around the time of the fire, Ms. Row's

parenting, her relationship to her husband, her husband's abusive behavior, her husband's

mechanical ability (presumably because it related to his ability to set the fire), her *husband's*

mental health, etc.  *See* HEs 1033, 1036, 1037, 1040, 1041, 1080, 1103, 1124, 1152.  A type-

written document on the witnesses is to the same effect.  *See* HE 1081.  Aside from the cursory,

passing reference, *see, e.g.*, HE 1105 at 1, there is almost nothing in these notes reflecting

questions about Ms. Row's childhood, head injuries, toxins, or any of the other things that a

mitigation investigation would cover.[26]  In short, this was work product generated almost

entirely for the guilt phase.  In fact, Mr. Elam summed it up nicely when he testified that he

basically did all of his work on the guilt phase and then whatever he happened to stumble across

was, perhaps, looked at as an afterthought for sentencing.  Dkt. 703 at 143.  Since the issue here

is one of *penalty*-phase IAC, the fact that some work was done at the guilt phase has no bearing

on the claim under consideration now, and only reinforces trial counsel's ignorance.  *See Turner*

*v. Calderon*, 281 F.3d 851, 891 (9th Cir. 2002) ("Preparing for the penalty phase of a capital trial

is the equivalent of preparing for an entirely new trial, and trial counsel must treat it as such.").

---

[26] There are some documents and notes in the defense files regarding the deaths of Ms. Row's
other children in prior incidents, as well as other old offenses, *see, e.g.*, HE 1165; HE 1169 at 5,
but those obviously are not part of an investigation into *mitigating* evidence.

Petitioner's Replacement Post-Hearing Opening Brief – 39

Lastly, counsel failed to visit—or send anyone to visit—the town where Ms. Row grew up, or to investigate the circumstances of that town. *See* Dkt. 707 at 159; Dkt. 703 at 110–12. This is something any competent mitigation investigation would have done. *See* Dkt. 701 at 171–72. And it was a particularly costly omission here, since Ms. Row grew up in a setting plagued with toxins, *see infra* at 70–75, something that would have both helped counsel realize the possibility of brain damage, helped them substantiate its existence in court by establishing that her behaviors were consistent with brain damage, and helped them point to traumatic events in her life that likely exacerbated the brain damage, *see infra* at 69–71; *accord* Dkt. 701 at 167; Dkt. 707 at 16–17, 21–22. Had anyone from Ms. Row's defense team bothered to travel to her childhood neighborhood and simply taken a look around, they would not have needed a science degree to realize that Ms. Row was likely exposed to a highly toxic environment during her developmental years. *See infra* at 70–75. At a minimum, Ms. Row's attorneys could have and should have interviewed more witnesses about the environment in which she grew up, investigated the types of toxins that were poisoning the water and air around her, and explored whether those issues could have contributed to the abnormality in her brain. This failure, too, was deficient. *See Douglas v. Woodford*, 316 F.3d 1079, 1089 (9th Cir. 2003) (finding counsel deficient where he failed to investigate the effects of the defendant's exposure to toxins); *accord* HE 7 at 34.

### b.  Trial Counsel's Errors Were Not Reasonably Strategic

There are no reasonable, strategic objectives that justified trial counsel's failure to further investigate the possibility that Ms. Row suffered from brain damage. Most significantly, Mr. Cahill frankly denied that any tactical thought process justified his negligence: "There was no strategic decision." Dkt. 707 at 175. No further inquiry into counsel's potential thought process

is necessary.  *See Doe*, 782 F.3d at 444–45 (holding that where counsel "unequivocally said" that he had no strategy for his failure to investigate mitigation it would not be appropriate to assume that he acted reasonably because that would "contradict [the attorney's] testimony rather than fill[ ] a gap in memory, contravening the Supreme Court's" cases); *see also Duncan v. Ornoski*, 528 F.3d 1222, 1237 n.7 (9th Cir. 2008) (similar).

If the Court disagrees and continues to consider the matter further, the same result obtains.  First, it was not reasonable of Mr. Myshin to suggest in post-conviction that counsel had no duty to investigate brain damage after Dr. Beaver tentatively described Ms. Row as having anti-social features.  *See* Dkt. 400, Lodging 2 at 56; HE 42 at 220.  As noted, counsel failed to provide Dr. Beaver with the information that he needed in order to make an informed assessment of brain damage, including—most obviously—a radiologist's report indicating that there *was* brain damage, as well as the social-history information to corroborate and explain the condition.  *See supra* at 23–25, 30–37.  Consequently, it would not have been reasonable for counsel to rely upon Dr. Beaver's opinion.  *See Frierson*, 463 F.3d at 992 (rejecting a trial attorney's alleged reliance on the opinion of a mental health expert as a basis for not investigating brain damage because the attorney never informed the expert of a report's "reference to organic brain damage").

In addition, Dr. Beaver's analysis was exceedingly preliminary.  *See* Dkt. 704 at 41.  He administered only two tests, the Minnesota Multiphasic Personality Inventory II ("MMPI II") and the Millon Clinical Multiaxial Inventory II ("MMCI II").[27]  *See* HE 178; HE 42 at 126.

---

[27] Mr. Cahill testified at the *Martinez* hearing that he "thought" he had Dr. Beaver do "some" neuropsychological testing on Ms. Row, but that "in hindsight" he was "not so sure if that's accurate."  Dkt. 707 at 154.  Given Dr. Beaver's clear billing records and the fact that the voluminous record does not reflect any neuropsychological testing by him, Mr. Cahill's speculation that such testing was done cannot be credited.

These are *personality* tests.  *See, e.g.*, *Tyler v. Mississippi*, 618 So. 2d 1306, 1310 (Miss. 1993).

They are not *neuropsychological* tests, and they are certainly not imaging.  *See* Dkt. 707 at 63,

70, 134.  As a result, the tests would have been incapable of diagnosing brain damage.  *See*

*Richie v. Sirmons*, 563 F. Supp. 2d 1250, 1292 (N.D. Okla. 2008) (finding counsel ineffective

where they failed to present evidence of brain damage and relied upon "personality tests, rather

than neuropsychological tests which are designed to detect brain damage"), *aff'd*, 599 F.3d 1131

(10th Cir. 2010).  And counsel knew the difference between the two types of instruments, *see*

Dkt. 707 at 154; Dkt. 703 at 77, and knew that neuropsychological testing—not personality

testing—was necessary to diagnose brain damage, *see* Dkt. 703 at 78, so it cannot be that they

were reasonably ignorant of the state of the science.

      The preliminary nature of Dr. Beaver's involvement is further underscored by how

infrequent and brief his overall time investment in the case was.  He met Ms. Row only twice,

each time for an hour, and both times before the trial began.  *See* HE 178.  He only did three

hours of record review.  *See id.*; *accord* Dkt. 704 at 47.  And he only consulted with the attorneys

once.  *See* HE 178.  As Dr. Beaver testified, his total bill to trial counsel—$875 for less than nine

hours work—was "very small" in comparison to his typical case, which often involved "20 or 30

hours of record review" and "6 to 10 hours of interviewing and collateral contact, as well as a

significant more amount of testing."  Dkt. 704 at 41.  It strains credulity to imagine that this sort

of limited inquiry would have given counsel enough information about whether Ms. Row

suffered from brain damage.  To summarize, Mr. Myshin's attempt to justify his negligence after

the fact by relying on an expert that he himself failed to adequately prepare constitutes nothing

more than "post-hoc rationalizations rather than reasoned or strategic choices."  *Frierson*, 463

F.3d at 992.

The State insinuated at the *Martinez* hearing that it would have been reasonable for counsel to assume that Dr. Beaver's tentative description of Ms. Row as having antisocial issues represented an implicit determination that she did not suffer from brain damage. *See* Dkt. 703 at 23–24. But that conjecture does not hold water when one remembers that counsel failed to adequately equip Dr. Beaver, *see supra* at 23–25, 30–37, and when one considers that Dr. Beaver's description was only a preliminary one and that he "hadn't addressed organicity" one way or the other, Dkt. 704 at 42.

The fact that Ms. Row's 1992 scan was interpreted as normal, *see* HE 3, Tab 6, does not change the calculus. When there is an inconsistency in the evidence, counsel must pursue the favorable pieces and see if there is a way to defuse the unfavorable pieces. *See Shellito v. State*, 121 So. 3d 445, 453–56 (Fla. 2013) (finding counsel deficient in failing to follow up with conflicting evidence regarding the defendant's mental-health issues). That is precisely what Dr. Beaver would have told counsel had he been asked, as he should have been. More specifically, Dr. Beaver would have advised counsel that it was necessary to have a neuroradiologist compare the two scans, and have further testing done. *See* Dkt. 703 at 156. The presence of inconsistent evidence is a reason to investigate *further*, not to abandon the investigation altogether. That is especially true when the conflicting reports were never presented by trial counsel to the appropriate experts: a neurologist and a neuropsychologist. *See Frierson*, 463 F.3d at 992 (finding counsel deficient where he failed to consult with a neurologist about a report indicating brain damage and instead claimed to rely on a forensic psychiatrist).

The absence of any justifiable ignorance is made even more manifest by the evidence counsel did present at the guilt phase. Ironically, counsel focused heavily on brain damage in that proceeding. But they did so with respect to *Mr.* Row, one of the victims, at the very same

time they were failing to develop far more fruitful evidence in the same area about their own client.   Defense counsel's stratagem in this area at the guilt phase was to construct a theory that Mr. Row's damaged frontal lobe made him volatile and increased the chances that he committed the crime to punish his wife, which included testimony from numerous mental-health witnesses, including two psychologists.  *See* Dkt. 19, A-5 at 2898, 2904–07, 3005–66, 3476, 3490–91.[28] This is the rare case in which we can say with total certainty that counsel could have invoked the evidence they failed to, because it is the rare case in which they actually did so in the same trial, albeit with reference to the wrong person.[29]

As further proof that no strategic considerations obstructed counsel from investigating brain damage, consider the fact that Mr. Cahill *did* suggest to the sentencing court the possibility of brain damage.  In his sentencing memorandum, Mr. Cahill wrote that the alexithymia supposedly afflicting Ms. Row "[m]ay be related to [an] organic problem with brain functioning."  HE 21 at 4.  At the *Martinez* hearing, Mr. Cahill elaborated on why he included this line in his pleading: "[M]y belief is that even though people who are ill are responsible for their actions, if you will, . . . a person who is sick somewhat has less volitional control over . . . their behaviors than someone who is not sick."  Dkt. 707 at 169.  That is quite right.  It is just that counsel identified a non-existent sickness rather than finding the one lurking under their

---

[28] At the *Martinez* hearing, the State appeared to suggest that the defense considered using Dr. Janet Albee as a mental-health expert in mitigation, *see* Dkt. 703 at 68–69, but the record clearly indicates that counsel only consulted Dr. Albee on *Mr.* Row's brain damage, *see* HE 1140; Dkt. 19, A-5 at 3286.  There is no evidence that trial counsel conferred with Dr. Albee about Ms. Row's mental health and there is no basis to find the attorneys effective on that ground.  *See Hamilton*, 583 F.3d at 1115 (finding counsel deficient and discounting three interviews that the context clearly showed to be about the guilt phase).

[29] Counsel's strategy at the guilt phase plainly did not preclude presentation of brain damage at sentencing, as the attorneys did not rely on an innocence theory at the penalty phase, and indeed did present mental-health evidence, albeit weakly and ineffectively.  *See* HE 20 at 3783–3804; Dkt. 707 at 165–66.

Petitioner's Replacement Post-Hearing Opening Brief – 44

noses.  *See Hooper v. Mullin*, 314 F.3d 1162, 1170 n.5 (10th Cir. 2002) ("[D]efense counsel specifically chose a defense strategy that required presentation of psychological evidence in mitigation.  Having made that strategic decision, counsel's presentation of evidence without further investigation and in an ill-informed and unprepared manner resulted in constitutionally ineffective assistance.").

As this Court noted at the *Martinez* hearing, "given the gravity of a death penalty case, . . . there is a heightened obligation to pursue all reasonable lines of inquiry that might provide evidence of mitigation in the penalty phase of the proceeding."  Dkt. 707 at 182.  Trial counsel had such a line of inquiry dropped in their laps in the form of a report from an independent doctor finding brain damage and suggesting further exploration, thus alerting them that one of the most powerful mitigators in the capital world was present.  They failed to conduct that exploration, and they were grossly deficient as a result.

## 2.   State Post-Conviction Counsel Rendered Deficient Performance

PCR counsel's performance on brain damage was even more defective, as they actually saw the potential of brain damage and *still* failed to explore or present it in any meaningful way. The Court noted at the close of the *Martinez* hearing: "Given the fact that Ms. [Hudson] brought to the attention of [PCR counsel] the abnormal 1993 CT scans, I think that establishes deficient performance under *Strickland*."  Dkt. 705 at 44.  That is exactly right.  Deficient performance is about as stark here as it possibly could be, and the Court's analysis on this point could be nearly as concise as its statement at the hearing was.  Nevertheless, in the interest of preserving a full record for a potential appeal, Ms. Row will offer here a more elaborate explanation of PCR counsel's deficient performance.[30]

---

[30] In the interest of economy, any argument in the trial-counsel section that is relevant here is incorporated by reference and will not be repeated.

Ms. Row was represented in post-conviction by lead counsel Rolf Kehne and his law partner John Adams.  *See* Dkt. 701 at 11, 37.  They were assisted by Ms. Hudson, a mitigation specialist.  *See id.* at 12, 37, 113.  Although incomplete in many respects, a fairly extensive investigation was indeed conducted by Ms. Hudson.  The problem was that counsel failed to make use of and further develop the tremendously important information Ms. Hudson uncovered.

