Deborah A. Czuba, ID Bar No. 9648
Jonah J. Horwitz, ID Bar No. 10494
Federal Defender Services of Idaho
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone:   (208) 331-5530
Facsimile:   (208) 331-5559
ECF:   Deborah_A_Czuba@fd.org
        Jonah_Horwitz@fd.org

Attorneys for Petitioner Robin Lee Row

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| ROBIN LEE ROW, | ) | Case No. 98-0240-S-BLW |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | PETITIONER'S REPLACEMENT |
| | ) | POST-HEARING |
| THOMAS J. BEAUCLAIR, et al, | ) | RESPONSE BRIEF |
| | ) | |
| Respondents. | ) | |
| _____ | ) | |

# TABLE OF CONTENTS

I.   Overarching Issues ................................................................................................ 1

    A.   *Martinez* Exhibits and Testimony .......................................................... 1

    B.   Legal Questions ........................................................................................ 4

II.  Argument ................................................................................................................ 7

    A.   Deficient Performance .............................................................................. 7

        1.   Trial Counsel Rendered Deficient Performance ........................... 7

        2.   PCR Counsel Rendered Deficient Performance ........................... 10

    B.   Prejudice ................................................................................................... 11

        1.   The Pebble and the Boulder ........................................................... 12

        2.   The "Diagnosis" of Alexithymia Undermined and Undervalued
            Any Potentially Mitigating Evidence at Trial. ............................. 17

        3.   Environment and Social History are Relevant .............................. 17

        4.   Ms. Row is Not Adept at Sidestepping the Consequences of
            Criminal Behavior ......................................................................... 19

III. Conclusion ........................................................................................................... 20

Pursuant to this Court's orders, *see* Dkt. 706 at 1; Dkt. 749 at 2, Petitioner Robin Row files this post-hearing response brief.  Most of the arguments asserted in the State's post-hearing opening brief, *see* Dkt. 718, are sufficiently defeated by Ms. Row's own opening brief, *see* Dkt. 750.[1]  Ms. Row will focus here on the few points by the State that are not completely rebutted by her earlier pleading, and will show why they too do nothing to alter the fact that trial and PCR[2] counsel were egregiously ineffective in failing to present compelling evidence of brain damage.

## I.      Overarching Issues

Before turning to the heart of the ineffectiveness issues, there are two overarching issues to address at the outset: (1) the exhibits and testimony Ms. Row introduced for the *Martinez* hearing; and (2) the legal standards.

### A.      *Martinez* Exhibits and Testimony

The State does not object to the admission or consideration of any exhibits that Ms. Row introduced for the *Martinez* hearing.  *See generally* Dkt. 718.  If it had any objections, the opening brief was its opportunity to lodge them.  This is so because the Court only gave each party a single response brief.  *See* Dkt. 706.  Thus, if the State protests any exhibits now, Ms. Row will not have a chance to respond.  Through its silence, the State has consequently forfeited any objections to the exhibits, and they should all be considered by the Court.

In the event the Court disagrees, Ms. Row will briefly discuss the few exhibits for which Ms. Row has some sense of why the State might oppose their admission.

---

[1] Due to space limitations, Ms. Row will not mention every significant contention that the State could and should have raised in its opening brief.  Ms. Row believes each such contention should not be considered and should be regarded as forfeited if it appears for the first time in the State's response brief.

[2] Ms. Row will use the same abbreviations, short-hand designations, and conventions as she used in her opening brief.  *See generally* Dkt. 750.

First, the only exhibit about which the State makes any kind of remark that might conceivably go to admissibility is 178, which contains billing information for Dr. Beaver. *See* Dkt. 718 at 19 n.7. Even there, the State does not ask for the exhibit's exclusion, *see id.*, so there is no ground to disregard it. And in any event, there is no problem with the exhibit's consideration here. As undersigned counsel indicated at the *Martinez* hearing, Exhibit 178 was not on Ms. Row's exhibit list because they discovered it while preparing for the hearing. *See* Dkt. 705 at 37. The exhibit contains only thirteen relevant lines of text, none of which is inconsistent with the rest of the record, and the State was able to cross-examine Dr. Beaver about it. *See* Dkt. 704 at 47. No prejudice arose as a result of this innocent mistake and the exhibit is properly before the Court. *See* Fed. R. Civ. P. 37(c)(1) (providing that exclusion of evidence for failure to disclose is inappropriate if "the failure was substantially justified or is harmless"); *Century Indemnity Co. v. Marine Grp.*, No. 3:08-cv-1375, 2015 WL 13673517, at *2 (D. Or. Oct. 29, 2015) ("The court declines to exclude Exhibits 30–32, and 36, because their untimely production resulted in no prejudice to St. Paul.").

