UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN LEE ROW, | Case No. 1:98-cv-00240-BLW |
| Petitioner, | **CAPITAL CASE** |
| vs. | **ORDER AND NOTICE OF INTENT TO GRANT WRIT OF HABEAS CORPUS ON SENTENCING CLAIMS** |
| BONA MILLER, | |
| Respondent. | |

## INTRODUCTION AND SUMMARY OF RULING

### A. *Procedural Posture of Case and Court's Conclusion*

On February 10, 1992, Petitioner Robin Row ("Robin" or "Row") was convicted of arson of her rented duplex and first degree murder of her husband, Randy Row ("Randy"), and her two children, Joshua Cornellier ("Joshua") and Tabatha Cornellier ("Tabatha"), all of whom died in the fire. Row received the death penalty. After exhausting her state court remedies, she sought habeas corpus relief in federal court in 1998. *See* Dkts. 1, 4, 60, 293. Bona Miller, Row's custodian at the Pocatello Women's Correctional Center, is the Respondent ("the State").

On August 29, 2011, the Court entered an Order and Judgment denying federal habeas corpus relief on her Second Amended Petition. Dkts. 545, 293. On September 26, 2011, Row filed a Motion to Alter or Amend Judgment requesting, among other relief, that the Court retain this case until the United States Supreme Court issued its decision in *Martinez v. Ryan,* 566 U.S. 1 (2012). After *Martinez* was issued, Row filed an Amended Motion to Alter or Amend Judgment. Dkt. 572. Later, the United States Court of Appeals for the Ninth Circuit issued a decision particularly relevant to Row's reconsideration request: *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (*en banc*). *Dickens* held that an inadequately supported claim that was decided on the merits in state court can become a "new" procedurally defaulted claim on federal habeas review if the petitioner tries to offer new evidence that changes the factual basis of the claim such that it has become "fundamentally altered." *Id*. at 1318–19.

Row asked the Court to apply the *Martinez* exception to several of her claims to permit a de novo merits review. The Court granted in part Row's Amended Motion to Alter or Amend Judgment, permitting her to proceed to an evidentiary hearing to demonstrate that the *Martinez* exception should be applied to Claims 7 ¶ 81 (b), (e), and (h), all limited to organic brain dysfunction subject matter:

- Claim 7 ¶ 81(b): "failure to make an independent investigation of matters in mitigation." Dkt. 293, p. 25.

- Claim 7 ¶ 81(e): failure "to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by

> CT scans taken of Row revealing an atrophy of the brain."
> *Id*.

- Claim 7 ¶ 81(h): sentencing counsel were ineffective for their "[f]ailure to investigate, develop, and present evidence rebutting aggravating evidence considered by the trial court." *Id*.

*See* Dkt. 600.

The Court held an evidentiary hearing on the *Martinez* issues on June 5 through 9, 2017. Dkts. 701 to 705. Row did not attend the hearing. The parties filed Post-Hearing Opening Briefs (Dkts. 718, 750) and Responses (Dkts. 751, 752), with post-hearing briefing completed on May 31, 2019. As factfinder, the Court heard the witnesses, observed their demeanor at the evidentiary hearing, asked them clarifying questions, permitted counsel to cross-examine the witnesses on their clarifying answers, and reviewed the full record, including the state court record and the evidence admitted at the evidentiary hearing.

The Court concludes that Row has met the *Martinez* threshold by showing substantiality of Claims 7 ¶ 81(b), (e), and (h). Moreover, the Court preliminarily concludes that Row has presented sufficient evidence to show that she will prevail on the merits of these three sentencing claims. Therefore, unless the State can sufficiently rebut the Court's findings and conclusions in this Order (with a merits evidentiary hearing, if necessary), the Court will grant the writ on these three sentencing claims, vacate her death sentence, and order that Row's custodian (1) be permanently enjoined from carrying out her current death sentence and (2) produce her at a state court proceeding to

be resentenced, if applicable. Therefore, the Court issues this Order granting Petitioner's *Martinez* motion and giving the parties notice that it intends to grant the writ as to sentencing only. The parties may respond according to the schedule set forth below.

## B.  Summary of Ruling: The Perfect Storm

If there ever was a "perfect storm" in the medicolegal world, this case is it. Testifying experts agree that Row has longstanding and likely congenital cerebellar atrophy, as well as cerebral cortical atrophy. "Atrophy" means a reduced size of the brain's components. The experts tend to agree that Row had a cluster of atypical test results on her neuropsychological testing. However, the experts disagree whether Row's extraordinarily poor judgment and repetitive criminal behavior can be attributed to her brain abnormalities, which would tip the scales away from the death penalty. The worst of Row's life history shows that it is very likely she killed her one-year-old daughter Kristina in 1977 to unburden herself; it is also very likely she killed her six-year-old son Keith in 1980 to unburden herself and obtain over $20,000 in life insurance proceeds; and it is clear that she killed Joshua, Tabatha, and Randy in 1992 to unburden herself and obtain over ten times the amount of life insurance proceeds she received for Keith's death.

At the time of Row's sentencing hearing, two CT scans existed that objectively showed the two areas of brain atrophy, and scientific research existed that linked atrophy in those parts of the brain to deficits in empathy, judgment, and decisionmaking. Yet none of this evidence was presented at sentencing.

As early as April 7, 1992, ninety days after the crimes, Ada County investigator Gary Raney gathered sufficient facts to piece together a vivid mosaic of Row's extraordinarily bizarre life history from records and interviews of people who knew her, including law enforcement officers, social workers, psychologists, friends, and family members. Detective Raney compiled an April 1992 supplemental police report that included four references to Row having undergone a CT scan after she fainted and hit her head at work just a month prior to the 1992 murders. Trial counsel did not gather and review Row's medical records from 1992 in their investigation. To a neurologist, the 1992 CT scan image shows that Row's brain abnormalities existed before she was charged with the three murders at issue, even though the radiologist reported at the time that the scan was "normal," because he was primarily looking for fall injuries.

Trial counsel first consulted with psychologist Dr. Craig Beaver to determine whether there were psychological issues relevant to the guilt or penalty phase. Dr. Beaver did not ask counsel to gather Row's medical records for his review. Row herself might have revealed to Dr. Beaver that she had a prior head injury or CT scan, hinted at in this colloquy at the post-conviction hearing:

> Q. Okay. You talked about a CAT scan, that was done in 1991 on Robin Row. How were you aware of that CAT scan?
>
> A. Well, I only recently saw that CAT scan, but I—when I had originally interviewed Robin Row back in June of 1992, she had indicated that she had a –

> Q.     Let me stop you there, Doctor [Beaver]. I think that's
>         going beyond the scope of my question. It's fair to say,
>         then, that you have seen the '9[2] CAT scan; correct?
>
> A.     Yes, I have.

State's Lodging B-12, pp. 123-24. We do not know what the answer to that question would have been, but it does not bear on counsel's independent duties to investigate mitigating evidence for Row.

It was Dr. Beaver's usual practice to review the criminal records associated with a case. He charged three hours' time for a "records review" in Row's case. Because Dr. Beaver has long since destroyed his office records from the early 1990s, we do not know exactly what Dr. Beaver reviewed in Row's case.

We do know that Dr. Beaver did not perform or suggest any neurological or neuropsychological reviews or tests for Row, despite Row's possible disclosure of a prior CT scan directly to hm, despite the references to a CT scan and an outline of Row's bizarre life history in the police report, and despite the probability that she committed repeated acts of filicide.[1] Had Dr. Beaver administered neuropsychological testing, he would have discovered anomalies pointing to a brain disorder. Had a neurologist

---

[1] Mary Hudson, the mitigation specialist hired by post-conviction counsel in their investigation, provided the following article to post-conviction counsel: "A Comparison Study of Filicidal and Abusive Mothers," published in the *Canadian Journal of Psychology* in November 1984, by Arshad Husain, M.D., and Anasseril Daniel, M.D (Vol 29, No. 7, pp. 596-98). In that article the authors observed: "All filicidal women had a history of previous psychiatric disorder requiring intervention and treatment by a mental health professional," compared to only 23% of abusive mothers having such a history. *Id*. at 597. In addition, "[a]ll filicidal women showed major psychiatric disorders at the time of committing the murder," compared to only 7.7% of abusive women. *Id*.

reviewed the 1992 CT scan, the defense team would have discovered that the neuropsychological test results correlated with the CT scan results.

Dr. Beaver interviewed Row and administered two personality tests to her, which showed borderline personality and anti-social personality disorder (ASPD) traits. Many professionals who have *not* reviewed Row's brain scans and correlating neuropsychological test results have similarly labeled Row—including a prior psychologist in conjunction with a 1982 dependency action over Joshua when he was an infant, the attending physician for Row's 1993 suicide attempt, and the state's expert in the 1992-1993 criminal action. In 1992-1993, lawyers and psychologists alike knew, by their medicolegal experience, that an ASPD diagnosis was considered an aggravating factor and an almost-certain ticket to the execution chamber. For that reason, trial counsel decided they would not use Dr. Beaver as an expert witness for mitigation purposes.

In 1993, while awaiting trial, Row tried to commit suicide in the Ada County Jail. As part of the hospital diagnosis and treatment, she had another CT scan. The 1993 CT scan report stated:

> FINDINGS: The cerebellar folia are mildly deepened and sulci near the vertex are mildly deepened for a patient of this age. Combine cerebellar vermian and cerebral cortical atrophy can be caused by a number of irreversible etiologies, but reversible etiologies should be considered and the findings suggest the possibility of alcohol abuse, clinical correlation is advised.
>
> IMPRESSION: THERE IS MILD VERMIAN AND CEREBRAL CORTICAL ATROPHY, SEE ABOVE NARRATIVE FOR DISCUSSION.

Exh. 15, p. 65 (capitals in original).

The suicide attempt prompted trial counsel to engage Dr. Beaver for a second consultation, this time to determine whether Row was competent to stand trial. Dr. Beaver told trial counsel he would like to see Row's hospital records—which would have included the 1993 CT scan report—but counsel never provided them to Dr. Beaver. Row was deemed competent, proceeded to trial, and was convicted of arson and three counts of first-degree murder.

When trial counsel received the pretrial investigation report (PSI) in May 1993, the 1993 CT scan was attached. Despite the announcement of brain atrophy in all-capital letters in the CT scan report, trial counsel did *not* seek clinical correlation, even though the radiologist raised the possibility that alcohol abuse or something else had caused Row's brain atrophy—factors that could have been mitigating. If the 1993 CT scan omission was not enough, trial counsel also missed the attached supplemental police report containing the four references to the 1992 CT scan. That not only one, but *two*, CT scans existed for a criminal defendant—*removing the necessity of asking the court for funding for brain testing*—was phenomenal defense fodder. And, if even this were not enough, attached to the PSI report was a letter dated June 3, 1982, written by Lynn Aitken, the victim of a prior embezzlement case of Row, who, as a layperson, observed ten years before the crime at issue: "As we know Robin does have a problem with truth and being honest. Possibly a complete medical workup with chemical tests for

deficiencies and a brain scan would be helpful." Exh. 15, p. 46. The PSI report contained plenty of evidence that a neurological and/or neuropsychological workup was in order in this horrendous and bizarre case.

Even though a concrete organic brain atrophy defense was readily available to trial counsel at least six months before the sentencing hearing, no one on the defense team considered an organic angle to the defense strategy, including Row's newly-hired expert witness psychologist, Dr. Arthur Norman. Attempting to save Row from execution, Dr. Norman tried to discount multiple diagnoses of ASPD that Row had already been given and that his own personality tests had suggested. Instead, he came up with a creative, rarely-used condition of "alexithymia" and dodged prosecution questions about the personality tests. Like Dr. Beaver, Dr. Norman did not perform or suggest any neurological or neuropsychological reviews or tests for Row, despite his observation that her psychological issues were extreme and he had never experienced anyone like her in the 2,500 to 3,000 evaluations he had done before.

"Alexithymia," Dr. Norman explained, is a "a rare condition where people just seem to be totally out of touch with their feelings ... to a severe pathological degree." Exh. 20, p. 3847. Unfortunately, the alexithymia theory provided no explanation for *why Row might have committed such atrocious crimes*, but instead only addressed how and why, post-killing, she *covered up her feelings* about the incidents. The sentencing court focused on this distinction and found it was merely obvious that a person who had killed her entire family would try to emotionally bury her feelings about it. The only biological

reference the sentencing court noted was that Row's "'alexithymic' condition [the mere covering up of her feelings] may be related to some organic problem with brain functioning." State's Lodging A-2, p. 434 (Findings of the Court in Considering Death Penalty) (parenthetical added).

Unfortunately, after sentencing, the failure to discover, investigate, and present Row's brain abnormality as mitigating evidence continued with post-conviction counsel. Just like trial counsel, post-conviction counsel did not see or did not act on the all-capital-letter brain atrophy diagnosis in the 1993 CT scan attached to the PSI report. Post-conviction counsel did not see or did not act on the four references to the 1992 CT scan in the police report, also attached to the PSI report. Counsel did not consider the prior victim's suggestion that Row's behavior was so bizarre that chemical testing and a brain scan seemed appropriate.

In addition to failing to take note of the brain atrophy evidence, one of the post-conviction attorneys had a clear conflict of interest in his pursuit of Row's case. The post-conviction attorney considered one of the trial attorneys a friend so close he was really like "a brother." Post-conviction counsel admitted he probably didn't go after the trial attorney with his usual zealousness. Other problems plagued the post-conviction attorneys. They were bogged down with many cases, and the public defender conflict contract paid very little.

Time was also at issue. In a different state, post-conviction counsel might have been given extensive time to develop their ineffective assistance of trial counsel claims.

However, in Idaho's rushed capital sentence post-conviction world, there is little time for development of extra-record claims, because the governing statute provides that a post-conviction action in a death penalty case must be filed within 42 days of conviction.[2] (Ironically, convicted felons *not* subject to the death penalty can take up to a year to

---

[2] In *Creech v. State*, 137 Idaho 573, 575, 51 P.3d 387, 389, 390 (Idaho 2002), the Idaho Supreme Court explained:

> The expedited procedure for post-conviction review in capital cases is contained in Idaho Code § 19-2719. *Porter v. State*, 136 Idaho 257, 259, 32 P.3d 151, 153 (2001). The statute provides a defendant with one opportunity to raise all challenges to the conviction and sentence in a petition for post-conviction relief, except in those unusual cases where it can be demonstrated that the issues were not known and reasonably could not have been known within the time frame allowed by the statute. I.C. § 19-2719(5); *Porter* at *id.*; *Fields v. State*, 135 Idaho 286, 17 P.3d 230 (2000); *State v. Rhoades*, 120 Idaho 795, 820 P.2d 665 (1991). A claim that reasonably could be known immediately upon the completion of the trial and can be raised in a post-conviction petition, if not raised in the first post-conviction petition, is deemed waived. *Id.*; *Fields*, 135 Idaho at 290, 17 P.3d at 234; *Rhoades*, 120 Idaho at 797, 820 P.2d at 667. Any successive petition for post-conviction relief not within the exception of subsection (5) of the statute is to be dismissed summarily. I.C. § 19-2719(11).
>
> *   *   *
>
> Creech's fourth claim challenges the statutory scheme for capital post-conviction proceedings, arguing it is unconstitutional. This Court has previously concluded that successive claims involving the procedure and application of Idaho's death penalty statutory scheme are claims which were known or reasonably could have been known when the petitioner's first post-conviction petition was filed. *Lankford v. State*, 127 Idaho 100, 100-01, 897 P.2d 991, 991-92 (1995). Additionally, this Court has repeatedly upheld the constitutionality of Idaho Code § 19-2719. *Id.*; *State v. Rhoades*, 120 Idaho 795, 820 P.2d 665 (1991), *cert. denied*, *Rhoades v. Idaho*, 504 U.S. 987, 112 S.Ct. 2970, 119 L.Ed.2d 590 (1992); *State v. Beam*, 115 Idaho 208, 766 P.2d 678 (1988), *cert. denied*, *Beam v. Idaho*, 489 U.S. 1073, 109 S.Ct. 1360, 103 L.Ed.2d 827 (1989).

investigate, develop defense theories, and file their post-conviction petitions, even though their lives are not at stake. The purpose of the 42-day deadline is to make the death penalty cases conclude faster; however, that this case is now approaching the three-decade mark demonstrates that the unworkable deadline complicates and lengthens the review process.)

While post-conviction counsel could have approached the state district court for funding for a brain expert, armed with the concrete brain atrophy evidence, they did not see the brain issues and instead filed a vague request for funding for a "mitigation expert"—a paralegal-type specialist adept at obtaining life history records and interviewing witnesses. However, the PSI report and the police investigation had been extremely extensive, both covering at least three states and over ten years. Without anything solid to convince the judge that more of the same bizarre information would be worth publicly funding, the court denied the request without prejudice.

The mitigation specialist performed an abbreviated investigation, discovering the brain atrophy issue and speaking to a neurologist just before the final amended petition was due. However, post-conviction counsel did not add the brain atrophy issue to the final amended petition. Instead, they attached affidavits informing the court of the brain atrophy issue and asking for funding and time to pursue it. The request was not a motion, and it does not appear that the court ever acted on the request or that counsel requested a hearing or ruling.

Post-conviction counsel did almost nothing between June and November 1992 knowing that the hearing was scheduled for early January1993. In November, they finally selected a psychologist. In late December, the psychologist suggested a neurological consultation. Post-conviction counsel did not file a motion for a continuance but, instead, showed up on the day of the hearing unprepared and orally requested a continuance. Row's lead post-conviction attorney told the state district court that, if the extension of time was not granted, he would admit his performance was deficient if asked.

However, because the Idaho Supreme Court had set a strict deadline for the post-conviction case to be completed so that it could be consolidated with the direct appeal, it was simply too late for a continuance. The state district court denied the continuance and said that a "higher court" could take up the matter—something that became more and more impossible as Row attempted to present the old but newly-discovered facts to the Idaho courts. The state district court and Idaho appellate courts did *not* permit Row to bring these claims at a later date, because the supporting facts were known at the time of trial and at the time of the first post-conviction action and simply had not been developed. Further, the Idaho courts were *not* permitted to consider Row's post-conviction counsel's ineffectiveness as cause to excuse the default of that claim under Idaho law. Therefore, the Idaho Supreme Court felt constrained to uphold the death penalty under the circumstances, and left adjudication of the consequences of the organic defects for federal court.

Had Row's brain abnormalities been presented to the trial court in a timely, comprehensive, and scientific-evidence-based manner, there is a reasonable probability of a different outcome in Row's state sentencing proceedings. In fact, this case is extraordinary and unique, and presentation of the brain atrophy defense in 1993 or 1995 may have helped the evolution of American medicolegal common law to more closely align with existing scientific research at an earlier point in time than now. But now is when this Court has been charged with reviewing this case.

It is now 28 years post-sentencing. Science knows much more about the interplay of brain abnormalities, intellect, judgment, empathy, morality, and decisionmaking today. Do we now apply what science has learned in the intervening 28 years? The answer is no, because in 1993 there was sufficient scientific research—dating back to the 1800s—to support a strong mitigation defense that Row's particular brain abnormalities played a significant biological causal role in her lack of empathy, morals, and judgment. *See* Exh. 11 (Exhibits attached to Dr. Clay Ward Report).

But the answer is also yes, because there is even more cerebellum-specific, morality-specific, empathy-specific, and judgment-specific scientific research today that supports Row's brain abnormality mitigation defense. Because of the de novo procedural stance of a new *Martinez* claim, this Court is not constrained by the law to ignore modern research.

Motivated by "the evolving standards of decency that mark the progress of a

maturing society" undergirding the common law,[3] this Court has reconsidered, and other jurists and future sentencing factfinders in Row's case may want to reconsider, why the dividing line for the death penalty has been drawn on one side of ASPD-like behavioral manifestations and not the other. The question for modern society in the face of modern research is whether it desires to continue to attach execution-worthy blame to defendants whose complex childhood environments played a critical role in development of ASPD. In their 1986 work, *The Frontal Lobes*, researchers Donald T. Stuss, Ph.D. and D. Frank Benson, M.D. observe:

> Among the most troublesome of all psychiatric problems are the antisocial personality disorders that may be called sociopathy in the adult and delinquency in the child. A multitude of explanations have been offered for these behaviors over the years (Glueck and Glueck, 1970; Hirshci, 1969), most of which emphasize deprived socioeconomic status or troubled interrelationships in the family, suggesting that the sociopathic personality develops in an individual estranged from family and society (Rutter, 1972). Inadequate familial discipline in the formative years appears to be significant (Robins, 1966), and heredity may be a factor but is difficult to separate from environmental factors (Schulsinger, 1972).[4]

Exhibit 11, Tab 6, p. 133 (Exhibits attached to Dr. Ward Report).

---

[3] *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992)("[T]he Eighth Amendment's prohibition of cruel and unusual punishments draws its meaning from the evolving standards of decency that mark the progress of a maturing society, and so admits of few absolute limitations" (internal quotation marks and alteration omitted)).

[4] These researchers also note that ASPD with its serious sociopathic aberrations are far more frequently noted in the male (Winokur and Crowe, 1975). It is unclear whether the trial attorneys or psychologists considered Row's femaleness, which makes the killing of five people even more outside norm.

Quite pointedly, the guardians of societal decency must ask themselves why a person should be executed for the effects of their childhood environment, whether or not combined with heredity and/or an organic brain dysfunction. It is not as if the alternative to a death sentence—life in prison without the possibility of parole—is light punishment, and is not as if the Court is suggesting that all criminal punishment can or should be excused on this basis.

In the past, society has been willing to hang the executioner's hood on the following type of expert opinions, such as Dr. Robert Engle, the State's witness at Row's sentencing hearing in 1993:

> Mr. Cahill:   What causes one person to be a sociopathic personality and another one not to be?
>
> Dr. Engle:   I don't think we know.

State's Lodging A-6, pp. 3931-32. Permitting execution of individuals on evidentiary support that is based on the unknown hardly seems to fit within the standard of decency that marks the progress of a maturing society. It is reminiscent of the witchcraft phase of human thinking popular in the 1500s.[5]

---

[5] The following discussion between a history teacher and his students in Matt Haig's novel, *How to Stop Time*, illustrates the mindset of the witch hunt era:

> "What made people want to believe in witchcraft?"
> At first it looks like a girl on the front row is putting up her hand to answer, but it is just a yawn.

In our modern society, there is no crime so horrendous that we don't look at the whys behind the crime and the whys behind the person who committed the crime. As one state judge remarked, "the very factors which make murder a terrible crime make the death penalty a terrible punishment."[6] It begs the question to state that the factfinder must get it right.

Weighing on the Court's mind is that modern scientific research has also shown that brain circuitries causing deviant thinking can develop that way early in childhood because of poor nurturing environments. The brain wires itself one way in response to an enriched environment and another in response to a depleted environment, and the wiring is very difficult to rewire in later life. Poor environments can also stunt brain size.[7]

---

So I answer my own question....

"People believed in witches because it made things easier. People don't just need an enemy, they need an explanation.... Who do you think believed in witches?"

"Stupid people," someone says. It is a mumble, hard to locate.

I smile. There are fifty-five minutes left of the lesson.

"You'd think so. But no. It was all kinds of people. Queen Elizabeth the First passed a law against them. Then the one after her—King James—he considered himself an intellectual and he even wrote a book about them.... Almost everybody believed in witches."

*Id.*, p. 56 (2019).

[6] *See Lambright v. Schriro*, 490 F.3d 1103, 1126 (9th Cir. 2007) (quoting Arizona state sentencing court).

[7] Bernice B. Donald, Judge, U.S. Court of Appeals for the Sixth Circuit & Erica Bakies, her law clerk, observed the following in an article that was part of a symposium entitled *Criminal Behavior and the Brain: When Law and Neuroscience Collide*:

While the brain encompasses a wide variety of fields of study, neuroscience offers specific and tangible insight into brain

Again, when society's designated factfinders are considering ending someone's life, *where* the factfinders draw the dividing line of fault sufficient for execution should be based on objective facts and current scientific knowledge.

Studies on brain-damaged humans and monkeys conducted between 1869 and 1974 show that (1) brain-damaged human subjects "understood the nature of serious situations but seemed to take no real interest in the gravity of the situation" (1869); (2)

---

underdevelopment and brain injuries. For example, neuroscience demonstrates that what our childhood was like—whether good, bad, or in between—greatly impacts the full development of this vital organ. Studies show that exposure to stress and instability actually prevents the brain from fully developing. In other words, the brain remains small and those processes it controls immature.

Now that current neuroscience technology has the ability to demonstrate how exposure to childhood trauma affects an individual's brain, the next question is how this science and its conclusions in the courtroom can be effectively utilized. This question becomes very apparent in the context of sentencing, where a judge may consider a wide range of factors in determining an appropriate sentence for those defendants standing before her. Without disregarding the criminal justice system's ability to hold those accountable for their actions, neuroscience can be utilized to demonstrate that certain actions may actually be the result of developmental problems associated with the brain, like the effects of complex trauma on children. A judge may also use neuroscience to combat her implicit biases, which have ways of manifesting themselves in the courtroom and therefore need to be explicitly acknowledged. Neuroscience can offer additional insight into a defendant's thought process and accordingly provide a means for the judge to address and correct those biases.

"A Glimpse Inside The Brain's Black Box: Understanding The Role Of Neuroscience In Criminal Sentencing." Bernice B. Donald, Judge, U.S. Court of Appeals for the Sixth Circuit & Erica Bakies, law clerk to the Honorable Bernice B. Donald. (This Article is part of a symposium entitled Criminal Behavior and the Brain: When Law and Neuroscience Collide held at Fordham University School of Law. For an overview of the symposium, see Deborah W. Denno, Foreword: Criminal Behavior and the Brain: When Law and Neuroscience Collide, 85 FORDHAM L. REV. 399 (2016).)

brain-damaged monkeys were "impaired in inhibiting irrelevant reactions and deducing consequences" and "remained in a habitual state of indifference" (1895, 1922); (3) frontal lobe tumor patients exhibited a "dissociation between what the frontal patient knows or says, and how he or she behaves"—for example, a patient who "had an excellent sense of right and wrong when talking about it in an abstract manner ... showed no such sense in his actions" (1947); (4) human patients had "some type of disturbance in concern about losses, self-awareness, and reality monitoring" (1952); (5) human patients with brain abnormalities demonstrated an "inability to correct erroneous behaviors" (1964); (6) patients with brain damage exhibited "self indulgence and utter lack of concern for others" (1975); and (7) brain-damaged patients showed "a complete lack of empathy and lack of awareness for the needs of others" (1984, 1986). Exh. 9,  p. 2 (Dr. Ward Report); Exh. 11, Tab 3 (Exhibits attached to Dr. Ward Report, *Awareness of Deficit After Brain Injury. Clinical and Theoretical Issues*, ed. George P. Prigatano and Daniel L. Schacter (New York: Oxford Univ. Press 1991)).

These early studies tend to show that *knowledge* is distinct from *awareness* (or intellect and judgment are not the same thing), and that a brain-damaged person can know the wrongfulness of her decisionmaking in the abstract but not be able to apply that to her actual decisionmaking in real life. The studies tend to show that a person in a persistent state of indifference to others may lack the empathy that underlies morality and that the process of judgment is a "biological phenomenon," *see* Tr. 189:4-15 (Dr.

Merikangas)[8]—making the two different deficiencies in Row's brain of particular relevance to the decision of her "moral culpability," as phrased in the medicolegal world.

Studies such as those referenced above generally are performed on persons or animals who once had normal brains and behaviors but who exhibit grossly abnormal behavior after having suffered a brain injury. Especially conscience-pricking here is the question of whether a person whose longstanding brain abnormalities occurred early in life, like Row, *might never have developed* good judgment for moral decisionmaking in the first place. Because the standards for sentencing hearings are relaxed, relevant old and new research (from both sides of the spectrum) can be admitted to aid each factfinder to come to a moral decision of his or her own.[9]

---

[8] All references to the evidentiary hearing transcript from June 4-9, 2017, are designated "Tr." Where relevant, the Court has included the name of the expert witness from whose testimony the factual finding is derived.

[9] In "Neuroscience and the Civil/Criminal Daubert Divide," 85 Fordham L. Rev. 619, 628–29 (2016), Erin Murphy writes:

> In criminal cases, novel neuroscientific evidence is typically admitted at the request of the defendant in support of arguments to mitigate punishment, most often in serious sentencing hearings like capital cases.
>
> Thus far, courts' response to neuroscientific evidence when offered for these purposes has been tentative and inconsistent. Courts have shown the greatest enthusiasm for admitting evidence offered by capital defendants seeking to fight a sentence of death by showing brain conditions that mitigate their criminal responsibility. In this context, courts have admitted neuroscientific evidence to bolster claims of behavioral or emotional disorders, the absence of a culpable mental state or evidence of insanity, and diminished cognitive capacity. But it is only the use of neuroscientific evidence in the mitigation phase that has become genuinely common--so common, in fact, that appellate judges

Here, there is no doubt that Row's ASPD diagnosis must be reconsidered because the brain abnormalities at issue can cause behavioral manifestations that are *the same as* the symptoms defining ASPD. It goes without saying that the "alexithymia" condition presented by the psychologist at sentencing certainly must be reconsidered. Rather than leaving counsel, the psychologist, and the sentencing court scratching their heads about why Row acted as she did, counsel could have presented at the sentencing hearing Drs. Stuss and Benson's description of frontal lobe disorder symptoms that mirror Row's life's history: "Inappropriate and near total self-indulgence with a corresponding lack of concern for others." Interestingly, these doctors note that the term *pseudo-psychopath* has been suggested to describe a person whose brain disorder drives them to the types of behaviors seen in psychopaths. *See* Exh. 11, Tab 5, Stuss, Donald T. and Benson, D. Frank, "Neurological Studies of the Frontal Lobes" in *Psychological Bulletin*. 1984, Vol. 95, No. 1, 3-28, 20. As attorneys and psychologists knew in 1993, psychopathy is on the mitigation side of the death penalty qualification equation, while ASPD and sociopathy are usually on the aggravating side.

At the evidentiary hearing in this matter, one of the State's testifying experts summarized the defining feature of ASPD by saying, "[I]f we want to get it in terms of its flavor, it's a lack of *conscience development*." Tr. 671:4-10 (Moore) (emphasis added).

_____

have even found that failure to investigate neuroscientific explanations for behavior constitutes ineffective assistance of counsel.

