UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBIN LEE ROW,<br><br>Petitioner,<br><br>vs.<br><br>BONA MILLER,<br><br>Respondent. | Case No. 1:98-cv-00240-BLW<br><br>**CAPITAL CASE**<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

In 2017, the Court held a hearing pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). *See* Dkts. 701-705. The purpose was to determine whether Petitioner could meet the cause and prejudice threshold to bring procedurally defaulted ineffective assistance of trial counsel (IATC) organic brain dysfunction mitigation claims pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). At the time it granted a *Martinez* hearing, the Court acknowledged the lack of guiding precedent on the next step—whether that same evidence could be used for a merits determination:

> If the Court finds *Martinez* cause and prejudice and determines that it is permitted to review the merits de novo, the question remains whether "§ 2254(e)(2) still restricts the discretion of federal habeas courts to consider new evidence when deciding claims that were not adjudicated on the merits in state court." *Pinholster*, 131 S.Ct. at 1401. Section

> 2254(e)(2) restricts factual development in federal court if the applicant or his counsel failed to develop the factual basis of the claim in state court, *Williams (Michael) v. Taylor*, 529 U.S. 420, 432 (2000). In what may seem like a Catch-22, to qualify for *Martinez* a petitioner must show that post-conviction counsel was ineffective in failing to develop the factual (and/or legal) basis of the claim in state court, but on a merits review a petitioner can bring forward new facts only if he shows diligence in trying to present the evidence to the state courts under § 2254(e)(2). It seems the purpose of *Martinez* would be defeated if new evidence were permitted at the *Martinez* qualifying-round hearing, but not at the actual merits final-round hearing. Legal justification theories for permitting new evidence in a de novo hearing appear to be: (1) if 2254(e)(2) is met; (2) if a petitioner goes back to state court to try to develop facts and obtains a merits ruling, in effect, trying to fulfill 2254(e)(2)'s pre-requisites by having asked for evidentiary development in state court, but she is rejected; or (3) if 2254(e)(2) is rendered inapplicable by the equitable exception of *Martinez*.

Dkt. 600, pp. 40-41. The Court also noted that a "state court's rejection on the merits would implicate AEDPA review upon return to federal court," but wondered whether "rejection on procedural grounds may fulfill § 2254(e)(2)'s prerequisite of a diligent effort to present the claim to the state court." *Id*., p. 41, n. 10.

After much briefing and contemplation, in 2021 the Court issued a notice of intent to grant the habeas corpus petition on the sentencing claims of Petitioner Robin Lee Row. Dkts. 771, 774. However, *Shinn v. Ramirez*, 142 S.Ct. 1718 (2022) appears to have changed the lay of the land.  Relying upon *Ramirez*, Respondent Bona Miller (Respondent) filed a Federal Rule of Civil Procedure 60(b)(6) Motion asking the Court to reconsider all of its *Martinez* rulings. Respondent particularly asks the Court to reverse its decision of March 31, 2015, granting in part Petitioner Robin Row's Rule

59(e) Amended Motion to Alter Judgment, which permitted Petitioner to produce new evidence and proceed to an evidentiary hearing on Claims 7 ¶ 81 (b), (e), and (h)—IATC claims that counsel failed to use evidence of organic brain dysfunction in mitigation of Respondent's death penalty request. Dkts. 600, 572.

Having reviewed the parties' submissions and having considered new developments in the law, the Court concludes that *Ramirez* requires denial of habeas corpus relief on the remaining claims.

## REVIEW OF RESPONDENT'S MOTION TO RECONSIDER

Before the Court reaches the substance of Respondent's stance on the *Martinez* claims, it must address the procedural posture of the case and the parties' arguments about what is proper and improper given the circumstances and the uncharted course lying ahead.

1. **What Row sought in her "Rule 59 Amended Motion to Alter Judgment" that began the *Martinez* proceedings.**

The Court entered a final Order and Judgment in Respondent's favor on August 29, 2011. Dkts. 545, 546. Petitioner filed a timely Federal Rule of Civil Procedure 59 Motion, anticipating *Martinez*. Dkt. 547. After *Martinez* was published, she filed an Amended Motion asking the Court to reconsider specific claims (dependent upon new evidence) in the Second Amended Petition for Writ of Habeas Corpus that had been denied and dismissed. Dkts. 572, 293.

Petitioner stated in her original timely Rule 59 Motion:

> The Court found that to "the extent that Row relies on the
> Sixth Amendment right to effective assistance of counsel" in

post-conviction proceedings, Row did not establish a cognizable claim on this theory. Dkt. No. 545, p. 29. Whether there exists a Sixth Amendment right to effective assistance of state collateral proceedings counsel is a question that can only be raised in federal habeas proceedings. The United States Supreme Court has recently granted a petition of certiorari on the question of whether a defendant has a federal constitutional right to effective assistance of post-conviction counsel specifically with respect to an ineffective-assistance-of-trial-counsel claim. *Martinez v. Ryan*, Dkt. No. 10-1001, United States Supreme Court. The *Martinez* case has been fully briefed and argument is set for October 4, 2011.

….

This Court should: amend its Order; retain the case until the United States Supreme Court issues its decision in the *Martinez* case; and at which time this Court should take appropriate steps pursuant to the *Martinez* decision.

Dkt. 547, pp. 6-7. After *Martinez*, Petitioner amended the Rule 59(e) Motion "to include *Martinez* as a basis for relief," specifically as to "Ground Seven of the Second Amended Petition for Habeas Corpus (Dkt. 293)." Dkt. 572, p. 2.

The Court granted the Amended Motion in part. Dkt. 600. The Judgment remains inoperative until the Court concludes the *Martinez*-related litigation and enters an Amended Judgment, signaling that the case is ready for appeal. The Court agrees with Petitioner that all orders entered after the partial grant of the Rule 59 Amended Motion to Alter Judgment are interlocutory, meaning that the Court has retained jurisdiction over the case and it is not ripe for the filing of a notice of appeal. The Court's proper retention of jurisdiction in this case is supported by the following explanation from *Banister v. Davis*, 140 S. Ct. 1698 (2020), where the Court explained the important differences between a Rule 60(b) motion and a Rule 59(e) motion:

> In short, a Rule 60(b) motion differs from a Rule 59(e)
> motion in its remove from the initial habeas proceeding. A
> Rule 60(b) motion—often distant in time and scope and
> always giving rise to a separate appeal—attacks an already
> completed judgment. Its availability threatens serial habeas
> litigation; indeed, without rules suppressing abuse, a prisoner
> could bring such a motion endlessly. By contrast, a Rule
> 59(e) motion is a one-time effort to bring alleged errors *in a
> just-issued decision* to a habeas court's attention, before
> taking a single appeal. It is a *limited continuation of the
> original proceeding—indeed, a part of producing the final
> judgment* granting or denying habeas relief. For those
> reasons, *Gonzalez* does not govern here. A Rule 59(e) motion,
> unlike a Rule 60(b) motion, does not count as a second or
> successive habeas application.

*Id*. at 1710-11 (emphasis added).

This Court explained this principle similarly in its Order granting in part the

Amended Rule 59 Motion to Alter Judgment:

> A motion for reconsideration filed within 28 days of
> judgment suspends finality of the judgment and tolls the time
> for appeal until the motion is resolved. *See* Fed. R. App. P.
> 4(a)(4)(A). Motions filed after 28 days—regardless of their
> designation under 59(e) or 60(b)—face a tougher
> reconsideration battle because the judgment has become final.
> The United States Supreme Court has explained that Rule
> 59(e) was adopted "'to mak[e] clear that the district court
> possesses the power' to rectify its own mistakes in the period
> immediately following the entry of judgment." *White v. New
> Hampshire Dep't of Employment Sec*., 455 U.S. 445, 450
> (1982) (citing 1946 Amendment Advisory Committee Notes
> to Rule 59(e)). This rule serves judicial economy: if the
> district court can fix its own errors, thereby obviating the time
> and expense of an appeal, the court should be permitted to do
> so. *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau,
> Inc*., 690 F.2d 1240, 1249 (9th Cir. 1982).

Dkt. 600, p. 15.

**MEMORANDUM DECISION AND ORDER - 5**

## 2. Rule 60(b) has no application here

Respondent selected Rule 60(b)(6) as the legal vehicle to seek reconsideration because the Judgment has never been vacated. Dkt. 546. However, because the Judgment is actually in Respondent's favor and the subsequent orders are all interlocutory, the Court concludes that a Rule 60(b)(6) standard of law is procedurally improper.

Respondent improperly characterizes Petitioner's Rule 59 Motion as a Rule 60 motion, which, as *Banister* points out, is improper, because each Rule has a different purpose. The Court rejects Respondent's argument that the Court did not have jurisdiction to consider the post-*Martinez* Rule 59 Amended Motion, because the entire *Martinez* litigation phase after the initial timely Rule 59 motion has been interlocutory. The Amended Motion was a natural and even required post-*Martinez* supplementation of the requests in the original timely Rule 59 motion that anticipated but could not predict the outcome of *Martinez*. The Court has never issued another final order or amended judgment signaling that its jurisdiction is ended and the case is over and ready for appeal. The initial Motion asked for retention at the district court level, which the Court has done.

Similarly, Respondent's argument that the "untimely" Amended Motion did not "relate back" to the original timely Motion is simply inapplicable in the Rule 59 context, given the fact that everything filed after the timely Rule 59 *Martinez* motion was in aid of the Court's decision to retain the case and re-open the operative pleading for consideration and application of the new *Martinez* opinion until all *Martinez* issues are

finally resolved, rather than to relinquish jurisdiction of the case to the court of appeals.

The Court also rejects Respondent's argument that Petitioner's Amended Motion should have been treated as a second or successive petition under *Gonzalez v. Crosby*, 545 U.S. 524 (2005). In *Rishor v. Ferguson*, 822 F.3d 482, 492 (9th Cir. 2016), the Ninth Circuit devised a "hybrid" approach. After considering *Gonzalez*, and the various circuit court opinions, the Ninth Circuit departed from the approach of all other circuits. Specifically, the Ninth Circuit held that *Gonzalez* and § 2244(b) apply to Rule 59(e) motions only when the motion "raises entirely new claims." *Id*.

Petitioner's *Martinez* claims raised in the Amended Motion were not new. They had been asserted in the operative pleading (Dkt. 293) but rejected in the final Order and Judgment.

Petitioner argues that Respondent waived any *Ramirez*-like arguments in the twelve preceding years. The United States Supreme Court addressed the same argument in *Ramirez*:

> Ramirez alleges that Arizona forfeited any § 2254(e)(2) argument in his case because it did not object to some evidentiary development in the District Court or before the Ninth Circuit panel. But Arizona did object to further factfinding before the Ninth Circuit panel, see Respondents-Appellees' Answering Brief in Ramirez v. Ryan, No. 10–99023 (CA9), ECF Doc. 37, p. 58, and, in any event, the Ninth Circuit passed upon § 2254(e)(2) when it ordered additional factfinding on remand, *see United States v. Williams*, 504 U.S. 36, 41, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). Further, because we have discretion to forgive any forfeiture, and because "our deciding the matter now will reduce the likelihood of further litigation" in a 30-year-old murder case, *Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 14, 129 S.Ct. 2277, 174 L.Ed.2d 1 (2009) (plurality

**MEMORANDUM DECISION AND ORDER - 7**

> opinion), we choose to forgive the State's forfeiture before
> the District Court.