Most significantly, Ms. Hudson obtained definitive recommendations from several mental-health specialists that the 1993 CT scan constituted serious evidence of brain damage, and that further testing was essential.  *See* HE 110 (Ms. Hudson indicating in a memorandum that she interviewed Dr. Jonathan Pincus, the head of neurology at Georgetown University Hospital, who recommended a magnetic resonance imaging ("MRI") scan, a single-photon emission computed tomography ("SPECT") scan, a battery of neuropsychological tests, and a neurologic exam);[31] HE 33 at 13 (Ms. Hudson stating in an affidavit that Dr. Pincus felt that Ms. Row's brain damage "undoubtedly has associated behavioral and personality effects"); HE 114 at 2 (Ms. Hudson reporting to PCR counsel that once Dr. Beaver saw the 1993 CT report, he recommended "a more thoroughly charged neurocognitive exploration of the issues," including the administration of a series of neuropsychological tests); HE 130 (Dr. Donald True, a clinical and forensic psychologist, recommending to Ms. Hudson that a series of neuropsychological tests be administered and a neuropsychological specialist be hired).  The interview with Dr. Beaver should have been particularly enticing to PCR counsel, as he indicated that his previous

---

[31] The Pincus interview memorandum was sent to PCR counsel by fax.  *See* Dkt. 701 at 124; HE 110.  More generally, Ms. Hudson sent all of the records she amassed to counsel.  *See* Dkt. 701 at 116.  She also told them about the brain-damage issue by phone.  *See id.* at 120.  Ms. Row's PCR attorneys reviewed everything that was given to them by Ms. Hudson, *see id.* at 16, 43, making them presumptively aware of the recommendations she passed along to them from experts.

diagnosis of a personality disorder "would be absolutely changed now with the addition of the CAT scan report." HE 114 at 2.  PCR counsel thus had in their hands proof that the trial attorneys deprived their own expert of information that would have moved him from a highly adverse diagnosis in a far more positive direction.

There is no question that counsel recognized the significance of these leads.  In an affidavit, Mr. Kehne referred to them as "facts which I believe scream out for consideration by a mental health professional," and noted that he needed "more time and money to develop and present this information."  Dkt. 19, B-10 at 146–47.  Indeed, counsel presented the recommendations from Dr. Pincus for further testing to the court, in the form of an affidavit from Ms. Hudson.  *See id.* at 153–54.

Despite this mountain of evidence staring them in the face and uniformly demanding a full neuropsychological workup and imaging, PCR counsel inexplicable failed to do any of that. On the day of the evidentiary hearing, counsel had not arranged for neuropsychological testing, not pursued additional brain imaging, and not consulted with a medical imaging expert.  *See* HE 42 at 89–92.  In a word, counsel had done none of the things that multiple experts—and their own investigator—had strongly told them they had to do.  With such a patent lapse, deficient performance can be found on that basis alone.  *See Bean*, 163 F.3d at 1079 ("[W]hen testing requested by expert witnesses is not performed, . . . a capital defendant has not received effective penalty phase assistance of counsel."); *Daniels*, 428 F.3d at 1204 (finding counsel deficient where he had a preliminary examination indicating mental illness but "did not follow up on these important leads by seeking a comprehensive evaluation by more qualified and experienced practitioners").

Having done none of the legwork necessary to develop their case, despite the blueprint provided for them by their experts and investigator, the hearing was an unmitigated calamity for PCR counsel.  The only brain-damage "expert"[32] called was Dr. Beaver, who of course did not have the results of any of the testing and imaging that he and the other doctors had recommended, since counsel had failed to arrange for that testing and imaging.  The most Dr. Beaver could do was to reiterate, once again, the work that needed to be done to explore the possibility of brain damage.  *See* HE 42 at 121–31.  The attorneys themselves harbored no illusions about their failure to prove the case.  At the close of the hearing, PCR counsel argued not that they had prevailed on their claim, but rather that they should be given a continuance to do the testing and imaging their consultants had told them to do months ago, *see id.* at 331, which was of course denied, *see id.* at 365.

It is unclear exactly why counsel never took the unanimous and forceful recommendation of every expert their own investigator had contacted, or why they never capitalized on the investigator's own work.  That said, there appear to be a series of factors that played a role.  Two of the predominant issues were time and money.  As a preliminary matter, these concerns—no matter how they played out—would not justify counsel's failure to accomplish the tasks they needed to accomplish.  *See Daniels*, 428 F.3d at 1205 (finding counsel ineffective where it was a "lack of time and funding—and not a strategic choice—that hampered [defense counsel's] representation and ability to present mitigation evidence").  Setting that well-established rule of law aside, counsel did not reasonably handle the time and money issues.

---

[32] There is some ambiguity as to whether Dr. Beaver was truly called as an expert, rather than as a fact witness.  The State itself subpoenaed Dr. Beaver to testify at the hearing, *see* HE 42 at 133, which presumably would not have happened if he had been the other side's expert.

Starting with time, the PCR attorneys put themselves unnecessarily in an untenable position.  PCR counsel were assigned to the case at least as early as March 10, 1994.  *See* HE 20 at 4063.  On June 30, 1995, the evidentiary hearing was given a final setting—after several continuances—of January 8, 1996, more than six months in the future.  *See* Dkt. 19, B-10 at 170, 172.  Counsel knew there was little to no chance the hearing would be postponed.  As their notes reflected, "[t]rial date is firm, barring catastrophe."   HE 1215 at 2.  The judge had said as much.  *See* HE 35 at 1 ("No further continuance will be granted.").  Still, in those six months—from the June 30, 1995 scheduling order to the January 8, 1996 hearing—counsel did not file a motion for a continuance.  *See* Dkt. 19, B-10 at 182–97; Dkt. 19, B-11 at 198–208.  Instead, they showed up on the *day of the hearing*—January 8, 1996—when the State and the court were understandably expecting to hear testimony, and pleaded in person for more time.  *See* HE 42 at 89–92.  It is difficult to conceive of a more deficient act than for counsel to appear at an evidentiary hearing set six months earlier, having not submitted any request for an extension, with no evidence to present.  *See* Dkt. 701 at 155.

Aside from being late, the request for an extension was also unsupported, as counsel had not even begun to conduct the testing and imaging that they had been instructed by their experts to do long ago.  *See* HE 43 at 15.  Inevitably, PCR counsel's gambit was rejected by the court as based on "conjecture and speculation," HE 42 at 94, 110.[33]  In summary, PCR counsel's handling of the timing issue was a fiasco that in no way excuses their failure to conduct the further testing and investigation that was manifestly necessary.

---

[33] At the close of the hearing, PCR counsel suggested that the court was allowing them to continue their investigation and that they might "convince somebody to speedily try to do this neuropsychiatric evaluation."  HE 42 at 371.  But there is no evidence that evaluation ever occurred and there was no strategic reason for that either.  *See* Dkt. 701 at 63 (Mr. Kehne testifying: "Q.  Do you believe there was a strategic reason for not trying at that point?  A.  I am certain there was not.").

Petitioner's Replacement Post-Hearing Opening Brief – 49

Counsel's issues with punctuality were indisputably not tactical.  Mr. Kehne frankly acknowledged as much when discussing his failure to hire experts in time.  *See* Dkt. 701 at 55 ("[I]t's just as patent and apparent as it can be that we dropped the ball" and "[t]here couldn't possibly be" a strategic reason for the dilatory work on the brain-damage issue).  He did the same when it came to his failure to file a written motion for a continuance in advance of the hearing. *See id.* at 56 ("The judge ha[d] said . . . there will be no more continuances, and a lawyer has to take a judge at his word when he says something like that.  And we knew we weren't ready, but I don't know why we didn't file something.").

PCR counsel's billing records further demonstrate that counsel's issues with timing were in no wise strategic.  *See generally* HE 47.  As those records show, counsel were devoting a paltry amount of time to the case for the vast majority of their representation.[34]  They only increased their investment when they were scrambling to belatedly prepare for a deadline or court appearance, as in June 1995 when they had to cobble together a petition, *see id.* at 49– 52,and again in January 1996 when they had to throw something together for the evidentiary hearing.  *See id.* at 34–36, 94–96.  Perhaps most telling of all, the month in which counsel dedicated the most time to the case was February 1996, *see id.* at 89–92, 97–98, which came *after* the evidentiary hearing for which they were so unprepared.  By contrast, counsel only billed 4.6 hours for December 1995, *see id.* at 32–34, the month when extensive investigation was most crucial to marshal evidence for the January 8, 1996 hearing.  These are not statistics associated with counsel diligently working on a capital case.  They are statistics associated with counsel

---

[34] The statements that follow about counsel's billing records in this paragraph are supported by citations to an exhibit that was admitted at the evidentiary hearing.  *See* HE 47.  In Ms. Row's original opening brief, she attached a chart based on the information from that same hearing exhibit.  *See* Dkt. 717-3.  The chart did not contain any facts other than those in the exhibit, and was prepared simply to synthesize and simplify that information, which was properly introduced at the hearing.

falling tremendously behind due to a wildly inadequate amount of investigation and then struggling futilely to catch up.[35]

The chronology of Ms. Hudson's investigation further forecloses any holding that counsel's dilatory conduct was defensible.  The critical recommendations from experts for further testing and imaging first appeared on counsel's radar in mid-June 1995.  *See* HEs 110, 114; *see also* HE 33 at 6 (Mr. Kehne stating in a June 16, 1995 affidavit: "Medical imaging procedures have shown Robin to suffer from gross brain atrophy.").  Counsel had the next seven months to act on the advice.  And yet the only work counsel did was more or less on the eve of the hearing.  It was not until five weeks before the hearing that counsel reached out to Dr. Beaver.  *See* HE 70.  Even then, the majority of Dr. Beaver's work at that time consisted of evaluating the records and tests that had already been prepared, not conducting the further investigation that everyone agreed had to be done, and which was never done on PCR counsel's watch.  *See* HEs 70, 71.  The only consultation between PCR counsel and Dr. Beaver was on December 28, 1995,[36] less than two weeks before the January 8, 1996 hearing, *see* HE 71, even though counsel had known for months that further testing was necessary, *cf. Bean*, 163 F.3d at 1078 (finding counsel deficient where they received a recommendation for neuropsychological testing from their expert but did not conduct the testing "until the weekend immediately preceding the penalty phase, approximately ten months later").

The money question is somewhat murkier, but equally unavailing as a defense against ineffectiveness.  There is no question PCR counsel were under serious economic strain at the

---

[35] To the extent counsel's errors resulted from preoccupation with other cases, *see* HE 28 at 2; HE 66, at 2; Dkt. 19, B-10 at 67, 70–71, that does not render their omissions reasonable, *see Daniels*, 428 F.3d at 1205; *Lockett v. Anderson*, 230 F.3d 695, 711 (5th Cir. 2000).

[36] The dates of the consultations in Exhibits 70 and 71 are cut off but Dr. Beaver clarified the days referred to above at the *Martinez* hearing.  *See* Dkt. 703 at 157–58.

time of the Row case.  *See* HE 69 at 25; Dkt. 701 at 13, 40.  How those financial pressures affected counsel's performance is less obvious.

After unsuccessfully seeking funding decisions from the court, *see* HE 29; Dkt. 16, B-10 at 113, PCR counsel turned to the ACPD, and through ACPD, the county, for their funding needs.  *See* Dkt. 701 at 41–42, 81.  PCR counsel would then commit to making various expenditures, in the hope that the county would ultimately foot the bill.  *See id.* at 57–58.  There is conflicting testimony about whether monetary issues were an obstacle to a brain-damage workup.  *Compare* Dkt. 701 at 19 (Mr. Adams testifying that he believed the judge had denied "requests for resources" to conduct testing), *with id.* at 51, 57, 82; HE 46 at 2, 7, 10, 14, 18 (Mr. Kehne testifying that he had no recollection of being denied resources for testing but did feel constrained in his expenditures by the fact that Ada County could refuse to cover services he had already committed to and terminate their contract without cause).  Since Mr. Kehne was lead counsel and appeared to remember the details of the case better than Mr. Adams, and since the record does not appear to reflect any invoices from PCR counsel being denied by Ada County or the ACPD, it is most likely that Mr. Kehne's testimony is closest to the true story.

As stated at the outset, it does not matter—in the final analysis—how the money issue played out, for counsel were deficient regardless.  If they did not request the resources to conduct the necessary neuropsychological investigation, they certainly had no strategic reason for not at least trying and making the record.  *See* Dkt. 701 at 102 (Mr. Kehne testifying that he would not have refrained from requesting money because he thought there was a possibility it would not be given to him); *Correll*, 539 F.3d at 950 n.4 (discussing "the importance of creating a record for review, even if the trial judge likely would be unsympathetic").  And if they requested funding in some form that was not memorialized by the record, and were denied, they were still ineffective,

because the failure to do the work would still not come from a strategic decision.  *See Daniels*, 428 F.3d at 1205.[37]

We can be certain that counsel had no tactical motivation for failing to present evidence of brain damage because they did in fact *try* to present it.  At the close of the post-conviction proceeding, counsel were doing their utmost to get more time to offer the very brain-damage evidence that they were ineffective for not gathering earlier.  *See supra* at 48.  Consistent with this record, the PCR attorneys at the *Martinez* hearing both disclaimed any sort of strategic reason for their failure to follow up on the brain damage.  *See* Dkt. 701 at 51 (Mr. Kehne testifying that he was incapable of "even imagin[ing] a strategy that would call for not getting this testing done"); *id.* at 59 (Mr. Kehne testifying that lay witnesses were not called to support the brain-damage claim because counsel "just weren't prepared," even though there was no "reason not to give the court the benefit of what they had seen and observed"); *id.* at 32–33 (Mr. Adams disclaiming a strategic reason for the omissions).  This was not strategic.