Second, in a pre-hearing pleading, the State moved to exclude a series of exhibits relating to Rolf Kehne's disciplinary history with the Idaho State Bar. *See* Dkt. 649-1 at 12–13. The Court ruled that while the exhibits seemed too remote from the subject-matter of the hearing, it would admit them "[t]o the extent that Petitioner can lay foundation showing that Kehne was laboring under the same conditions identified in the disciplinary records at the time he handled Petitioner's case." Dkt. 683 at 4. Ms. Row believes that foundation was laid at the hearing when Mr. Kehne testified that depression and sleep apnea were responsible for the lapses that triggered the sanctions, and that he suffered from both conditions at the time of the Row post-conviction. *See* Dkt. 701 at 68–69.

Third, the State also moved, before the hearing, to exclude Russell Stetler—Ms. Row's standard-of-care expert—from testifying.  *See* Dkt. 649-1 at 8–12.  The Court ruled that Mr. Stetler was entitled to testify "about mitigation specialists and mitigation," but was "less qualified or likely unqualified to testify about legal standards and legal conclusions," a "closely related" area.  Dkt. 683 at 3–4.  At the hearing, the Court indicated that it would reserve its final ruling on Mr. Stetler's expertise.  *See* Dkt. 701 at 147.  Ms. Row stands on her prior briefing with respect to the admissibility of Mr. Stetler's testimony, *see* Dkt. 660 at 17–21, and submits that he established through his testimony, *see* Dkt. 701 at 138–48, and his declaration, *see* HE 7 at 5–12, that he was qualified to opine on every issue that he testified to.

Fourth, Ms. Row introduced a series of declarations from Ms. Row's prior acquaintances.  *See* HEs 163–72.  In regards to these declaration, the State stipulated that there were no foundation problems but did not consent to their admission.  *See* Dkt. 696 at 30–31.  The declarations recite first-hand observations about Ms. Row's background and behavior, demonstrating some of the factors that exacerbated her brain damage as well as some of the ramifications it had for her life.  *See* HEs 163–72; *see also* Dkt. 750 at 15 and internal references cited therein.  As such, the declarations are relevant and helpful, and they should be admitted.

Fifth and finally, some of the materials provided by Ms. Row to her brain-damage experts, Drs. Merikangas and Greenberg, were given to them later in the process and as a result disclosed to the State after the disclosure deadline.  This information was made available to Ms. Row's experts on April 6, 2017 and turned over to the State the next day, two months prior to the *Martinez* hearing.  For the Court's reference, the materials at issue can be found in the attachments to Dr. Merikangas's report at Tabs 211–20, 222–23, 233.  Dr. Merikangas and Dr. Greenberg both testified that the additional materials did not alter the substance of their opinions

and testimony.  Dkt. 702 at 8–9, 65–66.  The State's expert, Dr. Moore, also testified that he was able to review the materials before the hearing.  *See* Dkt. 704 at 49.  No prejudice flowed from this inadvertent slight tardiness, and the documents should be taken into account by the Court. *See* Fed. R. Civ. P. 37(c)(1); *Century Indemnity Co.*, 2015 WL 13673517, at *2.

To the extent Ms. Row has not addressed any specific item of evidence that she has offered, she maintains that all of them are relevant based on her substantive arguments here and in her opening brief.  If any exhibits are found inadmissible, Ms. Row requests in the alternative that the Court expand the record to encompass them or take judicial notice of them, just as it could do in any federal habeas case, regardless of whether a hearing takes place.  *See* Rule 7(a) of the Rules Governing Section 2254 Cases; *Runningeagle v. Ryan*, 686 F.3d 758, 773 (9th Cir. 2012).  Such an expansive approach is appropriate to ensure that this capital case is decided on the fullest possible record, which is also why Ms. Row is not objecting to any of the State's exhibits.  Should the Court decline to consider any particular pieces of Ms. Row's evidence, she takes the position that she is entitled to relief based on the balance of the evidence.

### B.    Legal Questions

On three general legal questions, the State is in error.

First, without any authority, the State suggests that the IAC test is more demanding for claims that are fundamentally altered under *Martinez* than it would be in the ordinary habeas case.  *See* Dkt. 718 at 13.  That gets the law exactly backwards.  When a claim is fundamentally altered and subject to *Martinez*, it is analyzed under the de novo standard, *see Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014) (en banc), which is far *less* arduous than AEDPA review, *see Renico v. Lett*, 559 U.S. 766, 773 (2010).  Similarly, the State submits that comity concerns are heightened because the Idaho courts never had "the opportunity to address the merits of the

claim." Dkt. 718 at 13.  Whatever the truth of that theory, it has no bearing here.  The Idaho

Supreme Court *did* have the chance to rule on Ms. Row's brain-damage IAC claim and it

expressly declined to do so, holding that the claim was too late and that PCR counsel's

ineffectiveness could not serve as cause.  *See Row v. State*, 21 P.3d 895, 900 (Idaho 2001).  As

*Martinez v. Ryan*, 566 U.S. 1, 13 (2012), observed on a related issue, the Idaho Supreme Court's

determination in that regard "is not without consequences for the State's ability to assert a

procedural default in later proceedings."[3]  It is not Ms. Row's fault that she was given

incompetent attorneys for trial and post-conviction, nor is it her fault that the Idaho Supreme

Court refused to take up the material that both sets of attorneys ineptly failed to present earlier.