Row's neuropsychological test results show that she has objective signs of executive function deficiencies known to correspond to the specific parts of her brain that are malformed. Is her "lack of conscience development" due to ASPD? Is it due to the brain abnormality? Or both? The most credible expert opinions in this case are those explaining that the organic cannot be divorced from the personality, but that a "biopsychosocial" model makes much more sense—defined as "the interaction between what the biological capacity of the organism is and the demands being placed upon it in the social environmental atmosphere in which they are in." Tr. 544:13-16 (Beaver).

The decision whether to condemn a human being to die—no matter how despicable the crimes at issue—must be made free from the constraints of the outdated all-or-nothing medicolegal model. In the past, if a defendant didn't fit into the box labeled *psychosis*, *organic brain disorder*, *frontal lobe syndrome*, or *cerebellar cognitive affective disorder*, then, by default, she was deemed to have had volition over her actions and was sent to the execution chamber. In Row's case, three somewhat unique biological factors are at issue: (1) that she has cerebellar atrophy; (2) that she has cerebral cortical atrophy; and (3) that these deficits are congenital or longstanding. Therefore, the issue is not simply whether we can fit her into the cerebellar cognitive affective disorder box, but how the cerebellar and cerebral cortical atrophy affect the entire workings of her brain, and, moreover, how her brain, morality, and judgment developed in the face of the likely-congenital nature of these deficits. The United States Supreme Court has recently reminded us that capital sentencing requires "an individualized determination on the basis

of the character of the individual and the circumstances of the crime," and that "the facts

in each capital sentencing case are unique." *Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020)

(quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)). The consideration of *character*

must take into account whether the foundational building blocks for its development are

missing or are so crumbly from the start that the foundation is nonfunctional.

The Court is also cognizant that there is a modern movement to destigmatize

mental health conditions in the United States so that more people feel better about

reaching out for mental health treatment.[10] There is also an international movement to

identify and track indigent and less-fortunate members of society who suffer from mental

illness and deficiencies to ensure that they have access to medication and counseling

despite a lack of economic resources, to try to keep these individuals on an even keel as

---

[10] The American Psychological Association's article, "Destigmatizing mental illness needs a national push, report says," provides this information:

> Easing the stigma of mental illness and substance abuse disorders needs a national effort that will involve health agencies, as well as the criminal justice system, employers, schools and media, according to a report from the National Academies of Sciences, Engineering and Medicine (NAS) released in April.

> The stigma of mental illness "is in the same category as racism and sexism," says Patrick W. Corrigan, PsyD, distinguished professor of psychology at the Illinois Institute of Technology, a co-author. "It permeates all of society and affects people at all levels."

*See, e.g.,* "The Fight to Destigmatize Mental Illness" at https://www.refreshmh.com/2021/01/27/the-fight-to-destigmatize-mental-illness/; and "Reducing the Stigma of mental illness" at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5314742/.

they interact with society.[11] Consistent with society's modern ideals, the 1993 legal model of "fault" seems faulty enough to be rejected in 2021 in favor of a more decent standard that reflects what society has learned about the brain and mental health in the past 28 years.

Unfortunately, throughout Robin Row's history, many experts, family members, and friends identified something very wrong with her, but she never consistently got the help—or the restraint if she was beyond help—needed to protect her and to protect society from her. Row's mental health and juvenile correction records from the age of 14 confirm what her sister, Tammy Cornelier ("Tammy"), told Detective Raney that, "for as

---

[11] *See, e.g.*, "Integrating Hospital and Community Care for Homeless People with Unmet Mental Health Needs: Program Rationale, Study Protocol and Sample Description of a Brief Multidisciplinary Case Management Intervention," in *Int J Ment Health Addiction* (2017) 15:362–378.

> Hospital inpatient and emergency department (ED) settings offer opportunities to engage homeless people in care and decrease their risk of poor health and social outcomes (Herman et al. 2007; Fontanella et al. 2014). Strategies that bridge hospital and community-based services for this population are therefore urgently needed. One such model, Critical Time Intervention (CTI), was originally developed as a time-limited case management intervention to reduce the risk of homelessness among people leaving shelters; it has since been implemented in a variety of settings, including hospitals (Herman et al. 2011). The CTI model connects individuals with mental illness to a case manager at the point of discharge from institutional to community settings. Individuals are followed for a transition period of up to 9-months, during which their case managers provide emotional and practical support and establish long-term ties to needed health and social services (Susser et al. 1997; Herman et al. 2007).

*Id.*, p. 364 (Canadian study focusing on the homeless population with mental illnesses).

long as she could recall, Robin has been a continuous liar and has always been different from the rest of the family in her interpersonal relationships." Exh. 15 (PSI), p. 182.

Especially relevant is that Row left Joshua, one of her last victims, in the hospital after she gave birth to him in 1981 because she wasn't sure whether she wanted him. In 1982, when Row was convicted of forgery and sentenced to jail during Joshua's infancy, the California welfare system took Joshua away from Row, but then gave him back to her, despite the social worker noting that Row's first two children, Keith and Kristina, has died suspicious deaths and that, with Row's "history [including a 'serious problem with lying'], [the social worker] would not feel comfortable returning this child to [Row] until she has had an in-depth psychiatric evaluation and intensive psychiatric treatment." Exh. 15, p. 92.

In explaining the results of a contemporaneous MMPI test, a California psychologist recommended and warned:

> There are unusual qualities in this patient's thinking which may represent an original or eccentric orientation or perhaps some schizoid tendencies. Further information is required to make this determination.
>
> She may become irritable, aggressive, or impulsive, often out of proportion to reality of the situation. On the other hand, the normal expression of this trait is enthusiasm, energy and goal-directed activity.
>
> The test results on this patient are strongly suggestive of a major emotional disorder. The test pattern resembles those of psychiatric outpatients who later require inpatient care. Appropriate professional evaluation and care and continued observation are suggested.

Exh. 15, p. 91.

This 1982 evaluation appears spot-on, but, unfortunately, by that time, Row likely had already killed Kristina in 1977 and Keith in 1980. It is clear that, contrary to the 1982 social worker and psychologist recommendations that Row have "an in-depth psychiatric evaluation and intensive psychiatric treatment" and that she remain under "continued observation" because she was likely to follow the pattern of a "psychiatric outpatient[] who later require[s] inpatient care," Row was given back her child and was left free to pursue her same pathway, culminating in the 1992 killings of Joshua, Tabatha, and Randy. In hindsight, we might ask the cliché-but-relevant-to-execution question—did Row fail society, or did society fail Row and her family?

This case cries out to be returned to a jury of Row's peers to decide her fate, guided by the modern biopsychosocial model of the human being. Lack of moral judgment and awareness can result in part from abnormal biological functioning of the brain, and not necessarily from the "darkness of [a person's] soul" or "the blackened heart of darkness," as the 1993 trial court understood and interpreted Row's symptoms that we *now* know are consistent *both* with ASPD *and* with brain abnormalities. Sentencing juries should know that human judgment occurs in certain parts of the brain, helped or hindered by their size and the neural circuitry woven together from the defendant's childhood environments and past experiences. Juries should know that the

parts of the brain governing judgment can be underdeveloped or underutilized—even where that same person can somewhat regularly function in society.

Modern jurists and sentencing juries alike must ask whether the medicolegal world has conflated knowledge or intelligence with moral judgment or awareness when evaluating the role of brain damage in the commission of crimes. In another similar case, *Jefferson v. Sellers*, Dr. James Merikangas, the same neuropsychiatry expert Row engaged here, testified that "people who cannot control their emotions due to brain injury have a physical problem with their nervous system, not a moral flaw." 250 F. Supp. 3d 1340, 1361 (N.D. Ga. 2017), *aff'd sub nom. Jefferson v. GDCP Warden*, 941 F.3d 452 (11th Cir. 2019).

This Court concludes, as did the federal district court in *Jefferson v. Sellers*, "Undoubtedly, this mental health evidence, *even if challenged*, would have been relevant as mitigating evidence" because a "jury should be instructed to consider 'any mitigating circumstances' during the penalty phase deliberations." *Id.* at 1384 (emphasis added). Still afloat in the perfect storm, Row's ship has not yet set sail into the sunset of no return. It is time to pause, reassess, and reconsider death penalty qualification, in specific and in general.

## PRELIMINARY EVIDENTIARY ISSUES

Prior to the *Martinez* evidentiary hearing, the Court ruled that the parties' joint and stipulated exhibits, as listed on the parties' exhibit lists as Docket Nos. 665 and 667 were admitted and could be considered and used throughout the upcoming hearing on June 5-9,

2017, with the exception of Exhibit 27, the deposition of Glen Elam, which was later admitted pursuant to another stipulation and Order to Expand the Record. *See* Dtk. 699.

The depositions of Dr. Moore, Dr. Kowell, Dr. Beaver, Rolf Kehne, John Adams, and Glenn Elam were admitted by stipulation and Order at Dkt. 699. Amil Myshin's depositions were admitted by Order at Docket 669.

On June 5, 2017, the Court ruled on the parties' evidentiary objections, leaving some of the final rulings to be sorted out after the hearing, because it was a bench hearing. The Court now revisits those rulings and its rulings on objections renewed at the hearing. Petitioner's Motion to Limit State Testimony from State Expert Roger Moore and to Strike Portions of his Report (Dkt. 645) is denied. It is clear that Dr. Moore has had sufficient experience with brain issues to render his opinions on whether Row's life history is reflective of someone with brain damage.

The parties' stipulated exhibits were admitted at the hearing for all or limited purposes as noted by the deputy clerk in the hearing minutes. Dkts. 686, 688.

Respondent's Motion in Limine (Dkt. 649) is denied as moot. The Court did not rely on the evidence that is the subject of the motion.

Dr. Kowell did not provide an opinion on Cerebellar Cognitive Affective Disorder (CCAD) in his report. It was explored at his deposition. The Court allowed Dr. Kowell to testify on CCAD and permitted the parties to brief whether it is proper to offer opinions only from the reports or also solely in deposition. Tr. 758:4-25 to 759:1-7. Because Row was on notice of Dr. Kowell's opinion prior to the hearing and the standards for expert

testimony disclosure at state sentencing hearings is relaxed (and that is what we are attempting to duplicate here), the Court will overrule the objection.

## REVIEW OF *MARTINEZ* SUBSTANTIALITY QUESTION: FINDINGS OF FACT

As noted above, this Order focuses on the penalty phase of proceedings, where evidentiary standards are relaxed. Therefore, the Court's findings of fact include those items that were presented or could have been presented to the factfinder at the penalty phase of Row's hearing, through either live testimony or documentary exhibits.  Of course, in laying out what evidence might have been presented at Row's sentencing hearing, the Court does not suggest what weight may have been assigned to such evidence by the factfinder. Simply because testimonial or documentary evidence (including hearsay) have been included in the "findings of fact" does not definitively show that the subject matter of the documents or layperson statements is true, but simply that it could have been presented at Row's sentencing or post-conviction hearing.

### A.  Row's Life History from New Hampshire to California

1.   Robin Cornellier (later Row) was born on September 12, 1957. Exh. 15 (PSI), pp. 1.

2.   On December 17, 1971, Row was fourteen and in the ninth grade. After evaluating Row, social worker Edward Fry wrote: "At present she is accused of stealing money from a neighbor's home while she was working there. Robin

claims she did not steal the money. Her neighbor is too nice of a person to steal from." Exh. 11, p. 13.

3.  Row also told Fry that she was raped by two teenaged boys, she became pregnant and had an abortion in New York City, and she later received many obscene and threatening phone calls from the rapist. *Id*., p. 15. In contrast, she told the presentence investigator in the 1992 case that her grandfather had regular intercourse with her beginning when she was twelve, that she got pregnant when she was thirteen or fourteen, and her mom took her to New York for an abortion, but "[b]ack then I really didn't understand what was going on." Exh. 15, p. 10.

4.  Row's mother had her committed by a New Hampshire court to a juvenile detention center, the "State Industrial School," for six months at age fifteen. Row says that "she was considered uncontrollable." Exh. 15, p. 34.

5.  On January 25, 1973, Virginia T. Steelman, performed a screening psychological evaluation on Row and observed:

> Robin states she was committed to the State Industrial School by violating her probation and not maintaining her curfew and truanting in school. She states she was initially placed on probation in December of 1971 for stealing $42 from the lady next door. (Please note that on initial psychological examination she denied stealing the money and admits readily at this time to having stolen it then although she does not know why she stole it.)
>
> At this time there is no evidence of psychosis in Robin, however, there are many neurotic characteristics visible.

Much of her actions appear to be rebellious in nature, based on a great deal of anger and effort to hurt others as a means of defending against her own hurt and as a means of wanting to inflict emotional suffering on others as she has experienced. However, after Robin has committed these various offenses, she experiences a great deal of guilt for her actions. Although at somewhat of a primitive level in terms of the inability to use the guilt as a preventive device to acting out, it is felt that this, too, can easily be worked with to help Robin overcome her impulsivity and desire to hurt others—if only to prevent the intense guilt afterwards.

With efforts at individual counseling on a routine basis, supplemented by peer group therapy, Robin shows a great potential for emotional development. She shows strong possibilities of gaining insight into the emotional dynamics operating, as well as making some efforts at behavior change. In addition to her intellectual ability and verbal skills as strong resources in the therapeutic process, she expresses strong desire for insight and behavior change.

Exh. 11, pp. 6-7 (record discovered by the Federal Defenders on Jan. 18, 2001).

6.     On January 26, 1973, social worker Amy King observed in Row's updated case

history: "She has been suspected by the Nashua Police Department as being a

pathological liar, as she has an uncanny way of explaining things which turn out

to be untruths." In addition, King noted:

Robin's probation was an interesting one. Her probation officer, Joe Landers, was apparently the object of an infatuation by Robin. Mrs. Cornellier suspects that much of Robin's acting out, i.e., curfew violation, truancy was to gain attention from Mr. Landers. Robin is also suspected of sending some unsigned secret admirer cards to Probation.

Exh. 11, p. 11.

7.  Row became sexually active at age fifteen and became pregnant by a seventeen-year-old boy, Michael Dionne, during the summer when Row was living with her cousin Gail's family as a live-in babysitter. Exh. 15, p. 11. Row says that her mother told police officers that Row was pregnant "because she had been raped and had to deal with that." Exh. 78, p. 11.

8.  In January 1974, Row moved in with her mother. Exh. 78, p. 11.

9.  On June 6, 1974, at age sixteen, Row, who was single, gave birth to her first child, Keith Cornellier. During that time, she continued to live with her mother in New Hampshire. Exh. 15, p. 129.

10. Row and Keith moved into their own apartment in September 1975, when Row was seventeen.

11. On September 12, 1975, Row turned eighteen. Exh. 15, pp. 1, 10.

12. On October 14, 1975, Row's second child, Kristina Cornellier, was born. Exh. 15, p. 10; 129. Row believes that a man named Bill White was the father; she never saw him again after she told him she was pregnant. *Id*., p. 11. Row's grandmother babysat Keith and Kristina so that Row could attend college. Exh. 78, p. 13.

13. After the birth of Kristina, Row met her "first boyfriend," Johnny Potter, who "introduced [her] to real sex." Exh. 15, p. 12; Exh. 78, p. 11. Potter was Row's "babysitter" and was five years older. She spent "every weekend" with him, and Row said he was her boyfriend for years. *Id*. (The timeframe may be off,

because there were not "years" in between Kristina's birth and Row's next

romantic relationship.)

14.    In August 1976, Row met her first husband, Robert Hardman, Jr. Exh. 15, pp.

10, 42-43. Tammy recalls that Hardman had gotten into trouble in New

Hampshire for arson. Exh. 15, p. 183.

15.    In 1976, Row was involved in the arson of a vehicle. Exh. 15, p. 87.

16.    In 1977, Row and Kristina were living in an apartment in New Hampshire.

Tammy believed a fire broke out in the apartment below Row's, forcing her,

Keith, and Kristina to move in with Row's mother. Exh. 15, pp. 183-84.

17.    On January 31, 1977, while in Row's care, Kristina died at Row's mother's

home (where she, Keith, Row, and Tammy lived). Tammy recalled the

following, as recounted to Detective Raney:

> On the night Kristina died, she slept with Tammy in Tammy's
> bedroom at their mother's house. When Tammy got up in the
> morning to go to school, she took Kristina in and left her with
> Robin. Tammy got ready for school and recalled that within a
> couple of hours someone came and got her because Kristina
> had died. Robin later told them that she had gotten out of bed
> and went into the kitchen and, when she went back, the dog
> was in the bedroom and Kristina was dead. Tammy is very
> suspicious over Kristina's death and thinks it's likely Robin
> murdered her.

Exh. 15, pp. 182-83.

18.    Kristina's cause of death was unknown and was classified as Sudden Infant

Death Syndrome (SIDS). Exh. 15, p. 11, 129; Exh. 1340.

19.     The Court takes judicial notice that more than 90% of SIDS deaths occur before the age of six months.[12] Kristina was fifteen months old. Exh. 15, p. 42.

20.     Row's stories about Kristina's health and death varied over the years. After the 1992 fire, Row told her friend Joan McHugh that Kristina "had multiple sclerosis or a similar disease and was in very poor physical condition, possibly being blind. Robin's story to Joan was that the daughter had slowly deteriorated and passed away when she was very young." Exh. 15, p. 135. Row told a boyfriend, David Grossman, that Kristina "had died of crib death but she did not mention any other medical problems when relating the story to him." Exh. 15, p. 181. When Row told her sister-in-law Kathy Austin the story of Kristina's death, Row said words to the effect of "I'm glad she's dead, she's in a better place now." Exh. 15, p. 140.

21.     Row told Detective Raney, "Kristina was the baby I didn't want; that I resented.... And I think it made it worse 'cause she was sick. Real hard to deal with." Exh. 15, p. 161. Row told Kathy Austin that Row used to have to beg Tammy to babysit Kristina for her. Row told mitigation investigator Mary Hudson (sometimes referred to in the record as Mary Hudson Goody) that "Mother used to say Kristina was so homely she was cute." Row said that

---

[12] *See SIDS by Baby's Age* published by the federal government at
https://www.dhhs.nh.gov/dphs/bchs/mch/ documents/sids-byage-infographic.pdf.

Kristina "was a very demanding" child. Row told Goody that Row "resented [Kristina] a lot but did not mistreat her." Exh. 78, p. 12.

22. On March 19, 1977, Row married Robert Hardman and moved to North Carolina. Exh. 15, pp. 11, 41, 43.

23. On August 11, 1977, Row pleaded guilty to and was convicted of six felony charges of obtaining property by false pretenses and served seven months of a four-year-long prison sentence. Exh. 15, p. 54. She was discharged from her sentence on August 19, 1978. *Id*., p. 53. Hardman took care of Keith for a few months and then left him at Row's mother's house in New Hampshire. Exh. 171, p. 5.

24. The couple got back together after Row was released from prison. One night Row had also uncharacteristically brought home beer and gave him one after another. Later that night, Hardman awoke with his bedroom wall ablaze. Row was not in the bedroom, but had uncharacteristically slept with Keith on the couch that night. Hardman observed that his can of gun powder had ignited the fire. The gun powder was sitting in an ash tray. Hardman said he always kept the can sealed, but he found it unsealed. In later years, Hardman became convinced that Row started the fire to kill him for his $20,000 death benefit. Exh. 171. p. 5.

25.    Row had no children with Hardman. Exh. 78, p. 12. In or after May 1979, the
couple separated, and Row and Keith moved back to New Hampshire. Exh. 15,
p. 43; Exh. 171, p. 5.

26.    In January 1980, Row and Keith moved to Big Bar, Trinity County, California.
Exh. 15, p. 43.

27.    In May 1980, Row purchased a life insurance policy on herself ($14,000) and
on Keith ($14,000), with a double indemnity clause for accidental death. Exh.
15, p. 174.

28.    On June 19, 1980, at the age of six, Keith Cornellier died in bed in a house fire.
Exh. 15, p. 84. The arson investigation "revealed that the fire was probably
caused by clothing left on top of an electric heater in the child's bedroom. The
remains of the boy were near[ly] totally incinerated and an exact cause of death
could not be determined." *Id*. Although Row told the police investigator she had
no life insurance policies on Keith because she was on welfare, she collected
$28,000 from a policy upon his death. *Id.*, p. 174.

29.    Over the years, Row told a variety of other lies associated with Keith's death.
Exh. 15, pp. 84–87. For example, she told Detective Raney that she had
received extensive injuries in the fire when he had attempted to save Keith and
spent three weeks in the hospital. *Id*., p. 129. She was not injured in the fire at
all. She told Cindy Teal that a young woman who was the victim of domestic
violence moved in with them and placed locks on the inside of Keith's bedroom

door for fear that the woman's husband would break in, but Keith was not tall
enough to unlock it, and he had been found dead by the door, trapped in the
bedroom because he couldn't reach the lock to escape. *Id*., p. 180.

30.   As part of his investigation into the 1992 arson deaths, Detective Raney went to
investigate Keith's death, spoke to Sergeant Chuck Sanborn of the Trinity
County California Sheriff's Department, and read the associated reports. Exh.
15, p. 137.

31.   Detective Raney reported the following on his investigation of Keith's death: "I
learned that on June 19, 1980, Robin had run to her next door neighbor's and
told them her cabin was on fire and Keith was trapped inside. Although she had
put Keith to bed a short time earlier, she told the neighbor she thought Keith
was trapped in the bathroom. He concentrated on gaining access into the
bathroom and upon doing so, found Keith was not there. By the time he was
done with that, the fire was overwhelming and he was unable to rescue Keith
from his bedroom. Upon investigating the scene after the fire, the investigators,
which included [Trinity County Coroner George] Files, found that as the bed
frame burned away, the mattress overlapped an electric heater. The electric
heater had been checked and found to be turned on to high, even though it was
the middle of June and the weather was quite warm." Exh. 15, pp. 1173-75.

32.   Sanborn told Detective Raney that he had investigated Keith's death 12 years
earlier and "believed the fire was intentionally set by Robin and in actuality was

a homicide." Exh. 15, p. 137. Sue Wickersham, who was Row's social worker near the time of Keith's death, said "she had no doubt that Robin had murdered Keith by setting the fire." *Id*., p. 177.

33.   After Keith's death, when Tammy was living with her, Row attempted suicide. Exh. 78, p. 14.

34.   Between August 1980 and the first part of 1981, Row had a relationship with David Grossman. She later told him he was Joshua's father, and though he doubted it, he began paying her child support for him in 1983. Exh. 15, pp. 181-182.

35.   In February 1981, Row obtained a divorce from Hardman in California. Exh. 15, p. 41.

36.   After receiving the insurance proceeds from Keith's death, Row purchased a car for $12,000 cash. Exh. 15, p. 85.

37.   On July 14, 1981, Row reported that her car had been stolen and burned. She had three keys to the car, told the investigator a thief had stolen the second key, but, later, the investigator noted she again had three keys. Cal-Farm Insurance Company paid $5,000 to have the car repaired and returned it to Row. Exh. 15, p. 85. Row refused to take a polygraph test regarding the damage to the car, saying she was pregnant (which was true). *Id*, p. 86.

38.   Row bought a double-wide mobile home and had it moved to Five Cent Gulch Mobile Home Park, paying $15,000 cash as a down payment. Exh. 15, p. 85-86.

39.    On December 6, 1981, Row gave birth to Joshua Cornellier, later to be one of the 1992 arson victims. A social worker noted: "[T]here was concern that [Robin] might possibly harm the infant. Robin did not take the child home from the hospital after delivery, stating she would pick him up the following day as she was unsure what she wanted to do. Given that statement and the facts regarding the deaths of her other two children, plus her own suicide attempt, it was appropriately referred to Child Protective Services." Exh. 15, p. 82.

40.    The social worker also noted: "Row indicated to this worker that her ambivalence at the hospital was due partially to disappointment that she did not have the feelings of bonding, etc., that she thought she should have." Exh. 15, p. 82.

41.    Tammy commented that "Robin's treatment of Joshua was never affectionate." Tammy "didn't feel Robin had any maternal instinct." Exh. 15, p. 183.

42.    Between October 19, 1981, and December 31, 1981, Row, a bookkeeper, embezzled $5,362.50 from her employer, Stitch Witchery, owned by Lynn Aitken. Row was prosecuted for and pled guilty to grand theft. Exh. 15, p. 39.

43.    On January 24, 1982, Row admitted to Lynn that she took the money from Stitch Witchery, saying that she needed it for cancer treatment. Row did not have cancer. Exh. 15, p. 40.

44.    Row had a relationship with Roy Williams through the early part of 1981, and he kept in contact with her until she went to jail in March 1982. After he ended

the relationship with Row, Williams kept an eye on Joshua because other people had told him they were concerned about Joshua's welfare. Tr. 498:8-24.

45.  Row told Williams that she was working in Weaverville for a secret government agency which was investigating the Trinity County Sheriff's Department. Tr. 497:9-20. Later, when Robin went to jail for embezzlement, she explained to him "how this was all part of her investigation and she would be seeking information on the Sheriff's Office from inside the jail." Exh. 15, p. 177. (Row later told people that Williams was Tabatha's father, but Tabatha was not born until October 1983. There is no evidence of paternity.)

46.  On March 24, 1982, Row was arrested and placed in the Trinity County Jail. Exh. 15, p. 177. She pleaded guilty to and was convicted of grand theft. She was sentenced to three years in prison, but the sentence was stayed. She was ordered to serve nine months in the county jail and to cooperate with the probation officer "in any plan for psychiatric or psychological counseling." *Id*., p. 48.

47.  In April 1982, Row purchased life insurance policies on her own life ($10,000), Joshua's life ($10,000), and her sister Tammy's life ($10,000); Tammy lived with her at that time. Exh. 15, p. 88. Row told the investigator that the policy was for Tammy's education when she reached the age of 25; however, the policy was term, without a cash value. *Id*. Tammy said she was furious when

she found out about the life insurance policy and "believe[d] this could mean Robin was considering killing Tammy." *Id.*, pp. 183-84.

48.     Tammy told Detective Raney that "for as long as she could recall, Robin has been a continuous liar and has always been different from the rest of the family in her interpersonal relationships." Exh. 15, p. 182. Chuck Sanborn reported that Tammy, her mother, and her sister told him that Row "is and always has been a 'pathological liar,' and that Tammy's mother and sister felt that Row caused the death of Keith but had no way to prove it." *Id.*, p. 88.

49.     In a presentence report of June 3, 1982, the presentence investigator noted:

> The defendant readily admits that she is a "pathological" liar. She states that at times she does not even realize that she is lying and cannot control this behavior. Her statements and the evidence in the instant offense tend to verify and support this information.
>
> Row does not appear remorseful.

Exh. 15, pp. 44, 49.

50.     On June 3, 1982, Lynn Aitken wrote a letter on behalf of Row for the judge in the embezzlement case, even though Aitken was the victim of the crime and made it clear that she expected restitution. She said: "As we know Robin does have a problem with truth and being honest. Possibly a complete medical workup with chemical tests for deficiencies and a brain scan would be helpful." Exh. 15, p. 46.

51.   Joshua was placed in foster care and custody of the Trinity County Welfare

Department. Betty Wines, his godmother, was his foster parent in May 1982.

Exh. 15, pp. 43, 68-69.

52.   On June 14, 1982, Joshua was declared a dependent of the court. Exh. 15, p. 68.

53.   On June 16, 1982, Barbara Childers, LCSW, with Trinity County Counseling

Center in Weaverville, California, concluded, "Robin has given her son

excellent physical care. However, with her history [including a 'serious problem

with lying'], I would not feel comfortable returning this child to her until she

has had an in-depth psychiatric evaluation and intensive psychiatric treatment."

Exh. 15, p. 92.

54.   On September 3, 1982, Don Williams, Ph.D. of Trinity Counseling Center

administered a Roche MMPI to Row at age 30, and reported:

> This patient is likely to show a history of social
> maladjustment and seriously disrupted interpersonal relations,
> particularly with the opposite sex. She is somewhat
> despondent, irritable, tense and suspicious. Psychoneurosis is
> unlikely, and the patient may show antisocial acting out,
> defective judgment, and unacceptable behavior of various
> kinds.
>
> Although the patient may appear sociopathic, the possibility
> of a psychotic or pre-psychotic condition should be
> considered. She is likely to show a minimal response to
> treatment, and the prognosis is poor.
>
> There are unusual qualities in this patient's thinking which
> may represent an original or eccentric orientation or perhaps
> some schizoid tendencies. Further information is required to
> make this determination.

> She is talkative and distractable, and faced with frustration, she may become irritable, aggressive, or impulsive, often out of proportion to reality of the situation. On the other hand, the normal expression of this trait is enthusiasm, energy and goal-directed activity.
>
> The test results on this patient are strongly suggestive of a major emotional disorder. The test pattern resembles those of psychiatric outpatients who later require inpatient care. Appropriate professional evaluation and care and continued observation are suggested.
>
> Exh. 15, p. 91.

55.    On November 30, 1982, Barbara Childers wrote to Susan Wickerman at the

Trinity County Welfare Department that there was no evidence of active

psychosis in Row, that Row expressed a willingness to continue in counseling,

alone or with her companion Roy Williams, that she "demonstrate[d] a high

ability to care for herself and is willing to work on areas where she hold in

feelings when it would be more appropriate to express them," and that

"[a]lthough major changes are not expected in therapy, she would probably

benefit from this contact." Exh. 15, p. 78.

56.    On December 2, 1982, in another statement about Row's MMPI results, Dr.

Williams wrote:

> MMPI test results indicate a somewhat anti social person with poor ability to make adequate interpersonal relationships, particularly with the opposite sex. She is talkative but distractable and faced with frustration, may become irritable, aggressive, or impulsive, often out of proportion to the reality of the situation. She has her own unique way of dealing with

> her world with may or may not coincide with accepted
> standards of behavior. She is not likely to change this style
> and would be a poor psychotherapeutic risk. The test results
> are strongly suggestive of a major emotional disorder. She is
> not likely to be predictable in her behavior, stable in her
> moods, or rational in her thinking.

Exh. 15, p. 91.

57.  On December 13, 1982, Joshua was returned to the custody of Row by court

order. Exh 15, p. 69.

58.  Between December 1982 and January 1983, Susan Wickerman noted that "Ms.

[Row] is admittedly unable to differentiate truth from lies. She states she

became so involved in the story about [having and losing] twins that she began

believing it. Robin states that a psychiatrist told her years ago that she has no

control over her lying." Exh. 15, p. 16.

59.  On June 1, 1983, Ruby R. Gimblin, director of the Trinity County Welfare

Department, prepared a semi-annual review/social worker report, stating that

Joshua had been declared a dependent of the court as a result of his mother

being sentenced to nine months in the Trinity County Jail. "Additionally," she

reported, "there were concerns as to Ms. Cornellier's history of pathological

lying and questionable circumstances of the deaths of two of her children." Exh.