*Ramirez*, 142 S. Ct. at 1730. Here, the Court raised the § 2254(e)(2) issue as an open question and called for briefing asking that the parties "assume *arguendo* that § 2254(e)(2) does not apply and address whether Row has alleged facts that, if proven to be true, would show that she is entitled to relief under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." Dkt. 472, p.14. Therefore, the Court cannot fault Respondent for not urging the applicability of § 2254(e)(2) earlier. Because final judgment has not been entered, *Ramirez* will apply here.

### 3. Standards of law for review of the substance of Respondent's Motion to Reconsider

The Court agrees that *Ramirez* clarified how *Martinez* and § 2254(e)(2) are to be applied on habeas corpus review. This Court's final order and judgment closing this entire case should reflect application of current law, so as to place this case in the best posture for appellate review. To the extent that the Court's reasoning and evidentiary basis for its Notice of Intent to Grant Habeas Corpus Relief transgresses *Ramirez*, Respondent's Motion for Reconsideration (Dkt. 770) will be granted.

The standard for reconsideration of an interlocutory order is that, "[a]s long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." *City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (internal citation omitted).

On reconsideration, a court may correct "simple mistakes," as well as alter "decisions based on shifting precedent, rather than waiting for the time-consuming, costly process of appeal." *U.S. v. Martin*, 226 F.3d 1042, 1049 (9th Cir. 2000). "Shifting precedent" is a fair characterization of the effect of *Ramirez* on these proceedings.

## RECONSIDERATION OF *MARTINEZ* RULINGS

### 1.  *Martinez v. Ryan* standard of law

To succeed on a Sixth Amendment ineffective assistance of counsel claim under *Strickland*, a petitioner must show that (1) under an objective standard of reasonableness, counsel's performance was deficient, and (2) the deficient performance prejudiced the petitioner's defense. 466 U.S. at 684. *Strickland* underlies the *Martinez* test, which evaluates the performance of both trial counsel and post-conviction review (PCR) counsel's performance, as well as the intertwined prejudicial effect of any deficient performance.

The *Martinez* cause and prejudice test consists of four necessary prongs: (1) the underlying ineffective assistance of trial counsel (IATC) claim must be "substantial"; (2) the procedural default must have been caused by PCR counsel's ineffectiveness or the lack of counsel during post-conviction review; (3) the post-conviction proceeding was the "initial" collateral review proceeding where the IATC claim could have been brought; and (4) state law or its practical procedures required that the IATC claim be raised in the initial post-conviction proceeding, rather than on direct appeal (as is the case in Idaho). *See Trevino v. Thaler*, 569 U.S. 416, 423, 429 (2013). The failure to meet any prong

**MEMORANDUM DECISION AND ORDER - 9**

means that the *Martinez* exception is unavailable to excuse the procedural default of a claim.

As to the first prong, "substantial" means that a "claim that has some merit." *Martinez*, 566 U.S. at 14. It cannot be "wholly without factual support." *Id*. at 16; *see Ramirez v. Ryan*, 937 F.3d 1230, 1241 (9th Cir. 2019). The "substantiality" test is like the standard for issuing a certificate of appealability (COA). *See Martinez*, 566 U.S. at 14, referencing by analogy *Miller–El v. Cockrell*, 537 U.S. 322, (2003)); *Apelt v. Ryan*, 878 F.3d 800, 828 (9th Cir. 2017). That standard is met if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id*. (internal citation and punctuation omitted). COA review consists of only a "general assessment" of the merits of the claim, and the court "should not decline to issue a certificate 'merely because it believes the applicant will not demonstrate an entitlement to relief.'" *Cook v. Ryan*, 688 F.3d 598, 610 n.13 (9th Cir. 2012) (quoting *Miller-El*, 537 U.S. at 336–37). *Martinez* review uses this preview standard that is more lenient than a *Strickland* merits standard.

## 2. Shifting analytics after *Shinn v. Ramirez*

*Martinez* held that "ineffective assistance of postconviction counsel can be 'cause' to forgive procedural default of a trial-ineffective-assistance claim if a State forecloses direct review of that claim." *Ramirez*, 142 S.Ct. at 1735-36 (citing *Martinez*, 566 U.S. at 9). *Martinez* did not address the question of whether the *Martinez* evidence can be used in a merits determination if the *Martinez* forgiveness threshold was met. Eleven years after *Martinez*, in *Ramirez*, the habeas petitioners "propose[d] extending *Martinez* so that

ineffective assistance of postconviction counsel can excuse a prisoner's failure to develop the state-court record under § 2254(e)(2)." 142 S.Ct. at 1736. On grounds of comity and plain statutory interpretation, the United States Supreme Court declined to do so.

Post-*Ramirez* petitioners may still rely on ineffective assistance of PCR counsel to excuse the failure to *bring* an IATC claim under *Martinez*'s equitable rule to *overcome procedural default*, but the petitioner may not rely on PCR counsel's negligence in failing *to develop the state court record* when it comes to the merits review of the same claim. *See Barbour v. Hamm*, No. 2:01-CV-612-ECM, 2022 WL 3570327, at *2 (M.D. Ala. Aug. 18, 2022) (analyzing *Ramirez*). Therefore, for most petitioners, *Martinez* leads nowhere.

### A. Definition of "the state court record" under *Ramirez*

*Ramirez* held that, for merits purposes, "under § 2254(e)(2), a federal habeas court may not conduct an evidentiary hearing or otherwise consider evidence beyond the state-court record based on ineffective assistance of state postconviction counsel." 142 S. Ct. at 1734. A threshold question not answered by *Ramirez* is what is included in "the state-court record" that a federal district court may use to determine the merits of a procedurally defaulted claim that entered through the *Martinez* gate. Once a case enters federal court, there are often both procedurally proper and procedurally improper phases of state appeals and post-conviction matters contained in "the state court record." Petitioner urges the Court to adopt a broad definition of the state court record for review of *Martinez*-forgiven claims. However, neither the AEDPA's text nor the United States Supreme Court's interpretation of AEDPA supports Petitioner's position.

**MEMORANDUM DECISION AND ORDER - 11**

In the context of properly exhausted claims, the rule is that "review under §
2254(d)(1) is limited to the record that was before the state court that adjudicated the
claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Lest procedurally
defaulted claims become the de novo choice of state petitioners in federal habeas
matters,[1] *Ramirez* clarified that, even in de novo hearings, federal court factual
development usually is prohibited.

True to past precedent, the *Ramirez* Court observed that "it would be unseemly in
our dual system of government for a federal district court to upset a state court conviction
without [giving] an opportunity to the state courts to correct a constitutional violation …
*and to do so consistent with their own procedures*." 42 S. Ct. at 1732 (emphasis added,
internal citations omitted). With that cue, several courts have held that federal habeas
petitioners may use only those portions of the state court record brought to the attention
of the state courts in a procedurally proper manner.

---

[1] In *Ramirez*, the Supreme Court observed:

> [B]roadly available habeas relief encourages prisoners to "'sandba[g]'"
> state courts by "select[ing] a few promising claims for airing" on state
> postconviction review, "while reserving others for federal habeas
> review" should state proceedings come up short. *Murray*, 477 U.S. at
> 492, 106 S.Ct. 2639; *see also Wainwright*, 433 U.S. at 89, 97 S.Ct. 2497.
> State prisoners already have a strong incentive to save claims for federal
> habeas proceedings in order to avoid the highly deferential standard of
> review that applies to claims properly raised in state court. *See* §
> 2254(d); *Harrington*, 562 U.S. at 105, 131 S.Ct. 770. Permitting federal
> factfinding would encourage yet more federal litigation of defaulted
> claims.

142 S. Ct. at 1739–40.

**MEMORANDUM DECISION AND ORDER - 12**

In *Madrid v. Hutchings*, No. 219CV01659APGNJK, 2022 WL 4110368 (D. Nev. Sept. 6, 2022), the district court agreed with the principle that only properly presented portions of the state court record can be used in a merits analysis:

> [T]he Supreme Court has indicated I may not consider documents that were not developed during the state court proceedings *in accordance with state court procedure* unless the requirements of 28 U.S.C. § 2254(e)(2) are met. *See supra*, pp. 14–15. I see nothing in the record demonstrating the police report was admitted at trial or presented to the state courts in accordance with state court procedures, as the report was presented as part of Madrid's third postconviction relief petition *that was deemed untimely and successive. The presentation of a claim in a procedural context in which the merits of the claim will not be considered, or will be considered only in special circumstances, does not constitute fair presentation of the claim. See, e.g., Castille v. Peoples*, 489 U.S. 346, 351–52, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989). The report indicates it was printed on May 5, 2005, and therefore could have been previously discovered through the exercise of due diligence during Madrid's initial state postconviction proceedings. Thus, I may not consider the report as Madrid cannot meet the requirements of 28 U.S.C. § 2254(e)(2).

*Id*. at *20 (emphasis added).

On the other hand, the *Madrid* court found that the following records were part of the properly presented state court record:

> Madrid submitted his medical records with his third state postconviction petition and in support of the petition here. Ex. 107 and ECF No. 33-6 at 23–31; see also ECF No. 9-2 at 39–47. In this instance, I may consider the medical records in determining whether Madrid has overcome the procedural default because they were *admitted at trial and were therefore part of the state court record at the time of Madrid's initial postconviction evidentiary proceedings*. Ex 23 and ECF No. 24-3 at 16; Ex. 30 and ECF No. 26-3 at 12–13.

**MEMORANDUM DECISION AND ORDER - 13**

*Id*. at *21 (emphasis added).

Similarly, in *Sosnowicz v. Shinn*, No. CV-20-00040-PHX-DGC, 2022 WL 2702457 (D. Ariz. July 12, 2022), the district court made the following points in deciding to reject "state court record" evidence that was developed in procedurally improper state court proceedings:

> A petitioner who clearly failed to develop the factual basis for an IAC claim in his first PCR case could be absolved from that failure and escape the strict requirements of § 2254(e)(2) by seeking to expand the record in an untimely second PCR petition, even if the state court found that the new equitable exception in Rule 32.2 should not apply. That is what happened here. The Arizona Supreme Court did not invoke the exception to permit Sosnowicz to expand the record, even though it has done so in other cases.
>
> ….
>
> As the government points out, accepting this argument would lead to an absurd result: "Any petitioner could circumvent the constraints of [§] 2254(e)(2) merely by presenting an IAC claim in an untimely, successive PCR in state court and subsequently claim in federal habeas proceedings that" because he acted "diligently" in the second proceeding, § 2254(e)(2) does not preclude an evidentiary hearing. Doc. 36 at 7 n.6.

*Id.*, at *3–4.

Proper presentation is a consistent theme with AEDPA. The word "presented" in the exhaustion of state court remedies provision of AEDPA, § 2254(c), has been interpreted to mean that the petitioner must have "properly presented his claims to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 847, 848 (1999). This interpretation gates off de novo habeas corpus review from petitioners who "could evade the exhaustion

requirement—and thereby undercut the values that it serves—by letting the time run on state remedies." *Id.* at 848 (quoting and discussing points of agreement with Justice Stevens' dissent).

Likewise, AEDPA expressly[2] refers to "properly filed" in its tolling subsection, providing suspension of the limitation period during the time in "which a properly filed application for State postconviction … is pending." 28 U.S.C. § 2244(d)(2). An application is "'properly filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings," such as those that prescribe "the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee." *Artuz v. Bennett*, 531 U.S. 4, 8 (2000) (footnote omitted).