Technical and justifiable ignorance on the part of post-conviction counsel was not to blame for their failures.  They knew exactly what the recommendations from the experts meant.  *See id.* at 46–49.  They also knew that the tests administered to Ms. Row by Dr. Beaver would not have been capable of reliably detecting brain damage.  *See id.* at 106.

At the *Martinez* hearing, Mr. Kehne suggested that Ms. Row "had used enough alcohol possibly to cause some organic changes" in her brain.  *Id.* at 86.  Ms. Row believes that Mr. Kehne's recollection here was flawed, as the record does not corroborate that proposition.  Nevertheless, even if that was Mr. Kehne's sense, it was not Mr. Kehne's reason for failing to

---

[37] Another contributing factor to the PCR attorneys' inadequate performance were trial counsel, with whom they were such intimate friends as to consider themselves "brothers" and with whom they had worked closely at the ACPD, leading them to temper their ineffectiveness claims.  *See* Dkt. 701 at 12–13, 85–86, 173–74.

investigate further, which was instead—by his own admission—sheer negligence and lack of preparedness. *See supra* at 53. Nor would the possibility of alcohol as a contributing factor have justified a failure to *investigate* the brain damage, to ascertain exactly what had caused it. *See Correll*, 539 F.3d at 949 ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all."). Indeed, had counsel actually investigated the matter fully, they would have discovered that alcohol abuse did not in fact play a role. *See infra* at 61. And even if it had, the brain damage would still have been mitigating. *See Sears*, 561 U.S. at 949.

This Court has suggested that the IAC-on-appeal standard might have some bearing in evaluating the deficient performance of post-conviction counsel. *See Creech v. Ramirez*, No. 1:99-cv-224, 2016 WL 8605324, at *12 (D. Idaho Jan. 29, 2016). As argued above, Ms. Row respectfully disagrees with that approach, and maintains that the trial-IAC framework controls. *See supra* at 4. Nevertheless, Ms. Row also prevails when the case is viewed through the appellate lens.

In evaluating appellate IAC, some courts have conducted a comparative analysis, juxtaposing the claims that were raised with those that were passed over. *See, e.g.*, *Fagan v. Washington*, 942 F.2d 1155, 1157 (7th Cir. 1991). As a threshold matter, Ms. Row submits that no such comparative analysis is necessary or appropriate, even if the Court applies the appellate-IAC test, because when "appellate counsel fails to raise a claim on appeal that is so obviously valid that any competent lawyer would have raised it, no further evidence is needed to determine whether counsel was ineffective for not having done so." *Eagle v. Linahan*, 279 F.3d 926, 943 (11th Cir. 2001). Rather, the "failure to raise it, standing alone, establishes [his] ineffectiveness." *Id.* That is what happened here. PCR counsel knew about the possibility that their death-sentenced client suffered from significant brain damage. They knew that trial counsel

had not presented any evidence of such a condition. And they knew that several experts

recommended testing. To not do the testing and present the results is so transparently inept that

the failure, on its own, demonstrates deficient performance.

If the comparative test is used, the result remains the same. First of all, when juxtaposing

the PCR petition generally with the fully developed brain-damage claim, there can be no real

dispute that the latter is far stronger than *anything* in the former. The PCR petition is a fourteen-

page hodgepodge consisting of about six pages of boilerplate challenges to the death penalty that

could have been made in any capital case in Idaho and about eight pages of weakly explained

and supported arguments on Ms. Row's case in particular. *See* HE 32. This is self-evidently not

a situation where counsel were winnowing. Consider, for example, the PCR petition's claim that

trial counsel were ineffective for failing to argue that the sentencing court was constitutionally

required to engage in "proportionality review." *Id.* at 9. The idea that such review was

necessary under the Constitution had been flatly rejected more than a decade earlier by the U.S.

Supreme Court. *See Pulley v. Harris*, 465 U.S. 37, 880 (1984). To state the obvious, an attorney

cannot be found ineffective for failing to raise a losing claim. *See Matthews v. State*, 839 P.2d

1215, 1222 n.2 (Idaho 1992) ("A claim of ineffective assistance of counsel cannot be predicated

upon counsel's failure to argue meritless issues."). Raising such hopeless claims, while failing to

develop much stronger ones, meant that the petition was "doomed from the beginning," *Brown*,

847 F.3d at 514, further dictating a ruling that PCR counsel rendered deficient performance.

### 3.   Conclusion to Deficient Performance

Trial counsel ignored a doctor's finding of brain damage and his recommendation for

follow-up, and PCR counsel then ignored their own experts' recommendation for testing and

imaging. Both sets of attorneys were deficient.

**B.  Prejudice**

Under *Strickland*, to satisfy prejudice, it must be established that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  In establishing prejudice, Ms. Row need not demonstrate that the evidence relating to her brain atrophy would necessarily have overcome the aggravating circumstances, *Williams*, 529 U.S. at 398, only that it "undermine[s] confidence in the outcome," *Strickland*, 466 U.S. at 694.  What the record needs to show—and clearly does—is that the evidence taken as a whole might have influenced the trial court's appraisal of Ms. Row's culpability and deservingness of mercy.  *See id.*; *see also Daniels*, 428 F.3d at 1210 (finding prejudice because the jury "was never exposed to meaningful mitigation evidence that *may* have meant the difference between a life or death sentence").[38]

All the experts at the *Martinez* hearing in this case agreed on three fundamental principles.  First, brain imaging of Ms. Row demonstrates that she has cerebral cortical atrophy.  Second, this atrophy was present at the time of her capital sentencing in 1993.  And finally, neuropsychology was sufficiently advanced at the time to understand that this atrophy could have impacted Ms. Row's functioning and behavior.  Without question, evidence of this significance undermines confidence in the result.

---

[38] In considering prejudice, it is worth taking into account that Ms. Row was sentenced under an unconstitutional regime, as a judge determined her punishment without the participation of a jury.  *See Ring v. Arizona*, 536 U.S. 584, 608–09 & n.6 (2002).  By the narrowest of margins, Ms. Row was deprived of the benefit of that landmark rule.  *See Schriro v. Summerlin*, 542 U.S. 348, 358 (2004).  Nevertheless, it merits mention that Ms. Row would never have been sentenced by a single judge had she been given a constitutional penalty phase, and she would be given a sentence by a jury if she obtains relief here, as she should have been given originally, and before which she would be even more likely to receive a life sentence now.  *See* Idaho Code § 19-2515(3)(b) (allowing a single juror to forestall a death sentence); *see also Mann v. Ryan*, 828 F.3d 1143, 1162 (9th Cir. 2016) (Thomas, C.J., concurring in part, dissenting in part) (noting the relevance of *Ring* to a judge-imposed death penalty despite its non-retroactivity).

Counsel's performance at sentencing left an inaccurate picture of Ms. Row in material respects. As a direct result of trial counsel and PCR counsel's failures,[39] there was an absence of powerful and readily available evidence of brain injury, a category of mitigation evidence which would both mitigate Ms. Row's moral culpability and undercut the State's presentation of aggravating evidence at sentencing. Had state defense counsel simply taken a step towards the compelling mitigation evidence right in front of them, they could have "alter[ed] the entire evidentiary picture." *Strickland*, 466 U.S. at 696.

Ms. Row will first address the mitigating value of the evidence and will then explain how it would have defused the State's aggravation.

### 1.   Presentation of Mitigating Evidence

The mitigating nature of Ms. Row's brain damage comprises three categories: (1) the brain damage proper; (2) the etiology; and (3) the neuropsychological effects.

### a.   Mitigating Effect of the Brain Damage

Ms. Row suffers from an abnormality of her cerebellum, atrophy in the cerebral cortex in general, and also in the parietal lobe. Dkt. 707 at 14–15; *see also* Dkt. 704 at 63 (testimony of State's expert Dr. Roger Moore that "there was cerebellar hypoplasia particularly in the supravermian, and then there was some cortical atrophy predominantly found around the parietal lobes"); Dkt. 705 at 9, 12 (testimony of State's expert Dr. Arthur Kowell that there was "cerebellar atrophy, and there was some cerebral cortical atrophy" and additionally that there was damage in the parietal lobes). This brain abnormality has impacted her neuropsychological

---

[39] Because this section deals with both trial counsel and PCR counsel, it will henceforth refer to them collectively as "state defense counsel." Most of the caselaw deals with trial IAC, so Ms. Row will use language discussing the effect the unpresented evidence would have had on sentencing, but she is still addressing the effect it would have had in post-conviction at the same time.

functioning, Dkt. 707 at 69, and existed at the time of trial and even beforehand, *id.* at 14–15, 70.

It "is going to affect her in the supermarket, it's going to affect her interacting with her kids.  It's

not something that comes and goes like an infection.  It's part of how she is wired, and it's going

to permeate, really, every aspect of her life."  *Id.* at 116–17.

Various neurological and neuropsychological terms have been utilized in the course of

these proceedings ("frontal lobe dysfunction," "frontal lobe syndrome," "cerebellar cognitive

affective disorder").  What is relevant to the questions facing the Court is not what label is placed

on Ms. Row's neurological condition, but what the imaging showed and what thorough

neuropsychological testing at the time of Ms. Row's capital sentencing would have revealed—

"regardless of the label, the identifying neurological source for the impaired behavior would

have been evident back in the '90s or the '80s or the '70s, frankly . . . .  [T]he importance is that

there is a structural defect in the central nervous system that is fueling these behavioral and

functional manifestations*."  Id.* at 117–18; *see also* Dkt. 705 at 13–14 (testimony Dr. Kowell that

"you could call it 'atrophy' or you could call it 'hypoplasia.'  Whatever it is, it's not a normal

size.").

The CT imaging conducted pretrial in February1993 indicated vermian and cerebral

cortical atrophy.  *See* HE 15 at 65.  Subsequent imaging in 2001 and 2016 confirmed these

findings.  *See* HE 1 at 14; HE 3, Tabs 194, 195, and 205; *see also* Dkt. 705 at 11, 22 (testimony

of Dr. Kowell that there was consistency of the imaging studies from 1992 to 2016).  Ms. Row's

brain atrophy is clearly demonstrated in the most recent 2016 imaging.[40]  In Image A, below, is a

view of the frontal lobe and cortex in which the atrophy in Ms. Row's cerebellum can be clearly

seen with large gaps in brain tissue in the parietal region and between the cortex and the

---

[40] These slices are representative images of the atrophy present.

perimeter of the skull.  Dkt. 707 at 28.  "The cerebellum, which is down here attached to the

brainstem, the structure you see that looks like a shrunken broccoli, is the vermis.  And that's

what's markedly abnormal in Robin's case."  *Id.*  Image B demonstrates again a clearly visible

absence of brain tissue the atrophy in the back part of Ms. Row's brain tissue "in the back part of

the brain."  *Id.* at 30.




Image A: HE 3, Tab 205
(Series 1 Slice 5 of 29)

Image B: HE 3, Tab 205
(Series 1 Slice 26 of 29)

Image C demonstrates the atrophy in the corpus callosum and the cerebellum showing

abnormalities in both.  Dkt. 707 at 30.  Image D demonstrates the atrophy of the parietal lobe of

Ms. Row's brain.  *Id.* at 31.




Image C: HE 3, Tab 205
(Series 2 Slice 84 of 176)

Image D: HE 3, Tab 205
(Series 2 Slice 103 of 176)

The neurological examination conducted by Dr. James Merikangas showed no overt signs of physical impairment, supporting the proposition that the etiology of Ms. Row's brain atrophy is longstanding and of congenital or developmental origin.  Dkt. 707 at 14, 24; *see* Dkt. 705 at 15 (Dr. Kowell opining that Ms. Row's brain atrophy was more likely congenital in nature based on the consistency of the atrophy over time).  Dr. Merikangas testified that because the brain atrophy had likely been present since childhood, Ms. Row's body had adapted "to it in terms of the movements and the coordination and reflexes," but it may have indicated why she had problems in her behavior and learning when growing up.  *Id.*; *see* Dkt. 705 at 16 (testimony of Dr. Kowell that the absence of neurological findings could be due to the fact that "many of the patients will adapt to it; meaning, as they develop, they develop means for compensating").[41] Dr. Merikangas added: "This is something that has been there a long time."  Dkt. 707 at 14; *see* HE 1346 at 83 (deposition testimony of Dr. Moore explaining why Ms. Row's deficits appear to be longstanding in nature).  Further, the pattern demonstrated in the brain imaging rules out atrophy due to alcohol abuse.  Dkt. 707 at 32 (explaining that Ms. Row's brain damage does not reflect alcoholism).  The cerebellum is a relatively small portion of the brain, but contains more neurons than the rest of the brain in toto.  *Id.* at 34.  A major function of the cerebellum is cognitive, "to modify learning, to modify emotions, to modify behavior, and to modify judgment . . . .  It is also related to decision-making, to planning, and to judgment.  And it has a lot to do with mood."  *Id.* at 35.  "It has an impact on a person's ability—how effectively they function in

---

[41] Dr. Kowell's report and testimony is geared towards the physical implications and manifestations of the brain atrophy, and his testimony should be taken in this context.  In light of this, it is important to note the difference between neurology and neuropsychology.  Neurology refers to the physical structure, functioning and diseases of the central nervous system.  *See* https://www.merriam-webster.com/dictionary/neurology.  Neuropsychology refers to the integration of psychological observations of behavior with neurological observations of the brain.  *See* https://www.merriam-webster.com/dictionary/neuropsychology.

certain situations, such as high stress situations, how well they are able to manage their emotions, make decisions [and] . . . regulate themselves." Dkt. 703 at 153. In addition, atrophy in the vermian, which was also implicated in the 1993 imaging studies, "is particularly involved with mood regulation and emotional functioning. It's often associated with individuals who have major mood disturbance, like recurrent major depression or schizophrenia, for example." *Id.*; *see* Dkt. 704 at 60 (testimony of Dr. Moore that "[t]here may be difficulties around speech, around executive functioning, around emotional regulation, visuospatial skills").