Indeed, the Idaho Supreme Court does not share the State's hostility toward federal

review of *Martinez* claims.  Quite to the contrary, the court announced only last year that it was

"not obligated to follow *Martinez*" and that it would "choose not to," which "simply means such

claims will not be procedurally defaulted in federal habeas proceedings and the federal court will

have to address those claims on the merits."  *Johnson v. State*, 395 P.3d 1246, 1261 (Idaho

2017).  In so ruling, the Idaho Supreme Court made reference to *Johnson v. Kirkman*, No. 4:14-

cv-395, 2014 WL 7186842, at *2 n.1 (D. Idaho Dec. 26, 2014).  *See Johnson*, 395 P.3d at 1261

n.14.  The cited footnote from this Court's *Johnson* opinion stated that because the Idaho

judiciary had elected not to apply *Martinez* to their own cases "the federal courts will be required

to consider" the matter "de novo."  *Johnson*, 2014 WL 7186842, at *2 n.1.  Clearly, the Idaho

Supreme Court has opted not to recognize *Martinez* excuses while knowing full well that their

---

[3] The State's view that *Martinez* itself establishes a more taxing IAC test for petitioners, *see* Dkt. 718 at 14, is mistaken.  In the passage highlighted by the State, where the Court noted that its decision "ought not to put a significant strain on state resources," 566 U.S. at 15, the opinion explicitly linked that conclusion to the fact that states would still be able to argue the merits of the implicated IAC claims, *see id.*  That has nothing to do with the standard of review.

Petitioner's Replacement Post-Hearing Response Brief – 5

approach will lead to de novo review of the underlying claims in the federal system. Under those circumstances, there is no basis in comity for imposing on Ms. Row a higher bar than the de novo one set for her by controlling Ninth Circuit law.

Second, the State misapprehends the burden of proof on prejudice. It asserts that Ms. Row "must establish by a preponderance of the evidence that her trial counsel was deficient and that the alleged deficiency was prejudicial." Dkt. 718 at 38. The State is right about deficient performance, but wrong about prejudice. To demonstrate prejudice, Ms. Row must show only that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A "'reasonable probability' is a standard of proof 'sufficient to undermine confidence in the outcome' and is 'somewhat *lower*' than a preponderance of the evidence." *United States v. Rodriguez-Vega*, 797 F.3d 781, 788 (9th Cir. 2015) (quoting *Strickland*, 466 U.S. at 694); *accord Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998). *Strickland* prejudice supplants the preponderance test, the State's misinterpretation of the law notwithstanding.

Third and finally, the State subverts the objective nature of the test for prejudice. By the State's lights, Ms. Row has "to demonstrate that evidence related to her atrophy was so compelling that, when weighed with the other mitigation considered by the sentencing judge, it would have elevated the mitigation from 'pal[ing] in significance and comparison' to a boulder that would 'come close' to tipping the balance away from a death sentence." Dkt. 718 at 26. Ms. Row has no such responsibility. The colorful boulder-and-pebble metaphor was an invention of the judge who happened to preside over Ms. Row's trial and post-conviction. *Strickland* prejudice, though, is an *objective* measure. *See* 466 U.S. 695 ("The assessment of prejudice should proceed on the assumption that the decision maker is reasonably,

conscientiously, and impartially applying the standards that govern the decision.").  The question is only one of a reasonable probability, and that hurdle has been cleared.

**II.     Argument**

Ms. Row will first take up the deficient performance of her trial and PCR attorneys, and then prejudice.

**A.     Deficient Performance**

The State weakly defends the egregious errors of both trial and PCR counsel.  Ms. Row will rebut it on the trial front, after which she will do so on the PCR front.

**1.     Trial Counsel Rendered Deficient Performance**

The State's account of trial counsel's activities on the case is flawed in several key respects.

For starters, the State continues to perpetuate the myth that Ms. Row had been "diagnosed" with ASPD.  *See* Dkt. 718 at 17 n.6.  It says that in its opening brief specifically with respect to Drs. Steuart and Beaver.  *See id.*  In actuality, neither reached that diagnosis. Instead, they had preliminary impressions—based on grossly incomplete information—of ASPD. *See* Dkt. 750 at 82–84.  Contrary to the State's exaggerations, there was no ASPD diagnosis, and brain damage would have been an enormously promising avenue for overcoming the negative antisocial label.