15, p. 68.

60.  Nevertheless, Gimblin recommended terminating dependency, reporting that,

since Row's release from jail, "[s]he has been able to gain reasonable control of

her anti-social behavior, i.e. pathological lying and she has been able to maintain appropriate interpersonal relationships with the exception of male companions." Exh. 15, p. 70.

61.    Tabatha Cornellier was born on October 17, 1983. Exh. 83, p. 1. Row believes Tabatha's father is Leslie Gorm. Exh. 78, p. 14. (There is no confirmation of paternity.)

62.    In 1986, Row was convicted of passing checks with insufficient funds, spent 12 days in jail, and was placed on probation. Exh. 15, p. 34.

63.    Also in 1986, Row began stealing checks from her close friend and neighbor Mary Smith. Row forged the checks to use Smith's bank account funds. Row was identified by several witnesses as the passer of the checks, and she wrote her driver's license number on one of the checks. All of the checks were cashed at facilities where bingo games were conducted. Exh. 15, pp. 185-86.

64.    Smith reported to Detective Raney:

> [S]he was a next door neighbor of Robin and they were
> friends and often shared coffee together in the mornings. One
> morning she went to Robin's trailer and is positive she left
> her key's [sic] on Robin's table. When it came time to leave,
> she could not locate her keys but knows Robin had to be the
> one to take them because she was the only one with
> opportunity. A short time afterwards Ms. Smith's checks
> were stolen and she ended up reporting this to law
> enforcement in Shasta County. After she reported the theft on
> one particular day, her dog, which she said barked a lot, came
> up missing, and was later found by animal control dropped
> some distance away. Ms. Smith was going to Bingo that night
> and Robin offered to babysit the kids through the night. Ms.

Smith went to Bingo and returned home. During the night, she heard a loud noise and immediately found out the middle bedroom of her trailer was on fire. Through the fire investigation she later learned the fire was thought to have started underneath a tall cabinet where they kept toys. Fire investigators apparently found a piece of cloth coming out from under the cabinet, but did not find any electrical or obvious accidental cause for the fire, although it was labeled accidental or unknown. Ms. Smith said she thought Robin had set the fire at the time but, again, had no proof of it.

Exh. 15, pp. 185-86.

65.     On March 19, 1987, Row was arrested. On July 31, 1987, she pleaded guilty to

two counts of felony forgery. Exh. 15, p. 32.

66.     The California presentence investigator, Susan Hern, described Row as "a

compulsive gambler" who supplemented her income by stealing. Exh. 15, p. 35.

Hern's analysis was:

The defendant's prior record indicates she has had problems before in taking what is not hers. With this offense, it becomes obvious that [Row] has not learned from her past experiences, nor has she gained any respect for the property of others. To the defendant's credit, she did on a prior offense pay full restitution to the victim, however, neither probation nor jail have served as a deterrent in preventing the defendant from victimizing others. To further add to this, [Row] denies wrong doing and attempts to present herself as the victim. It is this officer's opinion, based on the defendant's continuing criminal behavior and the potential threat she presents to the property of others that a State Prison commitment is in order, and further that the aggravated term be imposed.

*Id*.

## B. *Row's Life History in Idaho*

67.   Row failed to appear at her sentencing hearing on the forgery convictions and
      instead left California and moved to Boise, Idaho, with Joshua and Tabatha.
      Exh. 15, p. 12.

68.   Row stayed at a women's shelter for five days and volunteered to help in the
      soup kitchen, where a supervisor helped her apply for Boise City housing. Exh.
      15, pp. 12-13.

69.   In October 1987, Row and the children moved into their own apartment. Exh.
      15, p. 13.

70.   On February 1, 1988, Row obtained employment with the YWCA, as a program
      coordinator for the Harambee Center, which is a day shelter for homeless
      women and children. She later became manager of the YWCA bingo program.
      Exh. 15, p. 13.

71.   Row met Randy on March 27, 1988, and married him on June 11, 1988. Exh.
      15, p. 126.; Exh. 78, pp. 15-16. The Rows and the Cornellier children lived in a
      two-story duplex home at 10489 Seneca Drive, in Boise, Idaho. Exh. 15, p. 106.

72.   On August 8, 1988, Row underwent a total abdominal hysterectomy. Exh. 87.

73.   When Row was working at the YWCA, a fire started. Row reported to the
      insurance company that she was storing Christmas gifts there that were
      destroyed in the fire. Later, the Christmas gifts appeared, and Row changed the

subject when her sister-in-law asked her about notifying the insurance company that they had been found. Exh. 15, p. 140.

74. Row purchased life insurance policies on herself, Randy, Joshua, and Tabatha, as follows: on February 1, 1989, policies from Globe Insurance Company; on April 1, 1989, policies from Continental Casualty Company; on May 1, 1989, policies from Principal Company, an employer-sponsored plan; on December 10, 1989, policies from Mutual of Omaha Company; and on July 12, 1991, additional policies from Mutual of Omaha. The April, December, and July policies had a double indemnity clause. Exh. 15, p. 94.

75. In October 1989, Randy had a motorcycle accident that put him into a coma and caused some permanent mental disability. Exh. 15, p. 126.

76. By February 1990, Randy had awakened from the coma, partially recovered, and could drive a car and perform daily functions; however, he had difficulty with tasks requiring any kind of depth of thought. Exh. 15, p. 126.

77. In October or November of 1991, Robin told Carole Anderson that she and Randy were having marital problems. Robin said, "I'll never go through a divorce, I'll kill him first." Exh. 15, p. 136.

78. In early 1992, it was common knowledge that Robin intended to divorce Randy. Exh. 15, p. 126.

79.   In early 1992, Randy's brother, Robert "Bob" Row, heard Joshua say, "I told Mom that if she wants to leave this family, we're staying with you [Randy]." Exh. 15, p. 139.

80.   When interviewed by Detective Raney, Kathy Austin said Randy told her Row "had threatened to leave him previously, and that he would have to take care of the children because she didn't want to have to care for them." Exh. 15, p. 140.

81.   On January 22, 1992, Randy told the Row's friends Dave and Patty Coler that Row "was tired of me and the kids are getting on her nerves. She needs a new life." Exh. 15, p. 145.

82.   On January 24, 1992, Row purchased additional life insurance policies from Mutual of Omaha on herself and her family, with double indemnity clauses. Exh. 15, p. 94. The total Robin stood to receive from all of the policies she had purchased between 1989 and January 24, 1992, for the accidental deaths of her three family members was $265,000. *Id*.

83.   On January 28, 1992, Row fainted and hit her head on the floor where she managed the YWCA's bingo night. She was taken to St. Luke's hospital, where she had a CT scan; the *report* came back "normal." Exh. 85. However, to a neurologist's trained eye, the CT scan *image* is not "normal," but shows that Row's cerebellum is smaller than usual (in the mild-to-moderate range) and shows mild cerebral atrophy. Tr., 207:10-15 (Merikangas); 751:19-25 to 752:1;

Tr. 749:4-25 to 750:1-4 (Kowell). This anomaly was undetected or undisclosed by the radiologist.

84.    On February 2, 1992, Tabatha told Carole Anderson that Robin had said she didn't want Tabatha and had called her a "selfish little bitch." Exh. 15, p. 136.

85.    On February 6, 1992, Robin called Joshua and Tabatha's godmother, Betty Wines, of California, who had acted as Joshua's foster parent when Row was jailed in California, and with whom the children had spent every summer for the past several years. Row was crying and told Wines that she had been laid off from work at the YWCA, with only one week's notice. She asked Wines if she would be willing to take the children for the rest of the year. Later in the day, Robin called Wines back and said that "the YWCA was going to pay her the money she would have received in salary through the end of February and they had changed their mind and now decided it was not fair to send the kids away while they were going through a financial hardship." Exh. 15, p. 171.

86.    On February 7, 1992, Row told everyone that the YWCA bingo parlor was closing and the last night would be February 8, 1992. Exh. 15, p. 146.

87.    Also on February 7, 1992, Robin told Patty that she was going to move back to New Hampshire and get a divorce. She reportedly was going to move to New Hampshire first because "Idaho was a community property state and she didn't want to give Randy a dime in the divorce." Exh. 15, p. 141. Patty described Robin as "happy-go-lucky" that day. *Id*., p. 146.

88.   On February 9, 1992, Randy told Nancy Snow that "Robin had arranged for all of the valuables to be taken out of the house and put into a shed. Randy said Robin told him that after the divorce, she was moving to Colorado, Oregon, or Washington. Randy commented to Snow that he felt it would be strange she would move without the kids, but then said words to the effect of, 'After what happened in California, I'm not surprised.' Snow did not know exactly what Randy meant by this. Randy told Snow that he felt Robin was having an affair with someone name Joe or John at the Bingo parlor." Exh. 15, p. 131 (reported to Detective Raney). Dates and times retrieved from the Acorn Self-Storage facility (February 2 to 8, 1992) "seem to corroborate Randy's statements to friends and family that Robin had instructed him to move numerous items into the storage shed." *Id.*, pp. 147–148; 154.

89.   On February 9, 1992, James Tucker, 17-year-old nephew of Randy, spoke to Randy, and Randy said Robin was moving out without him or the children. Exh. 15, p. 154.

90.   Almost everything in the storage unit belonged to Row, rather than her family members. Tr. 713:3-6.

91.   Row told friends untrue stories that Randy had been arrested for domestic violence, had a court date scheduled on February 18, and had been committed to the state mental institution. Tr. 724:9-15; Exh. 15, pp. 145-146.

92.   Because of "marital issues," Row had left Randy, Joshua, and Tabatha in the
      Boise duplex where the Row family had been living and instead began staying
      overnight with her friend Joan McHugh on about Thursday, February 7, 1992.
      Exh. 15, p. 201.

93.   Row told her friends that Randy was withholding the children from her or
      "kidnaping" them. Exh. 15, p. 146.

## C.  Crimes at Issue and Investigation

94.   During the early morning hours of Sunday, February 10, 1992, a fire broke out
      at the Row duplex. Local fire trucks were dispatched to the scene. After the fire
      was sufficiently under control, fire crews entered the apartment and found the
      bodies of Randy, Joshua, and Tabatha. All three had died from carbon
      monoxide poisoning as a result of the fire (Randy, 41.4% carbon monoxide
      level; Joshua, 58%; Tabatha, 31.5%). Exh. 15, p. 126.

95.   In the very early morning hours of February 10, Row did a load of laundry,
      showered, and then woke up Joan McHugh. Row said words to the effect of,
      "Will you go with me [to the Seneca Street residence]? I have a terrible feeling.
      I need to see if they are there (referring to her story that Randy was going to
      kidnap the kids)." Exh. 15, p. 133.

96.   Joan and Row traveled to Row's residence. "Joan said they could not see the
      apartment or the fire from the roadblock, but Robin made some comment that

there was a tragedy at her apartment. Joan later realized that Robin could not have known something was wrong without some other information." Exh. 15, p. 134.

97.  After arriving, Joan and Row saw that the apartment was on fire and learned that the family had died in the fire. Exh. 15, p. 134.

98.   Eventually, Row was charged with three counts of first-degree murder and one count of aggravated arson. Exh. 15, pp. 28-30.

99.  The same day her family died, Row approached the mailman at Joan's house and asked him for a change of address form for herself, which she submitted the same day. Exh. 15, p. 160.

100.  After the house fire, Row reported to the YWCA that the money and files from the bingo game were lost in the fire. Exh. 15, p. 155.

101.  While the arson and multiple-death investigation continued, Detective Raney asked Joan McHugh to put a tape recorder on her telephone to record conversations between herself and Row. On March 20, 1992, Row telephoned McHugh from the jail. As suggested by Detective Raney, McHugh told Row that she had awakened at about 3:30 a.m. on the morning of the fire and had gone downstairs, but could not find Row in the residence. In response, Row told McHugh that she had left the residence that night, but stated that she was outside the house talking to her psychiatrist, who had driven over to Row's.

Exh. 15, pp. 187-188. There is no evidence to corroborate Row's story, such as testimony from her psychiatrist.

102.   Investigators determined that the arsonist started the primary fire on the north side of the closet door opening by the garage entrance. Exh. 15, p. 21.

103.   The arsonist started a secondary fire by igniting three or four pairs of children's underwear in the living room, using a flammable liquid accelerant. Exh. 15, p. 21.

104.   The arsonist disabled the smoke detector in the residence by turning off the upstairs power at the circuit breaker. Exh. 15, p. 21. As a result of the disconnected smoke alarm, the victims were not alerted to the fire that caused their deaths.

105.   In the Meridian storage unit, police discovered cash and files tending to prove that Row had been stealing from the YWCA bingo operation. This discovery resulted in Row's arrest on February 13, 1992, for grand theft by unauthorized control of funds belonging to the YWCA, while investigators continued to collect and review the arson and murder evidence. Row was placed in the Ada County Jail, and bail was set at $100,000. Exh. 15, p. 155.

106.   Before the fire, Row and her family had been spending a significant amount of time socializing and recreating with John Blackwell ("John"), the son of her friend Joan McHugh ("Joan"). Row called John "her best friend" and developed an obsession with him, as her letters from jail to him would show. Exh. 15, pp.

255-56; Exh. 1083-1088. Row said she and John never slept together and he was involved with a woman in Boston who was the mother of his children. *Id*. Investigators used this information to support motive for the murders.

107.   The purchasing of life insurance policies close to the time of the crimes also supported motive.

108.   Among Row's belongings investigators found her 1991 tax return showing an infant daughter under age 1 with the name "Terra Row." Detective Raney told her no such child existed and that was tax fraud. Row replied, "Just add it to the list." Exh. 15, p. 156.

## D.   Trial Counsel Work on Guilt Phase of Row's Case

109.   Attorneys Amil Myshin (first licensed in 1971) and August Cahill (first licensed in 1980), both experienced criminal defense attorneys from the Ada County public defender's office, represented Row from the preliminary hearing stage to several months after sentencing, ending their representation on March 10, 1994. Exh. 24, pp. 7-8. Cahill, who was chief deputy in the public defender's office, acted as lead counsel. Tr. 329:4-16; 331:10-11. Exh. 22, p. 13; Exh. 25, pp. 17-18.

110.   At the time Row was charged, the Ada County Public Defender's Office did not have a mitigation specialist, but it had had the services of Glenn Elam, the Public Defender's Office investigator, and limited funding for investigation. Tr. 702:329-30; Ex. 24, p. 32.

111. Cahill had no formal training regarding mental health issues; he just learned about them through experts or doing research on his own. Tr. 334:19-22, 335:1-5.

112. Cahill began his investigation into Row's mental health issues by engaging Dr. Craig Beaver, a local psychologist. Cahill "had a long professional association with him" and Dr. Beaver was his "go to" mental health expert. Tr. 390:17-24.

113. In March 1992, Cahill contacted Dr. Craig Beaver "to do an initial forensic psychological evaluation of Row to help in determining if there were some relevant issues for trial and/or in mitigation." Tr. 703:522; Exh. 26, p. 9; Exh. 24, p. 6.

114. Dr. Craig Beaver is a licensed clinical psychologist in practice in Idaho since 1983. He did an internship in clinical psychology and neuropsychology at Fort Miley Veterans Administration Medical Center and the University of California at San Francisco Medical School and attended a four-year post-doctoral training program with Dr. Lloyd Cripe, head of neuropsychological services for armed services in the Western Theater. Dr. Beaver holds diplomate status in clinical neuropsychology. Tr. 703:519; Exh. 42, p. 115.

115. On April 7, 1992, Detective Raney prepared a supplemental investigation report that included the following: (1) "In support of Robin's claim that Randy had become violent, she told me that she had recently gone to St. Luke's Hospital and received a CT scan after [Randy] slapped her in the side of the head and

bruised her brain wall" (Exh. 15, p. 129); (2) "Dave [Coler] took Robin to St.

Luke's hospital, where she supposedly had a CT scan" (*Id*., p. 141); (3) "Robin

talked about her claims of Randy's violence and that she had the CT scan at St.

Luke's after Randy hit her on the side of the head" (*Id*., p. 150); and (4) Row

told Anjanette Viehweg, her hairdresser, that "a guy at the crisis center had hit

her on the left side of her head. She later said she had to go to the hospital and

have a CT scan done. This was supposedly on January 31, 1992, that the CT

scan was done" (*Id*., p. 165).

116.    On or about June 11, 1992, Dr. Beaver performed a three-hour record review

and/or diagnostic interview. Exh. 178; Tr. 606:5-8. He doesn't have a specific

recollection of what he did in this matter, but relying on his prior history of

working on capital cases in the early 1990s, he would have requested existing

criminal records in the case in which she was charged, as well as "past records."

Tr. 522:9-16.

117.    On June 11, 1992, Dr. Beaver had Row complete a general questionnaire about

her history. Tr. 523:21-25; 524:1; Exh. 160. The same day, he administered the

MMPI-2 . Tr. 522:21-25 to 523:1-8; Exh. 158. On July 7, 1992, he administered

the MCMI-II (Millon Clinical Multiaxial Inventory-II). Tr. 523:8-20; Exh. 159.

118.    Cahill trusted Dr. Beaver "to do what he thought was appropriate in terms of

evaluating" Row to "determine if there was anything he could do to help," and

"it could be everything from competency to stand trial to ... sentencing issues

down the line." Tr. 391:13-18. Cahill relied on Dr. Beaver to ascertain what

testing was appropriate because Dr. Beaver was "more knowledgeable in the

area" and "more skillful at what he did than [Cahill] trying to tell him to do

more." Tr. 399:8-14. Co-counsel Myshin trusted Dr. Beaver to do the same.

Exhibit 25, p. 55 ("we used Beaver to look at her and give us guidance").

119. Cahill saw the MMPI, the Million (MCMI), and the Rorschach as personality

tests, not neuropsychological tests. Tr. 346:3-12.

120. Cahill and Myshin met with Dr. Beaver several times and spent several hours

with him. Exh. 22, p.14; Tr. 396:1-4.

121. Dr. Beaver communicated to Cahill and Myshin his concerns that Row had

"significant personality issues, both antisocial and borderline." Tr. 524:10-17.

Dr. Beaver told trial counsel basically the same information that was in the

discovery: "that she was a pathological liar, probably sociopathic, clearly

depressed.... She was competent. She was not psychotic." Exh. 42, p. 220.

122. Based on Dr. Beaver's evaluations and his discussions with defense counsel,

Cahill understood that Dr. Beaver did not find anything organic with respect to

Row, but that she suffered from a personality disorder. Cahill knew that Dr.

Beaver did not do a full-blow neurological examination, but understood—based

on the battery of tests he did perform—that Dr. Beaver found nothing

suggesting an organic basis. *See* Exh. 22, p. 15; Tr. 397:25 to 398:1-2.

123.    Myshin shared this same understanding of Dr. Beaver's opinion. Myshin testified in deposition in 1995: "I know there was no brain damage according to his analysis. There were antisocial features of her personality which were negative that I [didn't] want to let out. It's hard to remember exactly what – where it comes in. But in the terms of her records, I mean, pathological liar was all over her mental health records." Exh. 25, p. 19. Myshin agreed that brain atrophy was never an issue for trial counsel and was never given to any of the experts as an issue. Exh. 25, pp. 58-59.

124.    It was Cahill's understanding that it was a bad thing to have your client diagnosed with antisocial personality disorder. He considered that to be a mental health diagnosis that could be helpful as far as being mitigation, but would have worried more about it being considered an aggravating circumstance in a generic sense (that their behavior perhaps could not be modified in the future). Tr. 333:13-21.

125.    Cahill and Myshin decided not to order a report from Dr. Beaver because his conclusions were negative and would be more aggravating than mitigating at sentencing. Myshin said: "The things he had to say were not positive so we did not use him." Exh. 25, p. 19. Cahill said: "And what was damaging about Dr. Beaver was that basically Robin's personality style, as I recall, was consistent with the State's theory in this case, which is that she was, you know, dependent upon men. And her dependency for this John Blackwell, this new boyfriend,

could have contributed to her to doing everything they said that she had done."

Exh. 22, p. 15.

126. There is nothing in the record to show that Dr. Beaver deduced for himself as part of his diagnosis of Row, or suggested to trial counsel or anyone else, that any neurological or neuropsychological testing be conducted on Row.

127. On January 12, 1993, Row tried to commit suicide in the Ada County Jail in Boise, Idaho, where she was being held awaiting trial. Row was taken to St. Alphonsus ("St. Al's") hospital, where she received a CT scan. The January 12, 1993 CT scan report ("1993 CT scan") shows:

> FINDINGS: The cerebellar folia are mildly deepened and sulci near the vertex are mildly deepened for a patient of this age. Combine cerebellar vermian and cerebral cortical atrophy can be caused by a number of irreversible etiologies, but reversible etiologies should be considered and the findings suggest the possibility of alcohol abuse, clinical correlation is advised.
>
> IMPRESSION: THERE IS MILD VERMIAN AND CEREBRAL CORTICAL ATROPHY, SEE ABOVE NARRATIVE FOR DISCUSSION.

Exhibit 15, p. 65 (capitals in original).

128. The attending physician at St. Al's, Dr. Charles Steuart, noted "antisocial personality disorder," a history of depression, and history of suicide in Row. Exh. 15, p. 64.

129. At Cahill's request, in January or February of 1993, Dr. Beaver met with Row after her jail suicide attempt to review her competency to proceed to trial. Tr.

525:4-9. Dr. Beaver told Cahill that Row was competent to proceed. Exh. 22, p. 16.

130.     Cahill's handwritten notes reflect that Dr. Beaver told Cahill he would like to see the hospital records from Row's suicide attempt. Upon reviewing this note years later, Cahill concluded that he had not provided the St. Al's hospital records (including the 1993 CT scan report) to Dr. Beaver. Exh. 22, pp. 16, 18.

131.     Nor did trial counsel ever order a copy of the St. Al's hospital records, which would have included the 1993 CT scan report, in the course of their own investigation. Exh. 25, p. 59. Cahill doesn't think he saw the hospital records until the PSI report. *Id*., p. 17.

132.     Had counsel provided Dr. Beaver with the St. Al's hospital records, Dr. Beaver would have recommended neurological and neuropsychological testing for Row, with "more exploration of medical history." Tr. 528:2-5; 529:1-12; 530:8-14.

133.     Dr. Beaver had no other involvement in Row's case after her post-suicide attempt competency review. Tr. 525:4-9.

134.     On March 5, 1993, Row was convicted of all charges by a jury of her peers. *See* State's Lodging A-2, pp. 437-441.

## E.  Trial Counsel' Work on Penalty Phase of Row's Trial

135.     In 1993 in Idaho, sentencing was performed by the state district court judge, not a jury.

136.   To prepare for sentencing, Cahill and Myshin began looking for another psychological expert for mitigation purposes. Myshin knew of Dr. Arthur Norman through another attorney, who had used Dr. Norman on the David McAbee case. Myshin went to Canyon County to meet Dr. Norman and to observe his testimony in the McAbee case. Exh. 25, p. 20. Myshin was happy with Dr. Norman's work on the McAbee case and thought his vita was impressive—he had been working in death penalty cases for years. *Id*., p. 21. In fact, Dr. Norman had about 15 years of forensic work behind him. Exh. 20, p. 3834.

137.   Cahill retained Dr. Norman after the guilt phase but before the penalty phase "to try to develop some kind of mitigation, you know, about Robin's behavior and who she was and that sort of thing; in other words; just to help us help her." Tr. 342:14-18.

138.   For mitigation, Cahill was "looking at, at least, if there was anything dramatic in [Row's] background that might affect the way she acted, you know, abuse issues, substance abuse issues, probably would have concerned ourselves with whether she had suffered any trauma." Tr. 333:1-7.

139.   At the time of Row's sentencing, Cahill defined "mitigating evidence" as "anything in the person's character, background, life, the facts of the offense itself that would give rise to leniency on behalf of the judge who was the sentencer at that time." Tr. 332:17-23.

140.    Cahill was familiar with mental health issues as potentially being a mitigating factor. Tr. 333:10-12. At the time, he thought that brain damage could be a mitigating circumstance. Tr. 335:6-9, 352:12-16.

141.    The strategy with Dr. Norman was that counsel were trying to find "something more subtle or more than just, you know, financial gain, or you know, having a boyfriend that she wanted to be with instead of – and not being married." Tr. 357:20-25; 358:1-4.

142.    On or about May 28, 1993, Row's PSI report, prepared by Ada County District Court presentence investigator Laila M. Jeffries, was sent to Cahill and Myshin and prosecuting attorney Roger Bourne. The 1993 CT scan report was attached to the PSI as an exhibit. *See* Exh.15, pp. 1, 64. The supplemental investigation report with the four references to the 1992 CT scan was also attached. *See id*., pp. 123-192.

143.    Myshin read the PSI report. He recalls the 1993 CAT scan report being in the PSI report among the medical records for Row's hospitalization from the jail suicide attempt. Exh. 25, p. 56.

144.    Cahill testified, "If [the 1993 CT scan report] was in the PSI, I reviewed it." Tr. 340:5-9.

145.    Myshin did not do anything in response to seeing the CT scan report notation that "clinical correlation is advised." Exh. 25, p. 56. He did not follow up because, he said, "it wasn't a significant thing to us." Exh. 25, p. 56.

146. Cahill would have understood the 1993 CT scan report's notation that "clinical correlation is advised" to mean "that the doctor would recommend ... further information, ... whether it be further testing or just an examination of the history to maybe explain that." Tr. 348:8-20.

147. Cahill recalls that Row's history reflected that she did not seem to have a drinking problem. Tr. 348:21-23. The 1993 CT report mentioning alcohol abuse as a potential cause of the atrophy did not prompt him to do further investigation.

148. In 1992 and 1993, Cahill would have understood "vermian and cerebral atrophy" as expressed in the "Impression" part of the 1993 CT scan report as meaning "that there was something that's not fully developed or has—you know, is not as you might expect it to be." Tr. 347:20-25; 348:1. He wouldn't have known—and didn't at the time of the hearing know—what "cortical atrophy" or "vermian" meant without the help of an expert. Tr. 348:2-7.

149. Cahill testified: "If I thought it was an issue ... I typically would have vetted it to my doctor or my expert. In the sense of them telling me it was significant, you know, I might do research on that; ... in other words, try to make myself more informed about what they are talking about." Tr. 343:14-25.

150. None of the defense team researched brain atrophy. Tr. 343:11-25 to 344:1-2.

151. At his deposition on November 13, 1995, Myshin testified that he had "no recollection of any alleged brain atrophy." Exh. 25, p. 18.

152.   Likewise, Cahill testified in deposition: "I don't remember anything about [the brain atrophy in Robin] in particular." Ex. 22, p. 16.

153.   The following statements from Myshin and Cahill demonstrate that they perceived something was very wrong with Robin Row:

- Myshin testified in deposition: "Robin was a real enigma to me because she didn't seem appropriate. I mean, she was always so flat. I was very concerned about that. I didn't know what exactly it was I was dealing with." Exh. 25, p. 22.

- Myshin testified at the post-conviction hearing: "[G]iven the combination of the impression that we receive[d] from the videotapes [of Raney's interview] as well as the impression of her in court, as a defense lawyer, I wanted an explanation for that that wasn't just that she didn't care." State's Exhibit B-12, p. 223.

- Myshin stated: "We were desperate [b]ecause it was a horrible thing that happened and to try and outweigh that was—we were looking for answers. I never did, you know, figure Robin out myself. But that's what Dr. Norman came up with and it [Dr. Norman's diagnosis of alexithymia][13] seemed to make sense." Exh. 42, p. 216.

- Cahill noticed Row was very quiet and was not agitated about much of anything, "which sometimes is pretty

---

[13] At the time of the sentencing hearing, "alexithymia" was not classified as a "diagnosis" or a "personality disorder" in the Diagnostic and Statistical Manual (DSM)-III-R, but sometimes it would be referred to as a "diagnosis" for lack of a better term. Dr. Robert Engle, the State's psychological expert, testified at sentencing that it "is a general descriptor of one's psychological state. It is not found anywhere in the diagnostic criteria that I looked at, as well as the previous generation of diagnostic material that was revised in order to give us the standards we have now. I could not find it anywhere.... Alexithymia is a broad concept which encompasses a number of different diagnoses." State's Lodging A-6, p. 3926. Dr. Engle further testified that alexithymia is not "a mental diagnosis or a diagnosis of a mental condition" and "it certainly is not a mental illness of any kind." *Id.*, p. 3929.

unusual with people charged with serious crimes." Tr.
332:5-7.

- Cahill even argued at sentencing that "the problem in this
  case is that the nature of the defendant's illness is not
  known to us" and that Row's psychological problem "so
  far exceeds the bounds or normality as to interfere with
  her functioning," and Dr. Norman "can't say what really
  ... caused it for sure. It may be related to organic problem
  with brain functioning." State's Lodging A-6, pp. 3994-
  3995, Tr. 360:18-21.

- Cahill later explained why he made that sentencing
  argument: "I think what we knew about Robin is that we
  didn't know everything there was to know about Robin, in
  the sense of, you know, what her behavior was, was so
  outside of the norm, if, in fact, she did this, as to maybe
  there is something organic causing a problem." Tr.
  360:22-25 to 361:1-2.

154.  Notwithstanding their perception that something was very wrong with Robin

Row, Cahill and Myshin did not further personally investigate or follow up with

the facts that were in hand, but chose to rely only on their experts' opinions

alone. Dr. Norman declared in the post-conviction proceedings:

> Defense counsel conveyed no sentencing strategy to me and
> gave me no direction in the sentencing of Ms. Row, the result
> of which was that I developed my own strategy without input
> or direction from the defense counsel.
>
> It was my decision to have Robin Row "come clean," admit
> the offense, and show remorse. The attorneys did not
> participate or discuss this strategy with me.

Exh. 25, p. 2 or Dkt. 130, p. 2.

155.  During their investigation, Cahill and Myshin did not carefully read the exhibits

to the presentence report, particularly the 1993 CT scan report, to see or

ascertain the meaning of the words "clinical correlation is advised" to determine

the etiology of Row's brain atrophy, including whether it resulted from alcohol

abuse. Therefore, they did not point out the report to, or ask for clarification

about the report from, Dr. Norman. Tr. 343:5-10; Exh. 25, pp. 29 & 56-59.

156.   Cahill testified that there was no strategic decision to not further investigate

Row's brain damage. Tr. 367:13-16.