Both before and after *Ramirez*, the Ohio federal district courts distinguish proper and improper presentation of evidence in state court by recognizing two different categories. Evidence that was "presented to," but ultimately "not considered by, the state courts" falls into a category of the state court record not appropriate for federal district court consideration. *See Dunlap v. Paskett*, No. 1:99-CV-559, 2019 WL 1274862, at *8 (S.D. Ohio Mar. 20, 2019). Evidence from proper state proceedings falls into a different category and may be considered by the federal court, because in those instances, the state courts actually "ha[d] evidence before them." *Heiney v. Moore*, No. 3:21-CV-00501,

---

[2] The Court rejects any argument that because "properly" is included in the statute only in this subsection, the drafters intended to permit petitioners to use evidence improperly presented to the state courts in a federal habeas action.

2022 WL 4599234, at *8 (N.D. Ohio Sept. 29, 2022) ("Although the evidence attached to Petitioner's original state court petition for post-conviction relief was arguably presented to the state court, there is a 'critical distinction between state courts *being presented with* evidence and state courts *having evidence before them*.'") (quoting *Johnson v. Bobby*, No. 2:08-CV-55, 2021 WL 6125049, at *30 (S.D. Ohio Dec. 28, 2021) (*Pinholster* context)) (emphasis in original).

Nothing suggests that, in interpreting what portion of "the state-court record" can be used in the merits review of *Martinez*-forgiven claims, the United States Supreme Court would permit the federal district court to review evidence from procedurally improper state court proceedings.

An even more refined question is whether the properly presented portion of the "state court record" includes every piece of evidence, regardless of whether the petitioner used that item for another claim or purpose in state court or regardless of whether a document was part of the record but never used to support a claim, issue, or argument before the state courts. This Court has no need to struggle with that question here, given that it concludes that Petitioner's claims fail even if every piece of evidence prior to the final initial post-conviction proceeding is considered.

### B. A model for applying *Ramirez*

Having considered the foregoing principles and drawing from its survey of post-*Ramirez* cases, the Court has decided upon a model set of procedures to review *Martinez* claims. Preliminarily, the Court should determine whether *Martinez* prongs 3 and 4 are

met. If they are, an efficient way to handle assessment of *Martinez* prongs 1 and 2 and the merits of the claims is to consider each of the following points, as may be applicable.

   1)   Ask whether § 2254(e)(2) applies.

First, a court should consider whether § 2254(e)(2) does not apply at all. *Why* it does or doesn't apply leads to differing outcomes, as the following three possibilities demonstrate.

   a)   *Was the petitioner diligent in attempting to develop the facts in a procedurally proper state court proceeding*?

The court should assess whether the existing state court record shows that the petitioner or PCR counsel was *not* at fault for failing to develop the factual basis of a claim in state court—an issue not addressed by *Ramirez. See Mothershead v. Wofford*, No. C21-5186 MJP, 2022 WL 2275423, at *3 (W.D. Wash. June 23, 2022), *motion to certify appeal granted*, No. C21-5186 MJP, 2022 WL 2755929 (W.D. Wash. July 14, 2022). In *Mothershead*, the court noted that *Ramirez* "applies only to claims subject to § 2254(e)(2)—where the petitioner is 'at fault' for the undeveloped state-court record." *Id. Ramirez* retained the meaning of "at fault" from *Williams (Michael) v. Taylor*, 529 U.S. 420 (2000), that § 2254(e)(2) does not apply "'unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel.'" *Mothershead*, 2022 WL 2275423, at *4 (quoting *Williams*, 529 U.S. at 432).

Diligence depends on an assessment of "whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend ... upon whether those efforts could have been

successful." *Williams*, 529 U.S. at 435. For example, in *Caro v. Vasquez (Caro II)*, No. C

93-4159 JW, 1996 WL 478683 (N.D. Cal. Aug. 19, 1996), the court found:

> Section 2254(e)(2) does not prevent the Court from
> conducting an evidentiary hearing in this case. It has not been
> shown that Petitioner failed to develop the factual bases for
> the claims he raises in this Court during the state court
> proceeding. Petitioner raised the claims, requested discovery,
> funds and an evidentiary hearing and was denied on all
> requests. Based on such a record, the Court does not find that
> Petitioner failed to develop the bases for his claims during his
> state court proceeding.

*Id.* at *5; *see also Libberton v. Ryan*, 583 F.3d 1147, 1158, 1165 (9th Cir. 2009) (where

the state court denied an indigent pro se petitioner's request for an evidentiary hearing

and denied the petitioner's request for funds to investigate, the petitioner was deemed

diligent because he had found and attempted to present some but not all of the available

evidence to the state court).

As in *Caro II* and *Libberton*, if found diligent, the petitioner may proceed with

evidentiary development on the merits of the claim in the federal habeas corpus case. The

claim is heard de novo (not under § 2254(d)), and further §2254(e)(2) and *Ramirez*

analysis is unnecessary.

> b)  *Was cause unrelated to factual development of the claims?*

In unusual circumstances, the Court should determine whether post-conviction

counsel's ineffectiveness is "due entirely to causes unrelated to 'the factual basis of the

[habeas] claim,' § 2254(e)(2), and thus potentially outside the scope of Section

2254(e)(2)—for example, where a habeas court hears evidence that post-conviction

counsel was ineffective due to a family emergency which caused him to neglect his duty

to his client." *Gelsinger v. Superintendent Fayette SCI*, No. 21-2844, 2022 WL 3666228, at *2 n.5 (3d Cir. Aug. 25, 2022). In such an instance, § 2254(e)(2) would not bar factual development in federal court

c) *Is the petitioner challenging an "offense"?*

Section 2254(e)(2) does not apply if a petitioner is not challenging an "offense." Some courts have held that § 2254(e)(2)(B)'s use of the phrase "no reasonable factfinder would have found the applicant guilty of the underlying offense" excludes sentencing claims. The *Ramirez* Court—intentionally or unintentionally—paraphrased "offense" as "crime charged" but did not address the "sentence v. conviction" issue. 142 S. Ct. at 1734.

Here, Respondent argues that the word "offense" in § 2254(e)(2)(B) can mean only "offense," that is, only the crime or conviction. Dkt. 771, pp. 18–19. The following out-of-circuit cases support this view. In *Burris v. Parke*, 116 F.3d 256 (7th Cir. 1997), in the face of a death sentence for felony murder, the court decided:

> We have held that identical language in § 2244(b)(2)(B)(ii) [to that of § 2254(e)(2)(B)] refers unambiguously to the offense of conviction and does not permit proceedings concerning the sentence. *Hope v. United States,* 108 F.3d 119 (7th Cir. 1997). It follows that Burris could not obtain a hearing under the standards of § 2254(e)(2).

*Id.* at 258 (internal citation omitted).

In *Rodriguez v. Zavaras*, 42 F. Supp. 2d 1052 (D. Colo. 1999), a death sentence case, the Court observed that the plain language of the § 2254(e)(2)(B) standard is "obviously impossible for Petitioner to meet since he is not contesting the guilt phase of

**MEMORANDUM DECISION AND ORDER - 19**

his trial." *Id.* at 1057–58. *See also Bernal v. Helman,* 958 F.Supp. 349, 359 (N.D. Ill. 1997) (holding in a sentencing enhancement challenge that the claims were barred by § 2254(e)(2)(B) since "Congress clearly intended for a petitioner to receive an evidentiary hearing only when the alleged defect had resulted in the conviction of an innocent person").

However, the Ninth Circuit Court of Appeals came to the opposite conclusion as the Seventh Circuit in *Burris*. Reasoning by analogy to the same AEDPA successive petitions provision used in *Burris*, § 2244(b)(2), the Ninth Circuit determined: "We have interpreted this last prong as permitting a petitioner to establish by clear and convincing evidence that, "'but for constitutional error, no reasonable juror *would have found the petitioner eligible for the death penalty* under the applicable state law.'" *Babbitt v. Woodford*, 177 F.3d 744, 745–46 (9th Cir. 1999) (emphasis added) (quoting *Thompson v. Calderon,* 151 F.3d 918, 923 (9th Cir. 1998)).

*Babbitt* cited *Thompson*, where the Court explained:

> [T]he "underlying offense" in a death penalty case is capital murder rather than merely homicide. Under *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and its progeny, the special circumstances or aggravating factors making a defendant eligible for the death penalty must be particularly alleged in the indictment. Thus, by claiming the constitutional infirmity of the lone special circumstance that made him eligible for the death penalty, Thompson is challenging his conviction of the "underlying offense" of capital murder.
>
> Because the words "underlying offense" encompass a charge of capital murder and because of the likelihood that the difference in the language between the *Sawyer* standard and new § 2244(b)(2)(B)(ii) was to accommodate non-capital

> as well as capital habeas petitions, we hold that Thompson's claim that he is ineligible for the death penalty due to the constitutional infirmity of the rape conviction, which stands as his sole special circumstance, states a claim under § 2244(b).

151 F.3d at 924.

Because the language of § 2244(b)(2) is identical to § 2254(e)(2), the Ninth Circuit almost certainly would follow the reasoning in *Babbitt* and *Thompson* to conclude that §2254(e)(2) encompasses a capital sentence. The Court will take that stance here.

In an instance where the petitioner is not challenging an offense, as defined by the particular circuit, a petitioner is not permitted to attempt to make a § 2254(e)(2) showing to allow in federal court factual development; the petitioner must rely only on the facts in the state court record.

2) <u>Where § 2254(e)(2) applies, ask whether the petitioner can meet its requirements.</u>

Second, the Court should determine whether the existing state court record shows that the petitioner can meet the requirements of § 2254(e)(2).[3] If so, the petitioner may bring forward new extra-record evidence to prove the merits of the *Martinez* claim.

---

[3] 28 U.S.C. § 2254(e)(2) provides: If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--
(A) the claim relies on--
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

**MEMORANDUM DECISION AND ORDER - 21**

If not, the record may be clear that the petitioners made no effort to bring the claims in state court, making them unable to meet the diligence factor. In *Ramirez*, the petitioners conceded they had not met § 2254(e)(2)(A)-(B). *See* 142 S.Ct. at 1728-29, 1734. Or, if no concession is made, it may be clear from the record that an adequate and independent state procedural bar prohibits a finding of diligence. In these instances, a court proceeds to review the merits of the underlying claim on only the permissible state court record.

> 3) <u>Ask whether the petitioner is entitled to relief on the merits of the IATC claim on the permissible state court record.</u>

Third, if the petitioner was not diligent and cannot meet § 2254(e)(2)(A)-(B), the court should determine whether the petitioner can prevail on the merits of the ITAC claim on only the permissible state court record. *Gelsinger*, 2022 WL 3666228, at *2 (citing *Williams v. Superintendent Mahanoy SCI*, 45 F. 4th 713, 723-24 (3d Cir. 2022)). If the petitioner cannot succeed on the claim on the permissible state court record alone—using the *Strickland* prejudice standard, not the more lenient COA standard—the district court must deny relief. *Id.*

> 4) <u>Ask whether the petitioner can meet *Martinez* prong 2.</u>

Fourth, if the permissible state court record supports granting the writ on the IATC claim, the court should determine whether it is obvious from the existing state court record that PCR counsel was the cause for failing to bring the substantial IATC claim. If it is not obvious, then the district court may choose to hold an evidentiary hearing to evaluate whether PCR counsel was ineffective and the *Martinez* exception is met, using

**MEMORANDUM DECISION AND ORDER - 22**

the COA standard. *Williams*, 45 F.4th at 723 (finding that AEDPA's text does not forbid federal courts from developing the facts needed to excuse a procedural default).