The role of the cerebellum in behavior first became known in approximately 1974, when the development of brain imaging made it possible to study the cerebellum more. Dkt. 707 at 39. The connections between cerebral atrophy and its impacts on executive and emotional function were well established and recognizable to neurologists and neuropsychologists by the time of Ms. Row's trial. *Id.*; *see* Dkt. 704 at 146 (testimony of Dr. Moore that "even back in the early '90s, we knew about at least some degree of organic impact").

State defense counsel had a significant body of scientific literature available to them that clearly illustrated the critical role the cerebellum plays in the storing and processing of information, and how damage to (or abnormalities in) that region of the brain can cause complex behavioral, emotional, intellectual, and mental problems. In fact, in the one to two decades leading up to Ms. Row's 1993 trial, there was a paradigm shift among scientists and academics as they turned their attention to proving direct relationships between the cerebellum and cognitive functioning. *See* Henrietta C. Leiner, Alan L. Leiner, Robert S. Dow, *Does the Cerebellum Contribute to Mental Skills?*, Behav. Neurosci., Aug. 1986, 100(4) at 447. By the late 1980s, it was well-known that the cerebellum also functions as a central information-processing machine and warehouse, as well as a modulator of emotions. *See* Henrietta C. Leiner,

Alan L. Leiner, Robert S. Dow, *Reappraising the Cerebellum: What does the hindbrain contribute to the forebrain?* Behav. Neurosci. Oct. 1989, 103(5) at 998.  In the dozens of studies Ms. Row's state attorneys would have had at their disposal, had they used them, patients with damage to the cerebellum or anywhere along the intricate neural pathways that loop to and from it exhibited clear deficits in cognitive behaviors, either singularly on in some overlapping interplay of deficits referenced further below.  At the same time, these patients could appear to perform normally in many other cognitive areas, such as comprehension of facts and events.  For example, a seasoned lawyer in one study could not learn from the same successive mistakes in a relatively simple sorting test after suffering damage to his posterior cerebellum in a stroke, even though his memory regarding the learning of facts and events remained intact.  *See* Henrietta C. Leiner, Alan L. Leiner, Robert S. Dow, *The human cerebro-cerebellar system: its computing, cognitive, and language skills,* Behav. Brain Res., Apr. 1991, 44 at 117.  In other words, it is possible to understand the rules but be unable to alter one's behavior to follow them.  "When the cerebellum is damaged, something of fundamental importance to the learning process is lost: the ability to improve one's performance by practice."  *Id.*

Collectively, the patients in the studies available to state defense counsel showed deficits of a wide spectrum, including the following: inappropriate smiling or laughter, *see* Stephen J. Kish et. al., *Cognitive Deficits in Olivopontocerebellar Atrophy*, Ann. Neurol., Aug. 1988, 24(2) at 200; memory impairment, *see* HE 140 at 134; impaired self-awareness, lack of insight into one's own poor social judgement and behavior—and its impact on others—apathy, confabulation, callous unconcern, and denial of one's difficulties, s*ee generally* George P. Prigatano, *Disturbances of Self-Awareness of Deficit After Traumatic Brain Injury*, in *Awareness of Deficit After Brain Injury: Clinical and Theoretical Issues* 111 (1991); 1984, Donald T. Stuss

and D. Frank Benson, *Neuropsychological Studies of the Frontal Lobe*, Psychol. Bull., Jan. 1984, 95(1) at 3.

There is no question that the evidence that Ms. Row has cerebral atrophy is in itself mitigating.  *See Porter*, 558 U.S. at 454 (recognizing brain abnormality as a mitigating factor). Evidence of brain injury is "classic mitigation evidence."  *See Correll*, 539 F.3d at 950.  "More than any other singular factor, mental defects have been respected as a reason for leniency in our criminal justice system."  *Caro II*, 280 F.3d at 1258.

The very existence of neurological problems may serve as mitigation at sentencing by eliciting sympathy from the sentencer for someone who suffers from a serious disability that affects every aspect of their life.  *See Douglas*, 316 F.3d at 1090; *see also Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995) (holding that mental health evidence could be mitigating at the penalty phase even though it is insufficient to establish a legal defense to conviction in the guilt phase).  While Ms. Row's brain injury in and of itself would not have removed from her case indications of premeditation and planning, it certainly would have broadened the sentencing court's view of her humanity and her struggles.  *See Wallace v. Stewart*, 184 F.3d 1112, 1117 & n.5 (9th Cir. 1999) ("Although the lawyer's failure to develop and relay medical evidence did not constitute ineffective assistance at the guilt phase, we concluded that sentencing—where mitigation evidence may well be the key to avoiding the death penalty—is different."); *id.* ("[A]ll potentially mitigating evidence is relevant at the sentencing phase of a death case, so a troubled childhood and mental problems may help even if they don't rise to a specific, technically-defined level.").

### b.  The Mitigating Effect of Etiology

The etiology of Ms. Row's atrophy is a substantial mitigating theme both because it further supports the fact that Ms. Row has brain damage and because it demonstrates the consequences of that brain damage.

### i.  Mitigating Effect of Childhood Development

Dysfunction in Ms. Row's family history and the physical conditions she grew up in are intertwined with her brain atrophy.  Traditional mitigation issues such as poverty and abuse serve to exacerbate and complicate neurological and neuropsychological development.  Dkt. 707 at 17. Developmental issues, such as enuresis (i.e., involuntary urination), also play a role in documenting etiology.  *See e.g.*, Alexander von Gontard, et. al., *Neuromotor Dev. in Nocturnal Enuresis*, Developmental Med. and Child Neurology, Sept. 2006, 48(9); Marjo Riitta Jarvelin, *Developmental History and Neurological Findings in Enuretic Children*, Developmental Med. and Child Neurology, Dec. 1989, 31(6).

Ms. Row has a clearly established developmental history of enuresis.  The frontal lobes are critical to developing the necessary physical skills in children to remain continent during the nighttime hours; and the frontal lobes are slow to mature.  Dkt. 707 at 96.  While stress and anxiety may aggravate enuresis, both Dr. Merikangas and Dr. Mark Greenberg testified that in Ms. Row's case, it had the "hallmark of a . . . developmental neurological anomaly."  *Id.* at 98; *see id.* at 18.  Ms. Row's sister Terry, who is sixteen months younger, recalled that Ms. Row's enuresis continued well into their teenage years.  Dkt. 704 at 9; *accord* HE 3, Tab 137 at 19 (medical records from 1971 indicating that Ms. Row had nocturia, i.e., excessive urination at night); HE 3, Tab 88 at 2; HE 3, Tab 93 at 3; HE 3, Tab 94 at 6.

Terry also testified to trauma Ms. Row sustained as a child, in particular, several head injuries. She recalled pushing Ms. Row down the stairs when she was six or seven years old. Dkt. 704 at 10. Terry also testified that their mother had to help Ms. Row get up and that she was "dazed." *Id.* On another occasion, when Ms. Row was approximately eleven years old, Terry threw a "hunk of a 2x4" at Ms. Row, resulting in a "big gash" on the side of her head which required stitches. *Id.* at 10–11; HE 3, Tab 233 at 3.

Ms. Row also was a victim of and bore witness to violence in her home; this type of trauma, both as a victim and a witness, impacts brain development. *See e.g.*, Schalinski, *Defining the Impact of Childhood Adversities on Cognitive Deficits in Psychosis: An Exploratory Analysis*, Schizophrenia Research (2017); Christian Pietrek, et. al., *Childhood Adversities in Relation to Psychiatric Disorders,* Psychiatric Research, 206 at 103-110 (2012); Bessel A. van der Kolk, *Development Trauma Disorder: Toward a Rational Diagnosis for Children With Complex Trauma History*, Psychiatric Annals, 35(5) at 401-08 (2005).

The violence started with the relationship between Ms. Row's parents, Ginny and Gus. Gus's brother recalled that he "was in trouble since he was born." HE 3, Tab 177 at 1. Relatives recall that he was fourteen when he got in trouble for stealing a vehicle. *Id.* at 1–2. Early criminal records document Gus's arrest in 1955 for breaking and entering at the age of fifteen. HE 3, Tab 216 at 13. Gus and Ginny were married in February 1957; Gus was seventeen years old and Ginny had just turned sixteen. HE 3, Tab 100 at 359. Ginny was already two months pregnant with her first child, Ms. Row. By all accounts, the marriage was normal at first, but then Gus started to gamble and use drugs, stealing from everyone to support these habits. HE 3, Tab 177 at 2; HE 3, Tab 221 at 59. "He wanted to drink and spend all of his money and steal."

HE 3, Tab 179 at 2.  At times, Ginny had to turn to the neighbors for help with food and money.
HE 3, Tab 173 at 2.

In July 1961, when Gus, Ginny and a then-three-year-old Ms. Row were living in
Pepperell, Massachusetts, Gus embezzled money from his employer, a local dairy farm.  HE 3,
Tab 218 at 65, 83.  Gus worked at the dairy farm as a delivery driver.  *Id.* at 69.  The manager of
the dairy farm reported to police that he had checked with Gus's mother who told him that Gus
and his family "had taken off for parts unknown" in California.  *Id.* at 65, 71.  Ultimately, Gus's
brother smoothed things over and arranged for Gus to make restitution; by then, Gus had lost the
money—$674—"playing the horses at Rockingham."  *Id.* at 66; *see also* HE 3, Tab 223 at 3.
When the family returned from California, they relocated to Front Street in Nashua, and Gus was
again on the radar of the Nashua Police Department, this time suspected in a burglary.  HE 3,
Tab 218 at 98; HE 3, Tab 223 at 3.  A neighbor on Front Street, and friend of Ginny, recalled
that Gus was a verbally abusive drunk.  HE 3, Tab 173 at 2.  Extended family recalled an
occasion where Gus went over to Ginny's mother's house and physically attacked Ginny.  HE 3,
Tab 176 at 2.  During the altercation he pulled the phone off the wall with the intention of
choking Ginny.  *Id.*  Terry recalled that there was "a lot of tension in the house . . . my father was
an alcoholic and there was a lot of fighting between them.  I remember my father slapping my
mother across the face.  My dad also ran around and saw other women."  HE 3, Tab 233 at 2.

Shortly before their divorce, in November 1968, Ginny called the police because Gus was
trying to break into their home.  HE 3, Tab 218 at 63.  The police showed up and found Gus
hiding on the floor of one of the bedrooms in the house next door, where Ginny's mother lived.
*Id.*  Gus was charged with malicious damage for breaking a door at Ginny's mother's house.  HE
3, Tab 213 at 577.  The Cornellier's divorced in December 1968, and the cause was listed as

"treatment as seriously to injure health."  HE 3, Tab 100 at 360.  The divorce was bitter; Terry

recalled that there was "a lot of fighting in the courtroom.  My mother brought in witnesses and

it was really a nasty divorce.  My mom won custody.  I was kind of happy my father was leaving

because there was just so much fighting at the house."  HE 3, Tab 233 at 2.

      Gus repeatedly continued to show up at the home after the divorce.  *See e.g.*, HE 3, Tab

218 at 8 (indicating that Gus was arrested at the house for larceny and faked a fainting spell); *id.*

at 9–10 (indicating that Gus was arrested at the house for drunkenness and for assaulting a police

officer); HE 3, Tab 208 at 176 (indicating that Gus was found at the home with the kitchen in

disarray and a shotgun in his hands); HE 3, Tab 233 at 2 (Terry describing Gus coming over "to

pick a fight with mom" and how "it might [take] 5 or 6 cops to drag him out"); HE 3, Tab 94 at 3

(Ms. Row's uncle recounting how Gus would come home "trying to break down the door to his

family's house, screaming and yelling" while "visibly intoxicated," and how "five or six police

officers had to restrain Mr. Cornellier while he shoved and kicked and punched at" them).

      Gus's continual involvement with law enforcement during Ms. Row's childhood can best

be illustrated by his 1982 commitment history from the Massachusetts Department of

Corrections.  Gus had appeared in court nine times since 1963—when Ms. Row was six—to face

thirteen charges including several charges of armed robbery.  HE 3, Tab 216 at 52.  Before Ms.

Row turned eighteen, Gus's criminal history included charges for armed robbery, assaulting an

officer, drunk driving, and intoxication, all within a ten year period.  *Id.* at 86–87.

Eventually Gus's criminal behavior culminated in a robbery and murder in 1975.  HE 3, Tab 177

at 3.  As Gus's brother recounted, "I think [Ms. Row's] mind was lost when her father did that."

*Id.*  The brother later stated that Ms. Row and her siblings were "ostracized and picked on

mercilessly by the other kids at school" because of what Gus had done.  *Id.*  Ms. Row's brother

Kevin recalled that he felt a feeling of dread about his father, remembering the incidents when his father would barge into their house and the police would drag him away.  HE 3, Tab 92 at 1.