Continuing on the subject of Dr. Beaver, the State is uncomfortable with how tentative his report to trial counsel plainly was, and so it strives to muddy the waters with ambiguity where none exists.  Most significantly, the State struggles to write out of the record the fact that Dr. Beaver's impression of ASPD was a preliminary one.  *See* Dkt. 718 at 20 n.9.  To do so, the State announces, with no citation to the record, that "there is no evidence that trial counsel were

operating under a belief that Dr. Beaver's findings were 'preliminary'; in fact, the evidence is

that the opposite is true." *Id.*  That is incorrect.  Although Dr. Beaver's memory of his precise

interactions with counsel was of course imperfect in light of how much time had passed, he was

unequivocal at the *Martinez* hearing on how tentative his impression of ASPD was.  *See* Dkt. 703

at 163 ("I had preliminary information in offering the personality issues and concerns.  I clearly

had not done a comprehensive workup with regard to neuro issues on Ms. Row at that point.").

Contrary to the State's insinuation, there is nothing about Dr. Beaver's memory that would

compromise his ability to look at how much time he spent on a case and what he did and

ascertain whether it was a final diagnosis or not.  And there is certainly no foundation to

speculate—with the State—that Dr. Beaver would have told counsel anything other than the

truth, i.e., that his impression of ASPD was preliminary.  Along the same lines, the State quotes

Mr. Cahill as describing Dr. Beaver doing a "battery of tests," Dkt. 718 at 15, when he in fact

administered only two of them, neither of which were designed to detect brain damage, *see* Dkt.

750 at 41–42.

   The State's insistence that counsel reasonably relied upon Dr. Beaver[4] fails for another

elemental reason.  Counsel did not prepare him.  The State's citation to *Hendricks v. Calderon*,

70 F.3d 1032 (9th Cir. 1995), only underscore's counsel's failure.  In the quoted passage from

---

[4] The State's unsupported averment that "[t]here were few mental health experts available in
Idaho at the time of Row's trial," Dkt. 718 at 14, is dubious: there were fifty-six psychologists
and 149 psychiatrists licensed in the state in February 1992. *See*
https://ibol.idaho.gov/IBOL/BoardAdditional.aspx?Bureau=PSY&BureauLinkID=100 (allowing
the user to search for all psychology licenses issued prior to 1992);
https://isecure.bom.idaho.gov/BOMPublic/LPRBrowser.aspx (allowing the user to search for all
medical licenses with a specialty of psychiatry issued prior to 1992).  It is also irrelevant.
Counsel could easily have gone outside the state.  And in all events, had Dr. Beaver been shown
the crucial radiologist's report he would have advocated for the testing that was never done, *see*
HE 114 at 2.  Regardless of what alternative experts counsel had, they did not reasonably use the
one they ended up with.

that case, the court cautioned that counsel cannot be expected "to provide a psychiatric expert with *all* information necessary to reach a mental health diagnosis." Dkt. 718 at 21. Maybe not, but here there was a report *finding* brain damage as well as recommending further testing that was easily available to counsel, and they never gave it to the person they were expressly relying upon to investigate the possibility of organicity. *See* Dkt. 750 at 20–25. Whatever facts may have been involved in other cases, trial counsel here were blatantly deficient.[5] The State is even farther afield when it resorts to a Fifth Circuit case declaring that counsel is not deficient when he fails to explore a mental defect that he has no reason to suspect. *See* Dkt. 718 at 21. At the risk of stating the obvious, counsel here *did* have that reason, in the form of a radiology report telling them that their client had brain damage.

The State is on equally shaky ground in averring that "trial counsel had no duty to pursue additional testing when the experts consulted at that time did not recommend such testing." *Id.* As an initial matter, it is not evident that the State is correct. There is evidence that Dr. Norman did in fact request imaging and neurological testing and counsel refused. *See* HE 120 at 2. Even if that did not occur, though, counsel were deficient. They had a duty to *prepare* their expert. *See Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). A radiologist's report of brain damage was absolutely indispensable to that preparation, and there is no dispute that counsel never supplied it to Dr. Beaver, the person they wished to explore brain damage and the only

---

[5] *Hendricks* involved a failure to provide social-history records to experts. *See* 70 F.3d at 1038. It does not refer to brain damage, and by definition cannot absolve counsel of their failure to give evidence of brain damage to someone they were depending on to investigate brain damage. Moreover, *Hendricks* found that counsel had no duty to provide certain records to their expert at the *guilt* phase. *See id.* When it comes to capital sentencings, by contrast, the Ninth Circuit has squarely held that "[r]egardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's duty to seek out such evidence and bring it to the attention of the experts." *Hovey v. Ayers*, 458 F.3d 892, 925 (9th Cir. 2006). That is the precedential rule in terms of the penalty phase, and it must be enforced here.

expert they had who was qualified to do so.  *See* Dkt. 750 at 23–25.  For the same reason, the State cannot avail itself of the rule against twenty-twenty hindsight.  *See* Dkt. 718 at 22.  Counsel had a report finding brain damage and recommending further testing *at the time*, and they failed to explore it.