157.   In the course of Dr. Norman's workup of Row, on June 8, 1993, Dr. Alex B.

Caldwell prepared an analysis of Row's MMPI-2 for Dr. Norman. Exh. 3, Tab

47. Dr. Caldwell summarized the results as follows:

> She obtained a personality disorder profile that has been
> associated with passive-aggressive disturbances and
> borderline paranoid episodes. She is prone to be hostile,
> tense, and agitated when she feels trapped or threatened and
> then to react in manipulative and self-centered ways. She tests
> as prone to act out with poor judgment, lapses of forethought,
> and defective impulse controls. She would react with anxiety
> and nervousness to the threat of punishment for acting out,
> but her anxiety is apt to be transitory and situational. Many
> similar patients have proven severely vulnerable to
> difficulties in managing alcohol and any drugs that gave them
> an immediate relief from tension.
>
> Some similar patients have suspiciously misinterpreted
> particular events or shown circumscribed paranoid beliefs,
> but they remained well oriented and the break with reality
> was limited to the specific ideation. She tests as prone to
> project her angry feelings and aggressive impulses onto
> others. She would overreact to anger in others and would
> overreact especially to events that she saw as confirming her
> projections. Resentful and irritable, overt or poorly disguised
> temper outbursts are strongly predicted; these are apt to be
> disruptive and hard for others to deal with. Outward apathy

may at times conceal the intensity and depth of her
resentments.

Rationalizing, blaming, and self-excusing, she would be
especially rationalizing of any past retaliatory acts or
currently revengeful impulses. She appears evasive, lacking
in insight, and defensive about admitting emotional conflicts.

The pattern suggests a severe risk of dependency on
medications or misuse of them. With this pattern, a history of
using drugs to produce a "high" or for relief on tension would
emphasize the risk of future dependency and misuse.

*Id*., p. 42.

158.    Row's sentencing hearing was held on October 21 and 22, 1993. State's

Lodging A-6, p. 3683, *et seq*.

159.    There is a factual dispute over which tests Dr. Norman performed and

recommended to trial counsel. Dr. Norman testified at the hearing that he

conducted only MMPI and MCMI testing on Row. *Id*., pp. 3839, 3880. The

prosecutor and the state court judge asked for several clarifications, and the

answer was the same: the MMPI and the MCMI. *Id*., pp. 3881, 3882, 3892-97.

160.    Dr. Norman clarified that he also reviewed a one-page summary of a 1982

MMPI test conducted by "Roach Laboratories." Specifically, Dr. Norman said:

"There is that one page that made no sense to me, the Roach printout, there was

no data, no nothing. That service is now defunct, I believe." *Id*., p. 3893. Dr.

Norman testified that he also reviewed Dr. Beaver's MMPI and MCMI tests.

*Id*., p. 3894.

161.  Dr. Norman's associate, Carla Anderson (sometimes spelled "Karla Andersen" in the record), a psychology major at a junior college who had completed two years of studies but had no degree, performed about 50 hours of session work with Row for Dr. Norman's office. Anderson mentioned the following tests at the sentencing hearing: the MMPI,  MCMI, and the Rorschach.[14] State's Lodging A-6, pp. 3786, 3828-29.

162.  When Mary Hudson was investigating Dr. Norman's work on the case and spoke to him in 1995, it appears from her notes that he said he had performed additional tests. Hudson's notes reflect: "Tests they did: MMPI, MCMI, Rorshach with Echsner [sic] system, Wechsler, didn't see any organicity." Exh. 120 (The correct spelling of "Echsner" is "Exner"). Hudson's notes also say: "Thinks they requested a full scale SPECT to rule out. They W/N do the test. Wanted full neurological." *Id*. These notes from Hudson are hearsay and are completely contrary to Dr. Norman's testimony at the sentencing hearing. Dr.

---

[14] Cahill testified: The Rorschach is a "projective test, primarily. Although a lot of research has been done with it to expand its use and make it more objective, initially it was a fairly subjective interpretation. But it's the inkblot test." Although it is a neuropsychological test, "a lot of neuropsychologists don't use the Rorschach," Cahill testified, and he "wouldn't call it a standard." In response to a question of whether the Rorschach would have been generally accepted at the time that he was working on Robin's case, he answered: "I don't think all neuropsychologists or neurologists used it. And it's one of those things that, over time, experts have disagreed about vehemently." Tr. 92:1-21. Dr. Moore agreed: "The Rorschach would not be, in general, a standard piece of a neuropsychological assessment. In other words, a lot of neuropsychologists probably wouldn't use that as part of their battery. But the flip side of it is, if you had a Rorschach, you can certainly pick up signs of organicity on that." Tr. 616:8-12.

Norman knew he was under oath and did not disclose the Rorschach on cross-examination, and he certainly didn't disclose the Wechsler.

163.   In addition, his testimony gives no inkling that he suspected neurological testing would have been appropriate.

164.   In fact, Dr. Norman testified at the sentencing hearing that he did not have evidence that Row's alexithymia had an organic etiology:

> Q.   Now as you have gone through your—the literature, is there a reason that you can pinpoint why Robin has such a hard time dealing with her feelings?
>
> A.   I can only talk about the research and I can only talk about the theories. I cannot say she's brain damaged. I cannot say that the corpus callosum that connects both—they've done research on this, has been out or is damaged on the left side of her brain and right side don't—are disconnected. I mean, I don't have proof of that. The thing that they talk about, the early trauma, well we seem to have much more evidence to that. That people seem to go into a state of almost, it's not denial, somebody referred to it and I've have to pull it out as—it's well beyond denial, it's—I think the word pathological came up again, it's extreme, it goes beyond when we usually say somebody's in denial, a word that's used all the time. It's like it's not there, it doesn't exist, it's not real to her.

State's Lodging A-6, pp. 3861-3862.

165.   There is nothing in the record to show that Dr. Norman deduced for himself as part of his diagnosis of Row, or suggested to trial counsel or anyone else, that any neurological or neuropsychological testing be conducted.

166.    On this disputed factual issue, the Court finds Dr. Norman administered *only*

the MMPI and the MMCI to Row and that he did *not* advise trial counsel to

obtain neurological or neuropsychological testing. Exhibit 120 will be

disregarded to the extent it contradicts Dr. Norman's court testimony.

167.    Dr. Norman diagnosed Row with "alexithymia," which he described as "a rare

condition where people just seem to be totally out of touch with their feelings ...

to a severe pathological degree where they almost don't have words to describe

how they feel." State's Lodging A-6, p. 3847. Dr. Norman found more than 350

psychological articles dating back to 1974 on alexithymia "including

neuropsychological research." *Id*. Alexithymia is discussed as a mental illness

by the Task Force of the American Psychiatric Association, and it is

"pathological" in the sense that "it so far exceeds the bounds of whatever

normality is that it seems to interfere significantly with somebody's

functioning." *Id*., p. 3849.

168.    Dr. Norman testified that Row's case was very abnormal:

Q.    Now, you're—let me see if I can use a particular
example.  We've had the death of Robin's immediate
family, her two children and her husband, and are you
saying that she basically is in denial that that happened
or are you saying it's not denial, it's as though she's
unaffected by it?

A.    Well, as I said, it seems to go beyond denial. In order
to—it seems to be so extreme that—it's a tough—
tough call. Somehow it's blocked, somehow it's
damned up, somehow it's protected or, you know, they

> say her is [sic] ego protected from this, that it's so
> threatening and it could hurt, be so painful to have to
> put it away, hide it, lock it up or deny it, but it goes
> beyond denial.
>
> And the mechanism how exactly that works—as I said
> there are different theories. But you see that but this is
> the most extreme case.

*Id.*, p. 3862.

169.   In fact, Dr. Norman thought Row was so abnormal, he testified that "this was

certainly the most extreme case I have ever seen." In fact, "in 2,500 or 3,000

evaluations I have never really experienced anything like this." *Id.*, pp. 3848-

49.

170.   It appears that Dr. Norman came up with the alexithymia theory to avoid the

ASPD diagnosis in an effort to save Row from the death penalty.

171.   Even under cross-examination, Dr. Norman zealously stuck by his diagnosis of

alexithymia in an attempt to discredit Row's prior and contemporaneous ASPD

diagnoses. In response to the question of whether his alexithymia diagnosis was

"based upon testing instruments done by others, that is, the MMPI," Dr.

Norman answered, "No way, none—not at all." State's Lodging A-6, p. 3896.

He testified that his diagnosis of alexithymia also was not based upon testing

that he did—the MMPI and the MCMI. He said the test "results turned out to be

just nothing," and that they didn't eliminate any possibilities. *Id.*, p. 3900. Dr.

Norman clarified that his conclusion of "alexithymia" came from his "mental status exam" of Row, which was a series of interviews. *Id.*, p. 3898.

172.   Myshin testified that he disclosed nothing about Dr. Norman's opinions to the prosecution prior to the sentencing hearing. Exh. 25, pp. 22-23. Dr. Norman testified that he did not prepare a report, he "wrote down very little," and he essentially had "no notes." State's Lodging A-6, pp. 3883-3884.

173.   The prosecutor was indeed surprised by the alexithymia theory and asked the Court to order Dr. Norman to provide his test results to the prosecutor to prepare for a rebuttal. Dr. Norman provided his test results to the prosecutor between the first and second days of the sentencing hearing, and the prosecutor provided them to the State's expert, Dr. Robert Engle, a local psychologist and experienced expert witness, for his review. State's Lodging A-6, p. 3914.

174.   Even with the gravity of crimes at issue and the extreme abnormality of Row's case, Dr. Norman did not: (1) ask counsel or Row whether any brain scans existed; (2) notify counsel that any brain testing, neurological testing, or neuropsychological testing should be pursued; (3) notify counsel that an organic basis for any of the behavior could be or should be ruled out before a personality disorder diagnosis was made.

175.   To rebut Dr. Norman's testimony and theories, the prosecutor called Dr. Engle, who testified that Row's MMPI and MCMI results "are strongly indicative of" the following: (1) "antisocial personality traits," (2) "difficulties with paranoid

perception of the world," (3) "chronic depression," and (4) "histrionic

personality style." *Id*., pp. 3920-22.

176.    The state district court sentenced Row to death. Row's judgments of conviction

and commitment were entered on December 16, 1993. State's Lodging A-2, pp.

442-449. Findings of the state district court in support of the death penalty and

imposition of a death sentence were entered on the same day. *Id*., pp. 415-434.

The aggravating and mitigating factors found by the state district court are set

forth below.

### F.  Aggravating Circumstances Found by the Trial Court

177.    In *State v. Row*, 955 P.2d 1082 (Idaho 1998), the Idaho Supreme Court

determined that the state district court properly found the following

aggravating factors supporting imposition of the death penalty:

> • "In its decision to impose the death sentence the
> district court opined that the separate verdicts finding
> Row guilty of each of the three counts of first-degree
> murder established, as a matter of law, the statutory
> aggravating circumstances under I.C. § 19–2515(g).
> Idaho Code § 19–2515(g)(2) provided for a statutory
> aggravating circumstance when '[a]t the time the
> murder was committed the defendant also committed
> another murder.' Applying this statute, the district
> court held that because Row had 'obviously committed
> three first degree murders which the jury found to be
> willful, deliberate and premeditated,' the statutory
> aggravator existed. We agree with the district court
> that the facts and supporting jury verdicts objectively
> establish, as a matter of law, the 'multiple murders'
> statutory aggravator. The district court's finding of the

statutory aggravating circumstance is amply supported
by the record."

- "The district court also considered the fact that Row
  was found guilty of arson, which established the
  statutory aggravating circumstance found in Idaho
  Code § 19–2515(g)(7)—a murder committed in the
  perpetration of arson."

- "Furthermore, the district court concluded that 'two
  additional statutory aggravating circumstances have
  been proved beyond a reasonable doubt.' In this
  regard, the district court found that Row's anticipation
  of insurance proceeds established that the murders
  were committed for remuneration or the promise of
  remuneration pursuant to I.C. § 19–2515(g)(4)."

- The district court also concluded "that the nature of the
  murders established that Row exhibited utter disregard
  for human life, establishing the aggravating
  circumstance found in I.C. § 19–2515(g)(6)."

*Id*. at 1086–87.

## G. Mitigating Circumstances Found by the Trial Court

178.    The mitigating factors considered by the state district court at sentencing

included all of the following:

- "Defendant was probably sexually abused by her step-
  grandfather over a period of several years; this
  relationship resulted in her pregnancy and abortion.
  Defendant did not reveal this until just recently, but it
  clearly would affect her psychological makeup. One
  word of caution, however. Defendant is without a
  doubt a pathological and manipulative liar; such
  uncorroborated revelations must be viewed with some
  caution."

- "Defendant was physically and emotionally abused by
  her mother."

- "Defendant's parents were divorced when she was young, leading to resentment and rebelliousness by defendant."

- "Defendant was raised in an unstable environment where she observed domestic violence between her parents. Defendant's father was arrested in the home. She received very little positive nurturing and emotional support during her childhood."

- "Defendant had a special relationship with her father. He was incarcerated in prison most of her adolescent years. Her fears of abandonment are no doubt traceable to this circumstance."

- "Defendant was placed in an institution as a teenager. Her home life was sufficiently chaotic that she did not want to return home."

- "While a teenager defendant had two children. The fathers of these children were not supportive. Both of the children are now deceased."

- Defendant's "prior record includes no crimes of violence or acting out in any way which threatened physical harm to others."

- Defendant's "good qualities" include "being helpful to others ... being described and viewed as a 'good mother,' ... maintained steady employment, ... always served as the primary financial provider for her family," and had supporting character witnesses."

- Defendant had a "mutually abusive" marriage with Randy Row.

- Regarding Defendant's "mental, psychological and personality problems," the trial court stated:

  o "In a general or descriptive sense, I have no difficulty in referring to Robin Row as mentally ill or having a mental disorder, but certainly not in the sense that she is psychotic—ie. having lost touch with reality, or that she does not know the difference between right and wrong, or that she is incapable of conforming her conduct to the dictates and norms of society. MMPI test

results indicate basically an antisocial personality disorder, evidenced by poor impulse control, lack of empathy, manipulative, a pathological liar, somewhat paranoid with a histrionic personality style, suffering also from chronic depression."

o "Defendant has a personality style which makes her unhealthily dependent upon others and with a poor ability to make adequate interpersonal relationships, especially with the opposite sex. She may react in a manner out of proportion to events around her (passive-aggressive) and is generally insecure with fears of abandonment. She has a chronic self-defeating style of relating to the world and has been diagnosed with a major emotional problem, which may be generally described as 'alexithymia.'"

o "Defendant's alexithymia is evidenced by her extreme disconnection with her feelings; she is in emotional withdrawal and her emotional affect is way out of touch with her true feelings. Such affect is generally flat (ie. her feelings are not appropriate to or congruent with the event). This clinical disconnection can perhaps be best described as a pathological emotional denial. Defendant has buried her feelings so deep that it required extraordinary efforts by her psychologist before she could express her feelings of remorse for that much of her role in the crimes she was willing to admit. This 'alexithymic' condition may be related to some organic problem with brain functioning. She is just now beginning to express some feelings of remorse of her role in the deaths of her family."

State's Lodging A-2, pp. 415–434 (Findings of the Court in Considering Death

Penalty).

179.    The trial court weighed the mitigating factors against only one of the

aggravating factors—multiple murders—and found "the scale or balance tips

dramatically to that side authorizing the harshest penalty allowed by law."

State's Lodging A-2, p. 428. In support of its decision, the trial court noted the

following:

- "By any stretch of the imagination, the mitigating circumstances ... pale in significance and comparison to the premeditated murders."

- "The circumstances of the fire were such that any rational person would know and intend the logical consequences of this criminal conduct, ie. The deaths of the sleeping victims. And Robin Row is certainly rational in that sense! Defendant's alexithymic mental condition and emotional affect may explain how she could methodically destroy her family by blocking out all human feelings of remorse—without confronting the darkness of her own soul; but it cannot come close to justify or outweigh the gravity of three (3) murders."

- "The horror of what she has done may also explain her coping mechanisms of emotional withdrawal, blocking, flat affect, denial, and supposed memory loss (feigned, in my opinion); but such condition provides no justification to outweigh the gravity of this aggravating circumstance."

- "Robin Row must now be confronted with the reality of what she has done; she can run from it in her mind and emotions, but she can't hide from the truth of her chosen actions."

- "So defendant had a difficult childhood and came from a dysfunctional family; she may have been sexually abused; she has had a number of bad marriages with some abuse; she has some good qualities (so do we all) and was perceived as a loving, caring mother (the *ultimate irony*, I might add); and has lost touch with and blocked her emotions. (emphasis in original). This is hardly a counterbalance on the sales of justice towards leniency, *if* that is how a fixed life sentence is perceived."

- "The murders of Randy, Joshua and Tabatha weigh like a boulder over against the pebbles of [Row's mitigating circumstances]."

- "ALL mitigating factors do not come close to outweighing the aggravating circumstance of three (3) murders and by

> no stretch of the imagination make the imposition of death
> unjust; the calculus tips inexorably to a sentence of
> death."

State's Lodging A-2, pp. 428–430 (emphasis in original).

180.  Idaho Code § 19-2719 required Row to file a petition for post-conviction relief

in the state district court within 42 days after imposition of the death penalty.

Death penalty direct appeal actions must be consolidated with post-conviction

appeals in Idaho. *See id*.

181.  On January 24, 1994, Cahill filed a motion for extension of time to file a post-

conviction action to give conflict counsel time to investigate potential issues of

ineffectiveness of trial counsel. State's Lodging B-10, pp. 43-45.

### H. Post-Conviction Counsel Work in Post-Conviction Proceedings

182.  The motion for extension of time to file the post-conviction petition was

granted, and conflict counsel were directed to file a "'generic' post-conviction

petition immediately," followed by an amended petition "within forty-two (42)

days of the filing of the jury trial transcript." State's Lodging B-10, p. 50.

183.  From about March 10, 1994, to March or May of 1996, Rolfe Kehne (first

licensed in 1978) and John Adams (first licensed in about 1984), independent

contractor conflict counsel to the Ada County public defender's office,

represented Row in initial post-conviction proceedings through the post-

conviction appeal, pursuant to an assignment from Ada County Public Defender

Alan Trimming. State's Lodging B-10, pp. 50, 89 & C-1 to C-20; Tr. 11:9-19; Exh. 49, p.6; Exh. 69, p. 6.

184.   Adams considered Gus Cahill, one of Row's trial lawyers, a friend. Adams considered Amil Myshin, her other trial lawyer, a friend like a brother. Tr. 12:18-25; 13:1-6. This information was not disclosed to the court or to Row. Adams testified later, "[L]ooking back, I would say that I probably didn't go after them as hard as I might have somebody that I didn't consider a brother." Tr. 13:1-6. In other post-conviction cases, he "really went after [trial counsel], but [he] didn't go after Gus or Amil that way." *Id.*, 13:1-6.

185.   On March 17, 1994, Kehne filed Row's generic initial post-conviction petition. State's Lodging B-10, pp. 56-60.

186.   On September 22, 1994, Kehne received the 4,000+ page trial transcript. *Id.*, p. 89.

187.   Adams summarized the allocated time and funds for Row's post-conviction case as follows: "[W]e felt that there was a lot more we wanted to do, but we just didn't have the resources; we didn't have the money; we didn't have the time. We didn't have the physical stamina to work 18 hours a day. That's what I recall." Tr. 31:14-18.

188.   Kehne and Adams could have obtained Row's local medical records from 1992 and 1993 quickly, easily, and inexpensively.

189.    Kehne and Adams had access to a mitigation investigator, Mary Hudson, but had slim funding resources for her services or other experts. State's Lodging B-10, pp. 156–57; Tr. 12:1-7.

190.    Kehne and Adams decided to ask the court for public funding to hire Hudson expert to perform an investigation. State's Lodging B-10, pp. 73-81.

191.    There is nothing in the record to show that, before post-conviction counsel filed their motion for a mitigation expert, they had carefully read the pre-sentence report exhibits, in particular, the 1993 CAT scan report that recommended follow-up assessment for the brain atrophy issue, to know to specifically ask for funding for a neurologist and neuropsychologist to perform the follow-up. Nothing in the record reflects that post-conviction counsel reviewed the psychological records of Dr. Beaver or Dr. Norman carefully enough (or at all) to determine that neuropsychological testing had not been completed by either psychologist. They had not brought the 1993 CAT scan report to the attention of Dr. Beaver, Dr. Norman, or another professional to obtain an expert opinion that more neurological and neuropsychological testing was needed.

192.    Rather, on January 23, 1995, Kehne and Adams filed a bare "Motion re: Applications for Expert Assistance," with a Memorandum in Support of Ex Parte Applications to 'Money Judge.'" *Id*. These filings did not disclose the neuropsychological brain atrophy issues in particular or the need for an expert in that field. *Id*. The transcript of the ex parte hearing reveals that counsel

requested "an allotment of expert witness fees, basically for a mitigation

expert," and more specifically, that the state court characterized the request as

"$5,000 for expert witness fees for, for want of a better term, your paralegal or

the person that you have designated as an expert in this area. Apparently, she

has done this type of work in the past, sifting through all records, in terms of

she classifies herself as a litigation expert." State's Lodging B-11, pp. 102-03.

193.   The state district court denied the motion for funding on these grounds:

- The sentencing hearing ... involved a great deal of
  mitigation evidence that was presented through witnesses
  to the Court concerning the defendant's childhood and her
  emotional and physical abuse; positive qualities of the
  defendant's character were brought out at the sentencing
  hearing. There was an expert presented to deal with some
  of her mental, psychological and personal personality
  problems, her alexithymia, her disconnect with her
  feelings, her psychological and emotional denial.

- [A]t this time in the absence of a particularized showing,
  I'm going to deny your motion for opening up the
  pocketbook and out of whose budget, I don't know, for
  what amounts to a fishing expedition in terms of what is
  reasonable and necessary within the ambit of a UPCA
  hearing. I fail to see how rummaging through whatever
  this specialty person wants to do at this stage of the
  proceeding after trial, after sentence, and during appeal is
  reasonable and necessary in terms of defending Ms.
  Row's rights within the specific context of a UPCA
  hearing at this time. There is no particularized showing;
  nor is there any showing why such finding cannot be
  accomplished through the normal public defender budget
  under which I presume you are operating; nor any
  showing why you can't accomplish this yourself, i.e., why
  some special expert is needed over and above counsel's
  expertise.

State's Lodging B-11, pp. 113-14.

194. The state district court's reaction was quite understandable. The presentence investigation and PSI report, with exhibits, had been extensive (as shown by every reference to Exhibit 15, above). The PSI report quite comprehensively outlined the bizarre history of Row's behavior throughout her lifetime. *See* Exh. 15. In light of the PSI report's comprehensive nature and without a showing that something different was necessary, the record supports the state court's decision that there was little or no apparent need to fund a mitigation investigator.

195. In denying the request, the state district court left the door open for counsel to return and seek funding for some specific purpose: "The Court denies the motion, but notes that it would, in the future loot [sic] at this motion again is [sic] specificity exists." State's Lodging B-10, p. 99.

196. On May 1, 1995, Kehne and Adams wrote to Mary Hudson and said, "There is apparently no money for a full-blown investigation at this time." Tr. 83:13-24. 701:113. She agreed to work a certain number of hours for $2,500, in her words, "to develop what I felt were the themes in the mitigation in Ms. Row's case and also provide him with an affidavit that would give the court an idea of how much time and funds would be needed to do a full investigation." Tr. 113:20-25 to 114:1.

197. Mary Hudson traveled to Kehne and Adams's law office in Boise and reviewed the following information: (1) discovery provided by the prosecution; (2) PSI

report and exhibits; (3) witness testimony in guilt phase transcript; and (4) the penalty phase transcript. Exh. 126, p. 2.

198. Hudson requested Row's full medical records from the jail suicide attempt. In the stack of records, she found the 1993 CT scan report that identified the brain atrophy. Tr. 120:3-12. When she recognized the atrophy issue, she telephoned Kehne and "learned from him that they had already prepared the [post-conviction] petition and that they were preparing to move forward with filing it without including any mitigation information or any information about her potential mental health problems." Tr. 127:17-23.

199. June 15, 1995 was the deadline the Court gave for Kehne and Adams to file a "final amended Petition" State's Lodging B-10, p. 87. On that date, Hudson signed an affidavit extensively detailing all of the mitigation evidence she had found, including the 1993 CT scan and the recommendation by Dr. Jonathan Pincus, a Washington, D.C. neurologist, for neuropsychological testing, including the Wisconsin Card Sorting test and an MRI. Tr. 50:6-18; Exh. 126 (1995 Affidavit of Mary Hudson).

200. Post-conviction counsel Kehne's understanding was that, if Row had evidence of organicity, such organicity disqualified her from the diagnosis of antisocial personality disorder, or at least took a lot of the sting out of it. Tr. 701:103. Kehne's understanding was that psychologists, especially those in forensic

settings, were supposed to exclude the organic as part of the definition of antisocial personality disorder. Tr. 103:7-12; 104:1-25.

201.     Kehne knew that borderline personality disorder was inconsistent with brain damage, that a Rorschach test could not diagnose brain damage, and an MMPI was not a reliable indicator of brain damage. Tr. 106:8-24.

202.     On June 16, 1995, a Friday—one day after the deadline—Kehne and Adams filed Row's amended petition for post-conviction relief. It did *not* expressly include the brain atrophy issue, despite the trial court's admonition to them that this was to be the "final" amended petition. State's Lodging B-10, pp. 87, 121-134. Exhibit 32. Page 13 of the amended petition stated: "Petitioner needs more time and resources to investigate this area further and prays the court for time to submit supporting materials and to complete a neuropsychological examination of Petitioner." *Id.*, p. 52. With the amended petition, Kehne filed Hudson's affidavit detailing the mitigation and brain atrophy evidence found to date, a scientific article entitled, "Atrophy of the Cerebellar Vermis: Relevance to the Symptoms of Schizophrenia," and Kehne's own affidavit stating, in part, "One outstanding feature about the information we have uncovered is that it suggests extreme mental illness of some type." State's Lodging B-10, pp. 145-165.

203.     Kehne declared in his affidavit accompanying the amended petition the following:

> We are making arrangements for further testing of Petitioner; we are continuing to investigate the issues surrounding the petition and Petitioner's background; and we need more time for development of facts.
>
> Wherefore, I submit this affidavit in support of the amended Petition and Petitioner's request for more time and leave to amend or supplement this Amended Petition.

State's Lodging B-10, p. 148.

204.    This request by counsel for more time to amend or supplement the Amended Petition was not a formal motion. The court took no action on it, and Kehne and Adams did not ask for the court to do so. They did not file a renewed motion requesting funding for neuropsychological testing from the trial court. Tr. 57:5-7.

205.    The district court was required to file a "Report to the Idaho Supreme Court Pursuant to I.C. § 19-2719(8), and Request for Final Extension" to explain to the Idaho Supreme Court why it hadn't already adjudicated the post-conviction case, because resolution of that case was holding up the direct appeal. State's Lodging B-10, pp. 192-193. On August 31, 1995, the Idaho Supreme Court granted that request, giving the state district court until January 31, 1996, to complete the matter. *Id*., p. 194.

206.    Counsel had six months in between the time they filed the amended petition and the hearing date of January 8, 1996. Counsel did not engage Dr. Pincus or a local neurologist. They did not arrange for neuropsychological testing.

207.   In November 1995, counsel finally chose a psychologist "to be [their] expert and tell [them] where to go next." Tr. 55:11-22. They gave the psychologist the records to review about two months prior to the hearing. *Id.*

208.   On December 28, 1995, less than two weeks before the hearing, the psychological expert notified Kehne that he had completed his review and recommended that Kehne consult with neurologists Dr. Giles or Dr. Prochaska, obtain neuropsychological testing, and obtain an "NMR [sic]"expert. Exh. 42, p. 94.

209.   Kehne spoke to Dr. Giles and his partner Dr. Prochaska, but neither would agree to assist with the post-conviction case. Tr. 96:25 to 97:1-4.

210.   Kehne does not know why the neuropsychological testing was not done. It was their intention to do it. He thinks they just ran out of time. He cannot think of a strategic reason why the tests would have been left undone. Tr. 50:21 to 25-51:1-18.

211.   Kehne and Adams did not file a written motion to continue the hearing to accommodate the testing. Kehne testified, "I can't remember what we were doing that kept us from getting on it sooner. But, I mean, it's just as patent and apparent as it can be that we dropped the ball." Tr. 55:11-13. Kehne could think of no strategic reason they did not file a motion for a continuance. He said, "I do recall that John Adams and I were all but tearing our hair out as that hearing approached because we knew we were dead; we know we had really screwed

up." Because the judge had said, "No more continuances," they had to take him

at his word, even though they weren't ready for the hearing. Tr. 56:12-15.

212.    On January 8, the post-conviction hearing was scheduled to begin.

213.    On the first day of the hearing, Kehne said:

- "Judge, we are asking the court to vacate this hearing and grant us a continuance to allow us further time to develop our case."

- "Furthermore, we make the argument that whether or not trial counsel were ineffective, as a matter of due process of law and the need for accuracy under the cruel and unusual punishment clauses, Dr. Norman's evaluation was so inadequate that the sentence should not stand."

- "Among the things—what we need to do ... is consult with a medical imaging expert and we have chosen, although he hasn't agreed to do it yet, Dr. Giles or his partner, whose name I believe is Prochaska. And the reason we chose them is that Dr. Giles read a CAT scan taken of Robin after she attempted suicide in the Ada County Jail and in his report he noticed some brain atrophy. Judge, we have been able to obtain those films, and the brain atrophy that he is talking about is such that you can see it, I can see it, anybody who looks at these films can see it. I think that's a very significant thing that absolutely has to be followed up on. So our plan would be to consult with Dr. Giles, have him obtain a CAT scan given to Robin at Saint Luke's Hospital a year or two earlier and compare the two and at the same time proceed with neuropsychological testing and attempt to correlate that with behavior throughout Robin's life."

- "We also, unless Dr. Giles tells us that there is nothing here, we also would propose to get an NMR of her brain and then consult with a doctor from the University of Utah, who is an expert in imaging and to whom we have been referred."

- "So we ask for five months. And if we do not get the continuance, we do not have any witnesses today. We did not go to the expense of bringing the background witnesses from Massachusetts and from New Hampshire and from California because what they have to say isn't real [sic] significant until we tie it in with the mental health things."

- "If forced to go today, I am prepared to testify and give my opinions about trial counsel's failures and what should have been done and what needs to be done, but Judge, if I am given the opportunity in the future, I will testify that I am not prepared and I was not constitutionally effective or did not provide constitutionally effective assistance of counsel and that Robin Row is being denied due process of law."

Exh. 42, pp. 86, 90-92; see Tr. 55:17-24.

214.    The court responded: "Counsel, at this time, about the best you can give me is some conjecture or speculation that something might be revealed as a result of another CAT scan, MRI imaging or whatever. It goes from there. That's about it." Exh. 42, p. 94.