If the four prongs of *Martinez* are met, the Court may grant relief on the merits.

### 3. Analysis of Row's Case using the foregoing model

The Court will now apply the foregoing model to the facts of Petitioner's case, analyzing the performance of trial counsel and PCR counsel. Petitioner's trial counsel were August "Gus" Cahill and Amil Myshin. Petitioner's initial post-conviction counsel were Rolfe Kehne and John Adams.

### A. First inquiry: diligence

In Petitioner's case, Idaho Code § 19-2719 governed the presentation of claims and evidence in state capital criminal proceedings, providing, in pertinent part:

> (4) Any remedy available by post-conviction procedure, habeas corpus or any other provision of state law must be pursued according to the procedures set forth in this section and within the time limitations of subsection (3) of this section.

> (5) If the defendant fails to apply for relief as provided in this section and within the time limits specified, he shall be deemed to have waived such claims for relief as were known, or reasonably should have been known. The courts of Idaho shall have no power to consider any such claims for relief as have been so waived or grant any such relief.

On successive post-conviction review, the Idaho Supreme Court determined that Row had waived several new claims of ineffective assistance of trial counsel under Idaho Code § 19-2719(5), including a claim of IATC "for failing to adequately investigate

Row's alleged brain damage." *Row v. State*, 21 P.3d 895, 900 (2001) (*Row II*). The court

reasoned:

> Row alleges that the judge presiding over her first post-conviction proceeding denied her request for funds to hire experts specializing in neurology and psychiatry to determine whether she suffered any organic brain damage associated with the brain atrophy reflected by the comparison of CT brain scans taken in late 1991 and early 1993. In her petition in this case, Row admits that this issue was presented in her first petition for post-conviction relief and that the Idaho Supreme Court held that the judge did not abuse his discretion because Row had failed to make an adequate showing for the need for such expert testimony. She contends that such a showing has been made in her second petition for post-conviction relief. The court below properly dismissed this claim because there was no showing that the facts Row now attempts to present were not known or could not reasonably have been known at the time she brought her first petition for post-conviction relief….
>
> Row contends that her trial counsel was ineffective for … failing to adequately investigate Row's alleged brain damage…. The court below properly dismissed these claims because Row failed to show that any of the claims were not known and could not reasonably have been known at the time she filed her first petition for post-conviction relief.

*Row v. State*, 21 P.3d at 900.

More recently, when Row returned to state district court with her sixth post-conviction petition to assert that *Ramirez* was an appropriate ground to bring yet another post-conviction action, the Court summarily denied the petition on various procedural grounds and struck the exhibits/attachments to the petition. Dkt. 771-6, pp. 9–10. This case is now on appeal in the state courts.

The Court finds it is clear from the Idaho Supreme Court's analysis, as well as from the facts set forth below, that Petitioner's PCR counsel were *not* diligent in presenting the factual basis of the IATC organic brain dysfunction claims to the state courts, because the facts could have presented in the initial petition. Similarly, the direction of her sixth post-conviction action is faring no better, though the appeal remains unresolved. On the present record, Petitioner must meet § 2254(e)(2) to bring extra-record evidence here.

### B.  Second inquiry: challenge to the offense

Under Ninth Circuit precedent, Petitioner *is* challenging her offense, which encompasses a capital sentence. Petitioner is eligible to use § 2254(e)(2) to bring extra-record evidence if she meets the other requirements of that provision.

### C.  Third inquiry: merits of the IATC claim based on evidence from the permissible state court record

#### 1)  Standard of law governing deficient performance

An evaluation of deficient performance here is focused on whether trial counsel's investigatory actions protected their later strategy decisions, as described in *Strickland*. Strategic decisions, such as the choice of a defense, "are virtually unchallengeable" if "made after thorough investigation of law and facts relevant to plausible options." *Strickland*, 466 U.S. at 690. Moreover, an attorney who decides not to investigate a potential defense theory is not ineffective so long as the decision to forego investigation is itself objectively reasonable:

> [S]trategic choices made after less than complete
> investigation are reasonable precisely to the extent that

> reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690–91.

This principle means that "counsel's investigation must determine trial strategy, not the other way around." *Weeden v. Johnson*, 854 F.3d 1063, 1070 (9th Cir. 2017). For example, a petitioner's "counsel could not have reasonably concluded that obtaining a psychological examination would conflict with his trial strategy without first knowing what such an examination would reveal." *Id*.

2) <u>Standard of law governing prejudice</u>

*Strickland* defined prejudice in the death sentence context as follows:

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have

**MEMORANDUM DECISION AND ORDER - 26**

> been affected by errors than one with overwhelming record
> support.

466 U.S. at 695–96.

In *Caro v. Calderon*, 165 F.3d 1223 (9th Cir. 1999) (*Caro III*), a death penalty case, the appellate court determined that even a showing of "weak" prejudice, as described by the dissent, was enough: "It is submitted that 'weak' prejudice is prejudice nonetheless, particularly when the jury was not presented with the single most important evidence of mitigation—chemical brain poisoning causing aggressive behavior." *Id*. at 1228.

3)  Background relevant to IATC sentencing claims

On the heels of *Martinez*, the Ninth Circuit Court of Appeals for the Ninth Circuit issued a decision particularly relevant to Row's reconsideration request: *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc). *Dickens* held that an inadequately supported claim that was decided on the merits in state court can be transformed into a "new" procedurally defaulted claim on federal habeas review if the petitioner offers new evidence that changes the factual basis of the claim such that it has become "fundamentally altered." *Id*. at 1318–19.

Under *Martinez* and *Dickens*, the Court permitted Row an opportunity to show the *Martinez* exception should be applied to Claims 7 ¶ 81 (b), (e), and (h), all limited to organic brain dysfunction subject matter:

- Claim 7 ¶ 81(b): "failure to make an independent investigation of matters in mitigation." Dkt. 293, p. 25.

**MEMORANDUM DECISION AND ORDER - 27**

- Claim 7 ¶ 81(e): failure "to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Row revealing an atrophy of the brain." *Id.*

- Claim 7 ¶ 81(h): sentencing counsel were ineffective for their "[f]ailure to investigate, develop, and present evidence rebutting aggravating evidence considered by the trial court." *Id.*

*See* Dkt. 600.

Based on the following summary of facts and those particular facts outlined in Appendix 1, the Court concludes that Row has shown deficient performance but has failed to show sufficient prejudice to warrant habeas corpus relief on Claims 7 ¶ 81(b), (e), and (h).

On February 10, 1992, Petitioner was convicted of arson of her rented duplex and first degree murder of her husband, Randy Row ("Randy"), and her two children, Joshua Cornellier ("Joshua") and Tabatha Cornellier ("Tabatha"), all of whom died in the fire. Row received the death penalty.

It is clear from the record that Row killed Randy, Joshua, and Tabatha in 1992 to unburden herself and collect $200,000 in life insurance proceeds for Keith's death. The record also reflects that it is very likely she killed her one-year-old daughter Kristina in 1977 to unburden herself; it is also very likely she killed her six-year-old son Keith in 1980 to unburden herself and obtain over $20,000 in life insurance proceeds.

Respondent argues that this is an open-and-shut case for the death penalty because the sentencing judge weighed only one of the aggravating factors—multiple murders—

and found insufficient redeeming factors to sentence Row to life in prison. Nothing counsel could have done, Respondent argues, could have outweighed the aggravating factors.

Row's trial counsel presented a questionable and harmful psychological theory at the sentencing hearing. Instead, they could have presented two CT scans attached to the Presentence Investigation Report (PSI) that objectively showed two areas of brain atrophy: cerebellar atrophy and cerebral cortical atrophy. The term "atrophy" means a reduced size of the brain's components. They could have presented expert opinion to show the relationship of the atrophy to Row's ability to make moral decisions. But this entire area of plentiful and often successful mitigation evidence was left untouched.

Existing at the time of sentencing, but not found in the state court record, was abundant scientific research linking atrophy in those parts of the brain to deficits in empathy, judgment, and decision-making. The biological evidence could have been presented to explain Row's bizarre life history. The foundational evidence to support such a claim was well-documented for trial counsel as early as April 7, 1992, ninety days after the crimes, by Ada County investigator Gary Raney. Detective Raney gathered records and interviews of people who knew Row, including law enforcement officers, social workers, psychologists, friends, and family members. Detective Raney also compiled an April 1992 supplemental police report that included four references to Row having undergone a CT scan after she fainted and hit her head at work just a month prior to the 1992 murders.

To begin their investigation, trial counsel consulted with psychologist Dr. Craig Beaver to determine whether there were psychological issues relevant to the guilt or penalty phase. Trial counsel did not consider the need for a medical investigation; they did not gather and review Row's 1992 medical records for themselves, nor did they provide them to Dr. Beaver. Trial counsel did not consider the need for a neurological or neuropsychological investigation, despite the references to a CT scan in the police report.

Dr. Beaver interviewed Row and administered two personality tests, which showed borderline personality and anti-social personality disorder (ASPD) traits. Many professionals who have *not* reviewed Row's brain scans and correlating neuropsychological test results have similarly labeled Row—including a prior psychologist in conjunction with a 1982 dependency action over Joshua when he was an infant, the attending physician for Row's 1993 suicide attempt, and the state's expert in the 1992-1993 criminal action.

In 1992 and 1993, lawyers and psychologists alike knew, by their medicolegal experience, that an ASPD diagnosis was considered an aggravating factor and an almost-certain ticket to the execution chamber. For that reason, trial counsel decided they would not use Dr. Beaver as an expert witness for mitigation purposes.

In 1993, while awaiting trial, Row tried to commit suicide in the Ada County Jail. As part of the hospital diagnosis and treatment, she had another CT scan. The 1993 CT scan report stated:

> FINDINGS: The cerebellar folia are mildly deepened and sulci near the vertex are mildly deepened for a patient of this age. Combine cerebellar vermian and cerebral cortical

> atrophy can be caused by a number of irreversible etiologies, but reversible etiologies should be considered and the findings suggest the possibility of alcohol abuse, clinical correlation is advised.
>
> IMPRESSION: THERE IS MILD VERMIAN AND CEREBRAL CORTICAL ATROPHY, SEE ABOVE NARRATIVE FOR DISCUSSION.

Exh. 15, p. 65 (capitalizations in original).

The suicide attempt prompted trial counsel to engage Dr. Beaver for a second consultation, this time to determine whether Row was competent to stand trial. Dr. Beaver told trial counsel he would like to see Row's hospital records—which would have included the 1993 CT scan report—but counsel never provided them to Dr. Beaver. Exh. 22, pp. 16, 18. Row was deemed competent to stand trial.

When trial counsel received the pretrial investigation report (PSI) in May 1993, the 1993 CT scan was attached. Despite the announcement of brain atrophy in all-capital letters in the CT scan report, trial counsel did *not* seek clinical correlation, even though the radiologist raised the possibility that alcohol abuse or something else had caused Row's brain atrophy—factors that could have been mitigating, particularly where there was no evidence in the record that Row abused alcohol. If the 1993 CT scan omission was not enough, trial counsel also missed the attached supplemental police report containing the four references to the 1992 CT scan. That not only one, but *two*, CT scans existed for a criminal defendant—removing the necessity of asking the court for funding for brain testing—was a phenomenal windfall for defense counsel, leaving only a request for funding for a neuropsychiatrist to be made.