It is clear that once in prison, Gus's mental health deterioration began to be noticed and documented.  Gus started to claim that he did not know his relatives or that he was fathered by someone else.  HE 3, Tab 179 at 3; HE 3, Tab 177 at 3; HE 3, Tab 178 at 3.  He also made up fantastical stories, telling people that he had once been married to the country singer Barbara Mandrell.  HE 3, Tab 179 at 3.  Gus's psychosis and delusions are also peppered throughout his prison records, providing social-history evidence that could have been presented as corroboration of Ms. Row's brain atrophy.  *See, e.g.*, HE 3, Tab 207 at 38 (going "off on a tangent about people being branded, being part of the devil"); *id.* at 154 (paranoid delusions of his children's murder, international conspiracy and implanted monitoring devices on his head); *id.* at 155 ("Seen expressing paranoid delusions about commissioner, warden, all state police, guards (and even me) involved in massive conspiracy to kill his children and some (he won't name) already murdered."); *id.* at 393 ("presented himself as agitated, with quite an elaborate delusional system" including "persecutory and grandiose delusions"); *id.* at 400 (saying that he was "God and the Anti-Christ and could raise people from the dead."); HE 3, Tab 208 at 66 ("During these periods he becomes extremely delusional with grandiose hallucinations and often acts in a threatening aggressive manner."); *id.* at 361 (at the time of interview quite delusional); *id.* at 393 ("appears to have had fixed grandiose, omnipotent delusions since he has been under observation"); *id.* at 429 ("This inmate has been observed using the toilet to bless the masses of his followers.  When I last observed him he was sitting rigidly staring at the wall unable or unwilling to communicate . . . ."); *id.* at 430 ("his responses were given from his delusional preoccupation.  Went into comments about how the mafia had killed his daughter."); *id.* at 431

("claiming to be 'Charles Augustus, Emperor of the Roman Empire'"); *id.* at 435 ("Exhibiting psychotic symptomology, i.e., hallucinating and delusional with grandiose ideations."); HE 3, Tab 209 at 133 ("During that assessment it was evident that he was delusional, paranoid and somewhat out of touch with reality."); *id.* at 136 ("He remains psychotic—experiencing both hallucinations and delusions from time to time.").[42]

Ms. Row also experienced sexual trauma as a child and young teen, which is relevant here because such abuse can "impede brain development."  Dkt. 707 at 17.  The PSI contains a self-reported narrative of the sexual abuse by Ms. Row's step-grandfather.  HE 15 at 8.  The abuse started as inappropriate touching when Ms. Row was approximately six or seven years old and progressed in Ms. Row's early adolescence when she was twelve years old to full sexual intercourse.  *Id.* at 8–9.  The evidence that Ms. Row was sexually molested by her step-grandfather is supported by her sister Terry who experienced molestation by the same man in a similar pattern.  She was approached by him first at the age of eight and the molestation continued until she was eleven.  *See* HE 3, Tab 233 at 4.  Terry recalled that her grandfather would force her to perform a sexual act on him, and then he would touch her breasts.  *Id.*

There are additional social-history factors that fill out the picture of Ms. Row's childhood development—poverty, neglect, family etiology of mental health issues—all of these being present in Ms. Row's social history.  Childhood friends recall that the Front Street home was "dirty, smelly, and untidy."  HE 3, Tab 225 at 3.  One such friend recounted:

> The Cornellier home was filthy and disgusting.  Laundry was piled all over the place.  There were mattresses on the bedroom floors, a bathroom with no sink and a curtain for a door.  They had cats all over the place and it smelled of kitty litter.

---

[42] In the years prior to Gus's death in 2014, his medical records reflect an increasing decline into dementia.  *See* HE 3, Tabs 211–13.  There are also several CT scans that indicate that Gus had moderate central and cortical atrophy, and mild cerebral atrophy.  *See* HE 3, Tab 212 at 2308, 2314, 2319, 2471, 2613, 2639, 2700.  Gus was also demonstrating psychotic symptoms at times. *Id.* at 2409; *see also* HE 3, Tab 213 at 524, 529.

> Robin seemed embarrassed about this and tried her best to clean up but it was an impossible job.

HE 3, Tab 230 at 4. Youth Services records contemporaneous to that time note "the Cornelliers live in a five room apartment on a commercial street in Nashua, directly across the street from some of the major factories. The home is ill-kept and the furnishings worn." HE 3, Tab 137 at 10. Youth Services records also note other signs of poverty and neglect. *See id* at 6, 8 (Ms. Row presenting with "mildly decayed teeth" and "poor teeth"); *id.* at 28 (Ms. Row having "scars all over body").

Other extended family members also suffered from mental health and neurological issues. Ms. Row's sister was diagnosed with multiple sclerosis in 1989 when she was thirty-two years old. HE 3, Tab 88 at 2. Ms. Row's grandmother died from a brain aneurysm. HE 3, Tab 228 at 2. Another cousin committed suicide and numerous family members suffer from depression. *Id.* at 2–3; HE 3, Tab 223 at 4.

Ms. Row's history—as a witness to, and victim of, trauma, neglect, and sexual abuse—is relevant as mitigation in its own right. It is of particular relevance here, though to show factors that helped cause and exacerbate the brain atrophy, and that demonstrate the atrophy's existence and its effect on her life. *See Sochor v. State*, 883 So. 2d 766, 797 (Fla. 2004).

### ii. Mitigating Effect of Environmental Exposure

Dr. Merikangas testified that because Ms. Row grew up in "one of the most toxic places to be" "there was the possibility that she may have had a toxic exposure that caused some of the brain problems." Dkt. 707 at 17. Therefore, the pollution around her childhood home is pertinent here. *Cf. Douglas*, 316 F.3d at 1091 (finding prejudice where an expert could have "provided a valuable explanation of other mitigating evidence by explaining how the effects of"

toxins the defendant was subjected to and a car crash "may have exacerbated [the defendant's] pre-existing neurological deficit").

Ms. Row spent much of her childhood in close proximity to significant environmental toxins.  *See* HE 3, Tab 137 at 30 (1973 records noting that the family lived in a commercial area of Nashua).  The Front Street apartment where Ms. Row grew up was just feet from the river, in the heart of Nashua's industrial hub.  One witness recalls that the neighborhood was "a very industrial area with mills, factories and parking lots, criss-crossed by railroad tracks.  There was just a very small cluster of homes, which included ours, the Cornelliers, and Robin's grandmother and stepgrandfather."  HE 3, Tab 226 at 1.  Ms. Row's sister Terry testified that their house was literally surrounded by factories with the Nashua River flowing right behind the backyard.  Dkt. 704 at 6.[43]  A former neighbor indicated just how close the houses were to the Nashua River—her child drowned in the river while playing in the driveway, which was actually a former boat ramp to the river.  HE 3, Tab 173 at 1; *see also* HE 3, Tab 174 at 3.

---

[43] When Terry was testifying at the *Martinez* hearing, it was evident that she was suffering from her own neurological health issues—unable to stand up from her wheelchair to take the oath, or stop her hands from shaking long enough to reach for a glass of water.  Dkt. 704, at 3–23.

Petitioner's Replacement Post-Hearing Opening Brief – 71



*See* Cornellier Family Home (red arrow indicating site of former Cornellier home).

Across the river from their home was Irwin Toys, a plastic toy manufacturing plant, and an old textile mill.  Dkt. 704 at 6–7.  There was also a tannery down the road from the house, which drained into the Nashua River.  *Id.* at 7.  Terry testified that they did not fish or swim in the river; it was just too polluted.  *Id.* at 7–8.  The water in the river was "slimy and kind of greenish," and it would overflow into the backyard at least once a year and remain flooded for three to four weeks.  *Id.* at 8.



 Irwin Toys (plastic toy manufacturer, 419 feet from the Cornellier home)[44]

 The Cornellier Home

 Nashua Manufacturing Company (textile mill, at its closest point, 377 feet from the Cornellier home)

 Mohawk Tannery (designated Superfund Site, 4,414 feet from the Cornellier home)

 Railroad Tracks (299 feet from the Cornellier home)

Ms. Row moved into the duplex in 1965 and lived there through her teenage and young

adult years when it was legal for factories and sewage plants to dump toxins and feces into the

---

[44] The information demonstrated in the map is all drawn from publically available information. *See* Google Map of Area Surrounding Cornellier Home; Irwin Toys; Nashua Manufacturing Company Site Map; Information Regarding Nashua Manufacturing Company; Mohawk Tannery Superfund; Mohawk Tannery Site Map.

Petitioner's Replacement Post-Hearing Opening Brief – 73

air and water.[45]  The duplex has since been torn down.  But to this day, the brick factories that surrounded it still rise high above both riverbanks.



*See*  https://publicradio1-wpengine.netdna-ssl.com/newscut/files/2013/09/nashua_river.jpg.    The dire condition of the river during the 1960s and 1970s was well-documented by magazines, newspapers, environmentalists, and government regulators.  For instance:

- National Geographic Magazine, in a special Water edition, noted that the river was so polluted in the 1960s that "its fumes blackened paint on nearby buildings," and described how local residents used to "bet on whether it was going to be red, orange, blue, green, or white the next day," depending on what was being discharged.  HE 3, Tab 206 at 2–3, 13–15.

- A government study reported how the river was classified as "dead" in the 1960s, deprived of so much oxygen that at times sludge worms were the highest forms of life, and thousands of fish turned up dead along the riverbanks.  *See* Pollution of Nashua River and Recommendations for Improvement, Merrimack River Project, U.S. Dep't of Health Educ., and Welfare (1965).

- Other publications recalled the river being so trashed by pulp and sewage, it was "too thick to pour, too thin to plow."  *See* George Snell, *Nashua back to life, but needs attention*, Sunday Telegram Worcester, MA, Nov. 21, 1993, at B1.

Similar to the circumstances of Ms. Row's social history, her exposure to toxins during childhood and its connection to neurological development is relevant mitigating evidence whose absence was prejudicial in the penalty phase of Ms. Row's case.  Exposure to environmental

---

[45] The EPA was not established until 1970, *see* United States Environmental Protection Agency, and the Clean Water Act was not passed until 1972, *see* Clean Water Act.

toxins lends support to and strengthens the weight of the mitigating evidence of brain injury.  In addition, the physical environment that Ms. Row grew up surrounded by also adds independent weight as mitigating, giving broader depth to the social-history picture in Ms. Row's case.

### c. Mitigating Effect of the Neuropsychological Outcome of Frontal Lobe Impairment

The critical dimension of brain atrophy is the impact that it has on neuropsychological functioning.  The best way to measure that impact is through neuropsychological testing.  Dkt. 707 at 36; *see* Dkt. 704 at 60 (testimony of Dr. Moore that "one would do additional assessment to see the impact of that finding.  So it might be the neuroimaging studies like SPECT and PET.[46]  It might be neuropsych testing.").  The impact caused by any type of brain trauma or hypoplasia is unique to the individual—every symptom of or deficit in executive and emotional functioning will not manifest the same way in each individual.  Dkt. 707 at 36–37.  The neuropsychological testing that was conducted in Ms. Row's case revealed that she demonstrated significant deficits in twenty percent of the scorable parameters of her testing.  *Id.* at 76.  Additionally, the testing indicated that there was a significant and meaningful pattern to the deficits—a pattern indicative of frontal lobe dysfunction.  *Id.* at 77.

The frontal lobes of the brain comprise approximately forty percent of the brain's volume and control a myriad of functions.  *Id.*  Among some of the functions, the frontal lobes implicate decision-making, control behavior, and command motor activity.  *Id.* at 78–79.  There is a critical nexus between the frontal lobe and the cerebellum—where Ms. Row's brain abnormality is located.  As Dr. Greenberg testified,

> the cerebellum is informing the frontal lobe, and the frontal lobe is informing the cerebellum, which is why when you have cerebellum damage, you can see—the functional consequence is as if the damage was in the frontal lobe itself because it's been cut off and deprived from its input.  The channels of communication have

---

[46] PET is short for positron emission tomography.

been degraded, and, therefore, it's an apparent frontal lobe syndrome caused by a distant lesion based on the anatomical pathways.

*Id.* at 81.

Among the characteristics of frontal lobe dysfunction are impaired self-regulation, poor decision-making, impaired judgment, impaired insight, inability to match behavior with the requirements of the environment, impulsivity, perseveration, and problems with planning and integrating information. *Id.* at 82–83. Frontal lobe dysfunction can also impact an individual's emotions, causing "fleeting and intense emotional reactions" and wild fluctuations in emotion. *Id.* at 83–84;[47] *see* Dkt. 704 at 135 (Dr. Moore agreeing that aspects of frontal lobe functioning include judgment skills, decision-making skills, and that impairments in the frontal lobe cause pathologies of emotional expression including inappropriate or labile affect).

Ms. Row's neuropsychological testing indicated a diminished ability to plan and organize. As Dr. Greenberg testified, this does not mean Ms. Row could not plan; rather, it means that her planning function was "vulnerable." Dkt. 707 at 83–84. For example, it causes

---

[47] There is a dynamic range of behavioral changes that can be observed in the clinical picture of a frontal lobe syndrome:

> Some of these patients become puerile, profane, slovenly, facetious, grandiose, and irascible; others lose spontaneity, curiosity, and initiative and develop an apathetic blunting of feeling, drive, mentation, and behavior; others show an erosion of foresight, judgment, and insight, and lose the ability to delay gratification and often the capacity for remorse; still others show an impairment of abstract reasoning, creativity, problem solving, and mental flexibility, and become excessively concrete or stimulus bound. The orderly planning and sequencing of complex behaviors, strategic decision making based on the assessment of differential risks, the ability to heed several events simultaneously and flexibly shift the focus of concentration from one to the other, the capacity for grasping the context and gist of a complex situation, the resistance to distraction and interference, the ability to follow multistep instructions, the inhibition of immediate but inappropriate response tendencies, and the ability to sustain behavioral output without perseveration may each become markedly disrupted.

M. Marcel Mesulam, *Principles of Behavioral and Cognitive Neurology*, 42 (2d Ed. 2000).

abnormal planning and a failure to think through how to approach a problem.  *Id.* at 94.  Ms.

Row's testing also indicated inflexibility in thinking and impaired strategies.  *Id.* at 84.