In terms of Dr. Norman, the State posits that counsel chose him because of his "experience in capital cases" and "vetted him with other attorneys."  Dkt. 718 at 16. Nonetheless, there is no evidence they chose him because of his experience with *brain damage*, which he did not have, or that they vetted him on his qualifications in that area, of which he had none.  *See* Dkt. 750 at 28.  Since counsel had in their hands a report of brain damage, they could not reasonably have been relying on someone with no expertise in the field, while failing to share the report with the expert who did.

### 2.    PCR Counsel Rendered Deficient Performance

Given how obvious PCR counsel's deficient performance was, it is unsurprising that the State barely even tries to defend them, offering a mere four pages with little argument and no on-point authority whatsoever.  *See* Dkt. 718 at 32–36.  As this Court has already rightly commented, since PCR counsel had ample evidence of brain damage that they indisputably failed to develop in any way whatsoever, "that establishes deficient performance under *Strickland*."  Dkt. 705 at 44.  Nonetheless, in the interest of preserving a full record, Ms. Row will succinctly dispose of the mistakes in the State's briefing on this question.

To begin, the State's notion that it was reasonable of counsel to seek more time to explore the brain damage, *see* Dkt. 718 at 35, is both highly implausible as a factual matter and dead wrong as a legal matter.  On the factual side of things, counsel requested their extension on the day of a hearing that had been set six months earlier in an order ruling out any continuances,

having failed to obtain testing and imaging that had been strongly and uniformly recommended to them by their experts more than seven months beforehand.  *See* Dkt. 750 at 45–55.  In no world is that reasonable.[6]  As for the legal construct, the State fails to even acknowledge—let alone engage with—the well-established principle that even if counsel's pursuit of extra time was reasonable, their failure to obtain and present the brain-damage evidence was still not a function of any strategy and was therefore deficient.  *See Daniels v. Woodford*, 428 F.3d 1181, 1205 (9th Cir. 2005).

Also on the timing issue, the State misleadingly juxtaposes the amount of time the federal habeas proceedings have taken with the amount of time PCR counsel had to investigate brain damage.  *See* Dkt. 718 at 35.  It is an ironically inapt comparison, as the State elsewhere properly emphasizes how important it is to assess counsel's performance "from their perspective at the time of the alleged error."  Dkt. 718 at 12 (citing *Strickland*, 466 U.S. at 689).  Here, that perspective did not include the future federal habeas litigation.  Instead, looking at things as they stood in 1995, counsel had seven months to get testing and imaging that their experts all unambiguously advised them to get.  They did nothing.  There was no reasonable basis for that negligence, and the State's tepid justifications for counsel are meritless.

## B.    Prejudice

Similar to the State's arguments regarding trial and post-conviction counsel's performance, the State's arguments regarding prejudice are likewise superficial and at times misleading.  Again, while most of the arguments asserted in the State's post-hearing opening

---

[6] The State's quotation from PCR counsel reflects that workload issues might have partly been responsible for their dereliction, *see* Dkt. 718 at 33, but that is no excuse under *Strickland*, *see Lockett v. Anderson*, 230 F.3d 695, 711 (5th Cir. 2000) (finding deficient performance with "an overworked defense counsel, trying to present a defense in two death penalty trials a month apart while at the same time trying two other death penalty cases").

brief, *see* Dkt. 718, are sufficiently defeated by Ms. Row's own opening brief, *see* Dkt. 750, Ms. Row will focus on a few of the State's arguments on prejudice which call for rebuttal.  As she did in her opening brief, Ms. Row will address trial and PCR prejudice in the same section.  *See id.* at 17.

### 1.      The Pebble and the Boulder

Despite the State's argument otherwise, "[e]vidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."  *Littlejohn v. Trammel*, 704 F.3d 817, 864 (10th Cir. 2013); *see Porter v. McCollum*, 558 U.S. 30, 36 (2009) (failure to present evidence of a brain abnormality has been held to be an important indicator of prejudice); *Frierson v. Woodford*, 463 F.3d 982, 993–94 (9th Cir. 2006) (failure to present evidence of childhood brain injuries and resulting organic brain dysfunction contributed to finding of prejudice); *Frazier v. Huffman*, 343 F.3d 780, 794–800 (6th Cir. 2003) (finding there was prejudice based on failure to present brain injury evidence alone); *Caro*, 280 F.3d at 1257 (holding omission of evidence of brain damage rendered death sentence unreliable).

The State, however—falling back on the trial court's sentencing prose—argues that in Ms. Row's case the mitigating circumstances "pale in significance and comparison" to the aggravating factors.  The state echoes the trial court's language that Ms. Row's atrophy is a "pebble" in the weighing process, that the aggravating factors "weigh like a boulder," and that "the calculus tips inexorably to a sentence of death."  Dkt. 718 at 26–27.  The State argues that

Ms. Row's cerebral atrophy[7] and the results of her neuropsychological testing are of little mitigating value, citing *Runningeagle*.