215.    The prosecutor argued:

> Well, I'll tell the court that I've talked to Dr. Giles before we came to court today. I spoke to him after one of the last hearings and he says that there is nothing to this atrophy business, that perfectly normal people in society have brains, some bigger and some smaller than others and that there is nothing to this atrophy theory. And I assume that when they talk to him he'll tell them the same thing.

> Judge, we're dealing with smoke and mirrors here. There is nothing to this and the burden of proof is on them. The people of the state have clearly set it out that they expect those things to be done in 90 days and the Supreme Court has upheld that.

Exh. 42, p. 101.

216.   The court denied the oral motion to continue. The hearing began as scheduled.

217.   Kehne and Adams did not call any lay witnesses to testify about Row's

background or experiences in support of a brain damage claim at the hearing

because, Kehne said, they were simply unprepared. *See* Tr. 59:10-23. In

addition, this Court recognizes that counsel had *not* specifically included a brain

damage claim in the final post-conviction amended petition.

218.   Kehne testified as a legal expert at the hearing. He does not remember why they

did not hire someone else to testify. "[I[f we had more time, our intention was

not to do it that way but, of course, to hire or retain somebody else." Tr. 701:60-

61. The intent was to hire someone nationally who had more death penalty

experience than anyone available in the state of Idaho. Tr. 61:3-11.

219.   Kehne and Adams could have proffered 81 mitigation-related documents

Hudson obtained or generated during her investigation of Row. Tr. 119:2-24;

Exhibits 74 through 155. These included the 1993 CT scan image (not just the

report) that Hudson had obtained and transmitted to Kehne and Adams. Tr.

121:22-25 to 122:1-8.

220.   Kehne and Adams brought Hudson's documents to the post-conviction hearing,

but the documents were never admitted. Kehne's "guess is that we came

thinking we would admit all of those documents, or at least a lot of them, and

simply forgot to do it." There was no strategy reason they did not offer them. Tr. 62:23-25 to 63:1-9.

221.    Instead, the only exhibits Kehne and Adams proffered at the hearing were a medical report, a diagram, and a copy of newspaper articles about pretrial publicity. Kehne and Adams proffered no other exhibits because, in Kehne's words, they "weren't prepared to do the hearing." Tr. 62:1-22; Exh. 42.

222.    Dr. Beaver testified at the post-conviction hearing as follows:

- "The consideration of neurological findings in a patient that might affect their behavior affect, at least in my experience, has been considered an issue to present as mitigation."

- "[T]here is obviously a discrepancy between the '93 and the '91 scans." "[The '91 scan] was a normal test." (*This is untrue—the report said "normal" but the scan showed that the brain was abnormal—but because no neurological workup had been done, the longstanding nature of the abnormality was yet unknown.*)

- "[A]n expert in the field of reading these types of scans" would need to compare the two to determine whether the atrophy seen in the '93 scan is acute or chronic."

- Dr. Beaver did no neurocognitive tests on Row in his 1992 evaluation.

- Further testing would show "whether or not those abnormalities in emotionality are more related to her social, developmental and genetic history versus some organically induced condition or some combination thereof."

- Further testing would also show whether there is "an issue of cognitive control, for lack of a better term,

which was not evaluated to any great degree in the original examination of Ms. Row."

- There is a possibility that the brain atrophy "has potentially some effect on her behavior and her actions" and "that is a possibility, so if that is going to be explored, then I think a more thorough examination would be needed to look at that in light of the neuropathological findings."

Exh. 42, pp. 121–32.

223.    At the end of the hearing, the state district court denied the post-conviction

petition, stating:

- "There is no evidence whatsoever to assume that Robin Row is or was schizophrenic or suffering from any active psychosis. Her abnormalities were consistent with findings of affective disturbance and problems in emotionality."

- "Dr. Beaver's testimony [about lack of neurological analysis re: brain atrophy] is certainly worthy of note."

- "[A] comparison between defendant's two most recent CT brain scans (late 1991 and early 1993) reveal the possibility of some abnormality and mild brain atrophy."

- "Since no neurological tests were ever administered to Ms. Row, there is no real way of knowing to what extent, if any, this perceived organic condition might have affected her behavior and/or emotionality. [Dr. Beaver] was in no position to venture any opinion on whether there might be some organic basis related to her mental health problems."

- "I had earlier in the proceedings denied yet another request of counsel for a further continuance of three to five (3-5) months to investigate this potential issue, given the time requirements placed on this Court by

> Idaho Code Section 19-2719, the previous extensions
> already granted, the fact that sentence was imposed in
> December <u>1993</u>; and the current speculative,
> suppositional posture of this line of inquiry.
> Accordingly, I will defer to higher judicial authority on
> this issue and leave open the possibility of filing a
> successive (second) post-conviction petition pursuant
> to Idaho Code Section 19-2719(5)."

State's Lodging B-11, pp. 293–296 (emphasis in original).

## I.  *Expert Witnesses Appearing at the* **Martinez** *Evidentiary Hearing*

224.   Dr. James Merikangas, a medical doctor who is a neuropsychiatrist (both a

neurologist and a psychiatrist) practicing in California, testified for Row at the

2017 evidentiary hearing. Tr: 183:23-25. The specialty of neuropsychiatry is

"that branch of medicine that deals with the thoughts, emotions, mental

illnesses, and the like, in the context of medical aspects of a human being, how

the brain works." Tr. 184:14-17.

- Dr. Merikangas has been involved in the field of
  neurology for 45 years. Tr: 196:7-10.

- He joined the Yale faculty as a clinical member and has
  practiced neurology, psychiatry, and neuropsychiatry for
  25 years. Tr. 196:21-24.

- He has authored 35 to 40 publications in peer-reviewed
  journals, and he has authored eight book chapters,
  including one in the *Comprehensive Textbook of
  Psychiatry*. Tr. 197:23-25.

- He was contacted by Row's defense attorneys in 1999. He
  was asked to determine what, if anything, was wrong with
  Row in terms of her brain. Tr. 198:8-14.

- He performed a physical and neurological examination on Row in 2001 and 2003. 702:203. He also reviewed about 250 case documents. Tr. 198:15-18.

225. Dr. Mark Greenberg is a clinical neuropsychologist practicing in Massachusetts, who testified for Row.

- Dr. Greenberg's specialty is *diagnostic* neuropsychology, meaning he primarily (1) performs assessments using written testing designed to capture different aspects of brain function, (2) analyzes the pattern of test results, and (3) renders opinions about the nature of the defect and the presence or absence of various syndromes. Tr. 254:2-11.

- He has conducted thousands of neuropsychological tests in 30 years of practice. Tr. 256:3-6.

- He is affiliated with the Massachusetts General Hospital in Boston, where he does neuropsychological assessments on outpatients and traditional psychotherapy and counseling with college students. He also conducts research, such as studying traumatic brain injury and has published articles on how brain damage affects personality and the biological model of posttraumatic stress disorder. Tr. 252:4-19.

- He was contacted by Row's attorney in 2002 for neuropsychological review and testing. Tr. 256:7-10.

- He conducted a face-to-face independent neuropsychological examination of Row in October 2002. Exh. 4, p. 3. He reviewed the documents in Exhibit 6, 1-78 (admitted for the limited purpose of showing the depth and breadth of the investigation he performed). Tr. 258:6-13; 22-25.

226. Dr. Clay Ward is a neuropsychologist/clinical psychologist in the state of Idaho, who testified for Row.

- Dr. Ward has been practicing since 1987. He did neurological assessments of patients for the VA Medical Center at the Nevada School of Medicine after finishing his neuropsychology training. Tr. 314:20-24.

- He works primarily with patients who have some form of neurological disorder, most commonly, traumatic brain injuries. He has practiced in Idaho since 1990, including with the St. Alphonsus Medical Center. Tr. 313:21-25:14.

- He has treated over 10,000 patients with brain abnormalities. Tr. 315: 24-25; 316:1-3.

227.   Dr. Arthur Kowell is a neurologist practicing in California, who testified for the

State.

- Dr. Kowell was first licensed in 1975. Exh. 1000.

- He serves as a clinical professor of neurology at the UCLA David Geffen School of Medicine, in Los Angeles, California, where he supervises residents and sees patients. *Id*.; Tr. 745:2-13.

- He is board-certified in neurology, neuro*physiology*, and clinical neuro*physiology*, but he is not a neuropsychologist or neuropsychiatrist. *Id*.; Tr. 764:1-5.

- He has authored numerous articles in his field of expertise, including medicolegal topics. *Id*.

- He performed a records review on the Row case but did not interview or test her or interview other witnesses. *See id*.; Tr. 764:13-25 to 765:1-8.

228.   Dr. Roger B. Moore, Ph.D., a clinical and forensic psychologist who practices

in North Carolina, testified for the State.

- Dr. Moore received his Ph.D. in clinical psychology from George Mason University in 1993. Exh. 1002.

- His clinical practice includes neuropsychology. Tr., 607:1-24. He is also a Diplomate of the American Board of Forensic Examiners. Exh. 1002.

- He reviewed about 50,000 pages of exhibits in the Row case. Tr. 652:1-8. He reviewed materials that the federal public defender had provided to their own experts. He also reviewed Dr. Greenberg's raw test data and test results of Row. Tr., 609:3-10.

- He met with Row for about five hours in February 2017. Tr., 608:21-25 to 609:1-2.

## J. *All Brain Testing and Summary of Results*

229. Row underwent a CT scan without contrast on January 28, 1992; a CT scan without contrast on January 12, 1993; an MRI of the brain without contrast on October 15, 2001; a SPECT scan of the brain on October 16, 2001; an MRI of the brain without contrast on August 2, 2016; and an FDG/PET/CT brain image on August 2, 2016. *See* Exh. 1000, p. 3.

230. Two brain anomalies consistently appear in all of the neuroimaging scans from 1992 to 2016: (1) atrophy, hypoplasia, or loss of brain volume of the cerebellum; and (2) atrophy of the cerebral hemispheres, particularly, the cerebral cortex. Tr. 263:15-19 (Greenberg); *see* Tr. 206:24-25 to 207:1-7, 216:7-18 (Merikangas); *see* Tr. 659:8-10, 750:5-16, 751:1-10. (Kowell).

   i.   1992 CT Scan

231. A computerized axial tomogram, known as a CT or CAT scan, is a three-dimensional image made on a computer using x-rays that go through the body at

various degrees, from which the whole image is synthesized. Tr. 185:1-5 (Merikangas).

232.   The 1992 CT scan was taken after Row fainted and hit her head on the floor at work. Exh. 87.

233.   Dr. Glenn Bothwell prepared the CT scan report. Exh. 6, p. 1. Dr. Bothwell reported:

> FINDINGS: The osseous structures of the skull base and overlying calvarium are normal. The extra axial CSF spaces, cerebral sulci and ventricles are normal. Specifically, there are no extra axial fluid collections. The brain, including the posterior fossa contents are normal.
>
> CONCLUSION: Normal noncontrast enhanced head CT examination.

Exh. 87.

234.   However, to a neurologist, the 1992 CT scan image is not "normal," but shows the cerebellum is smaller than usual (in the mild-to-moderate range) and shows mild cerebral atrophy. Tr., 207:10-15 (Merikangas); 751:19-25; 752:1 (Kowell).

235.   Dr. Kowell explained that Dr. Bothwell, the 1992 CT scan radiologist, was looking at the image for a different purpose—for example, to determine whether the fall caused brain damage or bleeding. Dr. Kowell already knew that the cerebellum was at issue before he reviewed the brain scan, and so he looked for it in particular. Dr. Kowell explained that "if you were a radiologist and no specific history is given to you—in other words, was there any concern at that

time about a cerebellar problem—I could see that the radiologist might not

make any notation that there was anything different from a normal study." Dr.

Bothwell "may have passed it because maybe it was too artifactual." Tr. 749:4-

25-750:1-4 (Kowell).

    ii.   <u>1993 Scan</u>

236.    The January 12, 1993 CT scan was performed after Row tried to commit suicide

while awaiting trial. *See* Tr. 207:17-23. Dr. David Giles prepared the CT scan

report. Exh. 6, p. 2. Three of the experts reviewed the scan and concluded that

there is an abnormality or atrophy of the cerebellum and some cerebral cortical

atrophy, which means a decreased volume due to cellular loss or degeneration

of neurons. Tr. 207:19-25; 208:1 (Merikangas); 317:9-18 (Ward); 750:5-10

(Kowell).

237.    The January 12, 1993 CT scan report contains these "Findings": "The cerebellar

folia are mildly deepened and sulci near the vertex are mildly deepened for a

patient of this age. Combine cerebellar vermian and cerebral cortical atrophy

can be caused by a number of irreversible etiologies, but reversible etiologies

should be considered and the findings suggest the possibility of alcohol abuse,

clinical correlation is advised." Exh. 15, p. 65.

238.    The January 12, 1993 CT scan report contains this "IMPRESSION": "THERE

    IS MILD VERMIAN AND CEREBRAL CORTICAL ATROPHY, SEE

ABOVE NARRATIVE FOR DISCUSSION." Exh. 15 [capitalization in original].

239. Row's brain abnormalities were abnormal enough such that, in 1993, if a patient had been admitted to St. Alphonsus hospital after a trauma with a scan like hers, Dr. Ward would have expected to be consulted about the abnormality. However, in an outpatient setting, he may or may not have been consulted on a patient with the same abnormality as Row. Tr. 325:1-25.

240. The January 12, 1993 CT scan report was attached to Row's PSI. *See* Exh. 15, pp. 1, 64.

    iii.  2001 MRI Scan

241. A magnetic resonance image, or MRI, is an image generated on a computer in the same basic aspect as a CT scan, but it is done with magnetism and radio waves rather than x-rays. Tr., 185:25 to 186:1-3 (Merikangas).

242. The MRI is a better imaging technique in most cases for the cerebellum than a CT scan, but they both record images of the cerebellum. Tr. 748:10-12 (Kowell).

243. MRI services for follow-up diagnostics were available in the Boise area from the mid- to late-1980s and at the time of Row's sentencing, but the main testing used for the brain at that time was the CT scan. Exh. 156, p. 45 (Dep. Beaver); Tr. 320:14-17 (Ward).

244.  Row's MRI of October 15, 2001, showed "cerebellar atrophy, most severe in the superior vermis," and "mild diffuse cerebral volume loss, which was more than average for the patient's age of 44." Exh. 1000, p. 8 (Dr. Kowell Report).

245.  Row's MRI of August 2, 2016, showed "early atrophy" of the cerebrum and a cerebellum "small in size." Exh. 1000, p. 9 (Dr. Kowell Report).

      iv.  2001 SPECT Scan

246.  A single-photon computed tomogram, or SPECT, is "a type of image made of brain blood flow by putting in a radioisotope into the blood and looking at how it is, again, imaged by the same type of computer display as [] the CAT scans, the MRI scans. But it's radiation emitted through blood flow of the brain. It actually measures blood flow." Tr. 186:16-21 (Merikangas).

247.  SPECT imaging was first used in Boise in about 1995, which is after Row's sentencing proceedings but during post-conviction proceedings. Tr. 324:10-14 (Ward). SPECT began to be used in other states in about 1988. Tr., 188:10-14 (Merikangas).

248.  Row's October 16, 2001 SPECT report shows "decreased counts in the subfrontal cortical regions in the temporal lobe areas" and "decreased counts bilaterally in the posterior parietal regions." Exh. 1000, p. 9 (Dr. Kowell Report).

v.   2016 PET Scan

249.   A positron emission tomogram, or PET scan, "uses radioisotope—in this case, the oxyglucose, which goes to metabolic areas in the brain the same way that the fuel of the brain—that is, sugar, glucose—goes, and therefore allows you to see the activity of various parts of the brain in their anatomic representation. So it shows you how the various parts of the brain are functioning, not just their anatomy or their location." Tr., 187:1-7 (Merikangas).

250.   PET scans were available at the time of Row's sentencing, but were not really being used routinely in Boise until after 1995. Tr., 324:4-16 (Ward).

251.   Row's August 2, 2016 PET scan results showed "relatively uniform and symmetric metabolic activity throughout the cerebral and cerebellar cortices." Exh. 1000, p. 9 (Dr. Kowell Report).

## K.  Causation of Brain Anomalies

252.   A smaller-than-normal cerebellum can result from a wide variety of causes. Tr. 754:13-14 (Kowell).

253.   What caused Row's brain abnormalities is unknown and unknowable for lack of any brain neuroimaging records from Row's childhood, requiring experts to use a process of elimination to determine causation. Tr. 216:7-18 (Merikangas).

254.   Testifying experts ruled out the following as causes for the brain atrophy:

- external trauma that would have resulted in an organic brain injury, for lack of evidence from her life history, Tr. 757:19-21 (Kowell);

- stroke, multiple sclerosis, toxicity, the effect of a drug, Tr. 206:8-11 (Merikangas); and

- fetal alcohol syndrome or alcohol abuse, because alcohol abuse causes generalized shrinkage of the whole cortex and enlargement of the ventricles, which Row does not have.[15] Tr. 224:7-22; 225:7-11 (Merikangas).

255. Dr. Kowell could not rule out a degenerative disorder. Tr. 762:13-17.

256. In the absence of evidence of other causes, and because it appears consistent with Row's life history, it is nearly certain that Row's cerebral atrophy is longstanding, static, chronical, and developmentally-based, and, therefore, likely has a congenital origin. Tr. 205:18-25; 206:1-11 (Merikangas); 261:20-25; 262:1-7; 292:1-11; 312:13-17 (Greenberg); 542: 5-16 (Beaver).

### L.  Cerebellar Atrophy or Hypoplasia

257. The word "cerebellum" means "little brain." It is a structure that lies beneath or inferior to the cerebral hemispheres of the brain. Tr. 748:13-17 (Kowell). It has more neurons than the entire rest of the brain. Tr. 226:23-25 (Merikangas).

258. The brain scans consistently show that parts of Row's cerebellum are smaller than normal, which can be termed cerebellar "atrophy" or "hypoplasia." Tr.

---

[15] Although the radiologist who read the 1993 CT scan suggested follow-up assessment to determine whether the atrophy was caused by alcohol abuse, Row's life history does not show that she regularly abused alcohol. Tr. 348: 21-23 (Cahill). However, had the defense team obtained follow-up assessment with a neurologist for the purpose of checking for alcohol abuse as a mitigating factor, the brain abnormalities would have been discovered in time for use as mitigation. Even discovering an alcohol-affected brain would have been a more causation-oriented mitigation theory than alexithymia.

753:3-9 (Kowell). "Atrophy" means that the structure developed and then began to waste away. "Hypoplasia" means that it is smaller in size and never developed, or it may have developed and then shrunk, but it simply means "smaller." Tr. 617:8-20 (Moore). Row's cerebellar atrophy or hypoplasia is found particularly in the vermis or supravermian. Tr. 704:622 (Moore); 702: 222-23 (Merikangas).

259. Cerebellar atrophy and hypoplasia are organic anomalies (hereinafter together referred to as "cerebellar atrophy"). Tr. 617:8-13 (Moore). The 1992 CT scan shows this condition existed before Row committed the crimes at issue. Tr. 702:207 (Merikangas). There is no significant difference in the cerebellar atrophy in Row's brain between 1992 and 1993. Tr. 751:16-18; 752:5-13 (Kowell).

260. The cerebellar atrophy or smallness of the cerebellum is not severe, but it is in the mild-to-moderate range. Tr. 751:19-25; 752:1 (Kowell). Nevertheless, the atrophy can be deemed "objective and significant." Tr. 261:13-19 (Greenberg).

261. Functionally, Row's cerebellum is receiving blood flow, and glucose is being metabolized there, as shown in the more recent brain scans. There are some possible decreases in metabolic activity in the subfrontal temporary area and a little bit of a decrease in the parietal lobes. Tr. 623:1-15 (Moore).

### M. Cerebral Cortical Atrophy

262. The pre-crime 1992 CT scan shows that Row also had atrophy of her cerebral cortex, or cerebral hemispheres, predominantly in the parietal lobe, which lies behind the frontal lobe. Tr. 206:21-25 to 207:1-7; 223:7-10 (Merikangas); 263:15-19 (Greenberg); 622: 1-3 (Moore); 749:8-10 (Kowell). The 2001 MRI shows large spaces in the parietal region between the gyri, which is the cortex, and the sulci, which are the normal spaces between them. Tr. 220:4-24 (Merikangas). The area of the cortex is atrophic, having spaces between the gyri that are not sulci. *Id*. Another way of describing this anomaly is that there is less tissue in the parietal lobes (changes interpreted as *atrophied*) as compared to other areas of the brain, such as the cerebrum. Tr. 752:20-25 to 753:1-9 (Kowell).

263. The cerebral cortical atrophy could be congenital or the result of a damaging event in utero or at the time of birth, such as ischemia, which is decreased blood flow to certain parts of the brain. Tr. 753:10-15 (Kowell). Or, the cerebral cortical atrophy could be of more recent origin than the cerebellar atrophy, but both are shown on the 1992 (pre-crime) CT scan. Tr. 216:2-23 (Merikangas).

264. The cerebral cortical atrophy is characterized as mild. Tr. 751:19-22 (Kowell).

265. There are some possible decreases in metabolic activity in the subfrontal lobe, particularly around the subfrontal temporal area and a little bit of decrease in the parietal lobes, as indicated on the SPECT and PET scans. Tr. 623:5-15 (Moore).

266.     Much of the body's visuospatial skills are controlled by the parietal lobe, with
         some control in the frontal lobe. Tr. 621:6-7 (Moore).

**N.  What Was Known About Brain Damage as Mitigating Evidence in 1992 and 1993**

267.     In the early 1990s, mental health professionals knew about the potential impact
         of organic factors on human behavior and mental conditions. Tr. 705:1-14
         (Moore).

268.     In the early 1990s, it was "pretty standard knowledge" among medical and
         mental health professionals that the frontal lobes are the part of the brain that is
         responsible for personality, emotions, and higher-level cognitive functioning,
         such as planning and organization. Tr. 319:14-20 (Ward). Damage to part of the
         frontal lobes can result in a "disorder of awareness, and, in particular, disorders
         where a person would lack awareness into their own behavior." Tr. 319:22-25
         (Ward). The frontal lobes inhibit behavior; they help a person choose not to act;
         they are critical for "effective behavior and adaptive behavior." Tr. 270:18-23
         (Greenberg).

269.     In 1992 and 1993, mental health professionals used the Diagnostic and
         Statistical Manual (DSM) as the authoritative guide to the diagnosis of mental
         disorders. The DSM contains descriptions, symptoms, and other criteria for
         diagnosing mental disorders. In 1992, the DSM-III-R was the version in effect.
         Tr. 704:7-11 (Moore).

270.   The DSM is about *nosology*, meaning it is a classification system designed to help mental help professionals best describe behavior and mental conditions. "The DSM typically tries to stay away from etiology as a whole." Tr. 708:13-19 (Moore).

271.   To diagnose someone with antisocial personality disorder in 1993, typically a psychologist relied on three items: identifying certain behaviors and characteristics that occurred before age of 16, conducting a clinical interview, and performing or reviewing psychological testing. Tr. 323:9-14 (Ward).

272.   At the time of the DSM III-R, "there seemed to be kind of a line drawn between kind of emotional, behavioral, psychological problems and those caused by a brain function. And that's been probably not eliminated, but at least it's now recognized that they are very much interrelated." Tr. 704:12-19 (Moore). "[T]he DSM-III-R ... was the manual being utilized at that time as the standard. If there w[ere] organic findings that were contributory to that person's behavioral issues that had been part of the basis for the personality disorder, then you were excluded from applying personality disorder. The thought at that time was ... that if people had displayed a pattern of chronic behavioral and emotional issues and it was due, at least in part or in whole, to neurological issues, then personality disorder diagnoses were not applicable." Tr. 529: 20-25 to 530:1-4 (Beaver).

273.   "[I]t was certainly recognized if the personality appeared to be significantly impacted or the functioning was impacted by a significant biological factor or organic factor, then then the DSM recommended a diagnosis of organic personality disorder." Tr. 705:18-23 (Moore).

274.   To rule out organicity before diagnosing someone with a personality disorder, a practitioner would be looking for "impacts that are significant enough to have broadly affected that personality functioning." Part of the review would be to look for any major changes in behaviors at a specific point in time that significantly altered the person's behavior. Tr. 613:1-7 (Moore).

275.   On the disputed issue of whether organicity had to be ruled out before an ASPD diagnosis was rendered, the Court finds that neither the DSM-III-R nor standard mental health practice in 1992 or 1993 required a mental health professional to rule out organic factors or to obtain an MRI or CT scan before diagnosing a person with a personality disorder, including antisocial personality disorder. The dichotomy suggested in the DSM-III-R led practitioners to give an "organic brain dysfunction" diagnosis if the organic factor caused very significant and very obvious symptoms in a person's behavior, but otherwise led them not to be concerned with unknown organic bases where the symptoms were not significant and obvious and instead led them to use the personality disorder definitions and diagnoses—because etiology was not as great a concern as formulating a *description* of the person's behavior and mental conditions to

create a treatment plan. *See* Tr. 323:9-14 (Ward); 603:22-25; 604:1-2 (Beaver).
By the late 1990s and certainly by 2000, the ruling out of organic bases "was
essentially always done, for a variety of reasons." Tr. 603:6-10 (Beaver). But
neuropsychological testing in Row's era was not always automatically done in
forensic cases as it was in 2017 and beyond. Tr. 603:22-23 (Beaver).

276.    In 1993, regardless of the DSM and what *psychologists* or other mental health
professionals regularly did in practice, *neuropsychiatrists* would have agreed
that it is impossible to correctly diagnose someone definitively with "antisocial
personality disorder *that has no biological etiology*" without conducting
neuropsychological testing and ordering and reviewing brain scans, especially
in a forensic setting. Tr. 233:2-6 (Merikangas).

277.    "There was ample scientific literature and established neuropsychological
knowledge in Boise, Idaho in 1993 that brain atrophy represents
neurodegeneration of pathways connecting the cerebellum with the rest of the
brain, including the limbic system and frontal lobe. The limbic system is the
emotional life center of the brain. The frontal lobe is the executive control
center of the brain and is involved in judgment and the suppression of socially
unacceptable emotions and behaviors. There was ample neuropsychological
literature in 1992 and 1993 that brain disorder or disease often results in
behavioral, emotional and cognitive problems." Exh. 9, p. 2 (Ward).

278.   Dr. Ward attached a number of scholarly articles with research results to his

Report, showing the status of knowledge of the brain existing at or before the

time of the crimes. *See* Exh. 11; Tr. 319:1-11.

279.   Dr. Ward reported: "As early as 1975, Blumer and Benson[] reported problems

with self-indulgence and utter lack of concern for others were associated with

brain damage. Struss [sic] and Benson (1984, 1986) further reported a complete

lack of empathy and lack of awareness for the needs of others were associated

with brain damage. There is no doubt in 1993 that brain damage caused

problems [such as] lack of empathy and poor awareness of how one's behavior

impacts others (e.g., Prigatano, 1991)." Exh. 9, p. 2 (Dr. Ward Report).

280.   At the time of Row's sentencing investigation, the following information was

available from *Awareness of Deficit After Brain Injury. Clinical and Theoretical

Issues*, ed. George P. Prigatano and Daniel L. Schacter (New York: Oxford

Univ. Press 1991):

- "Bianchi (1895, 1922) reported that frontally damaged
  monkeys, in additional to not recognizing their owner and
  being impaired in inhibiting irrelevant reactions and
  deducing consequences, remained in a habitual state of
  indifference. Behkterev (1907) proposed that such animals
  were unable to evaluate the consequences of their actions
  or relate new experiences to their past" (p. 64).

- "Hoffman (1869) noted that patients with frontal lobe
  damage understood the nature of serious situations but
  seemed to take no real interest in the gravity of the
  situation" (p. 64).

- "Sachs (1927) noted that patients with frontal lobe tumors had a 'peculiar indifference' to their problems. *Id*. Patients underwent psychosurgery were reported to have "some type of disturbance in concern about losses, self-awareness, and reality monitoring." Stengel (1952) said such patients "described their losses with a detached attitude, like some unbiased reporter" (p. 64).

- Ackerly and Benton (1947) saw a "dissociation between what the frontal patient knows or says, and how he or she behaves." For example, a patient "had an excellent sense of right and wrong when talking about it in an abstract manner, but showed no such sense in his actions" (p. 65).

- Luria and Homskaya (1964) described "the inability to correct erroneous behaviors as an inadequate evaluation by the patient of his or her action, a general disturbance in self-regulation. Konow and Pribam (1970), however, differentiated error knowledge or evaluation from error utilization. A patient with damaged frontal lobes can recognize errors in others and at least occasionally in himself. Error evaluation therefore appears to depend more on posterior brain functions. Error, utilization, i.e., correction of inappropriate behaviors or erroneous responses in response to knowledge of errors, is disturbed primarily with anterior lesions, suggesting that frontal-limbic brain zones are relevant for this utilitarian function" (p. 65).

- "*Knowledge is a phenomenon distinct from awareness*. There is often a striking dissociation between correct knowledge, use of knowledge, or awareness of the implications of such knowledge. At least one such aspect of disturbance of self-awareness is a disruption in the judgment of the implications of acquired knowledge, a deficit in self-reflectiveness. Self-awareness is an inherent factor intermingled with the executive control functions of planning, coordinating, and monitoring, although it appears as well to be independent of them" (p. 78 (emphasis in original)).

Exh. 11, Tab 3 (attachment to Ward Report).

281.   At the time of Row's sentencing investigation, the following information was

available from *Psychiatric Aspects of Neurologic Disease*, ed. D. Frank Benson,

M.D. and Dietrich Blumer, M.D. (New York: Grune & Stratton 1975):

- Urinary incontinence has been reported in brain-injured patients with marked regularity (p. 153).

- Orbital lobe of prefrontal cortex lesions are related to changes toward "immoral, unfaithful, deceitful, thievish, and defiant behavior" (p. 153).

   Exh. 11, Tab 4 (attachment to Dr. Ward Report).

282.   At the time of Row's sentencing investigation, the following information was

available from Donald T. Stuss and D. Frank Benson, "Neurological Studies of

the Frontal Lobes" in *Psychological Bulletin*, Vol. 95, No. 1, 3-28 (1984):

- Neurologists historically have called the frontal lobe functions a "riddle":

    "Several reasons can be noted for the continuing riddle. Many frontal lobe lesions produce no primary neuropathological deficits; therefore, possible subtypes of frontal lobe dysfunction cannot be readily demarcated by neighborhood neurological findings. Because these deficits cannot be subclassified, the term frontal lobe syndrome is used to refer to an amorphous, varied group of deficits, resulting from diverse etiologies, different locations, and variable extents of abnormalities. A second source of confusion stems from inappropriate assessment procedures, lack of adequate control groups, and interinvestigator [sic] variations in testing procedures. In addition, frontal lobe pathology is often misinterpreted as a psychiatric problem" (p. 3).