**MEMORANDUM DECISION AND ORDER - 31**

And, if this were not enough, attached to the PSI report was a letter written by
Lynn Aitken, the victim of Row's prior embezzlement crime who, as a layperson,
observed ten years before the crime at issue: "As we know Robin does have a problem
with truth and being honest. Possibly a complete medical workup with chemical tests for
deficiencies and a brain scan would be helpful." Exh. 15, p. 46. The PSI report contained
plenty of evidence that a neurological and/or neuropsychological workup was in order in
this horrendous and bizarre case.

Even though a concrete organic brain atrophy defense was readily available to trial
counsel at least six months before the sentencing hearing, no one on the defense team
considered an organic angle to the defense strategy, including Row's newly-hired expert
witness psychologist, Dr. Arthur Norman. Attempting to save Row from execution, Dr.
Norman tried to discount multiple diagnoses of ASPD that Row had already been given
and that his own personality tests had suggested. Instead, he came up with a creative,
rarely-used condition of "alexithymia" and dodged prosecution questions about the
personality tests. Like Dr. Beaver, Dr. Norman did not perform or suggest any
neurological or neuropsychological reviews or tests for Row, despite his observation that
her psychological issues were extreme and he had never experienced anyone like her in
the 2,500 to 3,000 evaluations he had done before.

"Alexithymia," Dr. Norman explained, is a "a rare condition where people just
seem to be totally out of touch with their feelings ... to a severe pathological degree."
Exh. 20, p. 3847. Unfortunately, the alexithymia theory provided no explanation for *why
Row might have committed such atrocious crimes*, but instead only addressed how and

**MEMORANDUM DECISION AND ORDER - 32**

why, post-killing, she *covered up her feelings* about the incidents. The sentencing court focused on this distinction and found it was merely obvious that a person who had killed her entire family would try to emotionally bury her feelings about it. The only biological reference the sentencing court noted was that Row's "'alexithymic' condition [the mere covering up of her feelings] may be related to some organic problem with brain functioning." State's Lodging A-2, p. 434.

In the end, the state court's weighing of aggravating and mitigating factors went as follows.

### a) *Aggravating Circumstances Found by the Trial Court*

In *State v. Row*, 955 P.2d 1082 (Idaho 1998), the Idaho Supreme Court determined that the state district court properly found the following aggravating factors supporting imposition of the death penalty:

> - "In its decision to impose the death sentence the district court opined that the separate verdicts finding Row guilty of each of the three counts of first-degree murder established, as a matter of law, the statutory aggravating circumstances under I.C. § 19–2515(g). Idaho Code § 19–2515(g)(2) provided for a statutory aggravating circumstance when '[a]t the time the murder was committed the defendant also committed another murder.' Applying this statute, the district court held that because Row had 'obviously committed three first degree murders which the jury found to be willful, deliberate and premeditated,' the statutory aggravator existed. We agree with the district court that the facts and supporting jury verdicts objectively establish, as a matter of law, the 'multiple murders' statutory aggravator. The district court's finding of the statutory aggravating circumstance is amply supported by the record."

**MEMORANDUM DECISION AND ORDER - 33**

- "The district court also considered the fact that Row was found guilty of arson, which established the statutory aggravating circumstance found in Idaho Code § 19–2515(g)(7)—a murder committed in the perpetration of arson."

- "Furthermore, the district court concluded that 'two additional statutory aggravating circumstances have been proved beyond a reasonable doubt.' In this regard, the district court found that Row's anticipation of insurance proceeds established that the murders were committed for remuneration or the promise of remuneration pursuant to I.C. § 19–2515(g)(4)."

- The district court also concluded "that the nature of the murders established that Row exhibited utter disregard for human life, establishing the aggravating circumstance found in I.C. § 19–2515(g)(6)."

*Id.* at 1086–87.

b) *Mitigating Circumstances Found by the Trial Court*

The mitigating factors considered by the state district court at sentencing included

all of the following:

- "Defendant was probably sexually abused by her step-grandfather over a period of several years; this relationship resulted in her pregnancy and abortion. Defendant did not reveal this until just recently, but it clearly would affect her psychological makeup. One word of caution, however. Defendant is without a doubt a pathological and manipulative liar; such uncorroborated revelations must be viewed with some caution."

- "Defendant was physically and emotionally abused by her mother."

- "Defendant's parents were divorced when she was young, leading to resentment and rebelliousness by defendant."

**MEMORANDUM DECISION AND ORDER - 34**

- "Defendant was raised in an unstable environment where she observed domestic violence between her parents. Defendant's father was arrested in the home. She received very little positive nurturing and emotional support during her childhood."

- "Defendant had a special relationship with her father. He was incarcerated in prison most of her adolescent years. Her fears of abandonment are no doubt traceable to this circumstance."

- "Defendant was placed in an institution as a teenager. Her home life was sufficiently chaotic that she did not want to return home."

- "While a teenager defendant had two children. The fathers of these children were not supportive. Both of the children are now deceased."

- Defendant's "prior record includes no crimes of violence or acting out in any way which threatened physical harm to others."

- Defendant's "good qualities" include "being helpful to others ... being described and viewed as a 'good mother,' ... maintained steady employment, ... always served as the primary financial provider for her family," and had supporting character witnesses."

- Defendant had a "mutually abusive" marriage with Randy Row.

- Regarding Defendant's "mental, psychological and personality problems," the trial court stated:

  o "In a general or descriptive sense, I have no difficulty in referring to Robin Row as mentally ill or having a mental disorder, but certainly not in the sense that she is psychotic—ie. having lost touch with reality, or that she does not know the difference between right and wrong, or that she is incapable of conforming her conduct to the dictates and norms of society. MMPI test results indicate basically an antisocial personality disorder, evidenced by poor impulse control, lack of empathy, manipulative, a pathological liar, somewhat paranoid with a histrionic personality style, suffering also from chronic depression."

○ "Defendant has a personality style which makes her unhealthily
dependent upon others and with a poor ability to make adequate
interpersonal relationships, especially with the opposite sex. She
may react in a manner out of proportion to events around her
(passive-aggressive) and is generally insecure with fears of
abandonment. She has a chronic self-defeating style of relating to
the world and has been diagnosed with a major emotional
problem, which may be generally described as 'alexithymia.'"

○ "Defendant's alexithymia is evidenced by her extreme
disconnection with her feelings; she is in emotional withdrawal
and her emotional affect is way out of touch with her true
feelings. Such affect is generally flat (ie. her feelings are not
appropriate to or congruent with the event). This clinical
disconnection can perhaps be best described as a pathological
emotional denial. Defendant has buried her feelings so deep that
it required extraordinary efforts by her psychologist before she
could express her feelings of remorse for that much of her role in
the crimes she was willing to admit. This 'alexithymic' condition
may be related to some organic problem with brain functioning.
She is just now beginning to express some feelings of remorse of
her role in the deaths of her family."

State's Lodging A-2, pp. 415–434 (Findings of the Court in Considering Death Penalty).

As noted above, the trial court weighed the mitigating factors against only one of

the aggravating factors—multiple murders—and found "the scale or balance tips

dramatically to that side authorizing the harshest penalty allowed by law." State's

Lodging A-2, p. 428. In support of its decision, the trial court noted the following:

• "By any stretch of the imagination, the mitigating
circumstances ... pale in significance and comparison to
the premeditated murders."

• "The circumstances of the fire were such that any rational
person would know and intend the logical consequences
of this criminal conduct, ie. The deaths of the sleeping
victims. And Robin Row is certainly rational in that sense!
Defendant's alexithymic mental condition and emotional
affect may explain how she could methodically destroy

her family by blocking out all human feelings of remorse—without confronting the darkness of her own soul; but it cannot come close to justify or outweigh the gravity of three (3) murders."

- "The horror of what she has done may also explain her coping mechanisms of emotional withdrawal, blocking, flat affect, denial, and supposed memory loss (feigned, in my opinion); but such condition provides no justification to outweigh the gravity of this aggravating circumstance."

- "Robin Row must now be confronted with the reality of what she has done; she can run from it in her mind and emotions, but she can't hide from the truth of her chosen actions."

- "So defendant had a difficult childhood and came from a dysfunctional family; she may have been sexually abused; she has had a number of bad marriages with some abuse; she has some good qualities (so do we all) and was perceived as a loving, caring mother (the *ultimate irony*, I might add); and has lost touch with and blocked her emotions. (emphasis in original). This is hardly a counterbalance on the sales of justice towards leniency, *if* that is how a fixed life sentence is perceived."

- "The murders of Randy, Joshua and Tabatha weigh like a boulder over against the pebbles of [Row's mitigating circumstances]."

- "ALL mitigating factors do not come close to outweighing the aggravating circumstance of three (3) murders and by no stretch of the imagination make the imposition of death unjust; the calculus tips inexorably to a sentence of death."

State's Lodging A-2, pp. 428–430 (emphasis in original).

4) <u>Reconsideration of Claim 7 ¶ 81(b) upon permissible facts in the record</u>

Claim 7 ¶ 81(b) is an ineffective assistance of trial counsel claim for "[f]ailure to make an independent investigation of matters in mitigation." Dkt. 293, p. 25. This Court

considered and denied this vague claim on the merits because it "was raised and
adjudicated in state court in the first post-conviction action and was not procedurally
defaulted." Dkt. 600 (citing Dkts. 417, p. 13; 545, pp. 37-50). The Court construed this
claim as a *Dickens* "fundamentally altered claim" concerning only the organic brain
dysfunction sentencing defense.

Respondent argues that trial counsel's early decisions based on perusing the CT
scan were "strategic," insulating them from a finding of dilatory performance:

> While Dr. Giles' 1993 CT report was in the PSI and
> noted "cerebral cortical atrophy," he also explained that,
> while "atrophy can be caused by a number of irreversible
> etiologies," "reversible etiologies should be considered and
> the findings suggest the possibility of alcohol abuse." (State's
> Lodging A-7, p.65.) It was certainly reasonable for trial
> counsel, who had reviewed the PSI, to conclude there was no
> reason to further explore this area, particularly considering
> Drs. Beaver and Norman's conclusions that were based, at
> least in part, *on prior records of Row's mental health history*.
> Counsel are permitted to "formulate a strategy that was
> reasonable at the time and to balance limited resources in
> accord with effective trial tactics and strategies." *Richter*, 562
> U.S. at 107; *see also Michaels v. Davis*, 2022 WL 10225331,
> *45 (9th Cir. 2022) ("Part of an attorney's job is to allocate
> time and resources in preparing a defense, and limitations on
> time and resources must be considered when evaluating the
> reasonableness of an attorney's conduct.").

Dkt. 771, p. 55 (emphasis added).

This argument disregards the fact that trial counsel's *initial* deficiency was failure
to investigate existing medical history. Dr. Beaver—not an expert in neurology or
radiology—testified at the post-conviction hearing that there is "obviously a discrepancy"
between the 1992 and 1993 reports. Dkt. 142, p. 121.

**MEMORANDUM DECISION AND ORDER - 38**

The failure to adequately investigate dispels Respondent's argument that trial counsel's strategy developed *after the failure to investigate* was reasonable. A broad and thorough investigation was required because "the sentencer in capital cases must be permitted to consider any relevant mitigating factor." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). *Eddings* relied upon *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality), which observed that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Accord*, *Hurles v. Ryan*, 752 F.3d 768, 784 (9th Cir. 2014).

In *Caro III*, the Ninth Circuit Court of Appeals explained the importance of a thorough investigation at the sentencing phase of capital proceedings:

> It is imperative that all relevant mitigating information be unearthed for consideration at the capital sentencing phase. The Constitution prohibits imposition of the death penalty without adequate consideration of factors which might evoke mercy.