Specifically, Ms. Row demonstrated marked impairments in her "flexibility, problem-solving,

response to feedback, being able to learn on the fly, [and] being able to adapt to new . . . input."

*Id.* at 88.  This impairment included being unable to learn from past behavior.  *Id.*

Ms. Row consistently demonstrated the sort of poor decision-making, lack of insight, and

confabulation that is often associated with those suffering from cerebral atrophy.  One hallmark

of this was her continual fabrication of easily disproved stories about her life.  For instance, in

regards to another criminal charge for grand theft in 1981, Ms. Row falsely told the victim that

she needed the money for cancer treatment, naming specific doctors that she said were treating

her.  HE 15 at 40, 44–45.  Even facing capital murder charges, Ms. Row continued to perpetuate

easily disproved stories.  During her interrogation, Ms. Row told Detective Gary Raney that she

was pulled out of the fire that killed her son in California by an emergency technician, just as the

building collapsed, and that she was hospitalized for burns and smoke inhalation.  Dkt. 704 at

171; *see* HE 1094 at 70; HE 15 at 180.  Ms. Row's story was disproved in a single phone call to

the California officer on the case, Chuck Sanborn, who related that she spent no time in the

hospital and suffered no injuries.  HE 15 at 136–37.

Detective Raney's investigation documented many of the bizarre stories that Ms. Row

perpetuated.  One story involved Ms. Row creating a fictional pregnancy involving twins.  HE 15

at 176, 178, 181, 182.  Ms. Row created a fantastical story that the twins were in intensive care

after having been born prematurely.  *Id.* at 82, 176.  She told people that one twin died upon

delivery and that the other was in neo-natal intensive care, subsequently dying two weeks later.

*Id.*  Ms. Row recounted various iterations of this story to different individuals.  *See* HE 3, Tab

151 at 3-4; HE 3, Tab 154 at 4; HE 3, Tab 156 at 2; HE 3, Tab 157 at 3; HE 3, Tab 159 at 3; HE

3, Tab 160 at 4-5; HE 3, Tab 163 at 1.  Laura Taylor, one of Ms. Row's former coworkers,

observed that "Robin would tell a story about something one day, and the next day tell a different

story about the same thing."  HE 3, Tab 165 at 2.  Ms. Taylor thought the twin story was

particularly strange because it so directly mirrored an experience which Ms. Taylor herself had

gone through.  HE 15 at 176.  She called the hospital that Ms. Row went to and found out that

there was no record of the births; there was also no record of the twins being buried in the

cemetery Ms. Row told everyone that they were buried in.  *Id.*

Roy Williams, a short-term boyfriend of Ms. Row from the early 1980s, recalled that Ms.

Row told him she was a secret agent who was investigating the Trinity County Sheriff's Office.

Dkt. 703 at 122–23; HE 15 at 177; *see* Dkt. 704 at 174 (testimony of Detective Raney that Ms.

Row told witnesses that she had been a secret government agent).  When Mr. Williams was

interviewed by Detective Raney in 1993, he related that Ms. Row told him that going to jail was

all a part of her investigation and that she would be seeking information on the Sheriff's Office

from inside the jail.  HE 15 at 177.

In 1980, Ms. Row reported to Sergeant Sanborn that she was being threatened by a man

in a yellow Volkswagen whose attack she survived after he raped and murdered five other

women.  *Id.* at 87.  Sergeant Sanborn and his office immediately began to investigate, contacting

law enforcement in New Hampshire, and "within a day" had learned that no such case existed.

*Id.*  Ms. Row told this story to other individuals with slight variations.  *See id.* at 179 (perpetrator

hit her in the head with a rock and she was in a coma for three months).  Ms. Row also fabricated

numerous other stories which could have been easily disproven.  *See e.g.*, HE 15 at 139

(interview with Kathy Austin relating that Ms. Row told her she grew up with a considerable

amount of money that her father gambled away); *id.* at 141 (telling friends that Randy had been arrested for battery); *id.* at 141–42 (telling friends of Randy that he had hit her in the side of the head while Randy told the same friends that Ms. Row had informed him that a man at the YMCA had hit Ms. Row in the head); *id.* at 144 (wearing bandages one day that would be gone the next); HE 3, Tab 97 at 2 (telling friends that the reason her father was in prison was because he had killed her grandfather).

The crux of all of Ms. Row's storytelling is that her stories could be easily disproved. Simple phone calls to hospitals or police departments, often made by lay people, quickly verified that her stories were exaggerations of the truth or utter fabrications.  The stories were not well-planned or choreographed; they were scattered and ever-changing.

Ms. Row's propensity for bad planning and bad decision-making was also seen even after her arrest.  Detective Raney testified that Ms. Row made over ninety collect calls to Joan McHugh in the span of two months, making inculpatory statements on those calls, even though it was clear that they were being monitored.  Dkt. 704 at 169–70; *see also* Dkt. 19, A-03 at 117–20, 131.

The combined impact of Ms. Row's neuropsychological impairments—reflecting repeated instances of failure to learn; inability to understand real consequences and outcomes of behavior; and lability in affect—would have influenced the trial court's appraisal of Ms. Row's culpability.  The mitigating evidence introduced through Dr. Merikangas and Dr. Greenberg would have "reduce[d] the volitional nature of the crime, as well as [Ms. Row's] ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor."  *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011).  Undoubtedly, this mental health evidence, even if challenged, would have been relevant as

mitigating evidence and its absence from Ms. Row's penalty phase resulted in substantial prejudice.

### 2.   Rebuttal of Aggravation

In making a determination with respect to prejudice, the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—must be reweighed against the evidence in aggravation. *Porter*, 558 U.S. at 41.  It is clear that the neuropsychological impairments that flowed from Ms. Row's brain damage also would have weakened the aggravating circumstances in Ms. Row's case by defeating the devastating ASPD label as well as reducing the aggravating force of evidence that the crime was planned, evidence of prior crimes, evidence of inappropriate affect, and evidence on the brutality of the offense.  *See Ferrell*, 640 F.3d at 1234–35 (finding prejudice where "organic brain damage to [the defendant's] frontal lobe has led to impaired insight, impaired judgment, increased impulsiveness and explosiveness, emotional and mental dysfunctions, decreased ability to plan and understand consequences, and inability to process information in stressful situations").

Before addressing the specific areas of aggravation here, it should be born in mind that prejudice can be found even in the face of a substantial amount of aggravation, including cases where the defendant killed a spouse and several children, *see Smith*, 379 F.3d at 941–44, as well as other highly aggravated situations, *see Williams*, 529 U.S. at 368 (finding prejudice despite the fact that the defendant committed two prior attacks upon elderly victims—including a woman he beat into a coma—stabbed a man during another robbery, and set fire to a residence and a city jail, all in separate events); *Rompilla*, 545 U.S. at 383 (finding prejudice despite a lengthy history of violent and brutal crimes); *Douglas*, 316 F.3d at 1091 (noting "the gruesome nature of the killing did not necessarily mean the death penalty was unavoidable" where defendant raped,

tortured, and killed two teenage girls and buried them in the desert); *Hovey*, 458 F.3d at 898, 930 (defendant abducted and killed eight-year old girl, inflicted numerous skull fractures and laceration wounds); *Smith v. Stewart*, 189 F.3d 1004, 1006, 1013–14 (9th Cir. 1999) (defendant raped two women, then stabbed both repeatedly and punctured them with needles; bound them with rope, forced dirt in their mouths, which were then taped shut; left them naked in the desert to die).

The famous Susan Smith case from South Carolina demonstrates that a death sentence for Ms. Row was not inevitable. As in Ms. Row's case, Ms. Smith was convicted of killing her two children in the mid-1990s, painted by the prosecution as doing so "to improve her romantic chances with a lover," and "excoriated as a scheming liar." Elizabeth Rappaport, *Mad Women and Desperate Girls: Infanticide and Child Murder in Law and Myth*, 33 Fordham Urb. L.J. 527, 561 (2006). Unlike Ms. Row, however, Ms. Smith had competent attorneys who found and presented the mental health mitigation that was available, which led a jury to vote against death by an eleven to one margin. *See* Melinda E. O'Neil, *The Gender Gap Argument: Exploring the Disparity of Sentencing Women to Death*, 25 New Eng. J. on Crim. & Civ. Confinement 213, 229–30, 233 (1999). With capable attorneys, brain damage could likewise have saved Ms. Row's life. It is notable in the same regard that "[m]en arrested for murder are six times more likely to be sentenced to death than are women arrested for murder," Steven F. Shatz & Naomi R. Shatz, *Chivalry is Not Dead: Murder, Gender, and the Death Penalty*, 27 Berkeley J. Gender L. & Jus. 64, 84 (2012), further proving that Ms. Row's case was not a hopeless one and that a life sentence was within reach. Indeed, the prosecution in Ms. Row's own case offered her a plea deal for second-degree murder, *see* HE 22 at 44, an indication that even the State did not feel that a death sentence was the only acceptable result, *see Summerlin*, 427 F.3d at 641 (finding

prejudice where a plea agreement for second-degree murder showed that it "was not a clear-cut capital case").

### a. Rebuttal of Antisocial Personality Disorder

At sentencing, the State invoked Ms. Row's alleged ASPD as an aggravating factor, *see* HE 20 at 3979–80, and the trial court agreed, *see* HE 20 at 4050, 4054.  Nonetheless, Ms. Row has never been formally diagnosed with ASPD by a single clinician.  Dr. Norman did not testify at Ms. Row's trial that he was diagnosing her with ASPD.  *See generally* HE 20 at 3831–3909.  In fact, he specifically testified that Ms. Row did not have a "sociopathic disorder."  *Id.* at 3901.  Dr. Engle, the State's rebuttal expert, likewise never testified that he was diagnosing Ms. Row with ASPD; in fact, he specifically disavowed making a diagnosis.  *See id.* at 3920 (testing results indicative of antisocial personality traits); *id.* ("working hypothesis"); *id.* at 3922 ("I did not have a diagnosis. . . .").  Similarly, although Dr. Beaver had concerns about ASPD, that was not his diagnosis, but rather a preliminary impression.  *See* Dkt. 703 at 149, 163, 177; Dkt. 19, B-12 at 113–32; HE 114 at 1.[48]  And even the impression is reflective of Dr. Beaver's limited role in the case and the incomplete information given to him by trial counsel.  *See supra* at 23–25, 30–37.

Contrary to cross-examination by the State at the *Martinez* hearing, *see* Dkt. 701 at 89, the 1993 imaging report of Dr. Giles does not reference ASPD.  *See* HE 3, Tab 6.  And even if it had, as noted by Dr. Kowell in his deposition, a "radiologist is not the treating clinician; the

---

[48] Despite the State's repeated use of the word "diagnosis" in referring to ASPD at the *Martinez* hearing, *see, e.g.*, Dkt. 701 at 88; Dkt. 703 at 24, there is a world of difference between the use of the word "impression" and the use of the word "diagnosis" in the field of medicine and psychology.  An "impression" is an initial opinion of the clinician upon presentation of the patient; a diagnosis is the final opinion of the clinician and is used as the basis for treatment.  *See Graham v. Cook*, 682 S.E.2d 535, 541 (Va. 2009); *see also Monaco v. Hogan*, No. 1:98-cv-3386, 2016 WL 1322431, at *11 n.11 (E.D.N.Y. March 31, 2016).

radiologist just interpret[s] the study." Dkt. 713 at 56.  With regard to Dr. Charles Steuart, the

doctor at the Ada County Jail, his unsigned discharge report from the 1993 suicide attempt again

simply notes, without comment or explanation, an "impression" of ASPD.  HE 5 at 72.  Neither

of Ms. Row's own experts at the *Martinez* hearing diagnosed her as having ASPD.  Dr. Kowell

did not address this question.  *See generally* HE 1000; Dkt. 714; Dkt. 705 at 3–35.  Dr. Moore

stated in his report that there was evidence that Ms. Row had a personality disorder with

"antisocial . . . features."  HE 1001 at 14.  When asked by the State what evidence in Ms. Row's

case was "consistent with" ASPD, Dr. Moore's affirmative answer was based entirely on "all the

crimes that she either has been convicted of or in some cases suspected of . . . ."  Dkt 704 at 112.

Dr. Moore himself did not diagnosis Ms. Row with ASPD.

A diagnosis of ASPD is a grave detriment to capital defense practitioners: it is highly

prejudicial and often goes hand-in-hand with the label of sociopath or psychopath.  Such labels

are equated with "'wickedness' and 'evil,'" and create an "implication that psychopathic

individuals are subhuman."  Kathleen Wayland & Sean D. O'Brien, *Deconstructing Antisocial*

*Personality Disorder and Psychopathy: A Guidelines-Based Approach to Prejudicial Psychiatric*

*Labels*, 42 Hofstra L. Rev. 519, 558 (2013).  With that description in mind, it is not hard to see

why ASPD is properly considered a powerful aggravator.  *See Atwood v. Ryan*, 870 F.3d 1033,

1065 (9th Cir. 2017) (collecting cases); *Correll*, 539 F.3d at 963 (same); *accord Looney v. State*,

941 So. 2d 1017, 1028–29 (Fla. 2006).

Because ASPD is so aggravating, it was essential for state defense counsel to neutralize

it.  The label was vulnerable to attack from the outset because, as noted, Ms. Row had never

actually been given a diagnosis of the disorder.  And such an attack would have been highly

effective if it had utilized the available brain damage evidence.  Brain damage takes primacy

over ASPD.  That is, if someone has brain damage, it rules out ASPD.  *See* Dkt. 703 at 154; HE 1 at 12.  Accordingly, the brain damage evidence would have taken the extremely pejorative descriptor of ASPD off the table and would have replaced it with a classic mitigator.  Because state defense counsel failed to do so, Ms. Row was "left mainly with a diagnosis of antisocial personality disorder, which is not mitigating but damaging."  *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1368 (11th Cir. 2009); *accord Haliym v. Mitchell*, 492 F.3d 680, 718–19 & 719 n.31 (6th Cir. 2007) (granting sentencing relief where counsel presented evidence that the defendant had ASPD instead of available evidence that brain damage explained the same behaviors).