In *Runningeagle*, the Ninth Circuit affirmed the district court's denial of habeas relief under *Martinez*. The Court found "insufficient" and "equivocal" evidence that Runningeagle's post-conviction counsel had rendered deficient performance.[8] *Runningeagle*, 825 F.3d at 983–86. In addition, post-conviction counsel presented evidence that was cumulative to the evidence presented by trial counsel. *Id.* at 985. With regard to the "new" evidence presented by habeas counsel in support of *Martinez* relief, the Ninth Circuit found that this evidence was likewise "equivocal." *Id.* at 986. "Equivocal" to the Ninth Circuit meant an unsworn letter from a psychiatric consultant speculating that Runningeagle had post-traumatic stress disorder ("PTSD") and that he may have some other mental health conditions and recommending further evaluation, a thirteen-paragraph declaration from a psychologist stating that Runningeagle was an alcoholic and that an ASPD diagnosis may have been incorrect, and a report from a forensic psychologist opining that Runningeagle may have had or may not have had PTSD. *Id.* at 986–87.

In direct contrast to the expert opinions in *Runningeagle*, the reports and testimony of Dr. Merikangas and Dr. Greenberg are not equivocal—they are clear that Ms. Row has a brain injury

---

[7] The State emphasizes that one of the diagnostic labels for Ms. Row's condition—cerebellar cognitive affective disorder—"did not exist when she was sentenced." Dkt. 718 at 32. This is a red herring. As Ms. Row noted in her opening brief, the issue is not the terminology but the fact that she suffered from brain damage at the time of her offense, that it radically affected her behavior, and that competent trial and PCR attorneys could have proven as much had they looked into the matter. *See* Dkt. 750 at 58.

[8] The Ninth Circuit also pointed to the "paucity of evidence" of deficient performance, and specifically cited a single declaration from an investigator signed twenty years after the PCR proceedings. *Runningeagle*, 825 F.3d at 984. Again, that does not fairly describe Ms. Row's case, where she has presented a voluminous amount of evidence confirming that counsel were deficient.

and that brain injury affects her neuropsychological functioning.  Dr. Merikangas, a neurologist

and psychiatrist with nearly fifty years of experience (as well as a professor of psychiatry and

behavioral science at George Washington School of Medicine), reviewed numerous social

history records and witness declarations, conducted multiple neuro-imaging studies of Ms. Row,

and concluded that Ms. Row has cerebral atrophy.  *See* HE 1 at 13.  Dr. Greenberg, a forensic

neuro-psychologist with over thirty years of experience (as well as an instructor at Harvard

Medical School), also reviewed numerous social history records and witness declarations,

administered a full battery of neuropsychological testing, and likewise concluded that Ms. Row

demonstrated neurological impairment with significant signs of frontal lobe dysfunction.  *See* HE

4 at 6–10.  Both Dr. Merikangas and Dr. Greenberg confirmed these unequivocal opinions at the

*Martinez* hearing through their testimony.  *See* Dkt. 707 at 14–15, 69.[9]

The State also attempts to place Ms. Row's significant evidence on the wrong scale, *see*

Dkt. 718 at 26—the standard for prejudice under *Strickland* is not whether the omitted mitigating

evidence would necessarily have changed the outcome, but rather whether the evidence

undermines confidence in the outcome.  *Strickland*, 466 U.S. at 694.  Here, it unquestionably

does.

---

[9] In a complete mischaracterization of the evidence, the State asserts that the essence of Ms.
Row's evidence was "really Row's performance on two neuropsychological tests – the Rey and
the Wisconsin Card Sort – that Row offers as evidence of organicity."  Dkt. 718 at 28.  With
regard to the brain damage itself, all the experts at the hearing agreed that Ms. Row had cerebral
atrophy.  Dkt. 707 at 14–15; *see also* Dkt. 704 at 63 (testimony of State's expert Dr. Roger); Dkt.
705 at 9, 12 (testimony of State's expert Dr. Kowell).

With regard to Ms. Row's neuropsychological functioning, Dr. Greenberg himself administered
a full neuropsychological battery, which included—literally—dozens of testing instruments.  *See*
HE 4 at 29-30.  "Across the test battery" Ms. Row demonstrated "significant signs of frontal lobe
dysfunction."  HE 4 at 6.  The State could have required Ms. Row to submit to testing by their
own expert, *see* Dkt. 626 at 8–9, and chose not to do so.

Petitioner's Replacement Post-Hearing Response Brief – 14

The Ninth Circuit has been clear:

> In establishing prejudice under *Strickland,* it is not necessary for the habeas petitioner to demonstrate that the newly presented mitigation evidence would necessarily overcome the aggravating circumstances. Instead, in evaluating prejudice, we must compare the evidence that actually was presented to the [sentencer] with the evidence that might have been presented had counsel acted differently, and evaluate whether the difference between what was presented and what could have been presented is sufficient to undermine confidence in the outcome of the proceeding.