- Frontal lobe damage can result in "inappropriate and near total self-indulgence with a corresponding lack of concern for others" (p. 20).

- In fact, "the term *pseudo-psychopath* was suggested" as a label for people who exhibited ASPD-like behavior due to frontal lobe damage (p. 20).

Exh. 11, Tab 5.

283.   At the time of Row's sentencing investigation, the following information was

available from Donald T. Stuss, Ph.D. and D. Frank Benson, M.D., *The Frontal*

*Lobes* (New York: Raven Press 1986):

- Clinically, frontal lobe damage has been recognized as a source of significant and unique behavioral alterations for well over a century (p. 1).

- The most common consistently-appearing features of patients with frontal lobe damage are decreased drive (apathy), self-monitoring, and lack of control (disinhibition) (p. 129).

- The sociopathic individual recognizes what is right but fails to inhibit socially incorrect behavior, a description which resembles certain behavioral abnormalities that can follow frontal abnormality (p. 134).

Exh. 11, Tab 6.

284.   In 1995, Dr. Beaver testified that, generally, "there is a correlative relationship

between this scientific finding, findings, found on neurological examination of

patients that have a history of schizophrenia or major affective disorder. My

understanding of that literature is that we do not completely understand the

relationship there, but there is certainly a coexistence between those findings

and it is part of what has led to the ongoing discussion about the organic basis of severe mental health problems." Exh. 42, pp. 128-129.

285.    In 1995, Dr. Beaver testified in particular to Row: "I do believe that there were abnormalities in her emotionality, but I think that one would need to be further testing and analysis done to say whether or not those abnormalities in emotionality are more related to her social, developmental, and genetic history versus some organically induced condition or some combination thereof."  Exh. 42, p. 131.

## O.  Why the "Biopsychosocial Model" Requires Organic Information

286.    There are three main factors that impact a person's functioning, together called the "biopsychosocial model," defined as "the interaction between what the biological capacity of the organism is and the demands being placed upon it in the social environmental atmosphere in which they are in." Tr. 544:13-16 (Beaver).

287.    The first factor is the "biological aspects," including the "organic"—which implies more structural issues versus other physical factors like hormonal issues, for example. The second is the "psychological aspects—that is their temperament, their personality []—whether it's anxiety or depression, sort of the emotional foundation they bring in." Third is the sociological factors, "what's the environment that they are raised in." Tr. 649:6-25; 650:1-21 (Moore).

288.     It is best practice to look at the blend of all three to determine how these factors come together to create a person's self. Tr. 651: 3-5 (Moore). "Behavioral manifestations of poor judgment and poor executive function can be seen for all kinds of reasons. Human behavior is too complex to say it's just one thing." Tr. 237:9-15 (Merikangas). Rather, "there is a cocktail of factors that are going on." Tr. 709:1-5 (Moore). There are multiple factors that can affect behavior. It would be quite difficult to say that "this behavior falls in the organic category of that model," or "this behavior falls in the social category of that model." Tr. 710:15-19 (Moore.) A clinician likely could not definitively say that "[t]his behavior couldn't possibly be in the bio column of the biopsychosocial model; therefore, it must fall into one of these other two categories." Tr. 711:7-17 (Moore).

### P.  Classifications of Brain Disorders, pre-1998 Frontal Lobe Syndrome or Dysfunction

289.     Before 1998, something that is now called cerebellar cognitive affective disorder (CCAD)[16] would have been included in the category of frontal lobe syndrome or frontal lobe dysfunction, because the CCAD disorder or diagnosis did not yet exist. Tr. 296:19-24, 307:18-22 (Greenberg).

---

[16] CCAD also is interchangeably called "cerebellar cognitive affective syndrome" (CCAS) throughout this Order. Though there is a technical difference between a syndrome and a disorder, it is not important here. CCAD or CCAS is also called Schmahmann's syndrome.

290.   "Frontal lobe dysfunction" is a set of impaired functions including executive

functions and judgment skills. Tr. 659:14-20 (Moore). "Frontal lobe syndrome"

is the "adaptive correlates to functional deficits in the frontal lobe." *Id.*

291.   Because "cerebellar cognitive affective disorder" and "frontal lobe syndrome"

are so similar, a professional today still might call it "frontal lobe dysfunction."

Tr. 296:25 to 297:1-2 (Greenberg). However, a frontal lobe patient does not

necessarily have cerebellar atrophy. *Id.*

292.   Frontal lobe syndrome and cerebellar cognitive affective disorder can have

some different behavioral manifestations. Tr. 297:8-11 (Greenberg); 551: 5-14

(Beaver); 661:25 to 662:1-2 (Moore). For example, a patient with frontal lobe

syndrome might not necessarily have language difficulties. Tr. 665:21-24

(Moore). In Row's  case, the manifestations were the same. Tr. 296:3-12

(Greenberg).

293.   Row's atrophy is not limited to the cerebellum, but is present throughout the

cerebral hemisphere. Tr. 297:4-7 (Greenberg).

294.   Like cerebral cognitive syndrome, different subsets of frontal lobe disorders

exist. For example, attention deficit disorder (ADD) is characterized by the

following executive function problems: blurting out things, saying  things

inappropriately in a meeting, not reading the context before speaking, telling

off-color jokes at the wrong time, and keeping a disorganized household. Tr.

665:25, 666:1-11 (Moore). A person can have ADD (a frontal lobe disorder) and not have cerebellar dysfunction. *Id*.

295.   Row's brain scans showed nothing significant in the frontal lobes. Tr. 752:17-19 (Kowell). Nevertheless, experts in 1992 and 1993 would have categorized Row's deficits as frontal lobe syndrome or dysfunction because of the knowledge that the executive functions regulated by the cerebellum "are generally considered mediated through the frontal lobe, including planning organizing, sequencing behavior, initiating behavior, and inhibiting impulse." Tr. 621:1-5 (Moore); *see* Tr. 296:3-24. And "particularly as we get into the higher cortical functions, the things around emotional regulation, executive functioning, visuospatial, those types of things are certainly significantly mediated through other brain areas." Tr. 620:22-25 (Moore).

296.   Dr. Greenberg administered many different neuropsychological tests to Row and found that a number of abnormalities occurred and were clustered in a "meaningful pattern" consistent with "frontal lobe dysfunction," the clinical term used at the time of Row's crimes and prosecution. Tr. 268:22-25 to 269:1-2 (Greenberg).

297.   Some of Row's executive functions are very good and some are very deficient. This result is consistent with what was known about brain injuries at the time of the sentencing hearing. It is inconsistent with research to expect that every patient even with the same brain injury will manifest all of the same type of

symptoms. *See* Donald T. Stuss and D. Frank Benson, "Neurological Studies of the Frontal Lobes," published in *Psychological Bulletin* Vol. 95, No. 1, 3-28 (1984).

298.   A symptom or behavior is more likely to be organic in etiology when a person's behavioral deficits are manifested consistently across life circumstances. Tr. 649:14-17 (Moore); 711:18-2t to 712:1 (Moore).

299.   Dr. Greenberg explained that "this frontal lobe problem is going to affect her in the supermarket, it's going to affect her interacting with her kids. It's not something that comes and goes like an infection. It's part of how she's wired, and it's going to permeate, really, every aspect of her life. So we expect to see the footprints in normal behavior (her every day functioning) but also the extreme pathological behavior that she showed." Tr. 308:25 to 309:1-7 312.

300.   However, with "developmental or congenital problems, often the manifestations are a little bit more subtle because you've had your whole life to sort of—for that brain to adapt to that pattern. And you don't see the—often the dramatic— it's a generalization, because there are developmental syndromes that do show dramatic problems; but, in general, that's true." Tr. 273:19-24 (Greenberg).

## Q. *Classification of Post-1998 Cerebellum Anomalies*

301.   After 1998, organic defects in the cerebellum were classified as "cerebellar syndrome" or "cerebellar cognitive affective disorder" (CCAD), which is a subset of "cerebellar syndrome." Tr. 235:16-25 to 236:1-2; 246:18-25 to 247:1-

3 (Merikangas). "Cerebellar syndrome," meaning a damaged or abnormal

cerebellum, can cause problems in cognitive/neuropsychological functioning

and motor/neurological functioning. *See* Tr. 226:21-25 to 227:1-4 (Merikangas).

302.   An abnormal cerebellum vermis is the portion of the brain implicated in CCAD.

(Merikangas Tr. 220:23-25; 221:1-2.) As noted above, Row's cerebellar atrophy

is particularly in the vermis or supravermian. Tr. 704:622 (Moore); 702: 222-23

(Merikangas).

303.   The cerebellum controls various cognitive and affective functions, coordinating

with the frontal lobes and other parts of the brain. Tr. 748:18-22, 763:19-22

(Kowell).

304.   CCAD has four designated components:

- executive functioning: planning, organizing, sequencing
  behavior, initiating behavior and inhibiting impulse;

- impaired language functioning—like dysprosody and
  agrammatism;

- visual-spatial functioning; and

- affective regulation in personality functioning/emotional
  regulation, including impaired emotions, where person has
  very flat affect or very inappropriate affect.

Tr. 660:6-8 (Moore).

305.   Neuropsychological testing shows that Row has deficits that some of the experts

have classified into three of the four areas: executive functioning, visual-spatial

functioning, and affective regulation. Row has no impaired language functions.

306.  There has been more professional interest in cerebellar abnormalities since CCAD was identified in 1998. Tr. 309:8-19 (Merikangas).

307.  However, rather than which label is attached, "the importance is that there is a structural defect in the central nervous system that is fueling these behavioral and functional manifestations." Tr. 310:1-7 (Merikangas).

### R.  Neuropsychological/Cognitive Functioning

308.  Neuropsychological testing is the recognized "technique and technology for diagnosing brain damage using functional instruments." Tr. 255:8-10 (Merikangas). Neuropsychological testing is the best way to measure executive functioning. "Although you can look at someone's life history and see whether they have made a lot of stupid mistakes and have had judgment problems, the actual function, what your body does, is shown by actually having your body do it during testing." Tr. 227:23-25; 228:1-8 (Merikangas).

309.  A comprehensive neuropsychological evaluation is essential to determining what types of emotional, behavioral, or personality problems a person might have as a result of a brain abnormality. Tr. 318:2-5 (Ward).

310.  Dr. Greenberg administered many different neuropsychological tests to Row. None of the tests Greenberg administered relate directly to the cerebellum. Tr. 625:16-18 (Moore).

311.   Dr. Greenberg found that a number of abnormalities occurred and were clustered in a "meaningful pattern" consistent with "frontal lobe dysfunction." Tr. 268:22-25 to 269:1-2.

312.   Row had significantly poor results in 20 percent of the approximately 70 scorable parameters of testing. Tr. 268:12-20 (Greenberg). As testing goes, 20 percent is a significant amount. Tr. 269:8-15 (Greenberg).

313.   Row performed "notably poorly" on the Rey-Osterrieth and the Wisconsin Card Sort tests. Tr. 625:21-25 to 626:1-6 (Moore).

314.   The Rey-Osterrieth test assesses visuospatial organization and perception and planning. It has some special properties sensitive to various kinds of functional problems. Tr. 282:1-8 (Greenberg). Its description and Row's results are as follows:

- A model or the stimulus diagram is placed right in front of the patient, and they are instructed to copy it onto a blank piece of paper. Tr. 282:11-18 (Greenberg). The patient can look at the model the entire time and has unlimited time.

- "The box is the primary element, the gestalt, [or] the anchoring element. And a normal brain recognizes the anchoring elements and says Okay. I have got a box; now I got a bunch of other stuff. And they draw the box first with the crosshatching or the diagonals." Tr. 284:7-15 (Greenberg). In other words, they break the drawing down into subfigures, a large rectangle, a triangle, a cross, a square. 627:11-25; 628:1-8 (Moore).

- Row did not step back and see the larger pieces and draw those larger pieces. Tr. 628:5-25 (Moore). In Row's

drawing, "the anchoring pieces" like the rectangle are missing. *Id*.

- On Row's drawing, "[y]ou can recognize it and you can sort of see it's the same. But if you look at those different parameters, it's extremely distorted." She doesn't see the box, the primary shape; it is missing in her drawing. Tr. 283:10-13; 284:9-15 (Greenberg).

- A second obvious distortion is that the model triangle has a break in it, but she drew it straight, with no break. Tr. 285:3-5 (Greenberg)

- A third obvious distortion is that there are only two quadrants or boxes, but she drew three. Tr. 285:6-10 (Greenberg).

- A fourth obvious distortion is that Row rotated and drew her diagram at a 45-degree angle. "That's something you see in children. It's normal for kids to rotate as the brain is developing. That's not something that a mature brain should be doing.... [S]he doesn't rotate the stimulus, but her version is at a 45-degree angle counterclockwise, which ... seems normal to her, but it's a recipe for screwing up" the whole drawing. "And it's a pathological sign." Tr. 284:16-24 (Greenberg).

- There are 18 distinct elements that have been defined for the model, and each of them is a scorable parameter. There are different scoring systems. The one Dr. Greenberg used is that the patient scores a two-point, a one-point, or a half-a-point for each parameter. Tr. 282:24-25 to 283:1-3 (Greenberg).

- Row scored 27.5 out of 36. Her score is about three standard deviations below the mean, which is less than first percentile. This is considered seriously impaired. Tr. 285:11-14 (Greenberg).

- The Rey tests for planning, spatial ability, organizational, executive functions. There is an attentional element to it. Row's drawing is typical of the kinds of distortions with

frontal and executive impairments. Tr. 285:15-20 (Greenberg).

- Row's drawing shows impaired planning. This does not mean that a person cannot plan. But when you give her something that is novel, that she has never seen before, that she has no rules of the road for ... [t]here is more than chance likelihood that she is going to approach it in a fouled-up way and is not going to think through how to do this." Tr. 285:21-25 to 286:1-4 (Greenberg).

- In contrast, on one end of the spectrum, some people go the other way. They make dots, they start measuring, they ask for a ruler, trying to get it perfect. It doesn't have to be perfect to be scored well. Row was on the other extreme: "Draw first and hope it pulls together at the end." Tr. 286:1-9 (Greenberg).

- Neuropsychological testing does have limitations in identifying the manifestation of frontal lobe impairment. The testing doesn't always exactly match up to what is happening in real life. Tr. 286:17-25 (Greenberg).

- "For example, someone who clearly has frontal lobe syndrome because they have a big brain tumor may have tell-tale behavior signs in the waiting room and from the history that the family gives. However, the test results may turn out good. Sometimes it's the structure, it's the quiet, it's the one-on-one spoon-feeding of the neuropsych environment that actually conspires to obscure the problem. So sometimes you see much more problems in real life than you see on paper. And it could be that the -- you know, basically in that case, the examiner is sort of being the frontal lobe for the person: In a moment, I'll give you a pen. Then I'll say 'go,' and then you will draw that. And then I'll say 'stop' and we will take it away. You are structuring them in a way that's covering up or obscuring their -- the problems that they would have in the spontaneous environment." Tr. 286:20-25; 287:1-13 (Greenberg).

- In Row's case, the testing showed significant impairment. Looking at the kind of problems Row is having in her life and the errors in judgment and behavior, Dr. Greenberg thinks the neuropsychological testing, "if anything, underestimated [it], but it did detect it." Tr. 287:14-19 (Greenberg).

315. The Wisconsin Card Sorting Test is a matching test, a classic test of frontal lobe functioning. The patient doesn't know what the rules are and has to discover this as the test unfolds. There are model four cards. There are the following criteria: (1) four forms: triangles, stars, crosses, and dots; (2) four colors: red, green, yellow, and blue; and (3) four possible numbers of items on the card, between one and four items. Those are the basic dimensions: form, color, and number. And there are four variations on each of those dimensions. There are 128 cards in the deck that the doctor exposes one at a time and asks the patient, "Match this one on top with one of those." It is up to the patient to decide what matches. "Which dimension did they choose? Do they match by color? So will they put that cross with -- the two crosses with the four dots? Will they match by shape, put the two crosses with the three yellow crosses? Or by number, the two crosses with the two stars." Tr. 277:5-15 to 278:1 (Greenberg). The Wisconsin Card Sort test and Row's performance on the test are further described as follows:

- The matching dimension they choose to try "is up to them. And then you tell them right or wrong. So you are giving them feedback. Okay. And then after they get 10 right -- most people will get at least 10 right -- you switch it on

them, unbeknownst to them. So now the initial sort is color, always color. And then you change the rules on them, and now color doesn't work. And they keep doing color, and you say no. And you watch them. Sometimes they will keep doing it forever, thinking magically color is going to work, but it's not. And then other people get it and say, 'Okay. You're changing the rules on me,' and they explore, and they figure it out. It could be number or shape. And you cycle through those dimensions, color, form, number, color, form, number over the 64 or 128 trials and see how many they get correct." Tr. 278:2-16 (Greenberg).

- Row matched color and after 11 tries, she had gotten 10 right on color. Tr. 278:20-25 (Greenberg). This result shows that she had "an adequate base of problem-solving capacity." Tr. 641:1-8 (Moore).

- However, when the tester changed from color to form, it took Row "40 more trials to figure out form [and] even though sometimes she is getting three right" that should signal to her the rule has changed to form, she quits. She will do "form, form, form; correct, correct, correct. Then she will switch back to number or color." Tr. 278:22-25 to 279:1 (Greenberg).

- Row is not sticking with the new strategy—"she is perseverating on the old and failed strategy." Tr. 279:1-3 (Greenberg). "She goes all the way up to 56 before she gets 10 correct on form and never achieves number." Tr. 279:13-17 (Greenberg). She only gets two categories right out of the 128 cards. *Id.*

- Row performed very badly on multiple parameters of the Wisconsin Card Sort test, between the second and fifth percentile. Tr. 279:18-19 (Greenberg).

- The Wisconsin Sort Test also has a "learning to learn" parameter which shows your mistakes over time. This measures "flexibility, problem-solving, response to feedback, being able to learn on the fly, being able to adapt to new input," and "learning from past behavior."

Tr. 280:1-6 (Greenberg). Row exhibited an adequate level of problem solving but a lower level of flexibility on the test. Tr. 641:1-25; 645:12-16 (Moore).

## S.  Review of Row's Executive Functions

i.  <u>Intelligence</u>

316.    The Weschler Adult Intelligence Scale (WAIS), is an IQ test similar to the Stanford-Binet that is a "central foundation in most neuropsych assessments." Tr. 615:12-24 (Moore). It "begins to give you a broad-based picture of functioning across a number of domains: working memory, language use, visuospatial, perceptual organization." Tr., 615:25 to 616:1-6 (Moore). It is a tool that can be used to assess organicity. *Id*.

317.    Attorney Cahill testified:  "Neuropsychologists prefer the WAIS for a number of reasons regarding -- well, due to the amount of research that's been done for things you can find in, like, where the person does better and worse relative to himself is indicative, based on a lot of research, of certain kinds of organic damage or other neurological disease." Tr. 92:1-25.

318.    Row's elementary school records indicate IQ scores of 119 on the Kulman-Anderson test and 105 on the Otis-Lennon, with all scores above the average score of 100; these results correspond with the observation of many people that she is a bright person. Tr. 304:17-25 to 305:1-19 (Greenberg). Because both are above average, there is not a lot of significance to draw from the grade school

IQ scores from two different tests without knowing how they were administered or scored. Tr. 310:8-25 to 311:1-9 (Greenberg).

319.   Row's adult IQ falls within the average to above-average range; she performed very strongly on memory skills and average on other skills. Tr. 304:17-18 (Greenberg).

320.   However, on the picture completion portion of the Wechsler IQ test, which measures visuospatial attention, Row scored in the 16th percentile, which is one standard deviation below the mean. Tr. 304:1-5 (Greenberg).

321.   Other evidence in the record shows that Detective Raney interviewed Row for between five and eight hours over six to eight interviews, Tr. 718:7-12; 719:1-7, and assessed her to be "very intelligent," "very conversational," and "pleasant and engaging to talk to." Tr. 719:21-25 to 720:1. Detective Raney found that Row was manipulative and kept control of the conversation. Tr. 720:10-13.

ii.   Planning, Organizing, Sequencing

322.   A person having difficulty with planning, organizing and sequencing would have examples of these issues across many areas of their lives, such as having a "very scattered" household or "haphazardly" going through the grocery store picking up items instead of taking a list. Tr. 662:22-5; 663:1-4 (Moore).

323.   Dr. Moore opined that Row's life history demonstrates that she had very good planning skills across different areas of her life. Tr. 642:16-17 (Moore).

324.   Examples of Row's planning skills from the record are as follows:

- The feedback from the work supervisor in regards to her jobs at the Harambee Center were glowing. In terms of organization within her own life, she tended to do well. She showed her abilities in coming to Boise homeless, then working from a volunteer status to a paid position at the Y, which show her planning, organizing, and structure abilities. Row played a key role in developing a program creating activities to train homeless people: how to use the bus system, how to seek out various housing possibilities. This "would actually take a lot of planning and organization, at least to perform them well, and the feedback appears to be that she did." Tr. 642:16-25 – 644:1-25 (Moore).

- Row "was actually described as a fastidious housekeeper and vigilant to the kids being very neat." Also, "within her job there appeared to be planning, organizing, sequencing that went on. It appeared that she was able to, again, take care of her kids, look ahead to their needs, getting them enrolled in school, making sure Tabatha had a place to nap; even when they were homeless, obtaining a scholarship for Tabatha to go to preschool. Taking care of them and her own needs." Tr. 666:12-25; 667:1 (Moore).

- "[W]hen Randy had his accident, ... it really fell on her to take care of the household, and she did so. She kept track of money, kept track of debt, those types of things." Tr. 667:2-5 (Moore).

- Row clearly planned that she would obtain insurance proceeds by the deaths of her children, through policies taken out between four months and 17 days before murders. She purchased the double indemnity options. *See* Exh. 15; Tr. 712:13-21 (Moore).

- Row disabled the smoke detectors so that her husband and children would not be able to escape the fire. *See* Exh. 15.

- Row started building an alibi by staying with Joan prior to the night of the fire. See Exh. 15; Tr. 724:16-18 (Moore).

- About a week before the fire, Row had instructed her husband, Randy, to take all of the good furniture that they had purchased out of the apartment and put that in storage and move all the poor furniture that they had taken out of the apartment and put that back in the apartment. Tr. 724:19-23 (Moore). The storage unit was predominately filled with Row's personal items, not general household items. Tr. 713:3-6 (Moore).

- Row closed down the bingo game that she had been embezzling from only one night before the fire. Tr. 724:24-25; 725:1-3 (Moore).

- Row made "an effort to set up Randy as being abusive or at least more significantly abusive than whatever may have been there." Tr. 712:13-21 (Moore).

- "To the degree she was convicted of arson ... there was ... limited physical evidence. There wasn't the container—a container with an accelerant. There wasn't accelerant on her clothing or shoes or in her car. At some level one, on that short window, would have somehow needed to have adequately covered those types of tracks." Tr. 712:22-25 to 713:1-2 (Moore).

iii.  <u>Poor Judgment</u>

325.  Judgment skills are an aspect of frontal lobe functioning. Tr. 693:25 to 694:1-2

(Moore), but the impact of the cerebellum on judgment skills is more precisely

explained as follows:

> It's the network; it's the interconnectivity, and the cerebellum is powerfully connected reciprocally—that means forward and backwards—with the frontal lobe. So the cerebellum is informing the frontal lobe, and the frontal lobe is informing the cerebellum, which is why when you have cerebellum damage, you can see—the functional consequence is as if the damage was in the frontal lobe itself because it's been cut off and deprived from its input. The channels of communication have been degraded, and, therefore, it's an apparent frontal

lobe syndrome caused by a distant lesion based on the anatomical pathways.

Tr. 272:23-25 to 273:1-8 (Greenberg).

326. Dr. Merikangas testified that Row's poor judgment, as reflected in her life history, likely is related to the criminal behavior. Tr. 241:1-25 to 242:1.

327. Dr. Greenberg testified that the neuropsychological tests were consistent with the errors in judgment and behavior Row manifested in her life. Tr. 287:14-19.

iv.  Ability to Learn from Feedback

328. "Learning to learn" means that, with time and experience, a person gets more effective in their problem-solving or their approach to how they might learn. Tr. 646:1-3 (Moore).

329. Dr. Moore testified that Row's life history showed that she learned from her homeless experience and worked her way into a volunteer position and then a paid position at the YWCA. Tr. 643:2-25 to 644:1-8 (Moore).

330. Dr. Moore testified that Row used the information that she had learned in the past to commit new crimes, including stealing checks from people and embezzling. Tr. 682:3-20 (Moore). She became adept at sidestepping the consequences of her misdeeds, like fleeing the jurisdiction to avoid imprisonment. *Id*.

331.   Dr. Merikangas testified that Row's life history showed that she had no ability to learn better judgment or empathy and that she kept making the same serious mistakes over and over again. Tr. 211:2-7 (Merikangas).

    v.   <u>Inhibiting Behavior</u>

332.   The frontal lobes inhibit behavior. Choosing not to act is "ongoing and critical for ... effective behavior and adaptive behavior." Tr. 270:18-23 (Merikangas). How the frontal lobes inhibit behavior—relevant here because behavior is governed by the interconnectivity between the frontal lobes and the cerebellum—was explained by Dr. Greenberg as follows:

> [B]efore the frontal lobes ... can make a good decision, they have to get two different sources of input; otherwise, you're liable to make a bad, a poor decision. You're going to get input from deep in the brain that talks about—deals with emotionality and biological priorities. For instance, if you're hungry and you're tired, but you're also fearful, and you might even be a little romantic all at the same time, what do you do? Do you go to sleep? Do you pour a glass of water? Do you call out a takeout? How do you decide among behaviors? To make a good survival decision, you have to know about the state of your internal need, your emotional needs, and the sort of biological priorities. So that's the inside of the brain, called the limbic system, generally. So that information has got to be tapped into if you want to make a smart decision.
>
> Then the frontal lobe also stores learned information, rules of conduct, right and wrong, and the sort of norms for what you should do. Because often what we feel like doing is not what we should do given the environment and the situation you're in.

So the frontal lobe says to look at that situation and says: Okay. What is one supposed to do? What's appropriate for that situation?

And then there is just one more channel, which is that you—the frontal lobes tap into memory, and how have I acted in prior situations, and how did that work for me? So you sort of query your own autobiographical memory. And this is all done instantaneously, of course. And the consequences of prior acts and the track record, you know, helps you make a better decision.

So if you hear those fire alarms going, and you're all ready to run out of a building or jump out of the building, but then you remembered that there was a memo that said we're testing the fire alarm, that's a whole different story. Then you don't execute that escape behavior. So a brief or maybe not so brief summary, but that's what the frontal lobes do, and it's a lot of stuff.

Tr. 271:5-25; 272:1-14.

333.   The record reflects that Row did not inhibit her behavior to lie, to take advantage of her friends for personal monetary gain, and to kill her family members for a variety of different benefits to herself, as noted above.

vi.   Flawed, Aberrational, Abnormal Decisionmaking, Unreasonable, Nonsensical, Criminal Behavior

334.   If the executive ability is disturbed, then a person "will do things which are unreasonable, which don't make sense, and which may be, in fact, criminal." An example is autism, where one may "have a heightened ability to plan but a marked inability to understand or comprehend the end result of that planning." Tr. 244:22-25 to 245:1-7 (Merikangas).

335.   If the executive ability is impaired, people can rationalize what they are doing wrongly and do things which are immoral or criminal, thinking that it was right at the time for them. Tr. 241:14-16 (Merikangas).

336.   Row's brain dysfunction was "a substantial contributing factor to the flawed, aberrational, abnormal decisionmaking that she obviously did, in fact, engage in." Tr. 308:17-22 (Greenberg).

vii.   Poor Impulse Control

337.   A "symptom of organic brain dysfunction" can include "poor impulse control." Tr. 237:1-5 (Merikangas) (citing and quoting Dkt. 442).

338.   Impulsivity is a clinical term meaning behavior that is undertaken without full thought. Even if it's thought through, the actual trigger gets pulled very quickly. Tr. 713:7-14 (Moore).

339.   Row does not have a significant "problem with impulse control." Tr. 244: 5-6 (Merikangas); 714: 3-20 (Moore).

340.   However, impulsivity is related to poor judgment. Row exhibited impulsivity on the WAIS that may have been related to poor judgment:

> There was another part of the Wechsler scale that was -- she showed impulsivity, something called picture arrangement, where you have to set up cartoon cards in the right sequence. And she just wasn't looking at it carefully and was saying, "I got it," and she was mismanaging those sequences. There were some repeated figures that she drew that were -- she jumped the gun on. So there were definite small signs of impulsivity, but it wasn't – wasn't dramatic.

A normal frontal lobe will say: Hey, you know, is this the right thing to do? What's the smart thing to do here? What's in my own best interests? It will do it implicitly. It doesn't say it out loud. But it will, you know, prevent bad behavior and foolish behavior and risky behavior by saying: What is the environment suggesting? What does my memory tell me? What do the rules of society tell me? And what does my gut tell me? And somehow integrating all that and coming up with a decision that is appropriate.

[I]impulsivity can be sort of thoughtless and without any deliberation at all, but you also have people who sometimes obsess and know very clearly and think about it and then quickly do the wrong thing. So their control of their impulse is still impaired even though there is a delay or period of consideration. So it's not always instantaneous.

Tr. 280:13-25; 281:1-18 (Greenberg).

viii.  <u>Pathological Lying, Paranoia, Histrionic Style, Chronic Depression</u>

341.    "[S]ymptoms of organic brain syndrome" can include "lack of empathy, manipulation, pathological lying, paranoia, histrionic style and chronic depression"; and "involuntary behavior manifestations including poor judgment [and] poor executive function." Dkt. 442, pp. 5-6 (Merikangas Decl. Jan. 18, 2008).

342.    In a May 1982 social worker report, Susan Wickersham stated that Row "is admittedly unable to differentiate truth from lies.... Robin states that a psychiatrist told her years ago that she has no control over her lying." Exh. 15.

343.    Many examples of Row's pathological lying, beginning in her early teens, is documented above.

344. Row exhibited chronic depression, including two suicide attempts, during her life. *See, e.g.*, Exh. 15, p. 64 (Dr. Charles Steuart Hospital Report).