165 F.3d at 1227 (internal quotation marks omitted).

A criminal defense attorney is required to perform a more thorough investigation into mental health issues for the mitigation phase of death penalty proceedings than for the guilt phase *before* deciding upon a strategy for the guilt phase. *See Silva v. Woodford*, 279 F.3d 825, 843–44 (9th Cir. 2002) (citing *Hendricks v. Calderon*, 70 F.3d 1032, 1043–44 (9th Cir. 1995)). In *Wallace v. Stewart*, 184 F.3d 1112 (9th Cir. 1999), the court explained:

> In *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir.1995), we concluded that the defense lawyer had reasonably relied on psychologists' findings in not pursuing a mental defense at trial. *See id*. at 1037–39. Even though the psychologists lacked important information about Hendricks's drug problems and hard childhood, we held that counsel's failure to investigate and relay this information was not deficient because the psychologists had not asked for it. *See id*. at 1038. *At the penalty phase, however, this same lack of diligence did constitute ineffective assistance*. Recognizing that "[e]vidence of mental problems may be offered to show mitigating factors in the penalty phase, even though it is insufficient to establish a legal defense ... in the guilt phase," we said that "where counsel is on notice that his client may be mentally impaired, counsel's failure to investigate his client's mental condition as a mitigating factor in a penalty phase hearing, without a supporting strategic reason, constitutes deficient performance." *Id*. at 1043.

*Id.* at 1117 (emphasis added) (alterations in original) (footnote omitted).

Accordingly, the failure of defense counsel to "investigate a defendant's organic brain damage or other mental impairments may constitute ineffective assistance of counsel." *Caro III*, 165 F.3d at 1226 (citing *Hendricks*, 70 F.3d at 1043–44, and *Evans v. Lewis*, 855 F.2d 631, 637–38 (9th Cir. 1988)). To prepare for the penalty phase of a capital case, a defense attorney has a professional responsibility to investigate the defendant's background—and bring to the attention of mental health experts who are examining his client—any relevant facts *of which the attorney has notice*, even though the experts do not ask defense counsel to investigate the defendant's background further. *Wallace*, 184 F.3d at 1116, 1118.

For example, in *Caro III*, the majority opinion pointed out that the sentencing jury was never presented with "the most important evidence of mitigation—the chemical

**MEMORANDUM DECISION AND ORDER - 40**

poisoning of Caro's brain." 165 F.3d at 1227. The *Caro III* majority used the reasoning of the dissenting judge's opinion to illustrate how important it is that brain damage experts testify at sentencing to help the jury understand and discern the fine lines of scientific evidence associated with causal links:

> [T]he dissent fails to understand the difference between chemical poisoning causing brain damage which results in aggressive behavior and the death of a brain cell caused by the lack of oxygen as the result of a stroke which does not cause aggressive behavior. As the dissent does not understand that difference, then it is clear that a jury must have such a difference explained by experts. It may be the difference between life and death.

*Id.*; *see also Clabourne v. Lewis,* 64 F.3d 1373, 1385 (9th Cir. 1995) (concluding that trial counsel committed error "in failing to provide the state's experts with materials they needed to develop an accurate profile of Clabourne's mental health"). The "duty to provide the appropriate experts with pertinent information about the defendant is key to developing an effective penalty phase presentation." *Caro v. Woodford*, 280 F.3d 1247, 1255 (9th Cir. 2002) (*Caro IV*).

Here, had trial counsel investigated Row's CT scans, a far more helpful mitigation strategy could have been developed, with essential medical—not simply mental health—experts. It seems that counsel decided to go with the flow of Dr. Norman's theory and never made themselves aware before the hearing of the content, weaknesses, or potential harm of Dr. Norman's opinion.

Without taking adequate steps to investigate potential leads, counsel was left to follow a strategy which led nowhere—alexithymia. The Court concludes that existing

state court records alone show that trial counsel performed deficiently at the investigatory stage of the sentencing phase proceedings. However, without being able to use the evidence developed in the procedurally improper successive post-conviction petitions and in the federal habeas evidentiary hearing, Row cannot show prejudice. She has properly laid before the Court evidence showing that evidence of organic brain dysfunction in the police and PSI reports should have been developed prior to counsel selecting a sentencing strategy. However, she cannot rely on the facts developed after the first post-conviction matter to show the strength of that claim, which this Court believes would be sufficient to warrant federal habeas corpus relief absent *Ramirez*' curtailment of evidentiary development. The portions of the record which can be considered for this claim do not contain sufficient expert testimony to show a link between the organic brain dysfunction and the mitigating factors. Therefore, this claim must be denied.

5)  Reconsideration of Claim 7 ¶ 81(e) upon permissible facts in the record

Claim 7 ¶ 81(e) is ineffective assistance of trial counsel for "[f]ailure to retain a qualified neuro-psychiatrist to conduct appropriate medical testing regarding the apparent organic brain damage revealed by CT scans taken of Petitioner revealing an atrophy of the brain." Dkt. 293, p. 25. Previously, this Court "reviewed this claim on the merits on evidence that was presented to the state courts in the first post-conviction action—Dr. Beaver's speculative post-conviction testimony—and determined that it did not warrant habeas corpus relief. The Court declined to hear new evidence on this claim, because it was foreclosed by *Pinholster*." Dkt. 600 (citing Dkts. 417, p.13.). The Court later determined that this claim is procedurally defaulted and is a *Dickens* "fundamentally

altered claim" to the extent that it relates to the organic brain disfunction defense in the sentencing phase of trial, *see* Dkt. 600, pp. 21–22.

*Ramirez* forecloses Petitioner's new evidence from neurologists and neuropsychiatrists showing what would have been discovered had proper experts been hired at the sentencing stage. The lack of this crucial evidence places this claim back in the same evidentiary position as when the Court rejected it before. The Court concludes that either  (1) this claim is no longer fundamentally altered, because Petitioner's new evidence is barred; or (2) Petitioner has failed to show a causal link between the organic brain dysfunction and the mitigating or aggravating factors, for the same reason. In either form, the claim must be denied.

      6)  <u>Reconsideration of Claim 7 ¶ 81(h) upon permissible facts in the record</u>

Claim 7 ¶81(h) is ineffective assistance of trial counsel for their "[f]ailure to investigate, develop and present evidence rebutting aggravating evidence considered by the trial court." Dkt. 293, p. 25. This claim is procedurally defaulted because it was never presented to the state courts. Dkt. 600, p. 35. Because some of the aggravating factors appear to be the same as some of the symptoms of organic brain dysfunction, such as pathological lying, lack of empathy, manipulation, and poor judgment, the Court permitted Plaintiff to attempt to show cause and prejudice for the default of this claim by relying on *Martinez*.

The aggravating factor rebuttal theory that was lost was the same the *Caro IV* court articulated: "Because it has been established that Caro suffers from brain damage, the delicate balance between his moral culpability and the value of his life would

certainly teeter toward life." 280 F.3d at 1258. That certain behavioral characteristics are an *effect* of organic brain dysfunction and not the immoral or amoral *cause* of crime turns the basis for application of the aggravating factors on its head. However, none of this biological evidence was properly produced in a state court proceeding.

This Court has an inadequate basis to conclude that Row was prejudiced when, for lack of investigation, counsel bypassed the opportunity to show that the same characteristics that underlie the aggravating factors can be explained by the presence of organic brain dysfunction. This failure prevented defense counsel from arguing that the basis for applying some of the morality-based aggravating factors simply did not exist. This claim fails on the prejudice prong and must be denied.

### D. Fourth inquiry: *Martinez* prong 2: ineffective assistance of PCR counsel

As noted above, on June 5 through 9, 2017, before *Ramirez* was issued, the Court held an evidentiary hearing on the *Martinez* issues. Dkts. 701 to 705. *Ramirez* now cautions against holding hearings on *Martinez* threshold questions unless the petitioner can show, on the existing permissible state court record, entitlement to relief on the merits of the claim. Nothing in *Ramirez* prevents a federal district court from relying on evidence presented at a *Martinez* hearing to determine whether PCR counsel—as opposed to trial or sentencing counsel—were ineffective. The Court concludes that, the state court record, with or without new evidence presented at the federal court evidentiary hearing, shows that post-conviction counsel performed deficiently in failing to investigate

and develop the record for the claims at issue that are procedurally defaulted here—
Claims 7 ¶ 81(b), (e), and (h) (limited to brain dysfunction issues).

More particularly, the following facts show that post-conviction counsel lacked
diligence in carefully reading the State's pretrial evidentiary disclosures, investigating,
developing, or presenting this evidence in support of an IATC organic brain dysfunction
mitigation claim in the initial post-conviction proceeding:

1.  Idaho Code § 19-2719 required Row to file a petition for post-conviction relief
    in the state district court within 42 days after imposition of the death penalty.
    Death penalty direct appeal actions must be consolidated with post-conviction
    appeals in Idaho. *See id.*

2.  On January 24, 1994, trial counsel Gus Cahill filed a motion for extension of
    time to file a post-conviction action to give conflict counsel time to investigate
    potential issues of ineffectiveness of trial counsel. State's Lodging B-10, pp. 43-
    45.

3.  The motion for extension of time to file the post-conviction petition was
    granted, and conflict counsel were directed to file a "'generic' post-conviction
    petition immediately," followed by an amended petition "within forty-two (42)
    days of the filing of the jury trial transcript." State's Lodging B-10, p. 50.

4.  From about March 10, 1994, to March or May of 1996, Rolfe Kehne (first
    licensed in 1978) and John Adams (first licensed in about 1984), independent
    contractor conflict counsel to the Ada County public defender's office,
    represented Row in initial post-conviction proceedings through the post-

conviction appeal. State's Lodging B-10, pp. 50, 89 & C-1 to C-20; Tr. 11:9-19; Exh. 49, p.6; Exh. 69, p. 6.

5.     Adams considered Cahill, one of Row's trial lawyers, a friend. Adams considered Amil Myshin, Row's other trial lawyer, a friend like a brother. Tr. 12:18-25; 13:1-6. This information was not disclosed to the court or to Row. Adams testified later, "[L]ooking back, I would say that I probably didn't go after them as hard as I might have somebody that I didn't consider a brother." Tr. 13:1-6. In other post-conviction cases, he "really went after [trial counsel], but [he] didn't go after Gus or Amil that way." *Id*., 13:1-6.

6.     On March 17, 1994, Kehne filed Row's generic initial post-conviction petition. State's Lodging B-10, pp. 56-60.

7.     On September 22, 1994, Kehne received the 4,000+ page trial transcript. *Id*., p. 89.

8.     Adams summarized the allocated time and funds for Row's post-conviction case as follows: "[W]e felt that there was a lot more we wanted to do, but we just didn't have the resources; we didn't have the money; we didn't have the time. We didn't have the physical stamina to work 18 hours a day. That's what I recall." Tr. 31:14-18.

9.     Kehne and Adams could have obtained Row's local medical records from 1992 and 1993 quickly, easily, and inexpensively.

10.    Kehne and Adams had access to a mitigation investigator, Mary Hudson, but had slim funding resources for her services or other experts. State's Lodging B-10, pp. 156–57; Tr. 12:1-7.

11.    Kehne and Adams decided to ask the court for public funding to hire Hudson to perform an investigation. State's Lodging B-10, pp. 73-81.