### b.  Rebuttal of Planning and Prior Misconduct

At sentencing, the prosecution emphasized the aggravating nature of evidence that Ms. Row was a supposedly skillful criminal planner, both with respect to the charged homicides and also her prior offenses.  *See, e.g.*, HE 20 at 3953–63, 4025, 4026, 4030.  As an initial matter, Ms. Row can satisfy the prejudice standard without demonstrating that her brain damage negated any premeditation inherent in the crime, simply by virtue of the fact that such a condition is powerfully mitigating on its own.  *See supra* at 63–64; *see also Frazier v. Huffman*, 343 F.3d 780, 798 (6th Cir. 2003) (reversing a district court after it found that evidence of deliberation and forethought foreclosed relief on a similar claim because such an analysis "does not account for the probability that the jury would find that a murderer who suffers from a functional brain impairment is less morally culpable than one who does not, even if the brain impairment did not 'cause'" the murder).

In the same vein, assuming arguendo that the brain damage does not defeat evidence of planning, it still pushes back against the aggravation of the crime in important respects.  Dr.

Petitioner's Replacement Post-Hearing Opening Brief – 84

Merikangas concluded that Ms. Row's brain damage "has the probable neuropsychiatric outcome of reducing [her] ability to control her behavior and under conditions of emotional distress may have affected her ability to appreciate the wrongfulness of her behavior." Ex 1 at 9; *accord* Dkt. 707 at 49. That could have helped explain to the sentencing court that Ms. Row's violent conduct stemmed in large measure from her brain damage, *regardless* of whether or not she planned the murders. *See Lockett*, 230 F.3d at 715–16 (finding prejudice despite the "undeniable gravity, cruelty and deliberateness of the crimes" because unpresented evidence of brain damage "tended to explain [the defendant's] violent conduct and made him less able to control his behavior than a normal person" and "a reasonable juror could have found that his particular mental condition, which resulted from no fault of his own, made him less morally culpable for his cruel and senseless crime").

At any rate, though, the brain damage in this case *would* have been a forceful counter to the narrative created about Ms. Row by the State on the subject of premeditation. The planning evidence stressed by the State falls into several categories: that Ms. Row took out life insurance before the fire, portrayed herself as the victim of her husband's abuse, contrived an alibi that she was at her friend's house, moved all of the good furniture out of the house, and told people that her husband was going to be arrested the following Monday for kidnapping their children. *See* HE 20 at 3953–63, 4025, 4026, 4030; *see also* Dkt. 704 at 165–66. Each instance of planning could have been deconstructed if state defense counsel had performed effectively. For as discussed *supra* at 76, impairments in frontal lobe functioning do not foreclose the capacity to plan altogether. Rather, it is that the planning function is abnormal and poorly reasoned.

Taking in turn some of the State's evidence, it is not indicative of reasoned planning to move cherished and personal items out of your home into storage, in the presence of multiple

witnesses, shortly before the commission of an arson.  Doing so clearly provides circumstantial evidence of one's intent to commit a crime.  So too does the purchase of life insurance on one's victims, while listing yourself as the beneficiary shortly before you engage in the acts that bring about their deaths.  *See e.g.*, *Woods v. Henry*, No. 2:03-cv-2418, 2006 WL 403884, at *8, 12–13 (E.D. Cal. Feb. 16, 2006), *adopted by*, 2007 WL 2005087 (E.D. Cal. July 9, 2007).  Likewise, moving into a friend's house but then showing up at the scene of the crime while officers are fighting the fire on the flimsy pretext that one had a "premonition" something was wrong, HE 20 at 4046, is not evidence of ruthlessly effective scheming, but rather of profoundly impaired judgment.  Lastly, it is relevant that the State attempted at sentencing to suggest that part of Ms. Row's premeditated plot was to fake the fainting incident leading to the 1992 CT scan: the scan which was misread as normal, and portrayed by the State as normal.  *See* HE 20 at 3959.  Objective evidence that Ms. Row's brain was indeed damaged would have undermined the aggravating effect of that incident.  *See United States v. Sampson*, 820 F. Supp. 2d 202, 243 (D. Mass. 2011).

The State also accentuated Ms. Row's prior offenses at sentencing, *see* HE 20 at 3953–57, 3977–78, and the court accepted that history as aggravating, *see id.* at 4052.  But as indicated by Dr. Greenberg's findings, Ms. Row's historical misconduct reflects the "chronic pattern of self-defeating behavior" caused by her brain damage.  Dkt. 707 at 95.  Some clear examples of this can be found in the PSI.  For example, Ms. Row repeatedly stole money while at the same time appearing to almost go out of her way to make it obvious that she was the culprit.  *See* HE 15 at 32–33 (stealing a check from a friend and then writing her own driver's license number on it); HE 3, Tab 8 (stealing a check and then putting her own signature and liquor identification number on it).  Many of these crimes also reflected Ms. Row's impulsivity, which was likewise

caused by her brain damage.  *See* Dkt. 707 at 82–83.  In these several ways, brain damage could have been easily turned at sentencing to soften the aggravating force of Ms. Row's previous crimes.

In addition to her prior crimes, the State also harped at sentencing on Ms. Row's history of manipulation and deceit.  *See* HE 20 at 3959, 3963, 4016, 4025.  The sentencing court agreed that this behavior was aggravating, terming the defendant "a pathological and manipulative liar." *Id.* at 4051.  As set forth by Dr. Merikangas, though, Ms. Row's "manipulation" and "pathological lying" are "symptoms of organic brain syndrome."  HE 1 at 12; *accord* Prigatano, *supra*, at 111.  This is yet another way in which brain damage would have weakened the aggravation in the case.

### c.  Rebuttal of Inappropriate Affect

The State suggested at sentencing that Ms. Row was made more deserving of death because of the inappropriate affect that she demonstrated, laughing and making jokes while being questioned by police officers shortly after the deaths of her husband and children.  *See* HE 20 at 4023.  However, Detective Raney testified at the *Martinez* hearing that Ms. Row had a very flat affect and that "[s]he rarely showed emotion" during his interrogation of her.  Dkt. 704 at 169; *see* Dkt. 19, A-3 at 65–66.  What was aggravating about Ms. Row's affect was obviously not that it was necessarily too jovial, or too subdued.  It was rather that it was *inappropriate*. The real reason for the fluctuations, though, was Ms. Row's brain damage.  *See* Dkt. 707 at 98, 128.  This is yet another way in which the cerebral atrophy would have ameliorated the aggravation.

### d.  Rebuttal on Brutality of Crime

The trial court placed great aggravating weight on the brutality of the crime, referring to Ms. Row as a "cold-blooded, pitiless slayer" and describing her actions as the "[f]inal betrayal of motherhood."  HE 20 at 4050.  Some degree of such aggravation will inevitably be present when a mother is convicted of setting a fire that kills her husband and children.  That said, brain damage would have given state defense counsel a tool to reduce the aggravation inherent in such a crime.  As the sentencing court acknowledged, Ms. Row's marriage was "mutually abusive" and her husband "verbally abused" her.  HE 20 at 4053.  Committing murder to extricate oneself from such a situation is obviously unacceptable and unjustifiable.  It is also, though, the product of someone who has suffered serious damage to her judgment, decision-making ability, problem-solving skills, and the capacity to conform her conduct to societal norms, all of which were caused by her cerebral atrophy.  *See* Dkt. 707 at 82–83.  By focusing on Ms. Row's "betrayal of motherhood," HE 20 at 4050, the sentencing court was also calling attention to Ms. Row's lack of empathy for her own children, the people that society would most expect her to have the strongest feelings of sympathy and protectiveness for.  Cerebral atrophy played a role there too, as those afflicted with the condition "have a lack of empathy."  Dkt. 707 at 128; *accord* Prigatano, *supra*, at 111.

It is equally significant in this regard that Ms. Row's brain damage "has the probable neuropsychiatric outcome of reducing [her] ability to control her behavior and under conditions of emotional distress may have affected her ability to appreciate the wrongfulness of her behavior."  HE 1 at 9; *accord* Dkt. 707 at 49 (Dr. Merikangas testifying that individuals with cerebral atrophy "can rationalize what they are doing wrongly and do things which are immoral or criminal, thinking that it was right at the time for them.").  As mentioned, the sentencing court

acknowledged that Ms. Row's marriage was "mutually abusive," HE 20 at 4053, thereby causing her emotional distress that—in tandem with her brain damage—reduced her ability to discern between right and wrong. This would have given a far more mitigating gloss to the crime than the one the trial court had after state defense counsel's feeble effort: that Ms. Row was a cold, remorseless, psychopathic killer who knew exactly what she was doing. *See Correll*, 539 F.3d at 954 (finding prejudice where a PSI painted the defendant "as a 'threat' and a 'menace,'" whereas the unpresented mitigation—including brain damage—"could have colored Correll as an organically diseased and injured person who, through no fault of his own, lacks the ability to comprehend the immorality of his conduct").

Cerebral atrophy would thus have significantly diminished the force of the worst aggravating factor in the case, the horror at the thought of a woman murdering her own children.[49] The result of a sentencing where such an important cause of Ms. Row's behavior was completely absent is a result that cannot now be considered reliable with someone's life at stake.

### e. Rebutting the State's *Martinez* Experts

While Dr. Kowell offered a very limited opinion of Ms. Row's brain abnormalities—that he could not say that it was medically probable that the abnormalities caused any impaired neurologic function or behavioral abnormality—there are several critical caveats to what he was actually saying. First, Dr. Kowell himself did not do a neurological examination of Ms. Row. Second, there are very different meanings to the terms neurological findings and neuropsychological findings. And third, the information that Dr. Kowell was provided by the

---

[49] Although the State urged the trial court to find at sentencing that Ms. Row had created a great risk of death to many persons, HE 20 at 3969, the sentencing judge did not do so, *see id.* at 4041–60. Ms. Row therefore should not have to defeat this aggravator. If she did, it would also be undermined by the fact that Ms. Row's brain damage impaired her judgment and insight, *see supra* at 61, 63, 76, and thereby made it more difficult for her to assess the danger the fire would have posed to her neighbors.

State was very limited in scope. Constrained so narrowly by these limitations, Dr. Kowell's analysis does not meaningfully unsettle the more thorough, definitive, and well-informed work of Ms. Row's experts.

First, it is important to note that Dr. Kowell did not conduct an independent examination of Ms. Row, nor did he ever personally observe her in any manner. At his deposition, Dr. Kowell testified that in general practice, a neurologic consultation would involve several basic areas of inquiry, including the history of the present illness, past medical history, social history, family history, a physical examination, and a specialized neurologic exam. HE 1347 at 19–20. Dr. Kowell's neurologic exam would generally consist of a mental status exam, a cranial nerve examination, a motor system examination, and an evaluation of coordination and gait and stance. *Id.* at 21.

Second, when Dr. Kowell offered his opinion with regard to the atrophy in Ms. Row's case, it was in the context of finding no signs of physical neurological impacts of Ms. Row's brain abnormality on functioning, e.g., neurologic functions such as ataxia (coordination of the movements of your arms, legs and body), gait, and muscle tone. Dkt. 705 at 32. This is borne out by the limited nature of what he understood his referral questions to be: (1) to evaluate the findings on the imaging studies themselves; and (2) to evaluate Ms. Row's experts' opinions regarding the atrophy documented on the imaging studies. HE 174 at 3. Dr. Kowell answered his first referral question in the positive, agreeing that the imaging did reveal cerebral cortical atrophy and cerebellar atrophy. *Id.* at 9. With regard to his second referral question, Dr. Kowell stated his opinion that there were no physical outcomes of the atrophy. *Id.* at 9–10. This is reflected in his testimony at the *Martinez* hearing, where he testified that he didn't find anything "neurologically" wrong in his review of Ms. Row's records. Dkt. 705 at 6. The majority of Dr.

Kowell's testimony for the State was in fact limited to his descriptions of and conclusions regarding the physical structure of Ms. Row's brain, not the neuropsychological effects of the atrophy that make the condition so mitigating.  *Id.* at 6–22.

Third, as is indicated in his testimony at the *Martinez* hearing, Dr. Kowell did not have access to, nor did he review a great number of documents, including: records regarding Ms. Row's time in juvenile facilities which included mental health evaluations, *id.* at 23–24; social history interviews with lay witnesses, *id.*; testimony of Dr. Norman, *id.*; testimony of Dr. Beaver, *id.*; and early developmental records, *id.* at 29.  Dr. Kowell's deposition and report note that the only social-history information that he was provided by the State—other than medical records on Ms. Row—was a twenty-six page "psychosocial report" prepared eighteen years ago by a defense mitigation specialist no longer working on the case.  HE 1347 at 35; *see* HE 1000 at 3–4; HE 3, Tab 7.  Dr. Kowell acknowledged that his opinion was qualified by the limited information that he had and that he did not "have access to all of the records in this case or genetic history, et cetera."  Dkt. 705 at 21; *see* HE 1347 at 24.  As made evident above, all of the foregoing material is important to the case for brain damage, as it all points to the causes of the atrophy and its manifestations in Ms. Row's life.  *See supra* at 64–80.