*Lambright v. Schriro*, 490 F.3d 1103, 1121 (9th Cir. 2007) (per curiam). Thus the prejudice determination in Ms. Row's case rests on a weighing of what evidence was presented by trial counsel with what evidence could have been presented had trial counsel acted differently. In Ms. Row's case it is truly a pebble compared to a boulder.

There were fleeting references to brain functioning (markedly *not* to cerebral atrophy) at trial, for example,

- Testimony and sentencing report regarding a misread CT scan, *see* Dkt. 19, Lodging A-04 at 1646; HE 15 at 65;

- In the context of describing "alexithymia," *see* HE 20 at 3855–56 (*see* additional argument *infra* at 17);

- Testimony from the defense's only expert at sentencing that he "cannot say she is brain damaged" without the review any imaging studies or conducting even basic neuropsychological testing, *id.* at 3861;

- Closing argument at penalty phase that Ms. Row's behavior "may be related to an organic problem with the brain functioning," *id.* at 3994.

These references do not compare—they are a pebble, not a boulder—to competent imaging, a full neuropsychological battery by a competent and experienced neuropsychologist, reports and testimony from a neurologist and neuropsychologist, and evidence and testimony from lay witnesses and other documentary sources. *See Jones v. Ryan*, 583 F.3d 626, 642 (9th Cir. 2009) ("We have consistently held that merely skimming the surface on important issues does not make

in-depth discussion cumulative."), *vacated on other grounds*, 563 U.S. 932 (2011); *see also Correll*, 539 F.3d 938, 953 n.8 (9th Cir. 2008) ("While the bare facts of Correll's troubled past were indeed presented to the court, without further investigation and presentation of contextual evidence and argument, such facts served only to demonize Correll rather than to mitigate the appropriateness of imposing the death penalty for his actions.").

Even when confronted by "strong aggravating evidence," a death sentence is rendered unreliable if a court cannot conclude with confidence that a jury would have selected death if all the mitigating evidence had been presented and explained. *Caro*, 280 F.3d 1257; *see Sears v. Upton*, 561 U.S. 945, 951 (2010) (per curiam) (evidence may have not made the defendant more likeable, but it might have helped the jury understand the defendant and his acts); *Coleman v. Mitchell*, 268 F.3d 417, 452 (6th Cir. 2001) (failure to present even a substantial subset of mitigating evidence, including "potential organic brain dysfunction," likely affected the outcome such that confidence in the resulting death sentence was undermined).

In addition, the evidence and neuropsychological outcomes of Ms. Row's brain atrophy undermine the weight of aggravating evidence presented at trial. The existence of Ms. Row's brain atrophy would have diffused the trial court's findings that chipped away at the weight of the mitigation evidence—that she had antisocial personality disorder, that she was a pathological and manipulative liar, and that her uncorroborated revelations must be viewed with some caution. Further, the evidence of Ms. Row's brain atrophy could have been utilized to ameliorate some of the aggravating evidence and arguments presented.

It then is not just a matter of placing aggravating factors on one side of the scale and all available mitigating evidence on the other. The evidence of Ms. Row's brain atrophy and the neuropsychological outcomes of such atrophy fundamentally alter the picture created by the

aggravating evidence presented at trial *and* substantially change the picture painted in mitigation. *See Littlejohn*, 704 F.3d at 865 (prejudice heightened by the omission of evidence of organic brain disorder that would have provided an alternate explanation of criminal history); *see also Caro*, 280 F.3d at 1256–58.  "Because it has been established that [Ms. Row] suffers from brain damage, the delicate balance between [her] moral culpability and the value of [her] life would certainly teeter toward life."  *Caro*, 280 F.3d at 1258.

> ### 2.  The "Diagnosis" of Alexithymia Undermined and Undervalued Any Potentially Mitigating Evidence at Trial.

The State's argument that trial counsel's presentation at sentencing of the "diagnosis" of alexithymia is somehow equivalent to a meaningful presentation of brain atrophy is farcical.  *See* Dkt. 718 at 29.  The State attempts to tenuously relate an adjective that describes a deficit in emotional awareness with a serious physical impairment of the brain that has significant impacts on neuropsychological functioning—a comparison akin to saying that describing someone as tired is the equivalent to describing someone who is in a coma.