345. Dr. Robert Engle, the State's expert, explained that Row's MMPI and MCMI scores showed (1) "histrionic personality style" (82nd percentile); and (2) chronic depression, meaning over two years in duration (characterized by a sadness, a moodiness, an irritability, a lack of energy) (85th percentile). State's Lodging A-6, p. 3922.

## T.  Review of Row's Emotionality

### i.   Gross Flattening of Affect

345. Brain abnormalities can cause a "gross flattening of affect," meaning a lack of emotion that would be consistent across settings. Tr. 663:16-23 (Moore).

346. The record reflects that Row has a consistent gross flattening of affect related to how her harmful acts affect others, which correlates with her lack of empathy.

347. However, in other areas of her life, she shows appropriate affect. Dr. Moore opined that because Row holds her emotionality "much more in check "with people who were "of particular need or utility to her" (including men), the issue of a flat affect "was more at a personality level and that she had an ability to be in control of or to moderate her actions depending upon the circumstances that she was in," versus being incapable of controlling those because of other factors, rather than at an organic or structural level. Tr. 649:2-24 (Moore).

348.    Row's life history tended to show that she knew how to repress her feelings in public and express them in private, as her grandmother taught her. Exh. 15, p. 162. Prison records showed she cried in her cell and requested antidepressants. Tr. 667:20-25 to 668:1-14 (Moore).

349.    Most people reported her as "pretty even-tempered and docile, very neat, not a heavy drinker, and very personable." However, a "couple of people would see her as "more foul-mouthed" and showing more "irritation or agitation"— these were "females with whom she had a close ongoing relationship." With these people, "she would drop her guard a bit; or they weren't of particular need or utility to her." Tr. 648:16-25 to 649:1 (Moore).

350.    Dr. Moore opined that the record doesn't show that Row had a "biologically driven inability to experience affect." Rather, "[i]t appeared to be under volitional control, ... expressing or holding in that emotion across setting." When she had "flatness" of emotion, it was "seemingly very situationally played out." Tr. 665: 5-13 (Moore).

351.    While Row kept her children well-groomed, many who knew her described her as a person without maternal instinct, one who did not show natural affection to them, and one who did not talk about her children with affection. Exh. 15.

ii.   <u>Giddiness or Inappropriate Affect</u>

352.   "Giddiness" can be a symptom of CCAD or an organic brain abnormality. Giddiness is very inappropriate or labile emotion, like real silliness; it would come across as a great deal of immaturity, for example, in interaction with the person. Tr. 663:23-25 to 664:1-2 (Moore).

353.   There is no evidence in the record that Row exhibited giddiness. Tr. 665:14 (Moore). She had a demeanor that was professional enough to teach classes at the YWCA Harambee Center. Tr. 644:1-25 (Moore).

354.   Row had the ability to lightheartedly banter with Detective Raney in his investigative interviews with her. An example of her flirting is that when they were talking about John Blackwell, Row said, John "is handsome and charming, like you." Exh. 15, p. 259.

355.   While it may not be considered socially appropriate for Row to flirt with a detective investigating her for a triple murder, that is more indicative of poor judgment, not affect. She was implementing a strategy of being friendly that had served her well in the past when there was something in it for her—she was very good at starting and maintaining a friendship. Even some of those people she stole from and mistreated still considered her a friend.

356.   In the interview, Row "was looking for how to best maintain control in the verbal fencing match with Detective Raney—[t]he information she was going to be able to extract from him versus what he was going to be able to extract

from her."  Tr. 683:11-25 to 685:1-17 (Moore). Row also became much more quiet when Detective Raney tried to extract information about the crime from her. Her affect was in aid of her manipulation—trying to appear as if she had not committed the crimes. In fact, Detective Raney and his partner both noted that they wound up telling her far more than they normally would tell a defendant. *Id.*

357.    Dr. Moore testified he thought the Detective Raney interview was more indicative of Row's borderline personality traits (the ability to "be in this moment") than it was indicative of her having an "inappropriate affect." Tr. 683:6-20.

### iii.   Lack of Empathy

358.    "Symptoms of organic brain dysfunction" can include a lack of empathy. Dkt. 442 (Merikangas Decl. Jan. 18, 2008).

359.    The record reflects that Row had an extreme lack of empathy when it involved choices of how she treated others if she perceived that her needs overrode theirs, particularly her need to be free from taking care of others and her need for money beyond that which she was able to earn. She stole from best friends, next-door-neighbors, and employers. She very likely killed five family members. She likely tried to kill a former husband and considered killing her sister. She committed numerous acts of arson that damaged others' property.

360.    Row treated people well if it served a purpose—which is not empathy, but rather, manipulation. For example, she was kind and helpful to the McHughs, John Blackwell, and others. Detective Raney said—"she had many friends in the community. She had a lot of confidence in the community." Tr. 720:1-3.

361.    At times she had some altruistic moments, such as taking groceries to a friend in need and sending her sister's family money for Christmas gifts. *See* Exh 15.

## U. *Neurological/Motor Functioning*

362.    Turning to the physical aspects of brain abnormalities, the Court notes that Dr. Moore explained that the cerebellum controls motor functioning such as balance, gait, movement, and sensory motor integration, and a person with a cerebellar abnormality may or may not exhibit such problems. Tr. 619:10-23.

363.    Neurological testing reveals the level of one's motor functioning. Tr. 681:10-16.(Moore).

   i.    General Results

364.    When Dr. Merikangas performed physical and neurological examinations (which are differentiated from the neuropsychological examinations and the brain scans) on Row in 2001 and 2003, he found that the neurological testing was basically within normal limits for a female of Row's age. Tr. 205:19-20 (Merikangas).

365. No neurological abnormalities, including gait problems, nystagmus, or speech abnormalities, were reported in Row's life history or past or recent neurological testing: Tr. 757:12-14 (Kowell).

366. Dr. Arthur Kowell, a neurologist, reviewed all the scans and reports. After Row overdosed on medication in 1993, she had a positive Babinski response—which would be consistent with many types of drug overdose affecting the brain and/or spinal cord. Tr. 747:21-25 to 748:1-2 (Kowell).

367. However, the fact that the Babinski response happened twice in a year could be an indicator of a neurological problem in the frontal lobe. Tr. 681:2-9 (Moore).

368. Another slight abnormality in her records showed that "her motor functioning as assessed by finger-tapping speeds was about a standard deviation below the mean." Tr. 680:13-16 (Moore).

369. Dr. Merikangas opined that, when brain atrophy is congenital or developmental, "the body adapts to it in terms of the movements and the coordination and reflexes." Tr. 206:1-5. However, Dr. Merikangas also opined that, when the atrophy is congenital, "the behavioral manifestations would still be there in terms of the executive functions, the mood, and the affect." Tr. 237:18-25.

370. Dr. Kowell found no evidence of cerebellar dysfunction on Row's neurological exams or parts of her nervous system examined by physicians or

medical providers. Tr. 756:24-25 to 757:1-2. Dr. Kowell agreed with Dr. Merikangas that, where the cerebellar atrophy is congenital, "many of the patients will adapt to it; meaning, as they develop, they develop means for compensating for the small cerebellum or lack of cerebellar tissue. Whereas, if it were—if this phenomenon were occurring later, then I would be—more likely, I would except to see ... gait problems, nystagmus, speech abnormalities associated with it." Tr. 757:5-15 (Kowell).

371.    Enuresis (bedwetting) can be a sign of a neurological or frontal lobe problem, but is not necessarily so. Tr. 288:16-20 (Greenberg). There are basically two aspects to enuresis. One of them is the brain getting the signal that the bladder is full, and the second one is the release of antidiuretic hormones that decrease the production of urine at night. Tr. 657:20-24 (Moore). Late bedwetting such as described in Row's life history can be a sign that the nervous system was slow to develop. *Id*.; Tr. 209:13-25 (Merikangas).

372.    Row had enuresis "until about age 9, which is pathological." Tr. 209:13-16 (Merikangas). Row's sister, Terry Theriault, indicated that Row was wetting the bed into her early 20s. Tr. 657:1-3.

373.    The cause of Row's enuresis is inconclusive. It could have been hereditary, *see* Tr. 239:9-13 (Merikangas), 657:1-24; 658:8-17 (Moore); stress-related, Tr., 658:24-25 to 659:1-2 (Moore); an indication of a frontal lobe problem, Tr. 288:16-20 (Greenberg); or a mixture of some or all of these causes.

ii.   <u>Visuospatial</u>

374.   Dr. Moore opined that Row does not have the severe visuospatial problems that someone who has a diagnosis of CCAD generally would demonstrate. As poorly as Row performed on the visuospatial aspects of her test, someone with a CCAD disorder would have performed much more poorly, for example, a person with CCAD would generally have a worse Rey diagram copy than Row and "a great deal of difficulty either giving directions, following directions, literally in ... just anything that calls for visuospatial organization or orientation." Tr. 664:3-10 (Moore).

375.   Besides being governed by the cerebellum, visuospatial skills are also governed by the parietal lobes, and less so in the frontal lobes.[17] Tr. 621: 6-7 (Moore).

376.   Row approached the Rey test diagram differently from what most people would. Tr. 635:19-24 (Moore).

377.   However, it appears that Row had adequate real-life map-drawing skills. Dr. Moore offers a variety of reasons why she might actually have better visuospatial skills than the tests indicated:

---

[17] Row also has cerebral, particularly, parietal damage, which could impact the analysis of the cerebellar atrophy on her visuospatial skills, but no expert made a distinction between the two factors of cerebral atrophy and the cerebellar atrophy as far as affecting the one component of visuospatial skills where Row was deficient. However, experts discussed the connectivity among the cerebral and cerebellar areas of the brain. *See, e.g.*, Tr. 272:17-25 to 273:1-8 (Greenberg).

- If people approach the Rey test differently, the examiner tries to create hypotheses about how it might impact how they approach the world. Maybe they have "a more unconventional problem-solving approach." Tr. 635:1-9 (Moore). They may have a great deal of difficulty in giving directions, drawing maps, or it could be in real life, where they have a little bit more structure and time to think about it, then their visuospatial capacities are relatively intact and it wouldn't necessarily play itself out adaptively in real life. Tr. 635:9-17 (Moore).

- If, in fact, Row drew the map at Exhibit 1132, then it appears she had "good visuospatial capacity and that the drawing appears to be an appropriate rendition." Tr. 637:10-18 (Moore). Also she had drawn a map for the fire marshal that "appeared to be absolutely spot-on." *Id*.

- A different way of approaching a task. "Maybe they don't look at – or a person may not look at the whole picture when they begin to plan their approach; and, again, or it may be that they simply approach things in a different manner from someone else." Tr. 639:1-10: 640:9-16 (Moore).

## V.  *Language Issues*

378.   Another CCAD dysfunction is the manifestation of the following types of language problems: "very notably impaired prosody," a "manner of speaking [that] can be very staccato," and speech marked with unnatural "inflections, meaning that the flow of [language has] a very markedly atypical rhapsody to it." Tr. 664:11-15 (Moore).

379.   The experts found no indication of language or speech flow difficulties in Row's medical history, personal history, or examinations of her. *See, e.g*., Tr. 665:14-18 (Moore).

### W. No Malingering

380.    There was no evidence of malingering or faking on the part of Row during
        Dr. Greenberg's testing. Tr. 266:10-25; 267:1-24 (Greenberg). The tests are
        an accurate reflection of her capacities at the time she took the tests. Tr.
        694:23-25; 695:1-5 (Moore).

### X.  No Evidence of Environmental Toxins Playing a Role in Row's Behavior

381.    There is insufficient evidence in the record for experts to have evaluated the
        actual levels of toxins or her exposure to them from being exposed to
        environmental pollution in her neighborhood growing up. Tr. 216:1-3
        (Merikangas).

382.    Dr. Merikangas cannot say that there is a causal relationship between
        growing up in an area that was known for high levels of toxins and Row's
        decisionmaking. Tr. 215:1-12.

383.    Dr. Kowell opined that if Row were affected by a toxin, you would usually
        see other findings with it, such as cognitive problems, memory problems, or
        motor problems, which she doesn't have. Tr. 755:13-25 to 756:1-9.

### Y.  Many of Row's Traits are Indicative of Either a Personality Disorder, an Organic Brain Disorder, or Both

384.    "[S]ymptoms of organic brain syndrome (or dysfunction)" include "poor
        impulse control, lack of empathy, manipulation, pathological lying, paranoia,
        histrionic style and chronic depression"; and "involuntary behavior

manifestations including poor judgment, poor executive function, and poor impulse control." Dkt. 442, pp. 5-6 (Merikangas Decl. Jan. 18, 2008).

385.   These are also the symptoms of ASPD. *Id*. For example, Dr. Engle, the State's expert, testified at sentencing: "These individuals are not terribly responsive to the development of insight, the capacity for empathy." State's Lodging A-6, p. 3923.

386.   Based on the brain imaging and neuropsychological testing, Dr. Merikangas disagrees with Dr. Beaver and Dr. Norman about their respective diagnoses of antisocial personality disorder and alexithymia. Tr. 245:16-25 to 246-1-17. However, Dr. Beaver's and Dr. Norman's opinions were rendered without knowledge of Row's brain abnormalities. It is probable that Dr. Beaver and Dr. Norman would arrive at a different diagnosis with the new brain abnormality information.

387.   Modern research in this area aligns with the biopsychosocial model. "Personality disorder means that ... at least from the neurology standpoint, these are behavior patterns that are, quote, ingrained, unquote, in individuals. For example, obsessive-compulsive disorder. We know that patients who have been diagnosed with obsessive-compulsive disorder actually can have abnormalities on PET scans in the brain. So there is some overlap." Tr. 768:9-23 (Kowell).

388.    An expanding area of research "shows that some borderline personality disorders are actually the result of cerebellar problems; and that some types of immorality are related to the cerebellum, that empathy is related to the cerebellum, that it's become a much more fertile area for research in behavior." Tr. 227: 14-19 (Merikangas).

389.    At sentencing the State's expert, Dr. Engle, testified that Row's personality profile "is probably the most common profile that you will find in an incarcerated population." State's Lodging A-6, p. 3924.

## Z.  Summary of Expert Conclusions

390.    Dr. Greenberg testified that "the identifying neurological source for the impaired behavior would have been evident back in the "90s or the 80s or the 70s." Tr. 309:8-22. Dr. Ward's research, discussed above, confirms Dr. Greenberg's representation of the status of scientific knowledge between 1992 and 1995.

391.    The results of the neuropsychological testing correlate with the brain testing results (imaging). Tr. 231:23-25; 232:1-3 (Merikangas); see Tr. 274:5-10 (Greenberg).

392.    Dr. Merikangas explained:

    [T]he brain is an organ of behavior. It is that which allows
    you to act, to think to feel. [I]t's everything that has to do
    with being human.

> And so any condition that affects the brain, either anatomic or
> functional or disease, all those things are what I deal with.
> And it has to do with your emotions, your mood, your
> thinking. All those problems that—mental illnesses are really
> biologically based. They are certainly modified by
> psychological factors, how you were raised, what you have
> learned, where you live, the adversity, the trauma, and all of
> those. But anything your brain actually does is a biological
> phenomenon.

Tr. 189:4-15.

393.    Dr. Merikangas concluded that Row suffers from a cerebellar hypoplasia and

cortical atrophy, which are defects of the brain that have "involuntary

behavioral manifestations" including "poor judgment" and "poor executive

function." Exh. 1, p. 13 (Dr. Merikangas Report).

394.    Dr. Merikangas also concluded that "the brain defects exhibited by Robin

Row could have been demonstrated and evaluated at the time of her trial for

arson and murder" and that they are "significant factors" for a factfinder to

consider regarding mitigation and sentencing. Exh. 1 (Dr. Merikangas

Report).

395.    Dr. Merikangas was of the opinion that Row's life history supports the

conclusion that her neurological deficiencies (the physical brain atrophy)

substantially contributed to her poor judgment and decisionmaking, including

her criminal actions.

396.    Dr. Greenberg identified the important question as whether "there is a

structural defect in the central nervous system that is fueling these behavioral

and functional manifestations." Tr. 310:5 -7 (Greenberg). Dr. Greenberg said:
"The scan and the whole clinical picture of this, you know, pathological
behavior that looked very abnormal." Tr. 294: 12-13. "I think that with that ...
history, I think I would have gone ahead and done recommended neuropsych
testing even absent the radiological evidence." Tr. 294:19-21 (Greenberg).

397.    Dr. Greenberg answered that question after he completed neurological and
neuropsychological testing. He did find significant impairment in the testing,
and testified that "probably if you look at her life and the kinds of problems
she is having and the errors in judgment and behavior, I think the
neuropsych, if anything, underestimated, but it did detect it." Tr. 287:14-19.

398.    Dr. Greenberg concluded:

> [H]ad the appropriate and comprehensive neuropsychological
> examination been carried out in concert with a review of the
> existing brain scans and a neurological examination in early
> 1993, an alternative explanation for Ms. Row's behavioral
> tendencies would have been available for consideration. In
> particular, the undercovering of a biologically-based brain
> defect that may have directly impacted her degree of
> behavioral control would have raised a substantial source of
> clinical data in favor of mitigation.

> Exh. 4, pp. 9-10 (Dr. Greenberg Report).

399.    Dr. Greenberg was of the opinion that Row's life history supports the
conclusion that her neurological deficiencies substantially contributed to her
poor judgment and decisionmaking, including her criminal actions.

400.    Dr. Moore opined that Row has some features of borderline personality disorder, some of obsessive-compulsive personality style, and a depressive disorder. Tr. 701:3:12 (Moore).

401.    Dr. Moore was of the opinion that Row's life history does *not* support the conclusion that her neurological deficiencies had "a prominent impact adaptively." Tr. 667:6-10. Dr. Moore found that Row generally displayed excellent executive functioning skills, including successfully reinventing her life when she moved from California to Idaho, planning crimes, and dodging the consequences of those crimes. He did not, however, differentiate between judgment and intellect or awareness and actions.

402.    Dr. Moore's evaluation was preliminary. He testified that he would need to do further evaluation on Row, even with the two tests that tended to show significant impairment. He would do as Dr. Greenberg did and give her a full battery of tests to see "whether the difficulties are about sort of a global level of brain functioning or whether they seem to be more circumscribed." He would also review Row's life history interviews to see how any impairments were "playing out adaptively." Tr. 642:2-7 (Moore).

403.    Dr. Kowell opined that, "in the absence of any cerebellar dysfunction on her examination such as I was able to glean from the records, as I have indicated in my report, I can't say that it's ... medically probable that these

abnormalities or these findings on the neuroimaging studies have caused any

... impaired neurologic function or behavioral abnormality." Tr. 762:18-24.

404.   However, Dr. Kowell does *not* have neuropsychological or neuropsychiatric

expertise. Tr. 757:24-25; 764:1-5. Dr. Kowell is familiar with CCAD "to

some extent." He said, "I'm not a psychiatrist, but I know it's been reported

in the literature." Tr. 757:22-25.

405.   Even a mild brain injury can have significant impacts on psychological

functioning. Tr. 764:6-9 (Kowell).

406.   Dr. Ward opined that Row's brain scans "showed she had combined

cerebellar and cerebral cortical atrophy. Brain atrophy is the result loss of

brain cell, brain neurons and the connections between them. Cerebellar and

cerebral cortical atrophy is a strong indicator of an organic brain disorder and

indications of potential problems with the front-cerebellar circuitry. This type

of brain atrophy is an indication of a chronic brain disorder or the residual

result of a much earlier brain injury." Exh. 9, p. 2 (Ward Report).

407.   Dr. Ward also opined that the "brain CT scan in 1993 of Robin Row, coupled

with Dr. Norman's reported 'alexithymia' should have triggered a

recommendation for a neuropsychological evaluation in both clinical and

forensic practice because of the known close association between her type of

brain atrophy and problems with emotional apathy, self-awareness and

judgment." Exh. 9, p. 2.

408.   Dr. Beaver would have approached the case completely differently had he been aware of the CT scan showing a smaller-than-normal cerebellum. He would have recommended to trial counsel that they engage in a much more thorough "neurocognitive exploration," including a significant amount of testing. Tr. 46:17-24.

409.   Dr. Beaver opined that cerebral cortical atrophy "has an impact on a person's ability—how effectively they function in certain situations, such as in high-stress situations, how well they are able to manage their emotions, make decisions, things of that nature—regulate themselves." Tr. 528:18-22.

410.   Dr. Norman "would have referred Ms. Row for neurological testing including MRI and PET scans before going further in [his] evaluation," had he known about the abnormalities in Row's brain. Exh. 204/Dkt. 130, p. 3 (1999 Decl. of Dr. Norman).

## CONCLUSIONS OF LAW

### A.  *Standard of Law:* **Martinez v. Ryan** *Exception to Procedural Default Rule*

1.   In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court of the United States held that inadequate assistance of post-conviction review (PCR) counsel at initial-review collateral review proceedings may establish cause for a prisoner's procedural default of a substantial claim of ineffective assistance of trial counsel. *Id.* at 9. The Supreme Court defined substantial to be a "claim that has some merit." *Id.* at 14. An ineffective assistance of trial counsel claim does not

meet the standard if it is "wholly without factual support." 566 U.S. at 16; *see Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019).

2.  The "substantiality" test has been likened to the standard for issuing a certificate of appealability, which is "that reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017) (quotations omitted). Review consists of only a "general assessment" of the merits of the claim, and the court "should not decline to issue a certificate 'merely because it believes the applicant will not demonstrate an entitlement to relief.'" *Cook v. Ryan*, 688 F.3d 598, 610 n.13 (9th Cir. 2012) (alteration in original) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 336–37 (2003)).

3.  *Martinez* is a "picture in picture" analysis of whether *post-conviction* counsel was ineffective by failing to raise an ineffective assistance of *trial* counsel where trial counsel performed deficiently and the deficiency caused prejudice. *See id.*; *see also Strickland v. Washington*, 466 U.S. 668, 695–96 (1984). The United States Court of Appeals for the Ninth Circuit has instructed that the "analysis of whether both cause and prejudice are established under *Martinez* will have "considerable overlap," because "each considers the strength and validity of the underlying ineffective assistance claim." *Djerf v. Ryan*, 931 F.3d 870, 880 (9th Cir. 2019). "However, the requirements remain distinct." *Ramirez*, 937 F.3d at 1241.

4. To succeed on a Sixth Amendment ineffective assistance claim under *Strickland*, a petitioner must show that (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) the petitioner was prejudiced by the deficient performance. *Strickland*, 466 U.S. at 684.

5. In the assessment of trial counsel's performance under *Strickland*'s first prong, a reviewing court must view counsel's conduct at the time that the challenged act or omission occurred, making an effort to eliminate the distorting lens of hindsight. *Id*. at 689. The court must indulge in the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Id*.

6. In the assessment of prejudice under *Strickland*'s second prong, a court must find that, under the particular circumstances of the case, there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Id*. at 684, 694. A reasonable probability is one sufficient to undermine confidence in the outcome. *Id*. at 694.

7. A petitioner must establish both deficient performance and prejudice to prove an ineffective assistance of counsel claim. 466 U.S. at 697. On habeas review, the court may consider either prong of the *Strickland* test first, or it may address both prongs, even if one is deficient and will compel denial. *Id*.

8.  In *Strickland*, the ineffective assistance claim arose from trial counsel's decision to limit the scope of their investigation into potential mitigating evidence. 466 U.S. at 673. The Court reasoned:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690–691.

9.  Here, Row's claims are all about mitigation. The United States Supreme Court has emphasized that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) (explaining *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality), which observed that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death" (emphasis in original). *Accord, Hurles v. Ryan*, 752 F.3d 768, 784 (9th Cir. 2014).

10.     In *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999), the Ninth Circuit Court of

Appeals explained the importance of a thorough investigation at the sentencing

phase of capital proceedings:

> It is imperative that all relevant mitigating information be
> unearthed for consideration at the capital sentencing phase.
> The Constitution prohibits imposition of the death penalty
> without adequate consideration of factors which might evoke
> mercy.

*Id.* at 1227 (internal quotation marks omitted).

11.     A criminal defense attorney must perform a more thorough investigation into

mental health issues for the mitigation phase of death penalty proceedings than

for the guilt phase *before* deciding upon a strategy for the guilt phase. *See Silva*

*v. Woodford*, 279 F.3d 825, 843–44 (9th Cir. 2002) (citing *Hendricks v.*

*Calderon*, 70 F.3d 1032, 1043–44 (9th Cir. 1995)). In *Wallace v. Stewart*, 184

F.3d 1112 (9th Cir. 1999), the Court explained:

> In *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir.1995), we
> concluded that the defense lawyer had reasonably relied on
> psychologists' findings in not pursuing a mental defense at
> trial. *See id.* at 1037–39. Even though the psychologists
> lacked important information about Hendricks's drug
> problems and hard childhood, we held that counsel's failure
> to investigate and relay this information was not deficient
> because the psychologists had not asked for it. *See id.* at
> 1038. *At the penalty phase, however, this same lack of*
> *diligence did constitute ineffective assistance*. Recognizing
> that "[e]vidence of mental problems may be offered to show
> mitigating factors in the penalty phase, even though it is
> insufficient to establish a legal defense ... in the guilt phase,"
> we said that "where counsel is on notice that his client may be
> mentally impaired, counsel's failure to investigate his client's

> mental condition as a mitigating factor in a penalty phase
> hearing, without a supporting strategic reason, constitutes
> deficient performance." *Id*. at 1043.

*Id.* at 1117 (emphasis added).

12. Accordingly, the failure of defense counsel to "investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel." *Caro v. Calderon*, 165 F.3d at 1226 (citing *Hendricks*, 70 F.3d at 1043–44, and *Evans v. Lewis*, 855 F.2d 631, 637–38 (9th Cir. 1988)). To prepare for the penalty phase of a capital case, a defense attorney has a professional responsibility to investigate the defendant's background—and bring to the attention of mental health experts who are examining his client— any relevant facts *of which the attorney has notice*, even though the experts do not ask defense counsel to "investigate [the defendant's] background further." *Wallace*, 184 F.3d at 1116, 1118.

13. For example, in *Caro v. Calderon*, the majority opinion pointed out that the sentencing jury was never presented with "the most important evidence of mitigation—the chemical poisoning of Caro's brain." 165 F.3d at 1227. The *Caro* majority used the reasoning of the dissenting judge's opinion to illustrate how important it is that brain damage experts testify at sentencing to help the jury understand and discern the fine lines of scientific evidence associated with causal links:

> [T]he dissent fails to understand the difference between
> chemical poisoning causing brain damage which results in
> aggressive behavior and the death of a brain cell caused by
> the lack of oxygen as the result of a stroke which does not
> cause aggressive behavior. As the dissent does not understand
> that difference, then it is clear that a jury must have such a
> difference explained by experts. It may be the difference
> between life and death.

*Id*.; *see also Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th Cir. 1995)

(concluding that trial counsel committed error "in failing to provide the state's

experts with materials they needed to develop an accurate profile of

Clabourne's mental health"). The "duty to provide the appropriate experts with

pertinent information about the defendant is key to developing an effective

penalty phase presentation." *Caro v. Woodford*, 280 F.3d at 1255.

14.     Also a critical factor in the ineffective assistance of trial counsel analysis is

        whether trial counsel performed their own investigation to determine which

        experts should be consulted to analyze the evidence found in the investigation.

        A defense attorney's own investigation can be as simple as carefully reviewing

        the evidence that is already in the record to inform the attorney's

        decisionmaking before determining guilt-phase and a penalty-phase strategies.

15.     Because capital punishment is the ultimate penalty for crime, a defense attorney

        investigating mitigation is held to a high standard when it comes to the

        determination of which type of experts will be needed to support mitigation and

rebut aggravation. In *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006), the

court reasoned:

> As in *Caro*, [defense attorney] Lieman's failure to consult
> with a *neurologist*—the only expert qualified to evaluate
> organic brain dysfunction caused by multiple childhood head
> trauma—is not ameliorated by his alleged reliance upon the
> testimony of Dr. Gillick, a forensic *psychiatrist*. Further,
> Lieman admitted that he never spoke with Dr. Gillick about
> the advisability of a neurological examination "because Dr.
> Gillick never advised me that a neurological examination of
> Mr. Frierson was necessary." But because Lieman never
> informed Dr. Gillick of the brain injuries or the Turner
> Report's reference to organic brain damage, Lieman "failed to
> provide [his expert] with the information necessary to make
> an accurate evaluation of [Frierson's] neurological system."
> Here, the record indicates that Lieman never reviewed the
> trial transcripts of Frierson II. Lieman was unaware of the
> 1980 drug history report that Dr. Siegel prepared after he first
> evaluated Frierson. Dr. Siegel, however, referred to his report
> six times during his testimony in *Frierson II*. Lieman was
> also unaware that Dr. Gillick prepared a report in 1980,
> portions of which Dr. Gillick read into the record on five
> different occasions during his testimony in *Frierson II*.
>
> Lieman had only to review the trial transcripts of *Frierson II*
> to discover the existence of a prior investigative report
> prepared by Robert Turner (the "Turner Report") that
> indicated that a series of psychiatric evaluations had been
> conducted from 1971-74 while Frierson was committed to the
> custody of the CYA. One evaluation dated September 1971
> explained that Frierson exhibited "minor symptoms of
> organic brain dysfunction."
>
> Although Lieman later admitted that "organic brain
> dysfunction" could have "great legal significance," Lieman
> failed to pursue any avenues of investigation provided by the
> Turner Report-he did not consult with any CYA staff
> psychiatrists, he did not track down the psychiatric evaluation
> in question, and he did not seek the services of a neurologist

> even when alerted to evidence of possible organic brain
> damage. This is likely due to his failure to review the
> transcripts of the prior proceedings.

*Id.* at 990 (emphasis added).

16.    Perhaps most importantly, capital sentencing requires "an individualized

determination on the basis of the character of the individual and the

circumstances of the crime." *Shinn v. Kayer*, 141 S. Ct. 517, 526 (2020)

(emphasis omitted) (quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)).

## B.  *Analysis of Claim 7 ¶ 81(b)*

17.    Claim 7 ¶ 81(b) is that trial counsel's "failure to make an independent

investigation of matters in mitigation" violated Row's Sixth Amendment right

to effective assistance of counsel. Dkt. 293, p. 25.

   i.   <u>Deficient Performance Analysis</u>

18.    Trial counsel Cahill and Myshin had within their possession the facts necessary

to discover a brain atrophy mitigation defense: in particular, the 1992 CT scan

was mentioned four times in the April 1992 supplemental police report, and the

1993 CT scan report recommending further workup on Row's brain atrophy

was attached to the PSI report.