12.    There is nothing in the record to show that, before post-conviction counsel filed their motion for a mitigation expert, they had carefully read the pre-sentence report exhibits, in particular, the 1993 CAT scan report that recommended follow-up assessment for the brain atrophy issue, to know to specifically ask for funding for a neurologist and neuropsychologist to perform the follow-up. Nothing in the record reflects that post-conviction counsel reviewed the psychological records of Dr. Beaver or Dr. Norman carefully enough (or at all) to determine that neuropsychological testing had not been completed by either psychologist. They had not brought the 1993 CAT scan report to the attention of Dr. Beaver, Dr. Norman, or another professional to obtain an expert opinion that more neurological and neuropsychological testing was needed.

13.    Rather, on January 23, 1995, Kehne and Adams filed a bare "Motion re: Applications for Expert Assistance," with a Memorandum in Support of Ex Parte Applications to 'Money Judge.'" *Id*. These filings did not disclose the neuropsychological brain atrophy issues in particular or the need for an expert in that field. *Id*. The transcript of the ex parte hearing reveals that counsel requested "an allotment of expert witness fees, basically for a mitigation

expert," and more specifically, that the state court characterized the request as "$5,000 for expert witness fees for, for want of a better term, your paralegal or the person that you have designated as an expert in this area. Apparently, she has done this type of work in the past, sifting through all records, in terms of she classifies herself as a litigation expert." State's Lodging B-11, pp. 102-03.

14.     The state district court denied the motion for funding on these grounds:

- The sentencing hearing ... involved a great deal of mitigation evidence that was presented through witnesses to the Court concerning the defendant's childhood and her emotional and physical abuse; positive qualities of the defendant's character were brought out at the sentencing hearing. There was an expert presented to deal with some of her mental, psychological and personal personality problems, her alexithymia, her disconnect with her feelings, her psychological and emotional denial.

- [A]t this time in the absence of a particularized showing, I'm going to deny your motion for opening up the pocketbook and out of whose budget, I don't know, for what amounts to a fishing expedition in terms of what is reasonable and necessary within the ambit of a UPCA hearing. I fail to see how rummaging through whatever this specialty person wants to do at this stage of the proceeding after trial, after sentence, and during appeal is reasonable and necessary in terms of defending Ms. Row's rights within the specific context of a UPCA hearing at this time. There is no particularized showing; nor is there any showing why such finding cannot be accomplished through the normal public defender budget under which I presume you are operating; nor any showing why you can't accomplish this yourself, i.e., why some special expert is needed over and above counsel's expertise.

State's Lodging B-11, pp. 113-14.

15.    The state district court's reaction was quite understandable. The presentence investigation and PSI report, with exhibits, had been extensive (as shown by every reference to Exhibit 15 in Appendix 1). The PSI report quite comprehensively outlined the bizarre history of Row's behavior throughout her lifetime. *See* Exh. 15. In light of the PSI report's comprehensive nature and without a showing that something different was necessary, the record supports the state court's decision that there was little or no apparent need to fund a mitigation investigator.

16.    In denying the request, the state district court left the door open for counsel to return and seek funding for some specific purpose: "The Court denies the motion, but notes that it would, in the future loot [sic] at this motion again is [sic] specificity exists." State's Lodging B-10, p. 99.

17.    On May 1, 1995, Kehne and Adams wrote to Mary Hudson and said, "There is apparently no money for a full-blown investigation at this time." Tr. 83:13-24. 701:113. She agreed to work a certain number of hours for $2,500, in her words, "to develop what I felt were the themes in the mitigation in Ms. Row's case and also provide him with an affidavit that would give the court an idea of how much time and funds would be needed to do a full investigation." Tr. 113:20-25 to 114:1.

18.    Hudson provided the following article to post-conviction counsel: "A Comparison Study of Filicidal and Abusive Mothers," published in the Canadian Journal of Psychology in November 1984, by Arshad Husain, M.D.,

and Anasseril Daniel, M.D (Vol 29, No. 7, pp. 596-98). In that article the authors observed: "All filicidal women had a history of previous psychiatric disorder requiring intervention and treatment by a mental health professional," compared to only 23% of abusive mothers having such a history. Id. at 597. In addition, "[a]ll filicidal women showed major psychiatric disorders at the time of committing the murder," compared to only 7.7% of abusive women. *Id*.

19.    Hudson traveled to Kehne and Adams's law office in Boise and reviewed the following information: (1) discovery provided by the prosecution; (2) PSI report and exhibits; (3) witness testimony in guilt phase transcript; and (4) the penalty phase transcript. Exh. 126, p. 2.

20.    Hudson requested Row's full medical records from the jail suicide attempt. In the stack of records, she found the 1993 CT scan report that identified the brain atrophy. Tr. 120:3-12. When she recognized the atrophy issue, she telephoned Kehne and "learned from him that they had already prepared the [post-conviction] petition and that they were preparing to move forward with filing it without including any mitigation information or any information about her potential mental health problems." Tr. 127:17-23.

21.    June 15, 1995, was the deadline the Court gave for Kehne and Adams to file a "final amended Petition" State's Lodging B-10, p. 87. On that date, Hudson signed an affidavit extensively detailing all of the mitigation evidence she had found, including the 1993 CT scan and a recommendation by Dr. Jonathan Pincus, a Washington, D.C. neurologist, for neuropsychological testing,

including the Wisconsin Card Sorting test and an MRI. Tr. 50:6-18; Exh. 126

(1995 Affidavit of Mary Hudson).

22.    Post-conviction counsel Kehne's understanding was that, if Row had evidence

of organic brain dysfunction, such dysfunction disqualified her from the

diagnosis of antisocial personality disorder, or at least took a lot of the sting out

of it. Tr. 701:103. Kehne's understanding was that psychologists, especially

those in forensic settings, were supposed to exclude the organic as part of the

definition of antisocial personality disorder. Tr. 103:7-12; 104:1-25.

23.    Kehne knew that borderline personality disorder was inconsistent with brain

damage, that a Rorschach test could not diagnose brain damage, and an MMPI

was not a reliable indicator of brain damage. Tr. 106:8-24.

24.    On June 16, 1995, a Friday—one day after the deadline—Kehne and Adams

filed Row's amended petition for post-conviction relief. It did *not* expressly

include a claim based on brain atrophy, despite the trial court's admonition to

them that this was to be the "final" amended petition. State's Lodging B-10, pp.

87, 121-134. Exhibit 32. Page 13 of the amended petition stated: "Petitioner

needs more time and resources to investigate this area further and prays the

court for time to submit supporting materials and to complete a

neuropsychological examination of Petitioner." *Id.*, p. 52. With the amended

petition, Kehne filed Hudson's affidavit detailing the mitigation and brain

atrophy evidence found to date, a scientific article entitled, "Atrophy of the

Cerebellar Vermis: Relevance to the Symptoms of Schizophrenia," and Kehne's

own affidavit stating, in part, "One outstanding feature about the information

we have uncovered is that it suggests extreme mental illness of some type."

State's Lodging B-10, pp. 145-165.

25.     Kehne declared in his affidavit accompanying the amended petition the

following:

>    We are making arrangements for further testing of Petitioner;
>    we are continuing to investigate the issues surrounding the
>    petition and Petitioner's background; and we need more time
>    for development of facts.
>
>    Wherefore, I submit this affidavit in support of the amended
>    Petition and Petitioner's request for more time and leave to
>    amend or supplement this Amended Petition.

State's Lodging B-10, p. 148.

26.     This request by counsel for more time to amend or supplement the Amended

Petition was not a formal motion. The court took no action on it, and Kehne and

Adams did not ask for the court to do so. They did not file a renewed motion

requesting funding for neuropsychological testing from the trial court. Tr. 57:5-

7.

27.     The district court was required to file a "Report to the Idaho Supreme Court

Pursuant to I.C. § 19-2719(8), and Request for Final Extension" to explain to

the Idaho Supreme Court why it hadn't already adjudicated the post-conviction

case, because resolution of that case was holding up the direct appeal. State's

Lodging B-10, pp. 192-193.

28.     On June 30, 1994, the state district court held a hearing, regarding various

motions. State's Lodging B-12, pp. 38-83. The court set a "firm" date for an

evidentiary hearing, January 8, 1996, because, as the court described it, "I've

got the Idaho Supreme Court breathing down my neck." *Id*., pp. 79- 81.

29.     On August 31, 1995, the Idaho Supreme Court granted the "Request for Final

Extension," giving the state district court until January 31, 1996, to complete

the matter. *Id*., p. 194.

30.     Counsel had six months in between the time they filed the amended petition and

the hearing date of January 8, 1996. Counsel did not engage Dr. Pincus or a

local neurologist. They did not arrange for neuropsychological testing.

31.     In November 1995, counsel finally chose a psychologist "to be [their] expert

and tell [them] where to go next." Tr. 55:11-22. They gave the psychologist the

records to review about two months prior to the hearing. *Id*.

32.     Kehne and Adams took the depositions of Cahill and Myshin on November 13,

1995. Exh. 22, 25.

33.     On December 28, 1995, less than two weeks before the hearing, the

psychological expert notified Kehne that he had completed his review and

recommended that Kehne consult with neurologists Dr. Giles or Dr. Prochaska,

obtain neuropsychological testing, and obtain an "NMR [sic]"expert. Exh. 42, p.

94.

34.     Kehne spoke to Dr. Giles and his partner Dr. Prochaska, but neither would

agree to assist with the post-conviction case. Tr. 96:25 to 97:1-4.

**MEMORANDUM DECISION AND ORDER - 53**

35. Kehne does not know why the neuropsychological testing was not done. It was their intention to do it. He thinks they just ran out of time. He cannot think of a strategic reason why the tests would have been left undone. Tr. 50:21 to 25-51:1-18.

36. Kehne and Adams did not file a written motion to continue the hearing to accommodate the testing. Kehne testified, "I can't remember what we were doing that kept us from getting on it sooner. But, I mean, it's just as patent and apparent as it can be that we dropped the ball." Tr. 55:11-13. Kehne could think of no strategic reason they did not file a motion for a continuance. He said, "I do recall that John Adams and I were all but tearing our hair out as that hearing approached because we knew we were dead; we know we had really screwed up." Because the judge had said, "No more continuances," they had to take him at his word, even though they weren't ready for the hearing. Tr. 56:12-15.

37. On January 8, the post-conviction hearing was scheduled to begin.

38. On the first day of the hearing, Kehne said:

- "Judge, we are asking the court to vacate this hearing and grant us a continuance to allow us further time to develop our case."

- "Furthermore, we make the argument that whether or not trial counsel were ineffective, as a matter of due process of law and the need for accuracy under the cruel and unusual punishment clauses, Dr. Norman's evaluation was so inadequate that the sentence should not stand."

- "Among the things—what we need to do ... is consult with a medical imaging expert and we have chosen, although he hasn't agreed to do it yet, Dr. Giles or his partner,

whose name I believe is Prochaska. And the reason we chose them is that Dr. Giles read a CAT scan taken of Robin after she attempted suicide in the Ada County Jail and in his report he noticed some brain atrophy. Judge, we have been able to obtain those films, and the brain atrophy that he is talking about is such that you can see it, I can see it, anybody who looks at these films can see it. I think that's a very significant thing that absolutely has to be followed up on. So our plan would be to consult with Dr. Giles, have him obtain a CAT scan given to Robin at Saint Luke's Hospital a year or two earlier and compare the two and at the same time proceed with neuropsychological testing and attempt to correlate that with behavior throughout Robin's life."