It is also important to note that although Dr. Kowell understood his role in the case to be evaluating the opinions of Ms. Row's experts, HE 1347 at 26; *see* HE 1000 at 3, he never provided any meaningful assessment of them.  Other than a conclusory statement that "it cannot be concluded as medically probable" that Ms. Row's brain atrophy "caused any impaired neurologic function or behavioral abnormality," Dr. Kowell failed to provide any analysis or critique of Dr. Greenberg's work at all, and his only commentary on Dr. Merikangas's opinion was to recite what Dr. Merikangas's findings were.  HE 1000 at 10.  Dr. Kowell gave the Court

no grounds to question the expert analysis from Ms. Row's witnesses, and that analysis demonstrates significant brain damage with significant mitigating value.

Dr. Moore, the State's only other expert, was posed four referral questions: (1) if Ms. Row demonstrated brain damage, and if so, the nature and extent; (2) what relevance it had to the commission of the acts that she was found guilty of; (3) what clinical data was available in 1993 that could have been presented to the trial court in its weighing of aggravating and mitigating factors in determining Ms. Row's sentence; and (4) what does all the information reveal about "any diagnosable psychological conditions."  HE 1001 at 1.

Dr. Moore testified at the *Martinez* hearing that he reviewed approximately 50,000 pages of materials in connection with Ms. Row's case.  Dkt. 704 at 93, 142.  Dr. Moore's report specifies the documents he reviewed, *see* HE 1001 at 2–4, and he testified that he also reviewed additional materials that were disclosed by Ms. Row subsequent to his report, *see* Dkt. 704 at 116.  These materials collectively total 6,973 pages.  What the other 43,027 pages of material that Dr. Moore reviewed consists of is unknown, as they were not listed on his expert report or disclosed to Ms. Row.

As noted above, Dr. Moore agreed with Ms. Row's experts and Dr. Kowell that Ms. Row did indeed demonstrate brain atrophy: "[b]rain imaging studies have shown some mild cerebral and cerebellar atrophy . . . with some deficits in frontal lobe, and perhaps parietal lobe, functioning."  HE 1001 at 13; *see also* Dkt. 704 at 63 (testimony of Dr. Moore that "there was cerebellar hypoplasia particularly in the supravermian, and then there was some cortical atrophy predominantly found around the parietal lobes").  Dr. Moore also agreed that the atrophy and deficits were longstanding in nature.  HE 1001 at 13.

The second referral question posed to Dr. Moore—"[w]hat relevance, if any, might [brain damage] have for key faculties relevant to the commission of the acts that [Ms. Row] has been found guilty of: i.e., her judgment, decision-making capabilities, impulse control, and emotional reactions," *id.* at 1—is an imprecise framing of the question posed now to this Court.  It is axiomatic that a court may not require a capital defendant to establish that her mitigation evidence have an explanatory nexus to the charged offense, as a condition to the showing of the constitutional relevance of her proffered mitigation.  *Eddings v. Oklahoma*, 455 U.S. 105, 114–15 (1982) (evidence of defendant's personality disorder was constitutionally relevant mitigation despite the fact that it did not provide a legal excuse for the offense); *Smith v. Texas*, 543 U.S. 37, 44–45 (2004) (holding that a state appellate court's nexus-to-the-crime test for mitigation evidence was unconstitutional); *accord Styers v. Schriro*, 547 F.3d 1026, 1035 (9th Cir. 2008).  Thus, Ms. Row's brain damage need not—although it can—have a connection to her offense for it to be mitigating.  Rather, when a trier of fact is considering a death sentence, a mitigating circumstance is "*any aspect* of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death."  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality op.) (emphasis altered).

Neither is it required that Ms. Row's brain atrophy and resulting neurological impairments rise to the level that would negate an element of her conviction.  *See Douglas*, 316 F.3d at 1090–91 (granting penalty-phase relief on an ineffectiveness claim, in part because trial counsel never informed the jury about the defendant's brain damage, and observing: "Even if the testimony were not enough to negate an element of [the] underlying offense, it could have invoked sympathy from at least one member of the jury at the penalty phase, particularly when considered in connection with additional sociological history evidence discussed above."); *see*

*also Wallace*, 184 F.3d at 1117 & n.5 ("Although the lawyer's failure to develop and relay medical evidence did not constitute ineffective assistance at the guilt phase, we concluded that sentencing—where mitigation evidence may well be the key to avoiding the death penalty—is different."). Furthermore, there *is* a strong connection between Ms. Row's brain damage and her commission of the offense, as explained above. *See supra* at 84–89. At a bare minimum, it would be improper to simply presume that there is no prejudice on the basis of Dr. Moore's opinion when the sentencing court was never given the benefit of the extensive evidence that Ms. Row's brain damage mitigates the offense in critical ways. Even if a brain damage presentation would have led to *conflicting* evidence at sentencing, the fact that two well-trained, experienced, credible experts have now found substantially mitigating brain damage is enough to undermine confidence in the result of a trial where none of this critical evidence was aired in state court. *See Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir. 2005) ("Of course, we cannot be certain what the jury would have done had it been given all of the relevant mitigating information and had it not been presented with inadmissible aggravating evidence. But the fact that the task it actually undertook differed so profoundly from the one it would have performed had [the defendant's] counsel not been deficient is enough to undermine our confidence in the sentence it ultimately delivered.").

 Dr. Moore agreed with Ms. Row's experts in his third referral question that "Ms. Row could have had further brain studies done and a full neuropsychological evaluation could have been performed in advance of her trial." HE 1001 at 14. But Dr. Moore's report expresses his view that if Ms. Row's brain damage had been presented at trial, "data such as the videotaped interviews [with the police], showing a full range of affect, could have been presented by the prosecution to counter the contention that she was organically incapable of showing emotion." *Id.*

As an initial matter, there is nothing in Dr. Moore's background to give him a basis for analyzing the decisions that would have been made by a prosecutor at a capital sentencing, or for analyzing what would be admissible at such a proceeding. His analysis is also demonstrably wrong. The sentencing judge *did* see videotape of Ms. Row during her interrogation, and the prosecution *did* make the argument that the footage—along with her demeanor in the courtroom—showed that she was able to express different emotions. *See* HE 20 at 4023 ("What about the videotape that we watched between her and Detective Raney? She laughed with Detective Raney, she cried, she made jokes with Detective Raney, all expressing positive affect."). More to the point, evidence of Ms. Row's range of emotions would not have been inconsistent with a defense that incorporated brain damage. As noted, Ms. Row's atrophy causes *inappropriate* affect, not a perpetually flat affect. *See supra* at 62, 87. Ms. Row's prior expressions of emotion would thus have fit in perfectly with the brain-damage thesis. It was trial counsel's pseudo-scientific and ill-fitting alexithymia defense that made no sense in light of Ms. Row's emotional displays, and it was that defense that the prosecution easily skewered. Dr. Moore's argument only highlights how irrational it was for trial counsel to have pursued their unfounded alexithymia approach when they would have been so much better off with brain damage.

### 3.   Conclusion to Prejudice

Because of trial counsel's ineptitude, the sentencing court saw Ms. Row as nothing more than a cold-blooded, remorseless monster. Had the judge been given the powerful evidence of brain damage presented here, he would instead have seen Ms. Row as a damaged human being with a lifelong disability that permeated her everyday existence and severely compromised her ability to make good decisions and act morally. While that condition in no way justifies the tragic deaths of the victims, it would have given the judge a strong reason to show enough mercy to spare Ms. Row's life and instead send her to prison for the rest of her life. That important

story was never told in state court, where Ms. Row's brain damage was overlooked and where she was misunderstood as a brilliant, calculating villain.  Before Ms. Row is executed, the sentencer should be given the benefit of Ms. Row's true story.  "Because it has been established that [Ms. Row] suffers from brain damage, the delicate balance between [her] moral culpability and the value of [her] life would certainly teeter toward life."  *Caro II*, 280 F.3d at 1258.  The result of a trial where Ms. Row was unable to even inform the judge of her brain damage as a result of her lawyer's incompetence is not a trial with a reliable result, especially with a life hanging in the balance.  There is prejudice.

### III.    Certificate of Appealability

A petitioner cannot appeal the denial of habeas relief on any claim unless he has obtained a certificate of appealability ("COA") for that claim.  *See* 28 U.S.C. § 2253(c)(1)(A) (requiring a petitioner to secure a COA before appealing the denial of habeas relief); *see also* § 2253(c)(3) (providing that a COA must "indicate which specific issue or issues satisfy the showing required by" the COA standard).  Pursuant to Rule 11(a) of the Rules Governing 2254 Cases in the United States District Courts ("Rule 11(a)"), "[t]he district court must issue or deny a [COA] when it enters a final order adverse to the applicant."  A COA should be granted where the habeas petitioner "has made a substantial showing of the denial of a constitutional right."  § 2253(c)(2).  When a district court denies a claim on the merits, the COA inquiry examines whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right."  *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).  For claims dismissed on procedural grounds, "a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its

procedural ruling." *Id.* at 484.  "Although not dispositive, in a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA]." *Williams v. Woodford*, 384 F.3d 567, 583 (9th Cir. 2004) (alterations omitted).  "Where the petitioner faces the death penalty, any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Rhoades v. Davis*, 852 F.3d 422, 427 (5th Cir. 2017).

This Court has already granted a COA with respect to several claims.  *See* Dkt. 545 at 67. Most relevant to the current litigation, the Court certified for appeal Claim 7, "limited to the allegations [of] ineffective assistance of counsel at the capital sentencing proceeding" that were addressed in the merits ruling.  *Id.*  In its discussion of Claim 7, the merits ruling considered a broad argument of ineffectiveness for failure to present mitigating evidence, including evidence of Ms. Row's mental-health issues.  *See id.* at 46–50.  The ruling also specifically examined whether counsel were ineffective in their handling of evidence concerning brain damage.  *See id.* at 49–50.  By certifying this claim in 2011, the Court signaled that trial counsel's mitigation investigation generally—and their investigation of mental health and brain damage particularly—was sufficiently troubling that the issue "deserve[d] encouragement to proceed further."  *Slack*, 529 U.S. at 484.  Those same factual matters are implicated by the sub-claims briefed here, all of which likewise deal with a failure to investigate and present mental health related evidence, in this case having to do with brain damage.  Thus, the prior ruling demonstrates that, if the Court denies relief on any of the three sub-claims, it should certify that sub-claim for appeal.  Additionally, the fact that the Court set these sub-claims for a hearing, with all of the time and expense attendant to one, also proves that they are substantial enough to justify plenary appellate proceedings on them.

In granting the *Martinez* hearing on the three claims discussed in this brief, the Court also denied one on a series of other sub-claims. *See* Dkt. 600 at 37. Specifically, the Court rejected a hearing on Claim 7 ¶ 80(h), as well as Claim 7 ¶ 81(a), (d), (f), (g), (n), (o), (p), or (s). *See id.* In its final decision on the three brain damage sub-claims, the Court has an opportunity to issue a COA on these other sub-claims, and Ms. Row respectfully encourages the Court to do so. As discussed earlier, the Ninth Circuit has recently clarified that COAs on IAC issues should not pick and choose particular acts or omissions. *See Browning*, 875 F.3d at 471. Taking a cue from *Browning*, and since this Court has already given Ms. Row a COA on a sentencing-IAC sub-claim, it would be appropriate to expand the COA now so that it authorizes an appeal on the claim that trial counsel failed to adequately investigate and introduce mitigating evidence at sentencing, no matter what procedural status the constituent sub-claims now have.

## IV.    Conclusion and Prayer for Relief

Due to the incompetence of her previous attorneys, no court has ever considered Ms. Row's serious brain damage. Now that a judicial decision-maker finally has the evidence before it, there is an opportunity to correct the mistakes of the past and relieve Ms. Row of her illegal death sentence. Ms. Row should not be executed because of inexcusable errors made by her attorneys. To prevent that injustice from coming to pass, Ms. Row respectfully asks the Court for the following forms of relief:

(1) Ms. Row requests that the Court grant habeas relief on any or all of the penalty-phase IAC sub-claims briefed herein, and order the State, within a reasonable period of time (such as seventy days), to either initiate resentencing proceedings or resentence Ms. Row to "a lesser sentence consistent with law," *Richmond v. Lewis*, 506 U.S. 40, 52 (1992);

(2) In the event the Court determines that relief cannot be granted as a result of a failure to exhaust remedies in—or a lack of diligent factual development in—state court, Ms. Row moves the Court for a stay so that she can return to state court;

(3) In the event the Court denies habeas relief, Ms. Row moves the Court to issue a COA pursuant to 28 U.S.C. § 2253(c) and Rule 11(a) on the claim that trial counsel were ineffective for failing to adequately investigate and present mitigating evidence, *see Browning*, 875 F.3d at 471, which would encompass all of the sub-claims briefed here (Claim 7, ¶ 81(b), (e), and (h)), as well as the sub-claims for which the Court denied an evidentiary hearing (Claim 7, ¶ 80(h); Claim 7, ¶ 81(a), (d), (f), (g), (n), (o), (p), and (s));

(4) In the event the Court denies habeas relief and declines to grant the broad COA requested above, Ms. Row requests a COA on each of the sub-claims just mentioned;

(5) In all events, Ms. Row respectfully requests that, given the complexity and gravity of the issues in this capital case, the Court schedule oral argument at a time and place that is convenient for itself and the parties upon the completion of post-hearing briefing;

(6) In all events, Ms. Row respectfully asks the Court to grant any such other and further relief as may be appropriate to "dispose of the matter as law and justice require."  28 U.S.C. § 2243.

Respectfully submitted this 28th day of May 2019.

*/s/ Deborah A. Czuba*

Deborah A. Czuba
Jonah J. Horwitz
Attorneys for Petitioner

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 28th day of May 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

L. Lamont Anderson
Lamont.anderson@sg.idaho.gov

*/s/ Heidi Thomas*
Heidi Thomas