Simply stating that the alexithymic condition may be related to some organic problem with brain functioning does not make it a competent substitution for cerebral atrophy.  As argued more fully in Ms. Row's opening brief, the term "alexithymia" is not a mental health diagnosis. *See* Dkt. 750 at 29.  It is not a neurological impairment.  It is a term that is pejorative at best, and aggravating at worse, and one that is actually ill-suited to Ms. Row's affect and neuropsychological functioning.  *See id.*

> ### 3.  Environment and Social History are Relevant

The State argues that since etiology of Ms. Row's cerebral atrophy was likely congenital, there is no relevancy for evidence of other factors that may cause atrophy, such as environmental toxins, or the presence of trauma in a social history.  *See* Dkt. 718 at 27.  Again, the State shows

a fundamental lack of understanding of the connections of trauma and environmental factors to brain development.  Environmental toxins impact upon brain development.  *See e.g.*, Patricia M. Rodier*, Developing Brain as a Target of* Toxicity, 103 Environ. Health Perspect. 73, 73–76 (1995); Phillipe Grandjean & Philip J. Landrigan, *Developmental neurotoxicity of industrial chemicals*, 368 The Lancet 2167, 2167–78 (2006).  Childhood exposure to stress and trauma also play a role in brain development, both by potentially causing damage and by exacerbating damage if it already exists.  *See e.g.*, Charles B. Nemeroff, *Neurobiological Consequences of Childhood Trauma*, 65 J. Clinical Psych. 18, 18–28 (2004); Bruce D. Perry et al., *Childhood Trauma, the Neurobiology of Adaptation, and "Use-dependant" Development of the Brain: How "States" Become "Traits,"* 16 Infant Mental Health J. 271, 271–91 (1995).

The question of relevance is basic—evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401(a). Here, the fact that Ms. Row spent most of her early childhood living and playing in a landscape that was saturated with substantial environmental toxins—less than 2,000 feet from a Superfund site—makes it more probable that she has a structural defect in her brain that impacts on her neuropsychological functioning.  *See e.g.*, *Caro*, 280 F.3d at 1254–58 (finding counsel deficient for failing to investigate exposure to and impact of neurotoxins in a 1981 capital case). Similarly, the fact that Ms. Row was a witness to domestic violence, sustained multiple head injuries as a child, and was the victim of physical and sexual abuse as a child, makes it more probable that the structure of her brain and that later in life her neuropsychological functioning was impacted by this trauma.  *See* Dkt. 750 at 64–70.

**4.      Ms. Row is Not Adept at Sidestepping the Consequences of Criminal Behavior**

The State contends that Ms. Row did not display flawed decision-making, quoting their expert, Dr. Moore, that "the odds played out in her favor," and that Ms. Row was "pretty adept at sidestepping the consequences of her criminal behavior, [and] escaped prosecution for financial misdeeds." Dkt. 718 at 31. However, Ms. Row's social history undercuts Dr. Moore's skewed version of events. As laid out in Ms. Row's opening brief, Ms. Row was hardly the mastermind of criminal activity which greatly benefited her life.

Again, Ms. Row's historical misconduct reflects the "chronic pattern of self-defeating behavior" caused by her brain damage. Dkt. 707 at 95. As one example, Ms. Row repeatedly stole money while at the same time appearing to almost go out of her way to make it obvious that she was the culprit. *See* HE 15 at 32–33 (stealing a check from a friend and then writing her own driver's license number on it); HE 3, Tab 8 (stealing a check and then putting her own signature and liquor identification number on it).

Beyond any superficial gain from her prior crimes, the calculus of outcomes was clearly not to Ms. Row's benefit: as a thirteen year old and then again as a fifteen year old Robin was committed to the state industrial school, HE 84; by seventeen she lived on her own with a newborn in an apartment in a sketchy area of town, HE 3, Tab 137 at 6, 21-27, 30; by nineteen Robin committed patently obvious check thefts that resulted in more probation, HE 3, Tab 219 at 1–64; by age twenty, Robin married, and again faced a host of minor charges for bad checks, left everything she had ever known to move to North Carolina with her new husband, and then subsequently spent eight months in prison there for more petty crimes that she was easily caught for, HE 3, Tab 219 at 65–94, HE 15 at 53–54; in California, Robin created a fantasy world of secret agents, and false pregnancies, repeatedly had her mental health questioned, yet again

committed multiple thefts, and spent more time in jail, HE 6, Tabs 6 and 8; HE 15 at 4, 16–19, 32–52, 68–92, 172–81. This sad picture hardly represents an individual making cold, calculated choices which greatly inure to her benefit.

### III.    Conclusion

Despite the State's best efforts, it cannot persuasively stand up for a death sentence that was meted out and then upheld at two proceedings where no one knew the true story about Ms. Row: that she was a victim of serious brain damage which deeply compromised her capacity to conduct herself morally and make good decisions. Ms. Row should be allowed to finally tell that story to a jury, and she therefore respectfully asks for the writ to issue.

Respectfully submitted this 28th day of May 2019.


*/s/ Deborah A. Czuba*
Deborah A. Czuba
Jonah J. Horwitz

Attorneys for Petitioner


### CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of May 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which is designed to send a Notice of Electronic Filing to persons including the following:

L. Lamont Anderson
Lamont.anderson@ag.idaho.gov


*/s/ Heidi Thomas*
Heidi Thomas


Petitioner's Replacement Post-Hearing Response Brief – 20