19.    Cahill and Myshin did not provide Row's 1993 hospital records to their

psychological consulting expert, Dr. Beaver, when he asked for them. These

records would have revealed (1) the atrophy issues and (2) the radiologist's

recommendation to obtain etiological correlation from a neurologist.

20. Had Dr. Beaver and/or Dr. Norman been able to review the 1992 and 1993 CT scans, they almost certainly would have conducted neuropsychological testing and asked counsel to obtain a neurological expert to interpret the brain scans.

21. Had a neurologist or neuropsychiatrist reviewed the 1992 and 1993 CT scans and had neuropsychological testing been conducted, Dr. Beaver and Dr. Norman almost certainly would have significantly changed their analysis and diagnosis of Row and would have been able to offer objective and significantly stronger mitigation evidence at the sentencing hearing. Dr. Beaver's or Dr. Norman's testimony and a consulting neurologist's testimony would have been similar to the testimony provided by Dr. Merikangas, Dr. Ward, and Dr. Greenberg.

22. Had Dr. Beaver or Dr. Norman and a consulting neurologist and/or a neuropsychiatrist testified similarly to the testimony provided by Dr. Merikangas, Dr. Ward, and Dr. Greenberg, that testimony would have been significantly more mitigating than an "alexithymia" conclusion: experts agree it is not a DSM diagnosis, and it is an explanation that addresses only that Row is unable to feel the normal feelings associated with killing her immediate family—not an explanation that has a strong correlating or causal connection to the crimes, as the objective brain atrophy evidence does.

23. "[S]ymptoms of organic brain syndrome" include "lack of empathy, manipulation, pathological lying, paranoia, histrionic style and chronic

depression"; and "involuntary behavior manifestations including poor judgment, poor executive function, and poor impulse control." Dkt. 442, pp. 5-6 (Merikangas Decl. Jan. 18, 2008). These are *also* the symptoms of antisocial personality disorder. *Id*. Organic brain findings are considered to be among the strongest type of mitigating evidence in death penalty cases; on the other hand, anti-social personality disorder findings often are considered *aggravating* evidence in death penalty cases.

24. Row's congenital brain abnormalities raise the very significant issues of her ability to develop the regular moral system we expect humans in this society to adhere to, her ability to develop empathy (which is required to make moral decisions), and her ability to conform her behavior to societal norms despite a lack of awareness: the record strongly reflects that she killed family members on three separate occasions while friends, mental health providers, police investigators, and jurists recognized her grossly abnormal behavior and yet were unable to check or help thwart her path of destruction.

25. Clearly, the sentencing factfinder (just as counsel and Dr. Norman were doing), was grasping but had no explanation for Row's extreme and bizarre behavior other than she carried out three well-planned murders to rid herself of family obligations and obtain a huge pot of insurance proceeds. With the brain atrophy evidence, the sentencing factfinder would have had far more solid evidence that would have impacted the following portions of the trial court's "Findings of the

Court in Considering Death Penalty under Idaho Code Section 19-2515 and

Imposition of Sentence":

- In a general or descriptive sense, I have no difficulty in referring to Robin Row as mentally ill or having a mental disorder, but certainly not in the sense that she is psychotic—ie. having lost touch with reality, or that she does not know the difference between right and wrong, or that she is incapable of conforming her conduct to the dictates and norms of society. MMPI test results indicate basically an antisocial personality disorder, evidenced by poor impulse control, lack of empathy, manipulative, a pathological liar, somewhat paranoid with a histrionic personality style, suffering also from chronic depression.

- She may react in a manner out of proportion to events around her (passive-aggressive) and is generally insecure with fears of abandonment. She has a chronic self-defeating style of relating to the world and has been diagnosed with a major emotional problem, which may be generally described as "alexithymia."

- Defendant's alexithymia is evidenced by her extreme disconnection with her feelings; she is in emotional withdrawal and her emotional affect is way out of touch with her true feelings. Such affect is generally flat (ie. her feelings are not appropriate to or congruent with the event). This clinical disconnection can perhaps be best described as a pathological emotional denial. Defendant has buried her feelings so deep that it required extraordinary efforts by her psychologist before she could express her feelings of remorse for that much of her role in the crimes she was willing to admit. This "alexithymic" condition may be related to some organic problem with brain functioning. She is just now beginning to express some feelings of remorse of her role in the deaths of her family.

- Defendant's alexythymic mental condition and emotional affect may explain how she could methodically destroy her family by blocking out all human feelings of remorse—

without confronting the darkness of her own soul; but it cannot come close to justify or outweigh the gravity of three (3) murders.

- That Robin Row would block out her feelings of guilt and remorse; that she would disconnect from the magnitude of her crimes; that she would manipulate reality and bend the truth to soothe her conscience is, in my opinion, a foregone conclusion [emphasis in original].

- The horror of what she has done may also explain her coping mechanisms of emotional withdrawal, blocking, flat affect, denial, and supposed memory loss (feigned, in my opinion); but such condition provides no justification to outweigh the gravity of this aggravating circumstance.

- [T]his Court is drawn to the inescapable conclusion that the circumstances surrounding this crime exhibit the highest, utmost, callous disregard for human life, i.e., the cold-blooded pitiless slayer. Defendant's lack of conscientious scruples against the killing of her natural-born, pre-adolescent, innocent, and helpless children, along with her husband, catapult this case into the heightened dimension of utter disregard for human life as defined by the Idaho Supreme Court.

- Row's actions represent the final betrayal of motherhood and embody the ultimate affront to civilized notions of maternal instinct. She professed to love her children, yet cunningly and remorselessly took their lives to meet her own needs and antisocial delusions.

- Maternal "pedocide"—the killing of one's own children—is the embodiment of the cold-blooded, pitiless slayer—a descent into the blackened heart of darkness.

State's Lodging A-2, pp. 414-34 (Findings of the Court in Considering Death

Penalty).

26.     Cahill and Myshin had a duty to carefully read and investigate any items in the police report and presentence investigation report that raised a red flag as to aggravation or mitigation, because, at the least, counsel were duty-bound to raise particular objections to the PSI with the court.

27.     The PSI contained the 1993 CT report, which showed brain atrophy, suggested a possible cause for the atrophy (alcohol abuse), and recommended clinical correlation. Part of the critical wording of the 1993 CT scan was even in capital letters. Yet, counsel took no notice of the report. It would have been clear to a criminal trial attorney in 1992 to 1993 that an argument that alcohol abuse destroyed physical elements of Row's brain before she committed the crimes would have been a better mitigation theory than "alexithymia"—that she was unable to feel or describe her feelings after the killings. It would have been clear to a criminal trial attorney in 1992-1993 that the radiologist was suggesting that the etiology of the atrophy could have been something *other* than alcohol abuse, which would have been even more helpful to the mitigation theory than alcohol abuse, i.e., organic brain dysfunction. The ineffective assistance of counsel analysis does not consider whether a "better" defense strategy was available when the strategic decisionmaking was preceded by an adequate investigation— unlike in this case.

28.     The extensive life history of Row contained in the PSI report shows that something is very, very wrong with her. The PSI also shows exactly what is

wrong. The vital mitigating evidence in the PSI was not presented in a

mitigating light, or at all, at the sentencing hearing.

29.     The foregoing omissions constitute deficient performance.

ii.     <u>Prejudice Analysis</u>

30.     The foregoing analysis of what "might have been" at Row's sentencing hearing

also constitutes prejudice—enough for a *Martinez* showing and, preliminarily,

enough for a *Strickland* showing on the merits of the claim.

31.     The law is clear that the "any mitigating evidence" standard need not be of the

nature that it demonstrates the brain abnormality caused the defendant to

commit the crimes to the exclusion of other causes. Here, the brain abnormality

evidence is particularly strong, especially in light of the fact that the record

tends to show that this particular mother had a congenital biological

abnormality and that she killed all of her children over a period of twenty years.

32.     Row's counsel missed the opportunity to present the most powerful evidence

Row had. The United States Supreme Court has observed that "the strength" of

a defendant's mitigating evidence is its "tendency to prove that his [or her]

violent propensities were caused by factors beyond his [or her] control," such as

"neurological damage and childhood neglect and abandonment." *Abdul-Kabir v.

Quarterman*, 550 U.S. 233, 241 (2007). "Evidence of organic mental deficits

ranks among the most powerful types of mitigation evidence available."

*Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013). *See also Leavitt v.*

*Arave*, 646 F.3d 605, 623 (9th Cir. 2011), Reinhardt, C.J., dissenting (observing that, "[u]nder our case law, [organic brain injury] evidence, if it is credible, is considered weightier than evidence of non-organic, purely psychiatric or personality disorders ... that involve "a lack of emotional control") (quoting *Caro*, 280 F.3d at 1257–58).

33.   "Counsel in capital cases must explain to the [factfinder] why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012).

34.   On similar evidence placed against similar findings that led to a death sentence in *Littlejohn v. Trammell*, the Tenth Circuit Court of Appeals reasoned:

> Evidence that an organic brain disorder was a substantial factor in engendering Mr. Littlejohn's life of deviance probably would have been a significant favorable input for Mr. Littlejohn in the jury's decisionmaking calculus. And, under the particular circumstances of this case, there is a reasonable probability that such evidence would have led at least one juror to support a sentence less than death. Yet, here the jury received virtually no explanation of how Mr. Littlejohn's alleged mental problems played into the murder. And without this explanation, the prosecution was able to frame the mitigation defense as a mere collection of the social circumstances of Mr. Littlejohn's upbringing—circumstances that, while unfortunate, do not excuse murder. In this regard, the prosecutor stated, "It is unfortunate that children are raised in [rough] environment[s], but it doesn't make them killers. Choices make people killers." State R., Vol. VII, Resentencing Tr., at 346.

704 F.3d at 864–65.

35.    Under Ninth Circuit precedent, a sentencing factfinder should be "afforded the benefit of expert testimony explaining the effects that [the defendant's] physiological defects would have had on [her] behavior," because "explaining that [her] behavior was physically compelled, not premeditated, or even due to a lack of emotional control," means that "[her] moral culpability would have been reduced." *Caro v. Woodford*, 280 F.3d at 1258 (emphasis omitted). There are two separate instances *Caro* mentions that need elucidation by an expert: (1) behavior that is "physically compelled by an organic cause" rather than premeditated; and "behavior that is due to a lack of emotional control." *See id*. That is, the fact that there is sufficient evidence in the record to show that a crime was premeditated, as here, does *not* foreclose the defendant's right to explain in mitigation that, *notwithstanding the premeditation*, her behavior was due to a lack of emotional control. For Row, the right goes deeper. The defendant has the right to explain in mitigation (1) the objective evidence of brain defects shown on the brain scans, (2) the objective evidence of particular neuropsychological testing deficits that correspond to the particular brain defects shown on the brain scans, (3) the congenital or longstanding nature of the brain defects, and (4) the scientific evidence showing that the areas of the

brain where she has defects are the same areas involved in human judgment, awareness, and empathy.

36.    In *Sears v. Upton*, 561 U.S. 945 (2010), the defendant had similar neuropsychological results as Row. The United States Supreme Court reasoned:

> Regardless of the cause of his brain damage, [the defendant's] scores on at least two standardized assessment tests placed him at or below the first percentile in several categories of cognitive function, "making him among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior only to relevant stimuli." Exh. 1, 2 *id*., at 148; *see also* 1 *id*., at 37. The assessment also revealed that Sears' "ability to organize his choices, assign them relative weight and select among them in a deliberate way is grossly impaired." Exh. 1, 2 *id*., at 149. From an etiological standpoint, one expert explained that Sears' "history is replete with multiple head trauma, substance abuse and traumatic experiences of the type expected" to lead to these significant impairments. *Id*., at 150; *see also* 1 *id*., at 44.
>
> Whatever concern the dissent has about some of the sources relied upon by Sears' experts—informal personal accounts, *see post*, at 3269 – 3271 (opinion of SCALIA, J.)—it does not undermine the well-credentialed expert's assessment, based on between 12 and 16 hours of interviews, testing, and observations, *see* 1 Record 32, that Sears suffers from substantial cognitive impairment. Sears performed dismally on several of the forensic tests administered to him to assess his frontal lobe functioning. On the Stroop Word Interference Test, which measures response inhibition, *id*., at 36–37, 99.6% of those individuals in his cohort (which accounts for age, education, and background) performed better than he did. *Ibid*. On the Trail–Making B test, which also measures frontal lobe functioning, *id*., at 37–38, Sears performed at the first (and lowest) percentile. *Id*., at 38. Based on these results, the expert's firsthand observations, and an extensive review of Sears' personal history, the expert's opinion was unequivocal:

> There is "clear and compelling evidence" that Sears has
> "pronounced frontal lobe pathology." *Id*., at 68.

561 U.S. at 949–50.

37.    Here, the organic underpinnings that explain Row's actions are not speculative or tentative. The scans show the brain defects existed before the crime, and the experts generally agree they were longstanding and likely congenital. The neuropsychological testing deficits correspond to the brain defects. Defects in the cerebellum, disrupting connections to the frontal lobes, have been demonstrated in scientific research to be involved in judgment, empathy, awareness, and emotions. All of this information was available to lawyers, psychologists, and neurologists in 1992 and 1993.

38.    Neurological research from 1947 reflects that persons with brain damage can exhibit a dissociation between what the patient knows or says, and how she behaves; that is, a study recognized that a patient who had an excellent sense of right and wrong when talking about it in an abstract manner, showed no ability to apply that knowledge to her actions. *See* Exh. 11, Tab 3 (attachment to Ward Report).

39.    Row's facts are much like those in *Caro v. Woodford*. There, the court reasoned:

> In this case, counsel was aware of Caro's extraordinary
> history of exposure to pesticides and toxic chemicals, yet he
> neither investigated fully this history nor informed the experts
> who examined Caro of those facts that were known to him.

Further, despite counsel's awareness of these facts, he failed to seek out an expert to assess the damage done by this poisoning of Caro's brain. As we emphasized in our earlier opinion, "All counsel had to do was ask the question 'What did all that extraordinary exposure to chemicals do to his brain?' And then, in order to find the answer, he merely had to address the question to either a neurologist or a toxicologist." *Caro,* 165 F.3d at 1228. Such evidence would have provided powerful mitigating evidence at the penalty phase of Caro's trial.

280 F.3d at 1254–55.

40.     Substituting Row's facts in the above context to emphasize the close fit of this

precedent, this Court reasons:

In this case, counsel was aware [that Row twice tried to commit suicide and had an extraordinarily horrendous personal history indicative of a person with some type of major psychological problem, as evidenced by the presentence report]. Further, despite counsel's awareness of these facts, he failed to [read or give adequate attention to the PSI attachments to see that—*in the very midst of their representation of Row*—a brain scan had been performed, the brain scan revealed a brain defect, and the radiologist recommended correlative follow-up diagnostics for Row to discover the etiology of the brain defect]. [Again,] despite counsel's [imputed] awareness of these facts, he failed to seek out an expert to assess the [brain] damage [and determine its etiology, which would have unearthed the organic brain disorder evidence, which could have been provided to Dr. Norman to aid in the mitigation case.] As we emphasized in our earlier opinion, "All counsel had to do was ask the question 'What [caused Row's brain defect, as the radiologist asked someone to follow up on]?' And then, in order to find the answer, he merely had to address the question to [] a neurologist." *Caro*, 165 F.3d at 1228. Such evidence would have provided powerful mitigating evidence at the penalty phase of [Row's] trial.

41.   On the other hand, when "a reasonable investigation does not turn up signs of additional, reasonably available mitigating evidence, competent counsel may make the judgment not to pursue a line of inquiry further." *Crittenden v. Ayers*, 624 F.3d 943, 964–66 (9th Cir. 2010) (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009) (per curiam)). In *Bobby*, the Court rejected the assertion that defense counsel should have dug deeper into the defendant's family history than they did: "This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins v. Smith*, 539 U.S. 510, 525 (2003), or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard*, 545 U.S. 374, 389–393 (2005)." 558 U.S. at 11.

42.   Here, few if any jurists would agree that failing to read and undertake the advice of a radiologist to discover the etiology of a brain defect in a case of this magnitude (both in the nature of the crimes and the nature of Row's deviant background) from a CT scan contemporaneous with the legal representation qualifies as a "reasonable investigation." This United States District Court does not. The PSI report attachments were "staring trial counsel in the face," as in *Bobby*, 558 U.S. at 11, and counsel did not have to lift a finger to obtain the records—they were handed over by the presentence investigator.

43.   It is essential for Row's factfinder to have all the relevant pieces of evidence to determine what fits into each of the three categories of the biopsychosocial

model—to the extent that it is possible to differentiate—and how those pieces translate into moral culpability for her particular decisions and behaviors.

44.  The United States Supreme Court recognizes that the individuality of a death penalty decision is paramount. *See, e.g., Shinn*, 141 S. Ct. at 526. This is why we cannot have just a hint of an organic issue, as is now in the record, when objective imaging and neuropsychological test results show otherwise. Under the biopsychosocial theory, whether there is an organic basis for a person's decisionmaking and behavior is one-third of what the factfinder must review.

45.  No doubt, the State's experts would have been (or will be) called to rebut Row's expert opinions and scholarly research, but Row has provided sufficient evidence to show that one or more jurors could adopt her experts' points of view.

46.  The State's experts have not overwhelmed the Court with evidence that prevents Row from meeting the certificate of appealability standard, set forth above. Dr. Kowell, the State's neurologist, opined: "[I]n the absence of any cerebellar dysfunction on her examination such as I was able to glean from the records, as I have indicated in my report, I can't say that it's ... medically probable that these abnormalities or these findings on the neuroimaging studies have caused any ... impaired neurologic function or behavioral abnormality." Tr. 762:18-24. He qualified his opinion, however, with, "[b]ut I don't know that, at least my knowledge of the field—and I have spent a lot of time at this—

that I can always connect the dots. In other words, I'm not a psychiatrist." Tr. 768:20-23.

47. This Court concludes that Dr. Kowell's opinion addresses only one-third of the biopsychosocial model of the human being.

48. Scientific evidence shows that ASPD-like behavior can be the result of brain anomalies. Dr. Ward said, "[W]e now know a lot more about what the brains of antisocials look like." Tr. 323:23-2 .

49. Dr. Kowell's opinion is not expansive enough to reflect the breadth of modern research on ASPD-like behavior. It is known that the cerebellum is associated with the frontal lobe and has a part in regulating executive functions, empathy, judgment, awareness, and emotions. The other experts logically mixed and matched frontal lobe disorder with cerebral atrophy syndrome in their opinions because of the essential neural circuitry connecting the two, and didn't box themselves into discussing only the biological aspect.

50. Further, Dr. Kowell mostly ignored the fact that the particular deficits on Row's neuropsychological examinations correlated with those areas of the brain known to coordinate some of the behaviors at issue.

51. The State's psychological expert, Dr. Moore, pointed to many instances in Row's life that showed she had excellent planning and organizational executive function skills, was not impulsive, exhibited a gross flattening of affect only when it served her and expressed normal emotions at other times, was never

giddy, had a general affect that was appropriate and professional enough to land teaching and supervisory jobs at the YWCA, had no motor functioning deficits, and arguably was able to learn from feedback given that she often dodged the consequences of her bad behavior and in fact learned how to obtain a monetary reward for it.

52. Based on the observations set forth in the foregoing paragraph, Dr. Moore found that Row did not have all four of the aspects of CCAD, and was more likely to have ASPD and/or other personality disorders. *See* Tr. pp. 663-673.

53. However, other experts found Row potentially had deficits in three of the four areas: executive functioning, visual-spatial functioning, and affective regulation in personality functioning/emotional regulation. All experts agree that Row had no deficits in the fourth CCAD area: language impairments.

54. While some jurors may agree with Dr. Kowell and Dr. Moore, other jurors may not, especially considering that the State's expert opinions did not clearly differentiate between judgment and intellect or recognize the disconnect between knowledge and actions that research scientists have identified in brain-damaged individuals. All that is needed to avert the death penalty is to persuade one juror.

55. Nothing at the 1993 sentencing hearing covered in thorough fashion the important points that (1) brain atrophy can affect behavior, and (2) behavior that is ASPD-like can have an organic basis. The sentencing court drew a bright line

between a psychopath—who could not control her behavior—and a sociopath—who was thought to be able to control her behavior.

56.     The sentencing judge acknowledged that Row's covering up of her feelings after committing atrocious crimes against her family (1) "*may* be related to" (2) "*some* organic problem with brain functioning." State's Lodging A-2, p. 434 (emphasis added). However, the CT scans show that there are (1) *definitely* (2) *two different* brain abnormalities at work in Row, and that (3) the abnormalities in the cerebellum correspond to the areas of the brain where humans develop and implement moral and empathic decisionmaking.

57.     Even though Row's and the State's experts disagree as to whether Row's bizarre life history was consistent or inconsistent with CCAD or frontal lobe disorder, there are enough credible expert opinions and scholarly research studies for a reasonable juror to conclude that Row's two organic brain abnormalities combined to have enough of a causal impact on her morality, empathy, and decisionmaking such that the death penalty is inappropriate for her.

58.     The Court rejects the simplistic model that Row must fit cleanly into a diagnosis of CCAD to allow her brain deficits to qualify as mitigating evidence, especially given that her atrophy is likely congenital and she also has cerebral cortical atrophy. Therefore, the Court rejects the conclusion or theory that, if

she doesn't have manifestations in all four components, the brain deficit evidence cannot be mitigating.

59.     Again, inserting Row's name into *Caro*'s conclusion because of the cases' similarities, the Court concludes that "[b]ecause it has been established that [Row] suffers from brain damage, the delicate balance between [her] moral culpability and the value of [her] life would certainly teeter toward life. Therefore, [the Court concludes] that counsel's errors prejudiced [Row] by rendering the results of [her] penalty phase trial unreliable." *See Caro*, 280 F.3d at 1258.

60.     A "delicate balance" is indeed what the factfinder faces when considering whether it is moral and just for society to approve execution. Because this delicate balance was upset by the failure to bring forward Row's objective brain atrophy evidence at sentencing, the Court concludes that Row has met the *Strickland* standard of showing a reasonable probability that the outcome of the sentencing hearing would have been different.

## C.  Analysis of Claim 7 ¶ 81(e)

61.     Claim 7 ¶ 81(e) is that trial counsel failed "to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the organic brain damage revealed by CT scans taken of Row revealing an atrophy of the brain," thereby violating Row's Sixth Amendment right to effective assistance of counsel. Dkt. 293, p. 25.

62.    The Court concludes that the regular duties of criminal defense counsel in 1993

included carefully reviewing the police report and the presentence investigation

report with exhibits to determine whether there were any particular points that

needed to be rebutted, objected to, or further investigated. The 1993 CT scan

report that was done during trial counsel's representation of Row specifically

found atrophy and specifically recommended follow-up analysis to determine

whether the atrophy was caused by alcohol abuse or something else. Because

counsel did not read the exhibits carefully enough to discover that Row had an

organic brain problem that required neurological follow-up diagnosis by a

qualified neurologist, they rendered deficient performance in failing to engage

in their investigation either a neurologist (who could have worked hand in hand

with Dr. Beaver and/or Dr. Norman) or a neuropsychiatrist, who would have

been able to perform both the necessary neurological and neuropsychological

assessments and would have made retention of Dr. Beaver and/or Dr. Norman

unnecessary.

63.    The Ninth Circuit Court of Appeals found likewise in *Jones v. Ryan*, 1 F.4th

1170 (9th Cir. 2021):

> Jones has demonstrated that counsel's failure to seek
> neuropsychological and neurological testing prejudiced his
> defense. He has demonstrated that there is a "reasonable
> probability" that had such testing been conducted, and had the
> results been presented at sentencing, "the result of the
> proceeding would have been different." *Strickland*, 466 U.S.
> at 694, 104 S.Ct. 2052. While Dr. Potts presented brief,

conditional findings, the results of the neuropsychological and neurological tests conducted by various experts during Jones's federal district court proceedings confirmed that Jones suffered from a variety of psychological disorders stemming from birth and exacerbated by long-term drug use and trauma that affected Jones's cognitive functioning.

*Id*. at 1203–04.

64.     For the reasons set forth in the analysis of Claim 7 ¶ 81(b), the Court concludes that Row has shown a reasonable likelihood that the result of the proceeding might have been different had the evidence of an organic brain problem been presented at sentencing—both for *Martinez* and for *Strickland* merits purposes.

## D. Analysis of Claim 7 ¶ 81(h)

65.     Claim 7 ¶ 81(h) is that trial counsel rendered ineffective assistance of counsel for their "[f]ailure to investigate, develop, and present evidence rebutting aggravating evidence considered by the trial court." Dkt. 293, p. 25. The Court limited this claim to the extent (1) that relies on the failure to present evidence of the organic brain dysfunction, and (2) that it is separate and distinct from the mitigation claims that the state and federal courts decided on the merits.

66.     The analysis and conclusions of Claim 7 ¶ 81(b) and (e) above explain why trial counsel were deficient and why the deficiencies were prejudicial to Row's mitigation case in Claim ¶81(h).

67.     To reiterate an important point, the Court concludes that, regardless of whether Dr. Norman could have done more to discover the organic brain anomaly on

his own, trial counsel had an independent duty to read the supplemental police report that contained four references to a 1992 CT scan and to read the attachments to the presentence investigation report containing the 1993 CT scan report, and to bring both to Dr. Norman's attention. The 1993 CT scan report was plain enough that a layperson can discern that follow-up was required to determine why Row had brain atrophy. A criminal defense lawyer in 1992 and 1993 had the skill and knowledge to read the report, recognize that it needed follow-up, and perform the follow-up. These two CT scans were from local sources and were contemporaneous with the crime and with Row's pretrial detention. It was not as if counsel had to seek out-of-state records that were decades old to find the critical information. Failure to do anything about the references in the PSI to the 1992 and 1993 CT scans to rebut the prosecution's massive amount of aggravating evidence constitutes deficient performance. In addition, Dr. Beaver asked for, but was not provided with, the St. Al's suicide attempt hospitalization records, which would have brought the 1993 CT scan to his attention in time to prepare a brain atrophy mitigation defense for sentencing.

68.   The prejudice analysis for this claim is the same as above, supplemented with the following conclusions. Some of the aggravating factors or manifestations of antisocial personality disorder are the same as some of the symptoms of organic brain dysfunction, such as pathological lying, lack of empathy,

manipulation, and poor judgment. The areas of atrophy match the neurological dysfunctions, showing objectively that Row has organic impairment. The areas of atrophy are known to be among those areas of the brain and neurological circuitry that humans rely upon to develop and exercise judgment and empathy. Row's entire life history shows lack of normal judgment and lack of empathy in her decisionmaking—to such an extreme degree that the brain disorder could have provided the factfinder with an objective and rational explanation for her consistent, extreme decisionmaking and behavior.

## REVIEW OF POST-CONVICTION COUNSEL PERFORMANCE

69.     The record reflects that post-conviction attorneys Kehne and Adams performed deficiently in their representation of Row. Laying aside for a moment the very real and significant problems regarding time constraints and funding and their conflict of interest because of their friendship with trial counsel, in this particular case Kehne and Adams had to do no more than to review the PSI report, which contained (1) Row's extraordinarily bizarre life history, (2) the 1993 CT scan report identifying brain atrophy and recommending follow-up to determine etiology, (3) repeated mentions of the 1992 CT scans from which a comparison could have been made; (4) a past crime victim of Row's recommendation that Row's bizarre behavior begged to be worked up with neurological testing to uncover its origin; and (5) the preliminary

recommendations of a mitigation specialist, a neurologist, and a psychologist that more investigation into the brain atrophy issue was necessary.

70.  A careful reading of the PSI report and attachments would have been enough to open the door to all of the objective brain atrophy evidence from 1992 and 1993—including a strong basis for persuasive expert testimony on mitigation—that should have been raised at the sentencing hearing and at the post-conviction hearing.

71.  Even if the trial court would not have provided funding for neurological and neuropsychological experts for sentencing hearing preparation, trial counsel could have preserved the issue for direct appeal.

72.  Similarly, even if the post-conviction court would not have provided funding for neurological and neuropsychological experts for post-conviction hearing preparation, post-conviction counsel could have preserved the issue for the post-conviction appeal.

73.  Prejudice—that there is a reasonable probability that the sentencing hearing result would have been different—has been shown by the analyses above.

74.  Therefore, Row has met her burden of showing that her three remaining claims qualify for the *Martinez* exception.

## MERITS DETERMINATION PREVIEW AND ORDER

It is the preliminary opinion of this Court that the evidence presented at the 2017 *Martinez* hearing, in conjunction with scientific research from the 1800s to date, shows that Row prevails on the merits of the three remaining ineffective assistance of trial counsel claims. The Court preliminarily concludes that the failure to present evidence of Row's two brain atrophies does undermine confidence in the outcome of her sentencing. At the time of Row's sentencing, there was sufficient research available to the defense team to show that injuries to the brain, and, in particular, to the cerebellum, could cause a person to have a disconnect between what they believe is morally correct and what they actually do.

Does the Court's conclusion mean that Row's counsel were bad attorneys? No, it does not. These four attorneys—whose every action has been under a microscope for the past 28 years—served Idaho residents and the criminal justice system well during their legal careers. No professional ends a career without having made errors in judgment, omissions, and mistakes, without sometimes doing less than they could have done. At times the storms of life combine at a particular moment to set one on a course that would otherwise would not have been taken but for those particular combined circumstances. Life happens for lawyers, too. Fortunately for all of us, when someone's life depends on a lawyer's performance, society has created a series of safety nets, including habeas corpus, to permit scrutiny of the very final question of whether the terrible punishment of execution is warranted for the terrible crime of multiple murders.

The current storm has dissipated; the safety net is securely in place. In the succeeding 28 years since Row was sentenced, modern research has vastly expanded medicolegal information relevant to Row's particular abnormalities, including recognizing a new disorder or syndrome to specifically focus on cerebellar abnormalities. In addition, Row suffers from a second brain abnormality, *cerebral* atrophy. How that abnormality interacts with the cerebellar atrophy to influence Row's decisionmaking and behavior may be explored in future proceedings.

Because the United States Constitution "prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy," *Caro v. Calderon*, 165 F.3d at 1227, Row prevails on her *Martinez* motion and appears to prevail on the merits of her remaining three claims.

## ORDER

**IT IS HEREBY ORDERED** that, within **60 days** after entry of this Order, the parties shall submit either (1) supplemental briefing on the merits issue, which may include a request for an evidentiary hearing on the merits (detailing what additional evidence would be presented) or (2) a notification that the parties will accept this decision as a decision on the merits of the three sentencing claims.



DATED: September 30, 2021

B. Lynn Winmill
U.S. District Court Judge