- "We also, unless Dr. Giles tells us that there is nothing here, we also would propose to get an NMR of her brain and then consult with a doctor from the University of Utah, who is an expert in imaging and to whom we have been referred."

- "So we ask for five months. And if we do not get the continuance, we do not have any witnesses today. We did not go to the expense of bringing the background witnesses from Massachusetts and from New Hampshire and from California because what they have to say isn't real [sic] significant until we tie it in with the mental health things."

- "If forced to go today, I am prepared to testify and give my opinions about trial counsel's failures and what should have been done and what needs to be done, but Judge, if I am given the opportunity in the future, I will testify that I am not prepared and I was not constitutionally effective or did not provide constitutionally effective assistance of counsel and that Robin Row is being denied due process of law."

Exh. 42, pp. 86, 90-92; see Tr. 55:17-24.

39.   The court responded: "Counsel, at this time, about the best you can give me is

some conjecture or speculation that something might be revealed as a result of

another CAT scan, MRI imaging or whatever. It goes from there. That's about

it." Exh. 42, p. 94.

40.    The prosecutor argued:

> Well, I'll tell the court that I've talked to Dr. Giles before we
> came to court today. I spoke to him after one of the
> last hearings and he says that there is nothing to this atrophy
> business, that perfectly normal people in society have brains,
> some bigger and some smaller than others and that there is
> nothing to this atrophy theory. And I assume that when they
> talk to him he'll tell them the same thing.
>
> Judge, we're dealing with smoke and mirrors here. There is
> nothing to this and the burden of proof is on them. The people
> of the state have clearly set it out that they expect those things
> to be done in 90 days and the Supreme Court has upheld that.

Exh. 42, p. 101.

41.    The court denied the oral motion to continue. The hearing began as scheduled.

42.    Kehne and Adams did not call any lay witnesses to testify about Row's

background or experiences in support of a brain damage claim at the hearing

because, Kehne said, they were simply unprepared. *See* Tr. 59:10-23. In

addition, this Court recognizes that counsel had *not* specifically included a brain

damage claim in the final post-conviction amended petition.

43.    Kehne testified as a legal expert at the hearing. He does not remember why they

did not hire someone else to testify. "[I[f we had more time, our intention was

not to do it that way but, of course, to hire or retain somebody else." Tr. 701:60-

61. The intent was to hire someone nationally who had more death penalty

experience than anyone available in the state of Idaho. Tr. 61:3-11.

44.   Kehne and Adams could have proffered 81 mitigation-related documents Hudson obtained or generated during her investigation of Row. Tr. 119:2-24; Exhibits 74 through 155. These included the 1993 CT scan image (not just the report) that Hudson had obtained and transmitted to Kehne and Adams. Tr. 121:22-25 to 122:1-8.

45.   Kehne and Adams brought Hudson's documents to the post-conviction hearing, but the documents were never admitted. Kehne's "guess is that we came thinking we would admit all of those documents, or at least a lot of them, and simply forgot to do it." There was no strategic reason they did not offer the exhibits. Tr. 62:23-25 to 63:1-9.

46.   Instead, the only exhibits Kehne and Adams proffered at the hearing were a medical report, a diagram, and a copy of newspaper articles about pretrial publicity. Kehne and Adams proffered no other exhibits because, in Kehne's words, they "weren't prepared to do the hearing." Tr. 62:1-22; Exh. 42.

47.   Dr. Beaver testified at the post-conviction hearing as follows:

- "The consideration of neurological findings in a patient that might affect their behavior affect, at least in my experience, has been considered an issue to present as mitigation."

- "[T]here is obviously a discrepancy between the '93 and the '91 scans."[4] "[The '91 scan] was a normal test." (This is untrue—the *report* said "normal" but the scan *itself* showed that the brain was abnormal— because no neurological workup had been done, the

---

[4] At times in the record, the 1992 CT scan is referred to as the 1991 CT scan. There is not a 1991 scan.

**MEMORANDUM DECISION AND ORDER - 57**

longstanding nature of the abnormality was yet unknown.)

- "[A]n expert in the field of reading these types of scans" would need to compare the two to determine whether the atrophy seen in the '93 scan is acute or chronic."

- Dr. Beaver did no neurocognitive tests on Row in his 1992 evaluation.

- Further testing would show "whether or not those abnormalities in emotionality are more related to her social, developmental and genetic history versus some organically induced condition or some combination thereof."

- Further testing would also show whether there is "an issue of cognitive control, for lack of a better term, which was not evaluated to any great degree in the original examination of Ms. Row."

- There is a possibility that the brain atrophy "has potentially some effect on her behavior and her actions" and "that is a possibility, so if that is going to be explored, then I think a more thorough examination would be needed to look at that in light of the neuropathological findings."

Exh. 42, pp. 121–32.

At the end of the hearing, the state district court denied the post-conviction petition, stating:

- "There is no evidence whatsoever to assume that Robin Row is or was schizophrenic or suffering from any active psychosis. Her abnormalities were consistent with findings of affective disturbance and problems in emotionality."

- "Dr. Beaver's testimony [about lack of neurological analysis re: brain atrophy] is certainly worthy of note."

**MEMORANDUM DECISION AND ORDER - 58**

- "[A] comparison between defendant's two most recent CT brain scans (late 1991 and early 1993) reveal the possibility of some abnormality and mild brain atrophy."

- "Since no neurological tests were ever administered to Ms. Row, there is no real way of knowing to what extent, if any, this perceived organic condition might have affected her behavior and/or emotionality. [Dr. Beaver] was in no position to venture any opinion on whether there might be some organic basis related to her mental health problems."

- "I had earlier in the proceedings denied yet another request of counsel for a further continuance of three to five (3-5) months to investigate this potential issue, given the time requirements placed on this Court by Idaho Code Section 19-2719, the previous extensions already granted, the fact that sentence was imposed in December 1993; and the current speculative, suppositional posture of this line of inquiry. Accordingly, I will defer to higher judicial authority on this issue and leave open the possibility of filing a successive (second) post-conviction petition pursuant to Idaho Code Section 19-2719(5)."

State's Lodging B-11, pp. 293–296 (emphasis in original).

Based on the foregoing, and the supporting factual findings through the first post-conviction proceeding, the Court concludes that there was no external factor that prevented post-conviction counsel from identifying and building upon the evidence already in the record as a foundation to present a solid claim that trial counsel were ineffective for not pursuing an organic brain dysfunction defense at the sentencing hearing, rather than proceeding with Dr. Norman's ineffective, mostly unhelpful, and at times harmful psychological theories. Post-conviction counsel simply were not diligent at the stages of reviewing the record, investigating facts in the record, ordering obvious

**MEMORANDUM DECISION AND ORDER - 59**

medical records, timely investigating facts raised by the mitigation expert, drafting an IATC organic brain dysfunction mitigation claim for inclusion in the amended petition, properly requesting funding for a neuropsychiatrist, or presenting facts at the evidentiary hearing.

Petitioner has shown that she meets the *Martinez* gateway requirements for cause: that post-conviction counsel were deficient in failing to pursue a substantial claim. Petitioner has shown prejudice based on COA standard to qualify her claims for *Martinez* forgiveness of the default.

However, because Petitioner's post-conviction counsel were not diligent in developing the factual basis of the brain dysfunction claims in state court, *Ramirez* prohibits Petitioner from relying on any evidence developed after the first post-conviction matter to support her claims in the habeas corpus merits stage of proceedings. At the merits stage, something more is needed. An expert witness and the research from the 1800s through 1993 that Dr. Clay Ward found (see Appendix 2) would have been enough to provide a sufficient link between the brain atrophy and the mitigating factors. Because of this record deficiency, the Court cannot conclude that the permissible evidence in the records shows even a "weak" case of prejudice.

Petitioner has not met the requirements of § 2254(d)(2) to permit the Court to rely on the evidence developed in the successive post-conviction proceeding and the federal habeas evidentiary hearing. Left with only the evidence in the state court record through the first post-conviction matter's conclusion, Petitioner cannot show prejudice sufficient to prevail on the merits. The Court has compared this case to *Caro IV*, where the record

**MEMORANDUM DECISION AND ORDER - 60**

*did* contain an expert's opinion linking the environmental poisoning of Caro's brain to improper decisionmaking. 280 F.3d at 1248-54. That showing merited relief, though Caro had killed two teenagers, had shot and seriously wounded two other people the same day, and was suspected of but never charged with killing two other teenagers (much like Row's multiple-homicide history). *See People v. Caro*, 761 P.2d 680, 689 (1988), *as modified on denial of reh'g* (Dec. 1, 1988) (*Caro I*). Unfortunately, Row has no expert testimony in the permissible record to provide an alternative explanation for having committed multiple homicides.

## CONCLUSION

The extraordinary facts of this case called for at least an ordinary defense in a capital sentencing case. Row's trial counsel failed her at sentencing.  Row's first post-conviction counsel failed her at the initial post-conviction proceedings. Post-conviction counsel even admitted that he did not "go after" trial counsel in his regular aggressive manner because he considered trial counsel a friend that was so close he was like a brother. See Appendix 1.

The "great writ" is an "extraordinary remedy" that should be granted only if an "extreme malfunction" occurred "in the state criminal justice systems." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1731 (2022). This case clearly fits that description.

However, under the current state of the law, the Court can do nothing to provide a remedy to Petitioner.  This is a direct consequence of Idaho's shortsighted and sometimes inadequate system of expedited justice for death penalty cases, coupled with the equally harsh and unforgiving limitations imposed by AEDPA on habeas proceedings in federal

court. And now we have the Supreme Court's decision in *Ramirez* – holding that, under AEDPA, the Petitioner has no federal remedy for a violation of her constitutional rights, even when her state court attorneys were shockingly inept and ineffective. Thus, in this case the "great writ" is reduced to a meaningless exercise in futility. With great reluctance, the Court concludes that Petitioner's three *Martinez* claims must be denied and dismissed with prejudice, with a certificate of appealability issued for all three.

## ORDER

**IT IS ORDERED:**

1. Respondent's Motion for Reconsideration (Dkt. 770) is GRANTED in part and DENIED in part.

2. The remainder of Petitioner's Claims, 7 ¶ 81(b), 81(e), and 81(h), are DENIED.

3. The Second Amended Petition for Writ of Habeas Corpus (Dkt. 293) is DENIED.

4. This entire case is DISMISSED with prejudice.

5. The Court grants a certificate of appealability (COA) as to Petitioner's Claims 7 ¶ 81(b), 81(e), and 81(h). This is in addition to the COA granted in Docket No. 545 as to Claims 1, 2, 7 (limited to the allegations of ineffective assistance of counsel at the capital sentencing proceeding addresses herein), 35, and 36 in the Second Amended Petition, including its decision to deny Petitioner's requests for discovery, expansion of the record, or an evidentiary hearing on any of these claims, if applicable. The Court has reviewed its other decisions and orders in this case, and it does not find them to be reasonably debatable. The COA shall be limited to the claims listed above.

**MEMORANDUM DECISION AND ORDER - 62**

6. Petitioner may seek to broaden the COA in the United States Court of Appeals for the Ninth Circuit, pursuant to Rule 22 of the Federal Rules of Appellate Procedure and Local Ninth Circuit Rule 22-1. She is advised that she must still file a timely notice of appeal in this Court.

7. Upon the filing of a timely notice of appeal in this case, the Clerk of Court shall forward the necessary paperwork to the Court of Appeals for the Ninth Circuit for the docketing of an appeal in a civil case.

DATED: March 31, 2023

B. Lynn Winmill
U.S. District Court Judge